# TAB 2

Rozalia Williams Vol 1
February 24, 2016

1            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2               BROWARD DIVISION

3          CASE NO. 0:15-cv-60621-DPG

4

5    ROZALIA WILLIAMS,                    COPY

6          Plaintiff,
     v.

7

     FLORIDA ATLANTIC UNIVERSITY BOARD
8    OF TRUSTEES, CHARLES L. BROWN, SR.,
     an individual and COREY KING,
9    an individual,

10         Defendants.
     _____/

11

12

13                    VOLUME 1
                 DEPOSITION OF
14             ROZALIA C. WILLIAMS

15

                    February 24, 2016
16                  U.S. Legal Support, Inc.
                    3440 Hollywood Boulevard
17                  Suite 320
                    Hollywood, Florida

18

19

20

21

22          Stenographically Reported By:
             L. NATHANIA ROYER, R.P.R.
23          Registered Professional Reporter

24

25

Rozalia Williams Vol 1
February 24, 2016                                    2

1    APPEARANCES

2    ON BEHALF OF THE PLAINTIFF:

3         Ria N. Chattergoon, Esq.
          Saenz & Anderson, PLLC
4         20900 N.E. 30th Avenue
          Suite 800
5         Aventura, Florida 33180
          ria@saenzanderson.com

6

7    ON BEHALF OF THE DEFENDANTS FAU AND C. KING:

8         Lourdes Espino Wydler, Esq.
          Marrero & Wydler
9         2600 Douglas Road
          Coral Gables, Florida 33134
10        lew@marrerolegal.com

11

     ON BEHALF OF THE DEFENDANT C. BROWN:
12
          Kelsey D. Moldof, Esq.
13        Whitelock & Associates, P.A.
          300 S.E. 13th Street
14        Fort Lauderdale, Florida 33316
          moldoflawpa@gmail.com
15

16                        INDEX

17   TESTIMONY OF ROZALIA C. WILLIAMS

18                                                  Page

19   DIRECT EXAMINATION
     BY MS. WYDLER....................................... 4
20

21

22

23

24

25

Rozalia Williams Vol 1
February 24, 2016                    3

1                        EXHIBITS

2                                              Page

3  Defendant's Exhibit Number 1
   2/28/13 Investigation Conference Letter............. 53
4
   Defendant's Exhibit Number 2
5  Handwritten Notes.................................. 67

6  Defendant's Exhibit Number 3
   Student Code of Conduct........................... 76
7
   Defendant's Exhibit Number 4
8  Email Chain....................................... 82

9  Defendant's Exhibit Number 5
   3/8/13 Email/Note................................. 88
10
   Defendant's Exhibit Number 6
11 3/23/11 Letter.................................... 96

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rozalia Williams Vol 1
February 24, 2016                                     4

```
 1            Deposition taken before L. Nathania Royer,
 2    Registered Professional Reporter and Notary Public in
 3    and for the State of Florida at Large in the above
 4    cause.
 5                    P R O C E E D I N G S
 6            COURT REPORTER:  You do swear the testimony you
 7       are about to give will be the whole truth, and
 8       nothing but the truth, so help you God?
 9            THE WITNESS:  Yes, I do.
10                    ROZALIA C. WILLIAMS
11            being first duly sworn, was examined
12                  and testified as follows:
13                  DIRECT EXAMINATION
14    BY MS. WYDLER:
15       Q.   Could you please state and spell your name for
16    the record?
17       A.   R-O-Z-A-L-I-A, W-I-L-L-I-A-M-S.  Rozalia
18    Williams.
19       Q.   Ms. Williams, have you ever had your deposition
20    taken before?
21       A.   No.
22       Q.   Okay.  As I'm sure your attorney has explained
23    to you, I'm going to be asking you several questions
24    throughout the day.  If there are any questions about
25    how I phrase the question or if you don't understand
```

Rozalia Williams Vol 1
February 24, 2016                                    5

```
1    what I'm asking you, just let me know.  I can repeat,

2    rephrase.  It's probably the best advice I can give is

3    to give a verbal answer so that the court reporter can

4    take down everything that is being said.  If you need a

5    break at any time, just let me know.  As long as there's

6    not a question pending, we can take any time you need.

7    Okay?

8         A.   Okay.

9         Q.   Are you taking any medication right now that

10   would prevent you from recalling any facts?

11        A.   No.

12        Q.   What is your current address?

13        A.   3725 South Ocean Drive, Hollywood, Florida.

14        Q.   How long have you resided there?

15        A.   13 years.

16        Q.   And is that your only property?

17        A.   Yes.

18        Q.   Who else lives there with you?

19        A.   No one.

20        Q.   Where are you currently employed?

21        A.   I'm not currently employed.  I do consulting.

22   I'll get a consulting job periodically.

23        Q.   Do you have your own business right now?

24        A.   Yes.  I started an educational consulting

25   company.
```

Rozalia Williams Vol 1
February 24, 2016                                    6

1      Q.   What's the name of that?

2      A.   College Student Development Center.

3      Q.   And is that registered with the State of

4  Florida?

5      A.   Yes, it is.

6      Q.   When did you open that business?

7      A.   Last year.

8      Q.   Do you have any clients?

9      A.   No, not now.  I do -- I am cadre trainer for

10  the Children's Services Council, so when they want

11  training, they'll call me.  If they get enough people to

12  take the training, then I get paid.

13     Q.   And what do you get paid?

14     A.   It's $1,500 per training.

15     Q.   What does that training entail?

16     A.   How to counsel college-bound students.

17     Q.   And with respect to how often those trainings

18  take place, do you have any idea what that would be

19  like?

20     A.   They've contracted me for two per year.

21     Q.   Who is your supervisor there or the person that

22  you report to?

23     A.   Roxanne.  I forget her last name.  I just call

24  her Roxanne.  But it's through the training department.

25     Q.   Where is that business located?

```
 1        A.    It's off of Commercial.  Children's Services
 2   Council of Broward.  It's off of Commercial, West
 3   Commercial, just north of University.
 4        Q.    Have you gone by any other name other than
 5   Rozalia Williams?
 6        A.    Yes.  I listed those.  Arnetta Rozalia Williams
 7   and any -- a combination of those outside of my married
 8   name, which at one point was Baker and then my second
 9   marriage was Davis.
10        Q.    When did you marry an individual by the last
11   name of Baker?
12        A.    In 1972.
13        Q.    And that resulted in a divorce in what year?
14        A.    '74, I think.
15        Q.    And do you have any children from that
16   marriage?
17        A.    Yes, one child.
18        Q.    Who is that?
19        A.    Satonya.
20        Q.    How do you spell that?
21        A.    S-A-T-O-N-Y-A.
22        Q.    And how old is Satonya?
23        A.    Satonya is 43.
24        Q.    Where does she live?
25        A.    In Hollywood.
```

Rozalia Williams Vol 1
February 24, 2016                                    8

1        Q.   Is she married?

2        A.   No.

3        Q.   She lives by herself?

4        A.   Yes, with my grandson.

5        Q.   You said you were married a second time?

6        A.   Yes.

7        Q.   And when was that?

8        A.   The last name is Davis and that was 1977.

9        Q.   Do you have any children from that marriage?

10       A.   Yes.

11       Q.   What are their names?

12       A.   Marshall Junior.  Marshall Davis, Junior.

13   Myron Davis and Marcellus Davis.

14       Q.   And what are their respective ages?

15       A.   Myron is -- he was born in -- I mean, Marshall

16   was born in '77.  I've got to do the math.  I don't keep

17   up with them after so long.  Myron was born in '79, and

18   Marcellus was born in '83.  So they're all in their 30s.

19       Q.   And are you divorced from Mr. Davis?

20       A.   Yes, I am.

21       Q.   And that was -- do you recall what year?

22       A.   2003.

23       Q.   With respect to your divorce from Mr. Davis,

24   was that in -- what county did that occur?

25       A.   Broward County.

Rozalia Williams Vol 1
February 24, 2016                                   9

```
 1      Q.   Broward?  And Mr. Baker, what county did that
 2 occur in?
 3      A.   Miami-Dade.
 4      Q.   Other than Miami and Broward County, where else
 5 have you lived?
 6      A.   Well, for school, a short period of time in
 7 Gainesville and a short period of time just in school in
 8 Boston.
 9      Q.   What years did you live in Gainesville?
10      A.   1970 to '72.
11      Q.   And that was to attend UF?
12      A.   Yes.
13      Q.   University of Florida?
14      A.   Yes.  I lived in Tallahassee for a little while
15 as well.
16      Q.   When did you live there?
17      A.   I think from '72 to '73.
18      Q.   You were married at that time?
19      A.   Yes, to Steve Baker.
20      Q.   What years did you live in Boston?
21      A.   1993 to '95.
22      Q.   In the past five years, has anyone lived with
23 you at your house at 3725 South Ocean Drive?
24      A.   No.
25      Q.   Would you be able to give me the benefit of
```

1   your education background?

2       A.   Yes.  I graduated from high school, Miami

3   Jackson.

4       Q.   What year was that?

5       A.   1970.

6       Q.   Okay.

7       A.   I went to the University of Florida from '70

8   to '72.  I went to FIU and got my bachelor's, finished

9   my bachelor's there, and also got my master's there, and

10  went to Harvard Graduate School of Education and got a

11  master's in education administration.  Well, it's

12  administration, planning and social policy.  And I went

13  on and got my doctorate at Harvard with a doctorate in

14  administration, planning and social policy.  My

15  concentration is higher education administration.

16      Q.   What year did you get your bachelor's from FIU?

17      A.   I think it was -- I don't remember the

18  year.  '87?  Yeah.

19      Q.   And your master's from FIU?

20      A.   I think my master's was '87.  I know the

21  master's at Harvard was '93-'94 and then the doctorate

22  was in 2000.

23      Q.   Were you working during any of your schooling

24  experience?

25      A.   Yes.

Rozalia Williams Vol 1
February 24, 2016                              11

1        Q.    During what time periods?

2        A.    Well, from the -- between the time that I left

3    Tallahassee -- I was working when I was in Tallahassee.

4    I wasn't in school then, but I came back here and I

5    worked at FIU while I was going to school to complete

6    the bachelor's and the master's and I was on a grant, an

7    employee grant while I worked at FIU to go to Harvard.

8    There was a grant that employees could apply for and

9    receive so that they would continue to get paid while

10   they were studying as long as they came back to the

11   institution and worked at the institution.

12       Q.    So as far as getting your doctorate at Harvard,

13   how did you obtain that degree, was that some sort of

14   distance learning?

15       A.    No.  No.  I was there physically.  I left in

16   '93.  It's a residency program.  So I left in '93.  I

17   went up there and took my classes.  I came home in the

18   summers.  I came home for holidays.  Then I went back to

19   finish my course work, came home in the summers.  When I

20   came back in the summers, I went back to work and then I

21   would leave in the fall and spring and go back.  After I

22   finished my course work, I came back and I went back to

23   work and completed my dissertation while I was working.

24       Q.    So you completed course work up in --

25       A.    Boston.

Rozalia Williams Vol 1
February 24, 2016                              12

1        Q.     -- in Boston during the spring or summer?

2        A.     Fall and spring.

3        Q.     Fall and spring?

4        A.     (Nodding head.)

5        Q.     For your doctorate's degree?

6        A.     Yes, my master's and doctorate.

7        Q.     Now, prior to working at FAU, and we'll get

8   into your history at FAU, Florida Atlantic University,

9   where did you work?

10       A.     I worked at FIU.

11       Q.     How long did you work at FIU?

12       A.     Almost 20 years.

13       Q.     When did you start working there?

14       A.     I think about '74, '75.

15       Q.     What position did you hold at that time?  I'll

16  just ask you if you remember, you know, each position

17  you had during your 20-year career at FIU?

18       A.     Right.  Right.  I started there in the Office

19  of Information Services as an Information Specialist,

20  and I left that position and moved into Student

21  Retention, and I left that position and moved into

22  Multicultural Affairs.  I left that position and moved

23  into the Executive Assistant to the Vice President.  And

24  that's when I got admitted to the doctoral program and I

25  came back.

Rozalia Williams Vol 1
February 24, 2016                                    13

1       Q.   So what year was that?  I apologize.  What year
2   was that --
3       A.   When --
4       Q.   -- when you became the Executive Assistant to
5   the Vice President?
6       A.   I don't remember what year it was.
7       Q.   Okay.
8       A.   But it was before '93 because I left from that
9   position to go to Harvard in '93.
10      Q.   Okay.
11      A.   Where was I?
12      Q.   Multicultural Department after the Executive
13  Assistant position.
14      A.   No.  The Multicultural was before the Executive
15  Assistant.  So I did the Executive Assistant.  I went
16  away to school and I came back.  I was the Director of
17  Administration and Operations, and I left that and went
18  on to become the Associate Dean of University Outreach
19  and Continuing Education.
20      Q.   Do you recall the year that you became
21  Associate Dean of Outreach and Education at FIU?
22      A.   That's the same one, University Outreach and
23  Education.
24      Q.   What year was that, do you recall?
25      A.   I don't remember what year it was.

Rozalia Williams Vol 1
February 24, 2016                                    14

1       Q.   Who was your supervisor at that time?

2       A.   Robert Leighter.

3       Q.   How long did you hold that position?

4       A.   I don't recall.  At least two years.

5       Q.   Do you recall when you stopped working at FIU?

6       A.   I stopped working at FIU in 2000 -- in the year

7    2000.

8       Q.   And was your separation from FIU voluntary or

9    involuntary?

10       A.   It was involuntary.

11       Q.   What happened?

12       A.   The Office of Continuing Education was

13    reorganized where everything was centralized in one area

14    through all of the academic units.  Now it was going to

15    become decentralized, and so with the decentralization

16    there was no need to have an Assistant Dean because all

17    of the continuing education units went to the individual

18    academic areas.

19       Q.   After serving there for 20 years, did you try

20    to get another job there?

21       A.   I was offered another position there and I

22    chose not to accept it.

23       Q.   What position?

24       A.   I don't recall the title, but it was working

25    for the -- in the Provost's office.

Rozalia Williams Vol 1
February 24, 2016                              15

```
 1        Q.   Who offered you that position, if you remember?

 2        A.   Rosa Jones.

 3        Q.   Why did you choose not to accept that position?

 4        A.   At the time I had just gotten my doctorate and

 5   the position would not have allowed me to continue on

 6   the career path that I was on.

 7        Q.   How did the separation from FIU work, in terms

 8   of were you given any kind of notice prior to your last

 9   day of work?

10        A.   Yes.

11        Q.   How did that work over there?

12        A.   I had been there and so I forget how much time

13   it was, but they did give me -- they did give me time.

14        Q.   Dr. Williams, why did you change your name from

15   Arnetta to Rozalia?

16        A.   I found out that Arnetta was my nickname and I

17   didn't know legally until I went to go and get my Birth

18   Certificate, and Arnetta is the name that my father

19   called me because that's what he wanted me to be named,

20   and the name that was on my Birth Certificate was

21   Rozalia, and so by the time I found that out, legally,

22   with everything else that's involved in having a legal

23   name, my father had already passed away and my mother

24   was still living and it made her very happy that I began

25   to use the name that she wanted to call me, which was a
```

```
 1    derivative of her mother's name.

 2        Q.    What's your date of birth?

 3        A.    11/13/53.

 4        Q.    Where were you born?

 5        A.    Miami Beach, Florida.

 6        Q.    What are your parents' names?

 7        A.    My father's name is Raphu, R-A-P-H-U, Williams.

 8    My mother's name is Charlotte Williams.

 9        Q.    What race do you identify as?

10        A.    Black.  African American.

11        Q.    Would you say that's the same -- that you

12    identify the same way for ethnicity?

13        A.    I'm of Bahamian descent.

14        Q.    Other than your employment at FIU, prior to

15    FAU, did you have any other kind of independent

16    consulting business, any other kind of employment?

17        A.    No.  Outside of doing -- I wrote some grants to

18    -- during the time that I had -- after I left FIU to

19    provide counseling workshops for students in low income

20    areas.

21        Q.    And that was for private vendor or was that

22    something that you did for the state?

23        A.    No.  That was through the Miami-Dade County,

24    through Miami-Dade County.  They would have community

25    grants, and so I wrote a grant to provide services to
```

Rozalia Williams Vol 1
February 24, 2016                    17

```
 1    low income students to prepare them for college.
 2         Q.   Were you compensated for your grant writing?
 3         A.   Not for the grant writing, no.
 4         Q.   Were you compensated by any other source other
 5    than FIU prior to your employment at FAU?
 6         A.   I was compensated for providing instruction,
 7    not for the grant writing.
 8         Q.   And this was prior to working at FAU?
 9         A.   Prior to working at FAU, yes.
10         Q.   Let's talk about your employment at FAU.  Do
11    you remember when you first applied there?
12         A.   I applied there in -- it had to be 2001, I
13    believe it was.
14         Q.   What position did you apply for?
15         A.   The Assistant Director of Multicultural Affairs
16    on the Broward Campuses.
17         Q.   Did you have to go for some sort of interview?
18         A.   Yes.
19         Q.   Who did you interview with?
20         A.   I interviewed with the Search and Screen
21    Committee, several people, I don't remember how many,
22    and I interviewed with the Associate Dean of Students.
23         Q.   Who was that at the time?
24         A.   Marion Merzer.
25         Q.   And you were offered that position?
```

Rozalia Williams Vol 1
February 24, 2016                        18

1      A.    Yes, I was.

2      Q.    How long did you hold the Assistant Director of

3  Multicultural Affairs position?

4      A.    I held the position -- I was in Broward for a

5  total of, I think it was, five or six years.  Initially,

6  it was the Assistant Director and then it was upgraded

7  to Associate Director.

8      Q.    Do you remember when you were promoted to

9  Associate Director?

10      A.    I was there for maybe two or three years and I

11  was promoted.

12      Q.    Do you recall who promoted you?

13      A.    Marion Merzer.

14      Q.    And what's her position?

15      A.    Now?

16      Q.    At that time.

17      A.    At that time she was the Associate Dean of

18  Broward Campuses.

19      Q.    All right.  And what were your duties as the

20  Assistant Director and then thereafter as the Associate

21  Director?

22      A.    It was to provide multicultural programming,

23  educational programming as it related to diversity,

24  working with the different student government groups to

25  provide educational and social programming.

Rozalia Williams Vol 1
February 24, 2016                          19

 1      Q.   What were you paid in that position?

 2      A.   I think -- I think it was 30,000, 31-32,000

 3  initially.

 4      Q.   And your salary increased in that position?

 5      A.   When I was promoted to Associate, I think it

 6  took me into the 40s.

 7      Q.   What was the next position that you held at

 8  FAU?

 9      A.   The next position I held was Director of

10  Multicultural Affairs and Pre-College Programs on the

11  Boca Raton Campus.

12      Q.   So that would have been sometime in 2007?

13      A.   2008.

14      Q.   Did you have to apply for that position?

15      A.   Yes, I did.

16      Q.   And are you aware of any of the other

17  candidates that applied for that position?

18      A.   No.

19      Q.   Did you have an interview process for that?

20      A.   Yes, I did.

21      Q.   Who interviewed you?

22      A.   It was a Search and Screen Committee, and I was

23  also interviewed by Dr. Brown, Charles Brown.

24      Q.   Was that a separate interview or part of the

25  same --

Rozalia Williams Vol 1
February 24, 2016                                    20

1      A.    It was a separate interview.  I was also, yeah,

2   interviewed by Charles Brown, but there was also a whole

3   day of meeting with different constituent groups.  I met

4   with faculty groups, I met with student groups, I met

5   with current Directors of Student Affairs who were

6   already in Boca Raton, because I was in Broward, who

7   were already in Boca Raton, so I had a day of meeting

8   with various constituency groups, in addition to meeting

9   with Dr. Brown at the end.

10      Q.    Do you recall the individual that offered you

11   the position for the directorship?

12      A.    Charles Brown.

13      Q.    That would be considered a promotion, right?

14      A.    Yes.

15      Q.    And do you remember along with the promotion

16   did that include a hike up in your salary?

17      A.    Yes, it did.

18      Q.    Do you recall what that was?

19      A.    62,000.

20      Q.    How long did you hold this Director position?

21      A.    For two years.

22      Q.    And as a Director, how did your role change

23   from your other positions?

24      A.    Well, whereas I was previously responsible for

25   just providing social and educational programming on the

Rozalia Williams Vol 1
February 24, 2016                          21

```
 1    Broward Campus, I was responsible not only for the Boca

 2    Raton Campus but creating and overseeing programming on

 3    all of the campuses.

 4         Q.   Who was your supervisor as a Director?

 5         A.   Charles Brown, initially.

 6         Q.   And you say "initially" because I'm assuming

 7    that changed?

 8         A.   That changed.

 9         Q.   To what?

10         A.   To Corey King after Corey King was hired.

11         Q.   Do you recall when he was hired?

12         A.   I don't remember what year.  It must have been

13    2008, 2009 or later.  2009, around there.

14         Q.   When you were the Director, what position did

15    Dr. Brown have?

16         A.   It was Vice President for Student Affairs.

17         Q.   When Dr. Corey King was hired, what position

18    did he hold?

19         A.   Associate Vice President for Student Affairs

20    and Dean of Students.

21         Q.   And so at some point in time after 2008 you

22    were supervised by Dr. King?

23         A.   Yes.

24         Q.   Do you recall until when you were supervised by

25    him?
```

Rozalia Williams Vol 1
February 24, 2016                                    22

1       A.    Until 2010.

2       Q.    And that's when you received another promotion,

3    correct?

4       A.    Yes.  Correct.

5       Q.    That was for what position?

6       A.    The Associate Dean of Students in the Broward

7    Campuses.

8       Q.    You applied for that position?

9       A.    Yes, I did.

10       Q.    And were you interviewed for that position?

11       A.    Yes, I was.

12       Q.    Do you recall any of the candidates that also

13    interviewed for that position or applied?

14       A.    There was one candidate who was interim who I

15    think applied, David Bynes.  He was in the position on

16    an interim basis while they were advertising for it and

17    then I applied.  Internally, David Bynes was the only

18    person I knew.  I didn't know any of the other

19    candidates.

20       Q.    I'm going to assume David Bynes is a male?

21       A.    David Bynes is a male.

22       Q.    What's his race?

23       A.    He's a black male.

24       Q.    And you said he was the interim Associate Dean

25    of Students for Broward prior to you being placed in

1    that position?

2        A.    Yes.

3        Q.    With that promotion, I'm assuming that gave you

4    another salary hike?

5        A.    Yes, it did.

6        Q.    Do you remember what that was?

7        A.    75,000 a year.

8        Q.    Who did you interview with for that position?

9        A.    It was the same thing, the Search and Screen

10   Committee, a day of different constituents group --

11   constituency groups, and the Vice President for Broward

12   Campuses.

13       Q.    Who was that at the time?

14       A.    Joyanne Stephens.

15       Q.    Anyone else that you interviewed with?

16       A.    No.

17       Q.    When you say a "constituency group," what does

18   that mean?

19       A.    It means the faculty -- you meet with student

20   groups, you meet with people from the academic side, you

21   meet with people from the different departments.  It's a

22   day long of giving the people who you would be working

23   with on campus an opportunity to interview you.

24       Q.    As you sit here today, do you know why David

25   Bynes was not selected for the position and you were?

Rozalia Williams Vol 1
February 24, 2016                              24

1        A.    No, I don't.

2        Q.    Are you aware if either Dr. King or Dr. Brown

3   participated in the decision to hire you for that

4   Associate Dean position?

5        A.    Could you rephrase the question?

6        Q.    Do you know if -- I'll ask it better.  Do you

7   know if Dr. King participated in the decision to promote

8   you?

9        A.    I don't.  I don't know.

10       Q.    Do you know if Dr. Brown participated in the

11   decision to promote you to Associate Dean?

12       A.    Yes.

13       Q.    He did?

14       A.    He did.

15       Q.    And how do you know that?

16       A.    He and Dr. Stephens offered me the position

17   together in a meeting.

18       Q.    Do you recall if prior to your promotion as

19   Associate Dean of Students for the Broward Campuses if

20   Dr. King was the supervisor that filled out any of your

21   performance evaluations?

22            MS. CHATTERGOON:  Object to form.  You can

23       answer.

24       A.    Say it again.

25   BY MS. WYDLER:

Rozalia Williams Vol 1
February 24, 2016                              25

```
 1       Q.   Do you know if Dr. King evaluated you for
 2   performance evaluations prior to being promoted to --
 3       A.   No, he did not.
 4       Q.   Okay.  Who did?
 5       A.   No one did.  No one did.
 6       Q.   So to your knowledge, you don't have any
 7   performance evaluations on an annual basis while you
 8   were serving as the Director for Student -- I'm sorry.
 9   I don't want to butcher the name -- the title Director
10   of Multicultural Affairs?
11       A.   No.  The evaluation that I received was after I
12   was promoted.
13       Q.   And what evaluation are you referring to?
14       A.   The evaluation from Dr. King.
15       Q.   Do you recall what year that was?  That would
16   have been --
17       A.   That would have been 2010.
18       Q.   For the academic year of 2009-2010?
19       A.   Yes.
20       Q.   I'm just trying to understand the line of
21   reporting here.  As far as -- in 2008 you were reporting
22   directly to Dr. King?
23       A.   To Dr. Brown.
24       Q.   Dr. Brown.  And then in 2008 when you received
25   the promotion to Associate Dean, you started reporting
```

```
 1    to Dr. King?

 2        A.    No.

 3        Q.    Okay.  Explain that to me.

 4        A.    So what year -- start with what year you're

 5    talking about.

 6        Q.    2008.

 7        A.    In 2008 when I went to Boca Raton, I reported

 8    to Dr. Brown as the Director of Multicultural Affairs.

 9        Q.    And then after that in 2010 when you received

10    the promotion, you began reporting to Dr. King?

11        A.    No.  In 2008 I reported to Dr. Brown.  After

12    Dr. Brown hired Dr. King, he reorganized and

13    Multicultural Affairs reported to Dr. King.  In 2010 I

14    was promoted to Associate Dean on Broward Campuses, and

15    I reported to Joyanne Stephens, and for the day-to-day

16    operations for Student Affairs I reported to Dr. Brown.

17        Q.    So for 2009 you reported to Dr. King?

18        A.    Dr. King, right.  Dr. Brown, nor Dr. King, ever

19    evaluated me until I was promoted.

20        Q.    Is there -- was there a difference, as far as

21    who evaluated you, versus who you -- the line of

22    reporting?

23        A.    Yes.

24        Q.    Okay.  Can you explain that?

25        A.    At what point in time?  At what point in time?
```

Rozalia Williams Vol 1
February 24, 2016                              27

1        Q.   Okay.  Let's start from 2008.

2        A.   In 2008 I reported directly to Dr. Brown, and

3   Dr. Brown never evaluated me.  When I reported to

4   Dr. King, the entire time I reported to Dr. King, he

5   never evaluated me.  When I moved in 2010 back to

6   Broward, Joyanne Stephens evaluated me.

7        Q.   Okay.  And then 2010 you were reporting to who?

8        A.   Joyanne Stephens.

9        Q.   And then 2011?

10       A.   Joyanne Stephens retired and I reported to Tony

11  Abbate, and Tony Abbate evaluated me.

12       Q.   So you're saying your direct supervisor was

13  Tony Abbate?

14       A.   Yes.  And I reported to Brown regarding the

15  day-to-day activities in Student Affairs.

16       Q.   You were reporting to two different people

17  then?

18       A.   Essentially.

19       Q.   How does that work?

20       A.   From the organizational structure, the

21  positions in Broward report to Broward and are managed

22  in Broward and are funded by Broward, but because there

23  are, you know, collegial relationships among

24  departments, the day-to-day operations for a specific

25  area has a dotted line, so to speak, to that area in

Rozalia Williams Vol 1
February 24, 2016                                    28

```
 1   Boca Raton, so I had a dotted line to Dr. Brown that I
 2   reported to Joyanne Stephens and Tony Abbate.
 3        Q.   Tony Abbate, what was his position?
 4        A.   He's the Associate Provost for Broward
 5   Campuses.
 6        Q.   And he was the one who completed your
 7   evaluations?
 8        A.   Yes.
 9        Q.   From 2010 until 2012?
10        A.   From 2010 to '11, it was Joyanne Stephens.  She
11   retired.  He was the replacement, and Tony Abbate
12   evaluated me up to 2012.
13        Q.   So you reported to him for approximately about
14   a year and a half?
15        A.   Yes.
16        Q.   And can you explain the different Associate
17   Dean positions within the Student Affairs Department?
18        A.   What do you mean "explain"?
19        Q.   The different positions.  You were the
20   Associate Dean for Broward County and then there were
21   other Associate Deans, correct?
22        A.   Right.
23        Q.   What were those titles?
24        A.   Terry Mena was the Associate Dean on the Boca
25   Raton Campus and A.J. Chase is the Associate Dean on the
```

Rozalia Williams Vol 1
February 24, 2016                          29

```
 1    Jupiter Campus or the northern campuses.
 2         Q.   And Terry Mena is a female or male?
 3         A.   Male.
 4         Q.   Do you know the race?
 5         A.   Hispanic.
 6         Q.   A.J. Chase is a male or female?
 7         A.   Female.
 8         Q.   Her race?
 9         A.   White.
10         Q.   Would it be fair to say that A.J. Chase had the
11    same reporting line that you had?
12         A.   No.  Her position in reporting was different
13    because there's no statute that separates the northern
14    campuses from the Boca Raton campuses.  The Broward
15    campuses are self-governed by statute.
16         Q.   What do you mean "by statute"?
17         A.   The Florida law says that all of the management
18    and budgeting and decision-making for Broward stays in
19    Broward.
20         Q.   Do you know what law that is?
21         A.   No, but it's -- I don't know exactly what the
22    law is.
23         Q.   How do you know?
24         A.   It's called "the Broward law."
25         Q.   How do you know that?
```

Rozalia Williams Vol 1
February 24, 2016                            30

1       A.   Because we always had to take that into

2    consideration in everything we were doing to make sure

3    that all the budgeting, the decision-making, funding

4    that came from Broward or came to Broward stayed in

5    Broward.

6       Q.   Who did A.J. Chase report to?

7       A.   I think there was someone on the Jupiter Campus

8    that she had a day-to-day -- I don't know.

9       Q.   And as far as day-to-day and collegial, Student

10   Affairs, talking amongst colleagues on these issues, who

11   would all three of the Associate Deans report to?

12      A.   We were all part of the senior staff, and we

13   would all come together and meet as primarily King and

14   Brown.

15      Q.   So from 2010 up until what time were you

16   reporting to Tony Abbate?

17      A.   Right after his appointment, throughout his

18   appointment.

19      Q.   Throughout your tenure at FAU until the end,

20   were you reporting to Tony Abbate?

21      A.   Yes.

22      Q.   And just so I understand it, you're saying that

23   the Associate Deans did not report to the Dean of

24   Students?

25           MS. CHATTERGOON:   Object to form.

Rozalia Williams Vol 1
February 24, 2016                          31

```
 1       A.   I'm saying that the Associate Deans, for

 2   matters relating to student conduct, we consulted with

 3   the Dean of Students -- that I did from the partner

 4   campuses, but for all other matters it was group

 5   meetings with senior staff where we all came together

 6   and made decisions and discussed what would be done, and

 7   we did that with the Vice President.

 8   BY MS. WYDLER:

 9       Q.   Okay.  So you've made a differentiation between

10   student conduct and all other matters?

11       A.   Yes.

12       Q.   Can you give me -- just tell me what your

13   duties were as Associate Dean for Broward.

14       A.   I was the Chief Student Affairs Officer on the

15   Broward Campuses that had anywhere from five- to 8,000

16   students, and all of the divisions, all of the

17   departments in the Division of Student Affairs reported

18   to me.  There were like maybe ten, 12 different

19   departments in Student Affairs that reported to me:

20   Career Development, Student Government, Student

21   Activities.  So all the departments that were in Student

22   Affairs reported to me.  All of their coordinators

23   reported to me.  Anything that had to do with the

24   Division of Student Affairs on the Broward Campuses

25   reported to me.
```

Rozalia Williams Vol 1
February 24, 2016                          32

1      Q.   And explain your role as the Associate Dean in

2   relation to student conduct.

3      A.   So for whatever occurred in terms of

4   programming that related to students, you know, I was

5   responsible for.  I was responsible for making sure that

6   things got done and they got done in a way that they

7   were supposed to get done.  When it came to matters of

8   student conduct, there were committees that were formed

9   so that there would be broad consultation on student

10  conduct matters.

11     Q.   What do you mean by that?

12     A.   So if there was a case or a student who was in

13  crisis or a case that had come up, once a week all of

14  the Deans and Associate Deans and several other people

15  on campus would come together and discuss those cases.

16     Q.   That was the SA --

17     A.   SCA and SIT, the Student Intervention Team and

18  Student Crisis Awareness.  So whenever there was

19  anything that would come up, that would be done on a

20  consultation basis.

21     Q.   Who served on the SIT?

22     A.   All three of the Associate Deans.  It was

23  chaired by Dr. King, as the Dean of Students, and there

24  was several people from other departments in the

25  University.

1      Q.    What's the Chair's responsibility as part of

2   the SIT?

3      A.    Well, the Chair convenes the SIT and staffs it

4   and sets the agenda.

5      Q.    And this is to discuss particular cases that

6   arise related to the Student Code of Conduct?

7      A.    Yes.   That relate to students who have been

8   brought to any of the committee member's attention that

9   would appear to be a threat, threaten the safety, or be

10  a threat to themselves or constitute a violation of the

11  Student Code of Conduct.

12     Q.    How do you know if a student poses a threat

13  either to him or herself?

14     A.    You get -- it's reported to you.  You either

15  observe it or it's reported to you.

16     Q.    And how do you determine what is an actual

17  threat, is that based on training, is that based -- do

18  you have any sort of guidelines?

19     A.    Yes.  Yes.

20     Q.    What do you follow?

21     A.    Well, a police report, someone's reporting that

22  they were threatened, that you observe it, that you're

23  suspicious, intuitively you determine that something is

24  wrong, or you see something.

25     Q.    Do you refer to any kind of policies or

Rozalia Williams Vol 1
February 24, 2016                          34

1    procedures in determining whether a student has posed a

2    threat either to himself or somebody else?

3         A.   There are violations in the Student Code of

4    Conduct that would be used to determine whether or not

5    the reported behavior or the observed behavior is

6    consistent with a violation with the Code of Conduct.

7              There are also the policy on observing students

8    who are in distress or students who may exhibit certain

9    behavior, that that is someone who should be brought to

10   the attention of the Crisis Committee or the

11   Intervention Committee.

12        Q.   We reviewed the SIT.  Now, the other committee

13   that you mention, the Student Awareness?

14        A.   I was on both of them.  They met every other

15   week, so every week I was in one or the other, so for

16   me, there was no distinction between the two.

17        Q.   And did it consist of the same committee

18   members?

19        A.   One committee was a little smaller than the

20   other.

21        Q.   Which was that?

22        A.   I don't recall.  I just went every week.

23        Q.   And when you say you went every week, was that

24   a meeting that was held up in Boca?

25        A.   In Boca Raton, yes.

```
 1        Q.    And since it consisted, I'm thinking, of more
 2   or less the same members, the three Associate Deans and
 3   the Dean, at least you five were -- you four --
 4        A.    Right.
 5        Q.    -- were present --
 6        A.    Yes.
 7        Q.    -- at every weekly meeting?
 8        A.    Yes.
 9        Q.    Are there any other duties related to the
10   student conduct that you can recall as part of your
11   position?
12        A.    Yes.  You have to -- if you get a report, you
13   have to conduct an investigation.  You conduct an
14   investigation.  You interview witnesses.  You schedule
15   appointments.  You schedule -- you process the Student
16   Code of Conduct.
17        Q.    As Associate Dean, did you have anyone to
18   assist you in the investigations that you had to
19   conduct?
20        A.    Not in the investigations, no.
21        Q.    Did you have anyone to assist you with carrying
22   out the process of the Student Code of Conduct?
23        A.    I had an Administrative Assistant who would
24   schedule appointments with students.
25              There's a certain time frame with which you
```

Rozalia Williams Vol 1
February 24, 2016                    36

```
 1    have to give them notice, a certain time frame which you
 2    have to have a meeting, and so she kept up with that, in
 3    terms of scheduling according to the requirements in the
 4    code.
 5         Q.   Who was that?
 6         A.   Alicemaude Hernandez.
 7         Q.   How do you spell that, M-O-D-D?
 8         A.   A-L-I-C-E-M-A-U-D-E, one word.  Alicemaude
 9    Hernandez.
10         Q.   Do you know if she still works for FAU?
11         A.   No, she does not.  She retired.
12         Q.   Did she retire before you stopped working
13    there?
14         A.   No, she did not.
15         Q.   Do you keep in touch with her?
16         A.   Not regularly, no.
17         Q.   Do you know her number?
18         A.   No, not off -- not from memory, no.
19         Q.   Did anyone else assist you in any of your
20    duties related to processing the Student Code of
21    Conduct?
22         A.   No.
23         Q.   So in general, either something's been observed
24    and/or reported.  Can you walk me through what your
25    duties were as the Associate Dean in Broward for a
```

1    potential violation of the Student Conduct Code?

2        A.    If I got a report, I would read the report.

3    Generally, even in this case, it would be a police

4    report that I received.  I receive the report.  I look

5    at the behavior that is described.  I go to the Student

6    Code of Conduct, determine whether or not it is

7    characteristic of anything that could possibly be a

8    violation of the Code of Conduct.

9            In this case, it's a Code of Conduct situation,

10   not necessarily someone who might have a breakdown or be

11   Baker Acted or something.  I'm talking about a Student

12   Code of Conduct violation.

13           I would then check to make sure, for example,

14   in this case, if it was a faculty member, if the faculty

15   member had followed whatever procedure is required of

16   the faculty, and then begin to open a case and conduct

17   an investigation.  I would then report that name to the

18   -- on a weekly basis that name would then come up at the

19   SCAC or the SIT meeting.

20           So on a weekly basis, I would -- any reports

21   that I got or any situations, I would then bring that

22   name forward to the committee, and it would be discussed

23   and we would consult and determine the best procedure to

24   follow in that particular case.

25       Q.    So up until -- and I may interrupt you a couple

```
 1    of times here.  You kept on mentioning "in this case."
 2    I assume you're referring to the Rotela incident?
 3         A.   Yes.
 4         Q.   Now, in terms of up until the point where you
 5    have the SCAC or SIT meeting, what is issued to a
 6    student on a general basis?
 7              MS. CHATTERGOON:  Object to form.  You can
 8         answer.
 9         A.   If I determine that the behavior that is
10    observed or reported is a violation of the Code of
11    Conduct, I make an appointment with the student, so I
12    would ask Alicemaude, "Make an appointment with the
13    student so I can find out what happened."
14    BY MS. WYDLER:
15         Q.   And that's part of your investigation, correct?
16         A.   Right.  It's to find out what happened.
17         Q.   Is the student formally notified of an
18    investigation at that time?
19         A.   I'm not sure.  I think it's an appointment to
20    come in and see me.  It could be just -- no.  It's the
21    first phase.  Usually, it overlaps.  There would be --
22    the appointment is made because we want to talk to you
23    about it, it's been reported that you allegedly violated
24    the Student Code of Conduct, so the appointment is made
25    first and the appointment is followed up with a letter.
```

Rozalia Williams Vol 1
February 24, 2016                          39

1        Q.    What's that letter that's sent?

2        A.    I think that's the investigation letter.

3        Q.    And then this is all part of -- what happens at

4   that meeting with the student?

5        A.    The student is given a copy of the Code of

6   Conduct.  A student is told about what their rights are.

7   The student signs and initials that they know what their

8   rights are.  It's a whole litany of initials that need

9   to be -- they need to be informed of, and then you ask

10  the student, you know, what happened with their -- what

11  their side of the story is.

12       Q.    So you said that was part of a first phase.  Is

13  there any other step that's part of the first phase that

14  you can recall?

15       A.    Once you get the student's opinion about what

16  happened, if -- you would then -- if other people's

17  names are mentioned, you get everybody's side of the

18  story.

19            So everyone's who mentioned, you're calling the

20  witnesses, you're calling anyone else who may have

21  witnessed or observed the behavior, and you make a

22  determination on whether or not you're going to charge

23  the student with the Code of Conduct violation.

24       Q.    And charging the student, that's part of the

25  second phase?

Rozalia Williams Vol 1
February 24, 2016                    40

1        A.    Right.   Then the student receives a Notice of

2    Charges letter.

3        Q.    And the meeting that's held in consultation

4    with all the other Deans --

5        A.    Had not occurred.

6        Q.    In general.

7        A.    In general?  Oh, that meeting -- that meeting

8    takes place on a weekly basis.

9        Q.    Is there any guideline to determine the time

10   between the investigation, the conference letter, and

11   the Notice of Charges letter?

12       A.    When you say time "guideline," for?

13       Q.    Well, it seems like there's a meeting sometime

14   in the middle before -- typically, before a Notice of

15   Charges letter is issued, so is there any time that

16   should be elapsed before the next step?

17       A.    No.   It's whenever you finish the

18   investigation.  You have to get everybody's opinion in,

19   and that may take some time.

20       Q.    So once the Notice of Charges letter is issued

21   to a student, in general, what happens next?

22       A.    Well, generally, prior to the Notice of Charges

23   being issued, there's a consultation, so before you

24   would -- before I would issue a Notice of Charges, I

25   consult, I bring it to the committee, or I talk to

```
 1    Dr. King about it, because it's a conduct case and so
 2    that's what I do.  And then after that, a determination.
 3        Q.   What do you mean by "determination"?
 4        A.   Based on the consultation, you would come up
 5    with a -- with a process or a recommendation on how to
 6    proceed.
 7        Q.   You would come up, as the Associate Dean, with
 8    a recommendation?
 9        A.   I would, and then consult on whether or not
10    that's the accurate recommendation.
11        Q.   So who makes the decision as far as whether a
12    Notice of Charges letter is issued?
13        A.   The Associate Dean who is handling the case.
14        Q.   So you do more than a recommendation?
15        A.   You make the recommendation --
16             MS. CHATTERGOON:  Object to form.  Go ahead.
17        A.   I would make the recommendation as to what
18    would occur.  I would then bring that to the Dean or the
19    committee.
20    BY MS. WYDLER:
21        Q.   And then who makes the final decision as to
22    what Notice of Charge letter is going to be issued?
23        A.   It's a joint decision.
24        Q.   But you issue Notice of Charges letters all the
25    time, right?
```

Rozalia Williams Vol 1
February 24, 2016                          42

1      A.    No, not really.

2      Q.    It was within your authority to issue a Notice

3  of Charges letter?

4      A.    Yes.

5      Q.    And just to be clear on the record, I'm just

6  talking general right now and we'll get into the

7  incident.

8      A.    Okay.  I'm talking general and specific because

9  there's no unique student conduct case -- there is no

10  general student conduct case.  Every case is unique.

11     Q.    What do you mean by that?

12     A.    Different behaviors, different circumstances,

13  different results in investigations.  That's why we

14  needed to meet once a week.  Every single conduct case

15  is unique.

16     Q.    So what could normally happen in one particular

17  case as protocol, just because of one particular factor,

18  it could change?

19     A.    That's right.

20     Q.    In general, or consistent with the Student Code

21  of Conduct, after the Notice of Charges letter is issued

22  to the student, what happens next?

23     A.    The student comes back in and has the

24  opportunity to select whether or not they want to enter

25  into a mutual agreement -- admit that they had done

 1   something wrong and enter into a mutual agreement that

 2   would be developed between the Associate Dean and the

 3   student.

 4        That would -- could include sanctions, but it

 5   would be between the student and the Associate Dean, or

 6   the student can say, "I would like to have a hearing

 7   that includes a panel of my peers, faculty, and others,

 8   based on the composition of the hearing board, which is

 9   outlined; I don't want to enter into a mutual agreement,

10   I don't want to accept responsibility, I want to have a

11   hearing."

12        So the student is given both of those options.

13   Q.   What happens -- I'm assuming once the student

14   enters into a mutual agreement, that's done at the

15   Associate Dean level?

16   A.   That's done at the Associate Dean level.  If

17   the student accepts responsibility and admits they've

18   violated the Code of Conduct, they can enter into a

19   mutual agreement, and if necessary, and again, it's

20   unique, sanctions would be imposed by the Associate

21   Dean, and the student would agree not to engage in that

22   behavior again.

23   Q.   And if the student chooses the alternative

24   option, which is a hearing, how does that work?

25   A.   Then the request for hearing is sent to Boca

Rozalia Williams Vol 1
February 24, 2016                                44

1    Raton and Boca Raton -- the Dean's office schedules the

2    hearing, brings together the hearing board so that the

3    case could be heard by the board.

4        Q.   And if that option is selected, it's out of the

5    Associate Dean's hands?

6        A.   It's out of my hands at that -- I knew that to

7    be out of my hands at that particular time.

8        Q.   What happens during the mutual agreement phase,

9    since that's one of the duties that you have the

10   authority to handle, what typically happens?

11       A.   The student would -- if there are sanctions,

12   the student will fulfill the sanctions, and they don't,

13   you know, get reported for engaging in that behavior

14   again and that is it.

15       Q.   Does that go on their file?  How does that

16   work?

17       A.   It does.  It does go in their file.  It

18   depends.  Again, each one is unique, but it does.

19       Q.   And as part of a mutual agreement, does that

20   essentially mean that the University is not pursuing

21   certain student charges against -- as a violation of the

22   Student Code?

23       A.   Correct.

24       Q.   And if a student chooses to go with a hearing

25   option, they could either be found in violation of the

Rozalia Williams Vol 1
February 24, 2016                          45

 1   Student Code or the charge would be unsubstantiated?

 2       A.   Right.

 3       Q.   What was your -- strike that.

 4            Is there anything else, as part of the process,

 5   that you think is important in terms of the steps of

 6   charging?

 7            MS. CHATTERGOON:  Object to form.  You can

 8       answer if you know.

 9       A.   Just that it's important to follow every single

10   step in the Code of Conduct.  Everything that's in there

11   has to be followed to the T.

12   BY MS. WYDLER:

13       Q.   And with respect to what we've referred to here

14   today as "the Rotela incident," it's your position that

15   you were in complete compliance with the Student Code?

16       A.   Yes.

17       Q.   And it would be your position today that if the

18   FAU Administration believed that the actions that were

19   taken were not in compliance with the Student Code, you

20   would be in disagreement with that?

21            MS. CHATTERGOON:  Object to form.

22       A.   Yes.

23   BY MS. WYDLER:

24       Q.   You disagree with any position that the code

25   wasn't followed, correct?

```
 1              MS. CHATTERGOON:  Object to form.  Go ahead.
 2        A.   In this case, yes.
 3              (A recess was taken from 10:19 a.m.-10:30 a.m.,
 4        after which the following proceedings were had:)
 5   BY MS. WYDLER:
 6        Q.   Dr. Williams, I see that you have some
 7   documents in front of you.  Can you just let me see what
 8   those are?
 9        A.   (Witness complies.)
10        Q.   You have the Second Amended Complaint, and your
11   Answers to Charles Brown's First Set of Interrogatories,
12   as well as a letter from your attorney.
13              What did you do in preparation for your
14   deposition today?
15        A.   Answered the interrogatories and just went over
16   with my attorney what to expect today.
17        Q.   What documents did you review?
18        A.   I reviewed the Answers.  I reviewed the
19   Complaint.  I reviewed what's here.
20        Q.   So before we broke, we were talking about the
21   general Student Code of Conduct policies and the steps
22   to the charges, and I think now is a pretty good time to
23   go into the specifics related to the Rotela incident.
24              So tell me how you first learned of what we
25   have so deemed "the Rotela incident."
```

Rozalia Williams Vol 1
February 24, 2016                        47

1       A.    I received a police report.

2       Q.    Was it a police report?

3       A.    It's what I always receive.

4       Q.    And it was not from an outside agency, it was

5   from within FAU?

6       A.    Yes.

7       Q.    Do you recall the exact name of that document?

8       A.    No, I don't.

9       Q.    Is it a Security slash Incident Report?

10      A.    It could be.

11      Q.    Who did you receive the report from?

12      A.    Our Broward Campus Police Department.

13      Q.    When did you receive that report?

14      A.    I don't recall.  Whatever day -- the day after

15  it was written, I think, the morning after.  It was in

16  the mail.

17      Q.    Like an interoffice mail or how does that work?

18      A.    I don't know.  I don't know if it was brought

19  over or mailed.

20      Q.    If it's an extreme situation, do you get it any

21  other way other than mail?  Do you get a phone call?

22      A.    In a general extreme situation that is

23  occurring at that particular time, I would get a phone

24  call if the Police Department would think that I need to

25  be notified.

Rozalia Williams Vol 1
February 24, 2016                          48

```
 1        Q.   And in this case, you did not get any kind of

 2   phone call, you received the report in the mail?

 3        A.   I received the report, yes.

 4        Q.   Did you receive any other reports that day, if

 5   you recall?

 6        A.   I don't recall receiving any other reports.

 7        Q.   And what did you learn when you received that

 8   report?

 9        A.   I read it and I learned from the information

10   that was in the report that Rotela had threatened a

11   professor after class.

12        Q.   And the threat, was that based on -- how did

13   you determine that that was a threat?

14        A.   It was written in the report.

15        Q.   Written by the officer --

16        A.   Yes.

17        Q.   -- who interviewed the subject --

18        A.   Yes.

19        Q.   -- or the victim at that time, right, which

20   would have been who?

21        A.   Deandre Poole.

22        Q.   What did the report say?

23        A.   I don't recall verbatim.

24        Q.   But you recall that there was a threat to the

25   professor?
```

Rozalia Williams Vol 1
February 24, 2016                        49

```
 1        A.   Right.

 2        Q.   What kind of threat was made?

 3        A.   That he would hit the professor or fight with

 4   the professor or threaten to physically harm the

 5   professor.

 6        Q.   When?

 7        A.   I don't know.  We have that report.  Do we have

 8   the report where I can look at it?

 9        Q.   I don't have it here with me, but I just want

10   your independent recollection.

11        A.   Right.  This is --

12        Q.   And when was this threat going to -- when was

13   he going to either fight or threaten or physically harm

14   the professor?

15        A.   This happened after class.

16        Q.   And when was the threat supposed to be carried

17   out?

18             MS. CHATTERGOON:  Object to form.

19        A.   I don't know.

20   BY MS. WYDLER:

21        Q.   So there was --

22        A.   The threat was carried -- to my understanding,

23   the threat was carried out that night.  The threat was

24   made that night.

25        Q.   The threat was made that night.  And when was
```

Rozalia Williams Vol 1
February 24, 2016                               50

 1    it supposed to be carried out?

 2        A.   I don't know.

 3        Q.   Do you know what were the terms for it to be

 4    carried out?

 5        A.   I don't know.

 6        Q.   Did you learn, after speaking with the student,

 7    when that threat was supposed to be carried out?

 8        A.   No.  When you mean "carried out," when was he

 9    actually going to physically harm the professor, --

10        Q.   Well, what was the --

11        A.   -- when you say "carry it out"?

12        Q.   What was the actual threat?

13        A.   It's my understanding that he told the

14    professor, "Don't ever do that again; if you ever do

15    that again, then" -- he was supposedly punching his hand

16    in his fist like this (indicates).  This is what was

17    described to me by the witness.

18        Q.   That was something that you learned in your

19    investigation?

20        A.   Investigation, correct.

21        Q.   And the witness?

22        A.   And from Dr. Poole.

23        Q.   The witness that you said that was describing

24    that, who was that?

25        A.   I think it was -- his name is Andrew Cuthbert.

Rozalia Williams Vol 1
February 24, 2016                               51

1      Q.   He's another student, right?

2      A.   Yes, he is.

3      Q.   So as far as the threat being carried out,

4  there was no specific time other than "if you ever do

5  this again"?

6      A.   Right.

7      Q.   Once you received the report that it was

8  reported from an interview of an officer that there was

9  a threat made to a faculty member, what did you do next?

10     A.   Once I received the report and I read it, then

11 I went to the Code of Conduct.  I also went to the

12 Faculty Handbook.

13     Q.   When you say "Faculty Handbook," what exactly

14 are you referring to?

15     A.   There are procedures that are to be followed

16 when a faculty member has an altercation with a student.

17     Q.   Is that something that's published by the

18 Student Affairs Department?

19     A.   No.  It's Academic Affairs.

20     Q.   And you explained that as the procedures for a

21 faculty member to deal with a student when what happens?

22     A.   When they're engaging in inappropriate

23 behavior.

24     Q.   And what did the handbook say that the faculty

25 member had to do?

Rozalia Williams Vol 1
February 24, 2016                    52

```
 1        A.   That they should call for police and report it
 2   to the police.
 3        Q.   Did that give you any additional guidance on
 4   what your duty was as the Associate Dean?
 5        A.   Yes, in terms of -- in terms of making a
 6   determination if the interaction between the two of them
 7   was appropriate or done in accordance with whatever the
 8   policy is.
 9        Q.   Can you explain that?
10        A.   Well, if the faculty member had threatened him
11   back or if the faculty member had done something
12   inappropriate himself, what would that information be
13   that I would need as I'm following through with my
14   investigation.
15        Q.   So you looked at the Faculty Handbook and the
16   Student Code of Conduct and what did you determine after
17   reading the report and those two other documents?
18        A.   That I needed to talk to the student.
19        Q.   Did you contact the student?
20        A.   Alicemaude contacted the student to make an
21   appointment.  We did an Investigation Conference letter
22   after the appointment was scheduled.
23        Q.   Did the Investigation Conference letter go out
24   before or after you met with the student?
25        A.   Oh, no, it went out before.
```

Rozalia Williams Vol 1
February 24, 2016                          53

```
 1              (Thereupon, Defendant's Exhibit Number 1,

 2        2/28/13 Investigation Conference Letter, was

 3        marked for identification.)

 4   BY MS. WYDLER:

 5        Q.   We'll mark this as Defendant's Exhibit 1.  Have

 6   you seen this letter before?

 7        A.   Yes.

 8        Q.   And you were the author of this letter?

 9        A.   Yes.

10        Q.   Did anyone assist you in drafting this letter?

11        A.   No.

12        Q.   The date of this letter is February 28, 2013,

13   correct?

14        A.   Correct.

15        Q.   And this letter -- how was this provided to the

16   student, Mr. Rotela?

17        A.   It's mailed.

18        Q.   Do you recall the date of the incident that

19   transpired between him and Dr. Poole?

20        A.   No.  I don't know what the date was.  It's the

21   date before I received the report because I believe I

22   received the report the next day.

23        Q.   Would it be fair to say that it happened on

24   February 25th, does that sound familiar?

25        A.   Yeah.  That sounds familiar.
```

Rozalia Williams Vol 1
February 24, 2016                                    54

1      Q.   Do you remember if the class that met, that was

2  on a Monday?

3      A.   I think the class met Monday-Wednesday, it was

4  a Monday-Wednesday.

5      Q.   So we can look it up, but to my calculations, I

6  think February 25th was an actual -- February 25, 2013

7  was a Monday, which would make February 28th, 2013 a

8  Thursday, three days later.  Does that seem fair?  And

9  if you received the incident report the following day,

10  that would make it 2/26?

11      A.   (Nodding head.)

12          MS. WYDLER:  Was I correct on my Monday

13      calculation, Ria?

14          MS. CHATTERGOON:  I'm still looking.

15          Yeah.  It looks like the 25th was a Monday.

16      26 was a Tuesday, and the 28th, the date of the

17      letter, is a Thursday.

18          MS. WYDLER:  Okay.

19  BY MS. WYDLER:

20      Q.   Maybe the easiest way to track all of this is

21  by going through the Second Amended Complaint that you

22  have in front of you.  It might make things a little bit

23  easier with the dates.  So I would say for reference

24  purposes we could turn to Page 7, paragraph 34.

25      A.   Paragraph 34 is my Page 8.

Rozalia Williams Vol 1
February 24, 2016                              55

1        Q.   Do you have docket entry number 35?

2        A.   Uh-huh.

3        Q.   Okay.  So paragraph 34, February 26, that would

4    be the Tuesday where it's alleged that you received a

5    Security Incident Report, correct?

6        A.   Right.

7        Q.   And that's the same report that we were talking

8    about earlier, right?

9        A.   Right.

10       Q.   On paragraph 36 on the 28th, the same date that

11   the conference -- that the Investigation Conference

12   letter was issued, it says here that you spoke to Noemi

13   Marin and Dr. Poole and also with the student witness?

14       A.   Yes.

15       Q.   Tell me about your conversation with Noemi

16   Marin.

17       A.   I called her to ask her if she had spoken with

18   the student and whether or not -- and what transpired in

19   that conversation.

20       Q.   Why would you call the Chair?

21       A.   Because she was mentioned as the person who he

22   had talked to or Deandre Poole had talked to.

23       Q.   Who did you talk to first?

24       A.   I don't recall who I talked to first.  It was

25   really just a matter of getting -- because it takes so

1    long to contact people, it's who you talk to first.

2    It's like you know you have to talk to the people who

3    were mentioned, so you try to get them on the phone and

4    talk to them and wait for them to call you back or -- so

5    the order in which it occurred I don't recall.

6        Q.   And what information did Noemi Marin give you?

7        A.   She said that she met with the student and the

8    student told her that he lost his temper that night and

9    that she didn't know at the time what it was in

10   reference to, but he made it a point to meet with her

11   and let her know that he had engaged in behavior that he

12   regretted.

13       Q.   And did she have any kind of opinion as far

14   as --

15       A.   She just said that he was respectful.  He was,

16   you know, cordial, but he did let her know that he lost

17   his temper after class.

18       Q.   Did she relay to you any conversation that she

19   may have had with Dr. Poole?

20       A.   I'm not sure what or when -- I know afterwards

21   -- I don't know in this sequence, but I know at some

22   point she said that Dr. Poole had talked to her about

23   it, but she didn't know that he was the student who

24   Dr. Poole was talking about or somebody else on the

25   faculty who Dr. Poole may have shared it with.

Rozalia Williams Vol 1
February 24, 2016                                57

1      Q.   So based on your conversation with Dr. Marin,

2   the student self-initiated this conversation with the

3   Department Chair?

4      A.   Yes.

5      Q.   And based on your conversation with Dr. Marin,

6   she also had a separate conversation with Dr. Poole but

7   it wasn't clear if she had made the connection that they

8   were the same student -- teacher?

9      A.   I don't know if it was Dr. Poole or someone

10   else who Dr. Poole reported to.

11      Q.   Okay.  Have you told us everything that you

12   recall discussing with Dr. Marin on that day?

13      A.   To my recollection at this point, yes.

14      Q.   It also says on February 28th that you had a

15   conversation with Dr. Poole.  Can you tell us about

16   that?

17      A.   Right.  I called Dr. Poole to ask him what

18   happened.

19      Q.   And what did he tell you?

20      A.   He told me that the student came up to him

21   after class and threatened him, told him that he, you

22   know, did not, you know, approve of the activity and

23   that, you know, if he ever did it again, that -- it

24   should not be taught again.

25      Q.   Did Dr. Poole tell you in any form or fashion

Rozalia Williams Vol 1
February 24, 2016                          58

1    that he was going to do the exercise anytime in the near

2    future?

3        A.    He wouldn't.  No, he did not.

4        Q.    What was the exercise?

5        A.    He did explain that it's part of the curriculum

6    that's approved by Academic Affairs, it's an activity

7    that's taught every semester, it's been taught -- he's

8    taught it on other occasions, and that he had never had

9    a problem teaching it.

10       Q.    What was the exercise, to the best of your

11   knowledge?

12       A.    To the best of my knowledge, it was an exercise

13   in intercultural communication where the objective was

14   to explain to the students how one person's perception

15   of something that might be offensive would be different

16   from another person's perspective on what would be

17   offensive, and he asked them to write the name of Jesus

18   on a piece of paper and to put it on the floor, and I

19   don't know what specific instructions he gave him, he

20   gave the students, but some students stepped on the

21   paper and others said they would not.

22            There was a class discussion that ensued, and

23   it's my understanding Rotela made his point.  The

24   professor moved on.  He heard from other students who

25   made their points, and Rotela insisted that he be given

Rozalia Williams Vol 1
February 24, 2016                              59

1   more time to express his opinion, and Dr. Poole moved on

2   and Rotela was upset because he moved on.

3       Q.   What else did Dr. Poole advise you of the

4   incident?

5       A.   He told me that after class -- so the class

6   continued, he continued with his class.  Then after

7   class, Rotela stayed after class and said that he didn't

8   want it done again, or I don't know exactly what he

9   said, but he threatened him saying that "don't ever do

10  that again."  He and Andrew Cuthbert stayed after class.

11      Q.   What else, if anything, did Dr. Poole tell you

12  during that interview?

13      A.   That he -- I think he mentioned that he called

14  security and he asked the student to leave.  You know,

15  he was trying to get his phone.  He asked the student to

16  leave.  And then by the time security got there, the

17  student was gone, both students were gone.

18      Q.   Anything else?

19      A.   He said that the other student who was with

20  him, Andrew Cuthbert, wrote him a -- sent him an email

21  like at 12 or 1:00 in the morning, it was late that

22  evening, saying that he didn't know what happened, he

23  wanted him to know that he didn't agree with what

24  happened after class and he was concerned and that he

25  didn't agree with what Ryan did after class and he

Rozalia Williams Vol 1
February 24, 2016                    60

1    wanted him to know that.  They ride together, but he did

2    not agree with what happened.

3         Q.   Anything else in that conversation?

4         A.   Not at this time.

5         Q.   That conversation took place over the phone,

6    right?

7         A.   Correct.

8         Q.   It says also on that same date that you met

9    with the student witness?

10        A.   Andrew Cuthbert.

11        Q.   And where did you have that conversation with

12   Mr. Cuthbert?

13        A.   In my office.

14        Q.   How do you spell his name?

15        A.   C-U-T-H-B-E-R-T or something close to that, I

16   think it is.

17        Q.   You met with him in person?

18        A.   I met with him in person.

19        Q.   What did he tell you?

20        A.   He told me that -- he told me that after class

21   -- that he rides with Ryan, and after class Ryan wanted

22   to stay after class to tell Dr. Poole what he felt about

23   what occurred.  He was upset because he didn't think

24   that Dr. Poole listened to what he was saying during the

25   class or gave him enough time to talk about his view

Rozalia Williams Vol 1
February 24, 2016                              61

```
 1   after class, and he said he threatened him, you know,

 2   telling him, and I think he is the one who described the

 3   motion (indicates) of putting his fist in his hand

 4   saying that, you know, he would -- he was letting -- he

 5   was threatening Dr. Poole, led him to believe he was

 6   threatening Dr. Poole.

 7       Q.   Did he say anything else to you?

 8       A.   That I recall now, no.

 9       Q.   How long did you -- I'm sorry.  Go ahead.

10       A.   But it led me to believe that based on the

11   witness and based on what Dr. Marin told me that

12   something occurred, that I needed to bring him in.

13       Q.   How long did you meet with the witness, if you

14   remember?

15       A.   I don't remember.

16       Q.   How long did it take you to talk to Dr. Poole?

17       A.   I don't remember.

18       Q.   And Dr. Marin, do you remember?

19       A.   I don't remember.

20       Q.   Are these typically like all-day meetings or

21   are these just, you know --

22       A.   No.  They're not all-day meetings.  It could be

23   -- it's a meeting where there's no set time or it's a

24   conversation where there's no set time where you talk

25   until you get all of the information that is available
```

Rozalia Williams Vol 1
February 24, 2016                    62

```
 1   at the time.
 2       Q.   After you met and you conducted your
 3   investigation, that's when you decided to send out the
 4   letter to speak with Mr. Rotela?
 5       A.   Yes.
 6       Q.   When was the first time that you spoke with
 7   Mr. Rotela?
 8       A.   The first time I spoke with him was when he
 9   came to my office.  I think all the scheduling had
10   occurred with Alicemaude in terms of getting him in and
11   getting the letter to him, but if you look at the
12   letter, the date of the conference is already scheduled
13   on Thursday, March 7th at 4 p.m., so she made the
14   arrangements for him to come in based on when he said he
15   would be on campus and when he was available.
16       Q.   Do you know why the meeting was not done any
17   sooner?
18       A.   No.  It was done as soon as I could possibly
19   get to it.  Again, I'm the Chief Student Affairs Officer
20   for the entire campus and I have, you know, ten to 12
21   people reporting to me, and this was done in a timely
22   manner based on all of my responsibilities.
23       Q.   And March 7th would have been more than a week
24   past from the date of the incident, correct?
25       A.   Right, and that's the date that he said he
```

Rozalia Williams Vol 1
February 24, 2016                              63

1    could come in.

2         Q.   Are you aware if he attended class in the

3    interim?

4         A.   I'm not aware.  I'm not aware of the schedule,

5    but I know at some point in time during all of this

6    spring break was occurring, so I don't recall

7    specifically.

8         Q.   You don't know if spring break was in the

9    middle of between the class incident and when you met

10   with Rotela or --

11        A.   Oh, no.  This was before spring break.  What

12   day is March 7th?

13        Q.   That's a Thursday.

14        A.   Thursday.  It's a Thursday after -- oh, that's

15   the following week.  I would have to know the dates of

16   spring break.  I don't believe he had gone back to class

17   after the incident.  That might have been spring break,

18   I'm not sure, but he had not been back to class after

19   the incident.

20        Q.   So that would have already been almost

21   approximately ten days from the date of the alleged

22   threat, correct, that you had met with him?

23        A.   You mean on March 7th?

24        Q.   Yes.

25        A.   Yeah, between the 28th and 7th, however many

Rozalia Williams Vol 1
February 24, 2016                                        64

```
 1   days that is.  This date was set by him, in terms of

 2   when he could come.  And if I'm not mistaken, there is a

 3   certain number of days that he has to be able to get

 4   notice of this.

 5        Q.   Notice of the investigation?

 6        A.   Of the Investigation Conference.

 7        Q.   Now, it's my understanding that you would

 8   routinely send out Investigation Conference letters just

 9   as part of your duty?

10        A.   Yes.

11        Q.   And what Student Code of Conduct violation, if

12   any, were you investigating at the time that you sent

13   out the Investigation Conference letter?

14        A.   It's in the Notice of Charges letter.  It was

15   threatening behavior.

16        Q.   So let's jump to March 7th when you met with

17   Mr. Rotela.

18        A.   Yes.

19        Q.   Was that in person in your office?

20        A.   That was in person in my office.

21        Q.   Did he attend with anybody?

22        A.   No, he did not.

23        Q.   And he showed up at his scheduled time with

24   you?

25        A.   Yes.
```

Rozalia Williams Vol 1
February 24, 2016                          65

1      Q.   What happened?

2      A.   I invited him in and I told him about the

3   Student Code of Conduct.  There's a procedure you follow

4   to make sure that they know all of their rights.  There

5   is paperwork that they have to sign saying that they

6   understand what their rights are and that they agree to

7   continue with the meeting.

8      Q.   He agreed to continue with the meeting?

9      A.   Yes, he did.

10     Q.   And the meeting for your purposes is to obtain

11  information from him?

12     A.   From him on what his story was, what he said

13  occurred and to listen to what he had to say.

14     Q.   What was Rotela's version of the facts?

15     A.   He focused primarily on what occurred in the

16  class and what transpired with the exercise, and I told

17  him that I was not asking him about what happened in the

18  class -- during the class, I was inquiring about what

19  happened after class.

20          And he did not answer my questions about what

21  happened after class, he continued to focus on what

22  happened in class, and I kept talking to him about the

23  investigation was related to what -- that I was, you

24  know, not inquiring about what took place in the class,

25  that I was inquiring about what happened after class.

Rozalia Williams Vol 1
February 24, 2016                          66

```
 1          And that happened several times and I asked him
 2   directly -- I began to ask him directly, "Did you stay
 3   after class to talk to Dr. Poole?"  And he said, "Yes."
 4   I said, "Tell me about what happened."  And he said,
 5   "Nothing happened."
 6          I told him that I was going to go and talk to
 7   the Department Chair about the meeting.  And I probed
 8   further and he led me to believe that nothing out of the
 9   ordinary happened.
10      Q.  How long was your meeting with him?
11      A.  I don't recall how long it was, but it was a
12   regularly scheduled -- usually I'll schedule them for as
13   long as it takes, so --
14      Q.  You don't remember having any other appointment
15   afterwards?
16      A.  No, I don't.
17          MS. WYDLER:  I'm sorry.  I don't have another
18      copy of this.
19          (A discussion was held off the record.)
20   BY MS. WYDLER:
21      Q.  Have you seen this document that's just been
22   handed to you before?
23      A.  Yes.
24      Q.  Is that your handwriting?
25      A.  Yes.
```

1      Q.   I wasn't sure.  It doesn't have the author's

2   name on it.  I'm going to mark it as Defendant's Exhibit

3   Number 2.

4           (Thereupon, Defendant's Exhibit Number 2,

5       Handwritten Notes, was marked for

6       identification.)

7   BY MS. WYDLER:

8      Q.   Was this document authored by you while you

9   were in your meeting with Mr. Rotela?

10     A.    Part of it during the meeting and part of it

11  after the meeting.

12     Q.   If you don't mind, I'm having a hard time

13  deciphering the handwriting, would you mind reviewing it

14  with us, please?

15     A.   I can read what I've written here.

16     Q.   That's fine.

17     A.   Ryan talked about what occurred in class, said

18  that he didn't approve.  He was offended because he

19  moved to another student without acknowledging that what

20  he had done was wrong.

21          The situation -- well, I'm going to read what

22  it says.  The situation escalated.  He felt he had to go

23  to a superior.  It escalated because he never responded

24  and showed no remorse.  I don't -- I don't want this to

25  happen again, wanting his supervisor or superior to

Rozalia Williams Vol 1
February 24, 2016                              68

1  know.

2      Q.   Okay.

3      A.   After class, went to him with an associate he

4  carpools with.  I felt intimidated, afraid.  I felt

5  attacked.  It was necessary to wait after class to

6  further clear up with the professor.

7           Fear, intimidation, persecution -- fear,

8  intimidation, persecution.  Told him that he felt --

9  after class felt awful and something not -- did not feel

10 safe in that environment.

11     Q.   Fear, intimidation, persecution?

12     A.   Right.

13     Q.   Who said that?

14     A.   This is what Ryan said he told Dr. Poole, told

15 him, told Dr. Poole that he felt after class.  He felt

16 awful and did not feel safe in that environment.  He

17 said he did not say, "Don't ever do this again."  Asked

18 you to leave and you left.  Asked if he understood what

19 I said regarding the need to go to the superior.  At the

20 -- at the -- stayed after class to -- I don't know what

21 that is, what is it?  At --

22     Q.   Is that comments?

23     A.   No.  At the -- at the -- stayed after class to

24 further ensure this exercise would not -- this exercise

25 doesn't happen to a more radical degree -- let me just

```
 1    go back to that.

 2          He, the professor, didn't feel what he was

 3    doing was wrong, could do it again, wanting to let him

 4    know he would go to his supervisor.  Asked about what I

 5    wanted him to say.  Made it clear I was seeking the

 6    facts, summarized what he said.  He denied it could even

 7    be perceived that he engaged in threatening behavior.

 8          Q.   Okay.  It seems like Rotela was -- it was

 9    almost like he was complaining to you about the exercise

10    that had been done during class --

11          A.   Yes.

12          Q.   -- and that he wanted to go to the supervisor

13    and that's why you learned that he went to Dr. Marin?

14          A.   I don't know if I learned that in this

15    conversation, but I knew that he had gone to Dr. Marin.

16    Or I think I knew before I met with him that he had gone

17    to Dr. Marin but this is what he was saying.

18          Q.   And when did you draft these notes?

19          A.   That day.  It was a combination of during the

20    meeting and after the meeting so I could recall.

21          Q.   And based on your interview with him, he denied

22    making any sort of threatening behavior?

23          A.   Yes.

24          Q.   Other than these handwritten notes from your

25    interview with Mr. Rotela, do you have any other notes?
```

Rozalia Williams Vol 1
February 24, 2016                    70

1        A.    I don't have any other notes, but this is not

2    the entire documentation of what occurred in the

3    meeting.  These are just things that I would

4    periodically write because I'm having a conversation

5    with him.  I'm having a discussion with him, --

6        Q.    Right.

7        A.    -- so these are things I just happened to write

8    down but it is not the entire conversation or

9    documentation of the meeting.

10       Q.    And by "documentation," you mean probably, you

11   know, the initials that he signs off on, his student

12   rights, is that what you're referring to?

13       A.    No.  I'm talking about me notating what he is

14   saying to me.

15       Q.    Where would you have those notations?

16       A.    I wouldn't.  I wouldn't make any of those

17   notations.  It's just that I wanted to be clear that

18   this is not the entire summary of the meeting.

19       Q.    Understood.

20       A.    I don't write down everything.

21       Q.    So after you had your meeting with him, did you

22   -- you mailed to him what's been marked as Exhibit 1,

23   the Investigation Conference letter?

24       A.    No.  This is what preceded that meeting that I

25   had with him on the 7th.

Rozalia Williams Vol 1
February 24, 2016                              71

```
 1        Q.   Right.  I apologize.  Then the next part of
 2   your Complaint takes us to the following day.  So
 3   March 7th was a Thursday and March 8th is Friday, and
 4   you reached out to Dr. Poole again?
 5        A.   Right.
 6        Q.   What happened there?
 7        A.   I talked to Dr. Poole and, you know, told him
 8   that Ryan denied making the threat to him, denied
 9   violating the Student Code of Conduct, and he said to me
10   that if Ryan did not believe that anything that he had
11   done could be perceived to be as threatening that he did
12   not want him to come back to the class, and he wanted
13   him to be restricted from coming to the class.
14        Q.   What else did he say?
15        A.   He talked generally -- I don't know if it was
16   then or another time, but he talked about Ryan's overall
17   behavior in the class, that Ryan comes to class and he
18   essentially tries to monopolize class time by taking
19   advantage of a lot of controversial issues that come up
20   in the class related to multicultural conversations and
21   that he will come to class, he will not take notes, he
22   does not have the book, he will sit there and just not
23   be engaged at all, but when a controversial subject came
24   up, he would try to monopolize the class discussion.
25             He told me that there was a discussion about
```

Rozalia Williams Vol 1
February 24, 2016                              72

1    women in the military and so he won't be engaged as a

2    student but when that topic comes up.  So based on his

3    experience and the other students' experiences, that he

4    was there and he was engaging in behavior that he felt

5    was inappropriate.

6         Q.   And from your perspective, how he engaged in

7    those discussions during class, isn't that more of an

8    academic issue versus --

9         A.   That's why it was his call.  It was his call to

10   determine whether or not he would be able to continue to

11   teach if Ryan were in the class.  He made that call.

12        Q.   And when you say "he made that call," what do

13   you mean by that?

14        A.   Dr. Poole, when he requested that he be

15   restricted from the class.  He did not feel that he

16   would be able to teach the class without -- with Ryan

17   there.

18        Q.   What authority does Dr. Poole have to restrict

19   a student from a course that they're registered for?

20             MS. CHATTERGOON:  Object to form.  Go ahead.

21        A.   I don't know what authority he has, but it's my

22   experience through SCAC and SIT meetings on a regular

23   basis that when that request is made, it is usually

24   complied with, and generally there would be a procedure

25   to follow if that was the case, so it's typical that

Rozalia Williams Vol 1
February 24, 2016                          73

```
 1   when a professor requests that, that it be taken into

 2   consideration.

 3           Generally, if it is a situation where it's just

 4   a disagreement about a grade or a class assignment,

 5   certain things would be taken into consideration.  But

 6   generally, when it's related to safety and threatening

 7   behavior, it's taken very seriously and the

 8   recommendation is that the student not return.

 9   BY MS. WYDLER:

10       Q.   Since this occurred on Friday, March 8th, 2013,

11   during those ten days from the date of the classroom

12   exercise to your second discussion with Dr. Poole, did

13   he relay to you that any actions have been taken by

14   Mr. Rotela during that time period?

15       A.   I don't understand.

16       Q.   During those ten days between the class

17   exercise and your second meeting with Dr. Poole, did he

18   tell you that Rotela came back to talk to him at any

19   point in time?

20       A.   No, he did not.

21       Q.   Did Rotela --

22       A.   Not that I recall.

23       Q.   Did Dr. Poole during those ten days experience

24   any additional threat by Mr. Rotela?

25       A.   I don't know.
```

1     Q.   Did he relay to you that he had experienced

2  anything else other than what was in the incident

3  report?

4     A.   Yes.  He said other than what was in the

5  incident report that he had had several experiences with

6  Ryan in the class prior to this one and that Ryan had

7  engaged in behavior that was disruptive around

8  controversial issues that would come up in the class.

9  So he had other experiences with Ryan in the class.

10    Q.   Okay.

11    A.   And as a culmination of all of that, including

12 what happened after class, he did not want him to come

13 back to class.

14    Q.   I guess what I'm trying to ask here is if

15 during that ten-day period, did Dr. Poole tell you after

16 the incident that he had any contact with Ryan Rotela?

17    A.   So the ten-day period you're talking about is

18 between February 28th and March 7th?

19    Q.   If we want to be technical, I'm talking

20 March 1st to March 8th.

21    A.   Did Poole tell me that he had had other contact

22 with Rotela?

23    Q.   During that time period.

24    A.   Not to my memory or knowledge, no, not that I

25 recall.

Rozalia Williams Vol 1
February 24, 2016                    75

```
 1        Q.   Did he receive, at any point in time, any email
 2   from Ryan Rotela after the incident after class and when
 3   he met with you on March 8th, 2013?
 4        A.   So he, meaning did Dr. Poole receive emails
 5   from Ryan?  I don't know.
 6        Q.   Did he tell you that he had received any kind
 7   of email contact?
 8        A.   Not that I recall.
 9        Q.   Did Dr. Poole advise you after the week that
10   had passed that he had received any additional threat
11   other than what was reported for on the day of this
12   classroom exercise?
13        A.   Not that I recall.
14        Q.   How is a student, under FAU regulations and
15   policies, restricted from class in general?
16        A.   I don't know in general how that's done.
17        Q.   Under the Student Code of Conduct, what is the
18   policy to restrict a student from class?
19             MS. CHATTERGOON:  Object to form.
20        A.   It's not a policy.  It is an option for what
21   could be done after you are determining that something
22   needs to be done, so you have an option, as the person
23   who is implementing the Code of Conduct, to restrict the
24   person from class.
25   BY MS. WYDLER:
```

Rozalia Williams Vol 1
February 24, 2016                    76

```
 1        Q.   And the restriction from class, is that a
 2   serious measure?
 3        A.   It's an emergency measure.
 4        Q.   So under the Code of Conduct, the emergency
 5   measure provisions would be applied in order to restrict
 6   a student from class?
 7        A.   Yes.
 8        Q.   Do you recall offhand what provision that would
 9   be in the Student Code of Conduct?
10        A.   No.  But if we have the code, I can show it to
11   you.
12             (Thereupon, Defendant's Exhibit Number 3,
13        Student Code of Conduct, was marked for
14        identification.)
15   BY MS. WYDLER:
16        Q.   Is this the Code of Conduct for FAU?
17        A.   Yes, it is.
18        Q.   We're marking that as Defendant's Exhibit 3.
19        A.   I don't know what version it is, but this
20   appears to be -- it's updated pretty often.
21             MS. CHATTERGOON:  You have something else
22        attached to the back.  Do you want that in the
23        exhibit?
24             MS. WYDLER:  No.
25   BY MS. WYDLER:
```

Rozalia Williams Vol 1
February 24, 2016                                    77

```
 1        Q.   So let me ask you, now that you have the Code
 2   of Conduct in front of you, if you could direct me to
 3   the provision involving emergency measures.
 4        A.   Well, on Page 8 under number nine, emergency
 5   measures.
 6             MS. CHATTERGOON:  Just for the record, this
 7        goes 1, 3, 4, 8, 9.
 8             MS. WYDLER:  It was probably copied that
 9        way.
10             MS. CHATTERGOON:  Yeah.  It seems to be
11        missing portions of the code.
12             MS. WYDLER:  Okay.
13             MS. CHATTERGOON:  It's not a complete copy
14        of the code.
15   BY MS. WYDLER:
16        Q.   Where in the Emergency Measures in the page
17   that you have would it apply?
18        A.   It's not on this page.  It's on the next page.
19        Q.   On the next page.
20        A.   Here under A, "The Dean of Students or designee
21   has the authority to take appropriate immediate action
22   against a student who poses a danger of imminent or
23   serious physical harm to himself/herself or others at
24   the University, or where the Dean of Students determines
25   that an emergency exists which affects the health,
```

Rozalia Williams Vol 1
February 24, 2016                            78

```
 1   safety or welfare of a student or the University

 2   Community.  Emergency Measures include, but are not

 3   limited to, one or more of the following."

 4         If you go down to number three, "If the Dean of

 5   Students determines that other interim measures are

 6   appropriate to protect the health, safety or welfare of

 7   the student or the University Community, the Dean of

 8   Students may restrict or bar attendance of any or all

 9   classes."

10     Q.   Now, I think when you were reading just for

11   record purposes, you're saying that the provision that

12   applies is 9(a)3; is that correct?

13     A.   And (b).

14     Q.   9(a)3 a and b?

15     A.   Right.  "Restrict or bar access or contact with

16   individuals in the University Community."  Actually,

17   it's all of the options, a through e.

18     Q.   Okay.  And so three would -- subsection 9(a)3

19   would be the emergency measure that you're relying upon

20   in order to restrict Ryan Rotela from the class, as well

21   as access or contact with individuals in the University

22   community?

23     A.   Right.

24     Q.   And under number three, it says "the Dean of

25   Students;" is that correct?
```

Rozalia Williams Vol 1
February 24, 2016                              79

1      A.   Right.  And the Dean of Students is defined as

2  the Associate Deans, and under (a), it says "Dean of

3  Students or designee," and that would be me.

4      Q.   Based on your reading of these provisions of

5  the Student Code of Conduct, you believe that in order

6  to take measure 9(a)3 in any one of those subsections,

7  either a through e, it is within your authority as the

8  Associate Dean to take that measure?

9      A.   Yes.

10          MS. CHATTERGOON:  Object to form.

11  BY MS. WYDLER:

12      Q.   Even though under number three it specifically

13  says "if the Dean of Students"?

14      A.   Yes.  And the reason that is because in the

15  very beginning, and I don't know if it's here in this

16  copy, but under Definitions, it's -- under Definitions,

17  I don't see it in this copy, but in the code that I

18  implemented under Definitions, it says that -- yeah,

19  this is not the code that I was operating under.  This

20  is another code, but there is a section in the code --

21  in the code that I implemented for this case that says

22  the Dean of Students means the associate is defined as

23  the Associate Dean of Students as well.  I don't see

24  that in here.  Again, pages are missing.

25      Q.   And I'm sorry that pages are missing on the

Rozalia Williams Vol 1
February 24, 2016                          80

1    copies for the deposition.

2       A.   Yeah.  It goes to k.  But the Code of Conduct

3    defines Dean of Students as the Associate Dean of

4    Students.

5       Q.   So what's the purpose in three -- 9(a)3

6    specifically identifying Dean of Students, to your

7    knowledge?

8       A.   I don't know.

9       Q.   And you're saying that this Code of Conduct is

10   not the operable Code of Conduct that was in use in

11   February of 2013?

12      A.   That I don't know.  I just know that these

13   copies do not have the definition of Dean in it, so

14   these copies is not -- that appear before me.  There may

15   be pages missing where it is there, but under 9(a),

16   which (a) is the overall paragraph, it says, "The Dean

17   of Students or designee has the authority to take

18   appropriate immediate action against the student who

19   poses a danger of imminent or serious physical harm to

20   himself or others and determines that an emergency

21   exists."

22           So independent of what comes under paragraph

23   (a), I believe 9(a) gives me the authority.

24      Q.   And that would -- assuming it gives you the

25   authority, that would give you the authority to issue an

Rozalia Williams Vol 1
February 24, 2016                          81

```
 1    interim suspension, correct?

 2         A.    I didn't issue a -- yes, it would, but I didn't

 3    issue an interim suspension.

 4         Q.    And there's nothing in 9(a)1 that discusses the

 5    Dean of Students to make the determination, correct?

 6         A.    Under this 9(a) it authorizes a designee to

 7    implement one.

 8         Q.    And two also gives the authority to a designee

 9    to remove from a University housing, correct?

10         A.    Correct.

11         Q.    What did you do after you spoke with Dr. Poole

12    the second time?

13         A.    After I talked to Dr. Poole, I looked at all of

14    the information that I had gathered from the

15    investigation and I tried to contact Dr. King to talk to

16    him about what I had concluded.

17         Q.    And when you say you tried to contact him, what

18    did you do to contact him?

19         A.    I called his cell phone, I called his office

20    phone, I emailed him.

21         Q.    This is that Friday?

22         A.    Yes.

23         Q.    That was a Friday, and were you able to talk to

24    him that Friday?

25         A.    No.
```

Rozalia Williams Vol 1
February 24, 2016                                    82

1      Q.   Did you leave him a voicemail?

2      A.   Yes, I did.

3      Q.   Okay.  Do you remember what you said on the

4   voicemail?

5      A.   I needed to consult with him on a conduct case.

6      Q.   And why did you need to consult with him?

7      A.   Because I was going to issue a Notice of

8   Charges letter.

9      Q.   And prior to issuing any Notice of Charges

10  letter, you consult with Dr. King?

11     A.   Yes.

12     Q.   But you had the authority to issue the Notice

13  of Charges letter without consulting with him?

14     A.   Correct.

15     Q.   No word from Dr. King, correct?

16     A.   Correct.

17     Q.   On Friday?

18     A.   Correct.

19     Q.   Saturday comes along.  Did you hear back from

20  Dr. King?

21     A.   I don't know what day it was.  He sent me an

22  email and said he would get on -- I think it was

23  Saturday the -- was it March 9th was the Saturday?  Yes.

24  He said he would call me this weekend, that weekend.

25          (Thereupon, Defendant's Exhibit Number 4, Email

Rozalia Williams Vol 1
February 24, 2016                    83

1          Chain, was marked for identification.)

2     BY MS. WYDLER:

3          Q.   This seems to be two emails in one document,

4     correct?

5          A.   Correct.

6          Q.   The bottom one, is this the email that you were

7     referring to that you sent on Friday, March 8th, 2013 at

8     5:46 p.m.?

9          A.   Correct.

10         Q.   And this was "Consultation on Conduct Case."

11    In this particular email, Ryan Rotela was not identified

12    by name; is that fair to say?

13         A.   Correct.

14         Q.   But we are talking about Ryan Rotela in here?

15         A.   Yes.

16         Q.   And then Dr. King responded to you on Saturday

17    at 4:39 p.m.; is that correct?

18         A.   Correct.

19         Q.   And he indicated that he would call you this

20    weekend.  In your email to him on Friday, March 8th, you

21    indicated that you were investigating a student who

22    allegedly engaged in threatening behavior toward a

23    professor, that's what it says in the email, correct?

24         A.   Correct.

25         Q.   "I have not formally charged the student;" is

Rozalia Williams Vol 1
February 24, 2016                        84

```
 1   that correct?

 2       A.   Correct.

 3       Q.   When did you decide to formally charge the

 4   student?

 5       A.   I decided to charge the student later on that

 6   evening.  I waited until maybe a couple of hours to wait

 7   to hear from him.

 8            I decided to charge the student because the

 9   class was on Monday and it was already after 6:00 and if

10   we had to get a Notice of Charges letter out for him to

11   get it in time through the mail, that I had to mail it

12   on Friday, the Notice of Charges letter.  I had to mail

13   it that evening so that it would get there on Saturday

14   or on Monday to let the student know that he should not

15   attend class.

16       Q.   So on Friday, without the consultation of

17   Dr. King, if I'm understanding correctly, you issued the

18   Notice of Charges letter?

19       A.   Yes.

20       Q.   And the Notice of Charges letter included

21   emergency measures on it?

22       A.   Yes, it did.

23       Q.   According to your recollection of the Code of

24   Conduct, are emergency measures to be issued a separate

25   letter?
```

Rozalia Williams Vol 1
February 24, 2016                          85

```
 1        A.    According to the code, we're --

 2        Q.    To the best of your recollection.

 3        A.    Repeat the question.

 4        Q.    When a student is going to be issued emergency

 5   measures against them, is there a separate letter that

 6   goes out to them informing them of those measures that

 7   are going to be taken?

 8        A.    I don't know if there's a separate letter, but

 9   throughout the two years that I had been doing that and

10   had issued emergency measures, it was included in the

11   Notice of Charges letter, and I had done that in the

12   past and that is what the practice was and that's what I

13   did in this situation as well.

14        Q.    So you included the emergency measures within

15   the Notice of Charges letter?

16        A.    Yes.

17        Q.    In general -- and we'll go back to Rotela.   In

18   general, when a student is placed on interim -- have you

19   ever placed a student on interim suspension?

20        A.    No, not interim suspension, no, but I have

21   taken emergency measures.

22        Q.    Okay.  And what emergency measures are you

23   referring to?

24        A.    What was under 9(a)3.

25        Q.    Barring a student from class and barring them
```

Rozalia Williams Vol 1
February 24, 2016                          86

```
 1    from speaking to other University contacts?
 2        A.   Yes.
 3        Q.   So just so I understand, as far as your tenure
 4    is concerned as being an Associate Dean of Students, you
 5    never issued an interim suspension letter?
 6        A.   No.
 7             (Interruption.)
 8    BY MS. WYDLER:
 9        Q.   If you need to get that, I can take a break.
10        A.   No.  I'll turn it off.
11        Q.   So you never issued an interim suspension
12    letter.  Had you ever issued a letter for emergency
13    measures consisting of an interim removal from
14    University housing?
15        A.   No.
16        Q.   And had you ever issued any kind of temporary
17    revocation of a student's privileges?
18        A.   Yes, I have.
19        Q.   What would that entail?
20        A.   That would entail restricting or barring them
21    from a certain area of campus or because of their --
22    what they did in that particular area.
23             Well, I may not have issued it, but it was --
24    might have been part of a sanction in a different case.
25        Q.   Okay.  So do you recall actually issuing an
```

Rozalia Williams Vol 1
February 24, 2016                      87

```
 1   emergency measure letter where you restricted the
 2   student's access to a separate area on campus?
 3       A.   Not a letter, but it would have been part of a
 4   mutual agreement that I made with the student.
 5       Q.   During your tenure as Associate Dean, had a
 6   student ever been placed on interim suspension?
 7       A.   Yes.
 8       Q.   And that never fell within your Broward --
 9       A.   No.
10       Q.   Was that a situation where the Dean of Students
11   had issued the interim suspension for a Broward Campus
12   student?
13       A.   I don't know.  I'm not aware of an interim
14   suspension that would have occurred.
15       Q.   So for the three years that you were Associate
16   Dean, you don't remember?
17       A.   For the cases that were my responsibility, that
18   I investigated and that I processed under the Student
19   Code of Conduct, no.
20       Q.   No, no interim suspensions had been issued?
21       A.   I have never issued an interim suspension.
22       Q.   And interim suspensions, that would apply
23   University-wide, is that what that means?
24       A.   What do you mean?
25       Q.   Barring the individual from being on campus,
```

Rozalia Williams Vol 1
February 24, 2016                        88

1    any campus, University-wide, for an interim suspension?

2        A.   Well, according to this, a student under

3    interim suspension may not attend classes, may not be or

4    come onto University property, may not participate in

5    any University activities or organizations, and may not

6    use University facilities, equipment or resources.

7             (Thereupon, Defendant's Exhibit Number 5,

8        3/8/13 Email/Note, was marked for

9        identification.)

10   BY MS. WYDLER:

11       Q.   I've handed you what's been marked as

12   Defendant's Exhibit 5.  You've seen this before, right?

13       A.   Correct.

14       Q.   The first page of the exhibit is the email from

15   you to Ryan Rotela; is that correct?

16       A.   Correct.

17       Q.   And that was sent on March 8th at 6:52 p.m.?

18       A.   Correct.

19       Q.   And on the email that's been marked as

20   Exhibit 4, you emailed Corey King for consultation on

21   the charges at 5:46 p.m.?

22       A.   Correct.

23       Q.   So you waited approximately an hour before

24   issuing the Notice of Charges, right?

25       A.   No.  I waited longer than that.  I started

 1  calling Corey earlier in the day.  I didn't email him

 2  until later in the day, but I had started calling him

 3  and trying to get in contact with him for a longer

 4  period of time.

 5      Q.   Okay.

 6      A.   And it was an hour after I sent the email, or

 7  whatever the difference is in his email and mine was for

 8  him to respond to the email.

 9      Q.   But for practicality purposes, you needed to

10  get the letter out to put in the mail, so you made the

11  decision to issue the Notice of Charges letter?

12          MS. CHATTERGOON:  Object to form.

13      A.   After hours, after the day had concluded and

14  here about 7:00 that night staying there on a Friday

15  night until after 7 waiting to hear from Dr. King, I

16  made the determination that I needed to get it to the

17  Post Office.

18  BY MS. WYDLER:

19      Q.   Okay.  Well, was this placed in the Post Office

20  or emailed to the student?

21      A.   I personally -- I emailed the student and I

22  personally took it to the Post Office so he would get it

23  in writing.

24      Q.   Is there a requirement that both forms of

25  transmission be made, email and U.S. mail?

Rozalia Williams Vol 1
February 24, 2016                    90

```
 1        A.   I don't know, but I do both to cover my bases.
 2        Q.   And on the email that you sent to Ryan Rotela,
 3   you attached the Notice of Charges letter that's dated
 4   March 8th, right?
 5        A.   Correct.
 6        Q.   And so as part of the Notice of Charges letter,
 7   what typically goes into a Notice of Charges letter?
 8        A.   Everything that is here.
 9        Q.   Is there a standard form for the Notice of
10   Charges letter?
11        A.   Yes.
12        Q.   What are the -- for lack of better words, what
13   are the entries that are changed on a form letter for
14   the Notice of Charges?
15        A.   Generally, it is the charge, the specific
16   charge.  If you look at his letter, his charges letter
17   N, I think the charges go way past the normal alphabet
18   and we're in double digit alphabets, but the
19   determination of what charge it is changes, and if
20   you're implementing emergency measures, that will
21   change.
22        Q.   Obviously, the date and name of student,
23   correct?
24        A.   Correct.
25        Q.   And when you say "if you're implementing
```

Rozalia Williams Vol 1
February 24, 2016                                    91

```
 1    emergency measures," you're referring to third paragraph
 2    of the Notice of Charges letter?
 3         A.   Yes, the portion that's underlined.
 4         Q.   Where it says, "In the interim, you may not
 5    attend class (SPC 3710) or contact any of the students
 6    involved in this matter, verbally or electronically or
 7    by any other means," is that what you're referring to?
 8         A.   Correct.
 9         Q.   You would disagree with any position that you
10    were not allowed to include that interim measure on this
11    Notice of Charges letter?
12         A.   Yes.  In the Code of Conduct, the page that's
13    missing, it specifically says that any student who is
14    given emergency measures shall be notified in writing,
15    and that's the other reason, so it's in the section
16    after the page that's missing, nine, under another -- on
17    the other page.  It says if you are going to implement
18    emergency measures, that notification shall be given in
19    writing.
20         Q.   And you've understood the Code of Conduct to
21    include that in the Notice of Charges that is the
22    writing where you would include the emergency measures?
23         A.   That is what I had done in other situations
24    where I implemented emergency measures.  It was placed
25    in the Notice of Charges letter from over a two-year
```

Rozalia Williams Vol 1
February 24, 2016                                    92

```
 1   period of me making emergency measures.  That's where it
 2   was placed every time, in the Notice of Charges letter,
 3   and again, at the directive of and in consultation with
 4   the Crisis Awareness Committee and in consultation with
 5   Dr. King.
 6        Q.  All right.  Let's talk about those other
 7   instances where you implemented emergency measures on
 8   Notice of Charges.  You said there's more than one
 9   occasion?
10        A.  Yes.
11        Q.  Okay.  And tell me the first instance, if you
12   recall.
13        A.  I don't know in what order.  There were three.
14   If you have the examples, I can go through them with
15   you.
16        Q.  Well, just independent recollection and we'll
17   go through the exhibits.  So on the first instance, in
18   any order, what do you remember of implementing
19   emergency measures?
20        A.  You say "the first instance" and then you say
21   "in any order."
22        Q.  The first thing that you want to talk about.
23        A.  Okay.  I remember there was a student who had
24   engaged in threatening behavior and he threatened the
25   professor and he threatened students and he was
```

Rozalia Williams Vol 1
February 24, 2016                              93

1   perceived to be a threat to students who I issued an

2   emergency measure for him not to come back to class.

3   And I sent him a Notice of Charges letter and I included

4   that in his Notice of Charges letter.

5       Q.   Now, you said before that when you issued these

6   Notice of Charges letter, there was the committee

7   meeting --

8       A.   Yes.

9       Q.   -- with all the associates?

10      A.   Yes.

11      Q.   In this particular instance, there was the

12  committee meeting that took place, correct?

13      A.   Yes.  I submitted his name, and his name was

14  placed on the agenda and his case was discussed.

15      Q.   And what was the threatening behavior, if you

16  remember?

17      A.   He threatened to hit a professor or to fight

18  students in his group.  I'm not remembering all the

19  specifics.  He went downstairs and he tore up a plant.

20  He fought the plant or the tree as though he was

21  fighting an individual.

22      Q.   Do you remember if ten days had already passed

23  before the time that the initial incident had gotten to

24  you?

25      A.   I don't remember.

Rozalia Williams Vol 1
February 24, 2016                                94

1        Q.   Do you remember if you took these immediate

2    emergency measures right after the incident?

3        A.   I don't recall.

4        Q.   What's another example that you have?

5        A.   Another example is where a student was stalking

6    a student, another student who was tutoring her.  She'd

7    expressed interest in him, and it was unwanted behavior,

8    and in the Notice of Charges letter, I instructed her

9    not to contact the student.

10       Q.   So in that particular instance of the Notice of

11   Charges letter, there was no barring from class, just no

12   contact?

13       A.   Correct.

14       Q.   Do you have any other?

15       A.   The third one was a situation where there was a

16   student who was married who had a relationship with

17   another student outside of her marriage, and I don't

18   remember on that one whether it was no contact with the

19   student or -- yeah, I think it was no contact with the

20   student or it was -- yeah, it was again no contact with

21   the student.  I think it was not to come on campus.

22       Q.   Was it no contact with the student or not to

23   attend a class?

24       A.   I don't remember which one it was.  Between the

25   three of them and them being four or five years ago, I

Rozalia Williams Vol 1
February 24, 2016                        95

```
 1    can clarify that if I see the letters.

 2        Q.   Okay.  And on the second one that we were

 3    talking about with the student that was issued a no

 4    contact on the Notice of Charges, that was made in

 5    consultation with the SCAC?

 6        A.   I don't remember.  I don't think so.  I think

 7    that was something that I did either in consultation

 8    with Dr. King directly.  I'm not certain if that came to

 9    the meeting or not.

10        Q.   And do you remember on the unwanted behavior if

11    the police -- an outside agency was involved in relation

12    to, you know, the unwanted behavior from one student to

13    the other?

14        A.   I don't recall.

15        Q.   On, for lack of better words, the student who

16    was having the affair with the other student, the third

17    incident that we were talking about, that -- there was

18    an SCAC meeting in consultation before issuing that

19    Notice of Charge?

20        A.   I don't recall.

21        Q.   And do you remember if any outside police

22    agency had been involved related to those threats?

23        A.   I don't recall.

24        Q.   Do you remember on the third instance if the

25    emergency measures were implemented shortly after it
```

Rozalia Williams Vol 1
February 24, 2016                    96

1   being reported and investigated by you?

2       A.   I don't know the time frame that it was done

3   in.

4       Q.   And on the second incident where the -- there

5   was the threatening behavior towards the student who had

6   been tutoring the other student, do you remember the

7   time frame between when you -- when it was reported to

8   you, you investigated and implemented the emergency

9   measures?

10      A.   I don't recall.

11      Q.   I don't have copies of this but we can make

12  some.

13          (A recess was taken from 11:55 a.m.-12:01 p.m.,

14      after which the following proceedings were had:)

15          (Thereupon, Defendant's Exhibit Number 6,

16      3/23/11 Letter, was marked for identification.)

17  BY MS. WYDLER:

18      Q.   So I'm handing you a couple of documents marked

19  as one exhibit.  I think you had an opportunity to look

20  at them while we were talking.  Do they look familiar to

21  you?

22      A.   Yes.

23      Q.   The student that you had mentioned that engaged

24  in threatening behavior and had picked up a potted

25  plant, which Notice of Charge letter applied to that

Rozalia Williams Vol 1
February 24, 2016                          97

```
 1   student?
 2        A.   The very first one.
 3        Q.   So this one --
 4        A.   He didn't pick up a potted plant.  He assaulted
 5   a plant that was in the ground.
 6        Q.   Okay.  So the March 23rd, 2011 Notice of
 7   Charges letter, it states here as the interim measure,
 8   second to the last paragraph, "You may not attend your
 9   URP 4979 class which meets on Fridays from 6 p.m. to
10   8:50 in HE 613."
11        A.   Correct.
12        Q.   That's the interim measure --
13        A.   Emergency measure.
14        Q.   The emergency measure.  After reviewing this
15   Notice of Charges letter, did any additional facts come
16   to you?
17        A.   I think he -- I'm not certain of the -- I don't
18   recall the specific outcome, but I think he did come in
19   afterwards and I think we entered into a mutual
20   agreement with him or he was reassigned to another
21   class.  I don't recall.
22             But after the Notice of Charges, you do have
23   them come in and have a consultation, and I just really
24   don't recall what the outcome was, but I think he either
25   was assigned to another class and we entered into a
```

Rozalia Williams Vol 1
February 24, 2016                    98

1   mutual agreement.

2       Q.   And the Notice of Charges letter went out on

3   March 23rd, 2011.  If you turn to the next document in

4   this exhibit, there's an SIT agenda?

5       A.   Correct.

6       Q.   Dated February 10th?

7       A.   Correct.

8       Q.   And the interested student with the initials JC

9   case manager Williams, is that the same student that's

10  referenced in this Notice of Charges letter?

11      A.   Yes, it is.

12      Q.   Okay.  The next Notice of Charges letter that

13  we have here is dated October 3rd, 2011 with the student

14  initials of VTN?

15      A.   Right.

16      Q.   Would that be the second or the third incident

17  that you were explaining to me, if you remember?

18      A.   March, October.  The second.  Wait.  Let me

19  look at the third.  No.  This would have been the third

20  -- 2012, the second one, correct.

21      Q.   Just for clarification purposes, the

22  October 3rd, 2011 Notice of Charges letter was in

23  reference to the incident of the student engaging in

24  unwanted behavior towards her tutor, her student tutor?

25      A.   Yes.

Rozalia Williams Vol 1
February 24, 2016                              99

1       Q.   And the interim measures that were implemented

2   are in the penultimate paragraph?

3       A.   The part that's in bold underlined.

4       Q.   It says, "In the interim, you may not, under

5   any circumstances, contact any of the FAU students

6   involved in this matter, verbally or electronically,"

7   correct?

8       A.   Correct.

9       Q.   And after reviewing this document, did any

10  additional facts come to light?

11      A.   Yes.  When I met with the student, the student

12  realized the seriousness of the charges and I believe we

13  entered into a mutual agreement.

14      Q.   But prior to the issuance of the Notice of

15  Charges letter, you met with the student during the

16  Investigation Conference?

17      A.   Correct.

18      Q.   And you still don't recall if the student case

19  was discussed with the SIT or the SCAC?

20      A.   I don't recall.  I'm certain it was, but

21  whether it was before or after.  Routinely they're

22  discussed.  And if it's not with the committee, it is

23  with Dr. King.

24      Q.   All right.  So by process of elimination, the

25  third Notice of Charges letter leads us to the third

Rozalia Williams Vol 1
February 24, 2016                              100

1    instance that you were describing earlier with the

2    student initials of OS?

3         A.   Right.

4         Q.   And this was the affair case?

5         A.   Yes.

6         Q.   And after reviewing this document, did any

7    other information, additional facts come to light?

8         A.   Yes.

9         Q.   What do you remember?

10        A.   The student admitted that he was contacting or

11   in an affair with this -- with the other student, and I

12   believe we entered into a mutual agreement that he would

13   not contact her or --

14        Q.   After reviewing these three Notice of Charges

15   -- strike that.

16             Let's take a look at the Notice of Charges

17   letter issued to Ryan Rotela which should be 5, the

18   second page to 5.

19             With respect to Ryan Rotela, is it fair to say

20   that you implemented two separate emergency measures,

21   which was not to attend class and to not contact any

22   students?

23        A.   Correct.

24        Q.   And with respect to the three other Notice of

25   Charges letter, the first one, the interim measure that

Rozalia Williams Vol 1
February 24, 2016                    101

1   was issued was restricting attendance to class, correct?

2       A.   Correct.

3       Q.   And on the second Notice of Charges letter,

4   this was solely a no-contact restriction with the

5   students, correct?

6       A.   Correct.

7       Q.   And on the third instance, in the interim, you

8   implemented the emergency measure to not contact any

9   other student?

10      A.   Correct.

11      Q.   You would agree with me then that any of the

12  Notice of Charges letters that have been included in

13  Composite 6 do not include the two emergency measures

14  that you implemented against Ryan Rotela?

15      A.   It goes back to the uniqueness of every case.

16  So in these instances, there was not a need to do both

17  because the circumstances did not warrant it.

18           However, they were still related to someone

19  being threatened or potentially harmed as a result, so I

20  wanted to prevent an altercation, I wanted to prevent

21  someone from being hurt or harmed.

22           In this situation, it warranted both because

23  not only did the witness indicate that he was afraid

24  because they had been riding together and he knew -- and

25  Ryan knew that he was a witness, that he was afraid.

Rozalia Williams Vol 1
February 24, 2016                    102

```
 1   There were students in the class who later indicated
 2   that they were afraid.
 3        But in this particular instance, it was to
 4   protect the witness who had been in the military and
 5   said he had PTSD and he did not want to be involved in
 6   any kind of dispute, he knew what had happened was
 7   wrong, but because they had previously been friends, he
 8   didn't know how Ryan was going to respond in the future
 9   and he did not want to have an altercation with Ryan
10   because he disagreed with what Ryan had done after
11   class.
12        So as a result of the witness information that
13   he shared during the investigation student to student, I
14   restricted him from contacting other students.  And with
15   regard to the class, it was based on Dr. Poole's request
16   that he not come to class because he felt, based on a
17   culmination of his experiences, that he would be
18   disruptive.  That's why both of these are in here, to
19   protect the student and to protect the other students in
20   the class and the faculty member.
21        Q.   Did you follow-up with Cuthbert?
22        A.   Yes.
23        Q.   And did he have contact with Ryan Rotela?
24        A.   I don't recall.
25        Q.   Did they ride together to school still?
```

Rozalia Williams Vol 1
February 24, 2016                    103

1      A.   I don't know.  I don't recall.

2      Q.   If you've got the top page of Exhibit 5, if you

3   could just read out for me your notation only because

4   it's a little difficult for me with the copying.

5      A.   The notation is that I left a voicemail at 6:55

6   p.m. at the number 954-825-1036.  That's Ryan's phone

7   number.  I left that at five minutes to 7.  I waited.

8   Ryan called me at 7:12.  I told him that -- I told him

9   that I needed to schedule the --

10          MS. CHATTERGOON:  She wants you to read the

11      note.

12      A.   Okay.  Ryan called.  Will let me know on Monday

13   if he can make the meeting.  It may conflict with his

14   work schedule.  Asked about his class.  I told him he

15   cannot go to class because the professor believed he

16   allegedly violated the code, and Ryan does not believe

17   he engaged in behavior that violates the code.  Told him

18   he can waive his right to a hearing sooner than the five

19   days if he needs to reschedule.

20          At 7:18 I called Dr. Poole and informed him

21   that Ryan should not come to class.

22      Q.   Okay.  In this third conversation with

23   Dr. Poole, what else was discussed with him?

24      A.   I really don't recall.

25      Q.   Okay.  Other than what was in your notation for

Rozalia Williams Vol 1
February 24, 2016                    104

1    the 7:12 p.m. conversation with Ryan Rotela, was there

2    anything else that you remember independent of your note

3    in that conversation?

4         A.   No, other than the fact that he said he may

5    have a conflict and so we talked about his schedule.

6              MS. WYDLER:  Do you want to take a break now?

7              MS. CHATTERGOON:  Sure.  If it's a good

8         time.

9              MS. WYDLER:  Yeah, it's a good time.

10             (A lunch recess was taken from 12:15

11        p.m.-1:14 p.m., after which the following

12        proceedings were had:)

13             (Proceedings continued in Volume 2.)

14

15

16

17

18

19

20

21

22

23

24

25

Rozalia Williams Vol 1
February 24, 2016

1

**$**

**$1,500**   6:14

**(**

**(a)**   79:2
  80:16,23
**(b)**   78:13

**1**

**1**   53:1,5
  70:22 77:7
**10:19**   46:3
**10th**   98:6
**11**   28:10
**11/13/53**   16:3
**11:55**   96:13
**12**   31:18
  59:21 62:20
**12:15**   104:10
**13**   5:15
**1970**   9:10
  10:5
**1972**   7:12
**1977**   8:8
**1993**   9:21
**1:00**   59:21
**1st**   74:20

**2**

**2**   67:3,4
  104:13
**2/26**   54:10
**2/28/13**   53:2
**20**   12:12
  14:19
**20-year**   12:17
**2000**   10:22
  14:6,7
**2001**   17:12
**2003**   8:22

**2007**   19:12
**2008**   19:13
  21:13,21
  25:21,24
  26:6,7,11
  27:1,2
**2009**   21:13
  26:17
**2009-2010**
  25:18
**2010**   22:1
  25:17 26:9,13
  27:5,7 28:9,
  10 30:15
**2011**   27:9
  97:6 98:3,13,
  22
**2012**   28:9,12
  98:20
**2013**   53:12
  54:6,7 73:10
  75:3 80:11
  83:7
**23rd**   97:6
  98:3
**25**   54:6
**25th**   53:24
  54:6,15
**26**   54:16 55:3
**28**   53:12
**28th**   54:7,16
  55:10 57:14
  63:25 74:18

**3**

**3**   76:12,18
  77:7
**3/23/11**   96:16
**3/8/13**   88:8
**30,000**   19:2
**30s**   8:18
**31-32,000**
  19:2
**34**   54:24,25
  55:3

**35**   55:1
**36**   55:10
**3710**   91:5
**3725**   5:13
  9:23
**3rd**   98:13,22

**4**

**4**   62:13 77:7
  82:25 88:20
**40s**   19:6
**43**   7:23
**4979**   97:9
**4:39**   83:17

**5**

**5**   88:7,12
  100:17,18
  103:2
**5:46**   83:8
  88:21

**6**

**6**   96:15 97:9
  101:13
**613**   97:10
**62,000**   20:19
**6:00**   84:9
**6:52**   88:17
**6:55**   103:5

**7**

**7**   54:24 89:15
  103:7
**70**   10:7
**72**   9:10,17
  10:8
**73**   9:17
**74**   7:14 12:14
**75**   12:14
**75,000**   23:7

**77**   8:16
**79**   8:17
**7:00**   89:14
**7:12**   103:8
  104:1
**7:18**   103:20
**7th**   62:13,23
  63:12,23,25
  64:16 70:25
  71:3 74:18

**8**

**8**   54:25 77:4,
  7
**8,000**   31:15
**83**   8:18
**87**   10:18,20
**8:50**   97:10
**8th**   71:3
  73:10 74:20
  75:3 83:7,20
  88:17 90:4

**9**

**9**   77:7
**9(a)**   80:15,23
  81:6
**9(a)1**   81:4
**9(a)3**   78:12,
  14,18 79:6
  80:5 85:24
**93**   11:16
  13:8,9
**93-'94**   10:21
**95**   9:21
**954-825-1036**
  103:6
**9th**   82:23

**A**

**A-l-i-c-e-m-a-
u-d-e**   36:8

Rozalia Williams Vol 1
February 24, 2016

2

A.J.   28:25
  29:6,10 30:6
a.m.   46:3
a.m.-10:30
  46:3
a.m.-12:01
  96:13
Abbate   27:11,
  13 28:2,3,11
  30:16,20
academic
  14:14,18
  23:20 25:18
  51:19 58:6
  72:8
accept   14:22
  15:3 43:10
accepts   43:17
access   78:15,
  21 87:2
accordance
  52:7
accurate
  41:10
acknowledging
  67:19
Acted   37:11
action   77:21
  80:18
actions   45:18
  73:13
activities
  27:15 31:21
  88:5
activity
  57:22 58:6
actual   33:16
  50:12 54:6
addition   20:8
additional
  52:3 73:24
  75:10 97:15
  99:10 100:7
address   5:12
administration
  10:11,12,14,
  15 13:17

45:18
Administrative
  35:23
admit   42:25
admits   43:17
admitted
  12:24 100:10
advantage
  71:19
advertising
  22:16
advice   5:2
advise   59:3
  75:9
affair   95:16
  100:4,11
Affairs   12:22
  17:15 18:3
  19:10 20:5
  21:16,19
  25:10 26:8,
  13,16 27:15
  28:17 30:10
  31:14,17,19,
  22,24 51:18,
  19 58:6 62:19
affects   77:25
afraid   68:4
  101:23,25
  102:2
African   16:10
agency   47:4
  95:11,22
agenda   33:4
  93:14 98:4
ages   8:14
agree   43:21
  59:23,25 60:2
  65:6 101:11
agreed   65:8
agreement
  42:25 43:1,9,
  14,19 44:8,19
  87:4 97:20
  98:1 99:13
  100:12

ahead   41:16
  46:1 61:9
  72:20
Alicemaude
  36:6,8 38:12
  52:20 62:10
all-day
  61:20,22
alleged   55:4
  63:21
allegedly
  38:23 83:22
  103:16
allowed   15:5
  91:10
alphabet
  90:17
alphabets
  90:18
altercation
  51:16 101:20
  102:9
alternative
  43:23
Amended   46:10
  54:21
American
  16:10
and/or   36:24
Andrew   50:25
  59:10,20
  60:10
annual   25:7
Answers
  46:11,18
anytime   58:1
apologize
  13:1 71:1
appears   76:20
applied
  17:11,12
  19:17 22:8,
  13,15,17 76:5
  96:25
applies   78:12
apply   11:8
  17:14 19:14

77:17 87:22
appointment
  30:17,18
  38:11,12,19,
  22,24,25
  52:21,22
  66:14
appointments
  35:15,24
approve   57:22
  67:18
approved   58:6
approximately
  28:13 63:21
  88:23
area   14:13
  27:25 86:21,
  22 87:2
areas   14:18
  16:20
arise   33:6
Arnetta   7:6
  15:15,16,18
arrangements
  62:14
assaulted
  97:4
assigned
  97:25
assignment
  73:4
assist   35:18,
  21 36:19
  53:10
Assistant
  12:23 13:4,
  13,15 14:16
  17:15 18:2,6,
  20 35:23
associate
  13:18,21
  17:22 18:7,9,
  17,20 19:5
  21:19 22:6,24
  24:4,11,19
  25:25 26:14
  28:4,16,20,
  21,24,25

Rozalia Williams Vol 1
February 24, 2016
3

30:11,23
31:1,13 32:1,
14,22 35:2,17
36:25 41:7,13
43:2,5,15,16,
20 44:5 52:4
68:3 79:2,8,
22,23 80:3
86:4 87:5,15
**associates**
93:9
**assume** 22:20
38:2
**assuming** 21:6
23:3 43:13
80:24
**Atlantic** 12:8
**attached**
76:22 90:3
**attacked** 68:5
**attend** 9:11
64:21 84:15
88:3 91:5
94:23 97:8
100:21
**attendance**
78:8 101:1
**attended** 63:2
**attention**
33:8 34:10
**attorney** 4:22
46:12,16
**author** 53:8
**author's** 67:1
**authored** 67:8
**authority**
42:2 44:10
72:18,21
77:21 79:7
80:17,23,25
81:8 82:12
**authorizes**
81:6
**aware** 19:16
24:2 63:2,4
87:13
**Awareness**

32:18 34:13
92:4
**awful** 68:9,16

---

**B**

**bachelor's**
10:8,9,16
11:6
**back** 11:4,10,
18,20,21,22
12:25 13:16
27:5 42:23
52:11 56:4
63:16,18 69:1
71:12 73:18
74:13 76:22
82:19 85:17
93:2 101:15
**background**
10:1
**Bahamian**
16:13
**Baker** 7:8,11
9:1,19 37:11
**bar** 78:8,15
**barring** 85:25
86:20 87:25
94:11
**based** 33:17
41:4 43:8
48:12 57:1,5
61:10,11
62:14,22
69:21 72:2
79:4 102:15,
16
**bases** 90:1
**basis** 22:16
25:7 32:20
37:18,20 38:6
40:8 72:23
**Beach** 16:5
**began** 15:24
26:10 66:2
**begin** 37:16
**beginning**
79:15

**behavior**
34:5,9 37:5
38:9 39:21
43:22 44:13
51:23 56:11
64:15 69:7,22
71:17 72:4
73:7 74:7
83:22 92:24
93:15 94:7
95:10,12
96:5,24 98:24
103:17
**behaviors**
42:12
**believed**
45:18 103:15
**benefit** 9:25
**birth** 15:17,
20 16:2
**bit** 54:22
**black** 16:10
22:23
**board** 43:8
44:2,3
**Boca** 19:11
20:6,7 21:1
26:7 28:1,24
29:14 34:24,
25 43:25 44:1
**bold** 99:3
**book** 71:22
**born** 8:15,16,
17,18 16:4
**Boston** 9:8,20
11:25 12:1
**bottom** 83:6
**break** 5:5
63:6,8,11,16,
17 86:9 104:6
**breakdown**
37:10
**bring** 37:21
40:25 41:18
61:12
**brings** 44:2
**broad** 32:9

**broke** 46:20
**brought** 33:8
34:9 47:18
**Broward** 7:2
8:25 9:1,4
17:16 18:4,18
20:6 21:1
22:6,25 23:11
24:19 26:14
27:6,21,22
28:4,20
29:14,18,19,
24 30:4,5
31:13,15,24
36:25 47:12
87:8,11
**Brown** 19:23
20:2,9,12
21:5,15 24:2,
10 25:23,24
26:8,11,12,
16,18 27:2,3,
14 28:1 30:14
**Brown's** 46:11
**budgeting**
29:18 30:3
**business** 5:23
6:6,25 16:16
**butcher** 25:9
**Bynes** 22:15,
17,20,21
23:25

---

**C**

**C-u-t-h-b-e-r-
t** 60:15
**cadre** 6:9
**calculation**
54:13
**calculations**
54:5
**call** 6:11,23
15:25 47:21,
24 48:2 52:1
55:20 56:4
72:9,11,12
82:24 83:19

Rozalia Williams Vol 1
February 24, 2016                                4

called  15:19
  29:24 55:17
  57:17 59:13
  81:19 103:8,
  12,20
calling
  39:19,20
  89:1,2
campus  19:11
  21:1,2 23:23
  28:25 29:1
  30:7 32:15
  47:12 62:15,
  20 86:21
  87:2,11,25
  88:1 94:21
campuses
  17:16 18:18
  21:3 22:7
  23:12 24:19
  26:14 28:5
  29:1,14,15
  31:4,15,24
candidate
  22:14
candidates
  19:17 22:12,
  19
career  12:17
  15:6 31:20
carpools  68:4
carried
  49:16,22,23
  50:1,4,7,8
  51:3
carry  50:11
carrying
  35:21
case  32:12,13
  37:3,9,14,16,
  24 38:1 41:1,
  13 42:9,10,
  14,17 44:3
  46:2 48:1
  72:25 79:21
  82:5 83:10
  86:24 93:14
  98:9 99:18

  100:4 101:15
cases  32:15
  33:5 87:17
cell  81:19
Center  6:2
centralized
  14:13
Certificate
  15:18,20
Chain  83:1
Chair  33:3
  55:20 57:3
  66:7
Chair's  33:1
chaired  32:23
change  15:14
  20:22 42:18
  90:21
changed  21:7,
  8 90:13
characteristic
  37:7
charge  39:22
  41:22 45:1
  84:3,5,8
  90:15,16,19
  95:19 96:25
charged  83:25
charges  40:2,
  11,15,20,22,
  24 41:12,24
  42:3,21 44:21
  46:22 64:14
  82:8,9,13
  84:10,12,18,
  20 85:11,15
  88:21,24
  89:11 90:3,6,
  7,10,14,16,17
  91:2,11,21,25
  92:2,8 93:3,
  4,6 94:8,11
  95:4 97:7,15,
  22 98:2,10,
  12,22 99:12,
  15,25 100:14,
  16,25 101:3,
  12

charging
  39:24 45:6
Charles  19:23
  20:2,12 21:5
  46:11
Charlotte
  16:8
Chase  28:25
  29:6,10 30:6
CHATTERGOON
  24:22 30:25
  38:7 41:16
  45:7,21 46:1
  49:18 54:14
  72:20 75:19
  76:21 77:6,
  10,13 79:10,
  89:12 103:10
  104:7
check  37:13
Chief  31:14
  62:19
child  7:17
children  7:15
  8:9
Children's
  6:10 7:1
choose  15:3
chooses  43:23
  44:24
chose  14:22
circumstances
  42:12 99:5
  101:17
clarification
  98:21
clarify  95:1
class  48:11
  49:15 54:1,3
  56:17 57:21
  58:22 59:5,6,
  7,10,24,25
  60:20,21,22,
  25 61:1 63:2,
  9,16,18
  65:16,18,19,
  21,22,24,25
  66:3 67:17

  68:3,5,9,15,
  20,23 69:10
  71:12,13,17,
  18,20,21,24
  72:7,11,15,16
  73:4,16 74:6,
  8,9,12,13
  75:2,15,18,24
  76:1,6 78:20
  84:9,15 85:25
  91:5 93:2
  94:11,23
  97:9,21,25
  100:21 101:1
  102:1,11,15,
  16,20 103:14,
  15,21
classes  11:17
  78:9 88:3
classroom
  73:11 75:12
clear  42:5
  57:7 68:6
  69:5 70:17
clients  6:8
close  60:15
code  33:6,11
  34:3,6 35:16,
  22 36:4,20
  37:1,6,8,9,12
  38:10,24
  39:5,23 42:20
  43:18 44:22
  45:1,10,15,
  19,24 46:21
  51:11 52:16
  64:11 65:3
  71:9 75:17,23
  76:4,9,10,13,
  16 77:1,11,14
  79:5,17,19,
  20,21 80:2,9,
  10 84:23 85:1
  87:19 91:12,
  20 103:16,17
colleagues
  30:10
college  6:2
  17:1

Rozalia Williams Vol 1
February 24, 2016                                          5

college-bound
  6:16
collegial
  27:23 30:9
combination
  7:7 69:19
comments
  68:22
Commercial
  7:1,2,3
committee
  17:21 19:22
  23:10 33:8
  34:10,11,12,
  17,19 37:22
  40:25 41:19
  92:4 93:6,12
  99:22
committees
  32:8
communication
  58:13
community
  16:24 78:2,7,
  16,22
company  5:25
compensated
  17:2,4,6
complaining
  69:9
Complaint
  46:10,19
  54:21 71:2
complete  11:5
  45:15 77:13
completed
  11:23,24 28:6
compliance
  45:15,19
complied
  72:24
complies  46:9
Composite
  101:13
composition
  43:8

concentration
  10:15
concerned
  59:24 86:4
concluded
  81:16 89:13
conduct  31:2,
  10 32:2,8,10
  33:6,11 34:4,
  6 35:10,13,
  16,19,22
  36:21 37:1,6,
  8,9,12,16
  38:11,24
  39:6,23 41:1
  42:9,10,14,21
  43:18 45:10
  46:21 51:11
  52:16 64:11
  65:3 71:9
  75:17,23
  76:4,9,13,16
  77:2 79:5
  80:2,9,10
  82:5 83:10
  84:24 87:19
  91:12,20
conducted
  62:2
conference
  40:10 52:21,
  23 53:2 55:11
  62:12 64:6,8,
  13 70:23
  99:16
conflict
  103:13 104:5
connection
  57:7
consideration
  30:2 73:2,5
considered
  20:13
consist  34:17
consisted
  35:1
consistent
  34:6 42:20

consisting
  86:13
constituency
  20:8 23:11,17
constituent
  20:3
constituents
  23:10
constitute
  33:10
consult  37:23
  40:25 41:9
  82:5,6,10
consultation
  32:9,20 40:3,
  23 41:4 83:10
  84:16 88:20
  92:3,4 95:5,
  7,18 97:23
consulted
  31:2
consulting
  5:21,22,24
  16:16 82:13
contact  52:19
  56:1 74:16,21
  75:7 78:15,21
  81:15,17,18
  89:3 91:5
  94:9,12,18,
  19,20,22 95:4
  99:5 100:13,
  21 101:8
  102:23
contacted
  52:20
contacting
  100:10 102:14
contacts  86:1
continue  11:9
  15:5 65:7,8
  72:10
continued
  59:6 65:21
  104:13
continuing
  13:19 14:12,
  17

contracted
  6:20
controversial
  71:19,23 74:8
convenes  33:3
conversation
  55:15,19
  56:18 57:1,2,
  5,6,15 60:3,
  5,11 61:24
  69:15 70:4,8
  103:22 104:1,
  3
conversations
  71:20
coordinators
  31:22
copied  77:8
copies  80:1,
  13,14 96:11
copy  39:5
  66:18 77:13
  79:16,17
copying  103:4
cordial  56:16
Corey  21:10,
  17 88:20 89:1
correct  22:3,
  4 28:21 38:15
  44:23 45:25
  50:20 53:13,
  14 54:12 55:5
  60:7 62:24
  63:22 78:12,
  25 81:1,5,9,
  10 82:14,15,
  16,18 83:4,5,
  9,13,17,18,
  23,24 84:1,2
  88:13,15,16,
  18,22 90:5,
  23,24 91:8
  93:12 94:13
  97:11 98:5,7,
  20 99:7,8,17
  100:23 101:1,
  2,5,6,10

Rozalia Williams Vol 1
February 24, 2016

6

correctly
84:17
Council 6:10
7:2
counsel 6:16
counseling
16:19
county 8:24,
25 9:1,4
16:23,24
28:20
couple 37:25
84:6 96:18
court 4:6 5:3
cover 90:1
creating 21:2
crisis 32:13,
18 34:10 92:4
culmination
74:11 102:17
current 5:12
20:5
curriculum
58:5
Cuthbert
50:25 59:10,
20 60:10,12
102:21

_____

D
_____

danger 77:22
80:19
date 16:2
53:12,18,20,
21 54:16
55:10 60:8
62:12,24,25
63:21 64:1
73:11 90:22
dated 90:3
98:6,13
dates 54:23
63:15
David 22:15,
17,20,21
23:24

Davis 7:9
8:8,12,13,19,
23
day 4:24 15:9
20:3,7 23:10,
22 47:14 48:4
53:22 54:9
57:12 63:12
69:19 71:2
75:11 82:21
89:1,2,13
day-to-day
26:15 27:15,
24 30:8,9
days 54:8
63:21 64:1,3
73:11,16,23
93:22 103:19
deal 51:21
Dean 13:18,21
14:16 17:22
18:17 21:20
22:6,24 24:4,
11,19 25:25
26:14 28:17,
20,24,25
30:23 31:3,13
32:1,23 35:3,
17 36:25
41:7,13,18
43:2,5,15,16,
21 52:4
77:20,24
78:4,7,24
79:1,2,8,13,
22,23 80:3,6,
13,16 81:5
86:4 87:5,10,
16
Dean's 44:1,5
Deandre 48:21
55:22
Deans 28:21
30:11,23 31:1
32:14,22 35:2
40:4 79:2
decentralizati
on 14:15

decentralized
14:15
decide 84:3
decided 62:3
84:5,8
deciphering
67:13
decision
24:3,7,11
41:11,21,23
89:11
decision-
making 29:18
30:3
decisions
31:6
deemed 46:25
Defendant's
53:1,5 67:2,4
76:12,18
82:25 88:7,12
96:15
defined 79:1,
22
defines 80:3
definition
80:13
Definitions
79:16,18
degree 11:13
12:5 68:25
denied 69:6,
21 71:8
department
6:24 13:12
28:17 47:12,
24 51:18 57:3
66:7
departments
23:21 27:24
31:17,19,21
32:24
depends 44:18
deposition
4:1,19 46:14
80:1

derivative
16:1
descent 16:13
describing
50:23 100:1
designee
77:20 79:3
80:17 81:6,8
determination
39:22 41:2,3
52:6 81:5
89:16 90:19
determine
33:16,23 34:4
37:6,23 38:9
40:9 48:13
52:16 72:10
determines
77:24 78:5
80:20
determining
34:1 75:21
developed
43:2
Development
6:2 31:20
difference
26:20 89:7
differentiatio
n 31:9
difficult
103:4
digit 90:18
direct 4:13
27:12 77:2
directive
92:3
directly
25:22 27:2
66:2 95:8
Director
13:16 17:15
18:2,6,7,9,
20,21 19:9
20:20,22
21:4,14 25:8,
9 26:8

Directors
  20:5
directorship
  20:11
disagree
  45:24 91:9
disagreed
  102:10
disagreement
  45:20 73:4
discuss   32:15
  33:5
discussed
  31:6 37:22
  93:14 99:19,
  22 103:23
discusses
  81:4
discussing
  57:12
discussion
  58:22 66:19
  70:5 71:24,25
  73:12
discussions
  72:7
dispute   102:6
disruptive
  74:7 102:18
dissertation
  11:23
distance
  11:14
distinction
  34:16
distress   34:8
diversity
  18:23
Division
  31:17,24
divisions
  31:16
divorce   7:13
  8:23
divorced   8:19
docket   55:1

doctoral
  12:24
doctorate
  10:13,21
  11:12 12:6
  15:4
doctorate's
  12:5
document   47:7
  66:21 67:8
  83:3 98:3
  99:9 100:6
documentation
  70:2,9,10
documents
  46:7,17 52:17
  96:18
dotted   27:25
  28:1
double   90:18
downstairs
  93:19
draft   69:18
drafting
  53:10
Drive   5:13
  9:23
duly   4:11
duties   18:19
  31:13 35:9
  36:20,25 44:9
duty   52:4
  64:9

                E

earlier   55:8
  89:1 100:1
easier   54:23
easiest   54:20
education
  10:1,10,11,15
  13:19,21,23
  14:12,17
educational
  5:24 18:23,25
  20:25

elapsed   40:16
electronically
  91:6 99:6
elimination
  99:24
email   59:20
  75:1,7 82:22,
  25 83:6,11,
  20,23 88:14,
  19 89:1,6,7,
  8,25 90:2
Email/note
  88:8
emailed   81:20
  88:20 89:20,
  21
emails   75:4
  83:3
emergency
  76:3,4 77:3,
  4,16,25 78:2,
  19 80:20
  84:21,24
  85:4,10,14,
  21,22 86:12
  87:1 90:20
  91:1,14,18,
  22,24 92:1,7,
  19 93:2 94:2
  95:25 96:8
  97:13,14
  100:20 101:8,
  13
employed
  5:20,21
employee   11:7
employees
  11:8
employment
  16:14,16
  17:5,10
end   20:9
  30:19
engage   43:21
engaged   56:11
  69:7 71:23
  72:1,6 74:7
  83:22 92:24

96:23 103:17
engaging
  44:13 51:22
  72:4 98:23
ensued   58:22
ensure   68:24
entail   6:15
  86:19,20
enter   42:16
  43:1,9,18
entered
  97:19,25
  99:13 100:12
enters   43:14
entire   27:4
  62:20 70:2,8,
  18
entries   90:13
entry   55:1
environment
  68:10,16
equipment
  88:6
escalated
  67:22,23
essentially
  27:18 44:20
  71:18
ethnicity
  16:12
evaluated
  25:1 26:19,21
  27:3,5,6,11
  28:12
evaluation
  25:11,13,14
evaluations
  24:21 25:2,7
  28:7
evening   59:22
  84:6,13
everybody's
  39:17 40:18
everyone's
  39:19
exact   47:7

Rozalia Williams Vol 1
February 24, 2016                                        8

**EXAMINATION**
  4:13
**examined**  4:11
**examples**
  92:14
**Executive**
  12:23 13:4,
  12,14,15
**exercise**
  58:1,4,10,12
  65:16 68:24
  69:9 73:12,17
  75:12
**exhibit**  34:8
  53:1,5 67:2,4
  70:22 76:12,
  18,23 82:25
  88:7,12,14,20
  96:15,19 98:4
  103:2
**exhibits**
  92:17
**exists**  77:25
  80:21
**expect**  46:16
**experience**
  10:24 72:3,22
  73:23
**experienced**
  74:1
**experiences**
  72:3 74:5,9
  102:17
**explain**  26:3,
  24 28:16,18
  32:1 52:9
  58:5,14
**explained**
  4:22 51:20
**explaining**
  98:17
**express**  59:1
**expressed**
  94:7
**extreme**
  47:20,22

---
**F**
---

**facilities**
  88:6
**fact**  104:4
**factor**  42:17
**facts**  5:10
  65:14 69:6
  97:15 99:10
  100:7
**faculty**  20:4
  23:19 37:14,
  16 43:7 51:9,
  12,13,16,21,
  24 52:10,11,
  15 56:25
  102:20
**fair**  29:10
  53:23 54:8
  83:12 100:19
**fall**  11:21
  12:2,3
**familiar**
  53:24,25
  96:20
**fashion**  57:25
**father**  15:18,
  23
**father's**  16:7
**FAU**  12:7,8
  16:15 17:5,8,
  9,10 19:8
  30:19 36:10
  45:18 47:5
  75:14 76:16
  99:5
**fear**  68:7,11
**February**
  53:12,24
  54:6,7 55:3
  57:14 74:18
  80:11 98:6
**feel**  68:9,16
  69:2 72:15
**fell**  87:8
**felt**  60:22

67:22 68:4,8,
  9,15 72:4
  102:16
**female**  29:2,
  6,7
**fight**  49:3,13
  93:17
**fighting**
  93:21
**file**  44:15,17
**filled**  24:20
**final**  41:21
**find**  38:13,16
**fine**  67:16
**finish**  11:19
  40:17
**finished**  10:8
  11:22
**fist**  50:16
  61:3
**FIU**  10:8,16,
  19 11:5,7
  12:10,11,17
  13:21 14:5,6,
  8 15:7 16:14,
  18 17:5
**five-**  31:15
**floor**  58:18
**Florida**  4:3
  5:13 6:4 9:13
  10:7 12:8
  16:5 29:17
**focus**  65:21
**focused**  65:15
**follow**  33:20
  37:24 45:9
  65:3 72:25
**follow-up**
  102:21
**forget**  6:23
  15:12
**form**  24:22
  30:25 38:7
  41:16 45:7,21
  46:1 49:18
  57:25 72:20
  75:19 79:10

89:12 90:9,13
**formally**
  38:17 83:25
  84:3
**formed**  32:8
**forms**  89:24
**forward**  37:22
**fought**  93:20
**found**  15:16,
  21 44:25
**frame**  35:25
  36:1 96:2,7
**Friday**  71:3
  73:10 81:21,
  23,24 82:17
  83:7,20
  84:12,16
  89:14
**Fridays**  97:9
**friends**  102:7
**front**  46:7
  54:22 77:2
**fulfill**  44:12
**funded**  27:22
**funding**  30:3
**future**  58:2
  102:8

---
**G**
---

**Gainesville**
  9:7,9
**gathered**
  81:14
**gave**  23:3
  58:19,20
  60:25
**general**  36:23
  38:6 40:6,7,
  21 42:6,8,10,
  20 46:21
  47:22 75:15,
  16 85:17,18
**generally**
  37:3 40:22
  71:15 72:24
  73:3,6 90:15

Rozalia Williams Vol 1
February 24, 2016                                    9

get all  61:25
give  4:7 5:2,
  3 9:25 15:13
  31:12 36:1
  52:3 56:6
  80:25
giving  23:22
God  4:8
good  46:22
  104:7,9
government
  18:24 31:20
grade  73:4
Graduate
  10:10
graduated
  10:2
grandson  8:4
grant  11:6,7,
  8 16:25 17:2,
  3,7
grants  16:17,
  25
ground  97:5
group  23:10,
  17 31:4 93:18
groups  18:24
  20:3,4,8
  23:11,20
guess  74:14
guidance  52:3
guideline
  40:9,12
guidelines
  33:18

————————————
           H
————————————

half  28:14
hand  50:15
  61:3
handbook
  51:12,13,24
  52:15
handed  66:22
  88:11

handing  96:18
handle  44:10
handling
  41:13
hands  44:5,6,
  7
handwriting
  66:24 67:13
handwritten
  67:5 69:24
happen  42:16
  67:25 68:25
happened
  14:11 38:13,
  16 39:10,16
  49:15 53:23
  57:18 59:22,
  24 60:2 65:1,
  17,19,21,22,
  25 66:1,4,5,9
  70:7 71:6
  74:12 102:6
happy  15:24
hard  67:12
harm  49:4,13
  50:9 77:23
  80:19
harmed
  101:19,21
Harvard
  10:10,13,21
  11:7,12 13:9
head  12:4
  54:11
health  77:25
  78:6
hear  82:19
  84:7 89:15
heard  44:3
  58:24
hearing  43:6,
  8,11,24,25
  44:2,24
  103:18
held  18:4
  19:7,9 34:24
  40:3 66:19

Hernandez
  36:6,9
high  10:2
higher  10:15
hike  20:16
  23:4
himself/
herself  77:23
hire  24:3
hired  21:10,
  11,17 26:12
Hispanic  29:5
history  12:8
hit  49:3
  93:17
hold  12:15
  14:3 18:2
  20:20 21:18
holidays
  11:18
Hollywood
  5:13 7:25
home  11:17,
  18,19
hour  88:23
  89:6
hours  84:6
  89:13
house  9:23
housing  81:9
  86:14
hurt  101:21

————————————
           I
————————————

idea  6:18
identification
  53:3 67:6
  76:14 83:1
  88:9 96:16
identified
  83:11
identify
  16:9,12
identifying
  80:6

imminent
  77:22 80:19
implement
  81:7 91:17
implemented
  79:18,21
  91:24 92:7
  95:25 96:8
  99:1 100:20
  101:8,14
implementing
  75:23 90:20,
  25 92:18
important
  45:5,9
imposed  43:20
inappropriate
  51:22 52:12
  72:5
incident  38:2
  42:7 45:14
  46:23,25 47:9
  53:18 54:9
  55:5 59:4
  62:24 63:9,
  17,19 74:2,5,
  16 75:2 93:23
  94:2 95:17
  96:4 98:16,23
include  20:16
  43:4 78:2
  91:10,21,22
  101:13
included
  84:20 85:10,
  14 93:3
  101:12
includes  43:7
including
  74:11
income  16:19
  17:1
increased
  19:4
independent
  16:15 49:10
  80:22 92:16
  104:2

Rozalia Williams Vol 1
February 24, 2016

10

individual
  7:10 14:17
  20:10 87:25
  93:21
individuals
  78:16,21
information
  12:19 48:9
  52:12 56:6
  61:25 65:11
  81:14 100:7
  102:12
informed  39:9
  103:20
informing
  85:6
initial  93:23
initially
  18:5 19:3
  21:5,6
initials
  39:7,8 70:11
  98:8,14 100:2
inquiring
  65:18,24,25
insisted
  58:25
instance
  92:11,17,20
  93:11 94:10
  95:24 100:1
  101:7 102:3
instances
  92:7 101:16
institution
  11:11
instructed
  94:8
instruction
  17:6
instructions
  58:19
interaction
  52:6
intercultural
  58:13
interest  94:7

interested
  98:8
interim
  22:14,16,24
  63:3 78:5
  81:1,3 85:18,
  19,20 86:5,
  11,13 87:6,
  11,13,20,21,
  22 88:1,3
  91:4,10 97:7,
  12 99:1,4
  100:25 101:7
Internally
  22:17
interoffice
  47:17
interrogatorie
s  46:11,15
interrupt
  37:25
Interruption
  86:7
Intervention
  32:17 34:11
interview
  17:17,19
  19:19,24 20:1
  23:8,23 35:14
  51:8 59:12
  69:21,25
interviewed
  17:20,22
  19:21,23 20:2
  22:10,13
  23:15 48:17
intimidated
  68:4
intimidation
  68:7,8,11
intuitively
  33:23
investigated
  87:18 96:1,8
investigating
  64:12 83:21
investigation
  35:13,14

37:17 38:15,
  18 39:2
  40:10,18
  50:19,20
  52:14,21,23
  53:2 55:11
  62:3 64:5,6,
  8,13 65:23
  70:23 81:15
  99:16 102:13
investigations
  35:18,20
  42:13
invited  65:2
involuntary
  14:9,10
involved
  15:22 91:6
  95:11,22 99:6
  102:5
involving
  77:3
issuance
  99:14
issue  40:24
  41:24 42:2
  72:8 80:25
  81:2,3 82:7,
  12 89:11
issued  38:5
  40:15,20,23
  41:12,22
  42:21 55:12
  84:17,24
  85:4,10 86:5,
  11,12,16,23
  87:11,20,21
  93:1,5 95:3
  100:17 101:1
issues  30:10
  71:19 74:8
issuing  82:9
  86:25 88:24
  95:18

J

Jackson  10:3
JC  98:8
Jesus  58:17
job  5:22
  14:20
joint  41:23
Jones  15:2
Joyanne  23:14
  26:15 27:6,8,
  10 28:2,10
jump  64:16
Junior  8:12
Jupiter  29:1
  30:7

K

kind  15:8
  16:15,16
  33:25 48:1
  49:2 56:13
  75:6 86:16
  102:6
King  21:10,
  17,22 24:2,7,
  20 25:1,14,22
  26:1,10,12,
  13,17,18 27:4
  30:13 32:23
  41:1 81:15
  82:10,15,20
  83:16 84:17
  88:20 89:15
  92:5 95:8
  99:23
knew  22:18
  44:6 69:15,16
  101:24,25
  102:6
knowledge
  25:6 58:11,12
  74:24 80:7

Rozalia Williams Vol 1
February 24, 2016                                    11

---

## L

lack  90:12
  95:15
Large  4:3
late  59:21
law  29:17,20,
  22,24
leads  99:25
learn  48:7
  50:6
learned  46:24
  48:9 50:18
  69:13,14
learning
  11:14
leave  11:21
  59:14,16
  68:18 82:1
led  61:5,10
  66:8
left  11:2,15,
  16 12:20,21,
  22 13:8,17
  16:18 68:18
  103:5,7
legal  15:22
legally
  15:17,21
Leighter  14:2
letter  38:25
  39:1,2 40:2,
  10,11,15,20
  41:12,22
  42:3,21 46:12
  52:21,23
  53:2,6,8,10,
  12,15 54:17
  55:12 62:4,
  11,12 64:13,
  14 70:23
  82:8,10,13
  84:10,12,18,
  20,25 85:5,8,
  11,15 86:5,12
  87:1,3 89:10,
  11 90:3,6,7,

10,13,16
  91:2,11,25
  92:2 93:3,4,6
  94:8,11
  96:16,25
  97:7,15 98:2,
  10,12,22
  99:15,25
  100:17,25
  101:3
letters  41:24
  64:8 95:1
  101:12
letting  61:4
level  43:15,
  16
light  99:10
  100:7
limited  78:3
listed  7:6
listen  65:13
listened
  60:24
litany  39:8
live  7:24
  9:9,16,20
lived  9:5,14,
  22
lives  5:18
  8:3
living  15:24
located  6:25
long  5:5,14
  8:17 11:10
  12:11 14:3
  18:2 20:20
  23:22 56:1
  61:9,13,16
  66:10,11,13
longer  88:25
  89:3
looked  52:15
  81:13
lost  56:8,16
lot  71:19
low  16:19
  17:1

lunch  104:10

---

## M

M-o-d-d  36:7
made  15:24
  31:6,9 38:22,
  24 49:2,24,25
  51:9 56:10
  57:7 58:23,25
  62:13 69:5
  72:11,12,23
  87:4 89:10,
  16,25 95:4
mail  47:16,
  17,21 48:2
  84:11,12
  89:10,25
mailed  47:19
  53:17 70:22
make  30:2
  37:13 38:11,
  12 39:21
  41:15,17
  52:20 54:7,
  10,22 65:4
  70:16 81:5
  96:11 103:13
makes  41:11,
  21
making  32:5
  52:5 69:22
  71:8 92:1
male  22:20,
  21,23 29:2,3,
  6
managed  27:21
management
  29:17
manager  98:9
manner  62:22
Marcellus
  8:13,18
March  62:13,
  23 63:12,23
  64:16 71:3
  73:10 74:18,
  20 75:3 82:23

83:7,20 88:17
  90:4 97:6
  98:3,18
Marin  55:13,
  16 56:6 57:1,
  5,12 61:11,18
  69:13,15,17
Marion  17:24
  18:13
mark  53:5
  67:2
marked  53:3
  67:5 70:22
  76:13 83:1
  88:8,11,19
  96:16,18
marking  76:18
marriage  7:9,
  16 8:9 94:17
married  7:7
  8:1,5 9:18
  94:16
marry  7:10
Marshall
  8:12,15
master's
  10:9,11,19,
  20,21 11:6
  12:6
math  8:16
matter  55:25
  91:6 99:6
matters  31:2,
  4,10 32:7,10
meaning  75:4
means  23:19
  79:22 87:23
  91:7
measure  76:2,
  3,5 78:19
  79:6,8 87:1
  91:10 93:2
  97:7,12,13,14
  100:25 101:8
measures
  77:3,5,16
  78:2,5 84:21,
  24 85:5,6,10,

---

14,21,22
86:13 90:20
91:1,14,18,
22,24 92:1,7,
19 94:2 95:25
96:9 99:1
100:20 101:13
**medication**
5:9
**meet** 23:19,
20,21 30:13
42:14 56:10
61:13
**meeting** 20:3,
7,8 24:17
34:24 35:7
36:2 37:19
38:5 39:4
40:3,7,13
61:23 62:16
65:7,8,10
66:7,10 67:9,
10,11 69:20
70:3,9,18,21,
24 73:17
93:7,12 95:9,
18 103:13
**meetings** 31:5
61:20,22
72:22
**meets** 97:9
**member** 37:14,
15 51:9,16,
21,25 52:10,
11 102:20
**member's** 33:8
**members** 34:18
35:2
**memory** 36:18
74:24
**Mena** 28:24
29:2
**mention** 34:13
**mentioned**
39:17,19
55:21 56:3
59:13 96:23

**mentioning**
38:1
**Merzer** 17:24
18:13
**met** 20:3,4
34:14 52:24
54:1,3 56:7
60:8,17,18
62:2 63:9,22
64:16 69:16
75:3 99:11,15
**Miami** 9:4
10:2 16:5
**Miami-dade**
9:3 16:23,24
**middle** 40:14
63:9
**military** 72:1
102:4
**mind** 67:12,13
**mine** 89:7
**minutes** 103:7
**missing** 77:11
79:24,25
80:15 91:13,
16
**mistaken** 64:2
**Monday** 54:2,
7,12,15 84:9,
14 103:12
**Monday-
wednesday**
54:3,4
**monopolize**
71:18,24
**morning** 47:15
59:21
**mother** 15:23
**mother's**
16:1,8
**motion** 61:3
**moved** 12:20,
21,22 27:5
58:24 59:1,2
67:19
**multicultural**
12:22 13:12,

14 17:15
18:3,22 19:10
25:10 26:8,13
71:20
**mutual** 42:25
43:1,9,14,19
44:8,19 87:4
97:19 98:1
99:13 100:12
**Myron** 8:13,
15,17

---

**N**

**named** 15:19
**names** 8:11
16:6 39:17
**Nathania** 4:1
**necessarily**
37:10
**needed** 42:14
52:18 61:12
82:5 89:9,16
103:9
**nickname**
15:16
**night** 49:23,
24,25 56:8
89:14,15
**no-contact**
101:4
**nodding** 12:4
54:11
**Noemi** 55:12,
15 56:6
**normal** 90:17
**north** 7:3
**northern**
29:1,13
**Notary** 4:2
**notating**
70:13
**notation**
103:3,5,25
**notations**
70:15,17

**note** 103:11
104:2
**notes** 67:5
69:18,24,25
70:1 71:21
**notice** 15:8
36:1 40:1,11,
14,20,22,24
41:12,22,24
42:2,21 64:4,
5,14 82:7,9,
12 84:10,12,
18,20 85:11,
15 88:24
89:11 90:3,6,
7,9,14 91:2,
11,21,25
92:2,8 93:3,
4,6 94:8,10
95:4,19 96:25
97:6,15,22
98:2,10,12,22
99:14,25
100:14,16,24
101:3,12
**notification**
91:18
**notified**
38:17 47:25
91:14
**number** 36:17
53:1 55:1
64:3 67:3,4
76:12 77:4
78:4,24 79:12
82:25 88:7
96:15 103:6,7

---

**O**

**Object** 24:22
30:25 38:7
41:16 45:7,21
46:1 49:18
72:20 75:19
79:10 89:12
**objective**
58:13

observe
33:15,22
observed 34:5
36:23 38:10
39:21
observing
34:7
obtain 11:13
65:10
occasion 92:9
occasions
58:8
occur 8:24
9:2 41:18
occurred 32:3
40:5 56:5
60:23 61:12
62:10 65:13,
15 67:17 70:2
73:10 87:14
occurring
47:23 63:6
Ocean 5:13
9:23
October
98:13,18,22
offended
67:18
offensive
58:15,17
offered 14:21
15:1 17:25
20:10 24:16
offhand 76:8
office 12:18
14:12,25 44:1
60:13 62:9
64:19,20
81:19 89:17,
19,22
officer 31:14
48:15 51:8
62:19
open 6:6
37:16
operable
80:10

operating
79:19
operations
13:17 26:16
27:24
opinion 39:15
40:18 56:13
59:1
opportunity
23:23 42:24
96:19
option 43:24
44:4,25
75:20,22
options 43:12
78:17
order 56:5
76:5 78:20
79:5 92:13,
18,21
ordinary 66:9
organizational
27:20
organizations
88:5
OS 100:2
outcome
97:18,24
outlined 43:9
Outreach
13:18,21,22
overlaps
38:21
overseeing
21:2

_____

P
_____

p.m. 62:13
83:8,17
88:17,21
96:13 97:9
103:6 104:1,
11
p.m.-1:14
104:11

pages 79:24,
25 80:15
paid 6:12,13
11:9 19:1
panel 43:7
paper 58:18,
21
paperwork
65:5
paragraph
54:24,25
55:3,10
80:16,22 91:1
97:8 99:2
parents' 16:6
part 19:24
30:12 33:1
35:10 38:15
39:3,12,13,24
44:19 45:4
58:5 64:9
67:10 71:1
86:24 87:3
90:6 99:3
participate
88:4
participated
24:3,7,10
partner 31:3
passed 15:23
75:10 93:22
past 9:22
62:24 85:12
90:17
path 15:6
peers 43:7
pending 5:6
penultimate
99:2
people 6:11
17:21 23:20,
21,22 27:16
32:14,24
56:1,2 62:21
people's
39:16

perceived
69:7 71:11
93:1
perception
58:14
performance
24:21 25:2,7
period 9:6,7
73:14 74:15,
17,23 89:4
92:1
periodically
5:22 70:4
periods 11:1
persecution
68:7,8,11
person 6:21
22:18 55:21
60:17,18
64:19,20
75:22,24
person's
58:14,16
personally
89:21,22
perspective
58:16 72:6
phase 38:21
39:12,13,25
44:8
phone 47:21,
23 48:2 56:3
59:15 60:5
81:19,20
103:6
phrase 4:25
physical
77:23 80:19
physically
11:15 49:4,13
50:9
pick 97:4
picked 96:24
piece 58:18
place 6:18
40:8 60:5
65:24 93:12

Rozalia Williams Vol 1
February 24, 2016

14

planning
  10:12,14
plant  93:19,
  20 96:25
  97:4,5
point  7:8
  21:21 26:25
  38:4 56:10,22
  57:13 58:23
  63:5 73:19
  75:1
points  58:25
police  33:21
  37:3 47:1,2,
  12,24 52:1,2
  95:11,21
policies
  33:25 46:21
  75:15
policy  10:12,
  14 34:7 52:8
  75:18,20
Poole  48:21
  50:22 53:19
  55:13,22
  56:19,22,24,
  25 57:6,9,10,
  15,17,25
  59:1,3,11
  60:22,24
  61:5,6,16
  66:3 68:14,15
  71:4,7 72:14,
  18 73:12,17,
  23 74:15,21
  75:4,9 81:11,
  13 103:20,23
Poole's
  102:15
portion  91:3
portions
  77:11
posed  34:1
poses  33:12
  77:22 80:19
position
  12:15,16,20,
  21,22 13:9,13

14:3,21,23
15:1,3,5
17:14,25
18:3,4,14
19:1,4,7,9,
14,17 20:11,
20 21:14,17
22:5,8,10,13,
15 23:1,8,25
24:4,16 28:3
29:12 35:11
45:14,17,24
91:9
positions
  20:23 27:21
  28:17,19
possibly  37:7
  62:18
Post  89:17,
  19,22
potential
  37:1
potentially
  101:19
potted  96:24
  97:4
practicality
  89:9
practice
  85:12
Pre-college
  19:10
preceded
  70:24
preparation
  46:13
prepare  17:1
present  35:5
President
  12:23 13:5
  21:16,19
  23:11 31:7
pretty  46:22
  76:20
prevent  5:10
  101:20
previously
  20:24 102:7

primarily
  30:13 65:15
prior  12:7
  15:8 16:14
  17:5,8,9
  22:25 24:18
  25:2 40:22
  74:6 82:9
  99:14
private  16:21
privileges
  86:17
probed  66:7
problem  58:9
procedure
  37:15,23 65:3
  72:24
procedures
  34:1 51:15,20
proceed  41:6
proceedings
  46:4 96:14
  104:12,13
process  19:19
  35:15,22 41:5
  45:4 99:24
processed
  87:18
processing
  36:20
Professional
  4:2
professor
  48:11,25
  49:3,4,5,14
  50:9,14 58:24
  68:6 69:2
  73:1 83:23
  92:25 93:17
  103:15
program  11:16
  12:24
programming
  18:22,23,25
  20:25 21:2
  32:4
Programs
  19:10

promote  24:7,
  11
promoted
  18:8,11,12
  19:5 25:2,12
  26:14,19
promotion
  20:13,15 22:2
  23:3 24:18
  25:25 26:10
property  5:16
  88:4
protect  78:6
  102:4,19
protocol
  42:17
provide
  16:19,25
  18:22,25
provided
  53:15
providing
  17:6 20:25
provision
  76:8 77:3
  78:11
provisions
  76:5 79:4
Provost  28:4
Provost's
  14:25
PTSD  102:5
Public  4:2
published
  51:17
punching
  50:15
purpose  80:5
purposes
  54:24 65:10
  78:11 89:9
  98:21
pursuing
  44:20
put  58:18
  89:10

Rozalia Williams Vol 1
February 24, 2016                                    15

putting   61:3

**Q**

question   4:25
   5:6 24:5 85:3
questions
   4:23,24 65:20

**R**

R-a-p-h-u
   16:7
R-o-z-a-l-i-a
   4:17
race   16:9
   22:22 29:4,8
radical   68:25
Raphu   16:7
Raton   19:11
   20:6,7 21:2
   26:7 28:1,25
   29:14 34:25
   44:1
reached   71:4
read   37:2
   48:9 51:10
   67:15,21
   103:3,10
reading   52:17
   78:10 79:4
realized
   99:12
reason   79:14
   91:15
reassigned
   97:20
recall   8:21
   13:20,24
   14:4,5,24
   18:12 20:10,
   18 21:11,24
   22:12 24:18
   25:15 34:22
   35:10 39:14
   47:7,14 48:5,
   6,23,24 53:18

55:24 56:5
57:12 61:8
63:6 66:11
69:20 73:22
74:25 75:8,13
76:8 86:25
92:12 94:3
95:14,20,23
96:10 97:18,
21,24 99:18,
20 102:24
103:1,24
recalling
   5:10
receive   11:9
   37:4 47:3,11,
   13 48:4 75:1,
   4
received   22:2
   25:11,24 26:9
   37:4 47:1
   48:2,3,7
   51:7,10
   53:21,22 54:9
   55:4 75:6,10
receives   40:1
receiving
   48:6
recess   46:3
   96:13 104:10
recollection
   49:10 57:13
   84:23 85:2
   92:16
recommendation
   41:5,8,10,14,
   15,17 73:8
record   4:16
   42:5 66:19
   77:6 78:11
refer   33:25
reference
   54:23 56:10
   98:23
referenced
   98:10
referred
   45:13

referring
   25:13 38:2
   51:14 70:12
   83:7 85:23
   91:1,7
regard   102:15
registered
   4:2 6:3 72:19
regretted
   56:12
regular   72:22
regularly
   36:16 66:12
regulations
   75:14
relate   33:7
related   18:23
   32:4 33:6
   35:9 36:20
   46:23 65:23
   71:20 73:6
   95:22 101:18
relating   31:2
relation   32:2
   95:11
relationship
   94:16
relationships
   27:23
relay   56:18
   73:13 74:1
relying   78:19
remember
   10:17 12:16
   13:6,25 15:1
   17:11,21 18:8
   20:15 21:12
   23:6 54:1
   61:14,15,17,
   18,19 66:14
   82:3 87:16
   92:18,23
   93:16,22,25
   94:1,18,24
   95:6,10,21,24
   96:6 98:17
   100:9 104:2

remembering
   93:18
remorse   67:24
removal   86:13
remove   81:9
reorganized
   14:13 26:12
repeat   5:1
   85:3
rephrase   5:2
   24:5
replacement
   28:11
report   6:22
   27:21 30:6,
   11,23 33:21
   35:12 37:2,4,
   17 47:1,2,9,
   11,13 48:2,3,
   8,10,14,22
   49:7,8 51:7,
   10 52:1,17
   53:21,22 54:9
   55:5,7 74:3,5
reported
   26:7,11,13,
   15,16,17
   27:2,3,4,10,
   14 28:2,13
   31:17,19,22,
   23,25 33:14,
   15 34:5 36:24
   38:10,23
   44:13 51:8
   57:10 75:11
   96:1,7
reporter   4:2,
   6 5:3
reporting
   25:21,25
   26:10,22
   27:7,16
   29:11,12
   30:16,20
   33:21 62:21
reports   37:20
   48:4,6

Rozalia Williams Vol 1
February 24, 2016                                                16

request  43:25
  72:23 102:15
requested
  72:14
requests  73:1
required
  37:15
requirement
  89:24
requirements
  36:3
reschedule
  103:19
resided  5:14
residency
  11:16
resources
  88:6
respect  6:17
  8:23 45:13
  100:19,24
respectful
  56:15
respective
  8:14
respond  89:8
  102:8
responded
  67:23 83:16
responsibiliti
es  62:22
responsibility
  33:1 43:10,17
  87:17
responsible
  20:24 21:1
  32:5
restrict
  72:18 75:18,
  23 76:5 78:8,
  15,20
restricted
  71:13 72:15
  75:15 87:1
  102:14
restricting
  86:20 101:1

restriction
  76:1 101:4
result  101:19
  102:12
resulted  7:13
results  42:13
Retention
  12:21
retire  36:12
retired  27:10
  28:11 36:11
return  73:8
review  46:17
reviewed
  34:12 46:18,
  19
reviewing
  67:13 97:14
  99:9 100:6,14
revocation
  86:17
Ria  54:13
ride  60:1
  102:25
rides  60:21
riding  101:24
rights  39:6,8
  65:4,6 70:12
Robert  14:2
role  20:22
  32:1
Rosa  15:2
Rotela  38:2
  45:14 46:23,
  25 48:10
  53:16 58:23,
  25 59:2,7
  62:4,7 63:10
  64:17 67:9
  69:8,25
  73:14,18,21,
  24 74:16,22
  75:2 78:20
  83:11,14
  85:17 88:15
  90:2 100:17,
  19 101:14

  102:23 104:1
Rotela's
  65:14
routinely
  64:8 99:21
Roxanne  6:23,
  24
Royer  4:1
Rozalia  4:10,
  17 7:5,6
  15:15,21
Ryan  59:25
  60:21 67:17
  68:14 71:8,
  10,17 72:11,
  16 74:6,9,16
  75:2,5 78:20
  83:11,14
  88:15 90:2
  100:17,19
  101:14,25
  102:8,9,10,23
  103:8,12,16,
  21 104:1
Ryan's  71:16
  103:6

_____

        S

S-a-t-o-n-y-a
  7:21
SA  32:16
safe  68:10,16
safety  33:9
  73:6 78:1,6
salary  19:4
  20:16 23:4
sanction
  86:24
sanctions
  43:4,20
  44:11,12
Satonya  7:19,
  22,23
Saturday
  82:19,23
  83:16 84:13

SCA  32:17
SCAC  37:19
  38:5 72:22
  95:5,18 99:19
schedule
  35:14,15,24
  63:4 66:12
  103:9,14
  104:5
scheduled
  52:22 62:12
  64:23 66:12
schedules
  44:1
scheduling
  36:3 62:9
school  9:6,7
  10:2,10 11:4,
  5 13:16
  102:25
schooling
  10:23
Screen  17:20
  19:22 23:9
Search  17:20
  19:22 23:9
section  79:20
  91:15
security  47:9
  55:5 59:14,16
seeking  69:5
select  42:24
selected
  23:25 44:4
self-governed
  29:15
self-initiated
  57:2
semester  58:7
send  62:3
  64:8
senior  30:12
  31:5
separate
  19:24 20:1
  57:6 84:24
  85:5,8 87:2

Rozalia Williams Vol 1
February 24, 2016

17

separates
29:13
separation
14:8 15:7
sequence
56:21
seriousness
99:12
served 32:21
services 6:10
7:1 12:19
16:25
serving 14:19
25:8
set 46:11
61:23,24 64:1
sets 33:4
shared 56:25
102:13
She'd 94:6
short 9:6,7
shortly 95:25
show 76:10
showed 64:23
67:24
side 23:20
39:11,17
sign 65:5
signs 39:7
70:11
single 42:14
45:9
sit 23:24
32:17,21
33:2,3 34:12
37:19 38:5
71:22 72:22
98:4 99:19
situation
37:9 47:20,22
67:21,22 73:3
85:13 87:10
94:15 101:22
situations
37:21 91:23

slash 47:9
smaller 34:19
social 10:12,
14 18:25
20:25
solely 101:4
someone's
33:21
something's
36:23
sooner 62:17
103:18
sort 11:13
17:17 33:18
69:22
sound 53:24
sounds 53:25
source 17:4
South 5:13
9:23
SPC 91:5
speak 27:25
62:4
speaking 50:6
86:1
Specialist
12:19
specific
27:24 42:8
51:4 58:19
90:15 97:18
specifically
63:7 79:12
80:6 91:13
specifics
46:23 93:19
spell 4:15
7:20 36:7
60:14
spoke 55:12
62:6,8 81:11
spoken 55:17
spring 11:21
12:1,2,3
63:6,8,11,16,
17

staff 30:12
31:5
staffs 33:3
stalking 94:5
standard 90:9
start 12:13
26:4 27:1
started 5:24
12:18 25:25
88:25 89:2
state 4:3,15
6:3 16:22
states 97:7
statute
29:13,15,16
stay 60:22
66:2
stayed 30:4
59:7,10
68:20,23
staying 89:14
stays 29:18
step 39:13
40:16 45:10
Stephens
23:14 24:16
26:15 27:6,8,
10 28:2,10
stepped 58:20
steps 45:5
46:21
Steve 9:19
stopped 14:5,
6 36:12
story 39:11,
18 65:12
strike 45:3
100:15
structure
27:20
student 6:2
12:20 18:24
20:4,5 21:16,
19 23:19 25:8
26:16 27:15
28:17 30:9
31:2,10,14,

17,19,20,21,
24 32:2,8,9,
12,17,18
33:6,11,12
34:1,3,13
35:10,15,22
36:20 37:1,5,
11 38:6,11,
13,17,24
39:4,5,6,7,
10,23,24
40:1,21 42:9,
10,20,22,23
43:3,5,6,12,
13,17,21,23
44:11,12,21,
22,24 45:1,
15,19 46:21
50:6 51:1,16,
18,21 52:16,
18,19,20,24
53:16 55:13,
18 56:7,8,23
57:2,8,20
59:14,15,17,
19 60:9 62:19
64:11 65:3
67:19 70:11
71:9 72:2,19
73:8 75:14,
17,18 76:6,9,
13 77:22
78:1,7 79:5
80:18 83:21,
25 84:4,5,8,
14 85:4,18,
19,25 87:4,6,
12,18 88:2
89:20,21
90:22 91:13
92:23 94:5,6,
9,16,17,19,
20,21,22
95:3,12,15,16
96:5,6,23
97:1 98:8,9,
13,23,24
99:11,15,18
100:2,10,11

Rozalia Williams Vol 1
February 24, 2016                                    18

101:9 102:13,
19
**student's**
39:15 86:17
87:2
**students**  6:16
16:19 17:1,22
21:20 22:6,25
24:19 30:24
31:3,16 32:4,
23 33:7 34:7,
8 35:24
58:14,20,24
59:17 77:20,
24 78:5,8,25
79:1,3,13,22,
23 80:3,4,6,
17 81:5 86:4
87:10 91:5
92:25 93:1,18
99:5 100:22
101:5 102:1,
14,19
**students'**
72:3
**studying**
11:10
**subject**  48:17
71:23
**submitted**
93:13
**subsection**
78:18
**subsections**
79:6
**summarized**
69:6
**summary**  70:18
**summer**  12:1
**summers**
11:18,19,20
**superior**
67:23,25
68:19
**supervised**
21:22,24
**supervisor**
6:21 14:1

21:4 24:20
27:12 67:25
69:4,12
**supposed**  32:7
49:16 50:1,7
**supposedly**
50:15
**suspension**
81:1,3 85:19,
20 86:5,11
87:6,11,14,21
88:1,3
**suspensions**
87:20,22
**suspicious**
33:23
**swear**  4:6
**sworn**  4:11

———————

**T**

**takes**  40:8
55:25 66:13
71:2
**taking**  5:9
71:18
**talk**  17:10
38:22 40:25
52:18 55:23
56:1,2,4
60:25 61:16,
24 66:3,6
73:18 81:15,
23 92:6,22
**talked**  55:22,
24 56:22
67:17 71:7,
15,16 81:13
104:5
**talking**  26:5
30:10 37:11
42:6,8 46:20
55:7 56:24
65:22 70:13
74:17,19
83:14 95:3,17
96:20

**Tallahassee**
9:14 11:3
**taught**  57:24
58:7,8
**teach**  72:11,
16
**teacher**  57:8
**teaching**  58:9
**Team**  32:17
**technical**
74:19
**telling**  61:2
**temper**  56:8,
17
**temporary**
86:16
**ten**  31:18
62:20 63:21
73:11,16,23
93:22
**ten-day**
74:15,17
**tenure**  30:19
86:3 87:5
**terms**  15:7
32:3 36:3
38:4 45:5
50:3 52:5
62:10 64:1
**Terry**  28:24
29:2
**testified**
4:12
**testimony**  4:6
**thing**  23:9
92:22
**things**  32:6
54:22 70:3,7
73:5
**thinking**  35:1
**threat**  33:9,
10,12,17 34:2
48:12,13,24
49:2,12,16,
22,23,25
50:7,12 51:3,
9 63:22 71:8

73:24 75:10
93:1
**threaten**  33:9
49:4,13
**threatened**
33:22 48:10
52:10 57:21
59:9 61:1
92:24,25
93:17 101:19
**threatening**
61:5,6 64:15
69:7,22 71:11
73:6 83:22
92:24 93:15
96:5,24
**threats**  95:22
**Thursday**
54:8,17 62:13
63:13,14 71:3
**time**  5:5,6
8:5 9:6,7,18
11:1,2 12:15
14:1 15:4,12,
13,21 16:18
17:23 18:16,
17 21:21
23:13 26:25
27:4 30:15
35:25 36:1
38:18 40:9,
12,15,19
41:25 44:7
46:22 47:23
48:19 51:4
56:9 59:1,16
60:4,25
61:23,24
62:1,6,8 63:5
64:12,23
67:12 71:16,
18 73:14,19
74:23 75:1
81:12 84:11
89:4 92:2
93:23 96:2,7
104:8,9
**timely**  62:21

Rozalia Williams Vol 1
February 24, 2016                                    19

times  38:1
  66:1
title  14:24
  25:9
titles  28:23
today  23:24
  45:14,17
  46:14,16
told  39:6
  50:13 56:8
  57:11,20,21
  59:5 60:20
  61:11 65:2,16
  66:6 68:8,14,
  15 71:7,25
  103:8,14,17
Tony  27:10,
  11,13 28:2,3,
  11 30:16,20
top  103:2
topic  72:2
tore  93:19
total  18:5
touch  36:15
track  54:20
trainer  6:9
training
  6:11,12,14,
  15,24 33:17
trainings
  6:17
transmission
  89:25
transpired
  53:19 55:18
  65:16
tree  93:20
truth  4:7,8
Tuesday  54:16
  55:4
turn  54:24
  86:10 98:3
tutor  98:24
tutoring  94:6
  96:6
two-year
  91:25

typical  72:25
typically
  40:14 44:10
  61:20 90:7

U

U.S.  89:25
UF  9:11
Uh-huh  55:2
underlined
  91:3 99:3
understand
  4:25 25:20
  30:22 65:6
  73:15 86:3
understanding
  49:22 50:13
  58:23 64:7
  84:17
understood
  68:18 70:19
  91:20
unique  42:9,
  10,15 43:20
  44:18
uniqueness
  101:15
units  14:14,
  17
University
  7:3 9:13 10:7
  12:8 13:18,22
  32:25 44:20
  77:24 78:1,7,
  16,21 81:9
  86:1,14 88:4,
  5,6
University-
wide  87:23
  88:1
unsubstantiate
d  45:1
unwanted  94:7
  95:10,12
  98:24
updated  76:20

upgraded  18:6
upset  59:2
  60:23
URP  97:9

V

vendor  16:21
verbal  5:3
verbally  91:6
  99:6
verbatim
  48:23
version  65:14
  76:19
versus  26:21
  72:8
Vice  12:23
  13:5 21:16,19
  23:11 31:7
victim  48:19
view  60:25
violated
  38:23 43:18
  103:16
violates
  103:17
violating
  71:9
violation
  33:10 34:6
  37:1,8,12
  38:10 39:23
  44:21,25
  64:11
violations
  34:3
voicemail
  82:1,4 103:5
Volume  104:13
voluntary
  14:8
VTN  98:14

W

W-i-l-l-i-a-m-
s  4:17
wait  56:4
  68:5 84:6
  98:18
waited  84:6
  88:23,25
  103:7
waiting  89:15
waive  103:18
walk  36:24
wanted  15:19,
  25 59:23
  60:1,21 69:5,
  12 70:17
  71:12 101:20
wanting  67:25
  69:3
warrant
  101:17
warranted
  101:22
week  32:13
  34:15,22,23
  42:14 62:23
  63:15 75:9
weekend  82:24
  83:20
weekly  35:7
  37:18,20 40:8
welfare  78:1,
  6
West  7:2
White  29:9
Williams
  4:10,18,19
  7:5,6 15:14
  16:7,8 46:6
  98:9
witnessed
  39:21
witnesses
  35:14 39:20

Rozalia Williams Vol 1
February 24, 2016                          20

women  72:1
word  36:8
 82:15
words  90:12
 95:15
work  11:19,
 20,22,23,24
 12:9,11 15:7,
 9,11 27:19
 43:24 44:16
 47:17 103:14
worked  11:5,
 7,11 12:10
working  10:23
 11:3,23 12:7,
 13 14:5,6,24
 17:8,9 18:24
 23:22 36:12
works  36:10
workshops
 16:19
write  58:17
 70:4,7,20
writing  17:2,
 3,7 89:23
 91:14,19,22
written  47:15
 48:14,15
 67:15
wrong  33:24
 43:1 67:20
 69:3 102:7
wrote  16:17,
 25 59:20
WYDLER  4:14
 24:25 31:8
 38:14 41:20
 45:12,23 46:5
 49:20 53:4
 54:12,18,19
 66:17,20 67:7
 73:9 75:25
 76:15,24,25
 77:8,12,15
 79:11 83:2
 86:8 88:10
 89:18 96:17
 104:6,9

---
### Y
---

year  6:7,20
 7:13 8:21
 10:4,16,18
 13:1,6,20,24,
 25 14:6 21:12
 23:7 25:15,18
 26:4 28:14
years  5:15
 9:9,20,22
 12:12 14:4,19
 18:5,10 20:21
 85:9 87:15
 94:25