# TAB 3

Corey King Vol 1
March 10, 2016





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:  15-CV-60621-DPG

ROZALIA WILLIAMS,

             Plaintiff,
vs.

FLORIDA ATLANTIC UNIVERSITY,
CHARLES L. BROWN, SR., an
individual, and COREY KING, an
individual,

             Defendants.

_____/

DEPOSITION OF

DR. COREY KING

VOLUME 1 of 2
Pages 1 through 96

Thursday, March 10th, 2016
10:00 a.m. - 5:30 p.m.

US LEGAL SUPPORT
3440 Hollywood Boulevard
Hollywood, Florida

Stenographically Reported By:
Ashley C. Nehme, FPR
Florida Professional Reporter

```
 1    APPEARANCES:

 2
      On behalf of Plaintiff:
 3
      SAENZ & ANDERSON, PLLC
 4          20900 N.E. 30th Ave., Ste. 800
            Aventura, FL 33180
 5          (305)503-5131
            BY:  RIA CHATTERGOON, ESQ.
 6          ria@saenzanderson.com

 7
      On behalf of Defendant, FAU & DR. COREY KING:
 8
      MARRERO & WYDLER
 9          DOUGLAS CENTRE, PH-4
            2600 Douglas Rd.
10          Coral Gables, FL 33134
            (305)446-5528
11          BY:  LOURDES WYDLER, ESQ.
            lew@marrerolegal.com
12

13    On behalf of Defendant, DR. CHARLES BROWN:

14    WHITELOCK & ASSOCIATES, P.A.
            300 S.E. 13th St.
15          Fort Lauderdale, FL 33316
            (954)463-2001
16          BY:  CHRISTOPHER J. WHITELOCK, ESQ.
            cjw@whitelocklegal.com
17

18
      ALSO PRESENT:  ROZALIA WILLIAMS
19

20

21

22

23

24

25
```

Corey King Vol 1
March 10, 2016                                          3

1                          I N D E X

2

3    Examination                                    Page

4    Direct            By Ms. Chattergoon              4

5

6                      PLAINTIFF EXHIBITS

7    No.                                            Page

8    1    Bates No. 543 Organizational Chart           8

9    2    Bates FAU1166-1173 Posting for              16
          Associate Dean of Student Affairs
10
     3    1/8/14 Letter to Dr. Horstman and           22
11        Increase Request

12   4    Bates FAU 1231-1234, Student Treat          34
          Assessment and Management Policy
13
     5    Bates FAU 1485-1504, Regulation 4.007       41
14
     6    2012-2013 Student Code of Conduct           50
15        Flowchart

16   7    Bates FAU1438-1455                          62

17   8    University Official Statement Released      84
          to the Media
18

19

20

21

22          (Reporter's Note:   Plaintiff's Counsel
          retained exhibits.)
23

24

25

Corey King Vol 1
March 10, 2016                                    4

1    The following proceedings began at 10:13 a.m.:

2            THE COURT REPORTER:  Please, raise your

3        right hand.

4            Do you solemnly swear or affirm that the

5        testimony you are about to give in this case

6        will be the truth, the whole truth, and nothing

7        but the truth so help you God?

8            THE WITNESS:  I do.

9                    DR. COREY KING

10   having been first duly sworn, was examined and

11   testified as follows:

12                   DIRECT EXAMINATION

13     BY MS. CHATTERGOON:

14       Q.   Good morning, Dr. King.  Could you please

15   state your name for the record.

16       A.   Corey King.

17            MS. WYDLER:  Just for record purposes, I

18        would like on the record that the Plaintiff,

19        Dr. Rozalia Williams, is observing the

20        testimony here today by the witness.  And per

21        our agreement, you're going to start with

22        corporate rep questions.

23            MS. CHATTERGOON:  Yes.

24            MS. WYDLER:  And then indicate to the

25        witness when you will switch over to questions

1       pertaining to his personal knowledge in his

2       individual capacity.

3           MS. CHATTERGOON:  Absolutely.

4     BY MS. CHATTERGOON:

5       Q.   And in that respect, Dr. King, as you know

6     I represent Dr. Williams.  In that capacity, I'm

7     going to ask you a few questions under oath today.

8     Just a couple of rules for the deposition.

9           If you don't understand my question, ask

10    me to repeat it or rephrase it, I'd be glad to do

11    so.  If you don't hear my question, please ask - you

12    know say so, because the air in here is a little bit

13    loud.

14      A.   Okay.

15      Q.   If you answer the question, I'm going to

16    assume that you heard it and that you're answering

17    it to the best of your ability.

18          Do you suffer from any illnesses or

19    infirmities which will effect your ability to

20    testify truthfully today?

21      A.   I do not.

22      Q.   Are you under any medication or drugs

23    which will effect your ability to testify

24    truthfully?

25      A.   I am not.

Corey King Vol 1
March 10, 2016                                        6

1          Q.    Just for the record, you have to say yes,

2     no.  No shrugging of the shoulders so Ashley can

3     record.  Try to let me finish my question before you

4     answer.  I know sometimes we anticipate what each

5     other is going to say, and I'm going to try my best

6     to do the same.  Okay?

7          A.    Okay.

8          Q.    All right.  As your counsel stated, you

9     are here in your capacity as a corporate

10    representative, as well as in your individual

11    capacity.

12               Can you tell me your current position with

13    the University?

14         A.    Vice President for Student Affairs.

15         Q.    And how long have you been in that

16    position?

17         A.    About almost two years.  Partially as

18    interim and now as permanent.

19         Q.    And just for purposes of the corporate

20    representative depo, this is a copy of the Third

21    Amended Notice of Taking the Corporate

22    Representative Deposition.  We have ten designations

23    on there.  I've been told that you are here today,

24    in part, for designations one, three through seven,

25    and nine through ten.  Is that your understanding?

Corey King Vol 1
March 10, 2016                                              7

1          A.    Yes.

2          Q.    Now, as your Counsel stated, I'm going to

3    ask you in your capacity as corporate

4    representative.  I'll tell you when we'll switch

5    over to your individual capacity.  Unfortunately,

6    because of your position and the facts of this case

7    some of those may interlap, and so it may seem that

8    I ask you questions twice today.  All right.  Just

9    so you don't get a little bit annoyed with me.  All

10   right?

11         A.    Yes.

12         Q.    And I'm sorry, I had everything in order

13   and then everything got screwed up here.

14               You are the Vice President of?

15         A.    Student Affairs.

16         Q.    How long have you been in that position

17   again?

18         A.    About two years.  Part of that interim and

19   the other part permanent.

20         Q.    And prior to that, what was your position

21   with the University?

22         A.    Associate Vice President and Dean of

23   Students.

24         Q.    And in that capacity, did you report to

25   the Vice President?

1        A.    I did, yes.

2        Q.    And who was the Vice President, at that

3    time?

4        A.    Dr. Charles Brown.

5        Q.    As the Vice President of Student Affairs,

6    how many employees do you supervise?

7        A.    Somewhere between 12 and 13.

8        Q.    Are there different departments under

9    that --

10       A.    Yes.

11       Q.    -- purview?

12             What are they?

13       A.    Your question wanting me to name all of

14   the departments.

15       Q.    Let's do it this way.  I'll mark this as

16   Exhibit 1.

17             (The referred-to document was marked by

18       the court reporter for identification as

19       Plaintiff's Exhibit 1.)

20     BY MS. CHATTERGOON:

21       Q.    I'm showing you what's been marked as

22   Exhibit No. 1.  It's a Plaintiff's document No. 543.

23   It's an organizational chart from March 1st, 2012.

24   Have you seen this organizational chart before?

25       A.    Yes.

Corey King Vol 1
March 10, 2016                                           9

1      Q.    Has this organizational chart changed

2   since March 1st, 2012?

3      A.    Yes.

4      Q.    Okay.  How so?

5      A.    The position on the Broward campuses is no

6   longer an associate position and is a Director of

7   Campus Life.  Where it says Associate Dean of

8   Student Affairs, it is now Director of Campus Life.

9      Q.    And when was that changed?

10     A.    2014.

11     Q.    Do you recall when in 2014?

12     A.    I do not, no.

13     Q.    Okay.  So where it says Associate Dean of

14  Student Affairs -- This organizational chart is for

15  the Broward campus, correct?

16     A.    Yes.

17     Q.    It's now Director of Campus Life.  Is

18  there anything else that's changed on the Broward

19  campus?

20     A.    The Career Development Center,

21  Counseling/Psychological Services, and Student

22  Health Services no longer report or have purview by

23  the position.

24     Q.    Okay.  Do you know why the position was

25  changed from Associate Dean to Director of Campus

Corey King Vol 1
March 10, 2016                                    10

```
 1   Life?
 2        A.    There was a -- There was, I believe that
 3   we needed - we should create a more robust campus
 4   life on our partner campuses.  So the position as
 5   Associate Dean was more administrative.  We created
 6   a position that would be more programmatic.
 7        Q.    Why was that needed on the Broward campus?
 8        A.    In a form with students and our new
 9   incoming president, the comments that students made
10   was that we needed more - they wanted more
11   activities and programs.
12        Q.    And so who is the Director of Campus Life
13   now?
14        A.    Currently in the Broward campuses it's
15   Rafael Zapata.
16        Q.    And how long has Rafael been in that
17   position?
18        A.    A month or two.
19        Q.    Who held the position before him?
20        A.    It was an interim position and it was
21   David Bynes.
22        Q.    Why was it an interim position?
23        A.    The time between the search necessary to
24   find a successful candidate and the start of the
25   semester was such that an interim was needed in
```

Corey King Vol 1
March 10, 2016                                          11

```
 1   order to get the campus off and running for fall.
 2        Q.   How long was David Bynes the interim
 3   director?
 4        A.   Maybe five, six months.
 5        Q.   And was there a director before David
 6   Bynes was the interim director?
 7        A.   Yes.
 8        Q.   Who was that?
 9        A.   Bill Horstman.
10        Q.   And how long was Bill Horstman the
11   director?
12        A.   So it was under Bill Horstman that the
13   Associate Dean position changed from Associate Dean.
14   Dr. Horstman started as the Associate Dean of
15   Student Affairs and his position was converted to
16   Director of Campus Life.
17        Q.   I'm sorry, could you repeat that last.
18   Associate of Campus Life?
19        A.   No, he was the Associate Dean of Student
20   Affairs, and then the position was converted to
21   Director of Campus Life.  That's when it happened
22   under his purview.
23        Q.   How long was he titled the Associate Dean?
24        A.   I believe a year, year and a half.
25        Q.   And how long was he the Director of Campus
```

Corey King Vol 1
March 10, 2016                                    12

1    Life?

2        A.    Couple of months.

3        Q.    Did Dr. Horstman resign or was he

4    terminated?

5        A.    Neither.  He was reassigned to the Boca

6    campus as the Assistant Dean and Case Management.

7        Q.    Is that under Student Affairs, as well?

8        A.    That is, yes.

9        Q.    Okay.  Who reassigned him?

10       A.    I did.

11       Q.    Let me just go back.  Rafael Zapata, do

12   you know what race he is?

13       A.    Hispanic.  Latino.

14       Q.    Do you know how old he is?

15       A.    I do not, no.

16       Q.    David Bynes, what race is he?

17       A.    African-American.

18       Q.    Do you know how old he is?

19       A.    No.

20       Q.    Do you know if he's above 40?

21       A.    I don't believe he's above 40.

22       Q.    And Bill Horstman, do you know what race

23   he is?

24       A.    He's white Caucasian.

25       Q.    And do you know how old he is?

Corey King Vol 1
March 10, 2016                                    13

1          A.   No.

2          Q.   Do you know if he's above 40?

3          A.   Yes.

4          Q.   When you changed or when the position of

5    Associate Dean on the Broward campus was changed to

6    Director of Campus Life, was that a demotion in pay

7    or title?

8          A.   It was not.  It is not a demotion in pay.

9    The pay is the same.

10         Q.   Would it be considered a demotion in

11   title?

12         A.   That would be an HR question.

13         Q.   Okay.  Would Robin Kabat be able to answer

14   that?

15         A.   Yes.

16         Q.   And when you reassigned Dr. Horstman to

17   the Boca campus as the Assistant Dean and Case

18   Manager?

19         A.   Yes.

20         Q.   Was that a promotion?

21         A.   No.

22         Q.   Was that a promotion in title?

23         A.   No.

24         Q.   Was that a lateral move?

25         A.   No.

Corey King Vol 1
March 10, 2016                                    14

1      Q.   Okay.  What was it?

2      A.   Demotion.

3      Q.   It was a demotion.  Why was it a demotion?

4      A.   We had a need for Dr. Horstman to serve in

5  our Case Manager position, because the Case Manager

6  we had offered to had declined our offer.  And

7  because of the need of having a Case Manager and

8  Dr. Bill knowing that area, he and I in conversation

9  discussed it and he agreed to a voluntary demotion

10 to help us.

11     Q.   Was that a demotion in pay for

12 Dr. Horstman?

13     A.   It was.

14     Q.   How much of a demotion?

15     A.   Director of Campus Life is at 70, 72.  And

16 I believe the Case Manager was somewhere between 55

17 and 58.

18     Q.   And Dr. Horstman voluntarily took this

19 demotion?

20     A.   He did.

21     Q.   Did he accept any other responsibilities

22 with the University, at that time?

23     A.   He was the Assistant Dean and Case

24 Manager.

25     Q.   He didn't teach any classes?  He didn't do

Corey King Vol 1
March 10, 2016                                    15

1    anything for any extra income with the University?

2        A.   I believe Dr. Horstman taught the SLS

3    course, which is a Freshman learning seminar course,

4    and that does with an additional compensation.

5        Q.   Do you know how much that is?

6        A.   I do not.

7        Q.   Who would know that?

8        A.   The College of Education would know.  That

9    course falls under the College of Education, and the

10   designee, I believe, is either an instructor or

11   adjunct faculty.  And that varies by college at the

12   University.

13       Q.   Okay.  Since we're speaking about

14   Dr. Horstman, one of our designations is No. 10 you

15   see FAU's hiring of Dr. Williams' replacement.

16   You're saying Bill Horstman held the position of

17   Associate Dean before moving to the Assistant Dean

18   and Case Manager, correct?

19       A.   He held the position of Associate Dean of

20   Student Affairs.  It was converted to Director of

21   Campus Life, and then he moved to Assistant Dean and

22   Case Manager.

23       Q.   Okay.  And when did he become the

24   Associate Dean of Student Affairs?

25       A.   He was in -- I believe he was in the role

Corey King Vol 1
March 10, 2016                                    16

```
 1    about a year and a half to two years.

 2        Q.    Okay.  Do you know when he actually

 3    obtained the position?

 4        A.    That information, I believe, can be found

 5    in his personnel file.

 6        Q.    Prior to Dr. Horstman being the Associate

 7    Dean of Student Affairs, who held that position?

 8        A.    Repeat the question again.

 9        Q.    Prior to Dr. Horstman being - becoming the

10    Associate Dean of Student Affairs, who held that

11    position?

12        A.    Dr. Rozalia Williams.

13        Q.    And so did Dr. Horstman replace

14    Dr. Williams?

15        A.    Yes.

16             MS. CHATTERGOON:  I'm going to mark this

17        as 2.

18             (The referred-to document was marked by

19        the court reporter for identification as

20        Plaintiff's Exhibit 2.)

21      BY MS. CHATTERGOON:

22        Q.    I'm showing you what's been marked as

23    Exhibit 2.  It's the posting for the Associate Dean

24    of Student Affairs that's marked FAU1166 through

25    1173.  Just take a minute to look at it and let me
```

Corey King Vol 1
March 10, 2016                                          17

```
 1   know when you're ready.

 2             Have you seen this posting summary before?

 3        A.    Yes.

 4        Q.    And I didn't ask you earlier.  Prior to

 5   coming to this deposition, other than your attorney,

 6   have you spoken to anyone about this case?

 7        A.    Just my attorney.

 8        Q.    Have you reviewed any documents prior to

 9   coming to this deposition?

10        A.    Yes.

11        Q.    What documents were those?

12        A.    Student Code of Conduct.  The FAU Guide to

13   Student Affairs.  The questions that were - I signed

14   off on.

15        Q.    Your interrogatories?

16        A.    Yes.  A security report on an incident on

17   the Broward campuses.

18        Q.    Regarding?

19        A.    The Rotela case.  That's what I recall, at

20   this point, those documents.

21        Q.    And so this posting is for the Associate -

22   Exhibit No. 2 I'm looking at - for Student Affairs

23   on the Broward campus, correct?

24        A.    Correct.

25        Q.    And do you recall when this -- Well, if
```

Corey King Vol 1
March 10, 2016                                    18

1    you turn on the second page, it has a posting date

2    of January 10th, 2014, correct?

3         A.    Correct.

4         Q.    And it says their hiring authority email

5    cking14@FAU.  That's your email, correct?

6         A.    Correct.

7         Q.    Did you submit this posting for this job?

8         A.    Yes.

9         Q.    And why did you do so?

10        A.    Because we were looking for a position,

11   the Associate Dean in the Broward campus.

12        Q.    There's a job postdate of January 31st,

13   2014.  Do you see that?

14        A.    Yes.

15        Q.    So the job was open for about 21 days.  Is

16   that a normal job posting for the University?

17        A.    Two weeks is the minimum for the

18   University.  Two weeks, so 14 days.

19        Q.    And this is the position that was vacated

20   by Dr. Williams?

21        A.    Yes.

22        Q.    Okay.  If you look at the first page under

23   the posting summary.

24        A.    Uh-huh.

25        Q.    Who writes this position summary?

Corey King Vol 1
March 10, 2016                                    19

1          A.    Usually the supervisor, in consultation

2     with HR.

3          Q.    Who would be the supervisor for this

4     posting?

5          A.    I am.

6          Q.    Okay.  So you assisted in writing this

7     position summary?

8          A.    I did, yes.

9          Q.    Okay.  If you look at -- Well, let's just

10    go through it for a second.  It says, "The Associate

11    Dean is responsible for the following areas:

12    Diversity; student services, including students with

13    disabilities; multicultural affairs, and

14    international students; student life recreation;

15    leadership; student government; Student Union;

16    campus recreation; Center for Specific Engagement;

17    orientation, and student conduct.  And that

18    reflects -- That reflects what is on the

19    organizational chart in Exhibit 1, correct?

20         A.    Counseling, psychological services, and

21    student health is not mentioned.

22         Q.    Okay.

23         A.    Those two were moved from this position,

24    at that time.

25         Q.    Where were they moved to?

Corey King Vol 1
March 10, 2016                                    20

1        A.    They were reporting to the director of the

2    overall FAU services.

3        Q.    And who was that?

4        A.    Student Health Services at the time was

5    Cathy Wallace, and Counseling/Psychological Services

6    was Kirk Dougher.

7        Q.    What was your position as of January 10th,

8    2014?

9        A.    Associate Vice President Dean of Students.

10       Q.    And going to the second paragraph of the

11   position summary it says, "The Associate Dean

12   reports to the Associate Vice President and Dean of

13   Students and serves as a member of the Senior Vice

14   President of Student Affairs leadership team.

15   Flexible hours, including weekend and evening work

16   required."  Do you see that?

17       A.    Yes.

18       Q.    So this position reported to you?

19       A.    At the time of the posting, yes.

20       Q.    Was there a time that the Associate Dean

21   of Student Affairs on the Broward campus did not

22   report to you?

23       A.    Prior to the posting it did not report to

24   me.

25       Q.    Who did that position report to?

Corey King Vol 1
March 10, 2016                                      21

```
 1        A.    The Senior Vice President of Student
 2    Affairs.
 3        Q.    And who was it prior to January 2014?  Who
 4    was the Senior Vice President?
 5        A.    Dr. Charles Brown.
 6        Q.    Okay.  Why was there a change in
 7    reporting?
 8        A.    It was the decision of the Senior Vice
 9    President.
10        Q.    Do you know why that decision was made?
11        A.    I can say it was in relation to - from my
12    understanding from the Senior Vice President, it was
13    in relation to the handling of the Rotela case.
14        Q.    Okay.  What about the handling of the
15    Rotela case made that decision happen?
16        A.    That wasn't disclosed to me.
17        Q.    Dr. Brown would know that?
18        A.    Yes.
19        Q.    All right.  The next paragraph, it says,
20    "Essential duties are highly complex.  Develop
21    strategies, policies, and practices.  It applies
22    highly-developed rated and problem-solving skills.
23    Has authority to waive or deviate from established
24    policies and procedures without prior approval.
25    Exercises considerable authority and independent
```

Corey King Vol 1
March 10, 2016                                        22

1   judgment and has substantial latitude for

2   independent action."  Did any of these duties change

3   for this posting?

4        A.   No.

5        Q.   So these essential duties as described

6   here were the same duties that Dr. Williams had to

7   adhere to?

8        A.   Yes.

9             (The referred-to document was marked by

10        the court reporter for identification as

11        Plaintiff's Composite Exhibit 3.)

12     BY MS. CHATTERGOON:

13        Q.   I'm going to do this as Composite Exhibit

14   3.

15             Just let me know when you had a chance to

16   review it, Dr. King.

17        A.   Yes.

18        Q.   Okay.  The first letter is a letter to

19   Dr. Horstman dated January 8th, 2014 offering him

20   the interim position of Associate Dean, correct?

21        A.   Yes.

22        Q.   Okay.  Who was in -- Well, let me strike

23   that.

24             Do you recall when Dr. Williams separated

25   her position as Associate Dean of Students for the

Corey King Vol 1
March 10, 2016                                    23

1    Broward campuses?

2         A.    I do not.

3         Q.    Do you know whether there was an interim

4    appointment prior to Dr. Horstman's appointment for

5    that position?

6         A.    No.

7         Q.    Did you participate in the decision to

8    place Dr. Horstman as the Interim Dean of Students -

9    Associate Dean of Students?

10        A.    I'm confident that Dr. Brown talked to me

11   about it.

12        Q.    So Dr. Horstman was placed as an Interim

13   Associate Dean, and then the job posting was posted

14   on January 10th.  His interim placement was on

15   January 8th.  Was he eventually placed into that

16   position?

17        A.    After a national search, yes.

18        Q.    How long was the national search for?  And

19   you can see it on Exhibit No. 2.  I think we

20   discussed it.

21        A.    Well, Exhibit No. 2, for clarification

22   purposes, when you put something into what's called

23   our People Admin System, you get proposed dates.

24        Q.    Okay.

25        A.    So I'm confident these daters are not the

Corey King Vol 1
March 10, 2016

24

1    actual dates of the actual search.

2         Q.   How would we know the dates of the actual

3    search then?

4         A.   That would be an HR question.  They would

5    know the actual date it was posted.  This is what's

6    called a View Position Summary Proposal, where you

7    put into our system on the campus what you would

8    like to see happen and the dates you would like to

9    see it happen.

10        Q.   So who puts the information into that

11   system?

12        A.   Usually the supervisor or an assistant

13   related to the supervisor puts it into the HR

14   system.

15        Q.   Do you recall if you put this information

16   into the system?

17        A.   I don't recall, but I have put information

18   into the system before.

19        Q.   Whether you put it into the system or not,

20   would you have had to approve the information being

21   placed there?

22        A.   Yes.

23        Q.   And how many people did you interview for

24   the position of Associate Dean?

25        A.   That would be an HR question.

Corey King Vol 1
March 10, 2016                                    25

1        Q.    Would Robin Kabat know that?

2        A.    Yes.

3        Q.    Do you recall when Dr. Horstman was

4   permanently placed into the position of Associate

5   Dean of the Broward campuses?

6        A.    No.   That would be in his personnel file.

7        Q.    On the second page of that Exhibit 3

8   there's a request for a 20 percent increase for

9   Dr. Horstman based on his need to travel to the

10  Davie campus.   Do you see that?

11       A.    Yes.

12       Q.    Had that been done for any other dean -

13  Associate Dean of Students, at that time?

14             MS. WYDLER:   Form.

15       A.    It is customary in the University

16  environment that when a person is placed in an

17  interim position, they're given some type of

18  increase for additional responsibilities.

19  BY MS. CHATTERGOON:

20       Q.    Okay.   But that was not for additional

21  responsibilities, that was for travel, correct?

22       A.    According to this memo, you're correct.

23       Q.    Okay.   So just take a look at the first

24  page for me, the annual salary of $60,564.   Do you

25  know if that was an increase for Dr. Horstman in

Corey King Vol 1
March 10, 2016                                      26

1    pay?

2        A.    No, it wasn't.

3        Q.    It was not an increase?

4        A.    Not to my knowledge.

5        Q.    Once he was placed in the position of

6    Associate Dean of Student Affairs, did he receive an

7    increase in pay?

8        A.    The Associate Deans on the partner

9    campuses typically make between 70 and 72,000.

10       Q.    Who made the decision to hire Dr. Horstman

11   as the Associate Dean of Student Affairs for the

12   Broward campus?

13       A.    At that point, I would have been the

14   hiring authority, so I did it.

15       Q.    How many candidates did you interview for

16   that position?

17       A.    That would be an HR question.

18       Q.    Do you recall how many candidates you

19   interviewed?

20       A.    Three.  That would be on-campus

21   candidates.

22       Q.    What does that mean?

23       A.    So the process for searches in the Student

24   Affairs is typically that the Search Committee will

25   interview a slew of candidates, maybe anywhere

Corey King Vol 1
March 10, 2016                                    27

```
 1   between five, seven, and ten.  And then they would
 2   then provide three candidates that they would like
 3   to bring to campus for what we call on-campus
 4   interviews.
 5        Q.    Okay.  Just take a look at Exhibit No. 2
 6   for me.  If you go to Pages 7 and 8, are any of
 7   these -- Let me ask you, what are those names and...
 8        A.    Those names are HR, EOP, or EIC, which is
 9   our equal employment office and then myself.
10        Q.    What do these two pages indicate?  Are
11   those just changes to the posting?  Are they part of
12   the Search Committee?  What do those names indicate?
13   It's not clear.
14        A.    They're related to postings.  When a
15   position is posted it is entered, and once it's
16   entered it goes through a series of approval
17   processes before it's actually posted.  Once it's
18   posted, their system receives applicants.  And then
19   the applicants are in the system.  And then the
20   hiring authority or their designee can go in and
21   designate the applicants as whether interviewed, not
22   interviewed.  And then they also indicate their
23   candidate for choice.  Once we choose the person you
24   want to hire, you push the save button and then it
25   has to go through a series of University approval
```

Corey King Vol 1
March 10, 2016                                      28

1    processes before an offer can be made to a

2    candidate.

3         Q.   Do you recall who was on the Search

4    Committee for the Associate Dean of Student Affairs

5    position?

6         A.   I do not.

7         Q.   How many people would have been on the

8    committee?

9         A.   We typically have between five to seven

10   people on a Search Committee.

11        Q.   If you take a look at Page 4 of the

12   document.   It says Search Committee and there are a

13   list of six names?

14        A.   Okay.

15        Q.   Would those have been the members on the

16   Search Committee, as you recall?

17        A.   If that's here, yes.

18        Q.   And do you -- You said you recalled three

19   candidates for the position?

20        A.   Coming to on-campus interview, I believe

21   we had three candidates.   I believe three

22   candidates.

23        Q.   Did you interview those three candidates?

24        A.   Yes.

25        Q.   Do you recall their names?

Corey King Vol 1
March 10, 2016                                      29

1        A.   Of course, Dr. Horstman.   That's all I

2   recall at this point is Dr. Horstman.

3        Q.   Do you recall whether any of the other two

4   candidates were female?

5        A.   No.

6        Q.   Do you recall whether any of the other two

7   candidates were African-American?

8        A.   No.

9        Q.   Do you recall whether any of the other

10  candidates were over 40?

11       A.   No.

12       Q.   Where would I find that information?

13       A.   HR.

14       Q.   Okay.  So HR would have details of the -

15  all three candidates that interviewed for that

16  position in 2014?

17       A.   HR will have information of all candidates

18  interviewed, whether they're on campus or not,

19  whether it's a Skype interview, telephone interview.

20  HR considers those forms all interviews.  So they

21  would have all candidates interviewed whether they

22  came to campus or not.

23       Q.   How could I find out who actually came to

24  on-campus interview?  Is there a specific form that

25  would indicate that?

Corey King Vol 1
March 10, 2016                                    30

1        A.   That information would rest with the

2   Search Committee.

3        Q.   I'm sorry, repeat that for me.

4        A.   That information will rest with the Search

5   Committee.

6        Q.   Okay.  Which one of those six members of

7   the Search Committee?

8        A.   It more than likely would be in the files

9   of Student Affairs.

10       Q.   Okay.  When these candidates were

11  interviewed, who setup the schedule to interview

12  them?

13       A.   Typically, the chair would work with an

14  assistant.

15       Q.   And so would that be made around your

16  schedule or the Search Committee's schedule?  How

17  does that work?

18       A.   When a person comes to campus they meet

19  with a slew of people, so it would work around

20  people involved in the interview process.

21       Q.   Okay.  Would there have been a schedule

22  sent out --

23       A.   Yes.

24       Q.   -- to the Search Committees?

25       A.   A schedule would be sent out to all

Corey King Vol 1
March 10, 2016

31

1    participants.

2         Q.    Okay.  And would that schedule include the

3    name of these candidates?

4         A.    It will, yes.

5         Q.    You said you made the ultimate decision to

6    hire Dr. Horstman for that position, correct?

7         A.    Yes.

8         Q.    Why did you decide to hire Dr. Horstman

9    for that position as opposed to the other two

10   candidates?

11        A.    Based on qualifications and

12   recommendations of the Search Committee.

13        Q.    What about his qualifications made him the

14   ideal candidate for that position?

15        A.    The qualifications that were specified in

16   HR.  HR qualifies all candidates.

17        Q.    Dr. Horstman was a current employee of the

18   University, correct?

19        A.    Correct.

20        Q.    At that time?

21        A.    Yes.

22        Q.    And what was his position at the time, do

23   you recall?

24        A.    He had a position in our New Student & Owl

25   Family Programs.

Corey King Vol 1
March 10, 2016

32

 1       Q.   In interviewing Dr. Horstman for the

 2   position of Associate Dean of Student Affairs, did

 3   you look at his evaluations prior to his interview?

 4       A.   I did not, no.

 5       Q.   Does anyone in the Search Committee look

 6   at evaluations since he already worked for the

 7   University?

 8       A.   I don't know that answer.

 9       Q.   Is that something that a Search Committee

10   typically does when you're interviewing someone who

11   already works for the University?

12       A.   Typically what we do in all our cases is

13   do reference checks.  So he would have to share with

14   us his current supervisor, former supervisor,

15   professional colleagues; typically three or more

16   references.

17       Q.   And who conducts those reference checks?

18       A.   It could either be the chair of the

19   committee, the Search Committee, or the hiring

20   authority.

21       Q.   Do you know who the chair of the Search

22   Committee was for that position?  I think Page 4 has

23   the names of the Search Committees, if that would

24   jog your memory.

25       A.   I want to say Joanna Ellwood served as a

Corey King Vol 1
March 10, 2016                                    33

1    chair.

2         Q.   What is the university's policies with

3    regard to salary?  Is it a set salary based on the

4    position?  How does raises and promotions work?

5         A.   That's a question for Human Resources.

6         Q.   Do you have any authority in your position

7    as Vice President to give an Associate Dean a raise?

8         A.   Yes.

9         Q.   And do you have to submit any basis for

10   that raise to the University?

11        A.   Yes.

12        Q.   Can that decision be made unilaterally?

13        A.   No.

14        Q.   Okay.  Who does that have -- Who do you

15   have to consult with?

16        A.   Human Resources and the University -- At

17   my level Human Resources and University President.

18        Q.   Would Dr. Horstman have received a raise

19   when he was placed in that position?

20             MS. WYDLER:  Objection to form.

21      BY MS. CHATTERGOON:

22        Q.   You can still answer when she objects.

23        A.   I'm just thinking when you said raise.  My

24   understanding of our HR process is that when a

25   person is hired into a position, they are

Corey King Vol 1
March 10, 2016                                        34

1   compensated for qualifications and responsibilities

2   of the position, so...

3            MS. CHATTERGOON:  I'm going to mark this

4        as Exhibit 4.

5            (The referred-to document was marked by

6        the court reporter for identification as

7        Plaintiff's Exhibit 4.)

8            MS. WYDLER:  What designation are you

9        addressing now?

10           MS. CHATTERGOON:  Off the record.

11           (A discussion was held off the record,

12       after which the following proceedings were

13       held:)

14   BY MS. CHATTERGOON:

15   Q.   So I want to talk to you, Dr. King, about

16   the FAU's policy and procedures for investigating

17   threats made by students.  What is that policy?  Or

18   can you tell me what the university's policy and

19   procedures are for investigating threats made by

20   students?

21   A.   So threats made by students falls under

22   two areas of the University.  First is the

23   University Student Code of Conduct, which is not a

24   policy or procedure.  Our Student Code of Conduct is

25   a regulation which is governed by the Board of

Corey King Vol 1
March 10, 2016                                        35

```
 1    Trustees.  So all of the procedures that happen

 2    under 4.007 is under a regulation.  So here this

 3    document is a Student Crisis Awareness Committee,

 4    and is a committee that meets to discuss potential

 5    students of interest and it is for the sole purpose

 6    of intervening with students and being proactive.

 7    So students of interest come to this committee to

 8    discuss.  So this management policy, along with the

 9    Student Code of Conduct Regulation 4.007 governs

10    that process.

11        Q.   So that would also govern the procedure

12    for investigating threats made by students, correct?

13        A.   Either this policy and/or Regulation

14    4.007, correct.

15        Q.   Okay.  All right.  Let's talk about this

16    policy, which is Exhibit No. 4 that I marked.

17        A.   Yes.

18        Q.   It's the Student Threat Assessment and

19    Management Policy.  It's marked FAU 1231 through

20    1234.

21        A.   Uh-huh.

22        Q.   And this is the - it details what the

23    Student Crisis Awareness Committee and the Student

24    Intervention Team, their purposes and functions,

25    correct?
```

1       A.    Yes, correct.

2       Q.    Okay.  What is the purpose of the Student

3   Crisis Awareness Committee?

4       A.    The purpose of the committee is to "gather

5   information, review and advise University

6   administrators on how to cope with students

7   identified as having difficulty coping in college,

8   potentially possessing a risk of harm to themselves

9   or others, or engaging in behavior that threatens to

10  become a risk of harm to themselves or others in the

11  University community."

12      Q.    And who sits on this, and for purposes of

13  the deposition we'll say the SCAC Committee, because

14  that's how you refer to it, correct?

15      A.    Yes.

16      Q.    Okay.  Who sits on this SCAC Committee?

17      A.     Representatives from Athletics, Campus

18  Rec, Fraternity/Sorority Life, Dean of Students

19  Office, Housing and Residence Life, Student

20  Involvement Leadership, Student Conduct, Ombudsman

21  Office, police department, representatives from

22  Department of Campuses, faculty member CAPS which is

23  our counseling services, Health Services in OSD,

24  which all serve and consult all members.

25      Q.    You just went through a long list for me.

Corey King Vol 1
March 10, 2016                                    37

1    You did say the Associate Dean, correct?

2         A.    Yeah, representatives from the partner

3    campuses.

4         Q.    How many partner campuses are there?

5         A.    We typically designate two.  We put them

6    into a composition of campuses, so you have the

7    Broward campuses and you have the northern campuses.

8         Q.    What campuses are -- What campuses

9    constitute the northern campuses?

10        A.    Would be Jupiter, Harbor Branch, and at

11   that time, during this time period, I believe,

12   Treasure Coast was on the docket.

13        Q.    When you say during this time period, you

14   mean during?

15        A.    The time period of the 20- - when

16   Dr. Williams was the Associate Dean of Broward

17   campuses.

18        Q.    And Broward campuses would consist of

19   which campuses?

20        A.    The Davie campus, the Fort Lauderdale

21   campus, and SeaTech.

22        Q.    And so at this time, meaning at the time

23   Dr. Williams was employed with the University as the

24   Associate Dean of Students, who was the Associate

25   Dean for the northern campuses that sat on this

Corey King Vol 1
March 10, 2016                                    38

1    committee?

2          A.    Dr. A.J. Chase.

3          Q.    And what was her actual position?

4          A.    Associate Dean Northern Campuses.

5          Q.    It was for northern campuses or was it for

6    a specific campus?

7          A.    Northern campuses, yeah.   Northern

8    campuses, yes.

9          Q.    Did Terry Mena also sit on this committee?

10         A.    Yes.

11         Q.    What was his position?

12         A.    Associate Dean of Boca campus.

13         Q.    You stated northern and Broward campus,

14   but there's also a Boca campus?

15         A.    That's our main campus, Boca Raton.

16         Q.    How many associate deans were there at the

17   time of Dr. Williams' employment?

18         A.    Three, three associate deans.

19         Q.    So that would have been Dr. Williams,

20   Terry Mena and A.J. Chase, correct?

21         A.    Correct.

22         Q.    And so Terry Mena was the Associate Dean

23   of the Boca campus?

24         A.    Correct.

25         Q.    And it was just one campus, your main

1   campus?

2        A.   Our main campus.

3        Q.   And A.J. Chase was the Associate Dean of

4   the northern campuses, which consisted of how many

5   campuses?

6        A.   Jupiter which is our honors college,

7   Harbor Branch, and I believe - we had a Treasure

8   Coast campus that had subsequently closed.

9        Q.   And so how often would this SCAC Committee

10  meet?

11       A.   It typically would meet every two weeks.

12       Q.   And what was the purpose of meeting every

13  two weeks?

14       A.   The purpose as stated in the document on

15  page - on the first page.

16       Q.   Okay.  And so who set the agenda for this

17  SCAC meeting?

18       A.   I did at that point.  I was the Associate

19  VP and Dean of Students.  The agenda was set by

20  people submitting names for conversation for the

21  group.

22       Q.   So members of the committee would submit

23  names for conversation for the group, correct?

24       A.   Yes.

25       Q.   What it required - or were the members

Corey King Vol 1
March 10, 2016                                          40

```
 1    required to submit a name before taking any action

 2    against a student?

 3         A.    (Nods head in the negative.)

 4         Q.    You have to say yes or no.

 5         A.    No.

 6         Q.    And then tell me, what is the Student

 7    Intervention Team?

 8         A.    The Student Intervention Team is a smaller

 9    group.  The purpose of that is to act on the

10    recommendations of the SCAC and to respond to actual

11    and imminent risk or emergency situations to prevent

12    individuals from harming themselves or others.

13         Q.    And did this -- Who were the members of

14    this committee?

15         A.    Composition in No. 4 was myself, was the

16    Associate Vice President Dean of Students, associate

17    deans, assistant deans, the Chief of Police,

18    Director of Housing, faculty member, and advisory

19    group from CAPS and OSD and things of that nature.

20         Q.    So Dr. Williams would have sat on this

21    committee, as well, correct?

22         A.    In her role as Associate Dean, yes.

23         Q.    And how often did this committee meet?

24         A.    As deemed necessary.

25         Q.    I'm sorry?
```

Corey King Vol 1
March 10, 2016                                     41

1        A.    As deemed necessary.

2        Q.    What does that mean?

3        A.    When it was necessary for this smaller

4   group to come together, it came together.

5        Q.    So they didn't meet every two weeks or

6   every three weeks like the SCAC Committee meet?

7        A.    The individuals in SIT are a part of the

8   SCAC, so...

9        Q.    So all members would know what is going on

10  in each committee, correct?

11       A.    That is correct.

12       Q.    Did each committee -- Strike that.

13            MS. CHATTERGOON:  We'll mark this as 5.

14            (The referred-to document was marked by

15       the court reporter for identification as

16       Plaintiff's Exhibit 5.)

17  BY MS. CHATTERGOON:

18       Q.    Before I get to Exhibit 5, you said it

19  was - the SIT Committee would meet when it was

20  deemed necessary.  Would someone have to submit a

21  name or an issue for that committee to actually

22  meet?

23       A.    It would be up to the Associate VP and

24  Dean of Students to determine if there was a

25  possible of the imminent threat or concern.

Corey King Vol 1
March 10, 2016                                    42

1        Q.    Would it be necessary to convene a

2   committee if an Associate Dean of Students submitted

3   a name to the committee or an issue?

4        A.    To the SIT?

5        Q.    Yes.

6        A.    If the Associate Dean believed that the

7   situation was an imminent threat or emergency to the

8   University.

9        Q.    What about the SCAC Committee, other than

10  meeting every two weeks as you said, if there was a

11  need to convene that committee, who would do that?

12       A.    The Associate Dean - I mean, the Associate

13  VP and Dean of Students.

14       Q.    The Associate Dean and VP would make the

15  decision to convene that?

16       A.    The Associate VP and Dean would make -

17  outside of the regular every two week meeting, yes.

18       Q.    I want you to take a look at Exhibit 5.

19  That's Regulation 4.007, the Student Code of

20  Conduct.  And it's been marked FAU 1485 to 1504.

21            MS. CHATTERGOON:  Just so Counsels know,

22       it's handwritten on the bottom because when I

23       printed it it didn't print out.

24       Q.    Is this the -- Well, let me ask this.  Is

25  it a complete copy of the Regulation 4.007?

Corey King Vol 1
March 10, 2016                                        43

1          A.    Yes.

2          Q.    And this is the regulation you stated

3    earlier that the University is required to follow

4    with regard to threats made by students, correct?

5          A.    In investigations, yes.

6          Q.    In investigations.  Okay.

7                Can you walk me through how an

8    investigation begins and through the resolution.

9          A.    So a -- There is a complainant.  There is

10   usually a report of some nature that comes to an

11   appropriate University official within the Dean of

12   Students office.  It is only those individuals in

13   the Dean of Students office under the Dean's

14   designee who can invoke the code.

15         Q.    Who would those be?

16         A.    It would be the Dean and the three

17   Associate Deans and the Assistant Dean.

18         Q.    Okay.

19         A.    And the Assistant Director.

20         Q.    Okay.

21         A.    So a report comes and those individuals

22   review the report.  And from that, according to the

23   code, there should be - there will be an

24   investigatory conference.  So a student receives a

25   letter of an investigatory conference.  The only

Corey King Vol 1
March 10, 2016                                    44

1   deviation from that is that if there is an imminent

2   threat or emergency to the University community,

3   then emergency measures can take place.  And if

4   there is a belief that emergency measures are

5   necessary, then an emergency measure is invoked

6   before there is an investigatory conference, a

7   Notice of Charge, or anything thereafter.  If

8   emergency measures are not invoked when you move to

9   the investigatory conference, which will be where

10  the appropriate conduct officer would begin to

11  investigate the actual complaints.  If upon

12  investigating there is evidence or grounds for

13  charges, the conduct officer would submit a Notice

14  of Charge to the student indicating the purpose -

15  indicating the charges, the purpose of the charges,

16  and the date and time and location of their student

17  conduct conference.  Next step is the student

18  conduct conference.  And in that conference the

19  student, or in this point they're now the alleged

20  perpetrator or the alleged charged student, they

21  have an opportunity to review the information,

22  potential information from the investigation.  They

23  have, at that point, their rights are explained to

24  them.  They review the charges and then they take a

25  plea or they indicate that they are responsible or

```
1    not responsible for the charges.  If they take

2    responsibility for the charges, then right there the

3    conduct officer can issue sanctions related to the

4    severity of those charges.  And then those sanctions

5    are handed down in a letter to the student.  If the

6    student pleads not responsible, then the student has

7    an option to either go to what we call an

8    administrative hearing with one student conduct

9    officer or to a student conduct board that is

10   composed of faculty and students.

11        Q.   Okay.

12        A.   That board then determines whether or not

13   the student is responsible or not responsible.

14        Q.   And is that board -- Does that board have

15   the authority to hand down sanctions after that?

16        A.   That board has the authority to hand down

17   sanctions, yes.

18        Q.   Anything else in that procedure that we

19   haven't talked about?

20        A.   There is an appeals process to that

21   procedure.  Once sanctions have been handed down,

22   students can appeal in certain instances based on

23   the severity of the sanction they can appeal.  If a

24   student takes responsibility or conduct board

25   sanctions, they have appeal opportunities to the
```

Corey King Vol 1
March 10, 2016                                    46

1   next level.

2        Q.   Okay.  Is there a board for the appeals

3   process?

4        A.   There is no board for the appeals process.

5        Q.   Who makes the final decision in the

6   appeals process?

7        A.   The Vice President for Student Affairs

8   makes the final appeal decision for the University.

9   There is an appeal beyond the Vice President for

10  Student Affairs in the Circuit Court.

11       Q.   Let me just go back to the report.  You

12  said the report is made to the appropriate

13  individual designee; that would be the dean, the

14  three associate deans, the assistant dean, and the

15  assistant director, correct?

16       A.   Correct.

17       Q.   All right.  Is there a specific person for

18  each campus that is designated to receive a report?

19  For example, on the Broward campus, would it be the

20  Associate Dean of Students for the Broward campus

21  who would be the person giving that report to?

22       A.   Yes.

23       Q.   And then you said an investigatory

24  conference is held.  Well, let me ask you, wherein

25  the code does it provide for these procedures?

Corey King Vol 1
March 10, 2016                                    47

 1        A.    I talked about on Page 8 before we get to

 2   the investigatory conference that there is emergency

 3   measures.  So in the complaint if a - if the

 4   complaint is such that emergency measures need to be

 5   taken, this is where those emergency measures are

 6   taken at this point on Page 8.  And then on Page 9

 7   is where it gets actually into the procedures for

 8   the conduct proceedings to complain against.  And

 9   make a determination on Page 10 for Notice of

10   Charges, the student conduct conference, et cetera.

11   So you will find it eight, nine, ten, looks like

12   Page 11.  Page 12 is the structure of the board and

13   the hearings.  Page 13 is the actual hearings.  And

14   Page 14 talks about the sanctioning.  And then

15   Page - if you go all the way down to Page 18 talks

16   about the appeals.

17        Q.    Okay.  All right.  Let's start on Page 8

18   for the emergency measures.

19        A.    Yes.

20        Q.    At what stage can emergency measures be

21   taken?

22        A.    Usually, the -- Well, emergency measures

23   are taken on the front end.  That means there's a

24   imminent threat or concern to the University

25   community.  That's where emergency measures are

Corey King Vol 1
March 10, 2016                                          48

```
 1    taken even before an investigatory conference

 2    begins.

 3         Q.   I want you to take a look at Paragraph 8 -

 4    Page 8, Paragraph 9 Emergency Measures A under that.

 5    Do you see that?

 6         A.   Yes.

 7         Q.   Does it say there that the emergency

 8    measures have to be taken before the investigatory

 9    conference?

10         A.   It does not.

11         Q.   Are there different stages where emergency

12    measures can be taken?

13         A.   Please clarify.

14         Q.   Sure.

15              Are there different stages in the Student

16    Code of Conduct -- Let me try to rephrase that for

17    you.

18              Once there is a report, if there's an

19    investigatory conference done and an Associate Dean

20    or whoever the designee is at that time determines

21    that emergency measures need to be taken at that

22    point, are they allowed to take those emergency

23    measures?

24         A.   Emergency measures means that there is an

25    imminent threat to the health and welfare and safety
```

Corey King Vol 1
March 10, 2016                                        49

```
 1    of a student or the University community.  In my

 2    time as a Student Conduct Officer at FAU, emergency

 3    measures are taken before an investigatory

 4    conference or Notice of Charges are issued, because

 5    emergency measures means we have a threat to the

 6    safety and welfare of a student or the University

 7    community, and that's to my knowledge.

 8         Q.   Is there a chart for the process of

 9    applying the Student Code of Conduct at the

10    University?

11         A.   There is a flowchart, and it's in the

12    front of the actual blueprint of the printed Student

13    Code Conduct book.

14         Q.   Does that flowchart identify where

15    emergency measures must be taken?

16         A.   I'm unable to view that in my thought

17    process, but the process of this document such where

18    emergency measures SIT as compared to the other

19    procedures, indicates to me in my time at FAU, that

20    emergency measures are taken prior to an

21    investigatory conference or Notice of Charges or

22    anything thereafter.

23         Q.   During your time at FAU, since you

24    mentioned it, do you recall a situation where

25    emergency measures were taken after the
```

```
 1    investigatory conference or Notice of Charges?

 2         A.    I do not.

 3              MS. CHATTERGOON:   Off the record for a

 4         second.

 5              (A recess was taken from

 6         11:21 a.m. until 11:29 a.m., after which the

 7         following proceedings were held:)

 8              (The referred-to document was marked by

 9         the court reporter for identification as

10         Plaintiff's Exhibit 6.)

11    BY MS. CHATTERGOON:

12         Q.    Prior to our break, Dr. King, we talked

13    about flowcharts and we happen to have the Student

14    Code of Conduct for 2012 to 2013 and we've made

15    copies of that with the flowchart.  Is this the

16    flowchart that was in effect for 2012 to 2013?

17         A.    Correct.

18         Q.    And I want you to take a look at the

19    flowchart for me and it goes through the steps that

20    you discussed earlier.  It says complaint or

21    incident report, investigation.  There's an arrow

22    for matter closed or there's a box next to it with

23    emergency measures, which include interim

24    suspension, interim removal, housing, other

25    restrictions.  Do you see that?
```

Corey King Vol 1
March 10, 2016                                              51

1      A.    Yes.

2      Q.    And that flowchart for emergency measures

3  flow either from the beginning to the investigation

4  of the complaint or to the Notices of Charges,

5  correct?

6      A.    Correct.

7      Q.    Does that indicate to you that emergency

8  measures can be taken at any stage, either at the

9  complaint or incident report, the investigation of

10 the complaint, or the Notices of Charges?

11     A.    No.

12     Q.    Why not?

13     A.    What it indicates to me is that from the

14 complaint or the incident report, you can either go

15 to an investigation of the complaint or you

16 immediately go to emergency measures.

17     Q.    Fair enough.

18     A.    And then from emergency measures you

19 either go to an investigatory conference or you

20 immediately go to charges from the emergency

21 measures.

22     Q.    From the emergency measures?

23     A.    That arrow is pointing in one direction.

24 So from the emergency measures, you can go from the

25 emergency measures to the Notice of Charges, which

Corey King Vol 1
March 10, 2016                                    52

1    means you can bypass an investigation.

2         Q.   I'm sorry, say to that me again.

3         A.   So if you have a complaint you can go to

4    an emergency measures.  If the emergency measures is

5    such that you have all the information that you

6    need, you can bypass the actual investigatory

7    conference and go from the complaint to the

8    emergency measure to the Notice of Charges.

9         Q.   Okay.  At any time -- Well, who is the

10   ultimate -- Strike that.

11             The Senior Vice President of Student

12   Affairs is the person in charge of the - ensuring

13   the process of the Student Code of Conduct is

14   appropriately, what's the word I'm looking for,

15   managed, correct?

16        A.   Ultimately, yes.

17        Q.   Is there any training done on this

18   complaint procedure?

19        A.   Yes.

20        Q.   Who conducts that training?

21        A.   Typically, the Assistant Dean and Director

22   of Student Conduct.

23        Q.   And who would that have been in 2012 and

24   2013?

25        A.   Joanna Ellwood.

Corey King Vol 1
March 10, 2016                                    53

1          Q.    Do you know if any training was conducted?

2          A.    Yes.

3          Q.    And do you know whether emergency measures

4    were ever taken after investigation of a complaint

5    during your time on the SCAC or SIT Committee?

6          A.    No.

7          Q.    No, you don't know; or no, they weren't

8    taken?

9          A.    You said after -- Please clarify your

10   question.

11         Q.    Sure.  Let me repeat the question.

12               At any time from 200- -- Well, strike

13   that.

14               How long did you sit on the SCAC and SIT

15   Committee?

16         A.    Since I was hired in 2008.

17         Q.    Okay.  So any time you sat on that

18   committee, do you recall a time where emergency

19   measures were taken after the investigation of a

20   complaint?

21         A.    No.

22         Q.    Do you recall a time where emergency

23   measures were taken at the time Notice of Charges

24   were issued?

25         A.    No.

Corey King Vol 1
March 10, 2016                                    54

1        Q.   You stated earlier that it wasn't

2   necessary to meet with a SCAC or SIT Committee if an

3   assistant or associate dean were to take action

4   against a student if there was a threat made,

5   correct?

6        A.   I need clarification on that.

7        Q.   Sure.

8             Earlier I asked you whether it was

9   necessary for a member of the SCAC or SIT Committee

10  to meet with the committee before either conducting

11  an investigation or issuing a Notice of Charges and

12  you stated no; is that correct?

13       A.   That's correct.

14       Q.   So what would be the purpose of -- Strike

15  that.

16            Names that were submitted to the SCAC or

17  SIT Committee for discussion, what was the purpose

18  of submitting those names?

19       A.   The purpose was to really involve the

20  people around the table to see if the names of those

21  students of interest were involved in other areas

22  around the University.  Were there other issues or

23  concerns that other people were having.  Those

24  meetings, typically, yielded in a collaboration of a

25  student name coming forward and someone saying, oh,

Corey King Vol 1
March 10, 2016                                      55

1    yes, we dealt with that student; oh, yes, we...  So

2    there was more of a University approach of handling

3    that student or case management of a student.

4         Q.   So the handling or case management of that

5    student would be discussed in those meetings with

6    those committee members?

7         A.   Yes.

8         Q.   Okay.  Once a either the Associate Dean or

9    Associate Director issued a Notice of Charges, was

10   that Notice of Charges required to be approved by

11   the either Associate Dean or Senior Vice President

12   before it was sent to the student?

13        A.   Approved, no.

14        Q.   And so for this flowchart in Exhibit 6,

15   the Associate Dean designee, Assistant Dean,

16   Assistant Director had the responsibility for that

17   incident report through which process here on this

18   flowchart?

19             For example, an Associate Dean got the

20   incident report.  Were they responsible for the

21   investigation, the Notice of Charges, the student

22   conduct conference?

23        A.   Case management, yes.

24        Q.   Case management.

25        A.   With the exception of emergency measures.

Corey King Vol 1
March 10, 2016                              56

```
 1        Q.    Why is that?
 2        A.    Emergency measures, that was the
 3   discussion.  When you're taking emergency measures
 4   in a University environment, our practice has been
 5   there's a discussion with the Dean of Students
 6   and/or the Senior Vice President, because emergency
 7   measures means that you are taking away some
 8   student's privilege or access to some type of
 9   service.
10        Q.    And that's a verbal discussion?
11        A.    Typically, a verbal discussion.
12        Q.    Okay.  Going back to Exhibit 5, which is
13   the Student Code of Conduct under Page 8, Paragraph
14   9 Emergency Measures.  It says here, "The Dean of
15   Students or designee has the authority to take
16   appropriate immediate action against the student who
17   poses a danger of imminent or physical harm to
18   himself, herself, or others at the University, or
19   where the Dean of Students determine that emergency
20   exists which effect the health, safety, welfare of a
21   student or University community."  Where does it say
22   there in emergency measures that a discussion has to
23   take place?
24        A.    It does not say a discussion has to take
25   place; however, the authority of emergency measures
```

Corey King Vol 1
March 10, 2016                                        57

1    is a designee of Dean of Students.  It is ultimately

2    the authority of the Dean of Students, and the Dean

3    of Students designate that authority to others.  So

4    the practice has been, since it is a designation,

5    that there has been a conversation with the Dean of

6    Students and/or the Senior Vice President regarding

7    that.  So it's a practice.

8          Q.    It's a practice.  Okay.

9                So who would be the designee in a

10   situation like that?  Would that be the titles we

11   discussed earlier?

12         A.    Yes.

13         Q.    And who is the Dean of Students?  Is that

14   defined anywhere?

15         A.    The Dean of Students is a position held at

16   the University.

17         Q.    Take a look at Page 2 for me.  Under

18   Paragraph 4, Definition F, there's a definition for

19   Dean of Students.  It states, "The term Dean of

20   Students refers to any of the following person or

21   offices:  Associate Vice President and Dean of

22   Students, Associate Dean of Students, Assistant Dean

23   of Students, or designee."  Do you see that?

24         A.    I do.

25         Q.    Okay.  So in taking that definition to

1    Paragraph 9 for Emergency Measures.

2         A.   Yes.

3         Q.   It would seem to me that any person

4    defined under 4F would have the authority to take

5    emergency measures?

6         A.   Correct.  If you look on Page 2 it also at

7    the end says or designee.  So again, the Dean of

8    Students has a right to designate even more

9    individuals to do that based on their authority.

10        Q.   Okay.

11        A.   Yes.

12        Q.   But here it also defines Dean of Students

13   as the Associate Dean of Students, correct?

14        A.   As the Dean of Students, the Dean of

15   Students determine their designee.  And those

16   designees go in -- So when the book is printed for

17   2013/2014, the Dean could say I want to add another

18   position.  It is the Dean of Students every year who

19   determines who the designees would be for that

20   authority.  That's why this book is printed every

21   year.

22        Q.   So for 2012 and 2013 academic year.

23        A.   Yes.

24        Q.   The designee included the Associate Vice

25   President Dean of Students, the Associate Dean of

Corey King Vol 1
March 10, 2016                                    59

```
 1   Students, and the Assistant Dean of Students,

 2   correct?

 3        A.    Correct.

 4        Q.    For the emergency measures going back to

 5   Page 8.

 6        A.    Yes.

 7        Q.    It says here, "Emergency measures include

 8   but are not limited to one or more of the

 9   following."  And there are five measures that are

10   given?

11        A.    Yes.

12        Q.    Is there a requirement that one measure is

13   taken before another?  For example, does interim

14   suspension have to be taken before interim removal

15   from University housing?

16        A.    No.

17        Q.    I want to go back to that flowchart for a

18   second.

19              Once the Notice of Charges is issued.

20        A.    Yes.

21        Q.    There's a student conduct conference.

22        A.    Yes.

23        Q.    At that conference is where the student

24   actually enters into a plea or says they're not

25   responsible and want a hearing, correct?
```

Corey King Vol 1
March 10, 2016                                    60

1        A.    Correct.

2        Q.    If there is a plea and sanctions are

3    issued and they accept the sanctions, is the person

4    or persons to whom threats were made against also

5    included in that sanction process, or are they

6    notified of the sanction I should ask?

7              MS. WYDLER:  Object to the form.

8        A.    We have a portion of our code that is

9    called Victim Rights.

10   BY MS. CHATTERGOON:

11       Q.    Okay.

12       A.    And if -- When the person is deemed an

13   alleged victim in a situation, their rights are

14   outlined on 19, Page 19.

15       Q.    Okay.  So that's Paragraph 16 of the code?

16       A.    Yes.

17       Q.    Victim's Rights and Proceedings.

18             It seems like this is not a complete copy.

19   It seems like Pages 20 and 21 are missing.  That's

20   all right.

21             Take a look at Page 9 for me, Paragraph

22   10, the Procedures for Student Conduct Proceedings

23   at Florida Atlantic University.

24       A.    Yes.

25       Q.    And this is where the complaints get

Corey King Vol 1
March 10, 2016                                    61

1    started that we talked about, correct?

2        A.   Correct.

3        Q.   If you take a look at C4 for me.  Well, C

4    says, "The Dean of Students will determine if there

5    are reasonable grounds to believe the allegations of

6    complaint are true.  And if true, would constitute a

7    violation of the university's Code of Conducts."

8    And then it goes onto say, "The Dean of Students may

9    conduct an investigation conference with others."

10   Two says, "Make conduct with investigation with

11   others."  Three says, "Nothing in this regulation

12   shall prevent the mediation of a complaint when

13   deemed appropriate by the University."  And four

14   says, "Nothing in this regulation shall prevent the

15   disposition of the complaint administrative plea by

16   written agreement with mutual consent of the parties

17   involved.  Such disposition shall be final and there

18   shall be no subsequent proceedings."

19            So that seems to say to me, and correct me

20   if I'm wrong, that if a complaint is made and

21   there's a written agreement between the University

22   and the alleged perpetrator, that mutual consent of

23   all parties involved must be obtained.  Has that

24   been the practice?

25            MS. WYDLER:  Object to the form.

```
 1        A.    In my experience at FAU there are times

 2   when there is a mutual agreement between the

 3   University and the student.

 4   BY MS. CHATTERGOON:

 5        Q.    And in that mutual agreement, is the

 6   victim apprized of what that mutual agreement is?

 7        A.    That would be in accordance with whatever

 8   the victim rights proceedings are.

 9             MS. CHATTERGOON:  I'm going to mark this

10        Composite 7.

11             (The referred-to document was marked by

12        the court reporter for identification as

13        Plaintiff's Composite Exhibit 7.)

14   BY MS. CHATTERGOON:

15        Q.    One of our designations, Dr. King, is the

16   Security Incident Report and verbal threat made by

17   Ryan Rotela and the investigation of that report.

18        A.    Uh-huh.

19        Q.    I handed you Composite Exhibit No. 7,

20   which is FAU1438 through 1455.  I want you to take a

21   look at that packet and just let me know when you're

22   ready.

23        A.    Yes.

24        Q.    Does Exhibit No. 7 reflect the

25   investigation regarding the Ryan Rotela matter by
```

1    Dr. Williams?

2         A.   The information at hand reflects that the

3    Student Code of Conduct was invoked, that an

4    investigatory conference was notified.  There was a

5    meeting with the student, the rights were signed,

6    notes were taken in that meeting.  And subsequently,

7    a Notice of Charge was issued.

8         Q.   Have you seen these documents before?

9         A.   Some.

10        Q.   Okay.  Tell me which ones you've seen

11   before.  And you can indicate them by the FAU

12   stamped number on the bottom right.

13        A.   I've reviewed the -- I've seen the

14   verbal - the Security Offense Incident Report.

15        Q.   And that's 1439 through 1440, correct?

16        A.   Correct.

17             I've seen the Student Rights and the

18   Notice of Charges.

19        Q.   And the Student Rights, could you tell me

20   what FAU number that is?

21        A.   1455.  Looks like there are two, so I'm

22   not sure which.  I saw another Student Rights in

23   here.  There's also one 1449.

24        Q.   Which one is the one that you've seen?

25        A.   I don't - can't recall.

Corey King Vol 1
March 10, 2016                                    64

1        Q.    The one 1449 is dated March 7th, 2013 and

2    1455 is dated March 15th, 2013?

3        A.    I don't recall which date I saw.

4        Q.    Are there any other documents which - or

5    that you've seen which reflect the investigation of

6    the Ryan Rotela matter?

7        A.    Clarification.

8        Q.    Other than what I'm showing you here in

9    Exhibit No. 7, are there any other documents which

10    reflect the investigation done by the University

11    regarding the Ryan Rotela incident?

12        A.    The investigation?

13        Q.    Yes.

14        A.    No.

15        Q.    Take a look at the incident report.  You

16    said you reviewed this prior to coming here today,

17    correct?

18        A.    Yes.

19        Q.    Is this a typical incident report that

20    would start the process that we talked about on the

21    flowchart?

22        A.    Yes.

23        Q.    And this incident report was made by

24    Dr. Deandre Poole, correct?

25        A.    Reported by, yes.

Corey King Vol 1
March 10, 2016                                    65

1        Q.   Reported by him.

2             And is this what started the Ryan Rotela

3    incident?

4             MS. WYDLER:  Object to form.

5      BY MS. CHATTERGOON:

6        Q.   That was a bad question, so let me

7    rephrase it.

8             Is this what alerted the - either the

9    Associate Dean of Students or Associate - Assistant

10   Dean of Students, Vice President of Student Affairs

11   of the Ryan Rotela incident?

12       A.   This document alerted the Associate Dean

13   of Students of that campus.

14       Q.   And that Associate Dean was Dr. Williams,

15   correct?

16       A.   Correct.

17       Q.   And in fact, she's listed here as name of

18   FAU officer notified, correct?

19       A.   Correct.

20       Q.   And the reason Dr. Williams was notified

21   was because this happened on one of the Broward

22   campuses; is that correct?

23       A.   Correct.

24       Q.   When was the first time you reviewed this

25   incident report?

Corey King Vol 1
March 10, 2016                                      66

1     A.   I believe upon my involvement.  Upon my --

2   Let me look at the date.  My involvement sometime in

3   March, March of 2013.

4     Q.   Okay.  Once Dr. Williams received this

5   incident report, what was she required to do

6   according to the Student Code of Conduct?

7     A.   So the Student Code of Conduct would have

8   indicated that upon review of the report the first

9   question would be, is there an imminent threat,

10  emergency measures.  Do we need to take any

11  emergency measures because of an imminent threat to

12  the health and welfare of the campus.  Once that

13  determination was made, if it was in the

14  affirmative, then an interim measure letter would

15  have been generated and sent.  If not, then an

16  investigatory conference would take place.

17    Q.   And that determination of whether imminent

18  threat was apparent would be based on Dr. Williams'

19  subjective view; is that correct?

20    A.    If that would include her professional

21  subjective, yes, that is correct.  In consultation

22  with the Dean or appropriate person.

23    Q.   Okay.  So once she received this incident

24  report, if she felt there was imminent threat, she

25  was required to consult with the Associate Dean?

Corey King Vol 1
March 10, 2016                                    67

1          A.    It was practice that consultation with the

2    Dean of Students office in issuing emergency

3    measures was our practice.

4          Q.    Okay.  If you take a look at 1441.  These

5    are Dr. Williams' notes.  It's dated February 28.

6    Well, let me go back for a second.

7               The incident, date of the incident is

8    February 25th, 2013, correct?

9          A.    Correct.

10         Q.    Do you know if any emergency measures were

11   taken?

12         A.    No.

13         Q.    In looking at Dr. Williams' notes of

14   February 28th, 2013, it looks like she spoke or was

15   conducting an investigation.  Would you agree with

16   that?

17         A.    Yes.

18         Q.    Okay.  And she spoke to, looks like, Noemi

19   Marin and Dr. Deandre Poole?

20         A.    Yes.

21         Q.    She also -- I'm sorry?

22         A.    Yes.

23         Q.    And she also obtained a statement, going

24   to 1442, from Hubert Cuthbert to Dr. Poole.  Do you

25   see that?

Corey King Vol 1
March 10, 2016                                         68

1        A.    What's the number at the bottom?

2        Q.    1442.

3        A.    Okay.  Yes.

4        Q.    Okay.  Was it practice for a designee,

5    let's call it, to conduct an investigation once an

6    incident report was provided to him or her?

7        A.    Clarify.

8        Q.    We went through the flowchart.

9        A.    Uh-huh.

10       Q.    And the flowchart indicates that there's

11   an incident report and an investigation --

12       A.    Yes.

13       Q.    -- of the complaint by the Dean of

14   Students or a designee, correct?

15       A.    Correct.

16       Q.    Would this be the process of the

17   investigation, speaking to the either victim or

18   getting witness statements?

19       A.    Yes.

20       Q.    Take a look at 1447 for me.

21       A.    Yes.

22       Q.    This is the investigation conference

23   letter that was sent out to Mr. Rotela on

24   February 28th, 2013.  Have you ever seen this

25   document before?

Corey King Vol 1
March 10, 2016                                          69

1          A.    Yes.

2          Q.    When did you first see this document?

3          A.    This investigatory -- No, sorry.  No.

4          Q.    Does the University maintain a file on

5    Ryan Rotela for the incident which occurred on

6    February 25th, 2013?

7          A.    Yes.

8          Q.    What is the name of that file?

9                MS. WYDLER:  Object to the form.

10         A.    It would be under the student's name.

11    BY MS. CHATTERGOON:

12         Q.    Okay.  And do you know what documents are

13   included in that file?

14         A.    I would say all documents related to the

15   investigatory charges and resolution of the case.

16         Q.    Okay.  Earlier I asked you whether you had

17   seen certain documents in this packet --

18         A.    Yes.

19         Q.    -- labeled Exhibit 7.  You mentioned only

20   a few documents.

21         A.    Yes.

22         Q.    Namely, you did not mention Dr. Williams'

23   notes on the investigation.

24         A.    Yes.

25         Q.    Do you know if those notes are included in

Corey King Vol 1
March 10, 2016                                    70

1    that file?

2              MS. WYDLER:  Object to the form.

3         A.   I do not.

4      BY MS. CHATTERGOON:

5         Q.   Do you know if the witness statement is

6    included in that file maintained by the University?

7         A.   I do not.

8              MS. WYDLER:  Same objection.

9      BY MS. CHATTERGOON:

10        Q.   These documents were produced by your

11   attorney to my office.

12        A.   Yes.

13        Q.   Do you know if these documents are

14   included in the file, in the Ryan Rotela file?

15             MS. WYDLER:  Objection to the form.

16        A.   If attorneys provided them to you, then

17   they are in the files.

18      BY MS. CHATTERGOON:

19        Q.   Going back to the investigation conference

20   letter on 1447.  Is this a typical letter that would

21   be sent out if a conference was to be held?

22        A.   Yes.

23        Q.   Okay.  And in this letter it asks

24   Mr. Rotela to meet with Dr. Williams on Thursday,

25   March 7th, at 4:00 p.m.  It's the fourth paragraph

Corey King Vol 1
March 10, 2016                                          71

1    down.  Do you see that?

2         A.    Yes.

3         Q.    Prior to this letter being sent out, do

4    you know whether Dr. Williams consulted with

5    Dr. Brown or yourself in scheduling this meeting?

6         A.    No.

7         Q.    Was she required to?

8         A.    No.

9         Q.    And moving on to the next document,

10   actually the next two documents.  1449, there's a

11   student rights dated and signed by Ryan Rotela of

12   March 7th, 2013.  Do you see that?

13        A.    Yes.

14        Q.    So this would indicate that Dr. Williams

15   met with Mr. Rotela and gave him his student rights?

16        A.    Yes.

17        Q.    On that date?

18        A.    Yes.

19        Q.    Is that normal procedure?

20        A.    Yes.

21        Q.    Following that page on 1450 there are

22   notes presumably made by Dr. Williams.  Do you know

23   Dr. Williams' handwriting?

24        A.    Somewhat.

25        Q.    Let me ask you a better question.  Do you

Corey King Vol 1
March 10, 2016                                    72

```
 1   know if this is Dr. Williams' handwriting?
 2       A.   I do not.
 3       Q.   Do you know who made these notes on 1450
 4   and 1451?
 5       A.   I do not.
 6       Q.   Had you ever seen this document before?
 7       A.   I did -- No.
 8       Q.   You did not?
 9       A.   No.
10       Q.   If you go to 1452.  At the bottom it's an
11   email from Dr. Williams to yourself.  It says,
12   "Consultation on a conduct case."  Dated March 8th
13   2013.  Do you see that?
14       A.   Yes.
15       Q.   And that email says, "Hi, Cory.  I have a
16   case I'm investigating regarding a student who
17   allegedly engaged in threatening behavior/words to a
18   professor.  I met with the student yesterday and he
19   denied the allegation.  I spoke with the professor
20   today and was informed he prefer that the student
21   not come back to class until the matter is resolved.
22   The class meets again on Monday; however, I have not
23   formally charged the student.  Let's talk about
24   where we go from here.  Call me when you get a
25   chance."  Do you recall receiving this email?
```

Corey King Vol 1
March 10, 2016                                    73

1        A.    Yes.

2        Q.    And in fact, you responded on March 9th,

3    which was a Saturday, stating, "I will call you this

4    weekend."  Correct?

5        A.    Yes.

6        Q.    Was this Dr. Williams' attempt to consult

7    with you regarding the Ryan Rotela case?

8              MS. WYDLER:  Objection.  Form.

9      BY MS. CHATTERGOON:

10       Q.    Let me strike the question and I'll ask a

11   better question.

12             Prior to this email, did Dr. Williams

13   attempt to consult with you on the Ryan Rotela case?

14             MS. WYDLER:  Objection.

15       A.    The fact that the term student is used, I

16   would have not have been aware at that time.  The

17   email says, "I'm regarding a student."  So I was not

18   aware of the student that she was referring to.

19     BY MS. CHATTERGOON:

20       Q.    Okay.  My question was and let me reask

21   the question.

22       A.    Okay.

23       Q.    Do you recall whether Dr. Williams

24   contacted you regarding Ryan Rotela prior to this

25   email?

Corey King Vol 1
March 10, 2016                                    74

1       A.   No.

2       Q.   No, you don't recall; or no, she didn't?

3       A.   I don't recall.

4       Q.   Did you, in fact, speak to Dr. Williams

5  that weekend?

6       A.   I believe so.

7       Q.   Do you recall when you spoke to her?

8       A.   It was either that late Saturday or

9  Sunday.  I can't recall.  It was that weekend.

10      Q.   The email is dated --

11      A.   Saturday.

12      Q.   -- 4:39 p.m. on Saturday.

13      A.   Right.

14      Q.   Do you recall whether you spoke to

15  Dr. Williams on March 10th, which was a Sunday?

16           MS. WYDLER:  I object to the form.  For

17      record purposes, this is a corporate rep depo.

18      You're asking questions about recollection.

19           MS. CHATTERGOON:  Okay.

20           MS. WYDLER:  Standing objection on

21      anything that asks for a recollection based on

22      your corporate rep designation.

23           MS. CHATTERGOON:  Well, I'm asking about

24      the investigation.  He is the person involved

25      in the investigation.  I stated earlier they

Corey King Vol 1
March 10, 2016                                    75

1    overlap.  If you want to produce someone else

2    for the investigation, I can do it that way.

3    But there's no way for me to conduct a

4    deposition with him being the person involved

5    in the investigation and as the corporate rep

6    without asking his recollection and separate

7    it.  You can have your standing objection and

8    I'll ask him, it will just make the deposition

9    longer.

10         MS. WYDLER:  That's fine.  I think that's

11    the appropriate procedure if you're asking

12    recollection questions.

13         MS. CHATTERGOON:  Okay.

14   BY MS. CHATTERGOON:

15       Q.   The question is still pending.

16       A.   Repeat, please.

17       Q.   Sure.

18            Do you know whether you spoke to

19   Dr. Williams on March 10th?

20       A.   I remember speaking to her that - before

21   the weekend was over.

22       Q.   On 1454 it's the Notice of Charges dated

23   March 8th, 2013.

24       A.   Yes.

25       Q.   Is this notice of charges -- Strike that.

Corey King Vol 1
March 10, 2016                                    76

1           According to the flowchart for the Student

2    Code of Conduct, the Notice of Charges comes after

3    the investigation of a complaint, correct?

4        A.   Yes, correct.

5        Q.   And this Notice of Charges is issued by

6    the designee, whether it be Associate Dean or

7    whoever is designated by the Senior Vice President

8    or Associate Dean, correct?

9        A.   Correct.

10       Q.   Is the Associate Dean or Senior Vice

11   President required to review these Notice of Charges

12   before they are sent to the student?

13       A.   Clarification.

14       Q.   Sure.

15           Are the associate, in this case

16   Dr. Williams, was she required to give you this

17   Notice of Charges or Dr. Brown the Notice of Charges

18   to review prior to sending it to Mr. Rotela?

19           MS. WYDLER:  Objection.  Form.

20       A.   No.

21    BY MS. CHATTERGOON:

22       Q.   Was she required to discuss the emergency

23   measures with you?

24       A.   It was practice, but she.

25       Q.   I'm sorry, finish.

Corey King Vol 1
March 10, 2016                                    77

```
 1        A.    It was practice, but she was - you are

 2   required to follow what's on Page 10 of our

 3   Regulation 4.007, which specifically tells you what

 4   she did, a Notice of Charges.  The Notice of Charges

 5   shall be in correspondence and include the specific

 6   Code of Conduct violations, a brief description of

 7   alleged offenses, the student rights, and an

 8   invitation to attend a conduct conference, and the

 9   date and time of the student conduct conference is

10   also included.

11        Q.    I'm sorry, what page are you on?

12        A.    Page 10, 1494 FAU.

13        Q.    Okay.  Paragraph D is what you're reading?

14        A.    Paragraph D, yes.

15        Q.    Okay.  And so there's no deviation from

16   this Notice of Charges that you're seeing?

17        A.    No.

18        Q.    Okay.  Earlier you stated --

19        A.    Not to my knowledge.

20        Q.    -- that there was -- Well, let me ask you

21   this.

22             For emergency measures it says here, "The

23   designee or the Dean of Students has the authority

24   to take appropriate and immediate action."  You

25   stated earlier that it was practice for a
```

Corey King Vol 1
March 10, 2016                                    78

1    consultation to take place.

2         A.   Yes.

3         Q.   Is that correct?

4         A.   Yes.

5         Q.   Was it ever practice that the Notice of

6    Charges were changed?

7         A.   No, because that's where if you look on

8    the flowchart each one of those boxes represent a

9    different process, a different letter.  So at no

10   point have we practiced in my time at FAU combining

11   an emergency measure with a Notice of Charges.  That

12   was not the practice.

13        Q.   And so if I showed you Notice of Charges

14   where that emergency measures were listed, that

15   would be incorrect?

16        A.   It would be incorrect, yes.

17        Q.   Where does it say here that only the items

18   listed here must be listed in the Notice of Charges?

19        A.   It says to me those items that are

20   mentioned in D are the items that are included in

21   the Notice of Charges.

22        Q.   Okay.  So you're taking a literal reading

23   of Paragraph D?

24        A.   I'm taking the interpretation that I had

25   as the Dean, at that time.

Corey King Vol 1
March 10, 2016                          79

1       Q.   But you're not taking the literal reading

2    of Paragraph 9 for emergency measures?

3            MS. WYDLER:   Objection.   Document speaks

4       for itself.

5       A.   Clarification for me.

6            MS. CHATTERGOON:   Could you repeat the

7       question, Ashley.

8            (The requested portion of the record was

9       read back by the reporter.)

10      A.   By literal, my understanding is, which may

11   not be reflected in this document, in the practice

12   of our Student Code of Conduct there is a letter for

13   specific cases.   There is a standard letter for

14   emergency measures, there is a standard letter for

15   Notice of Charges, there is a standard letter for

16   student conduct conferences, there is a standard

17   letter for issuing sanctions.   So in my time I have

18   not seen any - I have not seen any document where

19   any of those processes have been combined into

20   multiple letters.

21     BY MS. CHATTERGOON:

22      Q.   When would the standard letter for

23   emergency measures be sent out?

24      A.   According to the flowchart, once a

25   complaint or an incident report is received, the

Corey King Vol 1
March 10, 2016

80

1    appropriate conduct officer can do one of two

2    things.  They can immediately issue emergency

3    measures or they can move to an investigatory

4    conference.  So it's at that point that emergency

5    measure is issued.

6         Q.   Is it --

7         A.   After review of the complaint or incident

8    report.

9         Q.   Is that the only time an emergency measure

10   can be issued?

11        A.   No.

12        Q.   Okay.  What other times can an emergency

13   measure be issued?

14        A.   Clarification.

15        Q.   I just asked you if -- Let's back up

16   again, because I feel like we've gone over this a

17   couple of times.

18             After an incident report is obtained you

19   said the letter, the standard letter for emergency

20   measures should be sent out if deemed necessary,

21   correct?

22        A.   Yes.  Uh-huh.

23        Q.   I then asked you, is that the only time

24   that emergency measure letters can be sent out.  You

25   said no.

Corey King Vol 1
March 10, 2016                                    81

1        A.    No.

2        Q.    So when else can an emergency measure

3   letter be sent out?

4        A.    At any point during the process, if the

5   alleged perpetrator does anything that exemplifies

6   an immediate threat or harm, an interim measure

7   letter can be issued.

8        Q.    What if the victim indicates that they

9   need an emergency measure to take place during the

10  investigation of the incident report?

11       A.    The victim does not determine that.  The

12  victim shares with the appropriate student conduct

13  officer information and that person makes a

14  professional judgment based on the information

15  provided.

16       Q.    Okay.  Fair enough.

17             So during the investigation of a

18  complaint, if the appropriate person determines that

19  an emergency measure is necessary, can that

20  emergency letter be sent out?

21       A.    Yes.

22       Q.    And you're saying it has to be a separate

23  letter, it cannot be combined with the Notice of

24  Charges?

25       A.    Our standard practice is there's a

Corey King Vol 1
March 10, 2016                                      82

1   separate letter for each step of our process.

2        Q.    Is there a policy in the Code of Conduct

3   that states that?

4        A.    In the regulation?

5        Q.    In the regulation.

6        A.    It does not state that.

7        Q.    The Notice of Charges letter in 1454

8   stated that - to the student that there was a

9   student conduct conference on March 15th, 2013.  Do

10  you see that?

11       A.    Yes.

12       Q.    Do you know if that conference ever took

13  place?

14            Well, let me reask that question.  I'll

15  ask a better question.  If you look at 1455 there's

16  a student rights dated March 15th, 2013.  Can we

17  assume that student conference took place?

18       A.    Yes.

19       Q.    What happens at that student conference?

20       A.    So according to our code, after a Notice

21  of Charges has been issued, which does indicate,

22  again, there is some separation between letters, a

23  student conduct conference may be established.

24  There are no witnesses called, at that point.  The

25  student conduct conference is not audio taped.  The

Corey King Vol 1
March 10, 2016                                    83

1    purpose of it is that the student will review the

2    charges that are alleged against them.  They will

3    choose to accept responsibility on forms that are

4    provided, which are done in this.  Failure to accept

5    responsibility, at that point, it goes to a hearing.

6    It could be a formal hearing with a hearing board or

7    an administrative hearing officer.  Or if the

8    student accepts responsibility, it can go right into

9    a - an administrative hearing, which, basically,

10   means the student waives their right to a hearing.

11   They're going to take sanctions.

12        Q.    Does the University have any record which

13   would reflect whether a hearing took place in the

14   Ryan Rotela matter?

15        A.    To my understanding, no hearing took place

16   in this matter.

17        Q.    Do you know why?

18        A.    To my understanding, the student in this

19   situation obtained legal counsel.

20        Q.    Okay.

21        A.    And there was conversation between our

22   legal counsel and that legal counsel, and there was

23   a, to my understanding, a neutral agreed upon

24   document that the University and legal counsel and

25   the student's counsel in this case came to some type

Corey King Vol 1
March 10, 2016                                    84

1    of conclusion.

2         Q.   At the conclusion of that agreement, do

3    you know whether Dr. Deandre Poole obtained --

4    Strike that.

5              Do you know whether mutual consent for

6    that agreement was obtained from Dr. Poole?

7         A.   The mutual consent for that agreement was

8    between the University and the student.

9         Q.   Does Dr. Poole play any part in that

10   mutual consent?

11        A.   It is the practice that mutual agreements

12   and consent are between that of the University and

13   the alleged student.

14        Q.   Is it the practice to discuss what is

15   agreed upon with the alleged victim?

16        A.   No.

17             (The referred-to document was marked by

18        the court reporter for identification as

19        Plaintiff's Exhibit 8.)

20     BY MS. CHATTERGOON:

21        Q.   I'm going to mark this as 8.  I want to go

22   to Designation No. 7, which is the university's

23   official statement released to the media regarding

24   Ryan Rotela.  I handed you what's marked as Exhibit

25   8.  It's also marked Plaintiff's 213.  Is this a

Corey King Vol 1
March 10, 2016                                    85

1    copy of the statement, an accurate copy of the

2    statement that was released by the University

3    regarding the Ryan Rotela matter?

4         A.    Yes.

5         Q.    Who drafted this statement, do you know?

6         A.    It is the practice of the University that

7    student - that Media Relations draft all of our

8    documents that are released to the media.

9         Q.    Does Media Relations have to consult with

10   anyone before drafting this statement?

11        A.    Yes.

12        Q.    Who do they consult with?

13        A.    Appropriate University officials regarding

14   the matter.

15        Q.    Who would the appropriate official be in

16   the Ryan Rotela matter?

17        A.    Since the matter involved a classroom

18   exercise, which is an academic matter, it would be

19   the Provost.

20        Q.    What about the Associate Dean?

21        A.    It looks to me that the media report here

22   deals specifically with the classroom exercise,

23   which is an academic matter, so it would be the

24   Provost.

25        Q.    Who was the Provost, at the time?

Corey King Vol 1
March 10, 2016                                        86

1        A.    Brenda Claiborne.

2        Q.    Do you know whether Ms. Claiborne was

3   consulted regarding this statement?

4        A.    Yes.

5        Q.    Did you participate in anyway regarding

6   this statement?

7        A.    Not as the Associate Vice President of

8   Dean of Students.

9        Q.    Did you participate in any other capacity?

10       A.    No.

11       Q.    If you look at the third paragraph.  It

12  says, "While we do not comment on personnel matters

13  and while student privacy laws prevent us from

14  commenting on any specific student at the

15  University, we can confirm no student has been

16  expelled, suspended, or disciplined by the

17  University as a result of any activity that took

18  place during this class."  Since that involved

19  student discipline, was the Media Relations

20  Department required to consult with student affairs?

21       A.    No.

22       Q.    Why not?

23       A.    To my understanding, the media response

24  what the University was specifically focused on the

25  classroom activity.

Corey King Vol 1
March 10, 2016                                    87

1      Q.   Okay.  But it says here they're confirming

2   no student has been expelled, suspended or

3   disciplined by the University.

4      A.   As a result of any activity that took

5   place during the class.  So for us it would be the

6   class activity.

7      Q.   Okay.  And who would they have to consult

8   with to determine that the student wasn't expelled

9   or suspended or disciplined?

10     A.   In matters of academics, they could have

11  consulted with the Dean of the college, who would

12  consult with the department chair, who could consult

13  with the faculty.  So there's a different arm that

14  they could go down to Student Affairs.

15     Q.   Is Student Affairs the appropriate

16  department -- Strike that.

17          Who can take action such as expelling,

18  suspended, or disciplining a student?

19     A.   Both the Provost and the Vice President of

20  Student Affairs.

21     Q.   Do you know whether Ms. Claiborne

22  confirmed that no student was disciplined for the

23  class exercise?

24     A.   The statement that we can confirm means

25  that there had to have been conversations between

Corey King Vol 1
March 10, 2016                                           88

```
 1    the Provost and, in this case, the Dean of the

 2    College of Arts and Letters, the department chair,

 3    and subsequently the faculty.

 4         Q.   Do you know that for a fact?

 5              MS. WYDLER:  Objection to form.

 6         A.   I do know that our Media Relations would

 7    not issue a statement to the media until they are

 8    confident and have confirmed all information

 9    therein.

10    BY MS. CHATTERGOON:

11         Q.   Do you know if Media Relations confirmed

12    with Student Affairs that Mr. Rotela had been

13    disciplined for activities that took place after the

14    class?

15         A.   Yes.

16         Q.   Okay.  When did that take place?

17         A.   I believe after the incident occurred that

18    there was a conversation with Dr. Brown and

19    appropriate University officials, to my

20    recollection, where he confirmed that the student

21    conduct - a process had been invoked related to an

22    incident after class.

23         Q.   Who were the other appropriate persons?

24         A.   In this case for him it would be the

25    University President and the University Provost.
```

Corey King Vol 1
March 10, 2016                                    89

1        Q.    Do you know when that - when about that

2    discussion took place?

3        A.    I can confirm that it was prior to the

4    release of this to the media.  I don't know the

5    exact, but I can confirm it was prior to this

6    statement being released.

7        Q.    So let me just clarify this for the

8    record.  You're saying prior to the release of this

9    statement, Dr. Brown confirmed that the Student

10   Conduct Code had been invoked?

11       A.    Yes.

12       Q.    How do you know that?

13       A.    I just confirmed based on this

14   conversation.

15       Q.    Did Dr. Brown ask you to provide any

16   information to him regarding the invocation of the

17   Student Code of Conduct?

18       A.    He did not.

19       Q.    How did Dr. Brown know that the student --

20   Strike that.

21             Were there any other statements released

22   by the Media Relations Department in relation to the

23   Ryan Rotela matter?

24       A.    Yes, I believe there were two.

25       Q.    Was there one before this or after this

Corey King Vol 1
March 10, 2016                                    90

1    one?

2         A.    Since this is not dated, I can't confirm.

3    I don't see a date here.

4         Q.    Do you recall what the other statement -

5    what the other statement said?

6         A.    I believe the other statement was actually

7    in a video done by Dr. Brown.

8         Q.    Did you provide Dr. Brown with any

9    information in order to make that statement?

10        A.    No.

11        Q.    That video statement?

12        A.    No.

13        Q.    Do you know whether the Media Relations

14   Department coordinated that statement with

15   Dr. Brown?

16        A.    Yes.

17        Q.    Do you know the reason that video

18   statement was released?

19        A.    On request of the University President.

20        Q.    And who was that, at the time?

21        A.    Mary Jane Saunders.

22        Q.    Do you know the reason for the video

23   statement?

24             MS. WYDLER:   Object to form.   Asked and

25        answered.

Corey King Vol 1
March 10, 2016

91

```
 1        A.    It was her request.

 2     BY MS. CHATTERGOON:

 3        Q.    Did Dr. Saunders ever state why she wanted

 4     that statement released via video?

 5        A.    Not any form I was in.

 6        Q.    Do you know if it was within any form

 7     within the University?

 8        A.    Yes.  I am confident that if she gave

 9     directive, she would have provided reasons for why

10     she wanted it done.

11        Q.    Do you know if there are any records of

12     those reasons?

13        A.    No.

14        Q.    And just to our last designation regarding

15     the student, the Davie student pavilion?

16        A.    Yes.

17        Q.    Do you have knowledge of the issues

18     surrounding the Davie student pavilion?

19        A.    I do.

20        Q.    And there is an allegation that was made

21     against Dr. Williams that she failed to carry out

22     supervisory directives regarding this pavilion on

23     the Davie campus.  Are you aware of that?

24        A.    Yes.

25        Q.    What were those failures?
```

Corey King Vol 1
March 10, 2016                                                92

```
 1        A.    I was aware that in a conversation in a
 2   senior staff meeting with Student Affairs that a
 3   dialogue took place between Dr. Brown and
 4   Dr. Williams regarding the pavilion and the desire
 5   of the students to want to see the pavilion happen.
 6   And I believe also the Broward administration.
 7   Dr. Brown expressed a concern that it was too much
 8   money.
 9        Q.    Were you present at that meeting?
10        A.    It was a senior staff meeting; yes, I was.
11        Q.    And you're stating Dr. brown said it
12   was --
13        A.    Too much money.
14        Q.    -- too much money?
15        A.    Yes.
16        Q.    What was too much money?  The actual
17   building of the pavilion?
18        A.    Yes.
19        Q.    Do you know whether there was a cost
20   estimate for that pavilion at the time of that
21   meeting?
22        A.    Yes, I believe Dr. Williams had provided
23   the appropriate documents or information to
24   Dr. Brown.
25        Q.    Were those documents reviewed at that
```

1    meeting?

2         A.    They were not.  It was a discussion.

3         Q.    Okay.  And so Dr. Brown's directive was to

4    not proceed with the pavilion?

5         A.    Dr. Brown directives in that meeting, from

6    what I heard, was it was too much money.

7         Q.    Do you know if there was a directive not

8    to proceed with the pavilion?

9         A.    No.

10        Q.    Do you know whether Dr. Brown -- Well,

11   strike that.

12             Do you know whether that pavilion was ever

13   built?

14        A.    It was not.

15        Q.    Do you know why it was never built?

16        A.    I assume it cost too much money.

17        Q.    Okay.  So how then did Dr. Williams fail

18   to carry out supervisory directives?

19        A.    That's a question of her direct

20   supervisor, at that time, Dr. Brown.

21        Q.    Prior to this senior staff meeting that

22   you're talking about was there a plan to build a

23   student pavilion?

24        A.    There was a -- Yes.

25        Q.    And how was that pavilion to be funded?

Corey King Vol 1
March 10, 2016                                    94

1      A.    I believe the initial discussion was with

2   CITF funding, which is Capital Improvement Trust

3   Funds.

4      Q.    And can you explain to me what that is.

5      A.    That's a -- Every student within the state

6   pays a dollar into the fund, and then the State

7   every couple of years allocate institutions money to

8   build capital projects.  We have a CITF Committee

9   advisory group that meets to determine how those

10  dollars would be spent.

11     Q.    Do you know if Dr. Brown requested an

12  increase in that fund in order to build a pavilion?

13     A.    He does not have the authority to ask an

14  increase in the fund.  That's the State.  That's

15  beyond our purview.

16     Q.    Do you know if he ever requested student

17  government leaders to request that increase from the

18  State?

19     A.    Not in terms of the CITF funds.

20     Q.    Were there funds from the CITF fund

21  specifically dedicated to the Davie student

22  pavilion?

23     A.    No.

24     Q.    So then how then was that pavilion to be

25  funded?

Corey King Vol 1
March 10, 2016                                    95

1       A.    So the CITF Advisory Group, once they get

2   a pot of money, the funds are distributed based on

3   requests.  So my assumption would be that there

4   would be a request from that group in order to build

5   a pavilion.  Or there could have been CITF monies

6   that were left over on that campus that they could

7   use to build a pavilion, as well.

8       Q.    Who makes the decision of how that money

9   is spent?

10      A.    Usually the committee makes a

11  recommendation to the Vice President of Student

12  Affairs.

13      Q.    Who sits on that committee?

14      A.    The Associate Deans of the partner

15  campuses, as well as the Student Government leaders

16  sit on this kind of Advisory Board or Advisory

17  Committee for CITF funding.

18      Q.    Do the Student Government leaders --

19  Strike that.

20          MS. CHATTERGOON:  All right.  I think

21      now's a good time to take a break from the

22      corporate rep depo.  We're done with that, and

23      we'll come back and conduct our individual

24      deposition.

25

Corey King Vol 1
March 10, 2016                                      96

1        (A luncheon recess was taken from

2    12:38 p.m. until 1:56 p.m., after which the

3    following proceedings were continued in Volume

4    2:)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Corey King Vol 1
March 10, 2016                                          1

**$**

**$60,564**  25:24

**1**

**1**  8:16,19,22
 19:19
**10**  15:14 47:9
 60:22 77:2,12
**10:13**  4:1
**10th**  18:2
 20:7 23:14
 74:15 75:19
**11**  47:12
**1173**  16:25
**11:21**  50:6
**11:29**  50:6
**12**  8:7 47:12
**1231**  35:19
**1234**  35:20
**12:38**  96:2
**13**  8:7 47:13
**14**  18:18
 47:14
**1439**  63:15
**1440**  63:15
**1441**  67:4
**1442**  67:24
 68:2
**1447**  68:20
 70:20
**1449**  63:23
 64:1 71:10
**1450**  71:21
 72:3
**1451**  72:4
**1452**  72:10
**1454**  75:22
 82:7
**1455**  62:20
 63:21 64:2
 82:15
**1485**  42:20

**1494**  77:12
**1504**  42:20
**15th**  64:2
 82:9,16
**16**  60:15
**18**  47:15
**19**  60:14
**1:56**  96:2
**1st**  8:23 9:2

**2**

**2**  16:17,20,23
 17:22 23:19,
 21 27:5 57:17
 58:6 96:4
**20**  25:8 60:19
**20-**  37:15
**200-**  53:12
**2008**  53:16
**2012**  8:23 9:2
 50:14,16
 52:23 58:22
**2013**  50:14,16
 52:24 58:22
 64:1,2 66:3
 67:8,14 68:24
 69:6 71:12
 72:13 75:23
 82:9,16
**2013/2014**
 58:17
**2014**  9:10,11
 18:2,13 20:8
 21:3 22:19
 29:16
**21**  18:15
 60:19
**213**  84:25
**25th**  67:8
 69:6
**28**  67:5
**28th**  67:14
 68:24

**3**

**3**  22:11,14
 25:7
**31st**  18:12

**4**

**4**  28:11 32:22
 34:4,7 35:16
 40:15 57:18
**4.007**  35:2,9,
 14 42:19,25
 77:3
**40**  12:20,21
 13:2 29:10
**4:00**  70:25
**4:39**  74:12
**4F**  58:4

**5**

**5**  41:13,16,18
 42:18 56:12
**543**  8:22
**55**  14:16
**58**  14:17

**6**

**6**  50:10 55:14

**7**

**7**  27:6 62:10,
 13,19,24 64:9
 69:19 84:22
**70**  14:15 26:9
**72**  14:15
**72,000**  26:9
**7th**  64:1
 70:25 71:12

**8**

**8**  27:6 47:1,
 6,17 48:3,4
 56:13 59:5
 84:19,21,25
**8th**  22:19
 23:15 72:12
 75:23

**9**

**9**  47:6 48:4
 56:14 58:1
 60:21 79:2
**9th**  73:2

**A**

**A.J.**  38:2,20
 39:3
**a.m.**  4:1 50:6
**ability**  5:17,
 19,23
**Absolutely**
 5:3
**academic**
 58:22 85:18,
 23
**academics**
 87:10
**accept**  14:21
 60:3 83:3,4
**accepts**  83:8
**access**  56:8
**accordance**
 62:7
**accurate**  85:1
**act**  40:9
**action**  22:2
 40:1 54:3
 56:16 77:24
 87:17
**activities**
 10:11 88:13

Corey King Vol 1
March 10, 2016                                                        2

activity
  86:17,25
  87:4,6
actual  24:1,
  2,5 38:3
  40:10 44:11
  47:13 49:12
  52:6 92:16
add  58:17
additional
  15:4 25:18,20
addressing
  34:9
adhere  22:7
adjunct  15:11
Admin  23:23
administration
  92:6
administrative
  10:5 45:8
  61:15 83:7,9
administrators
  36:6
advise  36:5
advisory
  40:18 94:9
  95:1,16
affairs  6:14
  7:15 8:5 9:8,
  14 11:15,20
  12:7 15:20,24
  16:7,10,24
  17:13,22
  19:13 20:14,
  21 21:2 26:6,
  11,24 28:4
  30:9 32:2
  46:7,10 52:12
  65:10 86:20
  87:14,15,20
  88:12 92:2
  95:12
affirm  4:4
affirmative
  66:14
African-
american
  12:17 29:7

agenda  39:16,
  19
agree  67:15
agreed  14:9
  83:23 84:15
agreement
  4:21 61:16,21
  62:2,5,6
  84:2,6,7
agreements
  84:11
air  5:12
alerted  65:8,
  12
allegation
  72:19 91:20
allegations
  61:5
alleged
  44:19,20
  60:13 61:22
  77:7 81:5
  83:2 84:13,15
allegedly
  72:17
allocate  94:7
allowed  48:22
Amended  6:21
and/or  35:13
  56:6 57:6
annoyed  7:9
annual  25:24
answering
  5:16
anticipate
  6:4
apparent
  66:18
appeal  45:22,
  23,25 46:8,9
appeals  45:20
  46:2,4,6
  47:16
applicants
  27:18,19,21
applies  21:21

applying  49:9
appointment
  23:4
apprized  62:6
approach  55:2
appropriately
  52:14
approval
  21:24 27:16,
  25
approve  24:20
approved
  55:10,13
area  14:8
areas  19:11
  34:22 54:21
arm  87:13
arrow  50:21
  51:23
Arts  88:2
Ashley  6:2
  79:7
asks  70:23
  74:21
Assessment
  35:18
assistant
  12:6 13:17
  14:23 15:17,
  21 24:12
  30:14 40:17
  43:17,19
  46:14,15
  52:21 54:3
  55:15,16
  57:22 59:1
  65:9
assisted  19:6
associate
  7:22 9:6,7,
  13,25 10:5
  11:13,14,18,
  19,23 13:5
  15:17,19,24
  16:6,10,23
  17:21 18:11
  19:10 20:9,

11,12,20
  22:20,25
  23:9,13 24:24
  25:4,13 26:6,
  8,11 28:4
  32:2 33:7
  37:1,16,24
  38:4,12,16,
  18,22 39:3,18
  40:16,22
  41:23 42:2,6,
  12,14,16
  43:17 46:14,
  20 48:19 54:3
  55:8,9,11,15,
  19 57:21,22
  58:13,24,25
  65:9,12,14
  66:25 76:6,8,
  10,15 85:20
  86:7 95:14
assume  5:16
  82:17 93:16
assumption
  95:3
Athletics
  36:17
Atlantic
  60:23
attempt  73:6,
  13
attend  77:8
attorney
  17:5,7 70:11
attorneys
  70:16
audio  82:25
authority
  18:4 21:23,25
  26:14 27:20
  32:20 33:6
  45:15,16
  56:15,25
  57:2,3 58:4,
  9,20 77:23
  94:13
aware  73:16,
  18 91:23 92:1

Corey King Vol 1
March 10, 2016
3

**Awareness**
  35:3,23 36:3

———————————

**B**

**back**  12:11
  46:11 56:12
  59:4,17 67:6
  70:19 72:21
  79:9 80:15
  95:23
**bad**  65:6
**based**  25:9
  31:11 33:3
  45:22 58:9
  66:18 74:21
  81:14 89:13
  95:2
**basically**
  83:9
**basis**  33:9
**began**  4:1
**begin**  44:10
**beginning**
  51:3
**begins**  43:8
  48:2
**behavior**  36:9
**behavior/words**
  72:17
**belief**  44:4
**believed**  42:6
**Bill**  11:9,10,
  12 12:22 14:8
  15:16
**bit**  5:12 7:9
**blueprint**
  49:12
**board**  34:25
  45:9,12,14,
  16,24 46:2,4
  47:12 83:6
  95:16
**Boca**  12:5
  13:17 38:12,
  14,15,23

**book**  49:13
  58:16,20
**bottom**  42:22
  63:12 68:1
  72:10
**box**  50:22
**boxes**  78:8
**Branch**  37:10
  39:7
**break**  50:12
  95:21
**Brenda**  86:1
**bring**  27:3
**Broward**  9:5,
  15,18 10:7,14
  13:5 17:17,23
  18:11 20:21
  23:1 25:5
  26:12 37:7,
  16,18 38:13
  46:19,20
  65:21 92:6
**brown**  8:4
  21:5,17 23:10
  71:5 76:17
  88:18 89:9,
  15,19 90:7,8,
  15 92:3,7,11,
  24 93:5,10,20
  94:11
**Brown's**  93:3
**build**  93:22
  94:8,12 95:4,
  7
**building**
  92:17
**built**  93:13,
  15
**button**  27:24
**Bynes**  10:21
  11:2,6 12:16
**bypass**  52:1,6

———————————

**C**

**C4**  61:3

**call**  27:3
  45:7 68:5
  72:24 73:3
**called**  23:22
  24:6 60:9
  82:24
**campus**  9:7,8,
  15,17,19,25
  10:3,7,12
  11:1,16,18,
  21,25 12:6
  13:5,6,17
  14:15 15:21
  17:23 18:11
  19:16 20:21
  24:7 25:10
  26:12 27:3
  29:18,22
  30:18 36:17
  37:20,21
  38:6,12,13,
  14,15,23,25
  39:1,2,8
  46:18,19,20
  65:13 66:12
  91:23 95:6
**campuses**  9:5
  10:4,14 17:17
  23:1 25:5
  26:9 36:22
  37:3,4,6,7,8,
  9,17,18,19,25
  38:4,5,7,8
  39:4,5 65:22
  95:15
**candidate**
  10:24 27:23
  28:2 31:14
**candidates**
  26:15,18,21,
  25 27:2
  28:19,21,22,
  23 29:4,7,10,
  15,17,21
  30:10 31:3,
  10,16
**capacity**  5:2,
  6 6:9,11 7:3,
  5,24 86:9

**capital**  94:2,
  8
**CAPS**  36:22
  40:19
**Career**  9:20
**carry**  91:21
  93:18
**case**  4:5 7:6
  12:6 13:17
  14:5,7,16,23
  15:18,22
  17:6,19
  21:13,15
  55:3,4,23,24
  69:15 72:12,
  16 73:7,13
  76:15 83:25
  88:1,24
**cases**  32:12
  79:13
**Cathy**  20:5
**Caucasian**
  12:24
**Center**  9:20
  19:16
**cetera**  47:10
**chair**  30:13
  32:18,21 33:1
  87:12 88:2
**chance**  22:15
  72:25
**change**  21:6
  22:2
**changed**  9:1,
  9,18,25 11:13
  13:4,5 78:6
**charge**  44:7,
  14 52:12 63:7
**charged**  44:20
  72:23
**charges**
  44:13,15,24
  45:1,2,4
  47:10 49:4,21
  50:1 51:4,10,
  20,25 52:8
  53:23 54:11
  55:9,10,21

Corey King Vol 1
March 10, 2016                                                    4

59:19 63:18
69:15 75:22,
25 76:2,5,11,
17 77:4,16
78:6,11,13,
18,21 79:15
81:24 82:7,21
83:2
Charles  8:4
21:5
chart  8:23,24
9:1,14 19:19
49:8
Chase  38:2,20
39:3
CHATTERGOON
4:13,23 5:3,4
8:20 16:16,21
22:12 25:19
33:21 34:3,
10,14 41:13,
17 42:21
50:3,11 60:10
62:4,9,14
65:5 69:11
70:4,9,18
73:9,19
74:19,23
75:13,14
76:21 79:6,21
84:20 88:10
91:2 95:20
checks  32:13,
17
Chief  40:17
choice  27:23
choose  27:23
83:3
Circuit  46:10
CITF  94:2,8,
19,20 95:1,5,
17
cking14@fau
18:5
Claiborne
86:1,2 87:21
clarification
23:21 54:6

64:7 76:13
79:5 80:14
clarify  48:13
53:9 68:7
89:7
class  72:21,
22 86:18
87:5,6,23
88:14,22
classes  14:25
classroom
85:17,22
86:25
clear  27:13
closed  39:8
50:22
Coast  37:12
39:8
code  17:12
34:23,24 35:9
42:19 43:14,
23 46:25
48:16 49:9,13
50:14 52:13
56:13 60:8,15
61:7 63:3
66:6,7 76:2
77:6 79:12
82:2,20
89:10,17
collaboration
54:24
colleagues
32:15
college  15:8,
9,11 36:7
39:6 87:11
88:2
combined
79:19 81:23
combining
78:10
comment  86:12
commenting
86:14
comments  10:9
committee
26:24 27:12

28:4,8,10,12,
16 30:2,5,7
31:12 32:5,9,
19,22 35:3,4,
7,23 36:3,4,
13,16 38:1,9
39:9,22
40:14,21,23
41:6,10,12,
19,21 42:2,3,
9,11 53:5,15,
18 54:2,9,10,
17 55:6 94:8
95:10,13,17
Committee's
30:16
Committees
30:24 32:23
community
36:11 44:2
47:25 49:1,7
56:21
compared
49:18
compensated
34:1
compensation
15:4
complain  47:8
complainant
43:9
complaint
47:3,4 50:20
51:4,9,10,14,
15 52:3,7,18
53:4,20 61:6,
12,15,20
68:13 76:3
79:25 80:7
81:18
complaints
44:11 60:25
complete
42:25 60:18
complex  21:20
composed
45:10

Composite
22:11,13
62:10,13,19
composition
37:6 40:15
concern  41:25
47:24 92:7
concerns
54:23
conclusion
84:1,2
conduct  17:12
19:17 34:23,
24 35:9 36:20
42:20 44:10,
13,17,18
45:3,8,9,24
47:8,10 48:16
49:2,9,13
50:14 52:13,
22 55:22
56:13 59:21
60:22 61:9,10
63:3 66:6,7
68:5 72:12
75:3 76:2
77:6,8,9
79:12,16 80:1
81:12 82:2,9,
23,25 88:21
89:10,17
95:23
conducted
53:1
conducting
54:10 67:15
conducts
32:17 52:20
61:7
conference
43:24,25
44:6,9,17,18
46:24 47:2,10
48:1,9,19
49:4,21 50:1
51:19 52:7
55:22 59:21,
23 61:9 63:4

Corey King Vol 1
March 10, 2016

5

66:16 68:22
70:19,21
77:8,9 80:4
82:9,12,17,
19,23,25
**conferences**
79:16
**confident**
23:10,25 88:8
91:8
**confirm** 86:15
87:24 89:3,5
90:2
**confirmed**
87:22 88:8,
11,20 89:9,13
**confirming**
87:1
**consent**
61:16,22
84:5,7,10,12
**considerable**
21:25
**considered**
13:10
**considers**
29:20
**consist** 37:18
**consisted**
39:4
**constitute**
37:9 61:6
**consult** 33:15
36:24 66:25
73:6,13 85:9,
12 86:20
87:7,12
**consultation**
19:1 66:21
67:1 72:12
78:1
**consulted**
71:4 86:3
87:11
**contacted**
73:24
**continued**
96:3

**convene** 42:1,
11,15
**conversation**
14:8 39:20,23
57:5 83:21
88:18 89:14
92:1
**conversations**
87:25
**converted**
11:15,20
15:20
**coordinated**
90:14
**cope** 36:6
**copies** 50:15
**coping** 36:7
**copy** 6:20
42:25 60:18
85:1
**Corey** 4:9,16
**corporate**
4:22 6:9,19,
21 7:3 74:17,
22 75:5 95:22
**correct** 9:15
15:18 17:23,
24 18:2,3,5,6
19:19 22:20
25:21,22
31:6,18,19
35:12,14,25
36:1,14 37:1
38:20,21,24
39:23 40:21
41:10,11 43:4
46:15,16
50:17 51:5,6
52:15 54:5,
12,13 58:6,13
59:2,3,25
60:1 61:1,2,
19 63:15,16
64:17,24
65:15,16,18,
19,22,23
66:19,21
67:8,9 68:14,

15 73:4 76:3,
4,8,9 78:3
80:21
**correspondence**
77:5
**Cory** 72:15
**cost** 92:19
93:16
**counsel** 6:8
7:2 83:19,22,
24,25
**counseling**
19:20 36:23
**Counseling/
psychological**
9:21 20:5
**Counsels**
42:21
**couple** 5:8
12:2 80:17
94:7
**court** 4:2
8:18 16:19
22:10 34:6
41:15 46:10
50:9 62:12
84:18
**create** 10:3
**created** 10:5
**Crisis** 35:3,
23 36:3
**current** 6:12
31:17 32:14
**customary**
25:15
**Cuthbert**
67:24

----

**D**

**danger** 56:17
**date** 18:1
24:5 44:16
64:3 66:2
67:7 71:17
77:9 90:3

**dated** 22:19
64:1,2 67:5
71:11 72:12
74:10 75:22
82:16 90:2
**daters** 23:25
**dates** 23:23
24:1,2,8
**David** 10:21
11:2,5 12:16
**Davie** 25:10
37:20 91:15,
18,23 94:21
**days** 18:15,18
**deals** 85:22
**dealt** 55:1
**dean** 7:22
9:7,13,25
10:5 11:13,
14,19,23 12:6
13:5,17 14:23
15:17,19,21,
24 16:7,10,23
18:11 19:11
20:9,11,12,20
22:20,25
23:8,9,13
24:24 25:5,
12,13 26:6,11
28:4 32:2
33:7 36:18
37:1,16,24,25
38:4,12,22
39:3,19
40:16,22
41:24 42:2,6,
12,13,14,16
43:11,13,16,
17 46:13,14,
20 48:19
52:21 54:3
55:8,11,15,19
56:5,14,19
57:1,2,5,13,
15,19,21,22
58:7,12,13,
14,17,18,25
59:1 61:4,8
65:9,10,12,14

Corey King Vol 1
March 10, 2016

6

66:22,25 67:2
68:13 76:6,8,
10 77:23
78:25 85:20
86:8 87:11
88:1
**Dean's** 43:13
**Deandre** 64:24
67:19 84:3
**deans** 26:8
38:16,18
40:17 43:17
46:14 95:14
**decide** 31:8
**decision**
21:8,10,15
23:7 26:10
31:5 33:12
42:15 46:5,8
95:8
**declined** 14:6
**dedicated**
94:21
**deemed** 40:24
41:1,20 60:12
61:13 80:20
**defined** 57:14
58:4
**defines** 58:12
**definition**
57:18,25
**demotion**
13:6,8,10
14:2,3,9,11,
14,19
**denied** 72:19
**department**
36:21,22
86:20 87:12,
16 88:2 89:22
90:14
**departments**
8:8,14
**depo** 6:20
74:17 95:22
**deposition**
5:8 6:22
17:5,9 36:13

75:4,8 95:24
**description**
77:6
**designate**
27:21 37:5
57:3 58:8
**designated**
46:18 76:7
**designation**
34:8 57:4
74:22 84:22
91:14
**designations**
6:22,24 15:14
62:15
**designee**
15:10 27:20
43:14 46:13
48:20 55:15
56:15 57:1,9,
23 58:7,15,24
68:4,14 76:6
77:23
**designees**
58:16,19
**desire** 92:4
**details** 29:14
35:22
**determination**
47:9 66:13,17
**determine**
41:24 56:19
58:15 61:4
81:11 87:8
94:9
**determines**
45:12 48:20
58:19 81:18
**Develop** 21:20
**Development**
9:20
**deviate** 21:23
**deviation**
44:1 77:15
**dialogue** 92:3
**difficulty**
36:7

**direct** 4:12
93:19
**direction**
51:23
**directive**
91:9 93:3,7
**directives**
91:22 93:5,18
**director** 9:6,
8,17,25 10:12
11:3,5,6,11,
16,21,25 13:6
14:15 15:20
20:1 40:18
43:19 46:15
52:21 55:9,16
**disabilities**
19:13
**discipline**
86:19
**disciplined**
86:16 87:3,9,
22 88:13
**disciplining**
87:18
**disclosed**
21:16
**discuss** 35:4,
8 76:22 84:14
**discussed**
14:9 23:20
50:20 55:5
57:11
**discussion**
34:11 54:17
56:3,5,10,11,
22,24 89:2
93:2 94:1
**disposition**
61:15,17
**distributed**
95:2
**Diversity**
19:12
**docket** 37:12
**document**
8:17,22 16:18
22:9 28:12

34:5 35:3
39:14 41:14
49:17 50:8
62:11 65:12
68:25 69:2
71:9 72:6
79:3,11,18
83:24 84:17
**documents**
17:8,11,20
63:8 64:4,9
69:12,14,17,
20 70:10,13
71:10 85:8
92:23,25
**dollar** 94:6
**dollars** 94:10
**Dougher** 20:6
**draft** 85:7
**drafted** 85:5
**drafting**
85:10
**drugs** 5:22
**duly** 4:10
**duties** 21:20
22:2,5,6

---

E

---

**earlier** 17:4
43:3 50:20
54:1,8 57:11
69:16 74:25
77:18,25
**Education**
15:8,9
**effect** 5:19,
23 50:16
56:20
**EIC** 27:8
**Ellwood** 32:25
52:25
**email** 18:4,5
72:11,15,25
73:12,17,25
74:10

Corey King Vol 1
March 10, 2016

7

emergency
40:11 42:7
44:2,3,4,5,8
47:2,4,5,18,
20,22,25
48:4,7,11,21,
22,24 49:2,5,
15,18,20,25
50:23 51:2,7,
16,18,20,22,
24,25 52:4,8
53:3,18,22
55:25 56:2,3,
6,14,19,22,25
58:1,5 59:4,7
66:10,11
67:2,10 76:22
77:22 78:11,
14 79:2,14,23
80:2,4,9,12,
19,24 81:2,9,
19,20
employed
37:23
employee
31:17
employees  8:6
employment
27:9 38:17
end  47:23
58:7
engaged  72:17
Engagement
19:16
engaging  36:9
ensuring
52:12
entered
27:15,16
enters  59:24
environment
25:16 56:4
EOP  27:8
equal  27:9
essential
21:20 22:5
established
21:23 82:23

estimate
92:20
evaluations
32:3,6
evening  20:15
eventually
23:15
evidence
44:12
exact  89:5
EXAMINATION
4:12
examined  4:10
exception
55:25
exemplifies
81:5
exercise
85:18,22
87:23
Exercises
21:25
Exhibit  8:16,
19,22 16:20,
23 17:22
19:19 22:11,
13 23:19,21
25:7 27:5
34:4,7 35:16
41:16,18
42:18 50:10
55:14 56:12
62:13,19,24
64:9 69:19
84:19,24
exists  56:20
expelled
86:16 87:2,8
expelling
87:17
experience
62:1
explain  94:4
explained
44:23
expressed
92:7

extra  15:1

F

fact  65:17
73:2,15 74:4
88:4
facts  7:6
faculty  15:11
36:22 40:18
45:10 87:13
88:3
fail  93:17
failed  91:21
Failure  83:4
failures
91:25
Fair  51:17
81:16
fall  11:1
falls  15:9
34:21
Family  31:25
FAU  17:12
20:2 35:19
42:20 49:2,
19,23 62:1
63:11,20
65:18 77:12
78:10
FAU'S  15:15
34:16
FAU1166  16:24
FAU1438  62:20
February
67:5,8,14
68:24 69:6
feel  80:16
felt  66:24
female  29:4
file  16:5
25:6 69:4,8,
13 70:1,6,14
files  30:8
70:17
final  46:5,8
61:17

find  10:24
29:12,23
47:11
fine  75:10
finish  6:3
76:25
Flexible
20:15
Florida  60:23
flow  51:3
flowchart
49:11,14
50:15,16,19
51:2 55:14,18
59:17 64:21
68:8,10 76:1
78:8 79:24
flowcharts
50:13
focused  86:24
follow  43:3
77:2
form  10:8
25:14 29:24
33:20 60:7
61:25 65:4
69:9 70:2,15
73:8 74:16
76:19 88:5
90:24 91:5,6
formal  83:6
formally
72:23
forms  29:20
83:3
Fort  37:20
forward  54:25
found  16:4
fourth  70:25
Fraternity/
sorority
36:18
Freshman  15:3
front  47:23
49:12
functions
35:24

fund   94:6,12,
  14,20
funded   93:25
  94:25
funding   94:2
  95:17
funds   94:3,
  19,20 95:2

---

G

gather   36:4
gave   71:15
  91:8
generated
  66:15
give   4:5 33:7
  76:16
giving   46:21
glad   5:10
God   4:7
good   4:14
  95:21
govern   35:11
governed
  34:25
government
  19:15 94:17
  95:15,18
governs   35:9
grounds   44:12
  61:5
group   39:21,
  23 40:9,19
  41:4 94:9
  95:1,4
Guide   17:12

---

H

half   11:24
  16:1
hand   4:3
  45:15,16 63:2
handed   45:5,
  21 62:19
  84:24

handling
  21:13,14
  55:2,4
handwriting
  71:23 72:1
handwritten
  42:22
happen   21:15
  24:8,9 35:1
  50:13 92:5
happened
  11:21 65:21
Harbor   37:10
  39:7
harm   36:8,10
  56:17 81:6
harming   40:12
head   40:3
health   9:22
  19:21 20:4
  36:23 48:25
  56:20 66:12
hear   5:11
heard   5:16
  93:6
hearing   45:8
  59:25 83:5,6,
  7,9,10,13,15
hearings
  47:13
held   10:19
  15:16,19
  16:7,10
  34:11,13
  46:24 50:7
  57:15 70:21
highly   21:20
highly-
developed
  21:22
hire   26:10
  27:24 31:6,8
hired   33:25
  53:16
hiring   15:15
  18:4 26:14
  27:20 32:19

Hispanic
  12:13
honors   39:6
Horstman
  11:9,10,12,14
  12:3,22 13:16
  14:4,12,18
  15:2,14,16
  16:6,9,13
  22:19 23:8,12
  25:3,9,25
  26:10 29:1,2
  31:6,8,17
  32:1 33:18
Horstman's
  23:4
hours   20:15
housing   36:19
  40:18 50:24
  59:15
HR   13:12 19:2
  24:4,13,25
  26:17 27:8
  29:13,14,17,
  20 31:16
  33:24
Hubert   67:24
Human   33:5,
  16,17

---

I

ideal   31:14
identification
  8:18 16:19
  22:10 34:6
  41:15 50:9
  62:12 84:18
identified
  36:7
identify
  49:14
illnesses
  5:18
immediately
  51:16,20 80:2
imminent
  40:11 41:25

42:7 44:1
  47:24 48:25
  56:17 66:9,
  11,17,24
Improvement
  94:2
incident
  17:16 50:21
  51:9,14
  55:17,20
  62:16 63:14
  64:11,15,19,
  23 65:3,11,25
  66:5,23 67:7
  68:6,11 69:5
  79:25 80:7,18
  81:10 88:17,
  22
include   31:2
  50:23 59:7
  66:20 77:5
included
  58:24 60:5
  69:13,25
  70:6,14 77:10
  78:20
including
  19:12 20:15
income   15:1
incoming   10:9
incorrect
  78:15,16
increase
  25:8,18,25
  26:3,7 94:12,
  14,17
independent
  21:25 22:2
indicating
  44:14,15
individual
  5:2 6:10 7:5
  46:13 95:23
individuals
  40:12 41:7
  43:12,21 58:9
infirmities
  5:19

information
  16:4 24:10,
  15,17,20
  29:12,17
  30:1,4 36:5
  44:21,22 52:5
  63:2 81:13,14
  88:8 89:16
  90:9 92:23
informed
  72:20
initial  94:1
instances
  45:22
institutions
  94:7
instructor
  15:10
interest
  35:5,7 54:21
interim  6:18
  7:18 10:20,
  22,25 11:2,6
  22:20 23:3,8,
  12,14 25:17
  50:23,24
  59:13,14
  66:14 81:6
interlap  7:7
international
  19:14
interpretation
  78:24
interrogatorie
s  17:15
intervening
  35:6
Intervention
  35:24 40:7,8
interview
  24:23 26:15,
  25 28:20,23
  29:19,24
  30:11,20 32:3
interviewed
  26:19 27:21,
  22 29:15,18,
  21 30:11

interviewing
  32:1,10
interviews
  27:4 29:20
investigate
  44:11
investigating
  34:16,19
  35:12 44:12
  72:16
investigation
  43:8 44:22
  50:21 51:3,9,
  15 52:1 53:4,
  19 54:11
  55:21 61:9,10
  62:17,25
  64:5,10,12
  67:15 68:5,
  11,17,22
  69:23 70:19
  74:24,25
  75:2,5 76:3
  81:10,17
investigations
  43:5,6
investigatory
  43:24,25
  44:6,9 46:23
  47:2 48:1,8,
  19 49:3,21
  50:1 51:19
  52:6 63:4
  66:16 69:3,15
  80:3
invitation
  77:8
invocation
  89:16
invoke  43:14
invoked  44:5,
  8 63:3 88:21
  89:10
involve  54:19
involved
  30:20 54:21
  61:17,23
  74:24 75:4

  85:17 86:18
involvement
  36:20 66:1,2
issue  41:21
  42:3 45:3
  80:2 88:7
issued  49:4
  53:24 55:9
  59:19 60:3
  63:7 76:5
  80:5,10,13
  81:7 82:21
issues  54:22
  91:17
issuing  54:11
  67:2 79:17
items  78:17,
  19,20

J

Jane  90:21
January  18:2,
  12 20:7 21:3
  22:19 23:14,
  15
Joanna  32:25
  52:25
job  18:7,12,
  15,16 23:13
jog  32:24
judgment  22:1
  81:14
Jupiter  37:10
  39:6

K

Kabat  13:13
  25:1
kind  95:16
King  4:9,14,
  16 5:5 22:16
  34:15 50:12
  62:15
Kirk  20:6

knowing  14:8
knowledge  5:1
  26:4 49:7
  77:19 91:17

L

labeled  69:19
late  74:8
lateral  13:24
Latino  12:13
latitude  22:1
Lauderdale
  37:20
laws  86:13
leaders  94:17
  95:15,18
leadership
  19:15 20:14
  36:20
learning  15:3
left  95:6
legal  83:19,
  22,24
letter  22:18
  43:25 45:5
  66:14 68:23
  70:20,23 71:3
  78:9 79:12,
  13,14,15,17,
  22 80:19
  81:3,7,20,23
  82:1,7
letters  79:20
  80:22 82:22
  88:2
level  33:17
  46:1
life  9:7,8,17
  10:1,4,12
  11:16,18,21
  12:1 13:6
  14:15 15:21
  19:14 36:18,
  19
limited  59:8

Corey King Vol 1
March 10, 2016

10

list  28:13
  36:25
listed  65:17
  78:14,18
literal  78:22
  79:1,10
location
  44:16
long  6:15
  7:16 10:16
  11:2,10,23,25
  23:18 36:25
  53:14
longer  9:6,22
  75:9
loud  5:13
luncheon  96:1

**M**

made  10:9
  21:10,15
  26:10 28:1
  30:15 31:5,13
  33:12 34:17,
  19,21 35:12
  43:4 46:12
  50:14 54:4
  60:4 61:20
  62:16 64:23
  66:13 71:22
  72:3 91:20
main  38:15,25
  39:2
maintain  69:4
maintained
  70:6
make  26:9
  42:14,16 47:9
  61:10 75:8
  90:9
makes  46:5,8
  81:13 95:8,10
managed  52:15
management
  12:6 35:8,19
  55:3,4,23,24

Manager  13:18
  14:5,7,16,24
  15:18,22
March  8:23
  9:2 64:1,2
  66:3 70:25
  71:12 72:12
  73:2 74:15
  75:19,23
  82:9,16
Marin  67:19
mark  8:15
  16:16 34:3
  41:13 62:9
  84:21
marked  8:17,
  21 16:18,22,
  24 22:9 34:5
  35:16,19
  41:14 42:20
  50:8 62:11
  84:17,24,25
Mary  90:21
matter  50:22
  62:25 64:6
  72:21 83:14,
  16 85:3,14,
  16,17,18,23
  89:23
matters  86:12
  87:10
meaning  37:22
means  47:23
  48:24 49:5
  52:1 56:7
  83:10 87:24
measure  44:5
  52:8 59:12
  66:14 78:11
  80:5,9,13,24
  81:2,6,9,19
measures
  44:3,4,8
  47:3,4,5,18,
  20,22,25
  48:4,8,12,21,
  23,24 49:3,5,
  15,18,20,25

50:23 51:2,8,
  16,18,21,22,
  24,25 52:4
  53:3,19,23
  55:25 56:2,3,
  7,14,22,25
  58:1,5 59:4,
  7,9 66:10,11
  67:3,10 76:23
  77:22 78:14
  79:2,14,23
  80:3,20
media  84:23
  85:7,8,9,21
  86:19,23
  88:6,7,11
  89:4,22 90:13
mediation
  61:12
medication
  5:22
meet  30:18
  39:10,11
  40:23 41:5,6,
  19,22 54:2,10
  70:24
meeting
  39:12,17
  42:10,17
  63:5,6 71:5
  92:2,9,10,21
  93:1,5,21
meetings
  54:24 55:5
meets  35:4
  72:22 94:9
member  20:13
  36:22 40:18
  54:9
members  28:15
  30:6 36:24
  39:22,25
  40:13 41:9
  55:6
memo  25:22
memory  32:24
Mena  38:9,20,
  22

mention  69:22
mentioned
  19:21 49:24
  69:19 78:20
met  71:15
  72:18
minimum  18:17
minute  16:25
missing  60:19
Monday  72:22
money  92:8,
  13,14,16
  93:6,16 94:7
  95:2,8
monies  95:5
month  10:18
months  11:4
  12:2
morning  4:14
move  13:24
  44:8 80:3
moved  15:21
  19:23,25
moving  15:17
  71:9
multicultural
  19:13
multiple
  79:20
mutual  61:16,
  22 62:2,5,6
  84:5,7,10,11

**N**

names  27:7,8,
  12 28:13,25
  32:23 39:20,
  23 54:16,18,
  20
national
  23:17,18
nature  40:19
  43:10
needed  10:3,
  7,10,25

Corey King Vol 1
March 10, 2016

11

negative 40:3
neutral 83:23
nods 40:3
Noemi 67:18
normal 18:16
 71:19
northern
 37:7,9,25
 38:4,5,7,13
 39:4
notes 63:6
 67:5,13
 69:23,25
 71:22 72:3
notice 6:21
 44:7,13 47:9
 49:4,21 50:1
 51:25 52:8
 53:23 54:11
 55:9,10,21
 59:19 63:7,18
 75:22,25
 76:2,5,11,17
 77:4,16 78:5,
 11,13,18,21
 79:15 81:23
 82:7,20
Notices 51:4,
 10
notified 60:6
 63:4 65:18,20
now's 95:21
number 63:12,
 20 68:1

O

oath 5:7
object 60:7
 61:25 65:4
 69:9 70:2
 74:16 90:24
objection
 33:20 70:8,15
 73:8,14 74:20
 75:7 76:19
 79:3 88:5

objects 33:22
observing
 4:19
obtained 16:3
 61:23 67:23
 80:18 83:19
 84:3,6
occurred 69:5
 88:17
Offense 63:14
offenses 77:7
offer 14:6
 28:1
offered 14:6
offering
 22:19
office 27:9
 36:19,21
 43:12,13 67:2
 70:11
officer
 44:10,13
 45:3,9 49:2
 65:18 80:1
 81:13 83:7
offices 57:21
official
 43:11 84:23
 85:15
officials
 85:13 88:19
Ombudsman
 36:20
on-campus
 26:20 27:3
 28:20 29:24
open 18:15
opportunities
 45:25
opportunity
 44:21
opposed 31:9
option 45:7
order 7:12
 11:1 90:9
 94:12 95:4

organizational
 8:23,24 9:1,
 14 19:19
orientation
 19:17
OSD 36:23
 40:19
outlined
 60:14
overlap 75:1
Owl 31:24

P

p.m. 70:25
 74:12 96:2
packet 62:21
 69:17
pages 27:6,10
 60:19
paragraph
 20:10 21:19
 48:3,4 56:13
 57:18 58:1
 60:15,21
 70:25 77:13,
 14 78:23 79:2
 86:11
part 6:24
 7:18,19 27:11
 41:7 84:9
Partially
 6:17
participants
 31:1
participate
 23:7 86:5,9
parties
 61:16,23
partner 10:4
 26:8 37:2,4
 95:14
pavilion
 91:15,18,22
 92:4,5,17,20
 93:4,8,12,23,
 25 94:12,22,

 24 95:5,7
pay 13:6,8,9
 14:11 26:1,7
pays 94:6
pending 75:15
people 23:23
 24:23 28:7,10
 30:19,20
 39:20 54:20,
 23
percent 25:8
period 37:11,
 13,15
permanent
 6:18 7:19
permanently
 25:4
perpetrator
 44:20 61:22
 81:5
person 25:16
 27:23 30:18
 33:25 46:17,
 21 52:12
 57:20 58:3
 60:3,12 66:22
 74:24 75:4
 81:13,18
personal 5:1
personnel
 16:5 25:6
 86:12
persons 60:4
 88:23
pertaining
 5:1
physical
 56:17
place 23:8
 44:3 56:23,25
 66:16 78:1
 81:9 82:13,17
 83:13,15
 86:18 87:5
 88:13,16 89:2
 92:3
placement
 23:14

Corey King Vol 1
March 10, 2016

12

Plaintiff
  4:18
Plaintiff's
  8:19,22 16:20
  22:11 34:7
  41:16 50:10
  62:13 84:19,
  25
plan  93:22
play  84:9
plea  44:25
  59:24 60:2
  61:15
pleads  45:6
point  17:20
  26:13 29:2
  39:18 44:19,
  23 47:6 48:22
  78:10 80:4
  81:4 82:24
  83:5
pointing
  51:23
police  36:21
  40:17
policies
  21:21,24 33:2
policy  34:16,
  17,18,24
  35:8,13,16,19
  82:2
Poole  64:24
  67:19,24
  84:3,6,9
portion  60:8
  79:8
poses  56:17
position
  6:12,16 7:6,
  16,20 9:5,6,
  23,24 10:4,6,
  17,19,20,22
  11:13,15,20
  13:4 14:5
  15:16,19
  16:3,7,11
  18:10,19,25
  19:7,23 20:7,

  11,18,25
  22:20,25
  23:5,16 24:6,
  24 25:4,17
  26:5,16 27:15
  28:5,19 29:16
  31:6,9,14,22,
  24 32:2,22
  33:4,6,19,25
  34:2 38:3,11
  57:15 58:18
possessing
  36:8
postdate
  18:12
posted  23:13
  24:5 27:15,
  17,18
posting  16:23
  17:2,21 18:1,
  7,16,23 19:4
  20:19,23 22:3
  23:13 27:11
postings
  27:14
pot  95:2
potential
  35:4 44:22
potentially
  36:8
practice  56:4
  57:4,7,8
  61:24 67:1,3
  68:4 76:24
  77:1,25 78:5,
  12 79:11
  81:25 84:11,
  14 85:6
practiced
  78:10
practices
  21:21
prefer  72:20
present  92:9
president
  6:14 7:14,22,
  25 8:2,5 10:9
  20:9,12,14

  21:1,4,9,12
  33:7,17 40:16
  46:7,9 52:11
  55:11 56:6
  57:6,21 58:25
  65:10 76:7,11
  86:7 87:19
  88:25 90:19
  95:11
prevent  40:11
  61:12,14
  86:13
print  42:23
printed  42:23
  49:12 58:16,
  20
prior  7:20
  16:6,9 17:4,8
  20:23 21:3,24
  23:4 32:3
  49:20 50:12
  64:16 71:3
  73:12,24
  76:18 89:3,5,
  8 93:21
privacy  86:13
privilege
  56:8
proactive
  35:6
problem-
solving  21:22
procedure
  34:24 35:11
  45:18,21
  52:18 71:19
  75:11
procedures
  21:24 34:16,
  19 35:1 46:25
  47:7 49:19
  60:22
proceed  93:4,
  8
proceedings
  4:1 34:12
  47:8 50:7
  60:17,22

  61:18 62:8
  96:3
process  26:23
  30:20 33:24
  35:10 45:20
  46:3,4,6
  49:8,17 52:13
  55:17 60:5
  64:20 68:16
  78:9 81:4
  82:1 88:21
processes
  27:17 28:1
  79:19
produce  75:1
produced
  70:10
professional
  32:15 66:20
  81:14
professor
  72:18,19
programmatic
  10:6
programs
  10:11 31:25
projects  94:8
promotion
  13:20,22
promotions
  33:4
Proposal  24:6
proposed
  23:23
provide  27:2
  46:25 89:15
  90:8
provided  68:6
  70:16 81:15
  83:4 91:9
  92:22
Provost
  85:19,24,25
  87:19 88:1,25
psychological
  19:20
purpose  35:5

Corey King Vol 1
March 10, 2016

13

36:2,4 39:12,
14 40:9
44:14,15
54:14,17,19
83:1
**purposes**  4:17
6:19 23:22
35:24 36:12
74:17
**purview**  8:11
9:22 11:22
94:15
**push**  27:24
**put**  23:22
24:7,15,17,19
37:5
**puts**  24:10,13

---

**Q**

**qualifications**
31:11,13,15
34:1
**qualifies**
31:16
**question**  5:9,
11,15 6:3
8:13 13:12
16:8 24:4,25
26:17 33:5
53:10,11 65:6
66:9 71:25
73:10,11,20,
21 75:15 79:7
82:14,15
93:19
**questions**
4:22,25 5:7
7:8 17:13
74:18 75:12

---

**R**

**race**  12:12,
16,22
**Rafael**  10:15,
16 12:11

**raise**  4:2
33:7,10,18,23
**raises**  33:4
**rated**  21:22
**Raton**  38:15
**read**  79:9
**reading**  77:13
78:22 79:1
**ready**  17:1
62:22
**reask**  73:20
82:14
**reason**  65:20
90:17,22
**reasonable**
61:5
**reasons**  91:9,
12
**reassigned**
12:5,9 13:16
**Rec**  36:18
**recall**  9:11
17:19,25
22:24 24:15,
17 25:3 26:18
28:3,16,25
29:2,3,6,9
31:23 49:24
53:18,22
63:25 64:3
72:25 73:23
74:2,3,7,9,14
90:4
**recalled**
28:18
**receive**  26:6
46:18
**received**
33:18 66:4,23
79:25
**receives**
27:18 43:24
**receiving**
72:25
**recess**  50:5
96:1

**recollection**
74:18,21
75:6,12 88:20
**recommendation**
95:11
**recommendation**
**s**  31:12 40:10
**record**  4:15,
17,18 6:1,3
34:10,11 50:3
74:17 79:8
83:12 89:8
**records**  91:11
**recreation**
19:14,16
**refer**  36:14
**reference**
32:13,17
**references**
32:16
**referred-to**
8:17 16:18
22:9 34:5
41:14 50:8
62:11 84:17
**referring**
73:18
**refers**  57:20
**reflect**  62:24
64:5,10 83:13
**reflected**
79:11
**reflects**
19:18 63:2
**regard**  33:3
43:4
**regular**  42:17
**regulation**
34:25 35:2,9,
13 42:19,25
43:2 61:11,14
77:3 82:4,5
**related**  24:13
27:14 45:3
69:14 88:21
**relation**
21:11,13

89:22
**Relations**
85:7,9 86:19
88:6,11 89:22
90:13
**release**  89:4,
8
**released**
84:23 85:2,8
89:6,21 90:18
91:4
**remember**
75:20
**removal**  50:24
59:14
**rep**  4:22
74:17,22 75:5
95:22
**repeat**  5:10
11:17 16:8
30:3 53:11
75:16 79:6
**rephrase**  5:10
48:16 65:7
**replace**  16:13
**replacement**
15:15
**report**  7:24
9:22 17:16
20:22,23,25
43:10,21,22
46:11,12,18,
21 48:18
50:21 51:9,14
55:17,20
62:16,17
63:14 64:15,
19,23 65:25
66:5,8,24
68:6,11 79:25
80:8,18 81:10
85:21
**reported**
20:18 64:25
65:1
**reporter**  4:2
8:18 16:19
22:10 34:6

Corey King Vol 1
March 10, 2016

14

41:15 50:9
62:12 79:9
84:18
**reporting**
20:1 21:7
**reports** 20:12
**represent** 5:6
78:8
**representative**
6:10,20,22
7:4
**representative
s** 36:17,21
37:2
**request** 25:8
90:19 91:1
94:17 95:4
**requested**
79:8 94:11,16
**requests** 95:3
**required**
20:16 39:25
40:1 43:3
55:10 66:5,25
71:7 76:11,
16,22 77:2
86:20
**requirement**
59:12
**Residence**
36:19
**resign** 12:3
**resolution**
43:8 69:15
**resolved**
72:21
**Resources**
33:5,16,17
**respect** 5:5
**respond** 40:10
**responded**
73:2
**response**
86:23
**responsibiliti
es** 14:21
25:18,21 34:1

**responsibility**
45:2,24 55:16
83:3,5,8
**responsible**
19:11 44:25
45:1,6,13
55:20 59:25
**rest** 30:1,4
**restrictions**
50:25
**result** 86:17
87:4
**review** 22:16
36:5 43:22
44:21,24 66:8
76:11,18 80:7
83:1
**reviewed** 17:8
63:13 64:16
65:24 92:25
**rights** 44:23
60:9,13,17
62:8 63:5,17,
19,22 71:11,
15 77:7 82:16
**risk** 36:8,10
40:11
**Robin** 13:13
25:1
**robust** 10:3
**role** 15:25
40:22
**Rotela** 17:19
21:13,15
62:17,25
64:6,11 65:2,
11 68:23 69:5
70:14,24
71:11,15
73:7,13,24
76:18 83:14
84:24 85:3,16
88:12 89:23
**Rozalia** 4:19
16:12
**rules** 5:8
**running** 11:1

**Ryan** 62:17,25
64:6,11 65:2,
11 69:5 70:14
71:11 73:7,
13,24 83:14
84:24 85:3,16
89:23

---

**S**

**safety** 48:25
49:6 56:20
**salary** 25:24
33:3
**sanction**
45:23 60:5,6
**sanctioning**
47:14
**sanctions**
45:3,4,15,17,
21,25 60:2,3
79:17 83:11
**sat** 37:25
40:20 53:17
**Saturday** 73:3
74:8,11,12
**Saunders**
90:21 91:3
**save** 27:24
**SCAC** 36:13,16
39:9,17 40:10
41:6,8 42:9
53:5,14 54:2,
9,16
**schedule**
30:11,16,21,
25 31:2
**scheduling**
71:5
**screwed** 7:13
**search** 10:23
23:17,18
24:1,3 26:24
27:12 28:3,
10,12,16
30:2,4,7,16,
24 31:12
32:5,9,19,21,

23
**searches**
26:23
**Seatech** 37:21
**security**
17:16 62:16
63:14
**semester**
10:25
**seminar** 15:3
**sending** 76:18
**senior** 20:13
21:1,4,8,12
52:11 55:11
56:6 57:6
76:7,10 92:2,
10 93:21
**separate** 75:6
81:22 82:1
**separated**
22:24
**separation**
82:22
**series** 27:16,
25
**serve** 14:4
36:24
**served** 32:25
**serves** 20:13
**service** 56:9
**services**
9:21,22
19:12,20
20:2,4,5
36:23
**set** 33:3
39:16,19
**setup** 30:11
**severity**
45:4,23
**share** 32:13
**shares** 81:12
**shoulders** 6:2
**showed** 78:13
**showing** 8:21
16:22 64:8

Corey King Vol 1
March 10, 2016

15

```
shrugging  6:2
signed  17:13
  63:5 71:11
sit  38:9
  41:7,19 42:4
  49:18 53:5,14
  54:2,9,17
  95:16
sits  36:12,16
  95:13
situation
  42:7 49:24
  57:10 60:13
  83:19
situations
  40:11
skills  21:22
Skype  29:19
slew  26:25
  30:19
SLS  15:2
smaller  40:8
  41:3
sole  35:5
solemnly  4:4
speak  74:4
speaking
  15:13 68:17
  75:20
speaks  79:3
specific
  19:16 29:24
  38:6 46:17
  77:5 79:13
  86:14
specifically
  77:3 85:22
  86:24 94:21
spent  94:10
  95:9
spoke  67:14,
  18 72:19
  74:7,14 75:18
spoken  17:6
staff  92:2,10
  93:21
```

```
stage  47:20
  51:8
stages  48:11,
  15
stamped  63:12
standard
  79:13,14,15,
  16,22 80:19
  81:25
standing
  74:20 75:7
start  4:21
  10:24 47:17
  64:20
started  11:14
  61:1 65:2
state  4:15
  82:6 91:3
  94:5,6,14,18
stated  6:8
  7:2 38:13
  39:14 43:2
  54:1,12 74:25
  77:18,25 82:8
statement
  67:23 70:5
  84:23 85:1,2,
  5,10 86:3,6
  87:24 88:7
  89:6,9 90:4,
  5,6,9,11,14,
  18,23 91:4
statements
  68:18 89:21
states  57:19
  82:3
stating  73:3
  92:11
step  44:17
  82:1
steps  50:19
strategies
  21:21
strike  22:22
  41:12 52:10
  53:12 54:14
  73:10 75:25
  84:4 87:16
```

```
89:20 93:11
  95:19
structure
  47:12
student  6:14
  7:15 8:5 9:8,
  14,21 11:15,
  19 12:7
  15:20,24
  16:7,10,24
  17:12,13,22
  19:12,14,15,
  17,21 20:4,
  14,21 21:1
  26:6,11,23
  28:4 30:9
  31:24 32:2
  34:23,24
  35:3,9,18,23
  36:2,19,20
  40:2,6,8
  42:19 43:24
  44:14,16,17,
  19,20 45:5,6,
  8,9,13,24
  46:7,10 47:10
  48:15 49:1,2,
  6,9,12 50:13
  52:11,13,22
  54:4,25 55:1,
  3,5,12,21
  56:13,16,21
  59:21,23
  60:22 62:3
  63:3,5,17,19,
  22 65:10
  66:6,7 71:11,
  15 72:16,18,
  20,23 73:15,
  17,18 76:1,12
  77:7,9 79:12,
  16 81:12
  82:8,9,16,17,
  19,23,25
  83:1,8,10,18
  84:8,13 85:7
  86:13,14,15,
  19,20 87:2,8,
  14,15,18,20,
```

```
22 88:12,20
  89:9,17,19
  91:15,18 92:2
  93:23 94:5,
  16,21 95:11,
  15,18
student's
  56:8 69:10
  83:25
students  7:23
  10:8,9 19:12,
  14 20:9,13
  22:25 23:8,9
  25:13 34:17,
  20,21 35:5,6,
  7,12 36:6,18
  37:24 39:19
  40:16 41:24
  42:2,13 43:4,
  12,13 45:10,
  22 46:20
  54:21 56:5,
  15,19 57:1,2,
  3,6,13,15,19,
  20,22,23
  58:8,12,13,
  14,15,18,25
  59:1 61:4,8
  65:9,10,13
  67:2 68:14
  77:23 86:8
  92:5
subjective
  66:19,21
submit  18:7
  33:9 39:22
  40:1 41:20
  44:13
submitted
  42:2 54:16
submitting
  39:20 54:18
subsequent
  61:18
subsequently
  39:8 63:6
  88:3
substantial
```

Corey King Vol 1
March 10, 2016

16

22:1
**successful**
  10:24
**suffer**  5:18
**summary**  17:2
  18:23,25 19:7
  20:11 24:6
**Sunday**  74:9,
  15
**supervise**  8:6
**supervisor**
  19:1,3 24:12,
  13 32:14
  93:20
**supervisory**
  91:22 93:18
**surrounding**
  91:18
**suspended**
  86:16 87:2,9,
  18
**suspension**
  50:24 59:14
**swear**  4:4
**switch**  4:25
  7:4
**sworn**  4:10
**system**  23:23
  24:7,11,14,
  16,18,19
  27:18,19

---

T

**table**  54:20
**takes**  45:24
**taking**  6:21
  40:1 56:3,7
  57:25 78:22,
  24 79:1
**talk**  34:15
  35:15 72:23
**talked**  23:10
  45:19 47:1
  50:12 61:1
  64:20

**talking**  93:22
**talks**  47:14,
  15
**taped**  82:25
**taught**  15:2
**teach**  14:25
**team**  20:14
  35:24 40:7,8
**telephone**
  29:19
**tells**  77:3
**ten**  6:22,25
  27:1 47:11
**term**  57:19
  73:15
**terminated**
  12:4
**terms**  94:19
**Terry**  38:9,
  20,22
**testified**
  4:11
**testify**  5:20,
  23
**testimony**
  4:5,20
**things**  40:19
  80:2
**thinking**
  33:23
**thought**  49:16
**threat**  35:18
  41:25 42:7
  44:2 47:24
  48:25 49:5
  54:4 62:16
  66:9,11,18,24
  81:6
**threatening**
  72:17
**threatens**
  36:9
**threats**
  34:17,19,21
  35:12 43:4
  60:4

**Thursday**
  70:24
**time**  8:3
  10:23 14:22
  19:24 20:4,
  19,20 25:13
  31:20,22
  37:11,13,15,
  22 38:17
  44:16 48:20
  49:2,19,23
  52:9 53:5,12,
  17,18,22,23
  65:24 73:16
  77:9 78:10,25
  79:17 80:9,23
  85:25 90:20
  92:20 93:20
  95:21
**times**  62:1
  80:12,17
**title**  13:7,
  11,22
**titled**  11:23
**titles**  57:10
**today**  4:20
  5:7,20 6:23
  7:8 64:16
  72:20
**told**  6:23
**training**
  52:17,20 53:1
**travel**  25:9,
  21
**Treasure**
  37:12 39:7
**true**  61:6
**Trust**  94:2
**Trustees**  35:1
**truth**  4:6,7
**truthfully**
  5:20,24
**turn**  18:1
**type**  25:17
  56:8 83:25
**typical**  64:19
  70:20

**typically**
  26:9,24 28:9
  30:13 32:10,
  12,15 37:5
  39:11 52:21
  54:24 56:11

---

U

**Uh-huh**  18:24
  35:21 62:18
  68:9 80:22
**ultimate**  31:5
  52:10
**ultimately**
  52:16 57:1
**unable**  49:16
**understand**
  5:9
**understanding**
  6:25 21:12
  33:24 79:10
  83:15,18,23
  86:23
**unilaterally**
  33:12
**Union**  19:15
**University**
  6:13 7:21
  14:22 15:1,12
  18:16,18
  25:15 27:25
  31:18 32:7,11
  33:10,16,17
  34:22,23
  36:5,11 37:23
  42:8 43:3,11
  44:2 46:8
  47:24 49:1,6,
  10 54:22 55:2
  56:4,18,21
  57:16 59:15
  60:23 61:13,
  21 62:3 64:10
  69:4 70:6
  83:12,24
  84:8,12 85:2,
  6,13 86:15,

Corey King Vol 1
March 10, 2016

17

17,24 87:3
88:19,25
90:19 91:7
**university's**
33:2 34:18
61:7 84:22

---

**V**

**vacated** 18:19
**varies** 15:11
**verbal** 56:10,
11 62:16
63:14
**Vice** 6:14
7:14,22,25
8:2,5 20:9,
12,13 21:1,4,
8,12 33:7
40:16 46:7,9
52:11 55:11
56:6 57:6,21
58:24 65:10
76:7,10 86:7
87:19 95:11
**victim** 60:9,
13 62:6,8
68:17 81:8,
11,12 84:15
**Victim's**
60:17
**video** 90:7,
11,17,22 91:4
**view** 24:6
49:16 66:19
**violation**
61:7
**violations**
77:6
**Volume** 96:3
**voluntarily**
14:18
**voluntary**
14:9
**VP** 39:19
41:23 42:13,
14,16

---

**W**

**waive** 21:23
**waives** 83:10
**walk** 43:7
**Wallace** 20:5
**wanted** 10:10
91:3,10
**wanting** 8:13
**week** 42:17
**weekend** 20:15
73:4 74:5,9
75:21
**weeks** 18:17,
18 39:11,13
41:5,6 42:10
**welfare** 48:25
49:6 56:20
66:12
**white** 12:24
**Williams** 4:19
5:6 16:12,14
18:20 22:6,24
37:16,23
38:19 40:20
63:1 65:14,20
66:4 70:24
71:4,14,22
72:11 73:12,
23 74:4,15
75:19 76:16
91:21 92:4,22
93:17
**Williams'**
15:15 38:17
66:18 67:5,13
69:22 71:23
72:1 73:6
**witnesses**
82:24
**word** 52:14
**work** 20:15
30:13,17,19
33:4
**worked** 32:6

---

**works** 32:11
**writes** 18:25
**writing** 19:6
**written**
61:16,21
**wrong** 61:20
**WYDLER** 4:17,
24 25:14
33:20 34:8
60:7 61:25
65:4 69:9
70:2,8,15
73:8,14
74:16,20
75:10 76:19
79:3 88:5
90:24

---

**Y**

**year** 11:24
16:1 58:18,
21,22
**years** 6:17
7:18 16:1
94:7
**yesterday**
72:18
**yielded** 54:24

---

**Z**

**Zapata** 10:15
12:11

---