# TAB "3"

**CORY KING'S DEPOSITION VOLUME II - DATED MARCH 10, 2016**

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:  15-CV-60621-DPG

ROZALIA WILLIAMS,

                    Plaintiff,
vs.

FLORIDA ATLANTIC UNIVERSITY,
CHARLES L. BROWN, SR., an
individual, and COREY KING, an
individual,

                    Defendants.
_____/

DEPOSITION OF

DR. COREY KING

VOLUME 2 of 2
Pages 97 through 255

Thursday, March 10th, 2016
10:00 a.m. - 5:30 p.m.

US LEGAL SUPPORT
3440 Hollywood Boulevard
Hollywood, Florida

Stenographically Reported By:
Ashley C. Nehme, FPR
Florida Professional Reporter

```
1    APPEARANCES:

2

     On behalf of Plaintiff:
3
     SAENZ & ANDERSON, PLLC
4        20900 N.E. 30th Ave., Ste. 800
         Aventura, FL 33180
5        (305)503-5131
         BY:  RIA CHATTERGOON, ESQ.
6        ria@saenzanderson.com

7

     On behalf of Defendant, FAU & DR. COREY KING:
8
     MARRERO & WYDLER
9        DOUGLAS CENTRE, PH-4
         2600 Douglas Rd.
10       Coral Gables, FL 33134
         (305)446-5528
11       BY:  LOURDES WYDLER, ESQ.
         lew@marrerolegal.com
12

13   On behalf of Defendant, DR. CHARLES BROWN:

14   WHITELOCK & ASSOCIATES, P.A.
         300 S.E. 13th St.
15       Fort Lauderdale, FL 33316
         (954)463-2001
16       BY:  KELSEY MOLDOF, ESQ.
         cjw@whitelocklegal.com
17

18
     ALSO PRESENT:  ROZALIA WILLIAMS
19

20

21

22

23

24

25
```

Corey King Vol 2
March 10, 2016

99

1                          I N D E X

2

3    Examination                              Page

4    Continued DirectBy Ms. Chattergoon        100
     Cross          By Ms. Wydler             251
5
     Certificate of Oath                      252
6    Certificate of Reporter                  253
     Read and Sign Letter to Witness          254
7    Errata Sheet (forwarded upon execution)  255

8

9                    PLAINTIFF EXHIBITS

10   No.                                       Page

11   9    Bates Plaintiff's 116-121, Employee   115
          Relations Department Disciplinary
12        Process

13   10   Bates Plaintiff's 579-583, Regulation  119
          5.12
14
     11   3/4/16 Interrogatory Answers          133
15
     12   Bates FAU1505-1506, Templates         152
16
     13   Bates Plaintiff's 560-566            155
17
     14   Bates Plaintiff's 184-188, Emails    195
18
     15   FAU 2012/2013 Academic Calendar      199
19
     16   Bates FAU1513-1522, Emails           211
20
21

22        (Reporter's Note:  Plaintiff's Counsel
          retained exhibits.)
23

24

25

1    The following proceedings continue from Volume 1 as

2    follows:

3                    CONTINUED DIRECT EXAMINATION

4      BY MS. CHATTERGOON:

5        Q.    Dr. King, we are back on the record.  Just

6    a reminder we are back from lunch and you are still

7    under oath.  Okay?

8        A.    Yes.

9        Q.    All right.  We are now starting the

10   portion of your deposition where I will depose you

11   in your individual capacity.  Okay?

12       A.    Yes.

13       Q.    Are you known by any other names?

14       A.    No.

15       Q.    Have you ever been arrested or convicted

16   of a crime?

17       A.    No.

18       Q.    Have you been involved in any prior

19   lawsuits?

20       A.    No.

21       Q.    What is your current position at FAU?

22       A.    Vice President of Student Affairs.

23       Q.    And how long have you been in that

24   position?

25       A.    About two years.  Part of it as interim.

1    Q.   How long were you interim Vice President?

2    A.   For almost a year.  About ten months or

3    so.

4    Q.   And did you have to interview for the

5    position of Vice President of Student Affairs?

6    A.   I did.

7    Q.   Who did you interview with?

8    A.   The Search Committee.

9    Q.   And who made the ultimate decision to hire

10   you, if you know?

11   A.   Protocol would probably say the hiring

12   authority was the University President.

13   Q.   And who was that, at the time?

14   A.   John Kelly.

15   Q.   I'm sorry?

16   A.   John Kelly.

17   Q.   Do you know whether there were any other

18   candidates interviewed for the Vice President of

19   Student Affairs at the time you interviewed?

20   A.   Yes.

21   Q.   Okay.  How many?

22   A.   That I don't know.

23   Q.   Prior to becoming the Vice President of

24   Student Affairs what position, if any, did you hold

25   at FAU?

Corey King Vol 2
March 10, 2016                                      102

1       A.   Associate Vice President and Dean of

2   Students.

3       Q.   And how long were you Associate Vice

4   President and Dean of Students?

5       A.   Since 2008.

6       Q.   And when you were the Associate Vice

7   President and Dean of Students, did you report to

8   the Vice President of Student Affairs?

9       A.   Dr. Charles Brown, yes.

10      Q.   Did Dr. Brown hire you for the Associate

11  Vice President position?

12      A.   Yes.

13      Q.   Prior to becoming the Associate Vice

14  President and Dean of Students at FAU in 2008, where

15  did you work?

16      A.   At East Carolina University.

17      Q.   Okay.  And what was your position at East

18  Carolina?

19      A.   Assistant Vice Chancellor of Student

20  Experiences.

21      Q.   And why did you leave East Carolina?

22      A.   Mom -- My mother was ill.

23      Q.   Did that cause a move to Florida?

24      A.   Mom -- Yes, mother was in Miami.

25      Q.   And prior to working -- Well, let me just

1    go back to your East Carolina.   You said Assistant

2    Vice Chancellor?

3         A.    For Student Experiences.

4         Q.    Did you resign that position?

5         A.    Yes.

6         Q.    Were you ever counseled or disciplined in

7    your position as a student - Vice Chancellor for

8    Student Experiences?

9         A.    No.

10        Q.    Prior to working for East Carolina where

11   did you work?

12        A.    Wheeling Jesuit University.

13        Q.    And that's jesuit you said?

14        A.    Jesuit.

15        Q.    When did you work for Wheeling?

16        A.    2001 to 2004.

17        Q.    When did you start working at East

18   Carolina?

19        A.    2004 to 2008.

20        Q.    And what was your position at Wheeling?

21        A.    Vice President of Student Affairs.

22        Q.    And why did you leave Wheeling?

23        A.    A professional opportunity at ECU.

24        Q.    Where is Wheeling University?

25        A.    In Wheeling, West Virginia.

1          Q.    So the position of Associate Vice

2    Chancellor for Student Experience was a higher or

3    better position than Vice President of Student

4    Affairs?

5          A.    It was.

6          Q.    What were your duties as an Assistant Vice

7    Chancellor?

8          A.    I was in charge of campus life.

9          Q.    And what were your duties as a Vice

10   President of Student Affairs at Wheeling?

11         A.    In charge of campus life and auxiliaries.

12         Q.    Why was it a promotion?

13         A.    Wheeling Jesuit has 2,000 students.   ECU

14   has 27,000.

15         Q.    Prior to working at Wheeling, where did

16   you work?

17         A.    The University of Florida.

18         Q.    How long did you work there?

19         A.    From 1995 to 2001.

20         Q.    And what was your position there?

21         A.    Multiple positions.   Started out as a

22   Resident Coordinator.   Became a coordinator for

23   Residential Programs and Housing, Assistant Dean for

24   Student Conduct, and I was ultimately Associate

25   Dean.

Corey King Vol 2
March 10, 2016

105

```
 1        Q.   And could you give me your educational
 2   background?
 3        A.   From what point?
 4        Q.   Starting college.
 5        A.   Okay.  I went to college at Florida State.
 6   Got a bachelor's degree in curriculum instruction.
 7   Went got my master's degree from Florida State, as
 8   well.  My doctorate came from Indiana University of
 9   Pennsylvania.
10        Q.   So you're a Seminole?
11        A.   I am a Seminole.
12        Q.   So am I.
13        A.   Except on paydays.
14        Q.   Have you ever -- Has a claim involving
15   gender discrimination ever been made against you
16   during your time at the University of Florida?
17        A.   Not to my knowledge.
18        Q.   What about at Wheeling University?
19        A.   Not to my knowledge.
20        Q.   And what about at East Carolina?
21        A.   Not to my knowledge.
22        Q.   Has there ever been a claim of gender
23   discrimination made against you during your
24   employment with Florida Atlantic University?
25        A.   Not to my knowledge.
```

Corey King Vol 2
March 10, 2016                                   106

1        Q.    What about race discrimination?

2        A.    Nope.

3        Q.    What about age discrimination?

4        A.    Nope.

5        Q.    What's your date of birth?

6        A.    7/17/70.

7        Q.    Do you know a Lauren Adamo?

8        A.    Yes.

9        Q.    Who is she?

10       A.    She worked at FAU in several capacities;

11   at Housing and in the Student Union, our Student

12   Union.

13       Q.    Was she ever a subordinate of yours?

14       A.    Never.

15       Q.    Do you know if Ms. Adamo ever filed a

16   complaint against you?

17       A.    Not to my knowledge.

18       Q.    What about Artie Jamison, do you know who

19   that is?

20       A.    I do.

21       Q.    Who is that?

22       A.    She worked in Housing and the Student

23   Union and now she works for us in our Office of

24   Diversity and Multicultural Affairs.

25       Q.    Has Ms. Jamison ever been your

Corey King Vol 2
March 10, 2016
107

1   subordinate?

2       A.    Nope.

3       Q.    Do you know if she's ever made a complaint

4   against you?

5       A.    Not to my knowledge.

6       Q.    When you became the Associate Vice

7   President and Dean of Students in 2008, did you

8   receive any training for that position from FAU?

9       A.    Not specifically from the institution, but

10  Dr. Brown did send me to conferences.

11      Q.    What conferences did you go to?

12      A.    SACSA and NASPA.

13      Q.    Can you tell me what those are?

14      A.    SACSA is the Southern Association for

15  College Student Affairs, and NASPA is the National

16  Association for Student Personnel Administrators.

17      Q.    Do you recall when you went to those

18  trainings?

19      A.    I do not.

20      Q.    Have you been back to either of those

21  conferences?

22      A.    Yes.

23      Q.    When was the last time you went?

24      A.    Last year.

25      Q.    Did you attend any of those conferences

Corey King Vol 2
March 10, 2016                                                108

1    anywhere from 2011 to 2014?

2         A.    Yes.

3         Q.    Okay.  Which ones?

4         A.    Between that time, both of them.

5         Q.    Okay.  How often?

6         A.    Well, they happen once a year, so I would

7    go once in the fall to SACSA and once in the spring

8    to NASPA.

9         Q.    So you attended both conferences in 2011?

10        A.    That I can't remember when.  I don't

11   recall that.

12        Q.    What about 2012?

13        A.    I don't recall 2012.

14        Q.    What about 2013?

15        A.    Yes.

16        Q.    What about 2014?

17        A.    Yes.

18        Q.    Do you know whether any of the -- Strike

19   that.

20              As your -- In your position as Associate

21   Vice President and Dean of Students, did you

22   supervise any employees?

23        A.    Yes.

24        Q.    How many?

25        A.    Between 12 and 15.

Corey King Vol 2
March 10, 2016                                    109

 1        Q.    Okay.  Were they in any specific

 2   department?

 3        A.    Yes.

 4        Q.    Okay.  What was that?

 5        A.    When I first got to EC - FAU, I supervised

 6   the Student Union, Campus Rec, Campus Recreation,

 7   Multicultural Affairs, Student Activities, Student

 8   Government, Student Conduct, Student Media, Greek

 9   Life.  That's what I'm remembering right now.

10        Q.    Okay.  In your position as Associate Vice

11   President and Dean of Students, did the Associate

12   Dean of Student Affairs report to you?

13        A.    No.

14        Q.    Okay.  Who do they report to?

15        A.    The Senior Vice President.

16        Q.    Did the Associate Dean of Students --

17   Strike that.

18              From 2010 to 2014, who were the Associate

19   Dean of Students?

20        A.    Terry Mena was in Boca.  Dr. Chase.  I'm

21   not sure.  Terry Mena was in Boca.  Broward, I can't

22   remember when Dr. Williams started.  Mary Mertz, I

23   don't know when she left.

24        Q.    Okay.

25        A.    And then in Jupiter we had Joe and then

Corey King Vol 2
March 10, 2016                                                110

```
 1    A.J. Chase.  So I'm not sure the timeframe of when
 2    Joe left.  I believe A.J. Chase was in the northern
 3    campuses during 2010.  I'm not sure when Maryann
 4    Mertzer left.
 5         Q.   What about 2012 and 2013, was that Terry
 6    Mena and A.J. Chase?
 7         A.   Yeah, definitely.
 8         Q.   And Dr. Williams?
 9         A.   2012 and 2013 is more clear for me.
10         Q.   So those were only three Associate Dean of
11    Students?
12         A.   Yes.
13         Q.   These two conferences, the SACSA and the
14    NASPA, did Terry Mena attend any of those
15    conferences?
16         A.   He may have went -- Yeah, he went to
17    NASPA.  He didn't go to SACSA.
18         Q.   Did A.J. Chase go to any of those
19    conferences?
20         A.   No.
21         Q.   What about Dr. Williams?
22         A.   No.
23         Q.   Okay.  Who -- Did Dr. Brown have to
24    approve the employees going to these conferences?
25         A.    Those direct reports, yes.
```

Corey King Vol 2
March 10, 2016

111

1      Q.   And he would have to approve you going to

2   those conferences, correct?

3      A.   Yes.

4      Q.   Did FAU pay for you to attend these

5   conferences?

6      A.   Yes.

7      Q.   Do you know if they paid for Terry to

8   attend these conferences?

9      A.   Yes.

10      Q.   Do you know whether Dr. Williams or A.J.

11   Chase requested to attend these conferences?

12      A.   I don't know that.

13      Q.   Who would know that?

14      A.   Dr. Brown.

15      Q.   Other than going to these conferences, did

16   you receive any other type of training from the

17   University?

18      A.   Yes.

19      Q.   What were they?

20      A.   Antidiscrimination training.

21      Q.   When did you receive that?

22      A.   When I first got there.

23      Q.   Okay.  Did you attend a training seminar,

24   or how was that training?

25      A.   It was an in-person training seminar.

Corey King Vol 2
March 10, 2016

112

1      Q.   Okay.  Who gave that in-person training

2  seminar?

3      A.   I don't remember, but it was sponsored by

4  the EEOP.

5      Q.   How many people attended that seminar, do

6  you know?

7      A.   No, that was in 2008.

8      Q.   Did you have any other antidiscrimination

9  training from 2008 to the present?

10     A.   Yes.

11     Q.   When was that?

12     A.   I cannot recollect the exact date, but the

13  State took us through some type of portal training;

14  discrimination, ethical, decision making, that type

15  of stuff.  Online module.

16     Q.   The State of Florida did?

17     A.   State of Florida, yes.

18     Q.   Okay.  Did you have any other

19  discrimination or harassment training from 2008 to

20  today, or have you had?

21     A.   Not that I can recall.

22     Q.   Did you receive any documents from any of

23  the trainings regarding discrimination?

24     A.   Yes, certificates of completion.

25     Q.   What about the actual training documents,

Corey King Vol 2
March 10, 2016
113

```
 1    did you receive those in a physical form?
 2         A.   I believe in PowerPoint presentation, they
 3    provided a copy of the PowerPoint presentation.
 4         Q.   That was the EEOP?
 5         A.   Yes.  And the same with the State
 6    training, you could printout the modules.
 7         Q.   Have you ever provided training to any of
 8    your subordinates regarding discrimination or
 9    harassment?
10         A.   No.
11         Q.   Did you ever receive any training on how
12    to administer disciplinary actions?
13         A.   Yes.  Well, how to evaluate performance,
14    but not administer.
15         Q.   I'm sorry, could you repeat that.
16         A.   How to evaluate employees during HR.  I
17    did a supervisor workshop through Human Resources.
18         Q.   When was that?
19         A.   Again, that was when I first got to the
20    University.  Within a year or so.
21         Q.   Could you tell me what was discussed
22    during that training?
23         A.   Supervision, how to do performance
24    appraisals, evaluations, time management.  Those
25    type of topics.
```

Corey King Vol 2
March 10, 2016

114

1     Q.   Did they -- Did that training -- In that

2   training, were you told how to administer

3   disciplinary actions?

4     A.   Not how to administer, but what the

5   appropriate disciplinary actions to be taken.

6     Q.   Okay.  And what were they?

7     A.   Well, it's according to what type of

8   employee.  SP could have a written reprimand, could

9   have a administrative leave, probation, termination.

10     Q.   Was there a policy that was reviewed with

11   you?

12     A.   Yes.

13     Q.   Do you recall what that was?

14     A.   It was the Employee Handbook, Employee -

15   Employment Handbook.

16     Q.   And that was in 2008 or '9 you're saying?

17     A.   Yes, 2008 or '9, yeah.

18     Q.   Do you know if the University had an

19   Employee Handbook in 2012 or '13?

20     A.   Yes.

21     Q.   And do you know if that handbook contained

22   disciplinary policies?

23     A.   It did.

24

25

Corey King Vol 2
March 10, 2016                                    115

1            (The referred-to document was marked by

2        the court reporter for identification as

3        Plaintiff's Exhibit 9.)

4     BY MS. CHATTERGOON:

5        Q.    I want you to take a look at Exhibit No.

6   9.  And it's marked Plaintiff's Documents 116

7   through 121.  And this is the - from the Employee

8   Relations Department Disciplinary Process.  Have you

9   ever seen this policy before?

10       A.    Yes.

11       Q.    Do you know if this policy was in place in

12  2012 through 2013?

13       A.    I do not.

14       Q.    Who would know that?

15       A..   Robin Kabat.

16       Q.    Is this the disciplinary process that you

17  were trained on, or something similar to it?

18       A.    Something similar.  Written suspension,

19  termination, yes.

20       Q.    Is there anything different than what's in

21  this policy that you were trained on?

22       A.    Well, in relation to employees, we are

23  trained there are different types.  So SP,

24  disciplinary procedures for SP.

25       Q.    What is SP?

Corey King Vol 2
March 10, 2016

116

1          A.    Support personnel who might be different

2     from A and P, which are administrative and

3     professionals.  SP are a protected class, protected

4     employees.  A and P we serve at will.

5          Q.    Okay.  And the position of Associated Dean

6     or Assistant Dean would be?

7          A.    A and P.

8          Q.    A and P?

9          A.    Yeah.

10          Q.    Okay.  Do you know why that distinction is

11     made?

12          A.    I have no idea.  Nope.

13          Q.    Take a look at Page 2 of that exhibit for

14     me.

15          A.    Uh-huh.

16          Q.    The third paragraph down.  Starting on the

17     second sentence where it says, "The employee should

18     always be given an opportunity to explain their

19     actions either verbally or in writing.  Disciplinary

20     actions should only be taken for just cause.  Before

21     taking disciplinary action, a member of Employee

22     Relations will work with a supervisor to determine,

23     one, the employee had notice that the behavior was

24     not acceptable; two, the offense is job related;

25     three, the offense has been investigated and there

Corey King Vol 2
March 10, 2016                              117

1    is reasonable belief there is proof of misconduct;

2    and four, the proposed discipline is consistent with

3    past practice; and five, the severity of the

4    discipline is appropriate."  Is this similar to the

5    steps you were trained on in the training you said

6    you had?

7          A.    Yes.

8          Q.    Any other trainings you received from the

9    University?

10         A.    Customer service.

11         Q.    Customer service training?

12         A.    Uh-huh.

13         Q.    What did that entail?

14         A.    It was about how to provide quality

15   services to our students, our parents, alumni,

16   community, how to be responsive.

17         Q.    When did you receive that training?

18         A.    I believe that was in 2014.

19         Q.    Any other trainings from the University?

20         A.    I think that's it.

21         Q.    Have you received any other trainings

22   outside of the University in your position as the

23   Associate Vice President and Dean of Students?

24         A.    Besides the conferences I mentioned,

25   that's it.

Corey King Vol 2
March 10, 2016

118

1          Q.    What about the Harvard Graduate School of

2     Education Institute?

3          A.    I didn't go to that.

4          Q.    Do you know what that is?

5          A.    I do.

6          Q.    What is it?

7          A.    It is -- Well, the one I applied for was

8     an intense leadership - higher leadership develop

9     week course with potential presidents, provosts,

10    VPs.

11         Q.    When did you apply for that?

12         A.    20- -- Either 2012 or 2013.

13         Q.    And did you have to apply for it?

14         A.    Yes, you have to apply.

15         Q.    Were you rejected for it?

16         A.    I was accepted.

17         Q.    So why did you not go?

18         A.    Too much money.

19         Q.    Did you request that FAU pay for it?

20         A.    Nope.

21         Q.    What about the NASPA Institute for

22    Potential Vice Presidents?

23         A.    I never went to that.

24         Q.    Did you ever apply for it?

25         A.    Nope.

Corey King Vol 2
March 10, 2016                                    119

1              (The referred-to document was marked by

2       the court reporter for identification as

3       Plaintiff's Exhibit 10.)

4    BY MS. CHATTERGOON:

5       Q.   I'm going to show you what we're marking

6    as 10.  I'm showing you what's been marked as

7    Exhibit 10.  It's Plaintiff document 579 through

8    583.  It's Regulation 5.12, the Employee Standards

9    and Discipline Procedures for Florida Atlantic

10   University.  Have you ever seen this regulation?

11      A.   Yes.

12      Q.   When was the last time you reviewed this

13   regulation?

14      A.   About a year, year and a half ago.

15      Q.   Why did you review it?

16      A.   Year and a half ago.

17           We reviewed this document in relation to

18   Title IX Investigations.

19      Q.   And so this regulation discusses

20   disciplinary procedures and how they should be

21   taken, correct?

22      A.   Correct.

23      Q.   Did you ever review this document as the

24   Associate Dean and Vice President?

25      A.   Associate Vice President, yes.

Corey King Vol 2
March 10, 2016

120

 1          Q.    This is a regulation, not a policy?

 2          A.    This was regulation, yes.

 3          Q.    And is this regulation what's followed

 4     when an employee needs to be disciplined?

 5          A.    It's guidelines, yes.  Guidelines.

 6          Q.    What do you mean guidelines?

 7          A.    Like on the second page it talks about

 8     guidelines for disciplinary action.  So it's a

 9     standard of guidelines of -- It doesn't give me if

10     you do this, this; if you do this, this; if you do

11     this, this.  We were always told it was a guideline

12     for your options when things happen in the work

13     place.

14          Q.    In your position as Associate VP and Dean

15     of Students you stated you had training on how to do

16     evaluations, correct?

17          A.    Yes.

18          Q.    And you did, in fact, evaluate employees,

19     correct?

20          A.    I did.

21          Q.    Did you ever evaluate Dr. Williams?

22          A.    I'm assuming I had to, so yes.

23          Q.    Why are you assuming you had to?

24          A.    I think Dr. Williams' time is she reported

25     to me when I was - when she was Director of

Corey King Vol 2
March 10, 2016

121

1    Multicultural Affairs.  I can't remember how long

2    she was in that position before she - how long she

3    reported to me in that position before evaluation

4    period.  I assuming I had to evaluate her, yes.

5         Q.   Did you ever evaluate Terry Mena?

6         A.   Yes.

7         Q.   When was that?

8         A.   My last evaluation with Terry?  It's

9    annual evaluation, so every year.

10        Q.   Okay.  Did you -- When did you begin

11   evaluating Terry Mena?

12        A.   Probably in 2009.  I started in

13   September 2008, so probably 2009.

14        Q.   Okay.  Was Terry Mena an Associate Dean in

15   2009?

16        A.   Yes.

17        Q.   I thought you mentioned earlier that Terry

18   and A.J. were Associate Deans and that position

19   reported to Dr. Brown?

20        A.   No, I'm sorry.  The Associate Deans at the

21   partner campuses reported to Dr. Brown.  The

22   Associate Deans in Boca reported to me.

23        Q.   Okay.  So Terry Mena reported to you?

24        A.   Yes.

25        Q.   And A.J. Chase and Dr. Williams reported

Corey King Vol 2
March 10, 2016

122

```
 1    to Dr. Brown?

 2          A.    Right.

 3          Q.    Why was that distinction made, do you

 4    know?

 5          A.    That was Dr. Brown's decision.

 6          Q.    So you never evaluated Dr. Chase?

 7          A.    Not that I recall.

 8          Q.    Have you ever -- Well, strike that.

 9                In your position as Associate Vice

10    President and Dean of Students, did you ever have to

11    discipline an employee?

12          A.    Yes.

13          Q.    Okay.  How many times?

14          A.    Oh, I don't know.  A handful.

15          Q.    Okay.

16          A.    Five or less I would say.

17          Q.    Do you recall who those employees are?

18          A.    As Associate VP, I do not.

19          Q.    Do you recall whether you ever issued a

20    Letter of Reprimand to any of those four or five

21    employees?

22          A.    I issued a Letter of Reprimand before,

23    yes.

24          Q.    Do you recall to whom?

25          A.    I do not.
```

Corey King Vol 2
March 10, 2016

123

1       Q.    Do you recall the reason for the Letter of

2    Reprimand?

3       A.    I do not.

4       Q.    Do you recall whether there were any

5    disciplinary actions prior to the Letter of

6    Reprimand that was taken for that employee?

7       A.    I do not.

8       Q.    Have you ever terminated an employee?

9       A.    Yes.

10      Q.    How many?

11      A.    In which capacity?

12      Q.    In your capacity as Associate Vice

13   President and Dean of Students?

14      A.    None.  I go back.  Terminate, they all --

15   In my attempt to terminate they've chosen to resign,

16   so there's not an actual termination.

17      Q.    So how many employees did you attempt to

18   terminate as --

19      A.    Two.

20      Q.    -- in your position as Associate VP?

21      A.    Two.

22      Q.    Who were they?

23      A.    I don't remember the other.  One of

24   them -- The one I do remember is Director of Student

25   Union, Brian Keintz.

Corey King Vol 2
March 10, 2016

124

```
 1        Q.   Why did you want to terminate Brian --
 2   What was his last name?
 3        A.   Keintz.
 4        Q.   Why did you want to terminate Brian?
 5        A.   Dr. Brown felt the Student Union was not
 6   operational under his leadership, and told me to
 7   move in a different direction.
 8        Q.   So was it Dr. Brown's decision or your
 9   decision to terminate?
10        A.   Dr. Brown directed me, so as my supervisor
11   I moved forward.
12        Q.   Do you know who -- You said you don't
13   recall the other employee?
14        A.   I do not.
15        Q.   In your position as Vice President of
16   Student Affairs, have you had to terminate any
17   employees?
18        A.   Yes.
19        Q.   How many?
20        A.   Three.
21        Q.   Who are those employees?
22        A.   Nicole Rokos.
23        Q.   Could you spell her last name for me?
24        A.   R-O-K-O-S.
25        Q.   What was her position?
```

Corey King Vol 2
March 10, 2016                                      125

1          A.    Director of OSD, Office of Students with

2     Disabilities.

3          Q.    Why was she terminated?

4          A.    Investigation.

5          Q.    Into?

6          A.    By HR and EEOP.

7          Q.    What were the facts surrounding this

8     investigation?

9          A.    The facts was such that I decided to

10    separate without cause per our University

11    regulation.

12         Q.    What were the facts that you were

13    investigating that brought you to that resolution?

14         A.    Mismanagement.

15              MS. WYDLER:  Object to form.  Go ahead.

16         A.    Mismanagement.

17    BY MS. CHATTERGOON:

18         Q.    Mismanagement of what?

19         A.    Her office OSD.

20         Q.    In what way?

21         A.    I did not get into the specifics of the

22    investigation.  It was done prior to my coming on.

23    I was just made aware of the allegation and what the

24    outcome was, which was mismanagement of her role,

25    and I decided to separate without cause.  So I never

Corey King Vol 2
March 10, 2016

126

1    really looked at the documents.

2        Q.    Okay.  So you decided to terminate an

3    employee without looking at the documents?

4        A.    I decided to terminate an employee upon

5    recommendation of HR that the recommendation

6    contained therein was serious enough for me to take

7    action and I did.

8        Q.    What was the information contained?

9        A.    Not sure.

10        Q.    So you don't know what Ms. Rokos was

11   mismanaging?

12        A.    No.

13        Q.    Do you know how old Ms. Rokos was?

14        A.    No.

15        Q.    And she is a female, correct?

16        A.    Yes.

17        Q.    Who is the second employee?  You said

18   there were three.

19        A.    Alex Graves.

20        Q.    How do you spell the last name?

21        A.    G-R-A-V-E-S.

22        Q.    And what was her position?

23        A.    Him.  White male.  Web developer.

24        Q.    Alice?

25        A.    Alex.

Corey King Vol 2
March 10, 2016

127

1      Q.    Why was Mr. Graves terminated?

2      A.    Reinstructing/reorganization of a unit.

3      Q.    Do you know whether Mr. Graves had any

4   disciplinary actions prior to his termination?

5      A.    I do not.

6      Q.    And who is the third person?

7      A.    Elvy Revolvi, E-L-V-Y.  And last name I

8   can't - begins with a R.

9      Q.    Revolvi?

10      A.    Revolvi, something like that.

11      Q.    Is that a male or female?

12      A.    Female.

13      Q.    Do you know her race?

14      A.    I do not.

15      Q.    And what was her position?

16      A.    She was in charge of technology for our

17   career center.

18      Q.    And why was she terminated?

19      A.    Reorganization/restructure of the unit.

20      Q.    And who made the decision regarding this

21   restructuring?

22      A.    I did as the Interim Vice President.

23      Q.    Were there any other employees terminated

24   as a result of this reorganization?

25      A.    No.

Corey King Vol 2
March 10, 2016

128

1    Q.   Why were those two -- Why were those two
2    positions decided, or why did you decide they were
3    no longer needed?
4        A.   Based on the make up of the organization
5    and the needs of the organizations we downsized.  So
6    we eliminated two positions.  Well, one position in
7    Career Center, and did the same in Marketing
8    Communication.  Other people were reassigned to
9    different areas.
10       Q.   Do you know who replaced Nicole Rokos?
11       A.   Michelle Shaw, white female.
12       Q.   Do you recall when you terminated
13   Ms. Rokos?
14       A.   2014.
15       Q.   In your position as Interim Vice President
16   or Vice President -- Strike that.
17           Is Terry Mena still employed with FAU?
18       A.   No.
19       Q.   Did he resign or was he terminated?
20       A.   Resigned.
21       Q.   When did he resign?
22       A.   2015.
23       Q.   Do you know why he resigned?
24       A.   Promotion of Lamar, Lamar University in
25   Texas.

Corey King Vol 2
March 10, 2016

129

1     Q.    Do you know what the promotion was?

2     A.    Associate VP and Dean of Students.

3     Q.    What about A.J. Chase, is she still

4  employed?

5     A.    She's not.

6     Q.    Do you know when she -- Do you know

7  whether she resigned or whether she was terminated?

8     A.    She resigned.

9     Q.    Do you know why she resigned?

10     A.    I believe she -- No.

11     Q.    Do you know when she resigned?

12     A.    No.

13     Q.    Who replaced Terry Mena as Associate Dean

14  in Boca?

15     A.    Joanna Ellwood, white female.

16     Q.    Had Joanna Ellwood previously worked for

17  the University?

18     A.    Yes.

19     Q.    In what capacity?

20     A.    Assistant Dean.

21     Q.    Assistant Dean of?

22     A.    Students.

23     Q.    Students.

24     A.    Uh-huh.  She was promoted to Associate

25  Dean.

Corey King Vol 2
March 10, 2016

130

1  Q. Was there a Search Committee and an

2 interview process, like you explained earlier for

3 other positions, for that position?

4  A. No, just promoted within.  We eliminated

5 Terry Mena's position, downsized, and we promoted

6 from Assistant Dean to Associate Dean.

7  Q. What do you mean you eliminated his

8 position?

9  A. Terry was Associate Dean, Joanna was

10 Assistant Dean.  When Terry left, we just got rid of

11 that line and promoted the other line.

12  Q. So you didn't eliminate the position, you

13 eliminated the Assistant Dean position what you're

14 saying?

15  A. No.  Terry was in position 99, Joanna was

16 in position 98.  We got rid of position 99, wiped it

17 out, and we promoted position 98 to Associate Dean.

18 So we still lost a position.

19  Q. But the title is still the same?

20  A. The title's the same.

21  Q. Were the duties the same?

22  A. Duties the same.

23  Q. Who replaced A.J Chase?

24  A. I believe Terry and I went up for a little

25 bit as interim, and I want to -- I can't remember.

Corey King Vol 2
March 10, 2016

131

1   The position was vacant for a moment.  I remember

2   serving as interim going up there and working with

3   them.  We ultimately hired Julie Kincaid, a white

4   female.

5       Q.   Do you know if there was a Search

6   Committee interview process for A.J's position?

7       A.   There was there was a Search Committee and

8   a search process.

9       Q.   How long was that position posting open

10  for, do you know?

11      A.   I do not.

12      Q.   Were you on that Search Committee?

13      A.   I was not.

14      Q.   Did you play any part in the decision

15  making of who obtained that position?

16      A.   Yes.

17      Q.   Did you have the ultimate decision?

18      A.   I was the hiring authority, yes.

19      Q.   Have there been any other recent

20  terminations other than the three you mentioned to

21  me?

22          MS. WYDLER:  Object to the form.

23  BY MS. CHATTERGOON:

24      Q.   For your department?

25      A.   Directly impacting me, no.  It can happen.

Corey King Vol 2
March 10, 2016

132

1   We have almost 200 and something employees.  So it

2   could happen in other units.

3       Q.   If they happened in other units, did they

4   have to seek your approval before the termination

5   actually happened?

6       A.   Yes.

7       Q.   So you would be made aware of it?

8       A.   I would be made aware of it, yes.

9       Q.   You don't recall any, at this time?

10      A.   Not of terminations.

11      Q.   Have you reprimanded any employees in your

12  position as Vice President?

13      A.   Orally, yes.

14      Q.   What do you mean by oral?

15      A.   Giving oral feedback on how people can

16  improve.

17      Q.   Okay.

18      A.   No written.

19      Q.   No written reprimands?

20      A.   No.

21      Q.   Have there been any recent resignation of

22  employees?

23      A.   Yes.

24      Q.   Who are they?

25      A.   Who is the most recent resignation?  Our

Corey King Vol 2
March 10, 2016                                     133

1    director of the Rec Center resigned.

2         Q.    Who was that?

3         A.    That was Laura Johnson.

4         Q.    Do you know the reason for her

5    resignation?

6         A.    Her decision.

7         Q.    Who did she report to?

8         A.    The Executive Director of Campus Life.

9         Q.    Any other recent resignations?

10        A.    The Executive Director of Campus Life have

11   resigned.

12        Q.    Who is that?

13        A.    Brett Klein.

14        Q.    Do you know the reason?

15        A.    For his own reason.

16        Q.    Have those positions been replaced?

17        A.    No, there's an interim.

18        Q.    Any other resignations?

19        A.    We have an interim director white female

20   in the Union.

21             (The referred-to document was marked by

22        the court reporter for identification as

23        Plaintiff's Exhibit 11.)

24    BY MS. CHATTERGOON:

25        Q.    I'm showing you what's been marked as

Corey King Vol 2
March 10, 2016

134

1   Exhibit 11.  It's your answers to Rozalia Williams'

2   interrogatories dated March 4th, 2016.

3        A.    Uh-huh.

4        Q.    Have you seen this document before?

5        A.    Yes.

6        Q.    And the very last page where it says

7   verification, is that your signature?

8        A.    It is.

9        Q.    I just want to go through some of these

10  interrogatories with you.

11             Starting with Interrogatory No. 1 it asked

12  you to "identify any person who has claims to have

13  or who you believe may have knowledge or information

14  pertaining any fact alleged in the pleadings filed

15  in this action or any facts underlying the subject

16  matter of this action."  You listed a number of

17  names here.  What knowledge would Heather Coltman

18  have regarding this case?

19       A.    Heather Coltman was the Dean of the

20  College of Arts and Letters.  So Deandre Poole's

21  course that he instructed actually fell under her

22  college.

23       Q.    And what about Joanna Ellwood, what

24  knowledge would she have?

25       A.    She is the Chief Conduct Officer.  So she

Corey King Vol 2
March 10, 2016                                                135

1    actually administers the conduct process.

2         Q.   Was she involved in the Ryan Rotela

3    matter?

4         A.   She should have been from the process

5    itself.  She's the one that guides the process so

6    she should have been involved in the knowledge of

7    the process.

8         Q.   And Edward Rowe, what knowledge would he

9    have regarding this case?

10        A.   I believe that as all of this was

11   unfolding, Rotela contacted his office, Ed's office,

12   as a possible religious discrimination activity that

13   was done in the classroom.

14        Q.   How do you know that?

15        A.   When the student contacted Ed Rowe, Ed

16   Rowe reached out to the Dean of Students Office, and

17   I was the Dean of Students at that point, to see if

18   we had any knowledge.

19        Q.   You were the Dean of Students at what

20   point?

21        A.   When Rotela - the Rotela case.  I was

22   Associate VP and Dean of Students.

23        Q.   So you recall speaking to Mr. Rowe?

24        A.   I do.

25        Q.   Do you recall what was said in that

Corey King Vol 2
March 10, 2016

136

1  conversation?

2      A.   I told him we were not aware of the

3  activity in the classroom.  The student was talking

4  about a complaint regarding the activity in the

5  classroom that it was a religious discriminatory

6  activity.

7      Q.   Do you recall when that conversation

8  occurred?

9      A.   I do not.

10     Q.   Do you recall whether it was after the

11  incident report of February 25th, 2013?

12     A.   It was after the date of the incident that

13  had happened in the classroom.

14     Q.   Do you know if it was before the Notice of

15  Charges was sent to him, to Ryan Rotela?

16     A.   That I do not know.  I wouldn't know that.

17     Q.   How is it that you don't know about the

18  incidents that occurred in the classroom?

19         MS. WYDLER:  Object to the form.

20     A.   It was an exercise from the teacher.  I

21  knew something happened.  I didn't know specifically

22  what the exercise was that happened.

23  BY MS. CHATTERGOON:

24     Q.   Did you know at the time, and this is at

25  the time of your conversation with Ed Rowe.

Corey King Vol 2
March 10, 2016                                                    137

1        A.    Yes.

2        Q.    Did you know at the time that disciplinary

3   proceedings had been started against Ryan Rotela?

4        A.    No.   Our conversation was specifically

5   about the incident related to in the classroom.

6        Q.    I'm sorry, say that for me one more time.

7        A.    The conversation was about what happened

8   in the classroom.   I was not aware at that point of

9   what had happened after the classroom, after the

10  class was over.

11            MS. CHATTERGOON:   Okay.   I need to take a

12        quick break.   Sorry.

13            (A recess was taken from

14        2:46 p.m. until 2:47 p.m., after which the

15        following proceedings were held:)

16  BY MS. CHATTERGOON:

17       Q.    I just want to go back over this

18  conversation with Ed Rowe.

19       A.    Yes.

20       Q.    You don't recall when that conversation

21  happened?

22       A.    I do not recall.

23       Q.    So Mr. Rowe called you to inform you that

24  there may have been an issue with Ryan Rotela

25  claiming religious discrimination for activities

Corey King Vol 2
March 10, 2016

138

```
1    that occurred in the classroom?

2         A.    I remember a conversation about that, yes.

3         Q.    Okay.  At that point, did you know about

4    the disciplinary proceedings, the investigation, or

5    the notice of charges that had been started by

6    Dr. Williams?

7         A.    No.

8              MS. WYDLER:  Object to form.

9         A.    Because that situation was a result of an

10   incident that happened after the class was over.

11     BY MS. CHATTERGOON:

12        Q.    So you didn't put the two together?

13        A.    I did not, at that point.

14        Q.    What is Ed Rowe's position?

15        A.    Associate Director ADA Coordinator.

16        Q.    Do you know whatever happened with

17   Mr. Rotela's claim of religious discrimination for

18   activities in the classroom?

19        A.    I do not.

20        Q.    Who would know that?

21        A.    EOP.

22        Q.    Going to Interrogatory No. 3.

23   Interrogatory No. 3 asked you to "describe any

24   complains made against Dr. Williams with regard to

25   her performance as an Associate Dean of Students."
```

Corey King Vol 2
March 10, 2016                                   139

```
 1    Here you list a complaint made to Ed Rowe by a Maria
 2    Salazar regarding handling of a transportation issue
 3    for disability.  How do you know of this complaint?
 4           A.   So when a complaint is made against a
 5    staff member or employee, EOP would reach out to you
 6    to let you know the nature of the complaint and that
 7    an investigation is going on.
 8           Q.   Okay.  Who reached out to you?
 9           A.   Ed Rowe.
10           Q.   Do you recall when?
11           A.   I do not.
12           Q.   Do you recall what Ed said to you about
13    this complaint?
14           A.   Exactly what's stated there.
15           Q.   Can you tell me in your own words what was
16    said?
17           A.   He indicated that a person had - a student
18    had reached out to him in terms of her disability
19    and felt that when her husband was trying to assist
20    her that she, basically, was demanded to - felt she
21    was demanded by the Associate Dean or whoever in
22    that purview to provide documentation so that her
23    husband could help her in her accommodations.
24    That's what I generally remember.
25           Q.   Okay.  Do you remember if this was before
```

Corey King Vol 2
March 10, 2016

140

1    or after the Rotela incident?

2         A.   I don't recall.

3         Q.   Do you recall whether the student's

4    husband had an altercation with any other student on

5    campus?

6         A.   Yes.

7         Q.   Okay.

8         A.   I was aware of that.

9         Q.   Who made you aware of that?

10        A.   I believe Dr. Williams did in some form.

11   I don't know if it was the SCAC or we were talking

12   in another venue, but I do remember that.

13        Q.   It says here in your response, "When her

14   husband was banned from campus due to an altercation

15   with another student, Ms. Salazar complained that

16   she would not be able to walk all the way to her

17   class buildings where her husband would not be

18   required to drop her off."  Do you recall any other

19   details regarding that statement that the husband

20   was banned from campus?

21        A.   No.

22        Q.   It then says, "Plaintiff improperly

23   demanded medical documentation of this student's

24   disability before allowing for an accommodation to

25   provide access to campus for this student, which is

Corey King Vol 2
March 10, 2016

141

```
 1   against University policy."  How do you know

 2   Dr. Williams improperly demanded medical

 3   documentation?

 4        A.   That was based on the student's report,

 5   the student's complaint.

 6        Q.   Did you ever discuss that with

 7   Dr. Williams?

 8        A.   No, not at all.

 9        Q.   Do you know whether Dr. Williams sent this

10   student to disability services and to Ed Rowe's

11   department?

12        A.   No.

13        Q.   Why didn't you have a discussion with

14   Dr. Williams about this?

15        A.   The practice has been when EOP informs me

16   of an investigation I do not inform - well, they

17   inform us.  We should not be discussing it with the

18   staff members until the investigation is completed.

19        Q.   Do you know if an investigation was ever

20   completed?

21        A.   I didn't get a final report, so I'm

22   assuming it was not.

23        Q.   Do you know if it's -- Is it normal

24   procedure for you to get a report?

25        A.   The supervisor, if there is an
```

Corey King Vol 2
March 10, 2016

142

1   investigation and findings, the supervisor would get

2   a report, a final report, but I don't remember

3   seeing a final report on this.

4       Q.   Who would know whether there was a final

5   report on this?

6       A.   EOP.

7       Q.   Mr. Rowe?

8       A.   Yes.

9       Q.   Was Dr. Williams ever reprimanded for this

10  Maria Salazar complaint?

11      A.   Not to my knowledge.

12      Q.   And you don't recall if this was before or

13  after the Rotela incident, correct?

14      A.   I do not.

15      Q.   In your answer here you state, "There was

16  another incident where an FAU alumni called EOP

17  office to complain about another alumni daughter FAU

18  student worker.  Do you have any firsthand knowledge

19  of that complaint?

20      A.   Firsthand knowledge?

21      Q.   Yes.  Do you have any -- How do you know

22  this incident occurred?

23      A.   EOP again.  Informed.

24      Q.   Was that Mr. Rowe?

25      A.   I can't remember.  I can't recall.  It

Corey King Vol 2
March 10, 2016

143

1    would be either Ed or Paula in that incident.

2        Q.   And they would have informed you of this

3    complaint?

4        A.   They just informed me that an

5    investigation is going on with a staff member within

6    the purview, and that's all I get.

7        Q.   What do you mean by that?  Did they

8    specifically state Dr. Williams?

9        A.   Yes.

10        Q.   And did they tell you -- You state some

11    detail here saying, "Plaintiff told the student that

12    she needed to be at home taking care of her child

13    instead of taking classes and attempting to work on

14    campus."  How did you find out that fact?

15        A.   So again, when EOP investigates a staff

16    member under your purview, they'll call you, tell

17    you this is what's going on.  They'll give you basic

18    facts so that you're aware, and that's all they do

19    until a final report comes up.

20        Q.   Was there ever a final report for this

21    incident?

22        A.   I don't recall seeing that.

23        Q.   And do you recall the name of the FAU

24    alumni?

25        A.   I do not.

Corey King Vol 2
March 10, 2016
144

1     Q.   And you don't recall whether you spoke to

2   Ed or Paula?

3     A.   On that one I do not.

4     Q.   Do you recall the name of the alumni's

5   daughter?

6     A.   I do not.

7     Q.   Did you ever discuss this with

8   Dr. Williams?

9     A.   Nope.

10    Q.   Do you recall whether this was before or

11  after the Ryan Rotela incident?

12    A.   I do not.

13    Q.   Do you know if Dr. Williams ever received

14  a reprimand for this incident?

15    A.   No.

16         MS. WYDLER:  Off the record.

17         (A discussion was held off the record,

18     after which the following proceedings were

19     held:)

20   BY MS. CHATTERGOON:

21    Q.   For the record, when I refer to the Ryan

22  Rotela incident, Dr. King, it's for the incident

23  that occurred on February 25th, 2013 and that

24  resulted in the Notices of Charge - Notice of

25  Charges being sent out.  Okay?

Corey King Vol 2
March 10, 2016

145

1        A.    Yes.

2        Q.    Interrogatory No. 5 asked the reasons for

3   Dr. Williams separation of employment and identify

4   the person who recommended the separation.   You

5   state here you didn't participate in the

6   decision-making process.   Who made the decision to

7   separate employment with Dr. Williams?

8        A.    Dr. Brown.

9        Q.    Anyone else?

10        A.    Not to my knowledge.

11        Q.    Were you ever consulted about

12   Dr. Williams' termination or separation of

13   employment?

14        A.    No.

15        Q.    Do you know the reason she was terminated

16   or separated?

17        A.    No.

18        Q.    Did you ever assist in drafting the Notice

19   of Separation letter?

20        A.    No.

21        Q.    Okay.   You say here, "Plaintiff was

22   separated consistent with FAU Regulation 5.008,

23   which does not require the separation be for cause."

24   How do you know that she was separated under that

25   regulation?

Corey King Vol 2
March 10, 2016

146

 1          A.   Dr. Brown communicated to me afterwards

 2    that she had been separated.

 3          Q.   Did he tell you the reason she was

 4    separated?

 5          A.   Separation when someone -- If there is a

 6    reason, it's usually termination.  So separation

 7    comes without cause.

 8          Q.   Okay.  Did Dr. Brown ever tell you why he

 9    made that decision?

10          A.   He did not.

11          Q.   In becoming the Vice President of Student

12    Affairs, did you ever review Dr. Williams'

13    separation and/or termination of employment?

14          A.   I did not.

15          Q.   Do you know whether Dr. Williams ever

16    asked for her job back?

17          A.   No.

18          Q.   I want to go to No. 6, and this asked you

19    to "please state any policy or procedure violations

20    that Defendant claimed Plaintiff violated with

21    regard to the Ryan Rotela incident on or about

22    February or March 2013."  Again, the Ryan Rotela

23    incident we're referring to is the incident of

24    February 25th, 2013 that we've been discussing.

25    Okay?

Corey King Vol 2
March 10, 2016

147

```
 1        A.    Yes.

 2        Q.    And you State here that "Plaintiff

 3   violated the procedures set forth in the Student

 4   Code of Conduct for handling alleged threats and

 5   implementation of emergency measures."  Can you tell

 6   me how Dr. Williams violated that procedure?

 7        A.    Again, my interpretation at that time as

 8   Dean of Students is when we do emergency measures

 9   there is consultation with myself or Dr. Brown in

10   terms of the interim measures and those interim

11   measures have procedurally been on a separate

12   letter.

13        Q.    Okay.  You say it's your interpretation.

14   Do you know what the interpretation of the

15   department was?

16             MS. WYDLER:  Object to form.

17        A.    As the Dean of Students I was - I am the

18   Chief Judicial Officer of the University and the

19   code is under my purview.

20   BY MS. CHATTERGOON:

21        Q.    Okay.  Did you ever discuss with either

22   Dr. Williams, Dr. Chase, or Terry Mena what your

23   interpretation of the emergency measures were?

24        A.    They were fully aware, yes.

25        Q.    How were they fully aware?
```

Corey King Vol 2
March 10, 2016                                    148

1        A.   Staff meetings and conversations and

2   trainings emergency measures have always been on a

3   separate letter.  We always discuss with me or

4   Dr. Brown any type of emergency measures that we

5   were going to take.  That's been standard practice.

6        Q.   You said you discussed with you or

7   Dr. Brown the emergency measures to be taken?

8        A.   Well, because Dr. Brown is the VP,

9   sometime if - the associate deans discuss with

10  Dr. Brown before they get to me in interim measures

11  if he agrees, it happens.

12       Q.   So you're saying that all three associate

13  deans were aware of your interpretation of these

14  emergency measures, correct?

15            MS. WYDLER:  Object to form.

16       A.   I believe they were.

17  BY MS. CHATTERGOON:

18       Q.   And just to go back to your statement, you

19  said it was discussed in meetings?

20       A.   Yeah.

21       Q.   Okay.  Do you know if Terry Mena ever

22  implemented emergency measures during his time as

23  Associate Dean of Students for the Boca campus?

24       A.   I can't recall.

25       Q.   What about A.J. Chase?

Corey King Vol 2
March 10, 2016

149

1      A.   Can't recall.

2      Q.   Do you know whether prior to the Ryan

3  Rotela incident whether Dr. Williams ever

4  implemented any emergency measures?

5      A.   I can't recall.

6      Q.   You go on to say, "Plaintiff

7  unilaterally - acted unilaterally to bar Mr. Rotela

8  from his class with Dr. Poole and also from coming

9  into contact with other students from Dr. Poole's

10  class possibly implicating his ability to attend

11  other classes without proper authority to do so."

12  Why was that a violation?

13      A.   That decision was made without discussing

14  it with either myself or Dr. Brown as has been our

15  practice if we're taking interim measures.

16      Q.   It goes on to say, "In doing so, she

17  modified a standard Notice of Charges letter without

18  authority or approval of FAU General Counsel's

19  Office potentially exposing FAU to liability."  Was

20  Dr. Williams required to seek authority or approval

21  from the General Counsel's Office to modify a Notice

22  of Charges letter?

23      A.   That has been our practice when we modify

24  the letters that we consult with our General

25  Counsel.

Corey King Vol 2
March 10, 2016

150

1      Q.    How was Dr. Williams supposed to be aware

2    of that?

3      A.    In Page 10 of the Student Code of Conduct

4    it specifically states what should be in the Notice

5    of Charges.  And when we add or take away from that,

6    that means for me the regulation is being adjusted

7    and there needs to be conversation with General

8    Counsel.

9      Q.    How would Dr. Williams know that?  Where

10   is that stated?

11     A.    Page 10D says specifically what's in the

12   Notice of Charges.  It's very clear.

13     Q.    Does 10D state authority or approval from

14   the General Counsel's Office shall be sought if it

15   was to be modified?

16     A.    It does not.

17     Q.    Okay.  Has there been any memos or

18   additional policies given to either the Associate

19   Dean of Students or any other designee stating that

20   they should seek authority of the - or approval of

21   the General Counsel's Office for modifying a Notice

22   of Charges letter?

23     A.    No.

24     Q.    Has that been discussed in any meetings?

25     A.    Yes.

Corey King Vol 2
March 10, 2016

151

```
1        Q.    When?

2        A.    Senior staff meetings.  Dr. Brown would

3    always inform us that we should be consulting

4    General Counsel.

5        Q.    For what reasons?

6        A.    In student conduct matters.  Yes, that has

7    been talked about before.

8        Q.    Okay.  So were the Associate Dean of

9    Students or it's designee, or any designee, required

10   to consult the General Counsel's Office for all

11   student conduct matters?

12       A.    In any matters where there is interim

13   measures being taken, we - the practice has been to

14   consult with General Counsel.  Or modification of

15   letters, consult with General Counsel.

16       Q.    Can you give me an example of when there

17   was a modification of a Notice of Charges letter

18   where the General Counsel was consulted?

19       A.    I don't believe I've ever seen a case

20   where the Notice of Charges was modified.

21       Q.    Were the Associate Dean of Students or

22   designees ever given a template for Notice of

23   Charges letters?

24       A.    Yes.

25       Q.    And who provided those templates to these
```

Corey King Vol 2
March 10, 2016

152

1      persons?

2          A.    It would probably be Joanna Ellwood who is

3      our Director of Student Conduct.

4          Q.    Would you have had to approve these Notice

5      of Charges?

6          A.    No.

7          Q.    The templates?

8          A.    No, they're reviewed by our General

9      Counsel.

10         Q.    Do you know if Ms. Ellwood ever gave these

11     templates?

12         A.    To?

13         Q.    To the Associate Dean of Students?

14         A.    I'm more than positive she did.

15         Q.    Do you recall when?

16         A.    She has training every year for every one,

17     so my belief is during those training sessions.

18         Q.    What are those training sessions?

19         A.    I believe every fall she has training for

20     conduct officers and conduct board members.

21         Q.    Is there a specific name of that training?

22         A.    It's -- I can't recall.

23              (The referred-to document was marked by

24         the court reporter for identification as

25         Plaintiff's Exhibit 12.)

Corey King Vol 2
March 10, 2016                                    153

1      BY MS. CHATTERGOON:

2          Q.   I'm showing you what's been marked as

3      Exhibit No. 12.  It's FAU1505 and 1506.  Are these

4      examples of templates that were provided to the

5      Associate Deans or designees?

6          A.   Yes.

7          Q.   Do you know if Joanna Ellwood provided

8      these templates?

9          A.   The expectation is she provided these in

10     training.

11         Q.   Okay.  Do you know when was the last time

12     these templates were provided to the Associate Dean

13     of Students?

14         A.   I do not.

15         Q.   And these are templates, correct, not form

16     letters?

17              MS. WYDLER:  Object to the form.

18              MS. CHATTERGOON:  Well, strike that.

19     BY MS. CHATTERGOON:

20         Q.   Is there a difference between a template

21     and a form letter?

22         A.   Yes.

23         Q.   What's the difference?

24         A.   The difference is for me that there are

25     places in a template that you can put information in

Corey King Vol 2
March 10, 2016

154

1    regarding the charges may change, the alleged

2    violation may change, the date and time of a meeting

3    may change.  So it gives you opportunity to change

4    pertinent data related to that specific case.

5        Q.   Okay.  And what's the definition of a form

6    letter?

7        A.   For me a form letter would be what is the

8    student rights, that letter that they initial.  That

9    form never changes.  It is the same.

10       Q.   We talked about emergency measures

11   earlier, and you said that you believe that a

12   separate letter is required for emergency measures;

13   is that correct?

14       A.   Yes.

15       Q.   This Student Code of Conduct requires that

16   emergency measures be furnished in writing; is that

17   correct?

18       A.   Yes.

19       Q.   And as you sit here today, you're saying

20   all emergency measures have been done on a separate

21   letter?

22       A.   To my knowledge.

23       Q.   To your knowledge?

24       A.   Yes.

25       Q.   Do you know whether Terry Mena ever

1   modified the Notice of - template Notice of Charges

2   or Notice of Interim Suspension?

3        A.   I do not.

4        Q.   In Exhibit 12?

5        A.   I do not.

6        Q.   Do you know whether A.J Chase ever did?

7        A.   I do not.

8        Q.   Do you know whether Dr. Williams did?

9        A.   Outside of this case, I do not.

10            (The referred-to document was marked by

11       the court reporter for identification as

12       Plaintiff's Composite Exhibit 13.)

13   BY MS. CHATTERGOON:

14       Q.   I'm going to show you what I'm going to

15   mark as Composite 13.  I'm showing you what's been

16   marked as Exhibit No. 13.  It's Plaintiff's 560

17   through 566.  The first page on that exhibit is a

18   Notice of Charges dated March 23, 2011 to a student

19   named Julius Christian.  Do you see that?

20       A.   Yes.

21       Q.   Have you ever seen this document before?

22       A.   I do not believe so.

23       Q.   Look at the third page of that exhibit for

24   me.  It looks like an agenda for a SIT meeting dated

25   February 10th, 2011.

Corey King Vol 2
March 10, 2016                                    156

1        A.    Yes.

2        Q.    There is a student of interest, Julius

3   Christian?

4        A.    Yes.

5        Q.    Do you see that?

6        A.    Yes.

7        Q.    Would you have attended this meeting?

8        A.    Yes.

9        Q.    And is this the -- We talked earlier about

10  the Student Intervention meetings and SCAC meetings

11  where student names are submitted for discussion.

12       A.    Yes.

13       Q.    Is this how the agenda would look if a

14  student's name was submitted?

15       A.    Yes.

16       Q.    So taking a look at the Notice of Charges

17  for Mr. Christian, this seems to be on the same

18  template or almost the same template that you claim

19  Joanna Ellwood gave in trainings, correct?

20       A.    Or Notice of Charges.

21       Q.    It's the second page.

22       A.    Pretty similar, yes.

23       Q.    Okay.  And if you look at the second to

24  last paragraph there it says, "Until this matter is

25  resolved you may not attend your URP 4979 class,

Corey King Vol 2
March 10, 2016

157

1    which meets on Fridays from 6:00 p.m. to 8:50 in HD

2    613."  Do you see that?

3         A.   Yes.

4         Q.   Is that an emergency measure?

5         A.   It doesn't say it.

6         Q.   What doesn't say it?

7         A.   It's an emergency measure.  In the

8    previous document it said in the interim.  I

9    wouldn't know if that was an emergency measure or

10   not.

11        Q.   I'm sorry, what previous document?

12        A.   The one for Ryan Rotela said in the

13   interim.

14        Q.   Okay.

15        A.   And then the one behind it said it as

16   well.  I reviewed it.  The second letter to Natalia

17   Nicholas said in the interim you may not.

18        Q.   Okay.

19        A.   So this letter doesn't say in the interim.

20   I wouldn't know if that's interim measures or not.

21        Q.   Okay.  I'm asking you whether it's an

22   emergency measure.

23        A.   Interim measures are emergency measures.

24        Q.   Okay.

25        A.   That's the same language, like an interim

Corey King Vol 2
March 10, 2016

158

1    suspension.  Yes.

2        Q.    So until this matter is resolved, because

3    it doesn't say interim, you don't know whether

4    that's an emergency measure?

5        A.    It's not clearly communicated to a student

6    that's in interim measure, or to me.

7        Q.    Well, it does say, "until this matter is

8    resolved," correct?

9        A.    Yes, but it doesn't say interim.

10       Q.    So you are going on the semantics of it?

11           MS. WYDLER:  Objection to form.

12       Argumentative.

13       A.    I'm going on the fact that a student reads

14   this or me it doesn't say this is interim measures.

15     BY MS. CHATTERGOON:

16       Q.    Okay.  So asking a student not to go to

17   class, what kind of measure would that be?

18       A.    Unclear.

19       Q.    Let's go back to the Student Code of

20   Conduct.  Under Page 9 of the Student Code of

21   Conduct Emergency Measures.

22           MS. MOLDOF:  Can you tell me what exhibit

23       you're referring to please.

24           MS. CHATTERGOON:  I'm sorry.  What exhibit

25       number is that?

Corey King Vol 2
March 10, 2016                        159

1          MS. WYDLER:  Five.

2          MS. MOLDOF:  Thank you.

3     BY MS. CHATTERGOON:

4     Q.   Does it say in the emergency measures that

5     it must state in the letter, wherever the emergency

6     measures are taken, that it has to state in the,

7     quote, interim?

8          MS. WYDLER:  Object to form.

9     A.   No, but it does say on Page 9 of B, "A

10    student subject to emergency measures shall be

11    furnished written notice of the emergency measure

12    and the reason for the emergency measure."

13    BY MS. CHATTERGOON:

14    Q.   Okay.  And so you're saying the Notice of

15    Charges to Mr. Julius Christian is not written

16    notice of an emergency measure?

17    A.   It doesn't even say the term emergency

18    measure, so the student does not know that that's

19    the emergency measure, nor are they being told the

20    reason why they can't come to class in this letter.

21    Q.   So the emergency measures, going back to

22    9, "include but are not limited to one of the

23    following:  Interim suspension."

24    A.   Uh-huh.

25    Q.   "Interim removal from University housing."

Corey King Vol 2
March 10, 2016

160

1    No. 3 says, "If the Dean of Students determines that

2    other interim measures are appropriate to protect

3    health, safety, or welfare of the student or

4    University community, the Dean of Students may A,

5    restrict or bar attendance of any or all classes; B,

6    restrict or bar access or contact with individuals;

7    C, restrict or bar access to university's property,

8    places, facilities, or equipment; D, restrict or ban

9    participation in University activities; or E,

10   otherwise restrict, conduct, or ban access to

11   University resources."  So barring attendance on a

12   class, according to this policy, would be an

13   emergency measure, correct?

14        A.    According to the code?

15        Q.    Yes.

16        A.    Yes.

17        Q.    Okay.  Where does it say that the student

18   has to be - or the letter has to state that it's,

19   quote, an emergency measure?

20        A.    On Page 9, "A student subject to emergency

21   measure shall be furnished, number one, written

22   notice of the emergency measure and reasons for the

23   action."

24        Q.    Okay.  So this gives the notice of the

25   emergency measure, but not the reason; is that what

Corey King Vol 2
March 10, 2016

161

1   you're saying?

2           MS. WYDLER:   Object to the form.

3       A.   I can't say this particular letter is

4   giving me from an onset that this is an emergency

5   measure.  And an 18, 19-year-old student or 20 year

6   old may not see that, as well.

7     BY MS. CHATTERGOON:

8       Q.   Okay.  You stated you had seen -- Have you

9   seen this letter before?

10      A.   No.

11      Q.   But you would have attended that SIT

12  meeting, correct?

13      A.   Yes.

14      Q.   So this emergency measure would have been

15  discussed in that meeting; is that correct?

16          MS. WYDLER:   Object to form.

17      A.   I can't recall.

18    BY MS. CHATTERGOON:

19      Q.   Do you know if it was?

20      A.   I can't recall.

21      Q.   Do you know whether Dr. Williams was

22  required to consult with the General Counsel's

23  Office before sending this letter?

24          MS. WYDLER:   What letter are you referring

25      to?

Corey King Vol 2
March 10, 2016
162

1          MS. CHATTERGOON:  I'm sorry, the letter to

2     Julius Christian dated March 23rd, 2011.

3          A.    It has been the practice that whenever we

4     do an emergency measure or modification to the

5     notices that we should consult General Counsel.  So

6     whether Dr. Williams consulted General Counsel in

7     these two cases, I wouldn't be privy to that.

8     BY MS. CHATTERGOON:

9          Q.    Do you know whether -- Do you know whether

10    Dr. Williams consulted with you regarding the Julius

11    Christian matter?

12         A.    I do not recall any discussion of interim

13    measures regarding this person.

14         Q.    Okay.

15         A.    Nor have I seen - privy to the Notice of

16    Charges prior to it being issued.

17         Q.    Just going back to 9B where it says, "A

18    student subject to emergency measures of the code

19    shall be given written notice and the reason for the

20    action."  Doesn't the charges No. 1 and No. 2 give

21    the student a reason for why he can't attend the

22    class?

23         A.    That has not been our practice.  Our

24    practice has been a separate notification for

25    emergency measures where the student - it is clear

Corey King Vol 2
March 10, 2016

163

1    the emergency measures are being taken and the

2    reasons for such actions.

3        Q.    Is there a template for the emergency

4    letter?

5        A.    Yes, that's an example.  Interim

6    suspension.

7        Q.    Oh, so it doesn't say emergency measures

8    per se?

9        A.    Well, the emergency measures is typically

10   practice the subject of the letter.  So Notice of

11   Interim Suspension, Notice of Interim Removal from

12   Class.  Whatever the action is taken typically is

13   what's the...

14       Q.    So if action was taken under 9A3, what

15   would the title of that letter be?

16       A.    9A3.

17            So it would be whichever - what was the

18   appropriate letter.  So restrict or bar attendance

19   of any or all classes, it would be Notice of Interim

20   Removal From Class.  Restrict or bar access from

21   contact with individuals in the community, again,

22   those titles would be appropriate, but the standard

23   format of the letter with the changing of the reason

24   would be in place.  So the student would be very

25   clear that the interim measures are separate from

Corey King Vol 2
March 10, 2016                                          164

1    the Notice of Charges.

2         Q.   What if it was multiple interim measures

3    under A3?

4         A.   A student on our campus who has to have

5    multiple interim measures should be interim

6    suspended at that point and that takes care of it.

7         Q.   My question, however, is if a student was,

8    for example, under 3A, A3A, restricted or barred

9    attendance of classes, and under B, restricted or

10   barred access contact with individuals, how would

11   that letter be titled?

12        A.   I can't tell you.  I've never been in a

13   situation where a person has been barred for

14   multiple areas.  At that point, that person would be

15   interim suspended.

16        Q.   Dr. King, you're saying to me that your

17   practice has been a separate letter for emergency

18   measures --

19        A.   Yes.

20        Q.   -- has been sent out, correct?

21        A.   Yes.

22        Q.   Okay.  And you're also saying that you

23   have never seen where a student has been restricted

24   or barred attendance of class and restricted or

25   barred access or contact with individuals placed in

Corey King Vol 2
March 10, 2016                                    165

1    the same letter, correct?

2         A.    In an interim letter, no, I have not seen

3    it.

4         Q.    Okay.  Are there other templates of

5    interim letters besides the Notice of Interim

6    Suspension?

7         A.    Yes, Notice of Charges, sanctions, student

8    conduct conference, hearing date and time; yes.

9         Q.    So --

10        A.    There are several standards, templates.

11        Q.    If there are several templates, are there

12   different templates for under 9A3?  Have you seen

13   templates for that?

14        A.    9A3, again, our practice has been that

15   when we take interim measures, there is consultation

16   with General Counsel who helps us to make sure we're

17   sending out the appropriated notifications.

18        Q.    So there are no templates for 9A3?

19             MS. WYDLER:  Objection to form.

20        A.    There are templates in terms of Notice of

21   Interim Suspension.  If this was an interim removal

22   from class, you would change the title and then the

23   areas that you can change will...

24     BY MS. CHATTERGOON:

25        Q.    Is there a template for interim removal

Corey King Vol 2
March 10, 2016

166

1    from University housing?

2        A.    Yes, I've seen that.

3        Q.    Is there a template for revoking student

4    privileges under 4?

5        A.    I haven't seen that.

6        Q.    So just because there aren't templates

7    doesn't mean that the -- Strike that.

8            Going back to Julius Christian's letter.

9    He was placed on the February 10th, 2011 SIT meeting

10   as shown on the third page, 562?

11       A.    Yes.

12       Q.    And you stated you would have been at that

13   meeting, correct?

14       A.    Yes.

15       Q.    Do you know whether it was discussed

16   whether any emergency measures would be taken

17   against Julius Christian?

18           MS. WYDLER:  Object to the form.  Asked

19       and answered.

20           MS. CHATTERGOON:  I haven't asked him that

21       question, actually.

22       A.    I don't recall, but I will say this.

23   February the 10th and taking interim measures on

24   March the 23rd, again, for me, interim measures,

25   according to our code, is that there is an imminent

Corey King Vol 2
March 10, 2016                                          167

1    threat to the health and wellbeing and safety.  So

2    from February 10th to March 23rd and not interim

3    measures, again, to me that would raise flags.

4        BY MS. CHATTERGOON:

5        Q.    What would raise flags?

6        A.    That you take -- You discuss a person on

7    February the 10th and interim measures are taken o

8    March the 23rd.  That's over a month and 13 days

9    later.

10       Q.    Okay.  And this was in 2011, correct?

11       A.    Those are the dates.

12       Q.    Do you know if Dr. Williams was ever

13   reprimanded for this Notice of Charges?

14       A.    I was not aware of this Notice of Charges.

15       Q.    Who would have been aware of this Notice

16   of Charges?

17       A.    I would -- I would have to yield, again,

18   to Joanna Ellwood, who is our conduct officer.

19       Q.    Do you know whether at the time Julius

20   Christian was discussed at the SIT meeting whether

21   there was a report or charge brought against him at

22   that point?

23       A.    I can't recall, again, February 10th, but

24   I can say standard practice is that if interim

25   measures were discussed on February the 10th, I'm

1    not clear why March 23rd they were invoked.

2         Q.   Well, I'm not saying whether interim

3    measures were discussed.

4         A.   Okay.  I don't remember Christian being

5    discussed.  I can't remember what was discussed in

6    that meeting.

7         Q.   So is it possible the student was

8    discussed and then a case was later brought against

9    the student and that's why emergency measures were

10   taken a month later?

11        A.   It's possible that a case was brought

12   against the student, but emergency measures are more

13   immediate and imminent to the actual date of the

14   incident, so...

15        Q.   We spoke earlier in your capacity as the

16   corporate rep deposition as to when those emergency

17   measures could be taken, correct?

18        A.   Uh-huh.

19        Q.   And looking at the flowchart that we

20   looked at, the emergency measures could be taken at

21   the very beginning of the incident, during the

22   investigation procedure?

23        A.   Yes.

24        Q.   Or at the Notice of Charges procedure?

25        A.   Yes.

Corey King Vol 2
March 10, 2016

169

1      Q.    Correct?

2      A.    That is correct.

3      Q.    Okay.

4      A.    You did ask me though in this meeting were

5  emergency measures discussed regarding Julius

6  Christian and I indicated I didn't remember.  But I

7  would like to say that if they were discussed in

8  this on February the 10th --

9      Q.    Okay.  Let me finish my question.

10         MS. WYDLER:  Can you not interrupt him

11      while he's giving testimony.

12         MS. CHATTERGOON:  I'm sorry.  I'll move to

13      strike as non responsive, because there was no

14      question pending.

15  BY MS. CHATTERGOON:

16      Q.    Do you know if a case was brought to this

17  SIT meeting being discussed, do you know whether

18  there was a continuing investigation for Julius

19  Christian?

20      A.    I can't recall what was discussed at this

21  particular meeting.

22      Q.    So you don't recall whether - or you don't

23  know the reason, I should ask, why interim measures

24  were taken against him on March 23rd, 2011?

25      A.    I do not.

Corey King Vol 2
March 10, 2016

170

1    Q.    Taking a look at what's marked 563.  It's

2    a letter dated October 3rd, 2011 to Vonita Nichols -

3    Nicholas.  And it says here, "In the interim, you

4    may not under any circumstances contact any of the

5    FAU students involved in this matter verbally or

6    electronically."  Is that an interim measure?

7    A.    I would say, again, no.

8    Q.    Why not?

9    A.    Again, there are standard -- It should be

10   on a standard interim measure letter giving written

11   notice of the interim measures and the reasons why

12   this student cannot contact these students involved

13   in the matter.

14   Q.    Earlier you stated that the letter to

15   Julius Christian was not an interim measure because

16   it did not state in the interim; is that correct?

17   In addition to the other reasons you gave.

18        MS. WYDLER:  Object to form.

19   A.    I believe I said that it doesn't have an

20   interim, so the student doesn't have any knowledge

21   or awareness that this is any type of interim

22   measures.  So in this second letter they have

23   knowledge, but again, it's not the appropriate -

24   what we've done in terms of our standard practice of

25   issuing notices of emergency measures to students.

Corey King Vol 2
March 10, 2016

171

1      BY MS. CHATTERGOON:

2         Q.   Okay.  For the letter to Vonita Nichols -

3      Nicholas, sorry.  It says, "You may not under any

4      circumstances contact any of the FAU students

5      involved in this matter verbally or electronically."

6      So the emergency or interim measure taken there is

7      under 9A3B, would you agree with that?

8         A.   Repeat the question again.

9              (The requested portion of the record was

10        read back by the reporter.)

11        A.   Yes.

12     BY MS. CHATTERGOON:

13        Q.   Is there a template for the emergency

14     measure written in the letter to Vonita Nicholas?

15        A.   I have not seen a template.

16        Q.   Okay.  How then would an Associate Dean of

17     Students notify the student that this interim

18     measure under - or emergency measure under 9A3B was

19     being taken against them?

20        A.   If the Associate Dean or appropriate

21     person would have communicated or would communicate

22     again with General Counsel and the Dean and take

23     emergency measures, guidance can be and will be

24     provided.  Our standard practice has been in taking

25     emergency measures there's consultation with the

Corey King Vol 2
March 10, 2016

172

1    Dean of Students and General Counsel.

2         Q.   But the policy says, Dr. King, that "a

3    student subject to emergency measures shall be

4    furnished written notice of the emergency measure

5    and the reason for such action, and then given the

6    opportunity to participate in student conduct

7    proceedings or to present relevant information for

8    consideration of his or her case," under B.  Do you

9    see that?

10        A.   I do.

11        Q.   Where does it state that consultation with

12   the General Counsel needs to happen?

13        A.   That is our practice.  It doesn't state it

14   in the regulation.

15        Q.   How long has that been the practice?

16        A.   Since I've been there in 2008.

17        Q.   Has that been for every case that

18   emergency measures have been taken since you've been

19   there in 2008?

20        A.   To my knowledge.  To my knowledge.

21        Q.   What does that mean, to your knowledge?

22        A.   I wasn't aware that these letters had been

23   modified.  So as Dean, I'm not aware of everything.

24        Q.   So it is possible that emergency measures

25   have been sent out in this manner from someone

Corey King Vol 2
March 10, 2016

173

```
 1    besides Dr. Williams?

 2              MS. WYDLER:  Object to the form.

 3         A.   I'm not aware of that.

 4    BY MS. CHATTERGOON:

 5         Q.   Okay.  Do you know if it's possible that

 6    Terry Mena sent out these type of letters?

 7         A.   No.

 8         Q.   What about A.J. Chase?

 9         A.   No.

10         Q.   Taking a look at the very last page, 566.

11    It's dated April 12th, 2012.

12         A.   Very last page?

13         Q.   The very last page of that exhibit.

14              There is an emergency or interim measure

15    listed in the third paragraph that states, "In the

16    interim you may not under any circumstances contact

17    any of the FAU students involved in this matter

18    verbally or electronically or by any other means."

19    Do you see that?

20         A.   I do.

21         Q.   And would you consider that an emergency

22    measure?

23         A.   Yes.

24         Q.   Okay.  Out of these three letters to these

25    students, would this constitute written notice of an
```

Corey King Vol 2
March 10, 2016

174

1   emergency measure taken against them?

2       A.   No.

3       Q.   And why is that?

4       A.   The written -- The emergency measure

5   letter should not be a part of the Notice of Charges

6   per our regulation on Page 9.  Is it Page 9?  Page

7   10 that talks about what specifically should be in

8   the Notice of Charges.  Our practice has been any

9   interim measures the students have been notified in

10  a separate letter.

11      Q.   But it doesn't say that anywhere in this

12  code, correct, Code of Conduct?

13      A.   In the code it states that, "The

14  notification of charges correspondence should

15  include or include the specific code of the

16  violation, brief description of the alleged offense,

17  the students rights, and an invitation to attend a

18  student conduct conference.  The date and time of

19  the student conduct conference is also included."

20      Q.   Going back to 9B on Page 9, it says, "A

21  student subject to emergency measures shall be

22  furnished written notice of the emergency measure

23  and reason for the action."  It doesn't say a

24  separate written notice, correct?

25      A.   That is correct.  Our practice has been a

Corey King Vol 2
March 10, 2016

175

1  separate written notice.

2      Q.   Could your practice have also been to

3  include it in the Notice of Charges and you weren't

4  aware of it?

5          MS. WYDLER:  Object to the form.

6      A.   No, no.

7  BY MS. CHATTERGOON:

8      Q.   Why not?

9      A.   I would be aware of modifications, major

10  modifications of letters related to the Student Code

11  of Conduct.  That would be a major modification.

12      Q.   What is a major modification?

13      A.   When you're talking about combining

14  letters and information.  That's a major

15  modification to the code.

16      Q.   I just showed you three letters that

17  include emergency measures.  Is that a major

18  modification?

19      A.   Oh, yes.

20      Q.   But you stated you weren't aware of these

21  letters?

22      A.   I was not aware of these letters.

23      Q.   But you just stated you would have been

24  made aware of these letters had major modifications

25  been made?

Corey King Vol 2
March 10, 2016

176

1      MS. WYDLER:  Objection.  That's a

2  misrepresentation of his testimony.

3      A.   If the templates of those letters were

4  majorly modified I would be aware.  If an individual

5  modified those letters outside of my purview, then I

6  probably would not be aware.

7  BY MS. CHATTERGOON:

8      Q.   Okay.  Explain that to me, because I'm

9  accused?

10     A.   You said templates.  The attorney help us

11  to draft our templates.  So if a template of a

12  letter, if we're going to combine the Notice of

13  Charges and emergency measures in a template, I

14  would probably be involved in those discussions with

15  General Counsel.  This right here is an individual's

16  choice to combine that, not a University decision.

17     Q.   Okay.  I want you to look at the templates

18  I showed you earlier, and look at the Notice of

19  Charges template on 1506.

20          Well, let me ask you this.  You said if

21  there was a template for emergency measures or for

22  Notice of Charges to include emergency measures, you

23  would have been aware because you would have had

24  those discussions, correct?

25     A.   With General Counsel.

Corey King Vol 2
March 10, 2016

177

1      Q.    With General Counsel.

2           But earlier you stated there were no

3  emergency measures or specific letter for emergency

4  measures under 3A through E, there was no template I

5  should say.

6      A.    There is a template for emergency

7  measures, but there is no template for specific

8  barring for classes or the other one you showed me,

9  because again, we have practice discussed those

10 emergency measures with General Counsel and they

11 have assisted us in drafting those letters.  So

12 therefore, we discuss emergency measures with

13 General Counsel.

14     Q.    So there's no template though?

15          MS. WYDLER:  Object to the form.

16     A.    Not for the specific ones you indicate.

17 BY MS. CHATTERGOON:

18     Q.    So for the specific ones I indicate - I

19 stated, if those emergency measures were going to be

20 taken place, the Associate Dean or designee would

21 have to, in your opinion, discuss that with the

22 General Counsel?

23     A.    That's been our practice, yes.

24     Q.    Going back to the template for Notice of

25 Charges.  On this template does it indicate where

Corey King Vol 2
March 10, 2016

178

1    the Associate Dean or designee is allowed to change

2    the language?  For example, does it say insert

3    charges here?

4         A.    It doesn't on this paper form printed out,

5    but in the system it does.

6         Q.    What does it say in the system?

7         A.    In the Maxient system it allows you to

8    pick charges and gives you an opportunity to put in

9    information where appropriate.

10        Q.    Does it allow you to put in emergency

11   measures in the Maxient system?

12        A.    Well, it allows you to put language in the

13   line.  Again, there is a letter in the Maxient

14   system for emergency measures.

15        Q.    Okay.  When did -- Sorry, I interrupted

16   you.

17        A.    No, I'm done.  Thank you.

18        Q.    When did the Maxient system go into place?

19        A.    I can't -- I don't recall that.  I would

20   say it would have to be between '10 or 2011 when the

21   Maxient system went into place.

22        Q.    Do you know if it was 2013?

23        A.    I can't -- I can't remember.  Honestly, I

24   cannot remember when the Maxient system went in

25   place.

Corey King Vol 2
March 10, 2016

179

1    Q.    Prior to the templates in the Maxient

2  system, how were Notice of Charges drafted?

3    A.    We were given templates to use on our

4  personal computers, and we were - in training we

5  were taught how - where the points that we could

6  change based on those templates.

7    Q.    Okay.  These are the only templates that

8  have been provided to me.  So on this template

9  Notice of Charges, where would you have been allowed

10  to change the language?

11    A.    Typically, in the bolded areas.  Not the

12  italicized, the bolded areas.  So the charges, my

13  office, by Friday, September 16th, the date, that

14  type of stuff.

15    Q.    Okay.

16    A.    And then there's a looks like a dot, dot,

17  dot at the top where allegations here.  No one put

18  the allegations in there, but there should be

19  allegations right afterwards.  So the allegations,

20  the Notice of Charges, the date and time of wherever

21  it is typically.  Those are the flexible or the

22  things that you can change in a template.

23    Q.    And you said in training it was stated

24  where you could change?

25    A.    We go through this in training, I think,

Corey King Vol 2
March 10, 2016

180

1    every fall and spring.

2        Q.   Who attends these trainings?

3        A.   Student conduct officers, student conduct

4    board members.

5        Q.   Is there a sign-in sheet or a certificate

6    of completion that's given for these trainings?

7        A.   I'm sure there's a sign-in sheet.  Joanna

8    Ellwood would have that.

9        Q.   Do you know if Dr. Williams ever attended

10   any of these trainings?

11       A.   Yes.

12       Q.   How do you know that?

13       A.   I can remember seeing her and A.J. Chase

14   and Terry Mena at trainings.

15       Q.   Do you know whether these templates were

16   discussed at the trainings you believe you saw her

17   at?

18       A.   Yes.

19       Q.   Just going back to your interrogatory

20   responses for No. 6.  It says here if you look at

21   the fourth sentence that begins, "All sanctions

22   relating to Student Code of Conduct must be taken in

23   consultation with the Vice President for Student

24   Affairs."  Do you see that?

25       A.   Yes.

Corey King Vol 2
March 10, 2016

181

1     Q.    Did Dr. Williams ever sanction Ryan

2  Rotela?

3     A.    Not to my knowledge.

4     Q.    Okay.  So why is this stated here?

5     A.    Well, I'll back up.  Interim measures is

6  sanction.  We do consider that a sanction imposed

7  against the student.

8     Q.    Can you tell me where in the Code of

9  Conduct it states that the interim measures are a

10  sanction against the student?

11     A.    If you look at the - on Page 8, the

12  restrictions of interim emergency measures, and you

13  look on Page 15 and 16, you will see some of those

14  same verbiages are in the sanctions.

15     Q.    Where is that?  Could you point that to

16  me.

17     A.    On Page 15.

18     Q.    Where on Page 15?

19     A.    Like No. 4.  Removal from housing, similar

20  language to No. 2.  It's just on an interim basis.

21     Q.    Am I looking at a different -- Can you

22  tell me what you're looking at?

23     A.    Page 15 where it talks about your

24  termination deferred, termination of housing which

25  is permanent.

Corey King Vol 2
March 10, 2016

182

1        Q.    What number?

2        A.    No. 4.

3        Q.    Is that 14B4?

4        A.    I'm looking at --

5        Q.    Yes.   Termination or deferred termination.

6        A.    That's a more permanent sanction.   But if

7    you look on Page 8, No. 2, that's an interim.   But

8    both are -- In both situations a student is being

9    removed from housing.   So these emergency measures

10   are simply sanctions that are done earlier.

11       Q.    Okay.

12       A.    Suspension is a sanction.   If you look on

13   Page 15, you should see the word suspension under

14   sanctions.   Look at Page 15.   Yup, Page 15 at the

15   bottom, No. 9, it says suspension, and on Page 8 it

16   says interim suspension.   So they are sanctions,

17   they're just in an interim nature.

18       Q.    Sanctions under Page 15 says, "Mandatory

19   separation from the University, barred from all

20   campuses unless specific permission is granted.

21   Once the entire period of suspension has been

22   served, the student may seek resubmission by

23   submitting a written request to the Dean of

24   Students."   And that is under Student Conduct

25   Sanctions, correct?

Corey King Vol 2
March 10, 2016

183

1        A.    Permanent sanctioners.

2        Q.    Permanent sanctions.

3              Where does it say that the emergency

4    measures are temporary sanctions, or does it?

5              MS. WYDLER:   Object to the form.

6        A.    Well, for me a suspension and interim

7    suspension means it's a suspension before a

8    suspension.   So my interpretation is such.

9    BY MS. CHATTERGOON:

10       Q.    So we're just going on this is your

11   interpretation of the student code?

12       A.    And this is my response to, yes, as the

13   Associate VP and Dean of Students.

14       Q.    You go on to say, "In doing so she,

15   Dr. Williams, modified a standard Notice of Charges

16   letter without authority or approval from FAU's

17   General Counsel, potentially exposing FAU to

18   liability.   This policy is reinforced by the FAU

19   SCAC and SIT committee --" I'm sorry.   "Reinforced

20   by the assessment and management policy and student

21   intervention team policy, which mandate that the

22   SCAC and SIT committee be chaired by the Assistant

23   Associate Vice President and Dean of Students."

24   What do you mean by that?

25       A.    When you take emergency measures of such

U.S. LEGAL SUPPORT
(813) 876-4722

Corey King Vol 2
March 10, 2016

184

```
 1    to notify the SCAC or the SIT of such measures have
 2    been a practice of ours.  Again, a practice.
 3         Q.    I'm sorry, could you repeat that for me.
 4         A.    When you take emergency measures, you
 5    should be consulting the appropriate people.
 6         Q.    No. 7 asked you to identify whether there
 7    were - whether you made a decision to drop any
 8    charges against Ryan Rotela.  And you said you did
 9    not make that decision.  First, were any charges
10    made against Ryan Rotela?
11         A.    Yes.
12         Q.    And was that in the Notice of Charges that
13    Dr. Williams sent him?
14         A.    Yes.
15         Q.    And were those charges dropped at any
16    point?
17         A.    Yes.
18         Q.    And who made that decision?
19         A.    I can speak to the fact there was an
20    agreement made between legal counsel of the
21    University and legal counsel of the student, and a
22    mutual agreement was reached.
23         MS. CHATTERGOON:  I'm going to take a five
24      minute break.
25
```

Corey King Vol 2
March 10, 2016

185

1           (A recess was taken from

2      3:48 p.m. until 3:52 p.m., after which the

3      following proceedings were held:)

4    BY MS. CHATTERGOON:

5      Q.   Dr. King, do you ever recall Dr. Williams

6    discussing the Notice of Charges, the three Notice

7    of Charges letters I showed you for Julius

8    Christian, Vonita Nicholas, and Oscar Silver?

9      A.   With me?

10      Q.   Yes?

11      A.   I do not recall.

12      Q.   Do you recall instructing Dr. Williams

13    after she wrote the first letter to ensure she put

14    the words "in the interim" on the second and third

15    letter?

16      A.   I don't recall.

17      Q.   I want to take a look at the posting

18    summary that we talked about earlier this morning.

19    I don't know what number that is.

20           MS. WYDLER:  I think it was two.

21           MS. CHATTERGOON:  Yes, it was one of the

22      first ones.  It looks like this.

23      A.   Yes.

24    BY MS. CHATTERGOON:

25      Q.   We went over the position summary, the

Corey King Vol 2
March 10, 2016

186

1   essential duties of the Associate Dean of Student

2   Affairs.  Do you recall that?

3        A.   Yes.

4        Q.   As part of those essential duties it

5   states, "Has the authority to waive or deviate from

6   established policies or procedures without prior

7   approval."  Do you see that?

8        A.   Yes.

9        Q.   Earlier you stated that these were the

10  same essential duties that was in place in 2013.  Do

11  you recall that?

12       A.   Yes.

13       Q.   Okay.  Did Dr. Williams have the authority

14  to waive or deviate from the practice of placing or

15  the practice of giving a separate emergency measure

16  letter?

17       A.   No.

18            MS. WYDLER:  Object to the form.

19  BY MS. CHATTERGOON:

20       Q.   Why not?

21       A.   Because the practice is that are - there

22  are related to our regulation, which are governed by

23  the BOT.  Policies and procedures are governed by

24  the University.

25       Q.   The regulation that we looked at 4.007, is

Corey King Vol 2
March 10, 2016

187

1   that what you're referring to?

2       A.   Yes.

3       Q.   But that regulation doesn't state that the

4   emergency measures have to be in a separate letter,

5   correct?

6       A.   It does not.

7       Q.   Just going back to your answer for No. 6,

8   Interrogatory No. 6, you put here that "Dr. Williams

9   potentially exposed FAU to liability."  What

10  liability were you referring to?

11      A.   All of the -- Our entire Student Code of

12  Conduct is exposed to liability.  In terms that when

13  you bring sanctions against students and charges,

14  they have a right to involve lawyers.  They have a

15  right to appeal our decisions to the Circuit Court,

16  so it's risky and there's liability whenever you

17  invoke code.

18      Q.   So if ever a Notice of Charges were given

19  to a student, there's a potential for liability

20  there?

21      A.   Yes, and there's potential for greater

22  liability if that notice is modified.

23      Q.   In your opinion?

24      A.   In practice with notification by General

25  Counsel.  Yes, in my opinion.

Corey King Vol 2
March 10, 2016

188

1      Q.   I want to discuss the Ryan Rotela incident

2   as we've been calling it today.  If you take a look

3   at, and I should have marked mine, I apologize.

4   It's the one that starts -- Yeah, that one.  What

5   number is that?

6      A.   No. 7.

7      Q.   And I want to just go through the timeline

8   of this Ryan Rotela incident, if you will.

9      A.   Okay.

10      Q.   We know from the incident report on 1439

11   and 1440 that the incident occurred on

12   February 25th, 2013, correct?

13      A.   Correct.

14      Q.   Well, let me ask you.  These documents

15   that I provided to you as Exhibit No. 7, do you see

16   that email, the first email in the front?

17      A.   Yes.

18      Q.   And that's an email from Dr. Williams to

19   Joanna Ellwood?

20      A.   Yes.

21      Q.   Dated March 18th, 2013?

22      A.   Yes.

23      Q.   And it has attached Student Hearing Docs,

24   Student Hearing Docs 2.  The email says, "Hi Joanna.

25   Attached please find the documents related to the

Corey King Vol 2
March 10, 2016

189

1   student hearing we discussed today.  Let me know if

2   you have any questions or need anything further."

3   Have you ever seen the documents that were attached

4   to this email?

5        A.   I don't recall.

6        Q.   Have you ever seen this email before

7   today?

8        A.   I don't recall.

9        Q.   Based on the documents provided by FAU,

10  Dr. Williams conducted an investigation on the 28th

11  and on the 26th of February.  She then sent out an

12  investigation conference letter on February 28th,

13  2013.  It's on 1447.

14       A.   Uh-huh.

15       Q.   Is that a template letter, as well?

16       A.   It looks like, yes.

17       Q.   What are you allowed to change on that

18  template letter in practice?

19       A.   The bold.

20       Q.   Only the bold?

21       A.   No, and the date, Thursday, March the 7th,

22  2013 at 4:00 p.m., and the location.

23       Q.   Okay.

24       A.   Yup.

25       Q.   Nothing else is allowed to be changed in

1   this letter?

2        A.   Not without consultation.  I'm trying to

3   see.

4        Q.   Consultation with who?

5        A.   General Counsel.

6             That can be changed, the date, the person.

7   Please contact Alice Maud, that can be changed.  So

8   any time you see a name or a number or a date in

9   that, looks like the third major paragraph.

10       Q.   After this investigation conference was

11  sent out, do you know whether there was a scheduled

12  SCAC meeting any time after this letter was sent

13  out?

14       A.   We would -- Yeah, February.  So there

15  would be scheduled SCAC meetings, yes.

16       Q.   Do you know if that meeting actually

17  happened?

18       A.   I can't recall, but SCAC meetings do

19  happen and they are canceled occasionally.

20       Q.   What would be the reason for canceling a

21  SCAC or SIT meeting?

22       A.   Scheduling, or we have only one name or

23  two names we could discuss in a different forum.

24  Various reasons, so periodically they are canceled.

25       Q.   We went over this earlier, but because I'm

1    deposing you in your individual capacity now I need
2    to ask you a couple more questions.  If you take a
3    look at 1452.  This is the email that Ms. Williams -
4    Dr. Williams sent you regarding her investigation of
5    the Ryan Rotela matter, correct?
6        A.   Yes.
7        Q.   Okay.  And you said, "I will call you this
8    weekend."  Do you recall speaking to Dr. Williams
9    that weekend?
10       A.   I believe so.
11       Q.   Do you recall what the discussion
12   surrounded?
13       A.   It was around this incident.
14       Q.   Okay.  Do you recall what was said?
15       A.   I believe she provided me with some of the
16   specifics of the case.
17       Q.   Do you recall what she said about the
18   specifics of the case?
19       A.   Not completely.
20       Q.   Okay.  Do you recall whether she indicated
21   to you that it was similar to the Julius Christian
22   matter?
23       A.   I do not recall that.
24       Q.   Do you recall her telling you that she
25   issued the same emergency measures that she did in

Cortez King Vol 2
March 10, 2016

192

1    the Julius Christian matter?

2         A.   I don't recall that.

3         Q.   Do you recall her telling you that she

4    placed emergency measures in the Notice of Charges?

5         A.   I don't recall that.

6         Q.   Do you recall her stating that she did not

7    do a separate letter of emergency measures?

8         A.   I don't recall that.

9         Q.   Do you recall her discussing with you her

10   investigation of the matter?

11        A.   Yes.

12        Q.   What about the investigation of the matter

13   do you recall?

14        A.   I just recall her giving me the facts of

15   what she has learned about the case.

16        Q.   Do you recall what that was?

17        A.   Not specifically, but I do remember a

18   student -- It was related to the classroom exercise

19   and what was happening, the student's frustration.

20   But more importantly, was focused on what happened

21   after the class, and that the student had allegedly

22   threatened or confronted the faculty member.

23        Q.   Do you recall whether she told you if she

24   spoke to the faculty member?

25        A.   I do remember she had spoken to Deandre

Corey King Vol 2
March 10, 2016

193

1    Poole.

2        Q.    Deandre Poole was the faculty member?

3        A.    Correct.

4        Q.    Do you recall what she stated, if

5    anything, that Dr. Poole stated to her?

6        A.    I do recall her stating that the faculty

7    member was either uncomfortable or afraid for the

8    student to come back to class.

9        Q.    Did she state to you that Dr. Poole did

10   not want the student coming back to his class?

11       A.    More or less, yes.

12       Q.    Well, is that yes or no?

13             MS. WYDLER:  Object to the form.

14       A.    I can't remember exactly what she said.  I

15   do remember that the faculty member, she indicated,

16   was somewhat concerned about his safety or about

17   this student returning to class.

18   BY MS. CHATTERGOON:

19       Q.    And if a faculty member was concerned

20   about his or her safety, what would be the procedure

21   in removing the student from the class, if any?

22       A.    Again, I could give my professional

23   opinion is that if a student has threatened a

24   faculty member and is threatening behaviors, to me,

25   that's a threat to the University community.  That's

Corey King Vol 2
March 10, 2016

194

1       an interim suspension.

2           Q.   Okay.

3           A.   In my professional opinion.   That student,

4       threatening behavior, we need to get that student

5       off our campus.

6           Q.   Did you tell Dr. Williams that during your

7       conversation on March 10th?

8           A.   I remember talking about interim measures

9       with Dr. Williams, I just don't remember the

10      specifics of that interim measure conversation.

11          Q.   Do you remember talking about interim

12      measures on March 10th?

13          A.   I don't recall if the conversation was on

14      March 9th or March 10th.   I remember I returned the

15      call.

16          Q.   It was one of those two days?

17          A.   It was the weekend.   It was before Monday.

18          Q.   And what in your consultation with

19      Dr. Williams did you say to her regarding emergency

20      measures?

21          A.   I remember the conversation around

22      emergency measures if there was a threat to members

23      of our community.   I remember talking about that.

24          Q.   What do you remember saying?

25          A.   I don't recall specifically what the

Corey King Vol 2
March 10, 2016

195

1    conversation was.

2        Q.   Do you recall Dr. Williams citing three

3    cases in which the SCAC or SIT committees took

4    similar actions regarding emergency measures?

5        A.   I do not.

6        Q.   Do you recall saying to Dr. Williams that

7    you agreed with her procedure of sending out the

8    Notice of Charges with the emergency measures in

9    this case?

10       A.   I do not.

11       Q.   So you became aware of this Ryan Rotela

12   incident on or about March 9th or 10th, 2013?

13       A.   Yes.

14            (The referred-to document was marked by

15       the court reporter for identification as

16       Plaintiff's Exhibit 14.)

17   BY MS. CHATTERGOON:

18       Q.   I'm showing you what's been marked

19   Plaintiff's 184 to 188.   The first page there's an

20   email from yourself to several people, including

21   Dr. Williams, saying, "No SCAC meeting on Tuesday.

22   And that's was dated February 25th.   So the meeting

23   would have been on the 26th, correct?

24       A.   Yes.

25       Q.   Okay.   Do you know why that meeting was

Corey King Vol 2
March 10, 2016

196

1   canceled?

2       A.   I do not.

3       Q.   Okay.  The next page on Wednesday

4   February 29th there's a meeting from yourself to

5   several individuals, including Dr. Williams stating

6   that you will not have SCAC meeting on Thursday,

7   which would have been March 1st.

8       A.   Uh-huh.

9       Q.   However, it says, "The SIT smaller group

10  will meet instead."  What is the smaller group of

11  SIT?

12      A.   The smaller group is the Director of

13  Housing, the Associate Deans on the partner

14  campuses, the Chief of Police, and representatives

15  from Counseling, Student Health, and OSD.

16      Q.   And how is that different than the regular

17  group of SIT?

18      A.   The smaller group really deals with

19  imminent and emergency measures that need to be

20  taken.

21      Q.   Do you know if that group met on

22  March 1st?

23      A.   There's no email canceling it, then yes.

24      Q.   Do you know why the SCAC meeting was

25  canceled on the 1st?

Corey King Vol 2
March 10, 2016

197

1          A.    I do not.  I do not.

2          Q.    Do you know whether on March 1st emergency

3    measures - whether there was any decision to take

4    emergency measures against Ryan Rotela?

5          A.    On March 11th?

6          Q.    On March 1st.

7          A.    March 1st?  I don't recall.

8          Q.    That would have been the date of the

9    smaller SIT meeting.

10         A.    Smaller group.  I don't recall.

11         Q.    The next email 186 is an email from

12   yourself to several individuals, including

13   Dr. Williams, stating, "No SIT on Tuesday,

14   March 5th."  Do you see that?

15         A.    Yes.

16         Q.    And the very last page - I'm sorry, not

17   the last page, the second to last page is an email

18   from yourself to several individuals saying, "Please

19   submit any names for our SCAC meeting."  Do you see

20   that?

21         A.    Yes.

22         Q.    Dr. Williams submitted Mr. Rotella's name,

23   do you see that?

24         A.    Yes.

25         Q.    Was that normal course for you to ask for

Corey King Vol 2
March 10, 2016

198

1    submission of names for the SCAC meeting?

2        A.    Typically, yes.

3        Q.    And what was the reason for that?

4        A.    So we would know if there were any

5    students of interest.  If there were a few names

6    submitted or one name submitted, we typically would

7    not meet.  So it was a determination of whether we

8    needed to meet as a group.

9        Q.    So this email went out on March 11th.

10   That was the Monday after you had spoken to

11   Dr. Williams, correct?

12       A.    Yes.

13       Q.    So you were aware of the Ryan Rotela

14   incident, at that point?

15       A.    At that point, on Monday, yes.

16       Q.    Did that meeting ever occur, that SCAC

17   meeting?

18       A.    Doesn't look like there's a cancellation,

19   so I'm assuming it did.

20       Q.    Do you know if Ryan Rotela was ever

21   discussed during that SCAC meeting?

22       A.    I do believe during one of the meetings he

23   was discussed.

24       Q.    Do you recall which meeting?

25       A.    I do not.

Corey King Vol 2
March 10, 2016

199

1        Q.    When do SCAC meetings usually occur?

2        A.    SCAC meetings usually occur on, I believe,

3   Tuesday, and SIT on Thursday or vice versa.  Let's

4   go back here.  No, SCAC on Thursday and the SIT

5   meets on Tuesday.

6        Q.    Do you recall whether you canceled the

7   SCAC or SIT meeting scheduled for March 12th?

8        A.    There doesn't seem to be an email, so I'm

9   assuming we had the meeting.

10       Q.    Going back to your discussion with

11  Dr. Williams regarding the Ryan Rotela matter on the

12  weekend of March 9th.

13       A.    Uh-huh.

14       Q.    Do you recall her telling you that she

15  needed to take an emergency measure because of

16  timing of when classes were to start?

17       A.    I do not.

18            (The referred-to document was marked by

19        the court reporter for identification as

20        Plaintiff's Exhibit 15.)

21  BY MS. CHATTERGOON:

22       Q.    I'm going to show you what's marked as 15.

23  This is FAU's academic calendar for 2012 and '13.

24  It says here mid-semester break, no classes March

25  4th through the 10th.  Would mid-semester break be

Corey King Vol 2
March 10, 2016

200

1   Spring Break, what's considered Spring Break?

2       A.   Yes, Spring Break, uh-huh.

3       Q.   So according to this document, which has

4   been marked Exhibit No. 15, Spring Break was March

5   4th through the 10th, correct?

6       A.   Yes.

7       Q.   So when you spoke with Dr. Williams, the

8   school was currently on Spring Break and would

9   resume on March 11th, correct?

10      A.   Yes.

11      Q.   I included if that exhibit a calendar of

12  March 2013.  Once you had that conversation with

13  Dr. Williams, whether on the 9th or the 10th of

14  March, during that week, the 11th through the 15th,

15  did you have any other discussions with Dr. Williams

16  about Ryan Rotela?

17      A.   I don't recall.

18      Q.   Did you ever express any concerns with any

19  of the emergency measures Dr. Williams took against

20  Ryan Rotela?

21      A.   Not at that time.  I don't recall it.

22      Q.   Okay.  Do you recall whether Dr. Williams

23  told you she was meeting with the student again

24  after you spoke to her on the 9th or the 10th of

25  March?

Corey King Vol 2
March 10, 2016

201

1      A.   I do not.

2      Q.   According to Exhibit, I believe this is 7.

3  It's the one with the email.

4      A.   Yes.

5      Q.   There was an email sent to Joanna Ellwood

6  with the Student Hearing Docs on March 18.   That

7  would have been the following week, correct?

8      A.   Correct.

9      Q.   If you take a look at the calendar I sent

10  you.

11      A.   Correct.

12      Q.   At that point, is it safe to assume that

13  the student had, the student being Ryan Rotela,

14  requested a hearing and that's why these documents

15  were being sent to Joanna Ellwood?

16      A.   No.

17      Q.   Why not?

18      A.   I don't see the appropriate forms for that

19  in this document here.  So typically there is a form

20  where the student takes responsibility, and I don't

21  see that anywhere in here.

22      Q.   What do you mean, the Student Rights

23  Letter?

24      A.   No.  It looks here that there's a letter

25  calling a Student Conduct Conference.

Corey King Vol 2
March 10, 2016

202

     Q.   Right.  On the 15th of March.

     A.   That's right.

     Q.   If you look at 1454.

     A.   Right.  Is that a Student Conduct
Conference.

     Q.   It's in the Notice of Charges, 1454.

     A.   So for me what I'm saying what I'm missing
is the Student Conduct Conference Letter.  And that
letter would indicate to me that the student is now
coming in to review their documents.  And then there
is another form where the student takes
responsibility for their actions.  And if they don't
take responsibility, there's another form where they
choose a hearing forum.  So since I don't see any of
that in here, it doesn't look to me like we got
beyond the Notice of Charges.

     Q.   Okay.  The email says, "Please find the
documents related to the student hearing we
discussed today."  Would there be any other student
hearing that would take place?

     A.   Yeah, but just because you say it, doesn't
mean it's -- To me, the documents would indicate to
me there is a hearing happening.

     Q.   My question is, is there any other student
hearing that would take place?

Corey King Vol 2
March 10, 2016

203

1      A.   I don't know that.

2      Q.   Is there any other student hearing besides

3   the one described in the Student Code of Conduct?

4      A.   I need clarification.

5      Q.   Okay.  It says on this email attached,

6   "Please find the documents related to the student

7   hearing we discussed today."  You're saying it

8   doesn't indicate whether the student selected a

9   hearing, because those letters you're describing are

10  not in here, correct?

11     A.   Yes.

12     Q.   Do you know whether Ryan Rotela walked out

13  of the office before Dr. Williams could give him

14  those letters to sign?

15     A.   I don't.

16     Q.   Do you have any reason to believe that

17  Ryan Rotela did not select a hearing based on

18  anything in this packet that I've shown you?

19     A.   I don't.

20     Q.   Once a student selects a hearing and the

21  hearing documents are sent to Joanna -- Who is

22  Joanna Ellwood, by the way?

23     A.   She's the -- Right, now she's the

24  Associate Dean and Director of Student Conduct.

25     Q.   What was her position in 2013?

Corey King Vol 2
March 10, 2016

204

1       A.     Assistant Dean and Director of Student
2  Conduct.

3       Q.     Does she work in your department?

4       A.     She did.

5       Q.     Was she your direct report?

6       A.     She was.

7       Q.     Once a student selects a hearing and these
8  documents are sent to Joanna Ellwood, are you made
9  aware of the student hearing?

10      A.     No.

11      Q.     Why not?

12      A.     Because I'm apart of -- Well, number one
13  is we got 30,000 students, so that's not the only
14  hearing going on that day.  So I'm typically not
15  aware of hearings unless it's a high-caliber-type
16  situation, typically.

17      Q.     What would a high-caliber type?

18      A.     Sexual assault, drug abuse, possession,
19  selling drugs.  Those type of things might be
20  brought to my purview.

21      Q.     So a student threatening a professor is
22  not a high priority?

23      A.     It all depends on how Joanna views it.  I
24  let her make that decision as a professional.

25      Q.     She would make the decision whether to

Corey King Vol 2
March 10, 2016

205

1    bring it to your attention?

2        A.    She does.

3        Q.    Okay.  Once she receives the student

4    hearing documents, what is she required to do?

5        A.    Again, I don't -- She's required to

6    schedule a hearing if the appropriate hearing

7    documents are provided to her.

8        Q.    Do you know if she was ever provided the

9    appropriate documents in this case?

10       A.    I don't see them.  I don't know what

11   Dr. Williams provided in this email.

12       Q.    Not in this email, just in general.  Do

13   you know if she was ever given the proper documents?

14       A.    I'm not aware.

15       Q.    And do you know if she ever scheduled the

16   hearing for Ryan Rotela?

17       A.    I'm aware there was no hearing scheduled.

18       Q.    And what was the reason no hearing was

19   scheduled?

20       A.    By the time my involvement came, I make

21   the assumption that no hearing was scheduled because

22   Ryan Rotela had retained legal counsel.  Our legal

23   counsel had got involved.  The process had stopped

24   and went in the hands of the legals, at that point.

25       Q.    When did you become involved with the Ryan

Corey King Vol 2
March 10, 2016

206

1  Rotela incident?

2        A.    When Dr. Williams called me that weekend.

3        Q.    But you just stated --

4        MS. CHATTERGOON:  Could you read that

5  back, Ashley.

6        (The requested portion of the record was

7  read back by the reporter.)

8  BY MS. CHATTERGOON:

9        Q.    Based on your statement, my question is

10  when did you become involved and your response was

11  when you spoke to Dr. Williams?

12        A.    My involvement is when I became aware.

13  The moment I became aware is when I became involved.

14  Whatever Saturday or Sunday she made me aware, to me

15  that was my point of involvement.

16        Q.    So then what did you mean by the point you

17  became involved the legals got involved?

18        A.    No, I said the point that -- You asked me

19  was the student hearing scheduled, and I said if a

20  student hearing wasn't scheduled I know there was a

21  point the legals got involved and he got an attorney

22  and our legal got involved, so that stopped whatever

23  processes moving forward.

24        Q.    Okay.  Do you recall talking to

25  Dr. Williams on or about March 20th about suspending

Corey King Vol 2
March 10, 2016

207

1    Ryan Rotela?

2         A.    I don't recall.

3         Q.    You don't recall having that conversation

4    with her?

5         A.    I don't recall having the conversation.

6         Q.    Do you recall Dr. Williams telling you

7    that she didn't believe suspension was necessary

8    because Mr. Rotela had a class on the Boca campus

9    and suspending him would prohibit him from attending

10   that class?

11        A.    We did have a conversation about interim

12   measures and suspension, I do remember that.

13        Q.    When was that?

14        A.    I don't remember the specifics.  I

15   remember on that weekend call we talked about the

16   interim measures and things of that nature.  I do

17   not remember having conversations after that.

18        Q.    During the call on March 9th or 10th, do

19   you recall Dr. Williams saying that's why she chose

20   not to suspend Ryan Rotela, because it would bar him

21   from classes at the Boca campus, which is why she

22   chose the measures under 9A3?

23        A.    I don't recall that.

24        Q.    Do you recall whether Ryan Rotela released

25   the Notice of Charges to the media?

Corey King Vol 2
March 10, 2016

208

1          Let me clarify that question.  Release the

2    notice of charges Dr. Williams sent him to the

3    media?

4        A.   No.

5        Q.   Do you recall when the legals, as you say,

6    became involved?

7        A.   It would have to be after March the 18th

8    if, in fact, Dr. Williams sent hearing documents to

9    Joanna Ellwood.  If the hearing did not take place,

10   my assumption would be the legals had - at some

11   point during that week he obtained an attorney.

12       Q.   Do you recall ever informing Dr. Williams

13   that the charges had been dropped against Ryan

14   Rotela?

15       A.   I don't recall.

16       Q.   Do you recall telling Dr. Williams that

17   she was, quote, out of it?

18       A.   In terms of the case management, I do

19   remember that conversation.

20       Q.   Going back to Exhibit, I think it was 13.

21       A.   Fourteen.

22       Q.   Did you ever place Ryan Rotela's name on a

23   SCAC or SIT meeting?

24       A.   I can't recall.  There would be an agenda

25   with his name on there.  I can't recall.

Corey King Vol 2
March 10, 2016

209

1      Q.    Which meeting would his name -- Which

2    agenda, what date would his name be on?

3      A.    I'm not sure the date, but the agenda

4    would mirror the agenda you showed before how we put

5    people on the docket.

6      Q.    Okay.

7      A.    That example you gave of the actual

8    internal document, yes.

9      Q.    Okay.  The meeting seems to have been

10   canceled a few times, so I'm not sure what date the

11   SCAC or SIT meeting would have occurred.  Do you

12   recall?

13     A.    I do not.

14     Q.    Do you recall ever discussing the Ryan

15   Rotela matter at a SCAC or SIT meeting during

16   March 2013?

17     A.    I do not.

18     Q.    Going back to your interrogatory

19   responses.  No. 8 asked you to "identify the person

20   who suggested that Dr. Williams receive a Letter of

21   Reprimand for the Ryan Rotela incident and ultimate

22   reason she did not receive the Letter of Reprimand."

23   Your attorneys issued an objection here.  However,

24   you state that "the decision to reprimand

25   Dr. Williams was made by Charles Brown who consulted

Corey King Vol 2
March 10, 2016

210

1  with you."  You say, "I assisted in drafting the

2  reprimand with Human Resources and FAU counsel.  I

3  was advised by Dr. Brown that he decided to separate

4  Plaintiff, at will Plaintiff, prior to issuing a

5  formal reprimand."

6          When Dr. Brown consulted with you about

7  the reprimand, what was said to you?

8      A.   He said that he was going to issue a

9  reprimand to Dr. Williams regarding the Rotela case.

10  And he asked for me to provide some language to

11  Human Resources regarding my involvement or the Code

12  of Conduct, something related to that.

13      Q.   Did he say why he was reprimanding

14  Dr. Williams?

15      A.   He did not.

16      Q.   Had Dr. Brown been involved in the Ryan

17  Rotela matter, at this point?

18          MS. WYDLER:  Object to the form.

19      A.   I can't recall.

20  BY MS. CHATTERGOON:

21      Q.   Okay.  Let me back up that question for a

22  second.

23          Do you recall whether Dr. Williams ever

24  discussed the Ryan Rotela matter and the incident of

25  February 25th, 2013 with Dr. Brown before the Letter

Corey King Vol 2
March 10, 2016

211

1    of Reprimand issue came about?

2         A.   No.

3         Q.   Did you discuss the Ryan Rotela matter

4    with Dr. Brown prior to, quote, unquote, the legals

5    becoming involved?

6         A.   Not to my knowledge.

7         Q.   Do you recall discussing the Ryan Rotela

8    matter in a senior staff meeting with Dr. Brown?

9         A.   I can't recall, but that doesn't mean it

10   didn't happen.  We discussed a lot of things at

11   senior staff.

12        Q.   I'm sorry, I believe I asked you this but

13   I don't recall your response.

14             Did Dr. Brown tell you why he was giving

15   Dr. Williams a reprimand?

16        A.   He did not.

17             (The referred-to document was marked by

18        the court reporter for identification as

19        Plaintiff's Exhibit 16.)

20   BY MS. CHATTERGOON:

21        Q.   I'm showing you what's been marked as

22   Exhibit No. 16.  It's FAU1513 through 1522.  Tell me

23   when you had a chance to look at the documents.

24        A.   Okay.

25        Q.   Do you recall seeing these documents

Corey King Vol 2
March 10, 2016

212

1    before?

2        A.    Yes, they're my emails.

3        Q.    Okay.  And they're emails between yourself

4    and Robin Kabat regarding the Letter of Reprimand to

5    Dr. Williams, correct?

6        A.    Correct.

7        Q.    And earlier you stated Dr. Brown asked

8    that you give an explanation for the reprimand; am I

9    stating that correctly?

10       A.    No.  He asked me to give my account of

11   what my involvement was.

12       Q.    Okay.  If you take a look at 1515, the

13   third page.

14       A.    Yes.

15       Q.    It's dated April 5th, 2013 from yourself

16   to Dr. Brown and the subject is, "Information.

17   Dr. Brown, here's what I experienced."  Do you see

18   that?

19       A.    Yes.

20       Q.    Is that a recollection of what you

21   experienced in the Ryan Rotela case?

22       A.    Yeah, looks like I spoke to her on

23   March 9th.

24       Q.    According to that calendar, March 9th

25   would have been the Saturday, correct?

Corey King Vol 2
March 10, 2016

213

1      A.    Yes.

2      Q.    Okay.

3      A.    Yes.

4      Q.    Have you had a chance to review this

5   email?

6      A.    This email here?

7      Q.    Yes.  Do you want to take a minute to

8   review it?

9      A.    I'm good, yes.

10      Q.    Okay.  In this email you state that you

11   received an email from Dr. Williams saying that, "A

12   student had threatening behaviors towards a faculty

13   member on the Davie campus.  She explained that the

14   faculty member did not want the student in class.

15   She further explained that she had not charged the

16   student and wanted to consult with me.  I spoke with

17   Dr. Williams on the phone on March 9th and explained

18   to her that the student does not need to return to

19   class until this matter is resolved."  Does that

20   refresh your recollection of the conversation you

21   had with Dr. Williams?

22      A.    Somewhat, yes.

23      Q.    Dr. King, isn't it true that Dr. Williams

24   was the one who stated to you that the student could

25   not return to class and that's why she was taking

Corey King Vol 2
March 10, 2016

214

1    emergency measures?

2              MS. WYDLER:  Object to the form.

3         A.   I don't recall.

4    BY MS. CHATTERGOON:

5         Q.   Dr. King, isn't it true that Dr. Williams

6    explained, actually explained to you that she had

7    issued the Notice of Charges to the student?

8         A.   I believe in the phonecall she did say she

9    had issued a Notice of Charges.

10        Q.   Do you recall now whether she had

11   explained to you that it was similar to the three

12   occasions where Notices of Charges that included

13   emergency measures had been issued before?

14        A.   I do not recall that.

15        Q.   In this email it says, "She further

16   explained Dr. Marin had met with the student.

17   Dr. Williams informed me that she would proceed with

18   charges based on threatening behaviors.  The

19   incident occurred on February 28th."  When you spoke

20   to -- Do you recall whether you -- Strike that.

21             Did you know whether the Notice of Charges

22   had been sent out prior to your conversation with

23   Dr. Williams on March 9th or 10th?

24        A.   No.

25        Q.   As you sit here today, do you know whether

Corey King Vol 2
March 10, 2016

215

1   it had been sent out?

2       A.   Yes, according to the letter what I

3   received today it said March 8th, right?  March 8th.

4   That's the letter I just saw.

5       Q.   When you had the conversation with

6   Dr. Williams, did she inform you that she sent out

7   the letter?

8       A.   I believe so.

9       Q.   It says here in this email dated

10  April 5th, "I later learned that Dr. Williams has

11  placed wording in our Notice of Charge letter

12  indicating to the student the following:  'In the

13  interim you may not attend class or contact any of

14  the students involved verbally or electronically or

15  by any other means.'  Our practice concerning the

16  student conduct process is that we do not place

17  additional wording in the Notice of Charges letter.

18  In fact, the practice is any changes to any Student

19  Conduct Letter must be reviewed by General Counsel."

20  Was Dr. Brown -- Do you know if -- Strike that.

21          Did you ever tell Dr. Williams that the

22  practice was that any changes must be reviewed by

23  the General Counsel?

24      A.   Well, we discussed it in our training

25  sessions.

Corey King Vol 2
March 10, 2016

216

1      Q.   When you had that conversation with her on

2  March 9th or 10th, did you ever tell her that any

3  changes to the letter must be reviewed by General

4  Counsel?

5      A.   I don't believe that we discussed at that

6  point the modification or Notice of Charges in the

7  conversation on the phone.  I found out later.

8      Q.   Earlier you said you didn't recall whether

9  she stated she was - or stated to you she had placed

10  emergency measures in the Notice of Charges letter.

11  Do you now recall?

12      A.   No, I said that I recall her saying she

13  had issued a Notice of Charges.  I did not know that

14  the Notice of Charges was altered until afterwards.

15      Q.   I asked you earlier if you recalled her

16  explaining to you that she did what was done in the

17  other three cases where emergency measures were

18  included in the Notice of Charges and that I showed

19  to you during the course of this deposition, and you

20  stated that you did not recall.

21          MS. WYDLER:  Object to the form.

22      A.   I don't recall.

23  BY MS. CHATTERGOON:

24      Q.   You don't recall?

25      A.   No.

Corey King Vol 2
March 10, 2016

217

1       Q.   You later forwarded this email to Robin

2   Kabat, correct?

3       A.   Yes.

4       Q.   That was on April 8th, 2013, if you look

5   above that email we were just reading on 1515.

6       A.   Yes.

7       Q.   And Ms. Kabat then sent you, if you look

8   at 1517, she says, "Here's the letter we discussed

9   ready for your letterhead.  Please let me know if

10  you plan to make any changes.  I hope I accurately

11  portrayed the situation."  And she attached a Letter

12  of Reprimand.  Do you see that?

13      A.   Yes.

14      Q.   Did you review this letter once it came

15  from Robin Kabat?

16      A.   Yes.

17      Q.   Whose letterhead was it going to be on?

18      A.   It should be on the Senior Vice President.

19  It was his decision.

20      Q.   What was his decision?

21      A.   Whether to issue the reprimand or not.

22      Q.   Why were you included on the copy of the

23  draft reprimand?

24      A.   You have to ask Robin Kabat that.

25      Q.   Okay.  Did you give any input into this

Corey King Vol 2
March 10, 2016

218

```
 1   letter once Robin Kabat sent it to you?
 2        A.   I did not.
 3        Q.   Okay.  If you go to 1520.  Well, I'm
 4   sorry, 1521.  There's a letter dated April 17th,
 5   2013 on Dr. Brown's letterhead.  Do you see that?
 6        A.   Yes.
 7        Q.   In comparing the letter dated April 8th,
 8   2013 to the one on April 17th, 2013, there seems to
 9   be some changes made to the initial letter Robin
10   Kabat sent.  Do you know who made those changes to
11   that letter?
12        A.   I do not.
13        Q.   Okay.  Did you ever revise the letter that
14   Robin Kabat sent?
15        A.   I don't recall.
16        Q.   Do you know who would have revised the
17   letter from April 8th to the letter of April 17th?
18        A.   Dr. Brown would know that.
19        Q.   Taking a look at the first page, 1513, of
20   that letter - of that exhibit, I'm sorry.  It's an
21   email from Robin Kabat to you.  It says, "Hi Corey.
22   I appreciate your suggestion about wording and I
23   definitely will use this within the letter; however,
24   I need much more information in order to do the
25   reprimand.  I'm meeting with Dr. Brown on Monday
```

Corey King Vol 2
March 10, 2016

219

1    morning, so perhaps I can get the information at

2    that time.  I need the date that this occurred, an

3    actual synopsis of what happened.  I need to know

4    what Rozalia said in her defense or the reason she

5    gave for making the changes.  Whatever information

6    you can provide will be very helpful."  You

7    responded to Robin saying, "Understood."  Do you see

8    that email?

9         A.   Yes.

10        Q.   Did you ever discuss the Ryan Rotela

11   incident and the Notice of Charges with

12   Dr. Williams?

13        A.   Yes.

14        Q.   When?

15        A.   When she called me on - our conversation

16   on March the 9th.

17        Q.   Okay.  After you -- When did you become

18   aware that Dr. Williams placed, quote, unquote,

19   wording in the Notice of Charges letter?

20        A.   I don't recall.  It was after the

21   March 9th conversation.

22        Q.   Do you recall whether it was before or

23   after the, quote, unquote legals became involved?

24        A.   Before.

25        Q.   Okay.  Did you ever reprimand Dr. Williams

Corey King Vol 2
March 10, 2016

220

1   for adding the wording in the Notice of Charges

2   letter, at that time?

3        A.   It wasn't my place to do so.  She reported

4   to Dr. Brown.

5        Q.   Did you ever make Dr. Brown aware that she

6   had changed or placed additional wording in the

7   Notice of Charges letter?

8        A.   When he approached me about the possible

9   reprimand.

10       Q.   And that would have been around April 5th,

11  2013?

12       A.   Not sure, but it definitely would have to

13  be after March 18 when she sent the hearing

14  documents to Joanna.

15       Q.   Okay.  So after she sent the hearing

16  documents to Joanna -- Well, let me back up for a

17  second.

18            Earlier you said you didn't recall seeing

19  the hearing documents.

20       A.   No.  I still don't recall seeing the

21  hearing documents.

22       Q.   So how are you sure that you informed

23  Dr. Brown about the additional wording placed in the

24  Notice of Charges letter after the 18th?

25       A.   Because that's when the email was sent to

Corey King Vol 2
March 10, 2016

221

1    Joanna Ellwood.  So I did see at some point the

2    Notice of Charge letter.  That's not the hearing

3    documents.

4        Q.    You just don't recall when you saw the

5    Notice of Hearing - Notice of Charge documents?

6        A.    I do not.  Hearing documents and Notice of

7    Charge are two separate things.

8        Q.    Do you know if you saw the Notice of

9    Charges document after the 18th of March 2013?

10       A.    I can't recall that.

11       Q.    Once you did see the Notice of Charges

12   letter, did you have a discussion with Dr. Williams

13   about the Notice of Charges letter?

14       A.    I don't recall.  I'm not sure.  I cannot

15   recall.

16       Q.    And you said you indicated to Dr. Brown at

17   some point after the 18th that she had placed

18   additional wording in the Notice of Charges letter?

19       A.    Yes.

20       Q.    Why did you -- Why did you indicate that

21   to Dr. Brown?

22       A.    Because in the media at that point had

23   says that he was suspended from class.

24       Q.    Okay.  Is that what the Notice of Charges

25   letter stated?

Corey King Vol 2
March 10, 2016

222

1       A.    Yes.

2       Q.    And what was the reason for you telling

3  Dr. Brown that?  Was there anything wrong with that

4  suspension?

5       A.    It wasn't according to our interim

6  measures, and he wanted to know why it wasn't

7  discussed with him.

8       Q.    Okay.  And what did you say to him?

9       A.    I told him I wasn't aware that we had

10 taken interim measures until I saw the Notice of

11 Charges.

12      Q.    But isn't it true that you knew interim

13 measures were taken form your conversation on March

14 9th or 10th after your conversation with

15 Dr. Williams?

16           MS. WYDLER:  Object to form.

17      A.    No, I knew a Notice of Charges had been

18 issued.  We did not discuss the details of a

19 finalization of an interim emergency measures, I'm

20 sorry.

21  BY MS. CHATTERGOON:

22      Q.    You say you didn't discuss the details of

23 the interim suspension or interim measures?

24      A.    Emergency measures.  Talked about the

25 Notice of Charges.

Corey King Vol 2
March 10, 2016

223

1    Q.   So you didn't have any discussion about

2  emergency measures on March 9th or 10th?

3    A.   Yes, I remember talking about possible

4  interim suspension and those discussions, but I

5  don't remember specifically what it was.  I don't

6  recall the specifics of the conversation.

7    Q.   And you don't know whether you had any

8  knowledge on March 9th or 10th that these emergency

9  measures had been placed in that Notice of Charges?

10    A.   I did not have any knowledge, at that

11  point.

12    Q.   Do you know when the letter, Notice of

13  Charges letter was released to the media?

14    A.   I didn't know the Notice of Charges letter

15  were released to the media.

16    Q.   You stated it was in the media at that

17  time that Ryan Rotela was suspended from class?

18    A.   That's right.

19    Q.   How was it in the media?

20    A.   I'm assuming that Ryan Rotela told them.

21    Q.   And at that point, you reviewed the Notice

22  of Charges letter?

23    A.   I can't recall.

24    Q.   Had there ever been another public --

25  Strike that.

Corey King Vol 2
March 10, 2016

224

1          Had there ever been another incident where

2    a student conduct was in the media or relayed to the

3    media, student conduct issue?

4          MS. WYDLER:  Form.

5      A.   I'm not sure if I see it as a student

6    conduct issue in terms of the media.  The media

7    focused on the class activity.  It focused on the

8    religious aspect and the academic freedom.  That was

9    pretty much the focus of the media.  It wasn't on

10   the conduct piece of it.

11   BY MS. CHATTERGOON:

12     Q.   Okay.  Fair enough.

13          So then why did you review the Notice of

14   Charges?

15     A.   I just remember at some point there was a

16   conversation of him being suspended from the class

17   and the academic did not do it, so who did.  So

18   Dr. Brown was concerned that he was not aware that

19   the student was suspended from the class.

20     Q.   Would Dr. Brown have to be aware if any

21   student was suspended from a class?

22     A.   Dr. Brown is aware of interim measures.

23     Q.   Of all interim measures for all 30,000

24   students?

25     A.   We don't take interim measures on all

Corey King Vol 2
March 10, 2016

225

1    30,000.  But interim measures, that means you

2    believe the student is an interim threat to the

3    health and welfare.  If I'm aware of the interim

4    measure, if I'm aware, I inform him.  Not sure what

5    the other Associate Deans who reported to him did.

6        Q.    Okay.

7        A.    But for me, when I invoked interim

8    measures, I let Dr. Brown know.

9        Q.    The other notice of charges that I showed

10   you for Julius Christian and the other two

11   individuals, do you know if Dr. Brown was aware of

12   those interim measures?

13       A.    I have no idea.  They reported directly to

14   Dr. Brown.

15       Q.    So they weren't required to tell you if

16   interim measures were taken?

17       A.    It was in consultation with me, but

18   ultimately their supervisor is Dr. Brown.

19       Q.    What does "in consultation" mean?

20       A.    To make me aware.  To seek guidance,

21   because at the end of the day the Dean of Students

22   is the Chief Conduct Officer.  And at the end of the

23   day, they're designees of the Dean of Students.

24       Q.    So when you had the conversation with

25   Dr. Williams on March 9th or 10th and interim

Corey King Vol 2
March 10, 2016
226

1    measures were discussed, did you discuss that with

2    Dr. Brown?

3              MS. WYDLER:  Object to the form.

4         A.   I can't recall that.

5    BY MS. CHATTERGOON:

6         Q.   Did you discuss the possibility of interim

7    measures being taken against Ryan Rotela after March

8    9th with Dr. Brown?

9         A.   After March 9th?

10        Q.   Yes.

11        A.   Yes.

12        Q.   When was that?

13        A.   When I learned that it was in the - put in

14   the Notice of Charges.

15             MS. CHATTERGOON:  I just need to take a

16        quick bread.

17             (A recess was taken from

18        4:48 p.m. until 4:52 p.m., after which the

19        following proceedings were held:)

20   BY MS. CHATTERGOON:

21        Q.   Dr. King, do you ever -- Do you recall

22   discussing the Ryan Rotela matter with Dr. Brown and

23   Dr. Williams in a senior staff meeting?

24        A.   We discuss a lot of things in senior

25   staff, so the answer I do not recall, but there is a

Corey King Vol 2
March 10, 2016

227

1    possibility of, yes.

2         Q.   Do you recall whether it was discussed why

3    Ryan Rotella's charges were dropped?

4         A.   I do not.

5         Q.   Do you recall Dr. Brown saying in a senior

6    staff meeting that the President said make it go

7    away?

8         A.   Yes.

9         Q.   What was he referring to?

10        A.   He said it to the group.

11        Q.   And was this in regards to the Ryan Rotela

12   matter?

13        A.   Yes.

14        Q.   And did he say anything else in that -

15   after saying that statement or before regarding the

16   Ryan Rotela matter?

17        A.   I don't recall.  I do recall that

18   statement, because he was very adamant and firm

19   about it.

20        Q.   Do you know what he meant by "make it go

21   away"?

22        A.   I do not.

23        Q.   Did you ever consult with Terry Mena on

24   emergency measures that he would have taken on his

25   campus?

Corey King Vol 2
March 10, 2016

228

```
 1        A.   At Boca?

 2        Q.   At Boca.

 3        A.   Yes.

 4        Q.   Do you recall whether Terry Mena ever took

 5   emergency measures against students on his campus?

 6        A.   I don't recall.

 7        Q.   But you remember discussing emergency

 8   measures with him?

 9        A.   Yes.

10        Q.   Do you remember whether he ever sent out

11   emergency measures in a separate letter to students?

12        A.   It's possible, yes.

13        Q.   Do you recall any specific ones?

14        A.   I do not.

15        Q.   Do you recall if A.J. Chase ever consulted

16   with you regarding emergency measures?

17        A.   No.

18        Q.   And when we say consult with you, are they

19   required to follow your direction if they consult

20   with you?  And when I say "they", meaning the

21   Associate Deans?

22        A.   I would assume that if there is a

23   disagreement between us, that we would take it to

24   Dr. Brown, at that point.

25        Q.   Do you recall any situations or incidents
```

Corey King Vol 2
March 10, 2016

229

```
 1    where there was a disagreement between yourself and

 2    any Associate Dean that would have resulted in

 3    taking it to Dr. Brown?

 4         A.    No.

 5         Q.    Did you ever contact Ryan Rotela regarding

 6    the incident on February 25th, 2013?

 7         A.    Yes.

 8         Q.    When was that?

 9         A.    I can't recall the exact date.

10         Q.    Why did you contact him?

11         A.    Dr. Brown had asked for me to follow up

12    with the student to ensure that there was a plan in

13    place for him to get his academics together in an

14    alternative fashion.

15         Q.    What do you mean by academics?

16         A.    The course that he was suspended from.

17         Q.    Okay.  And what was that alternative

18    fashion?

19         A.    It was a beginning conversation with

20    myself, Dean Heather Coltman, Noemi Marin.  That

21    conversation started, and by the time we got to a

22    certain point the legals had got involved.

23         Q.    Okay.  Did you actually ever meet with

24    Ryan Rotela?

25         A.    Yes.
```

Corey King Vol 2
March 10, 2016                                    230

```
 1        Q.    How many times?

 2        A.    I recall one time.

 3        Q.    What happened in that meeting?

 4        A.    We discussed the alternative measures of

 5   where - how he can get the work from the class, so

 6   he can get credit or continue taking the course

 7   without going back to the physical class.

 8        Q.    Did you discuss the incident itself with

 9   Mr. Rotela?

10        A.    I did not.

11        Q.    Why not?

12        A.    My purpose at that point, according to my

13   boss or my supervisor, was to find an alternative

14   academic measure for him to finish his course.  And

15   that was the sole purpose of the meeting.

16        Q.    Did you have any discussions about

17   Mr. Rotela's meeting with Dr. Williams?

18        A.    No.

19        Q.    During that meeting with Mr. Rotela?

20        A.    I do not recall that.

21        Q.    Who else was in that meeting?

22        A.    I believe he had somebody with him.  I

23   think it was myself, him, and somebody else.  It

24   wasn't general -- It wasn't his attorney at that

25   point, because I would have gotten legal counsel
```

Corey King Vol 2
March 10, 2016                                    231

 1    involved.

 2         Q.   Do you recall who it was?

 3         A.   I do not recall who it was, but it was

 4    somebody he brought.

 5         Q.   And you allowed that person to be in the

 6    meeting?

 7         A.   It wasn't a conduct meeting, so yes.

 8         Q.   In your answer to Interrogatory No. 12

 9    where it says, "Please state whether the complaints

10    regarding unfair treatment, discrimination, or

11    harassment has ever been made against you."  And you

12    said, "No other complaints besides the one filed by

13    Plaintiff after her separation have been made

14    against me."  Do you see that?

15         A.   Yes.

16         Q.   Isn't it true that Dr. Williams complained

17    or made a complaint about you in 2009 to Human

18    Resources?

19              MS. WYDLER:  Objection to form.

20      BY MS. CHATTERGOON:

21         Q.   Or to the EEO office, I apologize.

22              MS. WYDLER:  Same objection.

23         A.   If she did, they did not contact me for an

24    investigation.

25

Corey King Vol 2
March 10, 2016                                        232

 1     BY MS. CHATTERGOON:

 2        Q.   Are you aware of any complaint

 3     Dr. Williams made against you in 2009?

 4            MS. WYDLER:   Object to the form.

 5        A.   I'm aware that Dr. Williams had concerns

 6     about me.  Dr. Brown shared with me that

 7     Dr. Williams had concerns and that - I'm trying to

 8     remember what his exact words to me were.  He

 9     just -- I think he said just, basically, be aware.

10     That's what he said to me.  Be aware, and I said

11     okay.

12     BY MS. CHATTERGOON:

13        Q.   And after Dr. Brown told you to be aware

14     of Dr. Williams complaints, did you tell Dr. Brown -

15     Dr. Williams I'm sorry, that she should never go to

16     the EEO office about you?

17        A.   No, I don't recall that at all.

18        Q.   Did you ever direct her to come directly

19     to you to discuss any concerns she had?

20        A.   I did say to her that if she has concerns

21     related to our professional supervisory relationship

22     that she should feel free to come and talk to me

23     about them, yes.

24        Q.   At that time, were you her supervisor?

25        A.   Yes.

Corey King Vol 2
March 10, 2016

233

1      Q.   Did you ever refer to Dr. Williams as a
2  mad black woman in relation to the Terry - Tyler
3  Perry movie?
4      A.   No.
5      Q.   And if there were witnesses who said that
6  you referred to her as a mad black woman, they would
7  be lying?
8      A.   Yes.
9      Q.   Did you ever state to Dr. Williams that we
10  are not equals, while standing in a hallway?
11      A.   I don't recall that.
12      Q.   Did you ever accuse Dr. Williams of using,
13  quote, unquote, "big words"?
14      A.   I don't recall that.
15      Q.   Did you ever make any derogatory comments
16  to Dr. Williams regarding her attendance at Harvard
17  University?
18          MS. WYDLER:  Object to the form.
19      A.   No.
20   BY MS. CHATTERGOON:
21      Q.   Did you ever introduce Dr. Williams to any
22  other individual as, this is Dr. Williams and she
23  went to Harvard University?
24      A.   I don't recall that.
25      Q.   Did you ever refer to Dr. Williams as,

Corey King Vol 2
March 10, 2016                                234

1    quote, unquote, "one of those"?

2       A.   No.

3       Q.   Did you ever state to Dr. Brown that it

4    was people like Dr. Williams' father who made it

5    difficult for your father during the civil rights

6    movement?

7       A.   No.

8       Q.   Did you ever make any derogatory comments

9    to Dr. Williams about the fact that her parents

10   attended college?

11          MS. WYDLER:   Object to the form.

12      A.   No.

13   BY MS. CHATTERGOON:

14      Q.   Did Dr. Brown -- Strike that.

15          Do you know why the Letter of Reprimand

16   was never given to Dr. Williams?

17      A.   I do not.

18      Q.   Do you know whose decision it was not to

19   give her the Letter of Reprimand?

20      A.   Dr. Brown.

21      Q.   And do you know who made the decision to

22   terminate Dr. Williams?

23      A.   I believe it was separation, but Dr. Brown

24   would make that decision.

25      Q.   Were you consulted at all?

Corey King Vol 2
March 10, 2016                                              235

1        A.    No.

2        Q.    Do you know whether Dr. Williams was given

3   a six-month notice period for her - once she was

4   terminated?

5        A.    Once she was separated, yes.

6        Q.    Why was she given that six month notice?

7        A.    I'm not aware of that reason.

8        Q.    Were her duties reassigned during those -

9   that six months?

10        A.    Yes.

11        Q.    Where were they reassigned to?

12        A.    She reassigned to report to me, and she

13   had an office on the Fort Lauderdale campus.

14        Q.    Do you know why she was assigned to report

15   to you?

16        A.    I do not.

17        Q.    Who made that decision?

18        A.    Dr. Brown.

19        Q.    Did you ever have a meeting with Student

20   Affairs employees regarding Dr. Williams' separation

21   of employment?

22        A.    No.

23        Q.    Did you ever tell Student Affairs

24   employees that Dr. Williams had decided to, quote,

25   "step down"?

Corey King Vol 2
March 10, 2016

236

1      A.   I don't recall.

2      Q.   Did you ever discuss Dr. Williams'

3   separation of employment at the annual retreat?

4      A.   I don't recall.

5      Q.   Do you recall ever -- Do you recall

6   leading a session at the Division of Student Affairs

7   retreat on May 6, 2013?

8      A.   If we had a retreat, I probably led one of

9   the sessions when Dr. Brown was here, yes.

10      Q.   Do you recall whether those sessions

11   involved the Ryan Rotela matter?

12      A.   I do not.

13      Q.   Do you recall ever discussing the handling

14   of the Ryan Rotela case at the Division of Student

15   Affairs retreat on May 6, 2013?

16      A.   I don't recall that.

17      Q.   Do you ever recall stating - or do you

18   recall stating that -- Strike that.

19           Do you recall stating to the employees at

20   a session during the Student Affairs retreat on May

21   6th, 2013 that Dr. Williams failed to appropriately

22   communicate with you?

23      A.   I don't recall.

24      Q.   Do you recall making any statements

25   regarding Dr. Williams' management of the Ryan

Corey King Vol 2
March 10, 2016                              237

1    Rotela case to any employee at the University?

2              MS. WYDLER:  Object to the form.

3         A.   I do not.

4      BY MS. CHATTERGOON:

5         Q.   And let me just clarify that statement.

6    Other than legal counsel.

7              MS. WYDLER:  Object to form?

8         A.   I do not.

9      BY MS. CHATTERGOON:

10        Q.   Do you know whether, at the time of her

11   termination, whether Dr. Williams was in DROP?

12             MS. WYDLER:  Object to the form.

13        A.   I was not aware of that.

14     BY MS. CHATTERGOON:

15        Q.   Do you know what DROP is?

16        A.   I do.

17        Q.   What is DROP?

18        A.   I believe it's when you make an intention

19   that you're going to retire in a specific amount of

20   time and that's about all I know.

21        Q.   Was Dr. Poole ever suspended from the

22   University with regards to the Ryan Rotela incident?

23        A.   I'm not aware of that.  That would be an

24   academic matter.

25        Q.   Do you know whether the University ever

Corey King Vol 2
March 10, 2016

238

```
 1   put out a statement regarding his instruction at the

 2   University?

 3        A.   I do not recall.

 4        Q.   Did you ever meet with the Faculty Senate

 5   regarding the Ryan Rotela incident?

 6        A.   Members of the Faculty Senate, yes.

 7        Q.   Who did you meet with?

 8        A.   I can't recall who it was, but it was two

 9   or three members of the Faculty Senate regarding

10   this case in terms of academic freedom.

11        Q.   What about academic freedom?

12        A.   They wanted to know, did Student Affairs

13   at any point say this activity will not be done in

14   the classroom again.

15        Q.   And was that said?

16        A.   That was not said by me and Student

17   Affairs.

18        Q.   Did anyone in the Faculty Senate that you

19   met with discuss with you Dr. Williams' role in the

20   Ryan Rotela incident?

21        A.   I do not recall that discussion.

22        Q.   Do you recall a video -- Well, strike

23   that.

24             You mentioned earlier that there was a

25   video statement put out by Dr. Brown regarding the
```

Corey King Vol 2
March 10, 2016                                    239

1    Ryan Rotela incident, correct?

2         A.    Correct.

3         Q.    Did you ever have any discussions with

4    Dr. Brown about his video statement?

5         A.    Yes.

6         Q.    Can you tell me about those discussions?

7         A.    He said that the president wanted him to

8    do the video regarding his statement.

9         Q.    Did he say why?

10        A.    Because she felt it was a student and a

11   student matter.

12        Q.    Did the - that involve a student matter?

13        A.    Uh-huh.

14        Q.    Why was it -- Do you know why someone from

15   Student Academics didn't make the statement?

16        A.    They were asked first and they declined.

17        Q.    Why didn't the Provost make a statement?

18        A.    That I don't know.

19        Q.    Do you know if President Saunders asked

20   Dr. Brown to make the statement, the video statement

21   because he's black?

22             MS. WYDLER:   Object to the form?

23        A.    I'm not aware of that.

24     BY MS. CHATTERGOON:

25        Q.    Have you made any derogatory comments to

Corey King Vol 2
March 10, 2016

240

```
 1    Dr. Williams based on the color of her skin?

 2            MS. WYDLER:  Object to the form.

 3        A.   No.

 4     BY MS. CHATTERGOON:

 5        Q.   Have you made any derogatory comments to

 6    Dr. Williams based on her age?

 7        A.   No.

 8            MS. WYDLER:  Object to the form.

 9     BY MS. CHATTERGOON:

10        Q.   Do you recall whether Governor Scott got

11    involved in the Ryan Rotela incident?

12        A.   Yes.

13        Q.   What was his involvement?

14        A.   I believe he wrote a letter to the

15    Chancellor Frank Brogan.

16        Q.   Did you ever see that letter?

17        A.   I did not.

18        Q.   How do you know he wrote the letter?

19        A.   It was on the news.  They were talking

20    about it.

21        Q.   Do you know whether the - whether Governor

22    Scott asked for a report of the Ryan Rotela

23    incident?

24        A.   Honestly, that was above my pay grade, so

25    no.
```

Corey King Vol 2
March 10, 2016

241

```
 1        Q.   Did you ever tell Dr. Williams that she
 2   was too experienced to be in the position of
 3   Associate Dean of Students?
 4        A.   I don't recall that.
 5        Q.   Do you recall whether Senator Rubio ever
 6   got involved in the Ryan Rotela incident?
 7        A.   I cannot recall.
 8        Q.   Do you recall Dr. Williams telling you
 9   that she was receiving hate mail because of the Ryan
10   Rotela incident?
11        A.   Yes.
12        Q.   When did she tell you that?
13        A.   I don't -- I can't remember.  I don't
14   recall when it was, but she did say that, and the
15   faculty member as well.
16        Q.   Which faculty member?  Dr. Poole?
17        A.   Yes.
18        Q.   Did you ever discuss this incident with
19   Dr. Poole?
20        A.   Nope.  No.
21        Q.   When Dr. Williams told you she was
22   receiving hate mail, what was your response?
23        A.   I don't recall what that response was.
24        Q.   Did she ever show you any of the hate
25   mail?
```

Corey King Vol 2
March 10, 2016
242

1       A.   Not to my knowledge.

2       Q.   Did you ever receive any hate mail

3  regarding the Ryan Rotela incident?

4       A.   Not personally, no.

5       Q.   Do you know if Dr. Brown received any hate

6  mail?

7       A.   I'm not aware.

8       Q.   Do you have -- Do you recall any

9  discussions between yourself and Dr. Brown regarding

10  Dr. Williams' refusal to accept a Letter of

11  Reprimand?

12      A.   No.

13      Q.   Did Dr. Brown ever tell you that

14  Dr. Williams indicated to him that she would write a

15  rebuttal to a reprimand if given one?

16      A.   No.

17      Q.   Did you ever counsel or reprimand Terry

18  Mena or A.J. Chase?

19      A.   No.

20      Q.   Did you ever participate in drafting a

21  reprimand for Terry Mena or A.J. Chase?

22      A.   No.

23      Q.   Were you ever asked to give your

24  recollection of any events in support of a Letter of

25  Reprimand against Terry Mena and A.J. Chase?

Corey King Vol 2
March 10, 2016                                        243

 1       A.    No.

 2       Q.    Do you believe Dr. Williams should have

 3  been reprimanded for the wording placed in the

 4  Notice of Charges?

 5            MS. WYDLER:   Object to the form.

 6       A.    That's in the purview of her supervisor.

 7   BY MS. CHATTERGOON:

 8       Q.    You're in the position now as Vice

 9  President of Student Affairs, right?

10       A.    Yes.

11       Q.    So you are in the same position Dr. Brown

12  was in when he decided to issue the Letter of

13  Reprimand, correct?

14       A.    Yes.

15       Q.    Would you have made the same decision?

16            MS. WYDLER:   Object to the form.

17       A.    Depending on the circumstances.

18   BY MS. CHATTERGOON:

19       Q.    If the circumstances were the same.

20            MS. WYDLER:   Object to the form.

21       A.    Not able to answer that one.

22   BY MS. CHATTERGOON:

23       Q.    I'm sorry?

24       A.    I'm not able to answer that one.

25       Q.    Why not?

Corey King Vol 2
March 10, 2016

244

```
 1      A.   I don't know what I would do.

 2      Q.   Okay.  Do you know if Dr. Williams had any

 3  disciplinary actions during her employment with FAU?

 4      A.   No.

 5      Q.   No, you don't know; or no, she didn't?

 6      A.   I'm not aware before I arrived.

 7      Q.   Okay.  When you say before you arrived?

 8      A.   2008.

 9      Q.   From 2008 until her separation of

10  employment, do you know whether Dr. Williams had any

11  disciplinary actions taken against her?

12      A.   Not to my knowledge.

13      Q.   As the Vice President of Student Affairs

14  now, are you required to sign off on applications to

15  DROP for employees?

16      A.   I'm not sure.  I haven't had one yet, so

17  I'm not aware.

18      Q.   Do you know who Jill Eckardt is?

19      A.   Yes.

20      Q.   Who is she?

21      A.   She's the former Director of Housing and

22  Residential Life.

23      Q.   Do you know whether Ms. Eckardt was

24  terminated from FAU?

25      A.   I know she was separated, yes.
```

Corey King Vol 2
March 10, 2016

245

1      Q.   And when you say separated, what do you

2  mean by that?

3      A.   She was given a separation notice without

4  cause.

5      Q.   Do you not consider that a termination?

6      A.   I do not.

7      Q.   Why not?

8      A.   It's according to University policy that

9  states separation without cause.

10     Q.   Do you know why Jill Eckardt was given a

11  separation?

12     A.   I do not know.

13     Q.   Do you know whether Jill Eckardt had

14  disciplinary actions prior to her separation of

15  employment?

16     A.   No.

17     Q.   As the Associate Dean of Students and Vice

18  President, did you have any decision-making power

19  with regard to the Associate Dean of Students?

20          MS. WYDLER:  Object to the form.

21     A.   Clarification.

22  BY MS. CHATTERGOON:

23     Q.   Sure.

24          Did you -- Were you able to reprimand the

25  Associate Dean of Students?

Corey King Vol 2
March 10, 2016

246

```
 1        A.   Terry Mena, yes.

 2        Q.   Why Terry Mena?

 3        A.   He reported directly to me.

 4             MS. CHATTERGOON:  Let me just take a few

 5        minutes and I think we're done.

 6             MS. WYDLER:  I might have a few questions.

 7             (A recess was taken from

 8        5:18 p.m. until 5:25 p.m., after which the

 9        following proceedings were held:)

10   BY MS. CHATTERGOON:

11        Q.   I just have a few more questions,

12   Dr. King.

13        A.   Yes.

14        Q.   Going back to your conversation with

15   Dr. Williams on March 9th or 10th.  We've discussed

16   this emergency measures at length today.  You said

17   during that conversation that there was some

18   discussion about possible interim measures needing

19   to be taken, correct?

20        A.   Correct.

21        Q.   At that point, how were the interim

22   measures, if they needed to be taken, how were they

23   supposed to be implemented?

24        A.   Through a separate interim measures

25   letter.
```

Corey King Vol 2
March 10, 2016

247

1          Q.    Okay.  And did you discuss that with

2     Dr. Williams?

3          A.    I don't recall that.

4          Q.    Okay.  You also mentioned in order for

5     Dr. Williams to add language to the Notice of

6     Charges letter, that it would have required a

7     consultation with the attorney, correct?

8          A.    Yes.

9          Q.    Who would have had to consult with the

10    attorney?  Would that be Dr. Williams?

11         A.    Dr. Williams.

12         Q.    Isn't there a policy, Dr. King, that

13    states that you're the person that would have to

14    consult with the attorney?

15              MS. WYDLER:  Object to the form.

16         A.    I don't -- I'm not aware of that policy.

17      BY MS. CHATTERGOON:

18         Q.    Do you recall sending out a policy that

19    stated that the Associate Dean of Students were no

20    longer to contact the General Counsel?

21              MS. WYDLER:  Object to the form.

22         A.    I don't recall.

23      BY MS. CHATTERGOON:

24         Q.    Are the security and emergency measures

25    different on the Boca campuses as opposed to the

Corey King Vol 2
March 10, 2016

248

```
1    Broward campuses?

2         A.   No.

3         Q.   Why not?

4         A.   It's one Code of Conduct.

5         Q.   Are there different practices in

6    implementing emergency measures on the Broward

7    campus versus the Boca campus?

8         A.   Not that I'm aware of.

9         Q.   Is there police?  Is there student - I'm

10   sorry, campus police on the Broward campus?

11        A.   Today, yes.

12        Q.   In 2013, was there?

13        A.   Security officers.

14        Q.   How many security officers?

15        A.   I'm not aware of that number.

16        Q.   Were they campus police?

17        A.   No.

18        Q.   It was actual security officers?

19        A.   Yes.

20        Q.   Is there a difference between security

21   officers and campus police?

22        A.   Yes.

23        Q.   What is that difference?

24        A.   Campus police are sworn officers.

25        Q.   Okay.  We talked about the templates for
```

Corey King Vol 2
March 10, 2016

249

 1    the Notice of Charges and the Notice of Interim

 2    Suspension --

 3         A.   Yes.

 4         Q.   -- that was provided.  The dates on those

 5    were 2010 and 2011.  Was there a reason a template

 6    was sent out or given to the appropriate people?

 7         A.   You would have to ask Joanna Ellwood that.

 8         Q.   Joanna Ellwood was your subordinate,

 9    correct?

10         A.   Yes, but she is the Assistant Dean and she

11    administers the student conduct process.

12         Q.   Are you not involved with that?

13         A.   Only when she deems necessary.

14         Q.   Did you ever direct Joanna Ellwood to

15    create those templates?

16         A.   Those templates were in place prior to my

17    arrival in 2008.

18         Q.   And were those templates ever revised from

19    2008?

20         A.   Yeah, they've been revised over, yes.

21         Q.   Why were they revised?

22         A.   We typically have the attorneys look at

23    them periodically, just like the Student Code of

24    Conduct.

25         Q.   Was there ever an issue with the Notice of

Corey King Vol 2
March 10, 2016

250

1    Charges letter that required them to be revised?

2              MS. WYDLER:   Object to the form.

3      BY MS. CHATTERGOON:

4         Q.   That you know of.

5         A.   Not that I know of.

6         Q.   Since you've been the Vice President of

7    Student Affairs, have you been consulted on an

8    emergency measure taken on campus?

9         A.   I am.

10        Q.   Are you always consulted?

11        A.   Yes.

12        Q.   And is that a policy or a procedure?

13        A.   That's a practice that I ask for.

14        Q.   That you ask for when?

15        A.   When I became VP.

16        Q.   Was that a practice that Dr. Brown asked

17   for?

18        A.   I can say to me as his direct supervisor,

19   yes, he wanted to know.

20        Q.   Do you know whether he asked for it from

21   his Associate Dean of Students?

22        A.   I did not.  I'm not aware of what he had -

23   conversations he had with his direct supervisors.

24              MS. CHATTERGOON:   I don't think I have

25         anymore questions.

Corey King Vol 2
March 10, 2016                                           251

1                         CROSS-EXAMINATION

2       BY MS. WYDLER:

3           Q.    Dr. King, as far as any sort of

4    professional opinion or interpretation of the

5    Student Code, is it fair to say that as the Chief

6    Judicial Officer for the University you have that

7    authority?

8           A.    I do, yes.

9                 MS. WYDLER:   I don't have any other

10          questions.

11                MS. CHATTERGOON:   Counsel?

12                MS. MOLDOF:   No, no questions.

13                MS. WYDLER:   We'll read.

14                (Thereupon, the proceedings concluded at

15          5:30 p.m.)

16

17

18

19

20

21

22

23

24

25

Corey King Vol 2
March 10, 2016                                                    252

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF BROWARD


      I, the undersigned authority, certify
that DR. COREY KING personally appeared before me
and was duly sworn.

      WITNESS my hand and official seal this
10th day of March, 2016.


_____
ASHLEY C. NEHME, FPR
Notary Public, State of Florida
My Commission No. FF899454
Expires: 11/12/19

Corey King Vol 2
March 10, 2016                                        253

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF BROWARD

I, ASHLEY C. NEHME, Florida Professional
Reporter, do hereby certify that I was authorized
to and did stenographically report the foregoing
deposition of DR. COREY KING; that a review of
the transcript was requested; and that the
transcript is a true record of my stenographic
notes.

I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.

Dated this 23rd day of March, 2016.



_____
ASHLEY C. NEHME, FPR

                    WITNESS NOTIFICATION LETTER

March 23rd, 2016

MARRERO & WYDLER
DOUGLAS CENTRE, PH-4
2600 Douglas Rd.
Coral Gables, FL 33134
ATTN:  LOURDES WYDLER, ESQ.

Re:  WILLIAMS V. FLORIDA ATLANTIC UNIVERSITY
Case No.:  15-CV-60621-DPG
U.S. LEGAL SUPPORT JOB NO. 1383803

The transcript of the above-referenced proceeding
has been prepared and is being provided to your
office for review by the witness.

We respectfully request that the witness complete
their review within a 30 days and return the errata
sheet to our office.


Sincerely,


ASHLEY C. NEHME, FPR
U.S. Legal Support, Inc.
100 N.E. 3rd Ave., Ste. 1050
Fort Lauderdale, Florida 33301
(954)463-2933


CC via transcript:

CHRISTOPHER J. WHITELOCK, ESQ.

Corey King Vol 2
March 10, 2016

255

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re:  WILLIAMS V. FLORIDA ATLANTIC UNIVERSITY
Case No.:  15-CV-60621-DPG
DR. COREY KING
March 10th, 2016

PAGE    LINE        CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____          _____
Date                            DR. COREY KING

U.S. LEGAL SUPPORT
(813) 876-4722

Corey Young Vol 2
March 10, 2016

1

**1**

**1**   100:1
134:11 162:20
**10**   119:3,6,7
150:3 174:7
178:20
**10D**   150:11,13
**10th**   155:25
166:9,23
167:2,7,23,25
169:8 194:7,
12,14 195:12
199:25 200:5,
13,24 207:18
214:23 216:2
222:14 223:2,
8 225:25
246:15
**11**   133:23
134:1
**116**   115:6
**11th**   197:5
198:9 200:9,
14
**12**   108:25
152:25 153:3
155:4 231:8
**121**   115:7
**12th**   173:11
199:7
**13**   114:19
155:12,15,16
167:8 199:23
208:20
**14**   195:16
**1439**   188:10
**1440**   188:11
**1447**   189:13
**1452**   191:3
**1454**   202:3,6
**14B4**   182:3
**15**   108:25
181:13,17,18,
23 182:13,14,
18 199:20,22

200:4
**1506**   153:3
176:19
**1513**   218:19
**1515**   212:12
217:5
**1517**   217:8
**1520**   218:3
**1521**   218:4
**1522**   211:22
**15th**   200:14
202:1
**16**   181:13
211:19,22
**16th**   179:13
**17th**   218:4,8,
17
**18**   161:5
201:6 220:13
**184**   195:19
**186**   197:11
**188**   195:19
**18th**   188:21
208:7 220:24
221:9,17
**19-year-old**
161:5
**1995**   104:19
**1st**   196:7,22,
25 197:2,6,7

2

**2**   116:13
162:20 181:20
182:7 188:24
**2,000**   104:13
**20**   161:5
**20-**   118:12
**200**   132:1
**2001**   103:16
104:19
**2004**   103:16,
19
**2008**   102:5,14
103:19 107:7

112:7,9,19
114:16,17
121:13
172:16,19
244:8,9
249:17,19
**2009**   121:12,
13,15 231:17
232:3
**2010**   109:18
110:3 249:5
**2011**   108:1,9
155:18,25
162:2 166:9
167:10 169:24
170:2 178:20
249:5
**2012**   108:12,
13 110:5,9
114:19 115:12
118:12 173:11
199:23
**2013**   108:14
110:5,9
115:12 118:12
136:11 144:23
146:22,24
178:22 186:10
188:12,21
189:13,22
195:12 200:12
203:25 209:16
210:25 212:15
217:4 218:5,8
220:11 221:9
229:6 236:7,
15,21 248:12
**2014**   108:1,16
109:18 117:18
128:14
**2015**   128:22
**2016**   134:2
**20th**   206:25
**23**   155:18
**23rd**   162:2
166:24 167:2,
8 168:1
169:24

**25th**   136:11
144:23 146:24
188:12 195:22
210:25 229:6
**26th**   189:11
195:23
**27,000**   104:14
**28th**   189:10,
12 214:19
**29th**   196:4
**2:46**   137:14
**2:47**   137:14

3

**3**   138:22,23
160:1
**30,000**   204:13
224:23 225:1
**3:48**   185:2
**3:52**   185:2
**3A**   164:8
177:4
**3rd**   170:2

4

**4**   166:4
181:19 182:2
**4.007**   186:25
**4979**   156:25
**4:00**   189:22
**4:48**   226:18
**4:52**   226:18
**4th**   134:2
199:25 200:5

5

**5**   145:2
**5.008**   145:22
**5.12**   119:8
**560**   155:16
**562**   166:10
**563**   170:1

Corey Zing Vol 2
March 10, 2016

2

| | |
|---|---|

**566** 155:17
173:10
**579** 119:7
**583** 119:8
**5:18** 246:8
**5:25** 246:8
**5:30** 251:15
**5th** 197:14
212:15 215:10
220:10

---

**6**

**6** 146:18
180:20 187:7,
8 236:7,15
**613** 157:2
**6:00** 157:1
**6th** 236:21

---

**7**

**7** 184:6
188:6,15
201:2
**7/17/70** 106:6
**7th** 189:21

---

**8**

**8** 181:11
182:7,15
209:19
**8:50** 157:1
**8th** 215:3
217:4 218:7,
17

---

**9**

**9** 114:16,17
115:3,6
158:20 159:9,
22 160:20
174:6,20
182:15

**98** 130:16,17
**99** 130:15,16
**9A3** 163:14,16
165:12,14,18
207:22
**9A3B** 171:7,18
**9B** 162:17
174:20
**9th** 194:14
195:12 199:12
200:13,24
207:18
212:23,24
213:17 214:23
216:2 219:16,
21 222:14
223:2,8
225:25 226:8,
9 246:15

---

**A**

**A.j** 130:23
155:6
**A.j's** 131:6
**A.J.** 110:1,2,
6,18 111:10
121:18,25
129:3 148:25
173:8 180:13
228:15
242:18,21,25
**A3** 164:3
**A3a** 164:8
**ability**
149:10
**abuse** 204:18
**academic**
199:23 224:8,
17 230:14
237:24
238:10,11
**academics**
229:13,15
239:15
**accept** 242:10
**acceptable**

116:24
**accepted**
118:16
**access** 140:25
160:6,7,10
163:20
164:10,25
**accommodation**
140:24
**accommodations**
139:23
**account**
212:10
**accurately**
217:10
**accuse** 233:12
**accused** 176:9
**acted** 149:7
**action** 116:21
120:8 126:7
134:15,16
160:23 162:20
163:12,14
172:5 174:23
**actions**
113:12 114:3,
5 116:19,20
123:5 127:4
163:2 195:4
202:12 244:3,
11 245:14
**activities**
109:7 137:25
138:18 160:9
**activity**
135:12 136:3,
4,6 224:7
238:13
**actual** 112:25
123:16 168:13
209:7 219:3
248:18
**ADA** 138:15
**adamant**
227:18
**Adamo** 106:7,
15

**add** 150:5
247:5
**adding** 220:1
**addition**
170:17
**additional**
150:18 215:17
220:6,23
221:18
**adjusted**
150:6
**administer**
113:12,14
114:2,4
**administers**
135:1 249:11
**administrative**
114:9 116:2
**Administrators**
107:16
**advised** 210:3
**Affairs**
100:22 101:5,
19,24 102:8
103:21 104:4,
10 106:24
107:15 109:7,
12 121:1
124:16 146:12
180:24 186:2
235:20,23
236:6,15,20
238:12,17
243:9 244:13
250:7
**afraid** 193:7
**age** 106:3
240:6
**agenda** 155:24
156:13 208:24
209:2,3,4
**agree** 171:7
**agreed** 195:7
**agreement**
184:20,22
**agrees** 148:11
**ahead** 125:15

Alex  126:19, 25
Alice  126:24 190:7
allegation 125:23
allegations 179:17,18,19
alleged 134:14 147:4 154:1 174:16
allegedly 192:21
allowed  178:1 179:9 189:17, 25 231:5
allowing 140:24
altercation 140:4,14
altered 216:14
alternative 229:14,17 230:4,13
alumni  117:15 142:16,17 143:24
alumni's 144:4
amount  237:19
and/or  146:13
annual  121:9 236:3
answers  134:1
antidiscrimination  111:20 112:8
anymore 250:25
apologize 188:3 231:21
appeal  187:15
applications 244:14
applied  118:7

apply  118:11, 13,14,24
appraisals 113:24
approached 220:8
appropriated 165:17
appropriately 236:21
approval 132:4 149:18, 20 150:13,20 183:16 186:7
approve 110:24 111:1 152:4
April  173:11 212:15 215:10 217:4 218:4, 7,8,17 220:10
areas  128:9 164:14 165:23 179:11,12
Argumentative 158:12
arrested 100:15
arrival 249:12
arrived 244:6,7
Artie  106:18
Arts  134:20
Ashley  206:5
aspect  224:8
assault 204:18
assessment 183:20
assigned 235:14
assist  139:19 145:18
Assistant 102:19 103:1 104:6,23

116:6 129:20, 21 130:6,10, 13 183:22 204:1 249:10
assisted 177:11 210:1
associate 102:1,3,6,10, 13 104:1,24 107:6 108:20 109:10,11,16, 18 110:10 117:23 119:24,25 120:14 121:14,18,20, 22 122:9,18 123:12,20 129:2,13,24 130:6,9,17 135:22 138:15,25 139:21 148:9, 12,23 150:18 151:8,21 152:13 153:5, 12 171:16,20 177:20 178:1 183:13,23 186:1 196:13 203:24 225:5 228:21 229:2 241:3 245:17, 19,25 247:19 250:21
Association 107:14,16
assume  201:12 228:22
assuming 120:22,23 121:4 141:22 198:19 199:9 223:20
assumption 205:21 208:10
Atlantic 105:24 119:9

attached 188:23,25 189:3 203:5 217:11
attempt 123:15,17
attempting 143:13
attend  107:25 110:14 111:4, 8,11,23 149:10 156:25 162:21 174:17 215:13
attendance 160:5,11 163:18 164:9, 24 233:16
attended 108:9 112:5 156:7 161:11 180:9 234:10
attending 207:9
attends  180:2
attention 205:1
attorney 176:10 206:21 208:11 230:24 247:7,10,14
attorneys 209:23 249:22
authority 101:12 131:18 149:11,18,20 150:13,20 183:16 186:5, 13 251:7
auxiliaries 104:11
aware  125:23 132:7,8 136:2 137:8 140:8,9 143:18 147:24,25 148:13 150:1 167:14,15

172:22,23
173:3 175:14,
9,20,22,24
176:4,6,23
195:11 198:13
204:9,15
205:14,17
206:12,13,14
219:18 220:5
222:9 224:18,
20,22 225:3,
4,11,20
232:2,5,9,10,
13 235:7
237:13,23
239:23 242:7
244:6,17
247:16 248:8,
15 250:22

**awareness**
170:21

## B

**bachelor's**
105:6
**back** 100:5,6
103:1 107:20
123:14 137:17
146:16 148:18
158:19 159:21
162:17 166:8
171:10 174:20
177:24 180:19
181:5 187:7
193:8,10
199:4,10
206:5,7
208:20 209:18
210:21 220:16
230:7 246:14
**background**
105:2
**ban** 160:8,10
**banned**
140:14,20
**bar** 149:7
160:5,6,7

163:18,20
207:20
**barred** 164:8,
10,13,24,25
182:19
**barring**
160:11 177:8
**based** 128:4
141:4 179:6
189:9 203:17
206:9 214:18
240:1,6
**basic** 143:17
**basically**
139:20 232:9
**basis** 181:20
**begin** 121:10
**beginning**
168:21 229:19
**begins** 127:8
180:21
**behavior**
116:23 194:4
**behaviors**
193:24 213:12
214:18
**belief** 117:1
152:17
**big** 233:13
**birth** 106:5
**bit** 130:25
**black** 233:2,6
239:21
**board** 152:20
180:4
**Boca** 109:20,
21 121:22
129:14 148:23
207:8,21
228:1,2
247:25 248:7
**bold** 189:19,
20
**bolded**
179:11,12
**boss** 230:13

**BOT** 186:23
**bottom** 182:15
**bread** 226:16
**break** 137:12
184:24
199:24,25
200:1,2,4,8
**Brett** 133:13
**Brian** 123:25
124:1,4
**bring** 187:13
205:1
**Brogan** 240:15
**brought**
125:13 167:21
168:8,11
169:16 204:20
231:4
**Broward**
109:21 248:1,
6,10
**Brown** 102:9,
10 107:10
110:23 111:14
121:19,21
122:1 124:5,
10 145:8
146:1,8 147:9
148:4,7,8,10
149:14 151:2
209:25 210:3,
6,16,25
211:4,8,14
212:7,16,17
215:20
218:18,25
220:4,5,23
221:16,21
222:3 224:18,
20,22 225:8,
11,14,18
226:2,8,22
227:5 228:24
229:3,11
232:6,13,14
234:3,14,20,
23 235:18
236:9 238:25

239:4,20
242:5,9,13
243:11 250:16
**Brown's** 122:5
124:8 218:5
**buildings**
140:17

## C

**calendar**
199:23 200:11
201:9 212:24
**call** 143:16
191:7 194:15
207:15,18
**called** 137:23
142:16 206:2
219:15
**calling** 188:2
201:25
**campus** 104:8,
11 109:6
133:8,10
140:5,14,20,
25 143:14
148:23 164:4
194:5 207:8,
21 213:13
227:25 228:5
235:13 248:7,
10,16,21,24
250:8
**campuses**
110:3 121:21
182:20 196:14
247:25 248:1
**canceled**
190:19,24
196:1,25
199:6 209:10
**canceling**
190:20 196:23
**cancellation**
198:18
**candidates**
101:18

Corey Long Vol 2
March 10, 2016

5

**capacities**
106:10
**capacity**
100:11
123:11,12
129:19 168:15
191:1
**care** 143:12
164:6
**career** 127:17
128:7
**Carolina**
102:16,18,21
103:1,10,18
105:20
**case** 134:18
135:9,21
151:19 154:4
155:9 168:8,
11 169:16
172:8,17
191:16,18
192:15 195:9
205:9 208:18
210:9 212:21
236:14 237:1
238:10
**cases** 162:7
195:3 216:17
**center** 127:17
128:7 133:1
**certificate**
180:5
**certificates**
112:24
**chaired**
183:22
**chance** 211:23
213:4
**Chancellor**
102:19 103:2,
7 104:2,7
240:15
**change** 154:1,
2,3 165:22,23
178:1 179:6,
10,22,24
189:17

**changed**
189:25 190:6,
7 220:6
**changing**
163:23
**charge** 104:8,
11 127:16
144:24 167:21
215:11 221:2,
5,7
**charged**
213:15
**charges**
136:15 138:5
144:25
149:17,22
150:5,12,22
151:17,20,23
152:5 154:1
155:1,18
156:16,20
159:15
162:16,20
164:1 165:7
167:13,14,16
168:24 174:5,
8,14 175:3
176:13,19,22
177:25 178:3,
8 179:2,9,12,
20 183:15
184:8,9,12,15
185:6,7
187:13,18
192:4 195:8
202:6,16
207:25 208:2,
13 214:7,9,
12,18,21
215:17 216:6,
10,13,14,18
219:11,19
220:1,7,24
221:9,11,13,
18,24 222:11,
17,25 223:9,
13,14,22
224:14 225:9
226:14 227:3

243:4 247:6
249:1 250:1
**Charles** 102:9
209:25
**Chase** 109:20
110:1,2,6,18
111:11 121:25
122:6 129:3
130:23 147:22
148:25 155:6
173:8 180:13
228:15
242:18,21,25
**CHATTERGOON**
100:4 115:4
119:4 125:17
131:23 133:24
136:23
137:11,16
138:11 144:20
147:20 148:17
153:1,18,19
155:13
158:15,24
159:3,13
161:7,18
162:1,8
165:24 166:20
167:4 169:12,
15 171:1,12
173:4 175:7
176:7 177:17
183:9 184:23
185:4,21,24
186:19 193:18
195:17 199:21
206:4,8
210:20 211:20
214:4 216:23
222:21 224:11
226:5,15,20
231:20 232:1,
12 233:20
234:13 237:4,
9,14 239:24
240:4,9
243:7,18,22
245:22 246:4,
10 247:17,23

250:3,24
251:11
**Chief** 134:25
147:18 196:14
225:22 251:5
**child** 143:12
**choice** 176:16
**choose** 202:14
**chose** 207:19,
22
**chosen** 123:15
**Christian**
155:19 156:3,
17 159:15
162:2,11
166:17 167:20
168:4 169:6,
19 170:15
185:8 191:21
192:1 225:10
**Christian's**
166:8
**Circuit**
187:15
**circumstances**
170:4 171:4
173:16
243:17,19
**citing** 195:2
**civil** 234:5
**claim** 105:14,
22 138:17
156:18
**claimed**
146:20
**claiming**
137:25
**claims** 134:12
**clarification**
203:4 245:21
**clarify** 208:1
237:5
**class** 116:3
137:10 138:10
140:17 149:8,
10 156:25
158:17 159:20

Corey Strong Vol 2
March 10, 2016

6

160:12 162:22
163:12,20
164:24 165:22
192:21 193:8,
10,17,21
207:8,10
213:14,19,25
215:13 221:23
223:17 224:7,
16,19,21
230:5,7
**classes**
143:13 149:11
160:5 163:19
164:9 177:8
199:16,24
207:21
**classroom**
135:13 136:3,
5,13,18
137:5,8,9
138:1,18
192:18 238:14
**clear** 110:9
150:12 162:25
163:25 168:1
**code** 147:4,19
150:3 154:15
158:19,20
160:14 162:18
166:25
174:12,13,15
175:10,15
180:22 181:8
183:11
187:11,17
203:3 210:11
248:4 249:23
251:5
**college**
105:4,5
107:15
134:20,22
234:10
**color** 240:1
**Coltman**
134:17,19
229:20

**combine**
176:12,16
**combining**
175:13
**comments**
233:15 234:8
239:25 240:5
**committee**
101:8 130:1
131:6,7,12
183:19,22
**committees**
195:3
**communicate**
171:21 236:22
**communicated**
146:1 158:5
171:21
**Communication**
128:8
**community**
117:16 160:4
163:21 193:25
194:23
**comparing**
218:7
**complain**
142:17
**complained**
140:15 231:16
**complains**
138:24
**complaint**
106:16 107:3
136:4 139:1,
3,4,6,13
141:5 142:10,
19 143:3
231:17 232:2
**complaints**
231:9,12
232:14
**completed**
141:18,20
**completely**
191:19
**completion**
112:24 180:6

**Composite**
155:12,15
**computers**
179:4
**concerned**
193:16,19
224:18
**concerns**
200:18 232:5,
7,19,20
**concluded**
251:14
**conduct**
104:24 109:8
134:25 135:1
147:4 150:3
151:6,11
152:3,20
154:15
158:20,21
160:10 165:8
167:18 172:6
174:12,18,19
175:11 180:3,
22 181:9
182:24 187:12
201:25 202:4,
8 203:3,24
204:2 210:12
215:16,19
224:2,3,6,10
225:22 231:7
248:4 249:11,
24
**conducted**
189:10
**conference**
165:8 174:18,
19 189:12
190:10 201:25
202:5,8
**conferences**
107:10,11,21,
25 108:9
110:13,15,19,
24 111:2,5,8,
11,15 117:24
**confronted**

192:22
**consideration**
172:8
**considered**
200:1
**consistent**
117:2 145:22
**constitute**
173:25
**consult**
149:24
151:10,14,15
161:22 162:5
213:16 227:23
228:18,19
247:9,14
**consultation**
147:9 165:15
171:25 172:11
180:23 190:2,
4 194:18
225:17,19
247:7
**consulted**
145:11 151:18
162:6,10
209:25 210:6
228:15 234:25
250:7,10
**consulting**
151:3 184:5
**contact** 149:9
160:6 163:21
164:10,25
170:4,12
171:4 173:16
190:7 215:13
229:5,10
231:23 247:20
**contacted**
135:11,15
**contained**
114:21 126:6,
8
**continue**
100:1 230:6
**CONTINUED**
100:3

continuing
  169:18
conversation
  136:1,7,25
  137:4,7,18,20
  138:2 150:7
  194:7,10,13,
  21 195:1
  200:12 207:3,
  5,11 208:19
  213:20 214:22
  215:5 216:1,7
  219:15,21
  222:13,14
  223:6 224:16
  225:24
  229:19,21
  246:14,17
conversations
  148:1 207:17
  250:23
convicted
  100:15
coordinator
  104:22 138:15
copy  113:3
  217:22
Corey  218:21
corporate
  168:16
correct  111:2
  119:21,22
  120:16,19
  126:15 142:13
  148:14 153:15
  154:13,17
  156:19 158:8
  160:13
  161:12,15
  164:20 165:1
  166:13 167:10
  168:17 169:1,
  2 170:16
  174:12,24,25
  176:24 182:25
  187:5 188:12,
  13 191:5
  193:3 195:23
  198:11 200:5,

9 201:7,8,11
  203:10 212:5,
  6,25 217:2
  239:1,2
  243:13
  246:19,20
  247:7 249:9
correctly
  212:9
correspondence
  174:14
counsel
  149:25 150:8
  151:4,14,15,
  18 152:9
  162:5,6
  165:16 171:22
  172:1,12
  176:15,25
  177:1,10,13,
  22 183:17
  184:20,21
  187:25 190:5
  205:22,23
  210:2 215:19,
  23 216:4
  230:25 237:6
  242:17 247:20
  251:11
Counsel's
  149:18,21
  150:14,21
  151:10 161:22
counseled
  103:6
Counseling
  196:15
couple  191:2
court  115:2
  119:2 133:22
  152:24 155:11
  187:15 195:15
  199:19 211:18
create  249:15
credit  230:6
crime  100:16

CROSS-
EXAMINATION
  251:1
current
  100:21
curriculum
  105:6
Customer
  117:10,11

_____

D

data  154:4
date  106:5
  112:12 136:12
  154:2 165:8
  168:13 174:18
  179:13,20
  189:21 190:6,
  8 197:8
  209:2,3,10
  219:2 229:9
dated  134:2
  155:18,24
  162:2 170:2
  173:11 188:21
  195:22 212:15
  215:9 218:4,7
dates  167:11
  249:4
daughter
  142:17 144:5
Davie  213:13
day  204:14
  225:21,23
days  167:8
  194:16
deals  196:18
Dean  102:1,4,
  7,14 104:23,
  25 107:7
  108:21
  109:11,12,16,
  19 110:10
  116:5,6
  117:23 119:24
  120:14 121:14
  122:10 123:13

129:2,13,20,
  21,25 130:6,
  9,10,13,17
  134:19
  135:16,17,19,
  22 138:25
  139:21 147:8,
  17 148:23
  150:19 151:8,
  21 152:13
  153:12 160:1,
  4 171:16,20,
  22 172:1,23
  177:20 178:1
  182:23
  183:13,23
  186:1 203:24
  204:1 225:21,
  23 229:2,20
  241:3 245:17,
  19,25 247:19
  249:10 250:21
Deandre
  134:20 192:25
  193:2
deans  121:18,
  20,22 148:9,
  13 153:5
  196:13 225:5
  228:21
decide  128:2
decided
  125:9,25
  126:2,4 128:2
  210:3 235:24
  243:12
decision
  101:9 112:14
  122:5 124:8,9
  127:20
  131:14,17
  133:6 145:6
  146:9 149:13
  176:16 184:7,
  9,18 197:3
  204:24,25
  209:24
  217:19,20
  234:18,21,24

Corey Long Vol 2
March 10, 2016

8

235:17 243:15
**decision-making** 145:6
245:18
**decisions**
187:15
**declined**
239:16
**deems** 249:13
**Defendant**
146:20
**defense** 219:4
**deferred**
181:24 182:5
**definition**
154:5
**degree** 105:6,
7
**demanded**
139:20,21
140:23 141:2
**department**
109:2 115:8
131:24 141:11
147:15 204:3
**Depending**
243:17
**depends**
204:23
**depose** 100:10
**deposing**
191:1
**deposition**
100:10 168:16
216:19
**derogatory**
233:15 234:8
239:25 240:5
**describe**
138:23
**describing**
203:9
**description**
174:16
**designee**
150:19 151:9
177:20 178:1

**designees**
151:22 153:5
225:23
**detail** 143:11
**details**
140:19
222:18,22
**determination**
198:7
**determine**
116:22
**determines**
160:1
**develop** 118:8
**developer**
126:23
**deviate**
186:5,14
**difference**
153:20,23,24
248:20,23
**difficult**
234:5
**direct** 100:3
110:25 204:5
232:18 249:14
250:18,23
**directed**
124:10
**direction**
124:7 228:19
**directly**
131:25 225:13
232:18 246:3
**director**
120:25 123:24
125:1 133:1,
8,10,19
138:15 152:3
196:12 203:24
204:1 244:21
**Disabilities**
125:2
**disability**
139:3,18
140:24 141:10
**disagreement**

228:23 229:1
**disciplinary**
113:12 114:3,
5,22 115:8,
16,24 116:19,
21 119:20
120:8 123:5
127:4 137:2
138:4 244:3,
11 245:14
**discipline**
117:2,4 119:9
122:11
**disciplined**
103:6 120:4
**discrimination**
105:15,23
106:1,3
112:14,19,23
113:8 135:12
137:25 138:17
231:10
**discriminatory**
136:5
**discuss** 141:6
144:7 147:21
148:3,9 167:6
177:12,21
188:1 190:23
211:3 219:10
222:18,22
226:1,6,24
230:8 232:19
236:2 238:19
241:18 247:1
**discussed**
113:21 148:6,
19 150:24
161:15 166:15
167:20,25
168:3,5,8
169:5,7,17,20
177:9 180:16
189:1 198:21,
23 202:19
203:7 210:24
211:10 215:24
216:5 217:8
222:7 226:1

227:2 230:4
246:15
**discusses**
119:19
**discussing**
141:17 146:24
149:13 185:6
192:9 209:14
211:7 226:22
228:7 236:13
**discussion**
141:13 144:17
156:11 162:12
191:11 199:10
221:12 223:1
238:21 246:18
**discussions**
176:14,24
200:15 223:4
230:16 239:3,
6 242:9
**distinction**
116:10 122:3
**Diversity**
106:24
**Division**
236:6,14
**docket** 209:5
**Docs** 188:23,
24 201:6
**doctorate**
105:8
**document**
115:1 119:1,
7,17,23
133:21 134:4
152:23
155:10,21
157:8,11
195:14 199:18
200:3 201:19
209:8 211:17
221:9
**documentation**
139:22 140:23
141:3
**documents**
112:22,25

Corey Long Vol 2
March 10, 2016

9

115:6 126:1,3
188:14,25
189:3,9
201:14
202:10,18,22
203:6,21
204:8 205:4,
7,9,13 208:8
211:23,25
220:14,16,19,
21 221:3,5,6
**dot** 179:16,17
**downsized**
128:5 130:5
**draft** 176:11
217:23
**drafted** 179:2
**drafting**
145:18 177:11
210:1 242:20
**drop** 140:18
184:7 237:11,
15,17 244:15
**dropped**
184:15 208:13
227:3
**drug** 204:18
**drugs** 204:19
**due** 140:14
**duties** 104:6,
9 130:21,22
186:1,4,10
235:8

**E**

**E-l-v-y** 127:7
**earlier**
121:17 130:2
154:11 156:9
168:15 170:14
176:18 177:2
182:10 185:18
186:9 190:25
212:7 216:8,
15 220:18
238:24

**East** 102:16,
17,21 103:1,
10,17 105:20
**EC** 109:5
**Eckardt**
244:18,23
245:10,13
**ECU** 103:23
104:13
**Ed** 135:15
136:25 137:18
138:14 139:1,
9,12 141:10
143:1 144:2
**Ed's** 135:11
**Education**
118:2
**educational**
105:1
**Edward** 135:8
**EEO** 231:21
232:16
**EEOP** 112:4
113:4 125:6
**electronically**
170:6 171:5
173:18 215:14
**eliminate**
130:12
**eliminated**
128:6 130:4,
7,13
**Ellwood**
129:15,16
134:23 152:2,
10 153:7
156:19 167:18
180:8 188:19
201:5,15
203:22 204:8
208:9 221:1
249:7,8,14
**Elvy** 127:7
**email** 188:16,
18,24 189:4,6
191:3 195:20
196:23
197:11,17

198:9 199:8
201:3,5
202:17 203:5
205:11,12
213:5,6,10,11
214:15 215:9
217:1,5
218:21 219:8
220:25
**emails** 212:2,
3
**emergency**
147:5,8,23
148:2,4,7,14,
22 149:4
154:10,12,16,
20 157:4,7,9,
22,23 158:4,
21 159:4,5,
10,11,12,16,
17,19,21
160:13,19,20,
22,25 161:4,
14 162:4,18,
25 163:1,3,7,
9 164:17
166:16 168:9,
12,16,20
169:5 170:25
171:6,13,18,
23,25 172:3,
4,18,24
173:14,21
174:1,4,21,22
175:17
176:13,21,22
177:3,6,10,
12,19 178:10,
14 181:12
182:9 183:3,
25 184:4
186:15 187:4
191:25 192:4,
7 194:19,22
195:4,8
196:19 197:2,
4 199:15
200:19 214:1,
13 216:10,17

222:19,24
223:2,8
227:24 228:5,
7,11,16
246:16 247:24
248:6 250:8
**employed**
128:17 129:4
**employee**
114:8,14,19
115:7 116:17,
21,23 119:8
120:4 122:11
123:6,8
124:13 126:3,
4,17 139:5
237:1
**employees**
108:22 110:24
113:16 115:22
116:4 120:18
122:17,21
123:17
124:17,21
127:23 132:1,
11,22 235:20,
24 236:19
244:15
**employment**
105:24 114:15
145:3,7,13
146:13 235:21
236:3 244:3,
10 245:15
**end** 225:21,22
**ensure** 185:13
229:12
**entail** 117:13
**entire** 182:21
187:11
**EOP** 138:21
139:5 141:15
142:6,16,23
143:15
**equals** 233:10
**equipment**
160:8

essential
  186:1,4,10
established
  186:6
ethical
  112:14
evaluate
  113:13,16
  120:18,21
  121:4,5
evaluated
  122:6
evaluating
  121:11
evaluation
  121:3,8,9
evaluations
  113:24 120:16
events   242:24
exact   112:12
  229:9 232:8
EXAMINATION
  100:3
examples
  153:4
Executive
  133:8,10
exercise
  136:20,22
  192:18
exhibit
  115:3,5
  116:13 119:3,
  7 133:23
  134:1 152:25
  153:3 155:4,
  12,16,17,23
  158:22,24
  173:13 188:15
  195:16 199:20
  200:4,11
  201:2 208:20
  211:19,22
  218:20
expectation
  153:9
Experience
  104:2

experienced
  212:17,21
  241:2
Experiences
  102:20 103:3,
  8
explain
  116:18 176:8
explained
  130:2 213:13,
  15,17 214:6,
  11,16
explaining
  216:16
explanation
  212:8
exposed
  187:9,12
exposing
  149:19 183:17
express
  200:18

---

### F

facilities
  160:8
fact   120:18
  134:14 143:14
  158:13 184:19
  208:8 215:18
  234:9
facts   125:7,
  9,12 134:15
  143:18 192:14
faculty
  192:22,24
  193:2,6,15,
  19,24 213:12,
  14 238:4,6,9,
  18 241:15,16
failed   236:21
fair   224:12
  251:5
fall   108:7
  152:19 180:1
fashion

229:14,18
father   234:4,
  5
FAU   100:21
  101:25 102:14
  106:10 107:8
  109:5 111:4
  118:19 128:17
  142:16,17
  143:23 145:22
  149:18,19
  170:5 171:4
  173:17
  183:17,18
  187:9 189:9
  210:2 244:3,
  24
FAU'S   183:16
  199:23
FAU1505   153:3
FAU1513
  211:22
February
  136:11 144:23
  146:22,24
  155:25 166:9,
  23 167:2,7,
  23,25 169:8
  188:12
  189:11,12
  190:14 195:22
  196:4 210:25
  214:19 229:6
feedback
  132:15
feel   232:22
fell   134:21
felt   124:5
  139:19,20
  239:10
female   126:15
  127:11,12
  128:11 129:15
  131:4 133:19
filed   106:15
  134:14 231:12
final   141:21
  142:2,3,4

143:19,20
finalization
  222:19
find   143:14
  188:25 202:17
  203:6 230:13
findings
  142:1
finish   169:9
  230:14
firm   227:18
firsthand
  142:18,20
flags   167:3,5
flexible
  179:21
Florida
  102:23 104:17
  105:5,7,16,24
  112:16,17
  119:9
flowchart
  168:19
focus   224:9
focused
  192:20 224:7
follow   228:19
  229:11
form   113:1
  125:15 131:22
  136:19 138:8
  140:10 147:16
  148:15
  153:15,17,21
  154:5,7,9
  158:11 159:8
  161:2,15
  165:19 166:18
  170:18 173:2
  175:5 177:15
  178:4 183:5
  186:18 193:13
  201:19
  202:11,13
  210:18 214:2
  216:21
  222:13,16
  224:4 226:3

231:19 232:4
233:18 234:11
237:2,7,12
239:22 240:2,
8 243:5,16,20
245:20
247:15,21
250:2
**formal** 210:5
**format** 163:23
**forms** 201:18
**Fort** 235:13
**forum** 190:23
202:14
**forward**
124:11 206:23
**forwarded**
217:1
**found** 216:7
**Fourteen**
208:21
**fourth** 180:21
**Frank** 240:15
**free** 232:22
**freedom** 224:8
238:10,11
**Friday** 179:13
**Fridays** 157:1
**front** 188:16
**frustration**
192:19
**fully** 147:24,
25
**furnished**
154:16 159:11
160:21 172:4
174:22

---

**G**

**G-r-a-v-e-s**
126:21
**gave** 112:1
152:10 156:19
170:17 209:7
219:5

**gender**
105:15,22
**general**
149:18,21,24
150:7,14,21
151:4,10,14,
15,18 152:8
161:22 162:5,
6 165:16
171:22 172:1,
12 176:15,25
177:1,10,13,
22 183:17
187:24 190:5
205:12
215:19,23
216:3 230:24
247:20
**generally**
139:24
**give** 105:1
120:9 143:17
151:16 162:20
193:22 203:13
212:8,10
217:25 234:19
242:23
**giving** 132:15
161:4 169:11
170:10 186:15
192:14 211:14
**good** 213:9
**governed**
186:22,23
**Government**
109:8
**Governor**
240:10,21
**grade** 240:24
**Graduate**
118:1
**granted**
182:20
**Graves** 126:19
127:1,3
**greater**
187:21

**Greek** 109:8
**group** 196:9,
10,12,17,18,
21 197:10
198:8 227:10
**guidance**
171:23 225:20
**guideline**
120:11
**guidelines**
120:5,6,8,9
**guides** 135:5

---

**H**

**half** 119:14,
16
**hallway**
233:10
**handbook**
114:14,15,19,
21
**handful**
122:14
**handling**
139:2 147:4
236:13
**hands** 205:24
**happen** 108:6
120:12 131:25
132:2 172:12
190:19 211:10
**happened**
132:3,5
136:13,21,22
137:7,9,21
138:10,16
190:17 192:20
219:3 230:3
**happening**
192:19 202:23
**harassment**
112:19 113:9
231:11
**Harvard** 118:1
233:16,23

**hate** 241:9,
22,24 242:2,5
**HD** 157:1
**health** 160:3
167:1 196:15
225:3
**hearing** 165:8
188:23,24
189:1 201:6,
14 202:14,18,
20,23,25
203:2,7,9,17,
20,21 204:7,
9,14 205:4,6,
16,17,18,21
206:19,20
208:8,9
220:13,15,19,
21 221:2,5,6
**hearings**
204:15
**Heather**
134:17,19
229:20
**held** 137:15
144:17,19
185:3 226:19
246:9
**helpful** 219:6
**helps** 165:16
**high** 204:22
**high-caliber**
204:17
**high-caliber-
type** 204:15
**higher** 104:2
118:8
**hire** 101:9
102:10
**hired** 131:3
**hiring** 101:11
131:18
**hold** 101:24
**home** 143:12
**Honestly**
178:23 240:24

hope   217:10
housing
   104:23
   106:11,22
   159:25 166:1
   181:19,24
   182:9 196:13
   244:21
HR   113:16
   125:6 126:5
Human   113:17
   210:2,11
   231:17
husband
   139:19,23
   140:4,14,17,
   19

            I

idea   116:12
   225:13
identification
   115:2 119:2
   133:22 152:24
   155:11 195:15
   199:19 211:18
identify
   134:12 145:3
   184:6 209:19
ill   102:22
imminent
   166:25 168:13
   196:19
impacting
   131:25
implementation
   147:5
implemented
   148:22 149:4
   246:23
implementing
   248:6
implicating
   149:10
importantly
   192:20

imposed   181:6
improperly
   140:22 141:2
improve
   132:16
in-person
   111:25 112:1
incident
   136:11,12
   137:5 138:10
   140:1 142:13,
   16,22 143:1,
   21 144:11,14,
   22 146:21,23
   149:3 168:14,
   21 188:1,8,
   10,11 191:13
   195:12 198:14
   206:1 209:21
   210:24 214:19
   219:11 224:1
   229:6 230:8
   237:22 238:5,
   20 239:1
   240:11,23
   241:6,10,18
   242:3
incidents
   136:18 228:25
include
   159:22 174:15
   175:3,17
   176:22
included
   174:19 200:11
   214:12 216:18
   217:22
including
   195:20 196:5
   197:12
Indiana   105:8
indicating
   215:12
individual
   100:11 176:4
   191:1 233:22
individual's
   176:15

individuals
   160:6 163:21
   164:10,25
   196:5 197:12,
   18 225:11
inform   137:23
   141:16,17
   151:3 215:6
   225:4
information
   126:8 134:13
   153:25 172:7
   175:14 178:9
   212:16 218:24
   219:1,5
informed
   142:23 143:2,
   4 214:17
   220:22
informing
   208:12
informs
   141:15
initial   154:8
   218:9
input   217:25
insert   178:2
Institute
   118:2,21
institution
   107:9
instructed
   134:21
instructing
   185:12
instruction
   105:6 238:1
intense   118:8
intention
   237:18
interest
   156:2 198:5
interim
   100:25 101:1
   127:22 128:15
   130:25 131:2
   133:17,19
   147:10 148:10

   149:15 151:12
   155:2 157:8,
   13,17,19,20,
   23,25 158:3,
   6,9,14 159:7,
   23,25 160:2
   162:12 163:5,
   11,19,25
   164:2,5,15
   165:2,5,15,
   21,25 166:23,
   24 167:2,7,24
   168:2 169:23
   170:3,6,10,
   11,15,16,20,
   21 171:6,17
   173:14,16
   174:9 181:5,
   9,12,20
   182:7,16,17
   183:6 185:14
   194:1,8,10,11
   207:11,16
   215:13 222:5,
   10,12,19,23
   223:4 224:22,
   23,25 225:1,
   2,3,7,12,16,
   25 226:6
   246:18,21,24
   249:1
internal
   209:8
interpretation
   147:7,13,14,
   23 148:13
   183:8,11
   251:4
interrogatorie
s   134:2,10
interrogatory
   134:11
   138:22,23
   145:2 180:19
   187:8 209:18
   231:8
interrupt
   169:10

Corey Lang Vol 2
March 10, 2016

13

interrupted
 178:15
intervention
 156:10 183:21
interview
 101:4,7 130:2
 131:6
interviewed
 101:18,19
introduce
 233:21
investigated
 116:25
investigates
 143:15
investigating
 125:13
investigation
 125:4,8,22
 138:4 139:7
 141:16,18,19
 142:1 143:5
 168:22 169:18
 189:10,12
 190:10 191:4
 192:10,12
 231:24
Investigations
 119:18
invitation
 174:17
invoke 187:17
invoked 168:1
 225:7
involve
 187:14 239:12
involved
 100:18 135:2,
 6 170:5,12
 171:5 173:17
 176:14
 205:23,25
 206:10,13,17,
 21,22 208:6
 210:16 211:5
 215:14 219:23
 229:22 231:1
 236:11 240:11

241:6 249:12
involvement
 205:20
 206:12,15
 210:11 212:11
 240:13
involving
 105:14
issue 137:24
 139:2 210:8
 211:1 217:21
 224:3,6
 243:12 249:25
issued
 122:19,22
 162:16 191:25
 209:23 214:7,
 9,13 216:13
 222:18
issuing
 170:25 210:4
italicized
 179:12
IX 119:18

                J

Jamison
 106:18,25
jesuit
 103:12,13,14
 104:13
Jill 244:18
 245:10,13
Joanna
 129:15,16
 130:9,15
 134:23 152:2
 153:7 156:19
 167:18 180:7
 188:19,24
 201:5,15
 203:21,22
 204:8,23
 208:9 220:14,
 16 221:1
 249:7,8,14

job 116:24
 146:16
Joe 109:25
 110:2
John 101:14,
 16
Johnson 133:3
Judicial
 147:18 251:6
Julie 131:3
Julius 155:19
 156:2 159:15
 162:2,10
 166:8,17
 167:19 169:5,
 18 170:15
 185:7 191:21
 192:1 225:10
Jupiter
 109:25

                K

Kabat 115:15
 212:4 217:2,
 7,15,24
 218:1,10,14,
 21
Keintz 123:25
 124:3
Kelly 101:14,
 16
Kincaid 131:3
kind 158:17
King 100:5
 144:22 164:16
 172:2 185:5
 213:23 214:5
 226:21 246:12
 247:12 251:3
Klein 133:13
knew 136:21
 222:12,17
knowledge
 105:17,19,21,
 25 106:17
 107:5 134:13,

17,24 135:6,
 8,18 142:11,
 18,20 145:10
 154:22,23
 170:20,23
 172:20,21
 181:3 211:6
 223:8,10
 242:1 244:12

                L

Lamar 128:24
language
 157:25 178:2,
 12 179:10
 181:20 210:10
 247:5
Lauderdale
 235:13
Laura 133:3
Lauren 106:7
lawsuits
 100:19
lawyers
 187:14
leadership
 118:8 124:6
leading 236:6
learned
 192:15 215:10
 226:13
leave 102:21
 103:22 114:9
led 236:8
left 109:23
 110:2,4
 130:10
legal 184:20,
 21 205:22
 206:22 230:25
 237:6
legals 205:24
 206:17,21
 208:5,10
 211:4 219:23
 229:22

Corey Lang Vol 2
March 10, 2016

14

length   246:16
letter
  122:20,22
  123:1,5
  145:19 147:12
  148:3 149:17,
  22 150:22
  151:17 153:21
  154:6,7,8,12,
  21 157:16,19
  159:5,20
  160:18 161:3,
  9,23,24 162:1
  163:4,10,15,
  18,23 164:11,
  17 165:1,2
  166:8 170:2,
  10,14,22
  171:2,14
  174:5,10
  176:12 177:3
  178:13 183:16
  185:13,15
  186:16 187:4
  189:12,15,18
  190:1,12
  192:7 201:23,
  24 202:8,9
  209:20,22
  210:25 212:4
  215:2,4,7,11,
  17,19 216:3,
  10 217:8,11,
  14 218:1,4,7,
  9,11,13,17,
  20,23 219:19
  220:2,7,24
  221:2,12,13,
  18,25 223:12,
  13,14,22
  228:11
  234:15,19
  240:14,16,18
  242:10,24
  243:12 246:25
  247:6 250:1
letterhead
  217:9,17
  218:5

letters
  134:20 149:24
  151:15,23
  153:16 165:5
  172:22 173:6,
  24 175:10,14,
  16,21,22,24
  176:3,5
  177:11 185:7
  203:9,14
liability
  149:19 183:18
  187:9,10,12,
  16,19,22
life   104:8,11
  109:9 133:8,
  10 244:22
limited
  159:22
list   139:1
listed   134:16
  173:15
location
  189:22
long   100:23
  101:1 102:3
  104:18 121:1,
  2 131:9
  172:15
longer   128:3
  247:20
looked   126:1
  168:20 186:25
lost   130:18
lot   211:10
  226:24
lunch   100:6
lying   233:7

M

mad   233:2,6
made   101:9
  105:15,23
  107:3 116:11
  122:3 125:23
  127:20 132:7,
  8 138:24

139:1,4 140:9
  145:6 146:9
  149:13
  175:24,25
  184:7,10,18,
  20 204:8
  206:14 209:25
  218:9,10
  231:11,13,17
  232:3 234:4,
  21 235:17
  239:25 240:5
  243:15
mail   241:9,
  22,25 242:2,6
major   175:9,
  11,12,14,17,
  24 190:9
majorly   176:4
make   128:4
  165:16 184:9
  204:24,25
  205:20 217:10
  220:5 225:20
  227:6,20
  233:15 234:8,
  24 237:18
  239:15,17,20
making   112:14
  131:15 219:5
  236:24
male   126:23
  127:11
management
  113:24 183:20
  208:18 236:25
mandate
  183:21
Mandatory
  182:18
manner   172:25
March   134:2
  146:22 155:18
  162:2 166:24
  167:2,8 168:1
  169:24 188:21
  189:21 194:7,
  12,14 195:12

196:7,22
  197:2,5,6,7,
  14 198:9
  199:7,12,24
  200:4,9,12,
  14,25 201:6
  202:1 206:25
  207:18 208:7
  209:16
  212:23,24
  213:17 214:23
  215:3 216:2
  219:16,21
  220:13 221:9
  222:13 223:2,
  8 225:25
  226:7,9
  246:15
Maria   139:1
  142:10
Marin   214:16
  229:20
mark   155:15
marked   115:1,
  6 119:1,6
  133:21,25
  152:23 153:2
  155:10,16
  170:1 188:3
  195:14,18
  199:18,22
  200:4 211:17,
  21
Marketing
  128:7
marking   119:5
Mary   109:22
Maryann   110:3
master's
  105:7
matter   134:16
  135:3 156:24
  158:2,7
  162:11 170:5,
  13 171:5
  173:17 191:5,
  22 192:1,10,
  12 199:11

209:15
210:17,24
211:3,8
213:19 226:22
227:12,16
236:11 237:24
239:11,12
**matters**
151:6,11,12
**Maud** 190:7
**Maxient**
178:7,11,13,
18,21,24
179:1
**meaning**
228:20
**means** 150:6
173:18 183:7
225:1
**means.'**
215:15
**meant** 227:20
**measure**
157:4,7,9,22
158:4,6,17
159:11,12,16,
18,19 160:13,
19,21,22,25
161:5,14
162:4 170:6,
10,15 171:6,
14,18 172:4
173:14,22
174:1,4,22
186:15 194:10
199:15 225:4
230:14 250:8
**measures**
147:5,8,10,
11,23 148:2,
4,7,10,14,22
149:4,15
151:13
154:10,12,16,
20 157:20,23
158:14,21
159:4,6,10,21
160:2 162:13,

18,25 163:1,
7,9,25 164:2,
5,18 165:15
166:16,23,24
167:3,7,25
168:3,9,12,
17,20 169:5,
23 170:11,22,
25 171:23,25
172:3,18,24
174:9,21
175:17
176:13,21,22
177:3,4,7,10,
12,19 178:11,
14 181:5,9,12
182:9 183:4,
25 184:1,4
187:4 191:25
192:4,7
194:8,12,20,
22 195:4,8
196:19 197:3,
4 200:19
207:12,16,22
214:1,13
216:10,17
222:6,10,13,
19,23,24
223:2,9
224:22,23,25
225:1,8,12,16
226:1,7
227:24 228:5,
8,11,16 230:4
246:16,18,22,
24 247:24
248:6
**media** 109:8
207:25 208:3
221:22
223:13,15,16,
19 224:2,3,6,
9
**medical**
140:23 141:2
**meet** 196:10
198:7,8
229:23 238:4,

7
**meeting** 154:2
155:24 156:7
161:12,15
166:9,13
167:20 168:6
169:4,17,21
190:12,16,21
195:21,22,25
196:4,6,24
197:9,19
198:1,16,17,
21,24 199:7,9
200:23 208:23
209:1,9,11,15
211:8 218:25
226:23 227:6
230:3,15,17,
19,21 231:6,7
235:19
**meetings**
148:1,19
150:24 151:2
156:10
190:15,18
198:22 199:1,
2
**meets** 157:1
199:5
**member** 116:21
139:5 143:5,
16 192:22,24
193:2,7,15,
19,24 213:13,
14 241:15,16
**members**
141:18 152:20
180:4 194:22
238:6,9
**memos** 150:17
**Mena** 109:20,
21 110:6,14
121:5,11,14,
23 128:17
129:13 147:22
148:21 154:25
173:6 180:14
227:23 228:4
242:18,21,25

246:1,2
**Mena's** 130:5
**mentioned**
117:24 121:17
131:20 238:24
247:4
**Mertz** 109:22
**Mertzer** 110:4
**met** 196:21
214:16 238:19
**Miami** 102:24
**Michelle**
128:11
**mid-semester**
199:24,25
**mine** 188:3
**minute** 184:24
213:7
**minutes** 246:5
**mirror** 209:4
**misconduct**
117:1
**mismanagement**
125:14,16,18,
24
**mismanaging**
126:11
**misrepresentat
ion** 176:2
**missing** 202:7
**modification**
151:14,17
162:4 175:11,
12,15,18
216:6
**modifications**
175:9,10,24
**modified**
149:17 150:15
151:20 155:1
172:23 176:4,
5 183:15
187:22
**modify**
149:21,23
**modifying**
150:21

module   112:15
modules   113:6
MOLDOF   158:22
   159:2 251:12
Mom   102:22,24
moment   131:1
   206:13
Monday   194:17
   198:10,15
   218:25
money   118:18
month   167:8
   168:10 235:6
months   101:2
   235:9
morning
   185:18 219:1
mother
   102:22,24
move   102:23
   124:7 169:12
moved   124:11
movement
   234:6
movie   233:3
moving   206:23
Multicultural
   106:24 109:7
   121:1
multiple
   104:21 164:2,
   5,14
mutual   184:22

**N**

named   155:19
names   100:13
   134:17 156:11
   190:23 197:19
   198:1,5
NASPA   107:12,
   15 108:8
   110:14,17
   118:21
Natalia
   157:16

National
   107:15
nature   139:6
   182:17 207:16
needed   128:3
   143:12 198:8
   199:15 246:22
needing
   246:18
news   240:19
Nicholas
   157:17 170:3
   171:3,14
   185:8
Nichols   170:2
   171:2
Nicole   124:22
   128:10
Noemi   229:20
normal   141:23
   197:25
northern
   110:2
notice   116:23
   136:14 138:5
   144:24 145:18
   149:17,21
   150:4,12,21
   151:17,20,22
   152:4 155:1,
   2,18 156:16,
   20 159:11,14,
   16 160:22,24
   162:15,19
   163:10,11,19
   164:1 165:5,
   7,20 167:13,
   14,15 168:24
   170:11 172:4
   173:25 174:5,
   8,22,24
   175:1,3
   176:12,18,22
   177:24 179:2,
   9,20 183:15
   184:12 185:6
   187:18,22
   192:4 195:8

202:6,16
207:25 208:2
214:7,9,21
215:11,17
216:6,10,13,
14,18 219:11,
19 220:1,7,24
221:2,5,6,8,
11,13,18,24
222:10,17,25
223:9,12,14,
21 224:13
225:9 226:14
235:3,6 243:4
245:3 247:5
249:1,25
notices
   144:24 162:5
   170:25 214:12
notification
   162:24 174:14
   187:24
notifications
   165:17
notified
   174:9
notify   171:17
   184:1
number   134:16
   158:25 160:21
   182:1 185:19
   188:5 190:8
   204:12 248:15

**O**

oath   100:7
Object   125:15
   131:22 136:19
   138:8 147:16
   148:15 153:17
   159:8 161:2,
   16 166:18
   170:18 173:2
   175:5 177:15
   183:5 186:18
   193:13 210:18
   214:2 216:21

222:16 226:3
232:4 233:18
234:11 237:2,
7,12 239:22
240:2,8
243:5,16,20
245:20
247:15,21
250:2
objection
   158:11 165:19
   176:1 209:23
   231:19,22
obtained
   131:15 208:11
occasionally
   190:19
occasions
   214:12
occur   198:16
   199:1,2
occurred
   136:8,18
   138:1 142:22
   144:23 188:11
   209:11 214:19
   219:2
October   170:2
offense
   116:24,25
   174:16
office   106:23
   125:1,19
   135:11,16
   142:17
   149:19,21
   150:14,21
   151:10 161:23
   179:13 203:13
   231:21 232:16
   235:13
officer
   134:25 147:18
   167:18 225:22
   251:6
officers
   152:20 180:3
   248:13,14,18,

21,24
Online    112:15
onset    161:4
open    131:9
operational
 124:6
opinion
 177:21
 187:23,25
 193:23  194:3
 251:4
opportunity
 103:23  116:18
 154:3  172:6
 178:8
opposed
 247:25
options
 120:12
oral    132:14,
 15
Orally    132:13
order    218:24
 247:4
organization
 128:4
organizations
 128:5
Oscar    185:8
OSD    125:1,19
 196:15
outcome
 125:24

P

p.m.    137:14
 157:1  185:2
 189:22  226:18
 246:8  251:15
packet    203:18
paid    111:7
paper    178:4
paragraph
 116:16  156:24
 173:15  190:9

parents
 117:15  234:9
part    100:25
 131:14  174:5
 186:4
participate
 145:5  172:6
 242:20
participation
 160:9
partner
 121:21  196:13
past    117:3
Paula    143:1
 144:2
pay    111:4
 118:19  240:24
paydays
 105:13
pending
 169:14
Pennsylvania
 105:9
people    112:5
 128:8  132:15
 184:5  195:20
 209:5  234:4
 249:6
performance
 113:13,23
 138:25
period    121:4
 182:21  235:3
periodically
 190:24  249:23
permanent
 181:25  182:6
 183:1,2
permission
 182:20
Perry    233:3
person    127:6
 134:12  139:17
 145:4  162:13
 164:13,14
 167:6  171:21
 190:6  209:19

231:5  247:13
personal
 179:4
personally
 242:4
personnel
 107:16  116:1
persons    152:1
pertaining
 134:14
pertinent
 154:4
phone    213:17
 216:7
phonecall
 214:8
physical
 113:1  230:7
pick    178:8
piece    224:10
place    115:11
 120:13  163:24
 177:20
 178:18,21,25
 186:10
 202:20,25
 208:9,22
 215:16  220:3
 229:13  249:16
places    153:25
 160:8
placing
 186:14
Plaintiff
 119:7  140:22
 143:11  145:21
 146:20  147:2
 149:6  210:4
 231:13
Plaintiff's
 115:3,6  119:3
 133:23  152:25
 155:12,16
 195:16,19
 199:20  211:19
plan    217:10
 229:12

play    131:14
pleadings
 134:14
point    105:3
 135:17,20
 137:8  138:3,
 13  164:6,14
 167:22  181:15
 184:16
 198:14,15
 201:12  205:24
 206:15,16,18,
 21  208:11
 210:17  216:6
 221:1,17,22
 223:11,21
 224:15  228:24
 229:22
 230:12,25
 238:13  246:21
points    179:5
police    196:14
 248:9,10,16,
 21,24
policies
 114:22  150:18
 186:6,23
policy    114:10
 115:9,11,21
 120:1  141:1
 146:19  160:12
 172:2  183:18,
 20,21  245:8
 247:12,16,18
 250:12
Poole    149:8
 193:1,2,5,9
 237:21
 241:16,19
Poole's
 134:20  149:9
portal    112:13
portion
 100:10  171:9
 206:6
portrayed
 217:11

position
  100:21,24
  101:5,24
  102:11,17
  103:4,7,20
  104:1,3,20
  107:8 108:20
  109:10 116:5
  117:22 120:14
  121:2,3,18
  122:9 123:20
  124:15,25
  126:22 127:15
  128:6,15
  130:3,5,8,12,
  13,15,16,17,
  18 131:1,6,9,
  15 132:12
  138:14 185:25
  203:25 241:2
  243:8,11
positions
  104:21 128:2,
  6 130:3
  133:16
positive
  152:14
possession
  204:18
possibility
  226:6 227:1
possibly
  149:10
posting   131:9
  185:17
potential
  118:9,22
  187:19,21
potentially
  149:19 183:17
  187:9
power   245:18
Powerpoint
  113:2,3
practice
  117:3 141:15
  148:5 149:15,
  23 151:13

  162:3,23,24
  163:10 164:17
  165:14 167:24
  170:24 171:24
  172:13,15
  174:8,25
  175:2 177:9,
  23 184:2
  186:14,15,21
  187:24 189:18
  215:15,18,22
  250:13,16
practices
  248:5
present   112:9
  172:7
presentation
  113:2,3
president
  100:22 101:1,
  5,12,18,23
  102:1,4,7,8,
  11,14 103:21
  104:3,10
  107:7 108:21
  109:11,15
  117:23
  119:24,25
  122:10 123:13
  124:15 127:22
  128:15,16
  132:12 146:11
  180:23 183:23
  217:18 227:6
  239:7,19
  243:9 244:13
  245:18 250:6
presidents
  118:9,22
pretty   156:22
  224:9
previous
  157:8,11
previously
  129:16
printed   178:4
printout
  113:6

prior   100:18
  101:23
  102:13,25
  103:10 104:15
  123:5 125:22
  127:4 149:2
  162:16 179:1
  186:6 210:4
  211:4 214:22
  245:14 249:16
priority
  204:22
privileges
  166:4
privy   162:7,
  15
probation
  114:9
procedurally
  147:11
procedure
  141:24 146:19
  147:6 168:22,
  24 193:20
  195:7 250:12
procedures
  115:24 119:9,
  20 147:3
  186:6,23
proceed
  214:17
proceedings
  100:1 137:3,
  15 138:4
  144:18 172:7
  185:3 226:19
  246:9 251:14
process
  115:8,16
  130:2 131:6,8
  135:1,4,5,7
  145:6 205:23
  215:16 249:11
processes
  206:23
professional
  103:23 193:22
  194:3 204:24

  232:21 251:4
professionals
  116:3
professor
  204:21
Programs
  104:23
prohibit
  207:9
promoted
  129:24 130:4,
  5,11,17
promotion
  104:12 128:24
  129:1
proof   117:1
proper   149:11
  205:13
property
  160:7
proposed
  117:2
protect   160:2
protected
  116:3
Protocol
  101:11
provide
  117:14 139:22
  140:25 210:10
  219:6
provided
  113:3,7
  151:25 153:4,
  7,9,12 171:24
  179:8 188:15
  189:9 191:15
  205:7,8,11
  249:4
Provost
  239:17
provosts
  118:9
public   223:24
purpose
  230:12,15

purview
  139:22 143:6,
  16 147:19
  176:5 204:20
  243:6
put   138:12
  153:25 178:8,
  10,12 179:17
  185:13 187:8
  209:4 226:13
  238:1,25

Q

quality
  117:14
question
  164:7 166:21
  169:9,14
  171:8 202:24
  206:9 208:1
  210:21
questions
  189:2 191:2
  246:6,11
  250:25
  251:10,12
quick   137:12
  226:16
quote   159:7
  160:19 208:17
  211:4 219:18,
  23 233:13
  234:1 235:24

R

R-o-k-o-s
  124:24
race   106:1
  127:13
raise   167:3,5
reach   139:5
reached
  135:16 139:8,
  18 184:22
read   171:10
  206:4,7

251:13
reading   217:5
reads   158:13
ready   217:9
reason   123:1
  133:4,14,15
  145:15 146:3,
  6 159:12,20
  160:25
  162:19,21
  163:23 169:23
  172:5 174:23
  190:20 198:3
  203:16 205:18
  209:22 219:4
  222:2 235:7
  249:5
reasonable
  117:1
reasons   145:2
  151:5 160:22
  163:2 170:11,
  17 190:24
reassigned
  128:8 235:8,
  11,12
rebuttal
  242:15
Rec 109:6
  133:1
recall   107:17
  108:11,13
  112:21 114:13
  122:7,17,19,
  24 123:1,4
  124:13 128:12
  132:9 135:23,
  25 136:7,10
  137:20,22
  139:10,12
  140:2,3,18
  142:12,25
  143:22,23
  144:1,4,10
  148:24 149:1,
  5 152:15,22
  161:17,20
  162:12 166:22

167:23
169:20,22
178:19 185:5,
11,12,16
186:2,11
189:5,8
190:18 191:8,
11,14,17,20,
23,24 192:2,
3,5,6,8,9,13,
14,16,23
193:4,6
194:13,25
195:2,6
197:7,10
198:24 199:6,
14 200:17,21,
22 206:24
207:2,3,5,6,
19,23,24
208:5,12,15,
16,24,25
209:12,14
210:19,23
211:7,9,13,25
214:3,10,14,
20 216:8,11,
12,20,22,24
218:15
219:20,22
220:18,20
221:4,10,14,
15 223:6,23
226:4,21,25
227:2,5,17
228:4,6,13,
15,25 229:9
230:2,20
231:2,3
232:17
233:11,14,24
236:1,4,5,10,
13,16,17,18,
19,23,24
238:3,8,21,22
240:10 241:4,
5,7,8,14,23
242:8 247:3,
18,22

recalled
  216:15
receive   107:8
  111:16,21
  112:22 113:1,
  11 117:17
  209:20,22
  242:2
received
  117:8,21
  144:13 213:11
  215:3 242:5
receives
  205:3
receiving
  241:9,22
recent   131:19
  132:21,25
  133:9
recess   137:13
  185:1 226:17
  246:7
recollect
  112:12
recollection
  212:20 213:20
  242:24
recommendation
  126:5
recommended
  145:4
record   100:5
  144:16,17,21
  171:9 206:6
Recreation
  109:6
refer   144:21
  233:1,25
referred
  233:6
referred-to
  115:1 119:1
  133:21 152:23
  155:10 195:14
  199:18 211:17
referring
  146:23 158:23
  161:24 187:1,

10 227:9
refresh
   213:20
refusal
   242:10
regard   138:24
   146:21 245:19
regular
   196:16
regulation
   119:8,10,13,
   19 120:1,2,3
   125:11
   145:22,25
   150:6 172:14
   174:6 186:22,
   25 187:3
reinforced
   183:18,19
Reinstructing/
reorganization
   127:2
rejected
   118:15
related
   116:24 137:5
   154:4 175:10
   186:22 188:25
   192:18 202:18
   203:6 210:12
   232:21
relating
   180:22
relation
   115:22 119:17
   233:2
Relations
   115:8 116:22
relationship
   232:21
relayed   224:2
Release   208:1
released
   207:24
   223:13,15
relevant
   172:7

religious
   135:12 136:5
   137:25 138:17
   224:8
remember
   108:10 109:22
   112:3 121:1
   123:23,24
   130:25 131:1
   138:2 139:24,
   25 140:12
   142:2,25
   168:4,5 169:6
   178:23,24
   180:13
   192:17,25
   193:14,15
   194:8,9,11,
   14,21,23,24
   207:12,14,15,
   17 208:19
   223:3,5
   224:15 228:7,
   10 232:8
   241:13
remembering
   109:9
reminder
   100:6
removal
   159:25
   163:11,20
   165:21,25
   181:19
removed   182:9
removing
   193:21
reorganization
   127:24
Reorganization
/restructure
   127:19
rep   168:16
repeat   113:15
   171:8 184:3
replaced
   128:10 129:13
   130:23 133:16

report   102:7
   109:12,14
   133:7 136:11
   141:4,21,24
   142:2,3,5
   143:19,20
   167:21 188:10
   204:5 235:12,
   14 240:22
reported
   120:24 121:3,
   19,21,22,23,
   25 220:3
   225:5,13
   246:3
reporter
   115:2 119:2
   133:22 152:24
   155:11 171:10
   195:15 199:19
   206:7 211:18
reports
   110:25
representative
s   196:14
reprimand
   114:8 122:20,
   22 123:2,6
   144:14
   209:21,22,24
   210:2,5,7,9
   211:1,15
   212:4,8
   217:12,21,23
   218:25 219:25
   220:9 234:15,
   19 242:11,15,
   17,21,25
   243:13 245:24
reprimanded
   132:11 142:9
   167:13 243:3
reprimanding
   210:13
reprimands
   132:19
request
   118:19 182:23

requested
   111:11 171:9
   201:14 206:6
require
   145:23
required
   140:18 149:20
   151:9 154:12
   161:22 205:4,
   5 225:15
   228:19 244:14
   247:6 250:1
requires
   154:15
Resident
   104:22
Residential
   104:23 244:22
resign   103:4
   123:15
   128:19,21
resignation
   132:21,25
   133:5
resignations
   133:9,18
resigned
   128:20,23
   129:7,8,9,11
   133:1,11
resolution
   125:13
resolved
   156:25 158:2,
   8 213:19
resources
   113:17 160:11
   210:2,11
   231:18
responded
   219:7
response
   140:13 183:12
   206:10 211:13
   241:22,23
responses
   180:20 209:19

Corey ing Vol 2
March 10, 2016

21

responsibility
201:20
202:12,13
responsive
117:16 169:13
restrict
160:5,6,7,8,
10 163:18,20
restricted
164:8,9,23,24
restrictions
181:12
restructuring
127:21
resubmission
182:22
result 127:24
138:9
resulted
144:24 229:2
resume 200:9
retained
205:22
retire 237:19
retreat
236:3,7,8,15,
20
return
213:18,25
returned
194:14
returning
193:17
review
119:15,23
146:12 202:10
213:4,8
217:14 224:13
reviewed
114:10
119:12,17
152:8 157:16
215:19,22
216:3 223:21
revise 218:13
revised
218:16

249:18,20,21
250:1
revoking
166:3
Revolvi
127:7,9,10
rid 130:10,16
rights 154:8
174:17 201:22
234:5
risky 187:16
Robin 115:15
212:4 217:1,
15,24 218:1,
9,14,21 219:7
Rokos 124:22
126:10,13
128:10,13
role 125:24
238:19
Rotela 135:2,
11,21 136:15
137:3,24
140:1 142:13
144:11,22
146:21,22
149:3,7
157:12 181:2
184:8,10
188:1,8 191:5
195:11 197:4
198:13,20
199:11
200:16,20
201:13
203:12,17
205:16,22
206:1 207:1,
8,20,24
208:14
209:15,21
210:9,17,24
211:3,7
212:21 219:10
223:17,20
226:7,22
227:11,16
229:5,24

230:9,19
236:11,14
237:1,22
238:5,20
239:1 240:11,
22 241:6,10
242:3
Rotela's
138:17 208:22
230:17
Rotella's
197:22 227:3
Rowe 135:8,
15,16,23
136:25
137:18,23
139:1,9
142:7,24
Rowe's 138:14
141:10
Rozalia 134:1
219:4
Rubio 241:5
Ryan 135:2
136:15 137:3,
24 144:11,21
146:21,22
149:2 157:12
181:1 184:8,
10 188:1,8
191:5 195:11
197:4 198:13,
20 199:11
200:16,20
201:13
203:12,17
205:16,22,25
207:1,20,24
208:13,22
209:14,21
210:16,24
211:3,7
212:21 219:10
223:17,20
226:7,22
227:3,11,16
229:5,24
236:11,14,25
237:22 238:5,

20 239:1
240:11,22
241:6,9 242:3

S

SACSA 107:12,
14 108:7
110:13,17
safe 201:12
safety 160:3
167:1 193:16,
20
Salazar 139:2
140:15 142:10
sanction
181:1,6,10
182:6,12
sanctioners
183:1
sanctions
165:7 180:21
181:14
182:10,14,16,
18,25 183:2,4
187:13
Saturday
206:14 212:25
Saunders
239:19
SCAC 140:11
156:10
183:19,22
184:1 190:12,
15,18,21
195:3,21
196:6,24
197:19 198:1,
16,21 199:1,
2,4,7 208:23
209:11,15
schedule
205:6
scheduled
190:11,15
199:7 205:15,
17,19,21
206:19,20

Scheduling
190:22
school 118:1
200:8
Scott 240:10,
22
search 101:8
130:1 131:5,
7,8,12
security
247:24
248:13,14,18,
20
seek 132:4
149:20 150:20
182:22 225:20
select 203:17
selected
203:8
selects
203:20 204:7
selling
204:19
semantics
158:10
seminar
111:23,25
112:2,5
Seminole
105:10,11
Senate 238:4,
6,9,18
Senator 241:5
send 107:10
sending
161:23 165:17
195:7 247:18
senior 109:15
151:2 211:8,
11 217:18
226:23,24
227:5
sentence
116:17 180:21
separate
125:10,25
145:7 147:11

148:3 154:12,
20 162:24
163:25 164:17
174:10,24
175:1 186:15
187:4 192:7
210:3 221:7
228:11 246:24
separated
145:16,22,24
146:2,4 235:5
244:25 245:1
separation
145:3,4,12,
19,23 146:5,
6,13 182:19
231:13 234:23
235:20 236:3
244:9 245:3,
9,11,14
September
121:13 179:13
serve 116:4
served 182:22
service
117:10,11
services
117:15 141:10
serving 131:2
session
236:6,20
sessions
152:17,18
215:25 236:9,
10
set 147:3
severity
117:3
Sexual 204:18
shared 232:6
Shaw 128:11
sheet 180:5,7
show 119:5
155:14 199:22
241:24
showed 175:16
176:18 177:8

185:7 209:4
216:18 225:9
showing 119:6
133:25 153:2
155:15 195:18
211:21
shown 166:10
203:18
sign 203:14
244:14
sign-in
180:5,7
signature
134:7
Silver 185:8
similar
115:17,18
117:4 156:22
181:19 191:21
195:4 214:11
simply 182:10
sit 154:19
155:24 161:11
166:9 167:20
169:17
183:19,22
184:1 190:21
195:3 196:9,
11,17 197:9,
13 199:3,4,7
208:23
209:11,15
214:25
situation
138:9 164:13
204:16 217:11
situations
182:8 228:25
six-month
235:3
skin 240:1
smaller
196:9,10,12,
18 197:9,10
sole 230:15
sort 251:3
sought 150:14

Southern
107:14
SP 114:8
115:23,24,25
116:3
speak 184:19
speaking
135:23 191:8
specific
109:1 152:21
154:4 174:15
177:3,7,16,18
182:20 228:13
237:19
specifically
107:9 136:21
137:4 143:8
150:4,11
174:7 192:17
194:25 223:5
specifics
125:21
191:16,18
194:10 207:14
223:6
spell 124:23
126:20
spoke 144:1
168:15 192:24
200:7,24
206:11 212:22
213:16 214:19
spoken 192:25
198:10
sponsored
112:3
spring 108:7
180:1 200:1,
2,4,8
staff 139:5
141:18 143:5,
15 148:1
151:2 211:8,
11 226:23,25
227:6
standard
120:9 148:5
149:17 163:22

Corey King Vol 2
March 10, 2016

23

167:24 170:9,
10,24 171:24
183:15
**standards**
119:8 165:10
**standing**
233:10
**start**  103:17
199:16
**started**
104:21 109:22
121:12 137:3
138:5 229:21
**starting**
100:9 105:4
116:16 134:11
**starts**  188:4
**state**  105:5,7
112:13,16,17
113:5 142:15
143:8,10
145:5 146:19
147:2 150:13
159:5,6
160:18 170:16
172:11,13
187:3 193:9
209:24 213:10
231:9 233:9
234:3
**stated**  120:15
139:14 150:10
161:8 166:12
170:14
175:20,23
177:2,19
179:23 181:4
186:9 193:4,5
206:3 212:7
213:24 216:9,
20 221:25
223:16 247:19
**statement**
140:19 148:18
206:9 227:15,
18 237:5
238:1,25
239:4,8,15,

17,20
**statements**
236:24
**states**  150:4
173:15 174:13
181:9 186:5
245:9 247:13
**stating**
150:19 192:6
193:6 196:5
197:13 212:9
236:17,18,19
**step**  235:25
**steps**  117:5
**stopped**
205:23 206:22
**strike**  108:18
109:17 122:8
128:16 153:18
166:7 169:13
214:20 215:20
223:25 234:14
236:18 238:22
**student**
100:22 101:5,
19,24 102:8,
19 103:3,7,8,
21 104:2,3,
10,24 106:11,
22 107:15,16
109:6,7,8,12
123:24 124:5,
16 135:15
136:3 139:17
140:4,15,25
141:10 142:18
143:11 146:11
147:3 150:3
151:6,11
152:3 154:8,
15 155:18
156:2,10,11
158:5,13,16,
19,20 159:10,
18 160:3,17,
20 161:5
162:18,21,25
163:24 164:4,
7,23 165:7

166:3 168:7,
9,12 170:12,
20 171:17
172:3,6
174:18,19,21
175:10 180:3,
22,23 181:7,
10 182:8,22,
24 183:11,20
184:21 186:1
187:11,19
188:23,24
189:1 192:18,
21 193:8,10,
17,21,23
194:3,4
196:15 200:23
201:6,13,20,
22,25 202:4,
8,9,11,18,19,
24 203:2,3,6,
8,20,24
204:1,7,9,21
205:3 206:19,
20 213:12,14,
16,18,24
214:7,16
215:12,16,18
224:2,3,5,19,
21 225:2
229:12
235:19,23
236:6,14,20
238:12,16
239:10,11,12,
15 243:9
244:13 248:9
249:11,23
250:7 251:5
**student's**
140:3,23
141:4,5
156:14 192:19
**students**
102:2,4,7,14
104:13 107:7
108:21
109:11,16,19
110:11

117:15,23
120:15 122:10
123:13 125:1
129:2,22,23
135:16,17,19,
22 138:25
147:8,17
148:23 149:9
150:19 151:9,
21 152:13
153:13 160:1,
4 170:5,12,25
171:4,17
172:1 173:17,
25 174:9,17
182:24
183:13,23
187:13 198:5
204:13 215:14
224:24
225:21,23
228:5,11
241:3 245:17,
19,25 247:19
250:21
**stuff**  112:15
179:14
**subject**
134:15 159:10
160:20 162:18
163:10 172:3
174:21 212:16
**submission**
198:1
**submit**  197:19
**submitted**
156:11,14
197:22 198:6
**submitting**
182:23
**subordinate**
106:13 107:1
249:8
**subordinates**
113:8
**suggested**
209:20

suggestion
218:22
summary
185:18,25
Sunday   206:14
supervise
108:22
supervised
109:5
Supervision
113:23
supervisor
113:17  116:22
124:10  141:25
142:1  225:18
230:13  232:24
243:6  250:18
supervisors
250:23
supervisory
232:21
support   116:1
242:24
supposed
150:1  246:23
surrounded
191:12
surrounding
125:7
suspend
207:20
suspended
164:6,15
221:23  223:17
224:16,19,21
229:16  237:21
suspending
206:25  207:9
suspension
115:18  155:2
158:1  159:23
163:6,11
165:6,21
182:12,13,15,
16,21  183:6,
7,8  194:1
207:7,12
222:4,23

223:4  249:2
sworn   248:24
synopsis
219:3
system   178:5,
6,7,11,14,18,
21,24  179:2

———————————

T

takes   164:6
201:20  202:11
taking   116:21
143:12,13
149:15  156:16
166:23  170:1
171:24  173:10
213:25  218:19
229:3  230:6
talk   232:22
talked   151:7
154:10  156:9
185:18  207:15
222:24  248:25
talking   136:3
140:11  175:13
194:8,11,23
206:24  223:3
240:19
talks   120:7
174:7  181:23
taught   179:5
teacher
136:20
team   183:21
technology
127:16
telling
191:24  192:3
199:14  207:6
208:16  222:2
241:8
template
151:22
153:20,25
155:1  156:18
163:3  165:25
166:3  171:13,

15  176:11,13,
19,21  177:4,
6,7,14,24,25
179:8,22
189:15,18
249:5
templates
151:25  152:7,
11  153:4,8,
12,15  165:4,
10,11,12,13,
18,20  166:6
176:3,10,11,
17  179:1,3,6,
7  180:15
248:25
249:15,16,18
temporary
183:4
ten   101:2
term   159:17
terminate
123:14,15,18
124:1,4,9,16
126:2,4
234:22
terminated
123:8  125:3
127:1,18,23
128:12,19
129:7  145:15
235:4  244:24
termination
114:9  115:19
123:16  127:4
132:4  145:12
146:6,13
181:24  182:5
237:11  245:5
terminations
131:20  132:10
terms   139:18
147:10  165:20
170:24  187:12
208:18  224:6
238:10
Terry   109:20,
21  110:5,14

111:7  121:5,
8,11,14,17,23
128:17  129:13
130:5,9,10,
15,24  147:22
148:21  154:25
173:6  180:14
227:23  228:4
233:2  242:17,
21,25  246:1,2
testimony
169:11  176:2
Texas   128:25
things   120:12
179:22  204:19
207:16  211:10
221:7  226:24
thought
121:17
threat   167:1
193:25  194:22
225:2
threatened
192:22  193:23
threatening
193:24  194:4
204:21  213:12
214:18
threats   147:4
Thursday
189:21  196:6
199:3,4
time   101:13,
19  105:16
107:23  108:4
113:24  119:12
120:24  132:9
136:24,25
137:2,6  147:7
148:22  153:11
154:2  165:8
167:19  174:18
179:20  190:8,
12  200:21
205:20  219:2
220:2  223:17
229:21  230:2
232:24

Corey King Vol 2
March 10, 2016

25

```
    237:10,20            117:8,19,21         underlying          215:14
timeframe                148:2 156:19          134:15          verbiages
    110:1                180:2,6,10,        Understood             181:14
timeline                 14,16                  219:7          verification
    188:7             transportation        unfair   231:10       134:7
times   122:13           139:2              unfolding          versa   199:3
    209:10 230:1     treatment                 135:11          versus   248:7
timing   199:16          231:10             unilaterally       vice   100:22
title   119:18       true   213:23             149:7             101:1,5,18,23
    130:19 163:15        214:5 222:12       Union   106:11,       102:1,3,6,8,
    165:22               231:16                 12,23 109:6        11,13,19
title's              Tuesday                    123:25 124:5      103:2,7,21
    130:20               195:21 197:13          133:20            104:3,6,9
titled   164:11          199:3,5           unit   127:2,19        107:6 108:21
titles   163:22      Tyler   233:2         units   132:2,3        109:10,15
today   112:20       type   111:16         University            117:23 118:22
    154:19 188:2         112:13,14             101:12 102:16      119:24,25
    189:1,7              113:25 114:7          103:12,24          122:9 123:12
    202:19 203:7         148:4 170:21          104:17 105:8,      124:15 127:22
    214:25 215:3         173:6 179:14          16,18,24           128:15,16
    246:16 248:11        204:17,19             111:17 113:20      132:12 146:11
told   114:2         types   115:23           114:18 117:9,      180:23 183:23
    120:11 124:6     typically                 19,22 119:10      199:3 217:18
    136:2 143:11         163:9,12              125:10 128:24      243:8 244:13
    159:19 192:23        179:11,21             129:17 141:1       245:17 250:6
    200:23 222:9         198:2,6              147:18 159:25     video   238:22,
    223:20 232:13        201:19               160:4,9,11         25 239:4,8,20
    241:21               204:14,16            166:1 176:16      views   204:23
top   179:17             249:22               182:19 184:21    violated
topics   113:25                               186:24 193:25       146:20 147:3,
trained                  _____         233:17,23           6
    115:17,21,23            U                 237:1,22,25       violation
    117:5                 _____        238:2 245:8          149:12 154:2
training             uh-huh   116:15          251:6              174:16
    107:8 111:16,        117:12 129:24     university's        violations
    20,23,24,25          134:3 159:24         160:7               146:19
    112:1,9,13,          168:18 189:14     unquote   211:4     Virginia
    19,25 113:6,         196:8 199:13         219:18,23           103:25
    7,11,22              200:2 239:13         233:13 234:1     Volume   100:1
    114:1,2          ultimate              URP   156:25        Vonita   170:2
    117:5,11,17          101:9 131:17                             171:2,14
    120:15               209:21               _____        185:8
    152:16,17,18,    ultimately                 V             VP   120:14
    19,21 153:10         104:24 131:3         _____        122:18 123:20
    179:4,23,25          225:18            vacant   131:1        129:2 135:22
    215:24           Unclear               venue   140:12        148:8 183:13
trainings                158:18            verbally              250:15
    107:18 112:23    uncomfortable            116:19 170:5
                         193:7                171:5 173:18
```

Corey King Vol 2
March 10, 2016

26

VPS   118:10

**W**

waive   186:5,
14
walk   140:16
walked   203:12
wanted   213:16
222:6 238:12
239:7 250:19
Web   126:23
Wednesday
196:3
week   118:9
200:14 201:7
208:11
weekend
191:8,9
194:17 199:12
206:2 207:15
welfare   160:3
225:3
wellbeing
167:1
West   103:25
Wheeling
103:12,15,20,
22,24,25
104:10,13,15
105:18
whichever
163:17
white   126:23
128:11 129:15
131:3 133:19
Williams
109:22 110:8,
21 111:10
120:21 121:25
138:6,24
140:10 141:2,
7,9,14 142:9
143:8 144:8,
13 145:3,7
146:15 147:6,
22 149:3,20
150:1,9 155:8

161:21 162:6,
10 167:12
173:1 180:9
181:1 183:15
184:13 185:5,
12 186:13
187:8 188:18
189:10 191:3,
4,8 194:6,9,
19 195:2,6,21
196:5 197:13,
22 198:11
199:11 200:7,
13,15,19,22
203:13 205:11
206:2,11,25
207:6,19
208:2,8,12,16
209:20,25
210:9,14,23
211:15 212:5
213:11,17,21,
23 214:5,17,
23 215:6,10,
21 219:12,18,
25 221:12
222:15 225:25
226:23 230:17
231:16 232:3,
5,7,14,15
233:1,9,12,
16,21,22,25
234:9,16,22
235:2,24
236:21 237:11
240:1,6
241:1,8,21
242:14 243:2
244:2,10
246:15 247:2,
5,10,11
Williams'
120:24 134:1
145:12 146:12
234:4 235:20
236:2,25
238:19 242:10
wiped   130:16

witnesses
233:5
woman   233:2,6
word   182:13
wording
215:11,17
218:22 219:19
220:1,6,23
221:18 243:3
words   139:15
185:14 232:8
233:13
work   102:15
103:11,15
104:16,18
116:22 120:12
143:13 204:3
230:5
worked
106:10,22
129:16
worker   142:18
working
102:25
103:10,17
104:15 131:2
works   106:23
workshop
113:17
write   242:14
writing
116:19 154:16
written   114:8
115:18
132:18,19
159:11,15
160:21 162:19
170:10 171:14
172:4 173:25
174:4,22,24
175:1 182:23
wrong   222:3
wrote   185:13
240:14,18
WYDLER   125:15
131:22 136:19
138:8 144:16
147:16 148:15

153:17 158:11
159:1,8
161:2,16,24
165:19 166:18
169:10 170:18
173:2 175:5
176:1 177:15
183:5 185:20
186:18 193:13
210:18 214:2
216:21 222:16
224:4 226:3
231:19,22
232:4 233:18
234:11 237:2,
7,12 239:22
240:2,8
243:5,16,20
245:20 246:6
247:15,21
250:2 251:2,
9,13

**Y**

year   101:2
107:24 108:6
113:20
119:14,16
121:9 152:16
161:5
years   100:25
yield   167:17
Yup   182:14
189:24