# TAB 6

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
2                        FORT LAUDERDALE DIVISION

3

4   ROZALIA WILLIAMS,

5            Plaintiff,
                                            CASE NO.:
6        vs.
                                        15-cv-60621-DPG
7   FLORIDA ATLANTIC UNIVERSITY,
    CHARLES L. BROWN, Sr., an
8   individual and COREY KING,
    an individual,
9
             Defendants.
10  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11

12              VIDEOCONFERENCE DEPOSITION OF

13                  CHARLES L. BROWN, SR.

14

15

                      March 11, 2016
16
                      11:06 a.m.
17

18

19                  2700 Centennial Tower
                     101 Marietta Street
20                    Atlanta, Georgia

21

22

23        Kelly S. Lawrence, CCR-B-1625

24

25



```
 1                    APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff:

 4        SAENZ & ANDERSON, PLLC
          RIA CHATTERGOON, Esq.
 5        Via Videoconference
          Suite 800
 6        20900 N.E. 30th Avenue
          Aventura, Florida  33180
 7        305.503.5131
          888.270.5549 Fax
 8        ria@saenzanderson.com

 9

10   On behalf of Defendants Florida Atlantic
        University and Corey King:

11        MARRERO & WYDLER
          LOURDES ESPINO WYDLER, Esq.
12        PH-4, Douglas Centre
          2600 Douglas Road
13        Coral Gables, Florida  33134
          305.446.5528
14        305.446.0995 Fax
          lew@marrerolegal.com

15

16   On behalf of Defendant Charles L. Brown, Sr.:

17        WHITELOCK & ASSOCIATES, P.A.
          KELSEY DAY MOLDOF, Esq.
18        The Whitelock Law Building
          300 S.E. 13th Street
19        Ft. Lauderdale, Florida  33316
          954.463.2001
20        954.463.0410 Fax
          moldoflawpa@gmail.com

21

22   Also Present:

23        ROZALIA WILLIAMS
24        Via Videoconference

25
```



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        3

1                        INDEX OF EXAMINATION

2

3    WITNESS: CHARLES BROWN, SR.

4    EXAMINATION                                              Page

5    Examination by Ms. Chattergoon                              5

6

7                              - - -

8

9                        INDEX TO EXHIBITS

10

11   Plaintiff's
       Exhibit              Description                       Page

12

13     Brown 1    Regulation 4.007, Student Code
                  of Conduct, FAU 1485 through
14                FAU 1504                                      36

15     Brown 2    Employee Relations, The
                  Disciplinary Process, PL 116
16                through PL 121                                56

17     Brown 3    Regulation 5.012, Employee
                  Standards and Disciplinary
18                Procedures, PL 579 through
                  PL 583                                       59
19
       Brown 4    Package of Documents Starting with
20                an E-Mail from Dr. Williams to
                  Joanna Ellwood, FAU 1438 through
21                FAU 1455                                      98

22     Brown 5    August 23, 2010, Notice of
                  Interim Suspension, FAU 1505 and
23                FAU 1506                                     109

24

25



1              INDEX TO EXHIBITS (Continued)

2

3    Plaintiff's
       Exhibit              Description                    Page

4

5     Brown 6    Notice of Service of Answers to
                 Plaintiff's First Set of
6                Interrogatories to Defendant,
                 Charles L. Brown                          169

7
      Brown 7    E-Mails Regarding the Letter of
8                Reprimand, FAU 1513 through
                 FAU 1522                                  198

9
      Brown 8    April 26, 2013, Letter to
10               Rozalia Williams from Charles Brown,
                 FAU 1186 and FAU 1187                     207

11
      Brown 9    December 9, 2013, Letter to
12               Dr. Rozalia Williams from
                 Paula Behul, PL 401 through
13               PL 409                                    231

14

15
          (Original Exhibits 1 through 9 have been
16    attached to the original transcript.)

17

18

19

20

21

22

23

24

25



1    VIDEOCONFERENCE DEPOSITION OF CHARLES L. BROWN, SR.

2                    March 11, 2016

3              (Reporter disclosure made pursuant to

4    Article 8.B. of the Rules and Regulations of the

5    Board of Court Reporting of the Judicial Council of

6    Georgia.)

7

8                    CHARLES L. BROWN, SR.,

9    having been first duly sworn, was examined and

10   testified as follows:

11                    EXAMINATION

12   BY MS. CHATTERGOON:

13       Q.    Good morning.  Could you state your name

14   for the record?

15       A.    Charles Brown.

16       Q.    Good morning, Dr. Brown.  And just for the

17   record, we are doing this deposition via

18   videoconference.  You are in Atlanta, Georgia.  And

19   present in the room with you is Ms. Lourdes Wydler

20   and Ms. Kelsey Moldof, correct?

21       A.    That's correct.

22       Q.    All right.  And present with me in Miami

23   is Ms. Rozalia Williams, the plaintiff.

24             My name is Ria Chattergoon, Dr. Brown, and

25   I represent Ms. Williams in this case.  If you're not



1    hearing me at all today, just let me know, okay?

2         A.    I will.

3         Q.    All right.  Have you been deposed before?

4         A.    No, I haven't.

5         Q.    Okay.  So let me review a couple of rules

6    with you.  You must respond orally, no shrugging of

7    the shoulders, shaking of the head, so that our court

8    reporter can record your testimony.

9         A.    Uh-huh.

10        Q.    Also, let me finish a question before you

11   respond.  If you answer the question, I'm going to

12   assume that you heard it and you're answering to the

13   best of your ability.  If you don't understand a

14   question, ask me to repeat it or rephrase it; and

15   I'll do so.  We may have a little delay because of

16   the videoconferencing.  So, you know, feel free to

17   ask me again if you haven't heard me, okay?

18        A.    Okay.  Fine.

19        Q.    And you do understand that you're under

20   oath today, correct?

21        A.    Yes, I do.

22        Q.    Okay.  And do you suffer from any

23   illnesses or infirmities which will affect your

24   ability to testify truthfully today?

25        A.    I don't think I do.



```
 1          Q.    I'm sorry?

 2          A.    I don't think I do.  No.  No.

 3          Q.    You don't think you do or you know you

 4    don't?

 5          A.    No, I don't.

 6          Q.    All right.

 7          A.    No.

 8          Q.    Do you take any medications or are you

 9    under any drugs which will affect your ability to --

10          A.    No.

11          Q.    -- testify truthfully today?

12          A.    No.

13          Q.    Have you spoken with anyone besides your

14    attorney about today's deposition?

15          A.    No, I have not.

16          Q.    Are you known by any other names,

17    Dr. Brown?

18          A.    No, I'm not.

19          Q.    All right.  And just because I can't see

20    everyone in the room, just for purposes of the

21    record, you can't speak to your attorney during the

22    deposition today.  She can't motion to you or do any

23    sort of gestures in order to assist you with your

24    deposition testimony.  Okay?

25          A.    Yes.
```



1    Q.    All right.  Have you ever been arrested or
2  convicted of a crime?
3    A.    No, I have not.
4    Q.    And have you ever been involved in any
5  other lawsuits?
6    A.    No, I have not.
7    Q.    Other than your attorney, have you spoken
8  to anyone else about this lawsuit?
9    A.    No, I have not.
10    Q.    Have you reviewed any documents in
11  anticipation of today's deposition?
12    A.    Just the information that I received from
13  my attorney and that's it.
14    Q.    Okay.  What information was that?
15    A.    Just the allegations.
16    Q.    Is that the complaint in this matter?
17    A.    Yes.
18    Q.    Any other documents?
19    A.    No, just what was sent to me, just that.
20  I'm assuming that's it.
21    Q.    Did you review your responses to
22  interrogatories --
23    A.    Yes, I did.
24    Q.    -- in preparation?
25    A.    Yes.  That's included, yes.



```
 1        Q.    Okay.  Any other documents?

 2        A.    No.

 3        Q.    Did you review Dr. King's interrogatory

 4   responses?

 5        A.    No, I have not.

 6        Q.    Did you review FAU's interrogatory

 7   responses?

 8        A.    No, I have not.

 9        Q.    Have you reviewed any of the documents

10   that FAU has provided in this lawsuit?

11        A.    No.

12        Q.    Do you maintain any diaries, calendars, or

13   files for this case?

14        A.    I have nothing pertaining to this case.  I

15   left everything when I left Florida Atlantic

16   University.  I have nothing pertaining to this case,

17   no.

18        Q.    Where are you currently employed,

19   Dr. Brown?

20        A.    I am a self-contractor.  I'm

21   self-employed.  I'm doing contract work.

22        Q.    I'm sorry, I didn't -- you're doing

23   subcontracting work for?

24        A.    I am doing contract work for myself,

25   contract.
```



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      10

```
1        Q.    Are you doing that through a company?
2        A.    No.  I solicit contracts on my own, yes,
3   teaching, consulting.
4        Q.    Have you formed a company in order to
5   conduct that work?
6        A.    Pardon me?
7        Q.    Have you formed a company --
8        A.    No, I have not.
9        Q.    -- in order to conduct that work?
10       A.    No, I have not.  I'm just doing things.
11  I'm teaching.
12       Q.    I'm sorry?
13       A.    I say I'm just teaching.  Teaching.
14       Q.    Okay.  Could you do me a favor and pull
15  the phone a little closer to you?
16            MS. WYDLER:  I'm doing it as we speak.  I
17        figured you were having a little difficulty.
18            MS. CHATTERGOON:  Thank you.
19            THE WITNESS:  I'm basically working part
20        time teaching.
21       Q.    (By Ms. Chattergoon)  Okay.  Where are you
22  teaching?
23       A.    Public school system.
24       Q.    And is that secondary school?
25       A.    Yes, it is.
```



1        Q.     Okay.  And what's the name of the school?

2        A.     It's for the district, Clayton County

3   School District.

4        Q.     Clay County?

5        A.     Clayton, C-l --

6        Q.     Clayton.  And are you teaching any

7   specific subjects?

8        A.     I sub as a social studies teacher.

9        Q.     Do you substitute teach; is that --

10       A.     That's what I'm doing.

11       Q.     Okay.  And how long have you been

12   substituting for Clay County -- Clayton County,

13   sorry?

14       A.     Since September, October.  I think that's

15   right.  October.

16       Q.     October of 2015?

17       A.     Yes.

18       Q.     Prior to substituting teaching, where were

19   you employed?

20       A.     Florida Atlantic University.

21       Q.     What was your last date of employment with

22   Florida Atlantic University?

23       A.     It was 2014.  I don't remember the exact

24   date.  2014.

25       Q.     Do you remember when in 2014?



1        A.    No.

2        Q.    Do you remember whether it was the earlier

3   or latter part of 2014?

4        A.    It was in May.  It was -- Dr. Kelly

5   informed me in May, I think, 2014 that he did not --

6   that he was going to make a change in my position.

7   That's right.  April, May.

8        Q.    That was John Kelly?

9        A.    John Kelly, yes.

10       Q.    And he was the president of FAU at the

11  time?

12       A.    He is the president of FAU.  He was the

13  incoming president of FAU.

14       Q.    Were you terminated from the university?

15            MS. WYDLER:  Object to the form.  Just as

16       a standing objection, Ria, it's the university's

17       policy to use the word "separation."  It's part

18       of the board of trustees' regs.  So standing

19       objection on that if you use termination.

20            MS. CHATTERGOON:  Okay.

21       Q.    (By Ms. Chattergoon)  What was the reason

22  for the end of your employment, Dr. Brown?

23       A.    I serve at the pleasure of the president.

24  My contract is one -- vice-presidents serve at the

25  pleasure of the president.  They can either retain or



CHARLES L. BROWN, SR.                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                        13

1    let us go when they take over as president.  He was

2    an incoming president.  He decided to make a change

3    in my position.

4         Q.    What was the change he decided to make?

5         A.    He let me go.  He made a change.  He hired

6    someone else in the position.

7         Q.    What was the reason he let you go?

8         A.    He didn't have to give me a reason.  He

9    just said he's making a change.  You have to ask him

10   that.

11        Q.    Okay.  Do you know who he hired in your

12   position?

13        A.    Yes; Corey King.

14        Q.    How long had John Kelly been the president

15   before he made that change in your position?

16        A.    One month.

17        Q.    One month?

18        A.    Yes.

19        Q.    Had John Kelly served as a vice-president

20   or provost for the university prior to that?

21        A.    Not at Florida Atlantic University.  He

22   came to the university from Clemson University.

23        Q.    Were you given a notice of separation?

24        A.    No.  What do you mean?  Explain what

25   you're asking.



1      Q.    Okay.  Your attorney -- well, Ms. Wydler

2  made a standing objection that the university uses

3  the term "separation" and not "termination."

4      A.    Uh-huh.

5      Q.    According to the regulations, I believe

6  it's 5.008, the university can give a notice of

7  separation without giving a reason --

8      A.    That's true.

9      Q.    -- for that separation.

10          Did you receive one of those?

11     A.    I received one of those after my

12  conversation with him.  He had a letter for me when

13  he called me in, yes.

14     Q.    Okay.  Prior to receiving that letter, did

15  you have any conversations with John Kelly about your

16  employment at FAU?

17     A.    No.

18     Q.    Did you have any -- who was the president

19  before John Kelly?

20     A.    The interim president was Dennis Crudele.

21     Q.    I'm sorry, I didn't get his last name.

22     A.    Crudele.  Dennis Crudele.

23     Q.    Crudele?

24     A.    Uh-huh.

25     Q.    Did you have any discussions with



1  Mr. Crudele about your employment with the

2  university?

3      A.    What do you mean evaluations?  What are

4  you asking?  Are you asking did he evaluate me or --

5      Q.    Did you have any discussions with

6  Mr. Crudele about separating from the university?

7      A.    No, not at all.

8      Q.    Did Mr. Crudele evaluate you?

9      A.    Yes, he did.

10      Q.    And did he give you a good evaluation in

11  your opinion?

12      A.    Well, I think so.  I got a $7,000 raise.

13  I would assume that was a good evaluation.

14      Q.    How long was that evaluation before your

15  separation of employment?

16      A.    A year.  He was interim president for a

17  year.

18      Q.    But when did you receive your evaluation

19  from him?

20      A.    July.  The previous July -- June or July.

21      Q.    Of 2013?

22      A.    Yes.  I think that was -- yes.  I think

23  that's correct.

24      Q.    Who was the president or interim president

25  before Dennis Crudele?



```
 1        A.    The president before Dennis Crudele was
 2   M.J. Saunders.
 3        Q.    And when did Ms. Saunders cease being the
 4   president?
 5        A.    I don't know the exact date.  I'm quite
 6   sure there are records of it, but I don't know the
 7   exact date.  It was spring semester, I think -- I
 8   don't know the exact date.  I don't want to try to
 9   answer something that I don't know.
10        Q.    Okay.
11        A.    I don't remember.
12        Q.    And fair enough.  I don't want you to
13   guess at anything today, okay?
14        A.    Yeah, I'm not going to guess.  That's why
15   I said I really don't know.
16        Q.    All right.  And what was your position at
17   FAU?
18        A.    I was vice-president for student affairs.
19        Q.    And how long were you in that position?
20        A.    Approximately eight years, seven and a
21   half to eight years.
22        Q.    Prior to holding the position of
23   vice-president of student affairs, where did you
24   work?
25        A.    I worked -- I came to Florida Atlantic
```



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 18 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       17

1   University from the University of South Florida,

2   St. Petersburg.  I was vice-chancellor for student

3   affairs at USF, St. Petersburg.

4        Q.    Can you give me the years of your

5   employment at USF?

6        A.    I don't -- I could send you a copy of my

7   resume, and it has it listed.  I don't want to give

8   you inaccurate dates.  I was there three years.

9        Q.    Okay.  So if you were at FAU for seven and

10  a half, eight years, then you started at FAU

11  around --

12       A.    2006.

13       Q.    -- two thousand -- I'm sorry?

14       A.    2006.

15       Q.    2006.  And so then were you at USF from

16  2003 to 2006?

17       A.    That's probably correct, yes.

18       Q.    Who hired you at FAU as the vice-president

19  of student affairs?

20       A.    At FAU?

21       Q.    Yes.

22       A.    Frank Brogan.

23       Q.    Have you ever had a claim made against you

24  involving gender discrimination?

25       A.    No, I have not.



1              MS. WYDLER:  Object to the form.

2       Q.    (By Ms. Chattergoon)  Have you ever had a

3  claim, and when I say a claim, for the record, I

4  mean, have you ever had a lawsuit or an EEO claim or

5  an EEOC claim filed against you for gender

6  discrimination?

7              MS. WYDLER:  Object to the form.

8       Q.    (By Ms. Chattergoon)  You can answer.

9       A.    No.

10      Q.    Have you ever had a claim for sexual

11 harassment made against you?

12             MS. WYDLER:  Object to the form.

13      Q.    (By Ms. Chattergoon)  When Ms. Wydler or

14 Ms. Moldof objects, you can still answer.

15      A.    No.

16      Q.    Have you ever had a claim of sexual

17 harassment against you -- being made against you at

18 the University of South Florida?

19      A.    No.

20      Q.    Have you ever had a claim or complaint of

21 retaliation made against you at the University of

22 South Florida?

23      A.    No.  No, I have not.

24      Q.    When you were hired at FAU in 2006, were

25 you provided with any training for your position?



1      A.    What type of training are you referring

2   to?

3      Q.    Were you given any type of professional

4   training, significant for your particular position as

5   vice-president of student affairs?

6      A.    I've gone through training throughout my

7   career.  When I first became a vice-president of

8   student affairs, I've gone through professional

9   training.  I have gone to -- which was national,

10  local, and state level training, yes.  The

11  professional organizations that I am a member of

12  provide training for individuals moving into the

13  vice-president of student affairs position.  So I

14  have gone through training.

15     Q.    Okay.  What associations are those?

16     A.    NASPA, National Association of Student

17  Personnel Administrators, and the American College of

18  Personnel Association all provide training for --

19  especially NASPA.  It's the largest student affairs

20  organization in the country.  It has workshops every

21  year for individuals moving into the chief student

22  affairs position.

23     Q.    You said they provide specific training

24  for people moving into those positions?

25     A.    They have workshops that are geared toward



1  new vice-presidents for student affairs.

2       Q.    And so someone who wanted to be a

3  vice-president or move into that position would

4  attend those types of workshops?

5       A.    They could go to the workshops, yes.  I've

6  even conducted some of the workshops since I've been

7  a vice-president.

8       Q.    Did you conduct any of those workshops at

9  FAU?

10      A.    I have worked -- we had staff development

11 workshops.  I set up workshops for the staff, all of

12 our staff.  We brought people in, and we had ongoing

13 staff development programs.  A variety of programs we

14 offered to our staff because we knew everybody could

15 not travel to conferences.

16      Q.    Okay.  And you set up those workshops.

17 Did you actually facilitate and conduct those

18 workshops?

19      A.    I've done some, yes, not all of them.

20      Q.    Did you attend any of the NASPA or ACPA

21 training during your employment as the vice-president

22 of student affairs with FAU?

23      A.    I went to conferences, yes.  And we had

24 conferences -- we had workshops specific for chief

25 student affairs officers, yes.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        21

1        Q.    Okay.  And those workshops that you

2   facilitated and conducted at FAU during your

3   vice-presidency, what were they?

4        A.    They were workshops on leadership,

5   workshops on financial management.  I co-facilitated

6   workshops with my budget person at FAU.  So there

7   were a variety of workshops in terms of how to deal

8   with students and on and on and on.  Many workshops,

9   yes.

10       Q.    And for the ones directly geared towards

11  leadership, who attended those workshops?

12       A.    Staff.  We had workshops for staff

13  members, yes.

14       Q.    Okay.  Would those be staff members in

15  your department?

16       A.    Yes.  In the division, yes.  And we also

17  brought in outside speakers, which was a part of the

18  workshops.  And we did a lot of that when I first

19  became vice-president and not as much during the

20  latter years.

21       Q.    Okay.  Putting aside the professional

22  training for a second, were you provided with any

23  discrimination training when you were first hired at

24  FAU?

25       A.    We -- I met with people in the EOC office,



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 23 of 200

CHARLES L. BROWN, SR.                                      March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          22

1    Paula Behul and her staff, and she would update me on

2    things.  Our attorneys oftentimes -- I always had the

3    attorneys to come and do a workshop with the

4    division, and I met with the attorney assigned to

5    student affairs on a regular basis with my issues and

6    concerns as related to legal ramifications for the

7    division of student affairs.

8          Q.    Who was that attorney that was assigned to

9    the student affairs division?

10         A.    First it was Larry Glick.  My first two

11   years, three years, Larry Glick.  And then Audra -- I

12   don't know her -- I have forgotten her last name.

13         Q.    Okay.  Larry and Audra were the only two

14   assigned?

15         A.    Yes.

16         Q.    Okay.  How often did you meet with Paula

17   Behul about discrimination?

18         A.    Not often.  Not often.

19         Q.    Okay.  In your seven and a half, eight

20   years of employment, how many times would you say you

21   met with Paula Behul about discrimination training?

22         A.    About discrimination training?

23               MS. WYDLER:  Form.

24         Q.    (By Ms. Chattergoon)  For discrimination

25   training.



CHARLES L. BROWN, SR.                                           March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                              23

```
 1              MS. WYDLER:  Form.

 2              THE WITNESS:  I don't quite --

 3        Q.    (By Ms. Chattergoon)  Let me rephrase that

 4    for you.

 5        A.    Yeah, I don't quite get your question.

 6        Q.    Okay.  How often -- you stated earlier

 7    that you met with Paula Behul and she would update

 8    you --

 9        A.    Yes.

10        Q.    -- on things, discrimination issues,

11    correct?

12        A.    Yes.  Just to update me on policies,

13    procedures, university's policies and procedures and

14    to keep me abreast of things that I should be aware

15    of, change in laws, those kinds of things.  And it

16    wasn't -- they were not formal meetings.  We would

17    just meet and just talk about things that I think --

18    I thought -- actually, I would come with questions

19    about things, what's new, issues, concerns.  So they

20    were more informal than formal.

21        Q.    Okay.  How many times would you say you

22    met with Paula about these issues?

23        A.    Not that often.  Maybe once a year.  Maybe

24    once a year.

25        Q.    Did you ever meet with Robin Kabat about
```



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 25 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        24

1   discrimination issues?

2        A.     Only when there was a -- yeah, I don't --

3   rephrase that.  I really don't know what you're

4   trying -- you're asking me.

5        Q.     Okay.  You stated that you met with Paula

6   Behul and she would update you on FAU's procedures,

7   policies, changes regarding discrimination issues,

8   correct?

9        A.     Yes.

10       Q.     Okay.  Did you meet with Robin Kabat about

11  those same issues and policies and procedures?

12       A.     Robin was not the EOC person.  She was

13  human resources.

14       Q.     Okay.

15       A.     It's not -- Robin is not an EOC person.

16       Q.     Okay.  Did you ever receive any training

17  on harassment from FAU?

18       A.     Yes.

19       Q.     Okay.  When did you receive that training?

20       A.     I don't remember, but I did.

21       Q.     Okay.  Do you remember whether it was

22  early on in your employment or after?

23       A.     It was earlier on in my employment at

24  Florida Atlantic University.

25       Q.     Did you receive any training on



1   discrimination or harassment from about 2011 to the

2   end of your employment?

3       A.    I don't recall.  I could have, but I don't

4   recall.

5       Q.    Did you ever receive a handbook from the

6   university?

7       A.    Did I ever receive a?

8       Q.    Handbook, an employee handbook.

9       A.    Yes.  Every employee gets one.

10      Q.    I'm sorry?

11      A.    You can go online and look at the -- are

12  you talking about human resources' policies and

13  procedures?  I went on --

14      Q.    Correct.

15      A.    I go online.  I did not receive a book,

16  but I went online to look at -- I always go online,

17  and I encourage employees to go online and read the

18  policies and procedures of -- HR policies and

19  procedures.

20      Q.    Okay.  You stated earlier that Dr. King

21  became the vice-president of student affairs,

22  correct?

23      A.    Yes.

24      Q.    Okay.  Prior to that, was he the associate

25  dean of students?



1       A.     No.

2       Q.     Or the --

3       A.     No.

4       Q.     What was his title?

5       A.     He was the associate vice-president and

6    dean of students.

7       Q.     Did you hire Dr. King?

8       A.     Yes, I did.

9       Q.     When did you hire him?

10      A.     I don't know the exact date.  I think it

11   was my second year as vice-president of student

12   affairs at Florida Atlantic.

13      Q.     Okay.  And who was the associate

14   vice-president and dean of students prior to

15   Dr. King?

16      A.     We didn't have one.  It was a title that I

17   created.  We had an assistant -- we had a dean of

18   students.  We did not have an assistant dean or

19   associate -- I mean, assistant vice-president or

20   associate vice-president.  We just had a dean of

21   students.

22      Q.     Who was the dean of students?

23      A.     Leslie Bates.

24      Q.     I'm sorry?

25      A.     Leslie Bates.



CHARLES L. BROWN, SR.                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                         27

1        Q.    Is Leslie a male or a female?

2        A.    A male.

3        Q.    When was Leslie Bates the dean of

4   students?

5        A.    Prior to my coming there up until a year

6   after I got there.  So he was dean of students --

7        Q.    Okay.

8        A.    -- long before I arrived there.

9        Q.    Do you know Mr. Bates's last name -- I'm

10  sorry, his race?

11       A.    He's African American.

12       Q.    Do you know how old he was?

13       A.    I don't know.  I really don't know what

14  his age was, no.

15       Q.    Why did you decide to create the position

16  of associate vice-president and dean of students?

17       A.    When I arrived at Florida Atlantic

18  University, Frank Brogan promised me resources to

19  really create a vibrant student affairs division.  I

20  received three new positions to fill; one associate

21  VP for campus life, associate VP for -- I redesigned

22  the dean of students office and created the associate

23  VP and dean of students to restructure, include more

24  things in that office.  I lost one of the positions.

25  I got -- there were two other positions.  I can't



1    recall the name of them, but I got money for those

2    positions.  The monies were -- all but the associate

3    VP and dean of students.

4              One of the things that the president at

5    the time asked me to do was really create a dean of

6    students office that addressed the issues and

7    concerns of students more thoroughly.  So I changed

8    the title from dean of students to associate

9    vice-president and dean of students.  I needed

10   someone who would be second in command when I was not

11   on campus.  I needed someone who really understood

12   judicial process.  I restructured the judicial

13   process.  I restructured the campus life process.

14   And this person became the second in command for the

15   division.

16        Q.    How did you restructure the judicial

17   process?

18        A.    We had -- first of all, we did not have a

19   system where records were kept accurately and

20   correctly.  We automated the system.  We brought in

21   technology, put everything on files and discs.  Hired

22   new staff.  Did national searches to upgrade the

23   staff, upgrade the positions.  A lot of things.

24              I brought a consultant in to look at the

25   division of student affairs.  And much of what I did



CHARLES L. BROWN, SR.                                   March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        29

 1   was based on a consultant's report.  We had Art

 2   Sandeen, who was guru of student affairs, long time

 3   VP at Florida, University of Florida, for 25 years.

 4   Lee Tubbs, who had been a long-time VP for student

 5   affairs and faculty member, who did a lot of

 6   publications on student affairs.  They came in, spent

 7   three days with us looking at all of our campuses,

 8   made recommendations.

 9        Those recommendations were taken by me to

10   the senior staff with President Brogan.  I asked for

11   funding based on those recommendations.  They

12   recommended that the dean of students office be

13   restructured.  That report is somewhere on campus,

14   probably in the vice-president's office.  That's what

15   I used as my blueprint and my strategy to restructure

16   the division as well as the dean of students, the

17   dean of students being the first office.

18        The counseling center and other -- most of

19   the major offices were restructured based on

20   consultants coming in and looking at how we were

21   operating, looking at the growth of Florida Atlantic

22   University, and looking at where we were going as an

23   institution, having more students living on campus,

24   providing more services to students.  So I used that

25   as my blueprint.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        30

1       Q.     Okay.   Who were the consultants you worked

2    with?

3       A.     Art Sandeen, who was the vice-president

4    for student affairs at the University of Florida for

5    25 years and a leader in student affairs, national

6    leader in student affairs across the country.  Lee

7    Tubbs, who was long-time VP for student affairs at

8    the University of Central Florida, who was also a

9    nationally known expert in student affairs.  Those

10   two people came in and did a thorough evaluation, met

11   with staff, met with the vice-president, met with

12   faculty members, met with deans, met with students,

13   and prepared a report for me that I used as my

14   strategic guidelines to redevelop, restructure the

15   division of student affairs at Florida Atlantic

16   University.  Included in there was a request for

17   positions and funding levels for each of the

18   positions, yes.

19      Q.     When you began your search for the

20   associate vice-president and dean of students, did

21   you form a search committee?

22      A.     Yes, I did.

23      Q.     How many people were on that search

24   committee?

25      A.     I don't remember.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        31

1          Q.    Do you recall giving any direction to the

2    search committee to finding the ideal candidate for

3    that position?

4          A.    Yes, I did.  I told them I wanted the best

5    candidate.  It was a national search.  I explained to

6    them that -- I explained to them that I had no one in

7    mind.  It was an open search.  We were going to try

8    to select the best person for the position.  Those

9    were my directives.

10         Q.    Did you give a directive that you wanted

11   to find a male candidate for that position?

12         A.    No.

13               MS. WYDLER:  Object to form.

14               MS. CHATTERGOON:  What's wrong with the

15         form?

16               MS. WYDLER:  What's the candidate

17         definition?

18               MS. CHATTERGOON:  The candidate is the

19         associate -- the candidate for the associate VP

20         and dean of students.

21         Q.    (By Ms. Chattergoon)  Did you understand

22   that I was talking about that candidate, Dr. Brown?

23         A.    Yes, I understand it, but let me just

24   explain.  When we do searches, we don't say we want a

25   male or a female.  I've never done that, no.  I did



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        32

1    not say I wanted a male.  I did not say I wanted a

2    female.  One of the things that we do stress is

3    diversity.  We talk about diversity of staff.  The

4    president -- that was a mandate from President Brogan

5    that we try to be reflective of our -- the students

6    that we serve.  But I never said it has to be a male,

7    it has to be a female, it has to be black, or it has

8    to be white or Hispanic or --

9         Q.    Did you ever -- I'm sorry.  I interrupted

10   you.

11        A.    -- or any other ethnic group.

12        Q.    Did you ever say to Dr. Williams privately

13   that you wanted to fill that position with an African

14   American male?

15        A.    No, I don't remember saying that to her.

16        Q.    Is it possible that you said that to her?

17        A.    No.

18              MS. WYDLER:  Object to the form.

19              THE WITNESS:  If -- okay.  No.

20        Q.    (By Ms. Chattergoon)  How many candidates

21   did you interview for that associate vice-president

22   and dean of students?

23        A.    I really don't remember.  At this time I

24   really don't remember.  That's been --

25        Q.    Did you -- I'm sorry.  I interrupted you.



CHARLES L. BROWN, SR.                                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                             33

1      A.    That's been eight -- that's been almost

2    eight years ago.  I really don't remember.

3      Q.    Did you interview any female candidates

4    for that position?

5      A.    I don't know.  I don't remember.

6      Q.    Did you interview anyone over 40 for that

7    position?

8      A.    Let me go back.  We did interview a female

9    for that position.  I remember, there was a female

10   for the position.  There were people -- there were

11   people over 40 interviewing for the position, yes.

12   Yes.

13     Q.    Okay.  Do you remember her name?

14     A.    No.  But I'm quite sure if you go to

15   records you can find it.

16     Q.    Okay.  Do you recall why you didn't hire

17   her?

18     A.    She wasn't the best fit for the job.

19     Q.    Do you know how old Dr. King was when you

20   hired him?

21     A.    No, I did not.

22     Q.    Did you ever tell Sandy Jakubow that you

23   wanted to hire an African American male?

24     A.    No, I did not.

25     Q.    What were the duties of an associate



1    vice-president and dean of students?

2        A.    The duties were to -- the primary duty was

3    to run the division of -- run the dean of students

4    office, be the second in command.  When I was away

5    from the campus, that person often stepped into my

6    role, attended meetings for me.  I restructured many

7    of the units that reported to me.  They reported to

8    him.  I took the campus life operation and moved

9    those to him.  I had the larger operations, like

10   housing, the counseling center, the career center.

11   And he had the campus life piece as well as the

12   student activity piece.

13       Q.    And was the associate vice-president and

14   dean of students -- you mentioned earlier you needed

15   someone who understood the judicial process.  Was the

16   associate vice-president and dean of students the

17   chief judicial officer?

18       A.    Yes.  They were responsible for the

19   administration of the code of conduct, yeah.

20       Q.    Okay.  And did you believe Dr. King was

21   the best candidate for that?

22       A.    Based on the candidates that came in, yes.

23   And -- yes.  Yes.

24       Q.    What made him the best candidate for that

25   position, Dr. King?



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        35

 1        A.     Dr. King had served at -- he understood

 2   the Florida system.  He went to Florida State.  He

 3   worked at Florida State.  He worked at the University

 4   of Florida.  He was a hearing officer at the

 5   University of Florida.  He worked with attorneys in

 6   terms of disciplinary cases in Florida, and that's

 7   one of the reasons that I -- one of the reasons I

 8   decided to hire him.

 9        Q.     What made him an ideal candidate for the

10   chief judicial officer portion of this position?

11        A.     He was ideal because he understood the SUS

12   student code of conduct process.  He understood it.

13   He had worked in two SUS schools.  He understood it.

14        Q.     Did you ever sit with Dr. King and discuss

15   the student code of conduct and -- well, strike that.

16             I'm going to show you a number of

17   documents today.  It's going to be a little bit

18   difficult because we're on the video and I'm not

19   there in person.  So what I'm going to do is refer to

20   the documents by the Bates stamp number.  Those are

21   the numbers at the bottom of the document.  And your

22   attorney will probably assist you with them.  Okay?

23        A.     Sure.  That's fine.

24        Q.     All right.  The first document I want to

25   show you is the student code of conduct.



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 37 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        36

1      A.     Okay.

2      Q.     And that's Bates labeled FAU 1485 through

3   1504.

4      A.     Uh-huh.

5             (Plaintiff's Exhibit-Brown-1 was marked

6   for identification.)

7      Q.     (By Ms. Chattergoon)  Dr. Brown, this has

8   been provided -- the student code of conduct in front

9   of you.  It's Regulation 4.007.  It's been provided

10  by Florida Atlantic University to me.  Just for

11  purposes of the record, it is missing Pages 20 and

12  21.  We figured that out yesterday.  And so that

13  you're aware, it's not a full and complete copy of

14  the student code of conduct, okay?

15     A.     Okay.  Uh-huh.  Sure.

16     Q.     Have you reviewed this student code of

17  conduct before?

18     A.     Years ago, yes.  I've not seen it since I

19  left Florida Atlantic University.  So I've not looked

20  at it in almost two years.

21     Q.     Okay.  Fair enough.  Did you participate

22  in any way in defining who the dean of students was

23  for the student code of conduct?

24     A.     I don't understand the question.

25     Q.     Sure.  Take a look at Page 4 -- I'm sorry,



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          37

```
 1    Page 2, Paragraph 4, the definitions.

 2         A.    Uh-huh.

 3         Q.    F, which says the dean of students.

 4         A.    Uh-huh.

 5         Q.    And it says:  The term "dean of students"

 6    refers to any of the following persons or offices:

 7    associate vice-president and dean of students,

 8    associate dean of students, assistant dean of

 9    students, or designee.

10         A.    Okay.

11         Q.    Did you ever participate in defining who

12    were these dean of students under Section F?

13         A.    I still don't understand what I'm being

14    asked.  I really don't --

15         Q.    Okay.

16         A.    -- understand what I'm being asked.

17         Q.    Let me try to clarify.  Did you have any

18    input on who was being defined as the dean of

19    students under Section F?

20              MS. WYDLER:  Form.

21              THE WITNESS:  I still don't understand

22         what the question is.

23         Q.    (By Ms. Chattergoon)  Okay.  Do you see in

24    Paragraph 4 it says definitions?

25         A.    Yes, I see the -- I see what you're
```



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        38

 1   saying.  What are you asking me?  That's what --

 2        Q.   I'm asking you did you have any input as

 3   the vice-president of student affairs to determine

 4   who was defined as the dean of students under

 5   Section F?

 6        A.   Yes, I would.  Yes.  I guess.  Yes.  Yes.

 7   I'm trying to understand what you're asking me.  But,

 8   yes, because I -- I reviewed the document, yes.  If

 9   you're asking me that, I reviewed the document, yes.

10        Q.   Okay.  Did you ever add or delete any

11   position from the dean of students definition?

12        A.   I don't know.  I really don't know.  It's

13   been so long.  I really don't know.  We reviewed --

14   we reviewed this document annually.  So we could have

15   deleted things.  We add things.  We meet every year.

16   The associate deans, the dean of students, and the

17   advisor -- the legal advisor to the dean -- to the

18   vice -- to the division of student affairs, we meet

19   annually, go through the code of conduct to make sure

20   that everything is updated.  There are things that we

21   delete.  There are things that we add to make sure

22   that we serve students well.  The idea behind the

23   meeting was to make sure that the document was clear

24   to our students.

25        Q.   I'm sorry, the document what?



CHARLES L. BROWN, SR.                                  March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      39

1          A.      Was clear to our students.

2          Q.      Okay.  And so in meeting and reviewing the

3    document, did you change language in the document

4    every year?

5          A.      We could have, yes.  We could have.

6    Because when you're trying to make something more

7    efficient, sometimes you add and sometimes you

8    delete.

9          Q.      And you said the purpose of that was to

10   make the document more clear, correct?

11         A.      Yes, to clarify.

12         Q.      I want you to take a look at Page 8,

13   Paragraph 9, Emergency Measures.  Just let me know

14   when you have had a chance to review it.

15         A.      Uh-huh.

16         Q.      Do you recall ever changing the language

17   or adding or deleting language to this section

18   labeled as Emergency Measures?

19         A.      We could have.

20         Q.      Okay.

21         A.      We could have.  We could have.  As I

22   stated earlier, we meet -- we met annually when I was

23   vice-president to review the document.  I asked the

24   associate deans, the deans -- even our hearing

25   officers to make comments, suggestions throughout the



1   year in terms of things that we might want to address

2   during our annual review of this document.  So we

3   could have.

4        Q.    Okay.  Could you walk me through the

5   process -- well, before we get there, how many

6   employees did you directly supervise?

7        A.    It depended.  At one time we had about 300

8   employees.  With budget cuts and the state going

9   through budget crisis, we were down to like 250

10   employees at Florida Atlantic.  So it vacillated

11   between 250 and 300 employees.

12        Q.    And those employees -- I'm sorry.  I

13   interrupted you.

14        A.    Pardon me?

15        Q.    No, I interrupted you.  I apologize.

16        A.    I just said it vacillated based on budget

17   and based on times.  We went crisis mode most of the

18   time I was there.  So we had to -- we cut positions,

19   and we integrated duties into positions that we kept.

20   So we vacillated between 250 and 300 people in the

21   division.

22        Q.    Were those your direct reports, the 250 to

23   300 employees?

24        A.    Pardon me?

25        Q.    Did those employees directly report to



```
 1   you, the 250 to 300 employees you're talking about?
 2        A.    No.
 3        Q.    Okay.  How many direct reports did you
 4   have?
 5        A.    I don't remember.  I don't want to give
 6   you a number.  I would say five or six.
 7        Q.    Do you remember the position of those five
 8   or six individuals?
 9        A.    Yes.  Housing, associate vice-president
10   and dean of students, director of the career center,
11   director of the counseling center -- and who else --
12   director of -- the assistant vice-president and
13   budget director, and director of communications.  But
14   it changed.  That's -- the reason I'm hesitating is
15   because it changed because I restructured the
16   division.  Because at one point --
17        Q.    When did you -- sorry.  Go ahead.
18        A.    At one point the associate deans on the --
19   the associate and assistant deans on the partner
20   campuses reported to me.  When M.J. Saunders arrived
21   on campus, she asked each of the vice-presidents to
22   look at those areas on the partner campuses that
23   would fall under them and start to integrate those
24   under them with direct supervision, reporting to each
25   vice-president.  I started slow; the counseling
```



CHARLES L. BROWN, SR.                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                              42

```
 1    center, career center.  And the dean of students
 2    office was the last one that I integrated into.  I
 3    had planned to do it, and it was the last one we did.
 4    So, basically, what we did, based on her directives,
 5    each of the vice-presidents -- like the finance
 6    person would take over all of the financial
 7    operations on the partner campuses.  I took over all
 8    the student affairs operation.  That's when I merged
 9    the associate deans/assistant deans into the dean of
10    students office, reporting to Dr. King.
11         Q.    Do you recall when that was?
12         A.    2013.  I think that's right.  '13, I
13    think.
14         Q.    Prior to that were the associate deans on
15    the partner campuses reporting to you directly?
16         A.    They reported to me directly, and they had
17    a dotted line also to the dean -- the vice-presidents
18    of those campuses.
19         Q.    Okay.  Did the associate deans on the
20    partner campuses report at all to the associate
21    vice-president and dean of students?
22         A.    Yes, they did because he was responsible
23    for all of the judicial, the code of -- the
24    administration of the code of conduct.
25         Q.    When you say he was responsible for the
```



1    administration of the code of conduct, what do you

2    mean by that?

3        A.    He was responsible for adjudicating the

4    cases, making sure hearing officers were trained,

5    panels were trained.  The process is that the dean of

6    students office would investigate any complaint

7    regarding student discipline.  We separated it out.

8    One of the things that I did when I restructured the

9    office, based on my conversations with President

10   Brogan and with our attorneys, is that we needed to

11   separate the adjudication process from the appellate

12   process.  The position that I held was the final

13   appeal for the university and the board of trustees.

14   So I separated -- this was one of the reasons I

15   restructured the dean's office.  I needed someone who

16   could come in and administer the code of conduct,

17   train -- make sure the training was done in a fair

18   way, in a timely way, involve more people across the

19   campus in the hearing process either as a hearing

20   officer or as a -- sitting on a hearing panel.  I

21   removed myself from that process because I was the --

22   and I was advised by the attorneys that if I'm the

23   final appellate piece of a case, I do not need to be

24   involved in the day-to-day hearing process.

25       Q.    Okay.  So the associate vice-president and



```
 1    dean of students, who was Dr. King at the time --
 2         A.    Yes.
 3         Q.    -- would be responsible for that process,
 4    the investigation process --
 5         A.    Yes.
 6         Q.    -- the administration of the judicial --
 7    of the code of conduct, correct?
 8         A.    Yes.
 9              MS. WYDLER:   Object to the form.
10              THE WITNESS:   It fell under his -- that
11         responsibility fell under his office, yes.  Yes.
12         Q.    (By Ms. Chattergoon)  Was the associate
13    vice-president and dean of students, and in this case
14    at the time that was Dr. King, was he required to
15    consult with you regarding, and to quote you, the
16    administration of that process?
17         A.    We talked about cases, yes.  But in terms
18    of the day-to-day process of a hearing, I was not
19    involved in that.  Sure, he would let me know what
20    cases were being heard.  He would let me know issues
21    and concerns because I needed to keep the president
22    abreast of those issues that might become a public
23    problem for the university.  Anytime you're dealing
24    with students, you never know what's going to happen.
25         Q.    Did you rely on Dr. King to keep you
```



1    abreast of those public issues?

2                MS. WYDLER:  Form.

3                THE WITNESS:  He was the dean of students,

4        yes.  Yes.

5        Q.    (By Ms. Chattergoon)  To clarify, at one

6    point did the -- the dean on the partner campuses

7    reported to you, correct?

8        A.    Yes.

9        Q.    With a dotted line to the VP of that --

10   whatever campus they were placed on, correct?

11       A.    Yes.

12       Q.    Did you supervise Dr. Williams at any

13   time?

14       A.    For a short time, yes.

15       Q.    Okay.  How long?

16       A.    I don't remember the date.  Whenever she

17   was appointed to that position up until I changed it.

18   Whatever timeline that is, that's how long I

19   supervised her until I changed the reporting line.  I

20   don't know the exact date.  I'm quite sure it's in

21   the records, yes.

22       Q.    Okay.  Prior to being appointed the

23   associate -- well, strike that.

24                Do you recall which campus she was the

25   associate dean of students for?



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 47 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        46

```
 1        A.    Yes.  Yes, I do.

 2        Q.    What campus?

 3        A.    The Broward campuses.

 4        Q.    Okay.  Prior to being the associate dean

 5   of students on the Broward campus, do you know what

 6   position Dr. Williams held?

 7        A.    Yes.  She was multicultural --

 8        Q.    What position did she have?

 9        A.    She was multicultural affairs at Broward,

10   and then I promoted her to be director of

11   multicultural affairs on the Boca campus.  I promoted

12   her to become associate dean.

13        Q.    Okay.  And were you her supervisor as the

14   director of multicultural affairs?

15        A.    No, I was not.  Dr. King was.  That was

16   one of the units that reported to Dr. King.

17        Q.    When you promoted -- well, let me ask you

18   this.  Prior to Dr. King's hiring as associate

19   vice-president and dean of students, was there an

20   interim associate vice-president and dean of

21   students?

22        A.    Let me see.  No.  No.  What I did -- no,

23   there wasn't.  No.

24        Q.    Was Terry Mena ever the interim associate

25   dean of students or associate vice-president?
```



1      A.    He was interim associate dean, but he was

2   not an interim associate vice-president and dean of

3   students.  He was interim associate dean, which is --

4      Q.    When was he --

5      A.    -- which is quite different from the

6   associate vice-president and dean of students.

7      Q.    How was it different?

8      A.    Terry Mena took -- I had two vacancies.

9   Terry Mena -- the associate dean of students at Boca

10  got married and moved to New York.  Leslie Bates

11  retired from the position as dean of students on the

12  Boca campus.  Both positions were open.  Terry Mena,

13  I -- Terry Mena had been with the university.  I

14  promoted him to interim associate dean on the Boca

15  campus from the Broward.  The position that

16  Dr. Williams is in now belonged to someone.  Terry

17  was the director of student activities at FAU some

18  years.  And I sought out recommendations from members

19  of the student affairs staff who would be -- because

20  I had only been there a year -- who would be a good

21  person to move into Lisa Bardell's role to help me

22  run the dean of students office.  Terry Mena was

23  brought in as the associate dean, not the

24  associate -- interim associate dean, at that, not the

25  interim associate vice-president and dean of



1  students.  That position stayed vacant.  I sort of
2  ran it from my office until we could finish the
3  search.  So he was never interim associate
4  vice-president and dean of students.
5       Q.    Okay.  Do you recall when he became the
6  associate dean of students?
7       A.    No.  I don't want to give you the wrong
8  date.  No.  But he was -- I appointed him associate
9  dean of students, yes.
10       Q.    Did Terry Mena perform any of the duties
11  that Dr. King ultimately performed when he became
12  associate vice-president and dean of students?
13       A.    Many of the duties that Dr. King took on
14  were sort of new -- I restructured the office at that
15  time.  I keep -- I have to -- I have to reiterate
16  that because the office was not in very good shape.
17  We did not have records.  There were a lot of issues
18  in the office.  So a lot of things, we built those
19  things.
20            When Dr. King was hired, I sat with him
21  and told him what I wanted.  I had pulled -- I had
22  looked at other schools across the country.  I based
23  it on my experience as being a vice-president at
24  three other -- at two other institutions.  I knew
25  what a dean of students office should look like.  In



1    my conversations with President Brogan at the time, I

2    shared those things with him.  He provided some

3    additional funding for me to get -- to carry out

4    those things.

5              No.  When Dr. King came, we started to

6    build the office.  I laid out some things that I

7    wanted done.  He carried those things out.  The

8    office is quite different than it was before he

9    arrived there.  And Terry was interim.  As I said, he

10   was the interim associate.  He did a few of the

11   things that I needed done.  The day-to-day things

12   that I could not do, yes, he did those things.  I

13   served as both until we got an associate VP and dean

14   of students.  I sort of ran the office.  I didn't do

15   a good job, but I did it until we got a good person

16   to come in.

17             MS. CHATTERGOON:  Okay.  Lourdes and

18        Dr. Brown and Kelsey, I need to take a

19        three-minute bathroom break.  Just for purposes

20        of timing, we're going to take a three-minute

21        break now.  We can take a lunch break around

22        1:00 for 45 minutes, and then we can try to

23        finish up because I know you guys have flights

24        to catch.

25             MS. WYDLER:  Thank you.



1          MS. CHATTERGOON:  All right.  So we'll be

2      right back.

3          MS. MOLDOF:  Okay.

4          (A recess was taken from 12:04 p.m. to

5   12:13 p.m.)

6          MS. CHATTERGOON:  We're back on.

7      Q.   (By Ms. Chattergoon)  Dr. Brown, in your

8   position as vice-president of student affairs, did

9   you ever discipline an employee who was your

10  subordinate?

11     A.   Yes.

12     Q.   From about 2011 to 2014, how many

13  employees did you discipline?

14     A.   I don't recall.

15     Q.   Okay.  Do you recall any employees that

16  you disciplined?

17     A.   No.  No.

18     Q.   Okay.  Did you ever give any of your

19  subordinates a letter of reprimand?

20     A.   Yes.

21     Q.   And who was that?

22     A.   Jill Eckardt and -- the director of

23  housing and associate director of housing.

24     Q.   I'm sorry, say that again.

25     A.   The director of housing and the associate



1    director of housing.

2          Q.    And who was that?

3          A.    I can't even recall her name.

4          Q.    Okay.  Was Jill Eckardt the director of

5    housing?

6          A.    Jill was the director of housing, yes.

7          Q.    And why did you give her a letter of

8    reprimand?

9          A.    An incident occurred in housing and our

10   protocol was not followed.

11         Q.    Did you ever terminate any employee?

12         A.    Yes.

13         Q.    And who was that?

14         A.    Two employees from another institution and

15   two employees, Dr. Williams and Jill Eckardt.

16         Q.    Okay.  And, I'm sorry, let me clarify

17   that.  Did you terminate any employees in your

18   position as vice-president of student affairs for

19   FAU?

20         A.    Other than Jill Eckardt -- Jill Eckardt.

21         Q.    Okay.  And did you give Jill Eckardt the

22   letter of reprimand before her termination?

23         A.    No.

24         Q.    Okay.  When did you give her the letter of

25   reprimand?



```
 1        A.     That was almost -- I don't remember, but
 2   it was early on.   I don't know.   I don't remember the
 3   date.
 4        Q.     Do you remember how long before or
 5   after -- well, it had to be before -- before her
 6   termination did you give Jill Eckardt a letter of
 7   reprimand?
 8        A.     No, I don't remember.
 9        Q.     And you said you gave Ms. Eckardt a letter
10   of reprimand for failure to follow protocol regarding
11   an incident?
12        A.     Uh-huh.
13        Q.     You have to say yes or no for the record.
14               MS. MOLDOF:   You have to verbally say yes
15        or no.   You can't say uh-huh or huh-uh.
16               THE WITNESS:   Repeat the question, please.
17        Q.     (By Ms. Chattergoon)   Sure.   Just to
18   confirm your testimony, you said you gave Jill
19   Eckardt a letter of reprimand for failure to follow
20   protocol for an incident that occurred in housing?
21        A.     Uh-huh.   Yes.
22        Q.     Okay.   And what was that incident?
23        A.     The incident involved allowing a group of
24   protesting students to enter the residence halls and
25   walk the floors and post posters on doors.   And our
```

1    policy, because of safety, we don't allow people into

2    the residence halls on the floors unless they live

3    there.  You have to have a key to get in the

4    elevator, go up the elevator.  And the students were

5    allowed to go upstairs, place stuff.  And we didn't

6    know who they were.  We knew they were FAU students,

7    but we really didn't know who they were.  And that

8    was a safety issue.  Someone could have been hurt.

9         Q.    And what were students protesting?

10        A.    It was -- it was -- I don't know.  They

11   were protesting.  I don't know.  I don't remember.

12        Q.    Do you recall what year this was?

13        A.    No.

14        Q.    And how did Jill Eckardt fail to follow

15   protocol?

16        A.    Her staff did not -- she did not inform

17   the staff of the policy, and the staff allowed these

18   young people to enter the elevator, go to the floors,

19   get on the floors, and place these flyers on

20   students' doors.

21        Q.    And so Ms. Eckardt was ultimately held

22   responsible for that?

23        A.    She was held responsible for it, yes.

24        Q.    Did you have a good working relationship

25   with Ms. Eckardt?



1          A.     Yes, I did.  I thought I did, yes.

2          Q.     Did you ever say that Ms. Eckardt was

3   difficult to get along with?

4          A.     Yes.

5          Q.     Did you have any other employees who were

6   difficult to get along with?

7          A.     No.

8          Q.     Is Ms. Eckardt married to Bill Horstman?

9          A.     Yes.  Can you go back to the question I

10  just answered, please, in terms of were there other

11  employees that were difficult to deal with?  Could

12  you explain that a little bit more, please, what you

13  are asking?

14         Q.     Sure.  Jill Eckardt reported to you in her

15  position as director of housing, correct?

16         A.     Yes, she did.

17         Q.     Okay.  Did you find that Ms. Eckardt was

18  insubordinate to you at all?

19         A.     Yes.

20         Q.     Did you find that she failed to follow

21  directives that you gave her?

22         A.     Yes.

23         Q.     All right.  Did you write anywhere in a

24  reprimand, evaluation, or e-mail that she was, quote,

25  difficult to get along with?



 1      A.    No, I did not.

 2      Q.    Other than giving her a letter of

 3 reprimand, did you discipline Jill Eckardt in any

 4 other fashion?

 5      A.    No.

 6            MS. WYDLER:  Object to the form.

 7            THE WITNESS:  Can you explain what you are

 8      asking me a little bit clearer?  Clarify a

 9      little more what you're asking.

10      Q.    (By Ms. Chattergoon)  Did you ever give

11 Jill Eckardt a verbal counseling?

12      A.    Yes.

13      Q.    Okay.  Did you ever give her a written

14 warning?

15      A.    No.

16      Q.    I want to show you -- we're going to mark

17 it as Exhibit Number 2.  It's the disciplinary

18 policy.  It's Bates Numbers 116 through 121.

19            MS. MOLDOF:  Hold on one second.  We've

20      got to find that.

21            MS. CHATTERGOON:  Sure.

22            MS. WYDLER:  What was the Bates stamp?

23            MS. MOLDOF:  116 to 121.

24            MS. CHATTERGOON:  Plaintiff's 116 through

25      121.



```
 1              (Plaintiff's Exhibit-Brown-2 was marked
 2     for identification.)
 3          Q.    (By Ms. Chattergoon)  Dr. Brown, let me
 4     know when you've had a chance to review the document.
 5          A.    Okay.
 6          Q.    Just let me know when you're ready.
 7          A.    I'm ready.
 8                MS. MOLDOF:  You read through the whole
 9          thing?
10                THE WITNESS:  I read it.
11          Q.    (By Ms. Chattergoon)  I'm sorry, I didn't
12     hear that.
13          A.    Give me five more minutes.
14          Q.    Sure.  Take your time.
15                MS. MOLDOF:  Are you good?
16                THE WITNESS:  Yeah, I'm good.
17          Q.    (By Ms. Chattergoon)  Okay.  Are you
18     ready?
19          A.    Yes.
20          Q.    All right.  I have given you what's been
21     marked as Exhibit 2.  And that is the -- it says
22     Employee Relations on the top.  It's Plaintiff's 116
23     through 121, and it's labeled The Disciplinary
24     Process.  Is that what you have in front of you?
25          A.    Yes.
```



CHARLES L. BROWN, SR.                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                              57

1        Q.     Earlier you said there were policies that
2    you reviewed online for the university?
3        A.     Uh-huh.
4        Q.     Do you recall that?
5        A.     Yes, I do.
6        Q.     Okay.  And was this ever -- I'm sorry?
7        A.     I didn't say anything.
8        Q.     Oh, I'm sorry, I thought I heard you.  Was
9    this one of the policies you reviewed online for the
10   university?
11       A.     Yes.
12       Q.     Okay.  And you reviewed this during your
13   employment as vice-president of student affairs --
14       A.     Yes.
15       Q.     -- for FAU?
16       A.     Yes.
17       Q.     I was asking you earlier whether you
18   disciplined Jill Eckardt in any way, and what I was
19   referring to is the disciplinary process that's
20   listed here.
21       A.     Uh-huh.
22       Q.     And so did you ever give Jill Eckardt an
23   oral reprimand?
24       A.     Yes, I did.
25       Q.     Do you recall when that was?



1      A.    No, I don't.

2      Q.    Okay.  Do you know how long before her

3   termination you gave her an oral reprimand?

4      A.    No.

5      Q.    Did you ever give -- and you stated that

6   you gave Jill Eckardt a written reprimand, correct?

7      A.    Yes.

8      Q.    Did you give her the written reprimand

9   before or after the oral reprimand?

10     A.    I don't recall.

11     Q.    Did you ever suspend Jill Eckardt?

12     A.    No, I did not.

13     Q.    Okay.  And did you terminate Jill Eckardt?

14     A.    I separated her from the university.

15     Q.    Okay.  What do you mean by separated her

16  from the university?

17     A.    I separated her employment from the

18  university.

19     Q.    Okay.  If you take a look at what's the

20  third page of that exhibit.

21     A.    Uh-huh.

22     Q.    It says, here on Plaintiff's 118,

23  termination.

24     A.    Uh-huh.

25     Q.    You're saying separation of employment.



1    This says termination.  What is the difference?

2              MS. WYDLER:  Object to form.

3        Q.    (By Ms. Chattergoon)  Do you know?

4              MS. WYDLER:  Calls for a legal conclusion.

5              THE WITNESS:  No.

6        Q.    (By Ms. Chattergoon)  Okay.  Have you ever

7    reviewed Regulation 5.012, Employee Standards and

8    Discipline Procedures?

9        A.    No.

10             MS. CHATTERGOON:  Lourdes or Kelsey, I

11        don't know if we have that regulation there.

12        It's Plaintiff's 579 through 583.

13             MS. MOLDOF:  Hold on.

14             MS. WYDLER:  I have it.

15             MS. MOLDOF:  We do?

16             MS. WYDLER:  Yeah.

17             MS. MOLDOF:  Oh, here.  Yeah.  Okay.  We

18        found it.

19             MS. CHATTERGOON:  Okay.  Can we mark that

20        as Exhibit 3.

21             (Plaintiff's Exhibit-Brown-3 was marked

22    for identification.)

23        Q.    (By Ms. Chattergoon)  Dr. Brown, could you

24    take a look at that regulation and let me know when

25    you've had a chance to review it.



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 61 of
200

CHARLES L. BROWN, SR.                                        March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                           60

1        A.    Okay.

2        Q.    Dr. Brown, as you're reviewing that, let

3   me just ask you one question because we may be able

4   to move on.  Had you ever seen that document before I

5   showed it to you today?

6        A.    I don't recall.  I don't recall.

7        Q.    Okay.  What was the reason you separated

8   Jill Eckardt's employment?

9             MS. WYDLER:  Object to the form.

10            THE WITNESS:  For not carrying out some of

11        the duties that had been spelled out for her in

12        the job.

13        Q.    (By Ms. Chattergoon)  Okay.  What were

14   those duties?

15        A.    We had -- the duties pertained to

16   marketing housing, creating a new marketing plan for

17   housing.  We had built a new residence hall.  We knew

18   we had to market the housing system completely

19   different.  And I had spelled out some things that I

20   wanted done, and those things were not done.

21        Q.    All right.  You supervised Dr. Williams

22   during her position as an associate dean of students,

23   correct?

24        A.    Yes, I did.

25        Q.    I'm sorry, let me just back up to Jill



1    Eckardt for a second.  When you separated her

2    employment, did you work with employee relations to

3    do that?

4         A.    Yes.

5         Q.    Okay.  Did you work with employee

6    relations when you gave her a letter of reprimand?

7         A.    Yes.

8         Q.    Who did you work with --

9         A.    I don't recall.

10        Q.    -- to do that?

11        A.    I don't recall.

12        Q.    Was it Robin Kabat?

13              MS. WYDLER:  Object to the form.

14              MS. MOLDOF:  Objection.

15              THE WITNESS:  As I said, I don't recall.

16              MS. CHATTERGOON:  I didn't hear.  Was

17        there an objection?

18              MS. MOLDOF:  Yes.

19              MS. WYDLER:  Yes, in unison.

20        Q.    (By Ms. Chattergoon)  All right.  What

21    were Dr. Williams's duties as an associate dean of

22    student affairs?

23        A.    She advises -- she advised -- she was

24    responsible for student government, the student

25    activities programs, all of the student life programs



1   on the Broward campuses, and worked with Dr. King,

2   reported to Dr. King in terms of judicial matters as

3   it related to students on campus.

4       Q.    Did she conduct investigations on student

5   conduct matters?

6       A.    Yes, she did in conjunction with the dean

7   of students office on the Boca campus.  Yes.

8       Q.    Okay.  How would you describe

9   Dr. Williams's overall job performance?

10      A.    She was a good employee but not the best.

11      Q.    Okay.  Why is that?

12      A.    There were better employees in the

13  division.  There were people that worked harder.

14      Q.    I didn't hear you, I'm sorry.

15      A.    There were better employees.  There were

16  people that worked harder in the division.  She was a

17  good employee, but she wasn't the best employee in

18  the division.

19      Q.    Okay.  What was wrong with the way she

20  performed her duties, if any?

21      A.    She did -- she did her job, but there were

22  people who went over and above in terms of carrying

23  out their job responsibilities, and I rated -- I

24  looked at that as -- saying who was the better

25  employee.  You're asking me.  That's what I'm saying.



1   There were people who worked even harder, people who

2   went over and beyond all the time.

3          Q.     Okay.  What do you mean by that, go over

4   and beyond?

5          A.     They were always participating in extra

6   programs that we did.  We always needed staff members

7   for student programming on all of the campuses, and

8   there were people who would always volunteer and be

9   there.  That's all I'm saying.  I'm not -- that's

10  what I'm saying, yes.

11         Q.     Okay.  Did Dr. Williams not volunteer for

12  certain programs that you thought she should?

13         A.     She did from time to time, but not as much

14  as many people in the division.  We had people that

15  were excellent.  I could call on them for anything.

16  They would be out at night; concerts, Step Shows.

17  Most of the -- most of the events occurred on the

18  Boca campus, but we had people coming from the other

19  campuses to work the events, the large events.  The

20  large events were on the Boca campus.  That's what

21  I'm saying.  You have excellent -- you have good

22  employees, you have very good employees, and you have

23  excellent employees.  And she was a good employee.

24         Q.     Do you know if she went to these events

25  that you're talking about on the Boca campus -- on



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 65 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        64

1    the Broward campus?

2         A.    Sometimes.  On the Broward campus, yes.

3         Q.    Okay.  Was she responsible for the Broward

4    campus?

5         A.    Yes, she was responsible for the Broward

6    campus.  The Broward campus's events were not nearly

7    as massive as those on the Boca campus, and we asked

8    for student affairs people from all of the campuses

9    for our large programs.

10        Q.    Was she required to attend events on the

11   Boca campus?

12        A.    There were some events I asked people to

13   come, the leadership, yes.

14        Q.    And did she come to those events when you

15   asked?

16        A.    Yes.

17        Q.    Okay.  Did you ever evaluate Dr. Williams?

18        A.    Yes.

19        Q.    Okay.  Do you recall whether you gave her

20   a good evaluation or a bad evaluation?

21        A.    I gave her a good evaluation, yes.

22        Q.    In fact, you evaluated Dr. Williams as

23   being an excellent employee, did you not?

24        A.    Since I don't have the evaluation form

25   here, I can't answer that, but.



1      Q.     Okay.  So the evaluations would speak for

2  themselves?

3              MS. WYDLER:  Object to the form.

4              THE WITNESS:  How do I answer that?  I

5      have to answer no.  No.

6      Q.     (By Ms. Chattergoon)  You answer no?

7      A.     Yes.

8      Q.     Okay.  So if I looked at her evaluations

9  and they had an excellent rating with your signature

10  on it, the document would not speak for itself?

11              MS. WYDLER:  Object to the form.

12              MS. MOLDOF:  Object.

13              THE WITNESS:  I think there are

14      explanations.  When you're doing an evaluation,

15      there are explanations that you give during

16      that.  And I gave some explanations during the

17      evaluation process.  That's what I mean.  So I

18      would say no.

19      Q.     (By Ms. Chattergoon)  Okay.  Were those

20  explanations written on the evaluation?

21      A.     No.

22              MS. WYDLER:  Object to the form.

23      Q.     (By Ms. Chattergoon)  Okay.  Where were

24  these explanations given?

25      A.     They were verbal.  They were verbal.



```
 1        Q.    Okay.  Who were they given to?
 2        A.    Dr. Williams.
 3        Q.    Okay.  And so could you tell me what
 4   information is given on an evaluation?
 5        A.    What information is given?
 6        Q.    Yes.
 7        A.    What do you -- explain that to me.
 8        Q.    Okay.
 9              MS. WYDLER:  And I'm going to object on --
10        Q.    (By Ms. Chattergoon)  Do you perform --
11              MS. WYDLER:  I'm going to object on
12        predicate here.
13              MS. CHATTERGOON:  Okay.  And I'll clear it
14        up.
15        Q.    (By Ms. Chattergoon)  During your time as
16   the vice-president of student affairs, you evaluated
17   Dr. Williams in her position as associate vice -- as
18   associate dean of students, correct?
19        A.    I'm trying -- I'm trying to think of
20   the -- I really -- I'm trying to think of the
21   timeline.  Yes, I did.  Yes.  Uh-huh.  Yes.
22        Q.    In evaluating her, did you use an
23   evaluation form provided to you by Florida Atlantic
24   University?
25        A.    Yes.
```



1          Q.     Okay.

2          A.     Yes.

3          Q.     And on that form, did that form give you

4     the option to indicate any positives or negatives

5     about Dr. Williams's employment?

6               MS. WYDLER:   Object to the form.

7          Q.     (By Ms. Chattergoon)   I'm sorry, her

8     performance.

9          A.     Yes.  Yes.

10          Q.     And would you have indicated that on the

11     evaluation form itself?

12          A.     No.  No.

13          Q.     Why not?

14          A.     Because one of the things that I tried to

15     do, and very succinctly, is to work with employees

16     who were good employees on the weaknesses and the --

17     the weaknesses that they had, and I would talk about

18     that during the evaluation process.  So, no.

19          Q.     Okay.  Did you ever discuss any weaknesses

20     with Dr. Williams?

21          A.     Yes, I did.

22          Q.     Okay.  What were some of those weaknesses?

23          A.     Some of the weaknesses were her inability

24     to get along with people sometimes.  People

25     complained about how difficult she was to work with.



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 69 of 200

CHARLES L. BROWN, SR.                                        March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          68

1   I mentioned those things to her.

2        Q.    Do you recall when that was?

3        A.    No.  No, I do not.  I also explained to

4   her her relationship -- since we're talking about

5   evaluation, reporting to Dr. King, being timely in

6   terms of getting things to him.  That was an issue at

7   times.

8        Q.    Getting what to Dr. King?

9        A.    Requests that -- requested information and

10  requested items to him.

11       Q.    Okay.  Let me just go back to -- you said

12  she didn't get along with people, that people said

13  she was difficult to get along with?

14       A.    Yeah.  I said that -- yes, people

15  indicated that sometimes she was very difficult to

16  work with.

17       Q.    And was that in the position as associate

18  dean of students?

19       A.    Yes, in the position as associate dean of

20  students.  Yes.

21       Q.    And who were those people?

22       A.    Pardon me?

23       Q.    Who were those people that complained?

24       A.    Eric Hawkes was one person that

25  complained.  Dr. King often complained about -- not



1    complained, but he expressed his frustration working

2    with her.  Dawn Howard, who was the director of

3    communications and marketing for the division of

4    student affairs, was another person that had some

5    concerns in terms of working with Dr. Williams.

6    Ilene Mates, who was the budget person for the

7    division of student affairs, expressed some concerns

8    in terms of working with Dr. Williams.

9         Q.    Anyone else?

10        A.    Christine Lynch was another person who

11   expressed some concerns in terms of how difficult it

12   could be at times to work with Dr. Williams, yes.

13        Q.    Anyone else?

14        A.    Not that -- I can't recall anyone else,

15   no.  No.

16        Q.    Okay.  Eric Hawkes, what complaints did he

17   have about Dr. Williams?

18        A.    Dr. Williams and Eric Hawkes were assigned

19   to the assessment program for student affairs, and he

20   felt like she was very difficult to work with.  That

21   was his concern.

22        Q.    Who is Eric Hawkes?

23        A.    Eric Hawkes was a former director of

24   university recreations at Florida Atlantic

25   University.  He's not -- he's not there anymore.  He



 1   was -- he's at North Carolina State, yes.

 2        Q.   Okay.  And why did he say Dr. Williams was

 3   difficult to get along with?

 4        A.   He just said it was difficult trying to

 5   get things done with her.  It was just --

 6        Q.   Okay.  Was there a point where

 7   Dr. Williams had to teach Eric Hawkes how to comply

 8   with collecting data and entering it into the

 9   database?

10        A.   No.

11        Q.   Okay.  Did Eric Hawkes complain that he

12   shouldn't have to collect data and enter it into a

13   database?

14        A.   No.

15        Q.   Okay.  Did you or Dr. King ever make Eric

16   Hawkes collect data and enter it into a database

17   after he complained he didn't want to do it?

18        A.   No.  He never -- no.  No.

19        Q.   Did Eric Hawkes ever have issues with his

20   assessment outcome?

21        A.   No, not to my knowledge.

22        Q.   Did ever give you an example of how

23   Dr. Williams was difficult to get along with?

24        A.   He said she was very difficult to get

25   along with in terms of trying to complete tasks,



 1   assigning portions of the assessment program to each
 2   of them.
 3        Q.    I couldn't hear you, I'm sorry.
 4        A.    He indicated that it was difficult
 5   sometimes to assign -- to make assignments.  She
 6   would do something -- assign something to her, and he
 7   would have something to do.  And it was just
 8   difficult sitting down going through the data with
 9   her.
10        Q.    Did he say why?
11        A.    She wouldn't listen.  That's basically --
12        Q.    I'm sorry?
13        A.    She would not listen to him.
14        Q.    Okay.  What were they working on together?
15        A.    The assessment program.
16        Q.    And what was the assessment program for?
17        A.    It was for the division of student
18   affairs, program assessment, how effective we were
19   serving our students and how the assessment tied into
20   our accreditation process in terms of meeting the
21   needs of students, and how the things that we did in
22   student affairs supported the academic growth of
23   students.
24        Q.    Okay.  Was there a committee formed to do
25   that assessment?



1      A.    We had committee members, and we had it

2   broken into several compartments.  We had committee

3   members, we had a committee, and we had -- I had

4   asked the two of them to take the lead on it.  We had

5   department committees working on it.  And all of this

6   would fold into one, be integrated into one.  We

7   would develop an assessment program for the division.

8   We also did updates about assessment accomplishments.

9      Q.    Okay.

10     A.    And --

11     Q.    Was there --

12     A.    Pardon me?

13     Q.    Were there --

14           THE COURT REPORTER:  Were there what?

15     Q.    (By Ms. Chattergoon)  Was there a chair,

16   chairperson for the committee?

17           MS. WYDLER:  Ria, I hear in the background

18       someone speaking, you know, and I understand

19       that your client is -- has the right to be

20       present during testimony.  And I'll put it on

21       the record as of today, but this would be the

22       second time that during deposition testimony of

23       a witness -- yesterday I did notice your client,

24       you know, typing up notes and pointing it to

25       your direction to ask certain questions, I'm



1    presuming, and I can -- and I see that you're

2    laughing now.  But I just -- you know, if it's

3    going to disrupt the deposition testimony, I

4    would ask you to please request of your client

5    to stop in that sort of conduct.

6           MS. CHATTERGOON:  Okay.  Let me respond to

7    you on the record.  My client is allowed -- this

8    is her case -- to be present at a deposition.

9    She's allowed to show me notes, pass me notes.

10   And I don't believe it was disruptive to anyone

11   yesterday.  There were no complaints during the

12   deposition of Dr. King.  Also, there was no

13   talking in the deposition right now.  So I'm not

14   sure what voices you heard.  And I don't recall

15   Dr. Williams interrupting me yesterday or asking

16   me any questions yesterday.  If anything, I

17   asked her a question before I questioned

18   Dr. King.  I'm laughing because I am surprised

19   by the notation that's being made on the record,

20   especially because there was no complaint

21   yesterday.  So if we could continue, I --

22   Dr. Williams is well aware that she is not

23   speaking on the record.

24          Do you understand that, Dr. Williams?

25          DR. WILLIAMS:  Yes, I do.



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 75 of
200

CHARLES L. BROWN, SR.                                     March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          74

```
1              MS. CHATTERGOON:  Okay.  All right.  Can
2       we continue?
3              MS. WYDLER:  Who else is in the room with
4       you?
5              MS. CHATTERGOON:  There's no one here.
6              MS. WYDLER:  Okay.
7              MS. CHATTERGOON:  Except Dr. King --
8       Dr. Williams.
9              MS. WYDLER:  And the reason why I made my
10      objection on the record is because I heard
11      another voice other than you in that room where
12      I am not present.  And as long as it does not
13      disrupt, like it did not yesterday, as long as
14      it does not disrupt the witness's testimony, I
15      have no objection.  That's the only reason why I
16      put it on the record.  And I suppose we can
17      proceed.
18             MS. CHATTERGOON:  I'm not sure if it was
19      someone talking outside.
20      Q.    (By Ms. Chattergoon)  But, Dr. Brown, I
21  apologize.  I'm not sure if it disrupted your
22  testimony today.  I have no control over that, if
23  someone is talking outside of the room.  But there is
24  no one else here, and Dr. Williams is not speaking on
25  the record.
```



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 76 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        75

1          Prior to all of this, I asked you whether

2    there was a chairperson for the committee that was

3    formed for the assessment?

4          A.    I don't remember.

5          Q.    Okay.  Do you recall if Dr. Williams was

6    the chairperson for that committee?

7          A.    I don't remember because I -- the

8    chairpersons, I rotated chairpersons.  Dr. King -- I

9    asked Dr. King to take the lead at one time.  So I

10   don't remember.  I know we rotated the chairs, but.

11         Q.    Do you recall whether Eric Hawkes refused

12   to do work that Dr. Williams directed him to do?

13         A.    No.  No.

14         Q.    Were you pleased with the outcome of the

15   accreditation process?

16         A.    Pardon me?

17         Q.    Were you pleased with the outcome of the

18   accreditation process for student outcomes?

19         A.    Yes, I was.

20         Q.    Let's go to Dr. King.  You said Dr. King

21   discussed his frustrations about Dr. Williams with

22   you.  What were those frustrations?

23         A.    Well, Dr. Williams reported to Dr. King

24   when she was director of the multicultural center.  I

25   met with them, the two of them, to discuss, and I



1    shared with Dr. Williams at the time when Dr. King

2    requests information from her she had to turn that

3    information in.  And she indicated when it's a short

4    turn around.  I explained to her that oftentimes the

5    president asks me for things with very little time,

6    turn-around time, that's just a part of the job.  I

7    met with the two of them to try to resolve the

8    relationship that existed between them in terms of

9    their professional relationship.  That was it.

10        Q.   Okay.  Can you give me an example of how

11   that happened?

12        A.   What do you mean, how -- pardon me.

13   Explain that -- explain what you're asking.

14        Q.   Sure.  Sure.  Can you give me an example

15   of when Dr. Williams did not give Dr. King

16   information?

17        A.   He had requested -- no, I can't -- I don't

18   remember the incident.  I brought them in and talked

19   with the two of them.

20        Q.   Okay.  Did Dr. Williams ever complain to

21   you that Dr. King would undermine her efforts?

22        A.   Yes.

23        Q.   Okay.  And did you ever meet with the two

24   of them regarding Dr. Williams's complaints?

25        A.   I met -- she met with me before that even





1    happened.  I brought them in.  She had spoken to me

2    before that time.  I brought them in, and we talked

3    about both sides of the -- both issues, his issues

4    and her issue.

5         Q.    Okay.  And what was the result of that

6    conversation?

7         A.    That they had to work together and

8    Dr. King was her boss, and I expected them to work

9    together.

10        Q.    And this was during her time at the

11   multicultural center?

12        A.    Yes.

13        Q.    Okay.  Did Dr. Williams ever make any

14   complaints about -- well, strike that.

15             Did Dr. King ever express any other

16   frustrations about Dr. Williams?

17        A.    No.

18        Q.    Okay.  Let's talk about Dawn Howard.  What

19   complaints did she have about Dr. Williams?

20        A.    She worked with all of the -- most

21   personnel in the leadership role in the division.

22   She was -- I hired her as the director of marketing

23   and communications.  She was also the branding person

24   for the division.  And she indicated to me that

25   Dr. Williams was very difficult to work with in terms



```
 1    of following directives and -- and her tone of voice,
 2    in terms of conversations with her, at times they
 3    were offensive.
 4         Q.    When did Dawn Howard make this complaint
 5    to you?
 6         A.    I can't remember the time.  I don't
 7    remember the timeline, but she did.
 8         Q.    Was it in 2012?
 9         A.    I don't know.  I really don't remember the
10    timeline.
11         Q.    Okay.  Was it during Dr. Williams'
12    position as associate dean of students?
13         A.    She was associate dean of -- it was -- it
14    included both times; when she was director of the
15    multicultural center as well as associate dean.  She
16    was associate dean when we were working on, if I
17    remember correctly, the program with the group out of
18    Broward.
19         Q.    Okay.  When did you appoint Dawn Howard as
20    director of marketing?
21         A.    I don't remember the exact date.  I don't
22    remember the date.
23         Q.    And when did Eric Hawkes make the
24    complaints about Dr. --
25         A.    I don't remember the dates.  I don't
```



CHARLES L. BROWN, SR.                                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                            79

1    remember the date.

2         Q.    Okay.  Was it during her time as associate

3    dean of students for the Broward campus?

4         A.    No.

5         Q.    Was it before then?

6         A.    It was before then, yes.

7         Q.    Okay.  Did you ever reprimand Dr. Williams

8    based on Eric Hawkes' complaint?

9         A.    I talked to Rozalia, Dr. Williams.  I

10   spoke with her.

11        Q.    Okay.  Did you ever discipline her

12   according to the disciplinary process that --

13        A.    No.

14        Q.    -- I showed you?

15        A.    No.  No.

16        Q.    Did you ever discipline Dr. Williams in

17   regard to Dr. King's --

18             MS. CHATTERGOON:  I'm sorry, I hear

19        talking in the background, so I just want to

20        make sure I'm not missing anything.

21             MS. WYDLER:  There are people outside.

22             MS. CHATTERGOON:  Okay.  Same situation,

23        then.  Okay.

24             MS. WYDLER:  Well, there's only a glass

25        separating us from the lobby here in this



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 81 of 200

CHARLES L. BROWN, SR.                                        March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          80

1        deposition site.

2              MS. CHATTERGOON:  I didn't hear you, I'm

3        sorry.

4              MS. WYDLER:  That there's only a glass

5        separating us from the lobby at this deposition

6        site.

7              MS. CHATTERGOON:  Okay.

8        Q.    (By Ms. Chattergoon)  Did you ever

9   discipline Dr. Williams with regard to Dr. King's

10  expression of frustration with Dr. Williams?

11       A.    No.

12       Q.    Okay.  Did you ever discipline

13  Dr. Williams in relation to Dawn Howard's complaints?

14       A.    No.

15       Q.    Okay.  Let's talk about Ilene Mattes or

16  Mates, I'm sorry.

17       A.    Uh-huh.

18       Q.    What was her complaint about Dr. Williams?

19       A.    Just the budget, dealing with the budget.

20  She was my financial person, and she said many times

21  it was a very difficult time dealing with her about

22  budget issues.  That's all.

23       Q.    Did she say what budget issues?

24       A.    No.  She just brought it up to my --

25  brought it to my attention because she was in the



1    office, and she shared that she had concerns that she

2    wasn't -- she was giving her a hard time about budget

3    issues.

4        Q.    Do you recall when that was?

5        A.    No.

6        Q.    Do you recall whether Dr. Williams had

7    expressed issues with the budget, that monies were

8    being spent outside of the budget?

9        A.    No.

10       Q.    Is Ilene Mates still with the university?

11       A.    No, she's not.

12       Q.    Was she terminated or separated from her

13   employment?

14       A.    I don't know.  You have to -- I've been

15   gone for two years.  You have to talk to someone

16   there.

17       Q.    How do you know she's no longer with the

18   university?

19       A.    I was told in a Facebook message.

20       Q.    You were told by whom?

21       A.    I don't -- it came up in Facebook.  I

22   don't know who sent the message around.

23       Q.    I can't hear you, I'm sorry.

24       A.    I don't know who sent the Facebook

25   announcement.  It just came out.  You know how people



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        82

1    write on Facebook?  I saw it on Facebook.

2        Q.    Okay.  Do you recall when you saw it?

3        A.    No.

4        Q.    Do you know whether Dr. King separated her

5    employment?

6        A.    I don't know.  I wasn't there.

7        Q.    Okay.  Do you recall when Ilene Mates made

8    the comments about Dr. Williams?

9        A.    No, I do not.

10       Q.    Did you ever discipline Dr. Williams for

11   the comments made by Ilene Mates?

12       A.    No, I did not.

13       Q.    Okay.  What complaints did Christine Lynch

14   have against Dr. Williams?

15       A.    The only complaint, she said she was very

16   difficult to deal with in terms of working with her

17   and didn't go into --

18       Q.    Did she say why?

19       A.    She didn't go into the specifics.  She

20   just said Dr. Williams was very difficult to deal

21   with.

22       Q.    Do you recall when this statement was

23   made?

24       A.    No.

25       Q.    And who was Christine Lynch?



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        83

1        A.    Christine Lynch was the -- when I was at

2    Florida Atlantic, she was director of new student

3    orientation in the program office.

4        Q.    Okay.  And did you ever discipline

5    Dr. Williams based on the comments made by Christine

6    Lynch?

7        A.    No, I did not.

8        Q.    And we got into this line of questioning

9    because you stated that you had talked to

10   Dr. Williams about her weaknesses.  Were there any

11   other weaknesses that you discussed with

12   Dr. Williams?

13       A.    I don't recall.  I'm quite sure there

14   were, but I don't recall because I do --

15       Q.    Okay.

16       A.    -- all of our employees.

17       Q.    Were there any strengths that you

18   discussed with Dr. Williams?

19       A.    I complimented her when she did good --

20   when she did a good job as I do with all employees.

21       Q.    Do you recall any specific instance when

22   you felt she did a good job?

23       A.    No.

24       Q.    I'm sorry, did you respond?

25       A.    I said no.



1    Q.    Okay.   How would you describe your working

2    relationship with Dr. Williams?

3          MS. WYDLER:   Form.

4    Q.    (By Ms. Chattergoon)   Let me clarify the

5    question before you answer, Dr. Brown.

6    A.    Uh-huh.

7    Q.    How would you describe your working

8    relationship with Dr. Williams during her stint as

9    the associate dean of students?

10   A.    I would describe it as okay.   It was okay.

11   It was okay.

12   Q.    Okay.   Did you have any issues with her?

13         MS. WYDLER:   Form.

14   Q.    (By Ms. Chattergoon)   With her performance

15   as an associate dean of students?

16   A.    Following protocol was one of the things

17   that I stressed, and sometimes I think she deviated

18   from protocol.   And I would have Dr. King to speak

19   with her about protocol because even though the

20   associate deans were still reporting to me up

21   until -- 2012, '13 -- '13, the whole judicial piece

22   was an important role for the associate deans.   They

23   went through Dr. King's office.   That's the way I set

24   it up.

25   Q.    Okay.   What protocols did you believe



CHARLES L. BROWN, SR.                                     March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                         85

1    Dr. Williams deviated from?

2         A.    In terms of dealing with disciplinary

3    cases, making sure that she touched bases with

4    Dr. King in terms of cases, keeping him abreast,

5    those kinds of things.  That was important to me,

6    that he knew what was going on on all of the campuses

7    and -- when it came to discipline.  And, also, since

8    the campus life piece reported up through his office

9    to me, knowing what was going on on the campuses.

10   And that was her responsibility to make sure he was

11   updated.  And there were times when he said he didn't

12   know.

13        Q.    I'm sorry, he said what?

14        A.    He did not know what was going on.  He was

15   not told.

16        Q.    He was not told what was going on on the

17   campus Dr. Williams was responsible for?

18        A.    Yes.  Yes.

19        Q.    Okay.  Do you know whether Dr. Williams

20   sat on the SCAC or SIT committee?

21        A.    I don't know because I don't sit on the

22   committee.  The committee reports to me.  The

23   committee members change, I know that.  Dr. King was

24   responsible -- I gave him the responsibility once the

25   committee was set up to make sure that we had



1    representation from all of the campuses as well as

2    colleges and departments on the campuses as well as

3    external, as well as our partners outside of student

4    affairs.

5         Q.   Okay.  And what is the SCAC committee?

6         A.   It's the student crisis committee.  It's a

7    committee that meets to discuss students who might be

8    in crisis, students in crisis, and they make

9    recommendations to my -- the position that I had at

10   FAU in terms of the kinds of services, if a student

11   should be removed from the university, if a student

12   should be in counseling, should I contact a parent,

13   or any other kinds of services that a student might

14   need to remain in the university.

15        Q.   Okay.  And what was the SIT committee?

16        A.   The SIT committee was a committee that

17   recommended that a student be removed from the

18   university.  It was a smaller committee.  And that's

19   a student in crisis.  And they would say we need to

20   remove this student from the university and get the

21   student in the appropriate -- into the appropriate

22   health provider.

23        Q.   Okay.  And for the record, the SCAC is the

24   Student Crisis Awareness Committee, correct?

25        A.   Right.



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 88 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        87

1    Q.    And the SIT committee is the Student

2    Intervention --

3    A.    Intervention committee that -- it's the

4    Student Intervention Team that really comes to --

5    makes a recommendation to my position, my old

6    position, that we remove a student from the

7    university.

8    Q.    And do you know if Dr. Williams sat on

9    those committees?

10   A.    I don't know.  I don't know.

11   Q.    Do you know if Dr. King sat on both

12   committees?

13   A.    He chaired the committees.

14   Q.    Do you know how often those committees

15   met?

16   A.    No.

17   Q.    Okay.  Did you meet with Dr. Williams as

18   her supervisor?

19   A.    As her supervisor?  Yes, when she --

20   before I moved her under Dr. King, yes.

21   Q.    Okay.  How often did you meet with

22   Dr. Williams?

23   A.    We tried to meet -- I don't remember.  I

24   don't remember.  I tried to meet with people at least

25   every two weeks, once a month.  I don't really



1   remember because there was some people I met with on
2   a more -- on a regular basis and there were others
3   that I did not.  So I really don't remember.
4        Q.     When you met with Dr. Williams, would she
5   meet you on the Boca campus or would you go to the
6   Broward campus?
7        A.     I would come down -- I started to go down
8   to -- she came to Boca more than I went down to the
9   Broward campuses, and that's the same for all of the
10  assistant/associate deans because of my schedule.
11  Many times the president would call -- call meetings
12  and I would have to go, so.  I tried to get down to
13  get to all of the campuses and meet with the
14  assistant/associate deans, but sometimes --
15       Q.     Do you know how often -- I'm sorry.  I
16  interrupted you.
17       A.     And sometimes that was not systemic
18  because of my schedule.
19       Q.     Do you know how often -- well, let me ask
20  you this.  Did Dr. King and Dr. Williams meet on a
21  regular basis?
22       A.     They were supposed to.
23       Q.     Okay.  Do you know if they met during the
24  student -- the SCAC or SIT committees?
25       A.     What are you asking me?



CHARLES L. BROWN, SR.                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                             89

1        Q.     Do you know if they met with each other

2   before or after the SCAC or SIT committee?

3        A.     No, I can't answer that.   No.

4        Q.     Okay.   Did you ever say to Dr. Williams

5   that you didn't have to go to the Broward campus

6   because she was doing a good job?

7        A.     I don't remember saying that.

8        Q.     Okay.   How often did you meet with Terry

9   Mena?

10       A.     Formal meetings, not often.   He would see

11  me on the breezeway, run by the office.   Anybody

12  could -- I had an open door policy.   Any of the staff

13  members could come and see me.   Everyone will tell

14  you they could come in and see me.   But I had no

15  formal meetings with Terry other than when he was

16  dealing with a student in crisis, but I did not have

17  set meetings with Terry because he was reporting to

18  Dr. King and he was housed in Dr. King's office on

19  the Boca campus.   So he really met with Dr. King on a

20  regular basis, and he was --

21       Q.     How often did -- I'm sorry.   I interrupted

22  you again.

23       A.     And Dr. King had, I think, weekly meetings

24  with his staff.

25       Q.     I'm sorry.   Say that for me again.



```
 1          A.    I think Dr. King had weekly meetings with
 2     his staff.
 3          Q.    Was his staff located on the Boca campus?
 4          A.    Yes, but he also had staff on the -- once
 5     we combined everything, he also was responsible for
 6     staff on the partner campuses.
 7          Q.    When did you combine or restructure?
 8          A.    I don't remember.  I can't recall the
 9     date.  The --
10          Q.    Do you recall whether it was in 2013?
11          A.    I can't recall.
12          Q.    Do you recall whether it was the spring of
13     2013?
14                MS. MOLDOF:  Objection.
15                THE WITNESS:  I can't recall.
16          Q.    (By Ms. Chattergoon)  Okay.  Terry Mena
17     sat -- or his office was physically in the Boca
18     campus, correct?
19          A.    Yes, Terry was housed in the dean's office
20     on the Boca campus.
21          Q.    Okay.
22          A.    And then we --
23          Q.    And going back -- I'm sorry.  I
24     interrupted you.
25          A.    Yeah.  That's okay.
```



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        91

1          Q.    Were you finished?

2          A.    Yeah.

3          Q.    Okay.  I can't see your attorneys.

4    Apparently, they can see me, but I can't see your

5    attorneys, okay?  So I'm just going to give you an

6    instruction to not have any verbal or facial contact

7    with your attorneys indicating you can answer or stop

8    answering a question, okay?

9          A.    I'm not doing that.

10         MS. WYDLER:  For the record, there are no

11         instructions being given on this side of the

12         table, Ria.

13         THE WITNESS:  There's nothing being given.

14         What are you talking about?

15         MS. CHATTERGOON:  Okay.

16         Q.    (By Ms. Chattergoon)  Can I continue?

17         A.    You may.

18         Q.    Okay.

19         MS. WYDLER:  And you can see the witness

20         as he's testifying.

21         MS. CHATTERGOON:  I'm sorry?

22         MS. WYDLER:  You can actually see the

23         witness as he's testifying.

24         MS. CHATTERGOON:  Yes, I am, and that's

25         why I made that statement on the record because



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        92

```
 1        I saw him look away.  And like I indicated, I
 2        can't see any of the attorneys.  I can only see
 3        him.
 4             MS. WYDLER:  There's a lovely view of the
 5        Atlanta skyline outside of our window.
 6             THE WITNESS:  I'm looking out the window.
 7        Q.   (By Ms. Chattergoon)  Okay.  How often did
 8   you meet with A.J. Chase?
 9        A.    It depends.  We tried -- I tried to -- my
10   schedule was so hectic.  I tried to meet with people
11   every two weeks or once a month.  But if I got called
12   from the president's office or from one of the other
13   vice-presidents for an emergency meeting, I had to
14   drop what I was doing to meet.  That's one of the
15   reasons I restructured.  That's one of the reasons --
16   because the associate dean's position was so
17   important, that's the other reason I restructured.  I
18   probably should have done it earlier.  So that's why
19   I'm answering the questions the way I am because it
20   depends on -- it was like two weeks, but I couldn't
21   do -- oftentimes I couldn't do two weeks because of
22   my schedule.
23        Q.    Okay.  And for the record, you don't
24   recall when you restructured --
25        A.    No.
```



1    Q.     -- these positions, correct?

2    A.     No.

3    Q.     Okay.

4    A.     It was -- no.  I'm trying to think.  No.

5          MS. CHATTERGOON:  All right.  I think this

6    is a good place to take a lunch break.  It's

7    about 1:15.  Could we come back at 2:00 o'clock?

8          MS. MOLDOF:  As long as you think you're

9    going to finish from 2:00 to 5:00.

10          MS. CHATTERGOON:  Why am I being given a

11    limitation from 2:00 to 5:00?

12          MS. MOLDOF:  I'm not limiting you.  But as

13    you know, we have flights to catch.  So just

14    making sure that 45 minutes is necessary.

15          MS. CHATTERGOON:  I understand you have

16    planes to catch.  I also have my time to take

17    Dr. Brown's deposition.  I'm going to do my best

18    to get you guys out of there by 5:00 because I

19    know you're trying to beat traffic, but I do

20    have a lot to cover.  So we'll push through

21    as much as we can, okay?

22          MS. WYDLER:  So can we just go -- can we

23    go through?

24          MS. CHATTERGOON:  No, because I need to

25    eat; and I'm a breast feeding mom, and I need to



```
 1        pump.

 2              MS. WYDLER:  All right.

 3              MS. MOLDOF:  Okay.

 4              MS. CHATTERGOON:  So we'll be back at

 5        2:00, okay?

 6              MS. MOLDOF:  Okay.

 7              MS. CHATTERGOON:  All right.  Thank you.

 8              (A lunch recess was taken from 1:16 p.m.

 9    to 2:16 p.m.)

10              MS. CHATTERGOON:  Are we all back in the

11        room?

12              MS. MOLDOF:  Yes.

13              MS. CHATTERGOON:  And it's the same

14        parties who have been in the room?

15              MS. MOLDOF:  Yes.  It's me, Lourdes,

16        Dr. Brown, and the court reporter.

17        Q.    (By Ms. Chattergoon)  Okay.  All right.

18    Dr. Brown, before we took a break, we were discussing

19    certain comments or complaints that were made by

20    different individuals.

21        A.    Uh-huh.

22        Q.    Do you recall that?

23        A.    Yes.

24        Q.    Did you ever sit down with Dr. Williams to

25    discuss these comments or complaints?
```



1    A.    I may -- I mentioned those to her at
2    times, yes, I did.  Yes, I did.
3    Q.    Do you recall when?
4    A.    No.  No, I did not -- I do not.
5    Q.    Okay.  Did you evaluate Terry Mena?  And
6    that's M-e-n-a.
7    A.    I evaluated him once when he served as the
8    interim associate dean when we did not have a dean.
9    I evaluated -- that's the only time I've evaluated
10   him.  Dr. King evaluated him from that point on.
11   Q.    Okay.  Do you know whether he was given
12   good evaluations by Dr. King?
13   A.    No.
14   Q.    No, you don't know?
15   A.    Do I know?  Let me think about that.  Yes,
16   he was given good evaluations.  Yes.
17   Q.    Did you have to sign off on Terry Mena's
18   evaluations?
19   A.    Yes, I did.
20   Q.    Okay.  What about A.J. Chase, did you ever
21   evaluate A.J. Chase?
22   A.    Yes, I did.
23   Q.    How long did you evaluate A.J. Chase for?
24   A.    I don't know the time period, but I
25   evaluated her -- I evaluated her jointly with the



```
 1   dean of the campus until we made the administrative

 2   change.  And then she was evaluated by Dr. King.  But

 3   up to that point I evaluated her along with the

 4   campus dean -- campus vice-president until we made a

 5   change of placing all of the associate deans directly

 6   under Dr. King's position.

 7        Q.   Okay.  And now that we've talked about it

 8   for some time, do you recall when that change was

 9   made?

10        A.   No.  No.  I was trying to recollect, no,

11   but I do not.

12        Q.   You said you ceased your employment with

13   FAU in May of 2014, correct?

14        A.   That's when I was given my letter of

15   separation, yes.

16        Q.   And at that time was Terry Mena still

17   employed with the university?

18        A.   Yes.

19        Q.   And was A.J. Chase still employed with the

20   university?

21        A.   No.

22        Q.   Okay.  Do you know why A.J. Chase was no

23   longer employed with the university?

24        A.   She resigned.

25        Q.   Do you know the reason he [sic] resigned?
```



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        97

 1        A.      No.

 2        Q.      What's A.J. Chase's race; do you know?

 3        A.      No.

 4        Q.      Do you know Terry Mena's race?

 5        A.      He's Hispanic.

 6        Q.      Do you know how old Terry Mena is?

 7        A.      No.

 8        Q.      And Terry is a male, correct?

 9        A.      He's a male, yes.

10        Q.      And for the record, A.J. Chase is a

11   female?

12        A.      Yes, she is.

13        Q.      And do you know how old A.J. is?

14        A.      No, I do not.

15        Q.      Did you know how old she was at the time

16   she was the associate dean for the northern campuses?

17        A.      No, I did not.

18        Q.      Other than Jill Eckardt and Dr. Williams,

19   did you separate any other employee during your time

20   as vice-president of student affairs at FAU?

21        A.      No.   No.   No.

22        Q.      Okay.   Dr. Brown, I want to talk a little

23   bit about what we're going to coin here as the Ryan

24   Rotela incident.   It is an incident which occurred on

25   February 25th, 2013.   Are you aware of that incident?



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 99 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        98

1          A.    Yes, I am.

2                MS. CHATTERGOON:   Okay.  If we could find,

3          Madam Court Reporter, Bates Number FAU 1438

4          through 1455.

5                MS. WYDLER:   What is it?

6                MS. CHATTERGOON:   It's the package of --

7          it starts with that e-mail from Dr. Williams to

8          Joanna Ellwood.

9                MS. WYDLER:   Okay.

10               MS. CHATTERGOON:   Student hearing request.

11               (Plaintiff's Exhibit-Brown-4 was marked

12         for identification.)

13         Q.    (By Ms. Chattergoon)  Dr. Brown, if you

14    could take a moment and take a look at these

15    documents and let me know when you're ready.

16         A.    Okay.  See, I can't -- I can only

17    internalize so much of this.

18         Q.    I'm sorry, I didn't hear you.

19         A.    I said -- I'm ready.

20         Q.    Okay.  I have shown you what we've marked

21    as Exhibit 4.  It is Bates stamp number FAU 1438 to

22    1455.  Have you seen these documents before today?

23         A.    Probably some time ago.  I don't know.  I

24    don't know if I've seen all of these documents.  I

25    saw some of them.



CHARLES L. BROWN, SR.                                     March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                         99

1        Q.    Do you recall Dr. Williams ever handing

2    you a copy of these documents in a parking lot at

3    FAU?

4        A.    No.  Not in a parking lot, no.

5        Q.    Okay.  Do you recall her handing it to you

6    anywhere on FAU's campus?

7        A.    No, I don't recall that.  I've seen some

8    of the documents, but I don't recall her giving me

9    documents because there were conversations going on

10   between Dr. Williams, Dr. King, and myself, I think.

11   So I don't know.  No, I don't -- I've seen some of

12   the documents, not all of them.  I don't remember

13   seeing them all.

14       Q.    Do you remember admitting to seeing the

15   file that Dr. Williams gave you to Dr. Williams?

16            MS. WYDLER:  Object to the form.

17            THE WITNESS:  No.  No.

18       Q.    (By Ms. Chattergoon)  Do you recall

19   leaving a voicemail to Dr. Williams saying, quote, I

20   have reviewed the file?

21       A.    No.  No.  I really don't, no.

22       Q.    You don't recall leaving that voicemail?

23       A.    No, I don't.  I don't.

24       Q.    Okay.  Before we get into these documents,

25   you mentioned earlier that Dr. King had expressed his



1    frustration with Dr. Williams not following close

2    protocol?

3         A.    Uh-huh.

4         Q.    We talked --

5         A.    Yes.

6         Q.    Is that correct?

7         A.    Pardon me?

8         Q.    Is that correct?

9         A.    What's correct?

10        Q.    That you testified that Dr. King had

11   expressed his frustration to you about --

12        A.    Yes.

13        Q.    -- Dr. Williams not following --

14        A.    That's correct.  That is correct, yes.

15        Q.    And you stated that protocol was not

16   getting him information in a timely manner, correct?

17        A.    Yes.

18        Q.    Did he ever express to you that

19   Dr. Williams was not following any other protocol?

20             MS. WYDLER:  Object to the form.

21             THE WITNESS:  Yes.  Yes.

22        Q.    (By Ms. Chattergoon)  Okay.  What was

23   that?

24        A.    Well, in terms of getting things to him in

25   a timely manner, which is protocol, and I mentioned



CHARLES L. BROWN, SR.                                      March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        101

1   that earlier.

2        Q.    Right.

3        A.    Okay.  That's what I mean.

4        Q.    Any other failure to follow protocol?

5        A.    I think that's -- yeah.  No.

6        Q.    Okay.  Did Dr. King ever complain that

7   Dr. Williams was not administering the student code

8   of conduct properly?

9        A.    Yes.

10        Q.    When was that?

11        A.    I don't know.  I don't know the exact

12   date, but, yes, he did express some concerns, yes.

13        Q.    Okay.  Was that before or after what we've

14   coined as the Ryan Rotela incident?

15        A.    That was before because that's why we met

16   to discuss processes, and I stressed that in staff

17   meetings that the processes should be followed by the

18   dean -- followed and led -- people should follow the

19   lead of the dean of students office.

20        Q.    Okay.  So do you recall what the actual

21   complaint was?

22        A.    No, I do not.

23              MS. WYDLER:  Form.

24              THE WITNESS:  No, I do not.

25        Q.    (By Ms. Chattergoon)  Okay.  When did you



1  have that meeting saying they should follow the dean

2  of students process?

3       A.    It was a part of my staff meetings.  I met

4  weekly with the senior staff, and I stressed the

5  importance of following protocol and working

6  together.  That was -- those were my calls at each

7  staff meeting, that we should follow protocol,

8  especially when it came -- when it comes to

9  disciplinary cases because sometimes we would discuss

10 disciplinary cases at the staff meetings, but for all

11 of our staff to follow protocol.

12      Q.    Okay.  And these meetings happened before

13 the Ryan Rotela incident?

14      A.    My weekly staff meetings.

15      Q.    Okay.

16      A.    My weekly --

17      Q.    What are you referring to when you say

18 protocol?

19      A.    Our policies and procedures, the way we do

20 things.  We talk about how we do things, how we

21 should do things, how we can be more efficient and

22 effective in terms of serving our students and

23 serving the university.  That's protocol.  And we

24 would discuss --

25      Q.    Okay.



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 104 of 200

CHARLES L. BROWN, SR.                              March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                             103

1      A.    We would discuss those things from time to

2    time.  At our retreat we would talk about those

3    things.  At senior staff meetings we would talk about

4    protocol.

5      Q.    And would following the student code of

6    conduct be a protocol?

7      A.    Yes.  Yes.

8      Q.    Okay.  And did Dr. King ever complain

9    prior to the Ryan Rotela incident that Dr. Williams

10   failed to follow student code of conduct?

11           MS. WYDLER:  Objection.

12           THE WITNESS:  Yes, he did.  Yes.

13     Q.    (By Ms. Chattergoon)  Okay.  What exactly

14   did he complain about?

15           MS. WYDLER:  Form.

16           THE WITNESS:  He would just complain about

17       her not being -- not responding to him in a

18       timely manner and in following the process that

19       we set up, and I would ask him to speak with

20       her.

21     Q.    (By Ms. Chattergoon)  Okay.  You would ask

22   him what?

23     A.    To speak with her.

24     Q.    Okay.  Did he say exactly what about the

25   student code of conduct Dr. Williams failed to



 1   follow?

 2        A.    He did, but I don't recall.  Yeah, he did,

 3   but I don't recall.

 4        Q.    And this is prior to the Ryan Rotela

 5   incident?

 6        A.    Yes.

 7              MS. WYDLER:  Object to the form.

 8              THE WITNESS:  Yes.  Uh-huh.

 9        Q.    (By Ms. Chattergoon)  And did Dr. King

10   ever -- well, strike that.

11              Do you recall if Dr. King ever complained

12   that Dr. Williams was administering notices of

13   charges incorrectly?

14              MS. WYDLER:  Form.

15              THE WITNESS:  I don't recall.  I don't

16        recall.

17        Q.    (By Ms. Chattergoon)  Do you recall

18   whether Dr. King ever complained to you prior to the

19   Ryan Rotela incident on February 25th, 2013, whether

20   Dr. Williams failed to administer emergency measures

21   according to the student code of conduct?

22              MS. WYDLER:  Object to form.

23              THE WITNESS:  I don't recall.

24        Q.    (By Ms. Chattergoon)  Do you recall there

25   ever being a problem with the way notices of charges



```
 1    were being administered by any associate dean of

 2    students?

 3              MS. WYDLER:   Form.

 4              THE WITNESS:   We had a discussion -- yes.

 5         Yes.  I'll just say yes.  Yes.

 6         Q.    (By Ms. Chattergoon)  Do you recall when

 7    that discussion was --

 8         A.    No.

 9         Q.    -- held?

10         A.    No.

11         Q.    What was the problem with the notice of

12    charges?

13         A.    Consistency and making sure the letters

14    were the same.  And my conversations with the -- with

15    our legal advisors in terms of being consistent, we

16    wanted to make sure the letters were all the same for

17    the same charges.  That's one of the reasons we

18    restructured the whole dean of students operation and

19    the judicial -- the adjudication process.  So that

20    was --

21         Q.    And do you recall what --

22         A.    Pardon me?

23         Q.    I'm sorry.  I'm sorry.  I interrupted you.

24         A.    That was one of the things that we wanted

25    to do, make sure we were consistent across the
```



1   campuses in terms of everything that we sent out to

2   students.

3        Q.    Do you recall when that was?

4        A.    No, I do not.

5        Q.    Do you recall whether that was early in

6   your tenure as vice-president?

7        A.    It was early in my tenure, and I can say

8   it continued throughout my tenure as vice-president

9   of student affairs.  I always stressed the importance

10  of following protocol, making sure we followed our

11  guidelines, and we also -- I also encouraged

12  people to -- staff people to make notes of things

13  that they thought we should address at the end of the

14  year when we review the code of conduct and other

15  protocols and procedures and policies and regulations

16  that we had in the division.

17       Q.    Did you ever review that process during

18  the time Dr. Williams was an associate dean of

19  students?

20       A.    Yes.  We did it on an annual basis.

21       Q.    Okay.  Were there ever templates provided

22  to the associate dean of students for handling

23  emergency measures or student conduct cases?

24       A.    That's a question that probably should be

25  directed to the dean of students office because that



1    responsibility was one that I gave the dean of

2    students.

3         Q.    And the dean of students meaning who?

4         A.    Dr. King.

5         Q.    Okay.  Well, I asked Dr. King about this

6    yesterday, and he stated that the template came from

7    Joanna Ellwood.  Does that refresh your memory any

8    about the template?

9         A.    Well, that's in his office.  That's one of

10   the -- that's one of the people that report to him.

11   That's why I said he is probably the person to best

12   answer that question because that's an assistant dean

13   in his office who works with our judicial cases, yes.

14        Q.    Would Dr. King have to have directed

15   Ms. Ellwood to prepare those templates?

16             MS. WYDLER:  Object to form.

17             THE WITNESS:  Again, that's a question I

18        think you should ask Dr. King.

19        Q.    (By Ms. Chattergoon)  Would that be one of

20   his duties as associate vice-president and dean of

21   students?

22        A.    Yes, as the -- as the dean of students and

23   the person responsible for the administration of the

24   code of student conduct, for the vice-president, yes.

25        Q.    Did you ever see a template that was



 1    provided to the associate dean of students?

 2              MS. WYDLER:  Form.  Predicate.

 3              THE WITNESS:  Probably.  Probably.

 4        Q.    (By Ms. Chattergoon)  And did you leave --

 5    and because you're referring me to Dr. King, I'm

 6    going to ask you this question.

 7        A.    Sure.

 8        Q.    Did you leave the administration of

 9    templates for conduct cases to Dr. King?

10              MS. WYDLER:  Form.

11              THE WITNESS:  Much of that would fall

12        in -- yes.  Yes.  Yes.

13        Q.    (By Ms. Chattergoon)  And would he have

14    the ultimate authority to approve or disapprove any

15    templates that were created by his department or

16    division?

17        A.    He would be -- yes, with my approval.

18        Q.    What do you mean, with your approval?

19        A.    I would -- if he asked to develop a

20    template and explained to me why he's doing the

21    template and how it would enhance the operation of

22    that office, he had that authority, yes.

23        Q.    Okay.  Do you recall Dr. King ever asking

24    for your permission to create templates?

25        A.    May I ask you to clarify what you mean by



1    a template?  Because one of the things that we have

2    done -- and I want to do this very succinctly.

3         Q.     Uh-huh.

4         A.     As I said to you earlier, we meet on an --

5    we met annually when I was in that role to look at

6    everything that we did in terms of the adjudication

7    process for students.  We deleted things.  We added

8    things.  Yes, things came across my desk.  They would

9    explain things to me, and I allowed them to --

10   because he was given that authority, allowed him to

11   develop those things that would work best for our

12   students and for the university.  But I don't know --

13   I really don't know what you're calling a template.

14        Q.     Okay.  I'll show you one.  If we could

15   find 1505 and 1506, FAU 1505 and 1506 and mark it as

16   Exhibit 5.

17             (Plaintiff's Exhibit-Brown-5 was marked

18   for identification.)

19        Q.     (By Ms. Chattergoon)  Before we get to

20   that, Dr. Brown, take a look at Exhibit Number 1 for

21   me, the code of conduct, on Page 9.

22             MS. MOLDOF:  Oh, here's one.

23             THE WITNESS:  Okay.

24        Q.     (By Ms. Chattergoon)  Page 9, and it's

25   Paragraph 10.  It says Procedures for Student Conduct



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 111 of
200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      110

```
1   Proceedings at Florida Atlantic University.
2        A.    Okay.
3        Q.    All right.  Is this the proceedings for
4   student conduct issues that was in place at the time
5   of your employment with FAU?
6        A.    You know, I really don't know.  I've been
7   gone almost two years.  I don't know what changes
8   were made to the code of conduct.  I really don't
9   know.  I have not read the code of conduct since I
10  left.  They're gone.
11       Q.    I didn't hear the last part, I'm sorry.
12            MS. MOLDOF:  He said they're gone.  Your
13       picture keeps disappearing.
14            MS. CHATTERGOON:  My picture?  Okay.
15            MS. MOLDOF:  Now it's back.
16            MS. CHATTERGOON:  You're fine on my end.
17            THE WITNESS:  What I said is that I --
18       you're gone again.
19            MS. MOLDOF:  I think they're just small,
20       though, up here.
21            THE WITNESS:  Okay.  I don't know.  I have
22       not looked at the code.  I've been gone almost
23       two years.  I have not looked at anything
24       pertaining to that office since I left.  So I
25       don't know.  I can't answer this yes or no.
```



CHARLES L. BROWN, SR.                                        March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                            111

1        Q.     (By Ms. Chattergoon)  Okay.  What were the

2   proceedings for student conduct issues at FAU when

3   you were there?

4        A.     I really don't remember.  I really don't.

5        Q.     Okay.  Would you have -- I'm sorry.

6        A.     Uh-huh.

7        Q.     I'm sorry, I heard talking.  I don't know

8   if I interrupted someone.

9        A.     That was me.  You interrupted me.  I said

10  I really don't know.

11       Q.     I'm sorry.

12       A.     I have not -- as I stated, I've been gone

13  two years.  I've forgotten a lot of things that I

14  did.  I just don't know.  I'm just being candid with

15  you.

16       Q.     Okay.  And I apologize for interrupting

17  you.  Sometimes it's hard to hear over the phone

18  here.

19              Would you have any reason to doubt the

20  procedures for student conduct proceedings as listed

21  in the student code of conduct that I am showing you

22  at Exhibit 1 is incorrect?

23              MS. CHATTERGOON:  Objection.

24              MS. WYDLER:  Object to the form.

25              THE WITNESS:  I don't want to say yes or



1    no.  I don't know.

2        Q.    (By Ms. Chattergoon)  Okay.  Well,

3    according to this document -- I'm looking at

4    Paragraph 10.

5        A.    Uh-huh.

6        Q.    It says first there is a complaint --

7        A.    Uh-huh.

8        Q.    -- made.  Then when a complaint is made

9    against a student, it's received by the dean of

10   students; and then the dean of students will

11   determine if there are reasonable grounds to believe

12   the allegations of the complaint are true.  I'm

13   looking at Paragraph 10(c).  And then they list

14   various steps under 10(c).

15             Then under (d) there's a notice of

16   charges.  It says the notification of charges shall

17   be in accordance and include the specific student

18   code of conduct violation, a brief description of

19   alleged offenses, the student's rights, and an

20   invitation to attend a student conduct conference,

21   the date and time of this student conduct conference

22   is also included.  Do you see that?

23             MS. WYDLER:  Object to the form.

24             THE WITNESS:  Repeat what you just read,

25        please.



1      Q.    (By Ms. Chattergoon)  Sure.  I was reading

2   Paragraph D, 10(d) on Page 10.

3      A.    Okay.  And the question is?

4      Q.    And the question is during these different

5   steps or procedures listed under Paragraph 10, are

6   there different letters that should be sent out at

7   different times, if you're aware?

8      A.    I think that's a question for Dr. King

9   because I leave -- I left that to him, and he would

10  discuss things with me.  I think that's a question

11  that should be directed to him.

12     Q.    Okay.  So you don't know what the

13  procedures are for conducting student conduct

14  proceedings?

15           MS. WYDLER:  Object to the form.

16           THE WITNESS:  Yes, I know, but I think

17       the -- to get the exact process, Dr. King is

18       that person.  He's the person I gave that

19       responsibility to.  He was my expert in that

20       area.  And this is why I said I think those are

21       questions that should be directed to him.

22     Q.    (By Ms. Chattergoon)  Okay.  Well, I'm

23  asking you today.  And so could you tell me what you

24  believe the process was?

25           MS. WYDLER:  Object to the form.



```
 1            THE WITNESS:  I'll say again I think
 2       Dr. King should answer the question.  That's my
 3       answer.
 4       Q.    (By Ms. Chattergoon)  Okay.  My question,
 5  however -- and I'm going to move to strike as
 6  nonresponsive.
 7            My question is what was the process that
 8  you knew for conducting student conduct proceedings
 9  while you were employed as the student -- as the
10  vice-president of student affairs?
11            MS. WYDLER:  Object to the form.  Vague.
12            THE WITNESS:  Again, I would say Dr. King
13       is the person this should be directed to.
14       Q.    (By Ms. Chattergoon)  Okay.  Are you
15  refusing to answer my question, sir?
16       A.    No, I'm not refusing.  I answered.  That's
17  not a refusal.
18       Q.    Okay.  Do you know?
19       A.    Again, I said to be -- to get the exact
20  process, Dr. King is the person you should talk to.
21  I'm not refusing to answer.
22       Q.    Okay.  I'm not asking you for the
23  direct -- I'm sorry.
24       A.    I'm not refusing to answer your question.
25       Q.    Okay.  I'm not asking you for the
```



1    direct -- oh, I'm sorry, I think we're talking over

2    each other.

3        A.    Go on.

4        Q.    I'll let you finish.

5        A.    No, I'm just saying I think you need to

6    talk to him.  I'm not going to give you some -- say

7    something that's inaccurate.  That's why I said

8    Dr. King is the person you probably should talk to

9    because he's the one that I gave that responsibility

10   to.  He's the one that kept me updated on this

11   process.  That's why -- I'm not refusing to answer

12   your question.  I'm just giving you an answer.

13       Q.    Okay.  My question is what was your

14   understanding of the process for conducting student

15   conduct proceedings?

16            MS. WYDLER:  Object to the form.

17            THE WITNESS:  I think I've answered the

18       question.

19       Q.    (By Ms. Chattergoon)  Okay.  For the

20   record, the deponent is not answering my question, my

21   specific question.  And I'm going to move on.

22            In your professional experience as a

23   vice-president of student affairs, what was --

24            MS. WYDLER:  Before --

25       Q.    (By Ms. Chattergoon)  -- the process for



```
 1   conducting student --

 2             MS. WYDLER:  Ria --

 3        Q.    (By Ms. Chattergoon)  -- conduct

 4   proceedings?

 5             MS. WYDLER:  Can you hear me, Ria?  In

 6        response --

 7             MS. CHATTERGOON:  Sorry.

 8             MS. WYDLER:  In response to your

 9        objection, just on the record, I'm going to make

10        an objection on the basis that the question has

11        been asked and answered.  It's vague.  And the

12        witness answered to the best of his ability in

13        response to the question that was posed.  But

14        you can continue.

15             MS. CHATTERGOON:  Okay.  And I'm just, for

16        the record, going to state I asked the question

17        several times and the witness continued to say

18        that Dr. King could probably answer that

19        question better and never gave an actual

20        response.  But we can move on.

21             MS. WYDLER:  There are other objections to

22        the question.

23             MS. CHATTERGOON:  I couldn't hear you.

24             MS. WYDLER:  Just -- we can go forward.

25        Q.    (By Ms. Chattergoon)  Okay.  We were
```



CHARLES L. BROWN, SR.                                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                             117

```
 1   talking about templates, Dr. Brown.
 2        A.    Uh-huh.
 3        Q.    If you take a look at Exhibit Number 5.
 4        A.    Okay.  Okay.  I'm looking at it.
 5        Q.    These two documents were identified to me
 6   as templates that were given to the associate dean of
 7   students.  Earlier you stated that if templates were
 8   to be drafted that Dr. King would -- you would have
 9   to approve these templates; is that correct?
10             MS. WYDLER:  Form.
11             MS. MOLDOF:  That's not what he said.
12             MS. WYDLER:  Mischaracterization.
13             THE WITNESS:  No, that's not -- I said he
14        would talk to me about the need for templates or
15        any other form letter, explain why, and I would
16        allow him to do it.
17        Q.    (By Ms. Chattergoon)  Okay.  I apologize.
18        A.    Yeah.
19        Q.    Did Dr. King ever express to you a need to
20   have a template for a notice of charges?
21        A.    No.  No.
22        Q.    Okay.  Did he ever -- did Dr. King ever
23   discuss with you the need to have a template for
24   notice of interim suspension?
25        A.    No.
```



1    Q.    Did Dr. King ever express to you a need to

2    have any type of template for conducting student

3    conduct proceedings?

4         A.    Yes.  Yes.

5         Q.    When was that?

6         A.    I don't know.  But he did.  When he first

7    arrived, we talked about things that we needed, those

8    things that we did not have.  He looked at things

9    that we had, and we looked at things we did not have.

10   Yes.

11        Q.    Okay.

12        A.    In those early discussions when he first

13   arrived and we were reorganizing the office.

14        Q.    And around what time was that?

15        A.    2008, 2009, when he first arrived as the

16   dean -- associate vice-president and dean of

17   students.

18        Q.    And did you ever approve around that time

19   the creation of templates?

20             MS. WYDLER:  Form.

21             THE WITNESS:  When you say around that

22        time, you mean the things that he discussed with

23        me?

24        Q.    (By Ms. Chattergoon)  Yes.

25        A.    Yes.



1    Q.   Okay.  And do you know if Dr. King

2  actually created templates or his department actually

3  created templates?

4    A.   If you are referring to these letters,

5  yes.

6    Q.   Okay.  Have you ever seen the two letters

7  that I'm showing you at Exhibit 5 before?

8    A.   You mean the template -- the -- explain

9  what you are asking me before I answer.

10    Q.   I'm asking you have you seen the letters

11  provided to you at Exhibit 5 before?

12    A.   Yes.

13    Q.   You sound hesitant.  Why do you sound

14  hesitant?

15         MS. WYDLER:  Form.

16         THE WITNESS:  Are you asking me have I

17      seen the templates before -- we have so many

18      cases that go through.  Are you asking me for

19      a -- about a specific letter or are you asking

20      me about the form letter?  That's why I'm

21      hesitant.

22    Q.   (By Ms. Chattergoon)  Okay.  I'm asking

23  you about the template.  And as I stated before, 1505

24  and 1506 have been provided to me as templates that

25  were created --



1    A.    Yes.

2    Q.    -- for the associate dean of students.

3    A.    Yes.  Yes.

4    Q.    Okay.  Were there changes to these

5  templates at any time?

6    A.    I don't know.

7          MS. WYDLER:  Object to the form.

8    Q.    (By Ms. Chattergoon)  Okay.  If there were

9  changes to template letters, would that -- would you

10 have to approve those changes?

11   A.    No.  No.

12   Q.    Would Dr. King have to explain to you the

13 need for the changes in the template letters?

14   A.    Yes.

15   Q.    And do you remember if Dr. King at any

16 time expressed to you that there was a need to change

17 the templates for either the notice of interim

18 suspension or notice of charges?

19         MS. WYDLER:  Form.

20         THE WITNESS:  No.  No.  No.

21   Q.    (By Ms. Chattergoon)  Do you know if these

22 templates were provided to the associate dean of

23 students?

24   A.    I don't know, no.  That's a question for

25 Dr. King.



CHARLES L. BROWN, SR.                                March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                   121

1      Q.    Okay.  Were you ever copied on an e-mail

2    forwarding templates to the associate dean of

3    students?

4      A.    Are you talking about templates -- explain

5    that to me again.  What are you asking me?  Are you

6    asking me about letters to students or just blank

7    letters?

8      Q.    Blank -- what do you consider a template?

9      A.    It would be one of these blank examples of

10   a letter.  It would be --

11     Q.    Okay.  So that's what -- okay.  So that's

12   what I'm referring to as a template.

13     A.    No.  No.  I would be copied on letters

14   that are sent out, I guess, but, no, no, not

15   before -- I never -- once I talked with him and gave

16   him approval, he had the right to draft templates --

17     Q.    Okay.

18     A.    -- what you are calling templates.

19     Q.    Okay.  And what I'm calling templates I'm

20   showing to you as Exhibit 5.  So I'm going to ask you

21   again.  I don't know if we actually clarified this.

22   Did you give Dr. King your approval to create the

23   templates I provided you at Exhibit Number 5?

24          MS. WYDLER:  Object to the form.

25          THE WITNESS:  Yes.



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 123 of 200

CHARLES L. BROWN, SR.                                  March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      122

1    Q.    (By Ms. Chattergoon)  Do you recall when

2    that was?

3    A.    No.  No.

4    Q.    Do you recall whether that was in the

5    beginning of Dr. King's employment?

6    A.    I don't recall.  I can't tell you when.

7    Q.    Okay.  The date on these templates that

8    I'm showing you, one is August 23rd, 2010.

9    A.    Uh-huh.

10    Q.    Does that refresh your memory at all?

11    A.    No.

12    Q.    The other date is September 12th, 2011.

13    Does that refresh your memory at all?

14    A.    No, not at all.

15    Q.    You said earlier that you were copied on

16    letters that were sent to students; is that correct?

17    A.    At times, yes.  At times.  Sometimes I was

18    not copied.  Other times I was copied.  I decided not

19    to be copied.  But, yeah.

20    Q.    Okay.  What would be the reason you would

21    be copied on a letter sent to a student?

22    A.    Just for information purposes, that's all,

23    because I'm not a part of the -- I did not get

24    involved in the adjudication process because I'm the

25    final line of appeal.  The attorneys, when I first



1    got to FAU, as I explained earlier, in a very

2    succinct way asked me to really restructure the

3    office so I would -- the position that I held would

4    be taken out of the adjudication process since I was

5    the final line of appeal for the university and the

6    board of trustees.

7         Q.    Okay.  And so who would copy you on these

8    letters to students?

9         A.    The dean of students office.

10        Q.    I'm sorry?

11        A.    The dean of students office.

12        Q.    Whose office would that be?  Dr. King's

13   office?

14        A.    That's Dr. King's office, correct.

15        Q.    Okay.  Would the associate dean of

16   students ever copy you on these letters to students?

17        A.    I don't -- I don't know.  I really don't

18   know.  I can't recall that.

19        Q.    Okay.  And what would be the reason

20   Dr. King's office would copy you on these letters to

21   students?

22        A.    Just for information purposes, that's all.

23        Q.    Did it involve specific types of cases?

24   Were those the letters you were required to be copied

25   on?



 1              MS. WYDLER:  Object to the form.

 2              THE WITNESS:  You know, I don't recall.  I

 3        don't want to give a false answer.  I don't

 4        recall.

 5        Q.    (By Ms. Chattergoon)  Okay.  Well, you

 6   stated earlier that sometimes you would be copied,

 7   sometimes you wouldn't be copied.

 8        A.    Right.  Yes.

 9        Q.    So I'm trying to determine what were the

10   reasons for the times you were copied.

11        A.    I'm trying to determine, also.  I've been

12   gone two years.  I've not thought about this.  I'm

13   just being very candid with you, and I don't want to

14   give you a false answer.  So I don't know.

15        Q.    Okay.  I want to go back to Exhibit

16   Number 4.  And just for the record, you said you

17   recall reviewing some of these documents, but you

18   don't recall receiving this entire file, correct?

19        A.    That is correct.

20        Q.    Okay.  I want you to take a look at the

21   second page.

22        A.    Uh-huh.  Okay.  I am.

23        Q.    It's 1439.  I'm sorry, is there somebody

24   talking back there?

25        A.    No.



Q. Oh, okay. I didn't know if somebody was trying to get my attention. Sorry, I don't know if there was like --

MS. WYDLER: It's the paper. We're going through the exhibits.

MS. CHATTERGOON: Oh, okay. There's some sort of echo on my end, so I apologize.

Q. (By Ms. Chattergoon) Dr. Brown, I'm looking at FAU 1439 and 1440. And when I refer to those numbers, it's the numbers on the lower right-hand corner. Do you see that?

A. Fourteen thirty --

Q. 1439 to 1440.

MS. MOLDOF: So the next page.

THE WITNESS: Sure.

Q. (By Ms. Chattergoon) Do you recall ever seeing this security offense or incident report?

A. I don't recall seeing it.

Q. Were you at any time made aware of this incident report during your employment as the vice-president of student affairs?

A. Yes. I was made aware of it, yes. Yes.

Q. Who made you aware of it?

A. Chief Lowe and I talked about it and --

Q. I'm sorry, I didn't hear you.



1        A.     The police chief and I talked about it,

2    and Dr. King talked with me about it.

3        Q.     Who was the police chief?

4        A.     Charles Lowe.

5        Q.     And do you recall when you spoke to

6    Charles Lowe about this incident report?

7        A.     No.  Huh-uh.  No.

8        Q.     And do you recall when you spoke to

9    Dr. King about this report?

10       A.     No, I don't recall either time.  I know I

11   spoke with the two of them about the report.

12       Q.     Okay.  Tell me about your discussions with

13   the police chief about the report.

14       A.     I just wanted to know who wrote the report

15   up, and he explained to me that it was a security

16   guard, not one of the sworn officers, and that was

17   the discussion.  Dr. King made me aware of the same

18   thing, it was a security officer who had written the

19   report up.  Both conversations dealt with who wrote

20   the report up.

21       Q.     Okay.  I want you to take a look at 1454,

22   which is in that packet.  It's a March 8th notice of

23   charges.

24       A.     1458?

25       Q.     1454.



1        A.      Okay.

2        Q.      Do you recall seeing this notice of

3    charges?

4        A.      Yes, I saw it.

5        Q.      Okay.  Do you recall when you first saw

6    it?

7        A.      No.

8        Q.      Do you recall whether you saw this notice

9    of charges before or after you spoke to the police

10   chief and Dr. King about the incident report?

11       A.      I don't remember.  I really don't

12   remember.  I can't recall.

13       Q.      How were you made aware of the notice of

14   charges on 1454?

15       A.      Through Dr. King.

16       Q.      Do you recall when he made you aware of

17   these notice of charges?

18       A.      No.

19       Q.      And why were you -- why did Dr. King make

20   you aware of these notice of charges?

21       A.      Because it was an incident, nonacademic

22   conduct incident that occurred in the classroom.  So

23   we had an academic issue, academic issue, as well as

24   a student conduct issue; and he wanted -- I wanted to

25   make the president aware and the cabinet aware of the



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 129 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      128

```
 1    incident.
 2         Q.    And prior to Dr. King making you aware of
 3    this notice of charges, had you ever seen it or heard
 4    of the incident before?
 5         A.    How do I answer this?  I'm trying to think
 6    of a way to answer this.  I had heard of the incident
 7    but not the -- not all the charges.  I guess that's
 8    the best way to put it.
 9         Q.    Okay.  Let's go back to the incident
10    report.
11         A.    Uh-huh.  Okay.
12         Q.    Have you actually read this incident
13    report before?
14              MS. WYDLER:  Can you repeat that?  I
15         couldn't hear you.
16              THE WITNESS:  What are you asking me?
17         Q.    (By Ms. Chattergoon)  Have you read this
18    incident report before?
19         A.    I probably read it, yes.  Yes.  Yes.
20         Q.    I'm sorry, I didn't hear your answer.
21         A.    Yes.  Yes.
22         Q.    Okay.  And what is your understanding of
23    the incident as written in this incident report?
24              MS. WYDLER:  Object to form.
25              THE WITNESS:  That we had an incident --
```



CHARLES L. BROWN, SR.                              March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                 129

```
 1          we had an incident in a classroom with a student
 2          and a faculty member, and the student objected
 3          to the -- to the content of the -- to the
 4          faculty member's teaching content, the exercise
 5          that he was doing that night.  That's basically
 6          what I got out of this.  And that's what was --
 7          Q.    (By Ms. Chattergoon)  Okay.
 8          A.    Okay.
 9          Q.    All right.  Could you look at the second
10   page of -- well, I'm sorry.
11          A.    Uh-huh.
12          Q.    At the bottom of Page 1439, under Brief
13   Offense Summary.
14          A.    Uh-huh.
15          Q.    It says:  This student, Mr. Ryan Rotela,
16   with a number, waited until that class was dismissed
17   to approach Dr. Poole, verbally berating him, stating
18   that he was unprofessional and at one point stated
19   that he wanted to strike Dr. Poole because he was
20   upset with him.  Do you see that?
21          A.    What page?  1439?
22          Q.    1439 continuing on to 1440.
23          A.    Uh-huh.
24          Q.    It's under the Brief Offense Summary
25   portion of the document.
```



1     A.     Okay.  I'm here.

2     Q.     Do you see that sentence?  It starts "this

3  student."

4     A.     What are you asking me?

5     Q.     I'm asking you if you see the sentence for

6  now in this report.

7     A.     And which sentence?

8     Q.     That starts with "this student" and ending

9  with "upset with him."

10    A.     On 1440?

11    Q.     It starts on 1439.

12    A.     Uh-huh.

13    Q.     It begins, "This student, Mr. Ryan

14  Rotela," and it continues on to the next page and

15  ends "upset with him."

16    A.     Yes.

17    Q.     Okay.

18    A.     I can't read the writing.

19    Q.     You stated earlier you were aware of the

20  incident or the situation involved during class.

21  Were you aware of the situation that happened after

22  class according to this incident report?

23    A.     It was shared with me by Dr. King later,

24  yes.  Yes.

25    Q.     When later?



CHARLES L. BROWN, SR.         March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC        131

1   A.  Dr. King shared with me -- I was away from

2 campus when all of this broke, and Dr. King updated

3 me on this when I arrived back on campus.  So I can't

4 give you the exact time.

5   Q.  Okay.  Do you recall whether -- well, let

6 me ask you this.  Did this incident make it into the

7 press or media?

8      MS. WYDLER:  Object to the form.

9      THE WITNESS:  Repeat the question, please.

10   Q.  (By Ms. Chattergoon)  Sure.  The incident

11 reported in this incident report.

12   A.  Did the report make it into the media, the

13 incident report?

14   Q.  No.  Did the incident, the facts of the

15 incident as listed in this report make it into -- or

16 was it reported by the press?

17      MS. WYDLER:  Object to the form.

18      THE WITNESS:  I don't know.  Are you

19   asking me if we presented it to the media?

20   Q.  (By Ms. Chattergoon)  No.  No, no, no.

21 Let me try to clarify my question for you, Dr. Brown.

22   A.  Okay.

23   Q.  The class activities as listed in this

24 incident report, were those activities reported by

25 the media?



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 133 of
200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        132

1    MS. WYDLER:  Object to the form.

2    Q.    (By Ms. Chattergoon)  At any time after

3    this incident report was created?

4    A.    I really don't know.  There were -- I

5    can't answer that because a lot was reported by the

6    media.  I don't know.  I really don't know.  I can't

7    recall that, what was all reported.  I know it was in

8    the media, but I don't -- the content of what was in

9    the media, I can't recall that.

10   Q.    Okay.  Take a look at 1454.  That's the

11   notice of charges.

12   MS. WYDLER:  You cut out.  What was that?

13   THE WITNESS:  Fourteen --

14   Q.    (By Ms. Chattergoon)  1454, the notice of

15   charges you looked at before.

16   A.    Okay.  I'm here.

17   Q.    Do you know whether the notice of charges

18   was ever released to the media by Ryan Rotela?

19   A.    I'm not sure, but I think so.  Are you

20   asking if he released them or the university released

21   them?

22   Q.    I'm asking you are you aware whether he

23   released the notice of charges?

24   A.    I really don't know how to answer that.  I

25   can say I was told that he released it.  That's my



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        133

 1   answer.
 2        Q.    Okay.  Who told you that?
 3        A.    That was rumored that he -- people asked,
 4   and I said the university did not release them.  So
 5   the rumor was that he released them.
 6        Q.    Okay.
 7        A.    It was just rumored.  I don't know for
 8   sure.
 9        Q.    Did you ever see him go -- strike that.
10              When did you first become aware of the
11   Ryan Rotela incident as we've coined that phrase
12   today?
13        A.    I became aware of the incident, it was
14   in -- the only thing I can say, I found out when I
15   was away at our national conference in Orlando; and I
16   don't know what dates they were.  I got a call from
17   the president's office about it.  I don't know the
18   exact date, but it was in -- I was at the National
19   Association of Student Personnel Administrators
20   national conference, and that was the first I had
21   heard about the incident.
22        Q.    What conference were you at, I'm sorry?
23        A.    NASPA, N-A-S-P-A.
24        Q.    Okay.  And that's an annual conference?
25        A.    That's an annual conference that's held



1    across the country, not in the same place.

2         Q.    Okay.  Is that conference held at the same

3    time each year?

4         A.    No, it moves -- the date shifts a week or

5    so depending on the contract with the hotels.

6         Q.    Okay.  But is it around the same time

7    period each year?

8         A.    It's in the spring, yes, February --

9    February, March; February, March.

10        Q.    Okay.  Did you ever receive an e-mail from

11   Dr. Williams advising you of the Ryan Rotela issue?

12        A.    I don't remember.  I don't remember.

13        Q.    Okay.  But you recall receiving a call

14   from the president's office?

15        A.    Yes.

16        Q.    And what did the call -- who made the call

17   to you?

18        A.    I don't remember.  One of the assistants

19   to the president.  It wasn't the president.  Asking

20   about the -- to give an update on the event, what was

21   going on.

22        Q.    I'm sorry, can you repeat that for me?

23        A.    It was one of -- one of the assistants to

24   the president.  Someone in the president's office

25   called and asked for an update on Ryan Rotela.



1    Q.    And what did -- what was your response?

2    A.    My response was I went to find Dr. King.

3    He was at the conference that day.  He came up for

4    the day.

5    Q.    Okay.  And did you have a discussion with

6    Dr. King about it then?

7    A.    I asked him what was going on and give me

8    an update, yes.

9    Q.    And what was his response?

10   A.    He gave me an update on it.

11   Q.    Do you recall what that update was?

12   A.    No.  He just said an incident with a

13   student in a classroom at -- on our Broward campuses.

14   Q.    Okay.  Did he inform you at that point

15   that the matter had been picked up by the media?

16   A.    Yes.  That's one of the reasons I got the

17   call.

18   Q.    No, my question is did Dr. King inform you

19   that the Ryan Rotela incident had been picked up by

20   the media?

21   A.    No, I shared it with him.

22   Q.    Okay.  So he didn't know prior to that?

23   A.    I don't think he knew prior -- I don't

24   think he knew -- I can't answer definitively that he

25   did.  But I brought him -- I made him aware of it.

1       Q.    Okay.   And when he updated you on the

2  Rotela incident, do you recall what he specifically

3  said?

4       A.    No, I don't.

5       Q.    Do you recall whether he complained to you

6  that Dr. Williams sent out a notice of charges with

7  emergency measures on it?

8       A.    No, I don't recall that.

9       Q.    Do you recall whether Dr. King stated that

10  anything inappropriate was done in investigating the

11  Ryan Rotela matter?

12            MS. WYDLER:   Form.

13            THE WITNESS:   Do you mean at this juncture

14     when he spoke -- brought me up to date on it?

15       Q.    (By Ms. Chattergoon)   When you spoke to

16  him in Orlando at the conference, yes.

17       A.    He did not, no.

18       Q.    Is there a way we can find out when that

19  conference is held?

20       A.    Yes.   You can go to the Web site.   They

21  will give you the dates of -- they will give you the

22  dates of the conference, the last five, six years of

23  the conference.   You can go to the NASPA Web site,

24  and they will tell you.

25       Q.    Okay.



CHARLES L. BROWN, SR.                              March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                              137

1              MS. WYDLER:  Off the record.  Off the

2      record.

3              (Discussion off the record from 3:24 p.m.

4      to 3:25 p.m.)

5              MS. CHATTERGOON:  We're back on.

6      Q.    (By Ms. Chattergoon)  For the record, we

7   determined the date of the NASPA conference was

8   March 16th through 19th of 2013.  Are you okay with

9   those dates, Dr. Brown?

10     A.    I thought that -- was it NASPA?  I guess I

11  am because, you know, it's been -- I've been away.

12  Yes.  Yeah.

13     Q.    Okay.  Do you recall whether -- well, let

14  me ask you this.  You said Dr. King came up for one

15  day of the conference, correct?

16     A.    Yes, I think so.  Yes, he drove up.

17     Q.    Did FAU pay for Dr. King to attend that

18  conference?

19     A.    Pardon me?

20     Q.    Did FAU pay for Dr. King to attend that

21  conference?

22     A.    Yes.  He has money in his budget to do

23  travel, some travel.  He had money in his budget.

24     Q.    Did you have to approve the use of that

25  money in his budget?



1      A.    Yes, I did.

2      Q.    Okay.  And did you have to approve his

3  travel to that conference?

4      A.    Yes.

5      Q.    Okay.  Do you recall what day of the

6  conference he came up --

7      A.    No.

8      Q.    -- to Orlando?

9      A.    No.

10      Q.    Do you recall whether it was the first or

11  second day of the conference?

12      A.    I don't recall.  I really don't recall.

13      Q.    After you had a discussion with Dr. King

14  and he updated you on the Ryan Rotela incident, what

15  happened after that?

16      A.    I don't recall.  I went -- I asked him to

17  just keep me updated.  When I got back to campus, I

18  updated the president and the staff more.  That's

19  what happened.

20      Q.    When did you get -- when did you get back

21  to campus; do you recall?

22      A.    The conference usually runs from Saturday

23  to Wednesday.  Probably Wednesday.  Wednesday.

24  Thursday morning I was back on campus.

25      Q.    Okay.  And did you give the president an



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        139

1   update?

2        A.    Yes.

3        Q.    And do you recall what you said -- I'm

4   sorry, who was the president at this time?

5        A.    M.J. Saunders.

6        Q.    Mary Jane Saunders?

7        A.    Yes.

8        Q.    And what was the update that you gave

9   Ms. Saunders?

10       A.    I don't remember, but I just gave an

11  update on the case based on what Dr. King had shared

12  with me, where we were, what happened, the incident,

13  and also the provost had given her an update because

14  of the faculty member.  So it was a two-pronged case,

15  academic affairs and student affairs.

16       Q.    Okay.  Do you recall what Ms. Saunders'

17  response was?

18       A.    No, I do not.

19       Q.    After you gave Ms. Saunders her update,

20  did you ever go back to Dr. King for a subsequent

21  update?

22       A.    Yes.  We talked about the case.  We talked

23  about issues surrounding the case, yes.

24       Q.    Okay.  Tell me what you talked about.

25       A.    Just where we were.  He just kept me



1  updated on the case in terms of the process, moving

2  through the adjudication process with the student,

3  trying to resolve the issue.

4      Q.    Can you tell me specifically what he said

5  to you?

6      A.    No, I cannot.  No, I don't remember.  I

7  can't tell you because I don't remember.

8      Q.    Okay.  You said something about the

9  student resolving the issue?

10     A.    I said --

11     Q.    Is that what you just said?

12     A.    What I said is that we talked about

13  resolution to the issue, that's all, just resolution,

14  how can we resolve the student issue.  We do that

15  with all student cases.  We try to resolve the issues

16  before they become even worse, so.

17     Q.    And what was the resolution being sought

18  in this case?

19     A.    I can't -- I don't remember.  I can't tell

20  you what we were talking about.  We were just talking

21  about issues surrounding the case.

22     Q.    Okay.  And what were those issues?

23     A.    It was what we -- how we could deal with

24  the case, how --

25     Q.    Deal with what with the case?



1        A.    Resolve the issue with Mr. Rotela.

2        Q.    Okay.  And how were you planning on

3   resolving that issue with Mr. Rotela?

4        A.    Through our process.  Through our process.

5        Q.    Which is what?

6        A.    The judicial process, the process that

7   Dr. King is responsible for.

8        Q.    So the plan was to resolve the issue with

9   Ryan Rotela through the process in the student code

10  of conduct?

11       A.    Yes.  Yes.  That's how we resolve all

12  student issues.

13       Q.    And would that have included meeting with

14  Mr. Rotela, advising him of his rights, explaining to

15  him that he had a right to enter into an agreement or

16  conduct a hearing?

17       A.    Yes.  All of that is part of our process,

18  yes.

19       Q.    Okay.  And that's the process that you and

20  Dr. King talked about?

21       A.    We did not talk about it in detail.  I

22  just said we need to look at our process and see how

23  we can resolve this.  As I stated to you earlier, I

24  don't get involved in the day to day.  I was just

25  encouraging him.  We were talking about it, let's get



1  it done.  Because in case there was an appeal -- he

2  went through the process, there was an appeal, I had

3  to deal with the appeal.  But I need to be aware of

4  everything that's -- be aware as much as possible

5  that I should be aware of because of my role as

6  vice-president of student affairs.

7       Q.    Okay.  Do you know if Ryan Rotela went

8  through the judicial process?

9       A.    No, he did not.

10      Q.    Okay.  Why not?

11      A.    The president -- we decided -- the

12  president, the group of us, the senior staff decided

13  not to take him through the process.

14      Q.    And why was that decision made?

15      A.    It was a group decision.  We thought it

16  was best for the university, best for the student.

17      Q.    Why was it best for the student?

18      A.    We just thought it was best for the

19  student.

20      Q.    Okay.  Why was the decision made that it

21  was best for the university?

22      A.    We just felt that it was best for the

23  university to move on.

24      Q.    Move on from what?

25      A.    From the incident.



CHARLES L. BROWN, SR.                                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                                      143

1          Q.     Okay.

2          A.     We made a decision as senior staff.  These

3    were decisions that we made as a team.

4          Q.     Okay.  Who was part of that team?

5          A.     The president, me.  I'm quite sure we

6    discussed it in senior staff, also, with the provost,

7    the vice-president -- provost and vice-president of

8    academic affairs, who is responsible for the faculty.

9          Q.     And who was the provost at the time?

10         A.     Brenda Claiborne.

11         Q.     Okay.  So yourself, Dr. Saunders, or

12   Ms. Saunders, and Brenda Claiborne discussed moving

13   on?

14         A.     I said we discussed it at a senior staff

15   meeting with all of the vice-presidents, but we

16   did -- we talked about the incident because it

17   impacted the university, impacted our students, and

18   we made a decision to not take the young man through

19   the code of conduct -- student code of conduct

20   process.

21         Q.     How did it impact the students?  How did

22   the incident impact the students?

23                MS. WYDLER:  Did you say students or

24         student?

25                MS. CHATTERGOON:  Students.  Dr. Brown, I



 1          believe, and correct me if I'm wrong, because I

 2          don't want to misstate your testimony, you said

 3          you thought that it was best to move on because

 4          of how it impacted the students.

 5                  MS. MOLDOF:  You're using singular or

 6          plural?

 7                  MS. CHATTERGOON:  Plural.

 8                  MS. MOLDOF:  Oh.

 9                  MS. CHATTERGOON:  Is that what Dr. Brown

10          said?  I mean, clarify --

11                  THE WITNESS:  No, I did not say students.

12          I said student.

13                  MS. MOLDOF:  He's saying he said singular.

14                  THE WITNESS:  Singular.

15          Q.   (By Ms. Chattergoon)  Okay.  Okay.  How

16     did the incident impact the university?

17                  MS. WYDLER:  I'm going to make an

18          objection on the basis of any sort of

19          attorney-client information that was -- that was

20          communicated at the time when Dr. Brown was

21          advised by the FAU general counsel's office.

22          And so you can answer the question.  I can't

23          instruct him, but I'm going to make that

24          objection.

25          Q.   (By Ms. Chattergoon)  Okay.  For the



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 146 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        145

1    record, Dr. Brown, I don't want you to discuss

2    anything with me that you may have discussed with

3    counsel for the university.  Is that clear?

4         A.    That's clear.

5         Q.    Okay.  My question to you is how did the

6    Ryan Rotela incident impact the university in your

7    opinion?

8         A.    In my opinion?

9         Q.    Yes, sir.

10        A.    It was just a negative -- a negative -- it

11   was negative for the university, and we did not want

12   to come across like we were treating a student

13   unfairly.  That's my opinion.

14        Q.    Okay.  How would you have been treating

15   the student unfairly?

16        A.    That was the perception out there.  I

17   think -- I can't -- I don't want to go into details

18   about all of this because I discussed it with the

19   attorneys.  I don't want -- I don't want to do that.

20             MS. MOLDOF:  Well, just don't specifically

21        discuss what was discussed with any attorney --

22             THE WITNESS:  Okay.

23             MS. MOLDOF:  -- because that's obviously

24        covered by privilege.

25             THE WITNESS:  Right.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       146

1       Q.    (By Ms. Chattergoon)  Okay.  How was the

2   Ryan Rotela incident negatively impacting the

3   university?

4       A.    I think it gave off -- it gave -- as I

5   said, gave off a negative perception of how we treat

6   our students, which was incorrect, but it did.

7   That's my answer.

8       Q.    When you say it was incorrect, what do you

9   mean?

10      A.    Pardon me?

11      Q.    You said which was incorrect.  What do you

12  mean by that?

13      A.    The university does not treat its students

14  negative -- I mean, harshly or unfairly.  That's what

15  I mean by that.  We treat our students fairly.  Even

16  students who violate the code of conduct, even

17  students who might violate their privileges, we still

18  treat those students fairly.  That's what I mean by

19  that.

20      Q.    Okay.  You stated in the senior staff

21  meeting the group made a decision to move on?

22      A.    Uh-huh.

23      Q.    Were the university's attorneys involved

24  in that group meeting?

25      A.    Yes.



CHARLES L. BROWN, SR.                                     March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       147

1        Q.    Okay.  Did Ryan Rotela violate the student

2   code of conduct?

3              MS. WYDLER:  Object to the form.

4              THE WITNESS:  I think that's a question

5        for Dr. King.

6        Q.    (By Ms. Chattergoon)  I'm sorry?

7        A.    I think that's a question you should ask

8   Dr. King.

9        Q.    Okay.  In reviewing the incident report

10  that is on -- attached to Exhibit 5, 1439 and 1440.

11  Have you read that incident report?

12       A.    What you gave me?  Yes, I did.

13       Q.    Yes.  I'm sorry.

14       A.    Yes.

15       Q.    Okay.  According to that incident report,

16  did Ryan Rotela violate the student code of conduct?

17       A.    Yes, he did.  Yes.

18       Q.    Did you have any discussions with

19  Dr. Williams about her investigation of the Ryan

20  Rotela incident?

21       A.    I might have.  I don't remember, but I

22  might have.

23       Q.    Did you ever review Dr. Williams's

24  investigation of the Ryan Rotela incident?

25       A.    Dr. King reviewed it.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        148

```
 1        Q.    Did you ever review it?

 2        A.    Dr. King reviewed it, and he talked with

 3   me about it, that's all.

 4        Q.    Do you recall when that was?

 5        A.    No.

 6        Q.    And when he reviewed it and talked to you

 7   about it, what did he say to you?

 8        A.    I don't recall the conversation, but he --

 9   we talked about it.

10        Q.    Do you recall whether he stated

11   Dr. Williams violated any policies?

12        A.    Yes.

13        Q.    And what was that?

14        A.    I'm trying to recall.  I can't remember

15   exactly what the conversation was about.  It was

16   concerning the interim suspension and on and on, so I

17   can't really tell you what the conversation -- it's

18   been two and a half years, so.

19        Q.    When the university made the decision to,

20   quote, move on from the Ryan Rotela incident and not

21   proceed with the appropriate judicial proceeding, was

22   an agreement entered into with Ryan Rotela?

23             MS. WYDLER:  Object to the form.

24             THE WITNESS:  I did --

25        Q.    (By Ms. Chattergoon)  To your knowledge.
```



```
 1          A.    Not to my knowledge.  Not to my knowledge.
 2          Q.    Okay.  So how did the university move on
 3   from the incident?
 4          A.    I think by not taking him through the
 5   judicial process we moved on.  Just to be honest with
 6   you, we moved on.  He did not go through the
 7   adjudication process.
 8          Q.    Do you know whether a mediation was ever
 9   held with Ryan Rotela and his attorney?
10          A.    No, I don't know.  No.
11          Q.    Did you ever meet with Ryan Rotela?
12          A.    No, I did not.
13          Q.    Do you know if Dr. King ever met with Ryan
14   Rotela?
15          A.    I don't know.
16          Q.    Did you ever instruct Dr. King to meet
17   with Ryan Rotela?
18          A.    No, I did not.
19          Q.    Did you ever instruct Dr. King to make
20   alternative arrangements for Ryan Rotela's class
21   schedule?
22          A.    If I did, I don't recall it.
23          Q.    Did Dr. King ever complain to you that
24   Dr. Williams did not consult with him prior to
25   sending out the notice of charges?
```



1     A.    Yes, he did.

2           MS. WYDLER:  Object to the form.

3     Q.    (By Ms. Chattergoon)  When did he tell you

4   that?

5     A.    I don't know.  I really don't remember the

6   timeline.

7     Q.    Do you remember whether this was before or

8   after the university, quote, decided to move on?

9     A.    No, I don't remember.

10    Q.    Do you remember what his complaint was?

11    A.    No.  It's been two and a half -- no.

12    Q.    Do you recall whether Dr. Williams was

13  required to consult with Dr. King about any notice of

14  charges she may have sent out?

15    A.    I can't answer that.

16    Q.    Why can't you answer that?

17    A.    Because Dr. Williams in terms of the

18  judicial process reported to Dr. King in terms of

19  anything dealing with the code of conduct.  Dr. King

20  meets with -- met with the deans and worked with the

21  associate deans and oftentimes gave them directives;

22  and the everyday directives, many times I was not

23  involved in those conversations.  That's why I can't.

24    Q.    Did Dr. King ever complain to you that

25  Dr. Williams failed to consult with him on conduct



1    cases?

2         A.    Yes.

3         Q.    And when was that?

4         A.    I don't know.

5         Q.    Was that in relation to the Ryan Rotela

6    case?

7         A.    Cases even before that.  Cases before the

8    Ryan Rotela case, yes.

9         Q.    How many cases did he complain that

10   Dr. Williams failed to consult with him?

11        A.    I don't recall.

12        Q.    When he complained to you that

13   Dr. Williams failed to consult with him on conduct

14   cases, did you reprimand Dr. Williams for that?

15        A.    I asked him -- she was -- I asked him to

16   talk with her.  That was my conversation with him,

17   talk with her and ask her to be timely and follow the

18   protocol.

19        Q.    What do you mean be timely and follow the

20   protocol?

21        A.    Get things to him.  Respond to cases in a

22   timely manner and talk with him.

23        Q.    Okay.

24        A.    Keep him in --

25        Q.    Did you ever reprimand Dr. Williams?



1      A.     About cases, no.

2      Q.     Okay.  Do you know if Dr. King ever spoke

3   with Dr. Williams about her failure to consult with

4   him on conduct cases?

5      A.     No.

6      Q.     Did you require Dr. King to speak with

7   Dr. Williams and report back to you?

8      A.     No.  No.  No.

9      Q.     Did you and Dr. King ever have any

10  discussions on the proper procedure for administering

11  emergency measures according to the student code of

12  conduct?

13     A.     Those were conversations that were had

14  during our annual update of the code of student

15  conduct.  And everybody was involved, all of the

16  associate deans, and the dean's office was involved.

17     Q.     Okay.  Do you recall any of those

18  conversations?

19     A.     No.

20     Q.     Was Dr. Williams involved in those

21  conversations?

22     A.     As an associate dean, I'm quite sure she

23  was.

24     Q.     Do you know for sure whether she was?

25     A.     Serving as an associate dean, I'm quite



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       153

```
 1    sure she was.

 2         Q.    Okay.  But you don't remember what the

 3    specific conversation involved?

 4         A.    No.

 5         Q.    Correct?

 6         A.    No.  No.  No.

 7         Q.    Do you recall whether any of these

 8    specific conversations involved the fact that --

 9    strike that.

10              Do you know if any of these conversations

11    revolved around an instruction by Dr. King to not put

12    emergency measures in a notice of charges?

13              MS. MOLDOF:  Object to the form.

14              MS. WYDLER:  Object to the form.

15              THE WITNESS:  Now, what are you asking me?

16         Q.    (By Ms. Chattergoon)  You said during the

17    annual meetings that emergency measures and the

18    procedure for emergency measures were discussed,

19    correct?

20         A.    Uh-huh.  Yes.

21         Q.    You have to say yes or no.  Okay.  And

22    during these meetings and during these discussions,

23    do you recall Dr. King giving any specific

24    instructions that emergency measures were not to be

25    included in a notice of charges?
```



1              MS. WYDLER:  Object to the form.

2              THE WITNESS:  No, I don't recall.

3         Q.    (By Ms. Chattergoon)  Do you know whether

4    at any time during his employment as associate

5    dean -- associate VP and dean of students whether

6    Dr. King instructed the associate deans not to put

7    emergency measures in a notice of charges?

8              MS. WYDLER:  Form.

9              THE WITNESS:  Not to my knowledge.

10        Q.    (By Ms. Chattergoon)  You stated that

11   Dr. King -- I just want to go back to the NASPA

12   conference.  You said Dr. King came up for one day.

13   He discussed with you the Ryan -- gave you an update

14   on the Ryan Rotela incident at that point, correct?

15        A.    Uh-huh.

16        Q.    You have to say yes or no for the record,

17   I'm sorry.

18        A.    Yes.

19        Q.    Okay.  And at that point in time, he did

20   not make any complaints to you about Dr. Williams'

21   handling of the Ryan Rotela, correct?

22              MS. WYDLER:  Object.

23              THE WITNESS:  I don't remember him doing

24        so.

25        Q.    (By Ms. Chattergoon)  Okay.  Do you



CHARLES L. BROWN, SR.                                        March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          155

1    remember at any point Dr. King making a complaint to

2    you that Dr. Williams failed in any fashion to manage

3    the -- or investigate the Ryan Rotela matter?

4              MS. WYDLER:   Form.

5              THE WITNESS:   He shared with me some

6        concerns regarding the investigation, yes, but I

7        don't recall the conversation.   Yes, he did.

8        Q.    (By Ms. Chattergoon)   What were those

9    concerns?

10       A.    I don't know.   I don't remember.

11       Q.    Do you know when he shared those concerns

12   with you?

13       A.    It was during that time period.   It was

14   during that time period, but I don't remember the

15   dates or time.

16       Q.    Do you remember whether it was after the

17   university, quote, decided to move on from the

18   incident?

19       A.    It was probably -- I don't remember.   I

20   really don't remember.

21       Q.    The Ryan Rotela incident was widely

22   publicized, correct?

23       A.    Yes.

24       Q.    During that time do you recall

25   Dr. Williams informing you that she received hate



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 157 of
200

CHARLES L. BROWN, SR.                                March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                    156

1   mail?

2       A.    Yes.  And others did, too.  I got 5,000.

3       Q.    Had you ever been involved in another

4   student conduct case that was publicized in the media

5   during your time as vice-president of student

6   affairs?

7           MS. WYDLER:  Object to the form.

8           THE WITNESS:  Are you asking me about my

9       time at Florida Atlantic University? my time at

10      USF, St. Petersburg? my time at Wayne State?

11      What are you asking?

12      Q.    (By Ms. Chattergoon)  Let's start with

13  your time at Florida Atlantic University.

14      A.    Not that I can remember.  But we -- not

15  that I -- you mean a Ryan Rotela case?  No.  A

16  similar case?  No.

17      Q.    Okay.  Were there any other cases, student

18  conduct cases, that became publicized --

19          MS. WYDLER:  Form.

20      Q.    (By Ms. Chattergoon)  -- by the media?

21      A.    Yes, there were cases that the media

22  picked up on.  And that's typical of universities.

23  Like I suspended the -- a fraternity.  I removed a --

24  when I first arrived at Florida Atlantic University,

25  I had to remove the SG president -- the media picked



1   up on that -- for violating the code of conduct.  So

2   that's not unusual in student affairs for cases to be

3   picked up by the media.  They don't get the -- they

4   write what they can get, but they don't get the facts

5   from the university in terms of what really happened

6   because of FERPA.  But, yeah, I've been involved in

7   cases like that.  And I think anybody in this role as

8   a vice-president is involved in cases that the media

9   is interested in.

10       Q.    And in any of the cases you handled that

11  the media got involved, did the university make a

12  decision to move on from that incident and not charge

13  the student?

14       A.    Yes.  We've done that with Greek

15  organizations where all of the members have not been

16  charged and have not been sanctioned, yes.  We pull

17  students out and say you're not being sanctioned and

18  the other students were being sanctioned, yes.  We've

19  done that, and other schools have done that, also.

20  Pardon me?

21       Q.    I'm sorry.  I interrupted you.

22       A.    Did you hear me?

23       Q.    What was your last statement?

24       A.    I said that's not unusual in high ed.

25       Q.    Okay.  Do you recall when the university



1   decided not to charge or sanction a fraternity or

2   fraternity member?

3       A.      Uh-huh.

4       Q.      When was that?

5       A.      I don't -- I don't recall the exact date,

6   but the record is out there.  You can find the

7   records at the university.  I've been gone.

8       Q.      Do you recall whether that was early on in

9   your employment with FAU?

10      A.      Probably my -- the middle of my tenure at

11  FAU.

12      Q.      I'm sorry, I didn't hear you.

13      A.      Probably the middle of my tenure at the

14  university.

15      Q.      Was Mary Jane Saunders the president

16  during that time?

17      A.      No.

18      Q.      You spoke about removing the SGA president

19  for violating the code of conduct?

20      A.      Uh-huh.

21      Q.      Did that incident become publicized with

22  the media?

23      A.      The media found out -- yes.  Yes, the

24  media --

25      Q.      Was the student -- did the student go



1    through the judicial process in that case?

2         A.    No.  The student agreed to step down.

3         Q.    Okay.  So there was an agreement with the

4    student?

5         A.    The student stepped down.

6         Q.    Okay.  Any other incidents that became

7    public knowledge through the media?

8         A.    Not that I can recall of -- recall at this

9    time.

10        Q.    Were there any student conduct issues

11   handled by Terry Mena that became public knowledge or

12   that was publicized by the media?

13        A.    Not to my knowledge, no.

14        Q.    Were there any student conduct issues that

15   A.J. Chase handled that became public?

16        A.    Not to my knowledge, no.  Not during my

17   tenure, no.

18        Q.    Do you know if Terry Mena administered

19   or -- I'm sorry, administered emergency measures?

20        A.    Explain what you're asking me.

21        Q.    Sure.  Do you know whether Terry Mena

22   during his employment as an associate dean of

23   students for the Boca campus --

24        A.    Uh-huh.

25        Q.    -- do you know if he ever implemented



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        160

1    emergency measures in any student conduct case?

2         A.    I think that's a question better addressed

3    to Dr. King.

4         Q.    Do you have any knowledge?

5         A.    Are you asking me for sure?  I don't want

6    to answer incorrectly.

7         Q.    Okay.  So you don't know?

8         A.    Don't know.

9         Q.    Do you know if Terry Mena implemented any

10   measures to stop one student from contacting another?

11        A.    I don't know.  I really don't know.

12        Q.    Do you know if Terry Mena implemented any

13   measures to bar a student from campus?

14        A.    No.  No.

15        Q.    No, you don't know or no, he did not?

16        A.    No, I don't know.

17        Q.    Okay.  I have the same question for A.J.

18   Chase.  Do you know whether A.J. Chase implemented

19   any emergency measures to bar a student from

20   contacting another student?

21        A.    I don't know.  I don't know.

22        Q.    What about A.J. Chase barring a student

23   from coming onto any campus?

24        A.    I don't know.

25        Q.    And what about keeping a student out of

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       161

 1    class?

 2         A.     I don't know.

 3         Q.     I want you to take a look at the code of

 4    conduct for me, Exhibit 1, Page 8.

 5         A.     (Witness complies with request.)

 6         Q.     Before we move on to that, would Dr. King

 7    have reported to you whether Terry or A.J.

 8    implemented emergency measures?

 9         A.     Yes and no.  Sometimes he did.  Sometimes

10    he didn't.  But I don't recall him reporting

11    emergency measures conducted by the two of them.

12         Q.     Okay.  And the emergency measures I'm

13    referring to are listed in the student code of

14    conduct under Paragraph 9.  It says Emergency

15    Measures, and there is (a) 1 through 5 and then (b)

16    and (c) on the next page.  Do you see that?

17         A.     Uh-huh.

18         Q.     Did you have any discussions with Dr. King

19    on how emergency measures were to be implemented in

20    student conduct cases?

21         A.     I'm quite -- yes, I did.

22         Q.     Do you recall what that discussion

23    entailed?

24         A.     No, because the discussions, again -- most

25    of my discussions with the staff regarding the code



CHARLES L. BROWN, SR.                                              March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                                  162

1  of student conduct occurred at our annual meetings

2  where we would review and delete and add things to

3  the code, we would refine things.  The legal advisor

4  to student affairs sat with us and looked at what we

5  were doing and gave us advice on how to make the code

6  even more -- to clarify the code and make it more

7  student friendly and make it a document that students

8  could understand.  So I -- you know, yes, but I don't

9  recall when.

10      Q.    Okay.  Do you recall there ever being an

11 instruction to the associate dean of students or any

12 designee that they need to follow the code of conduct

13 as it is written for that specific year?

14           MS. WYDLER:  Object to the form.

15           THE WITNESS:  Ask your question again.

16      Q.    (By Ms. Chattergoon)  Sure.  We talked

17 about following protocol earlier, correct?  That was

18 your term?

19      A.    Uh-huh.

20      Q.    You have to say yes or no for the record.

21      A.    Yes.

22      Q.    And would the emergency measures listed on

23 Page 8, Paragraph 9 be what you would coin a

24 protocol?

25      A.    Okay.  What are you asking me?



1          MS. CHATTERGOON:  Could you repeat my

2      question to him, Madam Court Reporter.

3          (The record was read by the reporter as

4      follows: "Question.  And would the emergency

5      measures listed on Page 8, Paragraph 9 be what you

6      would coin a protocol?")

7          THE WITNESS:  Yes, it's part of protocol,

8      and there are protocols that are not written.

9      Q.    (By Ms. Chattergoon)  I'm sorry, I didn't

10     hear you?

11     A.    Yes, I would coin it a protocol, but there

12     are protocols that we discuss as division of student

13     affairs as advised by our attorneys that are not

14     written that we follow.

15     Q.    Okay.  Were there any protocols regarding

16     emergency measures that were not written?

17     A.    It depends -- it depended on the case.

18     Depended on what happened and using common sense.

19     Q.    Okay.  Did any of those protocols that

20     were not written involve not placing emergency

21     measures on a notice of charges?

22     A.    That's a Dr. King question.

23     Q.    You wouldn't be aware of that?

24     A.    No.  That's a Dr. King question.  That's

25     probably something that I assigned to him, and that



```
 1   would be a question to him.
 2        Q.    Okay.  Earlier you stated, Dr. Brown, that
 3   you all discussed these issues at the annual meeting?
 4        A.    Uh-huh.
 5        Q.    So I'm asking you whether any of those
 6   discussions occurred at the annual meeting.
 7        A.    What discussions are you asking me?
 8        Q.    Discussions regarding emergency
 9   measures --
10        A.    Yes, we talked --
11        Q.    -- that is not written here in the code of
12   conduct?
13        A.    You mean protocol?  Unwritten protocol?
14   Yes, because we had the attorneys there, and the
15   attorneys would advise us.  They didn't tell us what
16   to do.  They would use examples, and I don't recall
17   some of the examples.  They would use examples in
18   terms of when you deviate a little bit but not
19   stray -- not even deviate, but enhance what we have
20   written.  And there are protocols that we talked
21   about, unwritten protocols that we have, practices
22   that we have.  And the attorneys said that was okay.
23        Q.    Okay.
24        A.    Ask me what they were, I don't remember.
25   I've been gone two and a half years.  I have not
```



 1   dealt with this.  I've not seen it.

 2        Q.   Do you know whether it was a practice to

 3   send out a separate letter for emergency measures?

 4        A.   That's a Dr. King question.  That is a

 5   Dr. King question.

 6        Q.   Who would dictate that practice?

 7        A.   Who do you mean, who would dictate it?

 8   Basically --

 9        Q.   Who would make --

10        A.   Excuse me.  I'm sorry.  Ask your question.

11        Q.   Who would make a decision on whether

12   something was a practice or not?

13             MS. WYDLER:  Form.

14             THE WITNESS:  What is she asking me?

15             MS. MOLDOF:  You've got to ask her to

16        repeat it.

17        Q.   (By Ms. Chattergoon)  Okay.  I'm going to

18   back it up a second.

19        A.   Yeah.

20        Q.   Because we seem to be getting confused

21   here.  You're saying that there were practices that

22   were discussed that were not written in the student

23   code of conduct, correct?

24        A.   Uh-huh.  Yes.

25        Q.   You have to say yes or no.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        166

```
 1        A.    Yes.  Yes.
 2        Q.    Okay.  My question to you is who would
 3   dictate what those practices were?
 4              MS. WYDLER:  Form.
 5              THE WITNESS:  The dean of students.  I
 6        gave --
 7        Q.    (By Ms. Chattergoon)  Would that --
 8        A.    That would be Dr. King.  I gave him -- as
 9   associate vice-president and dean of students, I gave
10   him leeway to make some decisions on his own without
11   having to come to me for approval for everything.  In
12   our discussions with our legal advisors, the attorney
13   assigned to student affairs, they indicated to us
14   that we could have practices and protocols that were
15   not necessarily -- that we did not have to
16   necessarily write.  They're best practices.  And a
17   lot of that is based on common sense.
18        Q.    Okay.  Would your assumption be that those
19   best practices would be relayed by Dr. King to the
20   associate dean of students or the appropriate
21   designee?
22        A.    Yes.  Yes.
23        Q.    And when you say some of that was common
24   sense, what do you mean by that?
25        A.    It's using logic.  And the other piece of
```



1    that is that I would stress that Dr. King any time

2    people are deviating from what's written they

3    should -- they should have conversations with

4    Dr. King.  That was the practice.  The other deans --

5    the other associate deans would call Dr. King when

6    they wanted to do something different in terms of our

7    procedures and -- written procedures and processes.

8         Q.    Okay.  So if it was not something

9    different, they would not have to consult with

10   Dr. King?

11        A.    No.  As long as they are following the

12   process, yes, our protocol, yes.  But the protocol

13   includes both the written and the non written.

14   That's how we --

15        Q.    Okay.  And so how would the associate dean

16   of students or designee know about the unwritten

17   protocols?

18        A.    Their meetings with Dr. King.

19        Q.    I'm sorry?

20        A.    They meet with Dr. King.  Their meetings

21   with Dr. King, the dean of students.

22        Q.    Okay.

23        A.    He's the person responsible for the

24   student code of conduct, administering the student

25   code of conduct for the vice-president of student



1    affairs.  He's that person, the dean of students

2    office, his staff, and they are a part of that staff.

3         Q.    And so if he approved a certain process or

4    conduct, he had that authority to do so?

5         A.    He had that authority to do so.

6         Q.    Do you recall Dr. King telling you that

7    Dr. Williams was not allowed to put emergency

8    measures in the notice of charges?

9         A.    No, I don't recall that.

10             MS. CHATTERGOON:  Okay.  I want to -- if

11        you could give Dr. Brown, and mark it as

12        Exhibit 6, his responses to plaintiff's first

13        set of interrogatories.

14             THE WITNESS:  Can we take a break?

15             MS. MOLDOF:  He wants to take a --

16             MS. CHATTERGOON:  Absolutely.

17             MS. MOLDOF:  Okay.  Hold on.

18             MS. CHATTERGOON:  Take a five-minute

19        break.

20             MS. MOLDOF:  Yeah.

21             MS. CHATTERGOON:  Okay.

22             (A recess was taken from 4:06 p.m. to

23    4:18 p.m.)

24             MS. CHATTERGOON:  Could we show Dr. Brown

25        his answers to plaintiff's first set of

1        interrogatories and mark it as Exhibit 7 -- I'm

2        sorry, Exhibit 6.

3              (Plaintiff's Exhibit-Brown-6 was marked

4     for identification.)

5        Q.    (By Ms. Chattergoon)  Dr. Brown, let me

6     know when you're ready, okay?

7        A.    Oh, I'm ready.

8        Q.    Okay.  You have obviously seen these

9     responses before, correct?

10       A.    Yes.

11       Q.    And I'm showing you what's been marked as

12    Exhibit 6.  It's your answers to Dr. Williams' first

13    set of interrogatories, correct?

14       A.    Yes.  Yes.

15       Q.    And the very last page is your signature,

16    correct?  Well, it looks like a -- and I'm just

17    realizing this for the first time.

18       A.    Yes.

19       Q.    It is not a signature.  It looks like a

20    computerized signature?

21       A.    Yes.  It's my signature, yes.

22       Q.    Okay.  You verified the answers that are

23    in this -- that are listed in these interrogatories,

24    correct?

25       A.    Yes.



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 171 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        170

1      Q.    Okay.  Interrogatory Number 2 asked you to
2   state whether you have any knowledge regarding any
3   sexist and/or derogatory comments made by Corey King
4   to Dr. Williams or any other female member of FAU.
5   It's on Page 5.
6      A.    Uh-huh.
7      Q.    Your attorney made an objection, and then
8   you responded none.
9      A.    Okay.
10      Q.    Were you never told of any derogatory or
11   sexist comments Dr. King made to Dr. Williams?
12      A.    No, I wasn't until -- Dr. Williams made a
13   comment to me, yes.  But no one else said anything,
14   no.
15      Q.    When did Dr. Williams make a comment to
16   you?
17      A.    She didn't even make a negative comment.
18   She just said she and Corey did not get -- were not
19   getting along.  It wasn't a negative -- it wasn't
20   even a negative comment, if you call that negative.
21   And that's when I -- that led up to my
22   conversation -- my bringing them together.  She
23   didn't make a negative comment.  She just said she
24   and Corey were not getting along.  I pulled the two
25   of them together.  I met with them, and we talked



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        171

 1    about her reporting to him.  No, no negative comments

 2    from anybody about -- from Dr. King, no.

 3         Q.    Do you recall when -- around what time

 4    period that was?

 5         A.    No, I don't.

 6         Q.    Do you recall whether Dr. Williams ever

 7    made a complaint to Paula Behul regarding Corey King?

 8         A.    No.  No.  No.

 9         Q.    Do you recall Paula Behul ever telling you

10    that Dr. Williams came to speak to her regarding

11    Corey King?

12         A.    I don't recall that.  I don't recall that.

13    No, I don't recall that.  I don't recall that.

14         Q.    Do you recall ever telling Dr. Williams

15    that she should not have gone to Paula Behul and she

16    should have come directly to you?

17         A.    I don't recall that, I really don't.

18         Q.    Interrogatory Number 3 asked you to state

19    whether you ever demanded that Dr. Williams accept a

20    salary lower than her counterparts upon her

21    appointment as dean of students -- associate dean of

22    students, and your response is yes, the plaintiff was

23    paid in accordance with the current budget at the

24    time.  The reason for this was plaintiff's

25    performance and the fact that other employees had



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        172

```
 1    more experience than plaintiff, including the fact
 2    that these employees had been assistant associate
 3    deans longer than plaintiff.  Do you see that?
 4        A.    Yes.
 5        Q.    Is there anything you want to add or
 6    clarify to that answer?
 7        A.    No.
 8        Q.    Okay.  You state here plaintiff was paid
 9    in accordance with the current budget at the time.
10    What do you mean by that?
11        A.    The budget that was in the line at -- for
12    that position on the Broward campuses.
13        Q.    Was that your budget?
14        A.    Yes.  All of the budgets were my budgets.
15        Q.    Okay.  Did her salary not come out of
16    Joyanne Stephens' budget in Broward?
17        A.    Joyanne Stephens did not control the
18    student affairs budget at Broward.  Joyanne Stephens
19    was gone.  As I said, the student affairs budgets
20    were budgets controlled by me.  Dr. Stephens had some
21    say-so, but it was my decision; and it was based on
22    what was in that budget.
23        Q.    Okay.  Was Joyanne Stephens gone in 2010?
24        A.    Was she gone?  I don't recall.
25        Q.    Okay.  The second sentence says the reason
```



CHARLES L. BROWN, SR.
WILLIAMS vs. FLORIDA ATLANTIC
March 11, 2016
173

1  for this was plaintiff's performance.  What about

2  plaintiff's performance affected or made you demand

3  that she accept a lower -- a salary lower than her

4  counterparts?

5      A.    But I wasn't demanding -- let me clarify

6  something.  I did not demand that she should take a

7  lower salary.  She took the salary that was in the

8  line.  That's it.

9      Q.    Was Dr. Williams offered a salary and then

10  asked to take a lower salary after accepting the

11  position of associate dean of students?

12      A.    No.  That is not true.  No.  That is --

13      Q.    Okay.  What is true?

14      A.    She was offered a salary that was in that

15  line.  She was offered the salary in that line.

16      Q.    Was she ever offered a different salary in

17  a meeting with you and Joyanne Stephens?

18      A.    No.  No.

19      Q.    Okay.  Let me ask it this way, Dr. Brown.

20  When Dr. Williams was offered the salary of -- I'm

21  sorry, the position of associate dean of students,

22  was she given a salary or not for that position?

23      A.    Yes, she was given -- she was offered the

24  salary that was in the salary line.

25      Q.    Okay.  And after she was given that salary



1    that was in the salary line, did you subsequently ask

2    her to take a lower salary?

3         A.    No, I did not.  No, I did not.

4         Q.    Okay.  So then your answer here is --

5    Interrogatory Number 3, the answer says yes.  So do

6    you want to clarify that answer?

7         A.    The answer is not --

8         Q.    The question -- I'm sorry.  You can finish

9    answering.

10        A.    The question is -- I explained what I

11   said.  The plaintiff was paid in accordance with the

12   current budget at this time.  She was paid according

13   to what was in that line for that position.  I'm not

14   saying --

15        Q.    Okay.

16        A.    I did not say I offered her something and

17   then changed the salary, no.  She was offered what

18   was in the line.

19        Q.    Okay.  The question that was listed says

20   please state whether you demanded plaintiff accept a

21   salary lower than her counterparts --

22        A.    That's --

23        Q.    -- upon her appointment as associate dean

24   of students and the reason for such a demand.  The

25   answer given says yes, semicolon, the plaintiff was



1    paid in accordance with the current budgets at that

2    time.  What is the yes responding to?

3              MS. WYDLER:  Object to the form.

4              MS. CHATTERGOON:  What's the objection?

5              MS. WYDLER:  It's a mischaracterization of

6         the question you're asking.  The question

7         doesn't say please state whether you called her

8         back after you offered her a salary and demanded

9         she accept a lower salary.  The question is

10        please state whether you demanded she accept a

11        salary lower than her counterparts.  Those are

12        two different things.

13             THE WITNESS:  Right.

14             MS. CHATTERGOON:  Okay.  I actually read

15        the question into the record.  And I'll do it

16        again.

17             MS. WYDLER:  No.  I --

18        Q.   (By Ms. Chattergoon)  The question is --

19   the interrogatory states please state whether you

20   demanded plaintiff accept a salary lower than her

21   counterparts, comma, upon her appointment as

22   associate dean of students, comma, and the reason for

23   such a demand.

24             Dr. Brown, your response was yes,

25   semicolon, the plaintiff was paid in accordance with



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 177 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       176

1    the current budget at that time.

2         A.    Right.

3         Q.    My question is what is the yes answer to?

4               MS. WYDLER:  Objection.

5               MS. CHATTERGOON:  What is the objection?

6               MS. WYDLER:  It's a compound

7         interrogatory.  And if you're reading that as

8         part of your question in the deposition, there's

9         my objection.

10              MS. CHATTERGOON:  Okay.

11        Q.    (By Ms. Chattergoon)  Dr. Brown, could you

12   answer my question?  What is the yes responding to?

13   So that I'm clear.

14        A.    Yes is that the salary was lower, but

15   that's the salary that was in the line.  That's all.

16        Q.    Okay.

17        A.    That's all I'm saying.  It was lower than

18   the others, but that was the budget -- that was the

19   budgeted line, and I explained that to Dr. Williams.

20   It had --

21        Q.    Okay.

22        A.    It had nothing --

23        Q.    I'm sorry.  I interrupted you.  I

24   apologize.

25        A.    I'm finished.



1      Q.    And then the second part of your answer

2    says the reason for this was the plaintiff's

3    performance and the fact that other employees had

4    more experience than the plaintiff, including the

5    fact that these employees had been an assistant

6    associate dean longer than the plaintiff.

7      A.    Uh-huh.

8      Q.    What does that refer to?

9      A.    What I was saying is that they -- they had

10   performed as the -- as assistant and associate deans.

11   That's all I'm saying.  She had not been -- performed

12   as an assistant/associate dean.  Maybe I wasn't

13   clear, but that's what I was saying.  They had been

14   performing as an assistant/associate dean.  She had

15   never performed as an assistant or associate dean.

16   That's what I was saying.  Does that -- is that clear

17   to you?

18     Q.    No, it is not really.  You say the reason

19   for this was the plaintiff's performance.  What do

20   you mean by that?

21     A.    Just what I said.  She had never performed

22   as a dean, associate dean.  Maybe I worded it wrong,

23   but that's what I'm saying.

24     Q.    Okay.  The other associate deans that

25   we're talking about, that would be Terry Mena and



CHARLES L. BROWN, SR.                                  March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                      178

```
 1    A.J. Chase, correct?
 2         A.    That's correct.
 3         Q.    And when did A.J. Chase become an
 4    associate dean?
 5         A.    A.J. had been a dean -- she was there
 6    before I got there.  So she had been there
 7    probably -- I came in 2006.  She was an associate
 8    dean.  She was appointed I think in -- I don't know,
 9    but she was there before I got there.
10         Q.    Okay.  And when did Terry Mena become an
11    associate dean?
12         A.    Terry Mena became an associate dean in
13    2007.
14         Q.    Okay.  Do you know whether Dr. Williams
15    had experience in student -- in student affairs
16    before you placed her in the associate dean position?
17         A.    I knew she had student affairs experience
18    at FAU, yes.
19         Q.    Do you know that she had student affairs
20    experience at FIU?
21         A.    Yes.  I knew she worked at FIU, yes.
22         Q.    Do you know whether she had 29 years of
23    experience in student affairs at the time you
24    appointed her to the position of associate dean?
25              MS. WYDLER:  Object to the form.
```



CHARLES L. BROWN, SR.                                       March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                          179

```
 1              THE WITNESS:  I knew she had years of
 2       experience, yes.
 3       Q.    (By Ms. Chattergoon)  Did Corey King ever
 4   make any comments regarding the color of plaintiff's
 5   skin in your presence?
 6       A.    No.
 7              MS. WYDLER:  Object to form.
 8              THE WITNESS:  No, he did not.
 9       Q.    (By Ms. Chattergoon)  I'm sorry?
10       A.    No.  I never heard him say anything about
11   Dr. Williams' skin, no.
12       Q.    Did Corey King ever refer to Dr. Williams
13   as, quote, one of those?
14       A.    No.
15              MS. WYDLER:  Form.
16              THE WITNESS:  No, not in my presence.  No.
17       Q.    (By Ms. Chattergoon)  Did Corey King ever
18   say to you that Dr. Williams' father was one of the
19   reasons --
20              MS. WYDLER:  Is there a delay?
21              MS. CHATTERGOON:  Give me a second,
22       please.
23       Q.    (By Ms. Chattergoon)  Dr. Brown, did
24   Dr. King say in your presence that it was people like
25   Dr. Williams's father, who was college educated, who
```



CHARLES L. BROWN, SR.                            March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                         180

```
 1    made it difficult for his father during the Civil
 2    Rights Movement?
 3              MS. WYDLER:  Object to the form.
 4              THE WITNESS:  Not to -- I never heard him
 5         say that.  I've never heard him say that, no.
 6         Q.    (By Ms. Chattergoon)  Did you ever hear
 7    Dr. King say to Dr. Williams that they were not
 8    equals?
 9         A.    No.
10              MS. WYDLER:  Object to form.
11              THE WITNESS:  I never heard him say that.
12         Q.    (By Ms. Chattergoon)  Did Dr. Williams
13    ever make that complaint to you?
14         A.    No.
15              MS. WYDLER:  Form.
16         Q.    (By Ms. Chattergoon)  Did you ever hear
17    Dr. King refer to Dr. Williams as a mad black woman
18    in reference to the Tyler Perry movie?
19              MS. WYDLER:  Object to the form.
20              THE WITNESS:  No.
21         Q.    (By Ms. Chattergoon)  Did you ever hear
22    Dr. King make any comments about Dr. Williams being
23    Harvard educated?
24         A.    No.
25         Q.    Did you ever hear Dr. King tell
```



CHARLES L. BROWN, SR.                                       March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       181

 1   Dr. Williams not to use such big words?
 2             MS. WYDLER:  Object to the form.
 3             THE WITNESS:  Not in my presence.
 4       Q.    (By Ms. Chattergoon)  Did you ever hear
 5   Dr. King tell Dr. Williams that women should be
 6   submissive to men?
 7             MS. WYDLER:  Form.
 8             MS. CHATTERGOON:  What's wrong with the
 9       form?
10             MS. WYDLER:  Object to the form.  Vague.
11             MS. CHATTERGOON:  I'm sorry?
12             MS. WYDLER:  Object to the form.
13             MS. CHATTERGOON:  I know.  I'm asking
14       what's wrong with the form.
15             MS. WYDLER:  It's vague.
16             MS. CHATTERGOON:  Okay.
17       Q.    (By Ms. Chattergoon)  You can answer if
18   you understand the question, Dr. Brown.
19       A.    What's the question again?
20       Q.    Sure.
21             MS. CHATTERGOON:  Madam Court Reporter,
22       could you read it back.
23             (The record was read by the reporter as
24   follows:  "Question.  Did you ever hear Dr. King tell
25   Dr. Williams that women should be submissive to



Case 0:15-cv-60621-DPG  Document 79-1  Entered on FLSD Docket 06/27/2016  Page 183 of 200

CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                       182

```
 1   men?")
 2              MS. WYDLER:  Form.
 3              THE WITNESS:  No, I didn't -- no, I've
 4        never heard Dr. King say that.
 5        Q.    (By Ms. Chattergoon)  Did Dr. King ever
 6   talk to you about his views on the role of women in
 7   the workplace?
 8              MS. WYDLER:  Object to form.
 9              THE WITNESS:  No.
10        Q.    (By Ms. Chattergoon)  All right.
11   Interrogatory Number 6 asked you to please state the
12   reason for plaintiff's separation of employment with
13   Florida Atlantic University and identify the person
14   who recommended plaintiff's separation of employment,
15   including all decision-makers.
16              The answer says I made the recommendation
17   to then President Saunders along with then FAU
18   counsel and the human resources department.  I don't
19   recall the exact names of the attorney and the
20   representatives in HR.
21              Do you see that?
22        A.    Yes.
23        Q.    Is there anything you want to clarify or
24   add to that portion of your answer?
25              MS. WYDLER:  Object to the form.
```



1           THE WITNESS:  No.  No.

2       Q.    (By Ms. Chattergoon)  The remaining of

3   your answer says the reasons for separation were that

4   over a period of time numerous people could not work

5   with the plaintiff, including Mr. King.  She did not

6   follow protocol with respect to the Rotela incident.

7   Do you see that part?

8       A.    Yes, I do.

9       Q.    Okay.  We've talked about some individuals

10  who made comments or complaints to you regarding

11  Dr. Williams early on today, correct?

12      A.    Yes, we did.

13      Q.    Other than those individuals, are there

14  anyone who stated that they could not work with

15  Dr. Williams?

16      A.    How do I answer this?

17      Q.    Do you need me to repeat the question?

18      A.    No, I'm thinking.

19      Q.    Okay.

20      A.    I'm sitting here thinking.

21      Q.    No problem.

22      A.    No.

23      Q.    Okay.  It says here she did not follow the

24  protocol with respect to the Rotela incident.  Do you

25  recall what protocol that was?



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 185 of 200

CHARLES L. BROWN, SR.                                     March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                         184

 1        A.    Yes.

 2        Q.    Okay.  What was it?

 3        A.    I think if we go back to the templates,

 4   whatever we were talking about earlier in terms of

 5   the code of conduct and changes, I think that in

 6   terms of changing what's in those letters, you have

 7   to -- when an associate dean or assistant dean

 8   changes, they have to get a -- get permission from

 9   somebody, either the attorneys or the dean of

10   students.  That's what I mean by that.  And I had to

11   think about that, but that's what I mean.  You just

12   can't --

13        Q.    Okay.

14        A.    Okay.

15        Q.    Do you know if Dr. Williams obtained

16   Dr. King's permission to add language to the notice

17   of charges?

18        A.    I don't know.  I don't know.

19        Q.    Did you ever ask Dr. King that?

20        A.    Did I ask him?  Let me think about that.

21   Yes, I did.  Let me -- yes, I did ask, and she did

22   not get his permission.

23        Q.    Did you ever ask Dr. Williams whether she

24   asked Dr. King's permission?

25        A.    No, I did not.



1      Q.    So you relied on Dr. King's recollection?

2      A.    Yes.  Yes, I did.

3      Q.    When you asked Dr. King whether

4    Dr. Williams had asked his permission to add language

5    to the notice of charges, do you recall asking him

6    whether that had ever been done before?

7      A.    No, I don't.

8      Q.    Are you aware whether that had been done

9    before in any other notice of charges?

10     A.    I'm not aware; but I know the process is

11   that any time you change the letters, you have to get

12   permission either from legal counsel or from the dean

13   of students office, Dr. King.

14     Q.    Okay.  And so if Dr. Williams sought

15   permission from the dean of students office to add

16   language to the letter, that would have been okay

17   with you?

18     A.    Yes.  Yes.

19     Q.    Why didn't you ask Dr. Williams if she

20   consulted with Dr. King?

21     A.    Because Dr. King is my associate, he's the

22   person that I depend on, he runs the office.  And if

23   Dr. King -- if Dr. Williams had gone to Dr. King,

24   Dr. King would have run the letter by the attorneys,

25   also.  So he knew the protocol.  That's why I



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 187 of 200

CHARLES L. BROWN, SR.                                                March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                                  186

1   depended on him.  He's the associate VP, he's second

2   in line, and he ran the division -- the division when

3   I was not available.

4       Q.    Where is that stated that it's the

5   protocol that she needed to consult with the dean of

6   students or the general counsel?

7       A.    That's one of those unwritten protocols

8   that I talked about earlier.  All of the deans know

9   that.  That's something we discuss in my staff

10  meetings.  That's something that we discuss at the

11  training sessions, that you always do that.  If you

12  want to change -- and that's advice from our

13  attorneys, that if you change the letters, you need

14  to run it by the attorneys and the dean of students.

15      Q.    And did Dr. Williams ever tell you that

16  she had, in fact, added language to the notice of

17  charges before the Ryan Rotela incident?

18      A.    No.

19      Q.    She didn't tell you that when you

20  threatened to give her a letter of reprimand?

21      A.    No, I don't remember that.  No, I don't

22  remember that.

23      Q.    Do you know if Dr. Williams was aware of

24  the unwritten protocol to consult with the dean of

25  students before adding any language to the notice of



1    charges?

2         A.    Yes.  All of the associate deans were

3    aware, yes, because we talked about it in my staff

4    meetings and we talked about it at our annual review

5    of the student code of conduct.

6         Q.    Okay.

7         A.    And the --

8         Q.    Are there -- I'm sorry.  I interrupted

9    you.

10        A.    And the lawyers -- the lawyer assigned to

11   the division of student affairs emphasized that

12   during our review of the code of conduct:  If we

13   change anything in those letters, run it by them and

14   run it by the dean of students.  And if they ran --

15   if the associate dean -- if an associate dean was --

16   ran it by the dean without the lawyer, usually the

17   dean would take it to the lawyer, yes.  The

18   protocol -- everyone knew.

19        Q.    Were there agenda -- were there agendas

20   written for these senior staff meetings?

21        A.    Sometimes, yes.  I had an agenda.  Much

22   of -- I had an agenda, yes.  There were items that

23   brought -- that people talked.  We had

24   around-the-table discussions.  So we had both written

25   agendas and we had agendas where people would bring



1    things to the group to talk about.

2         Q.    Who would maintain those agendas?

3         A.    My old -- I guess the administrative

4    assistant in the office.  Much of that -- yes, it

5    would be in the office.

6         Q.    You mentioned two attorneys who were

7    assigned to student affairs earlier.

8         A.    Uh-huh.

9         Q.    Do you recall which attorney advised

10   that --

11        A.    Both.

12        Q.    -- the deans needed to consult with either

13   the dean of students or attorneys before sending out

14   additional language in the notice of charges?

15             MS. WYDLER:  Object to the form.

16             THE WITNESS:  Are you waiting?

17        Q.    (By Ms. Chattergoon)  I am.

18        A.    Both of --

19        Q.    Do you recall which attorney --

20        A.    Both attorneys.

21        Q.    -- gave that advice?

22        A.    Larry Glick, when he advised us.  And

23   Audra -- I've forgotten her name -- when she advised

24   and worked with student of affairs.  They both

25   advised:  Any time we changed those templates, run it



CHARLES L. BROWN, SR.                          March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                             189

1   by the attorneys to make sure or -- and make sure you

2   run it by the dean of students office, yes, both.   It

3   was just --

4        Q.    Who did they give that advice to?   Was

5   that for you or Dr. King?

6        A.    They gave it to me, and they gave it to

7   Dr. King.   They just made me aware of it and Dr. King

8   aware because he was -- he's the administrator of

9   the -- my administrator for the student code of

10  conduct.

11       Q.    And who was required to seek advice of the

12  attorney?   Was it the associate dean of students or

13  was it Dr. King?

14       A.    Both.   Both could do it.   If the associate

15  dean did it, they would run it by Dr. King and say

16  they have spoken with the attorney, this is the

17  wording, yes, or Dr. King could do it.   They could go

18  to Dr. King and Dr. -- the two of them could do a

19  conference call or meet with the attorneys.

20       Q.    Okay.   And so under the reasons in your

21  answer to Number 6, the reasons for separation, there

22  are two reasons given here:   That over a period of

23  time numerous people could not work with

24  Dr. Williams, and then the second reason was that she

25  didn't follow protocol with respect to the Rotela



1    incident.

2        A.    Uh-huh.

3        Q.    Would you agree with that?  There are two

4    reasons stated there?

5        A.    Yes.  Over a period of time and -- over a

6    period of time it became more difficult for people to

7    work with her, and the Rotela incident was just the

8    culmination of all of this.  That's my opinion.

9        Q.    Okay.  Other than the complaints we talked

10   about from various people early on, were there any

11   other complaints around the Rotela incident that were

12   made against Dr. Williams?

13       A.    I don't know.  I'm quite -- I don't know.

14   I really don't know.  I don't want to answer that.  I

15   don't know.

16       Q.    Was there a specific complaint that led

17   you to believe Dr. Williams needed to be terminated

18   or separated from her employment?

19       A.    It was a culmination of things.  It wasn't

20   just one thing.  And I'll emphasize that it just

21   wasn't one thing.

22       Q.    What was the culmination of things?

23       A.    Her inability to work with people, the

24   complaints that I got from people that went on for a

25   period of time.  And to be honest with you, I think I



 1  worked with her.  I promoted her twice in -- even

 2  with -- even with the complaints, I promoted her

 3  twice to give her a chance to be successful.

 4       Q.    Okay.  So why didn't you reprimand her

 5  because of those complaints?

 6       A.    I spoke with her.  I spoke with her, and I

 7  think the HR policies allowed me flexibility in terms

 8  of how you deal with issues with -- personnel issues.

 9  And I think I was within those rights by speaking

10  with her and --

11       Q.    Why didn't you follow the disciplinary

12  process that we went over earlier today?

13       A.    The disciplinary process --

14            MS. WYDLER:  Object to the form.

15            THE WITNESS:  The disciplinary process is

16       guidelines that we use, and that's what I did.

17       I used the guidelines.  I didn't violate them.

18       I had the right to discipline her the way I did.

19       I spoke with her.  I had verbal conversations

20       with her.

21       Q.    (By Ms. Chattergoon)  And so if

22  Dr. Williams did not -- I'm sorry, go ahead.

23       A.    I chose to do it that way.  I think

24  that -- I think in terms of fairness, I was very fair

25  with her; and I chose to do it that way.  The



```
 1    disciplinary process is guidelines, and I followed

 2    the guidelines.  I was within the guidelines.

 3         Q.    Okay.  Well, it's not a guideline, it's a

 4    regulation, correct?

 5              MS. WYDLER:  Object to the form.  Calls

 6         for a legal conclusion.

 7         Q.   (By Ms. Chattergoon)  I showed you Exhibit

 8    Number 3.  It's Regulation 5.012.  Is that a

 9    regulation or a guideline?

10              MS. MOLDOF:  What exhibit was that?

11              MS. CHATTERGOON:  Number 3.

12              MS. WYDLER:  The employee standards one.

13              THE WITNESS:  Is she asking me?

14              MS. MOLDOF:  Yeah, Number 3.

15              THE WITNESS:  It says regulation.

16         Q.   (By Ms. Chattergoon)  Okay.

17         A.    Okay.

18         Q.    Was there a time period that you attempted

19    to give Dr. Williams a letter of reprimand?

20         A.    What are you asking?  Was there a time

21    period I was going to give her a letter or -- is that

22    what you're asking?

23         Q.    Did you give Dr. Williams a letter of

24    reprimand at any time during her employment?

25         A.    No, I did not.
```



CHARLES L. BROWN, SR.                                                March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        193

1        Q.     You did not attempt to give Dr. Williams a

2   letter of reprimand?

3        A.     You said attempt?  I thought you said did

4   I give her.  Attempt?  I did not give her a letter of

5   reprimand.

6        Q.     Did you attempt to give her a letter of

7   reprimand?

8        A.     No.

9        Q.     Did you ever tell Dr. Williams that you

10  were going to give her a letter of reprimand?

11       A.     Yes, I did.

12       Q.     When was that?

13       A.     It was during the Rotela incident.

14       Q.     And why did you tell her you were going to

15  give her a letter of reprimand?

16       A.     Because she did not follow protocol.

17       Q.     And what was her response when you told

18  her that?

19       A.     I don't remember.

20       Q.     Didn't Dr. Williams, in fact, tell you

21  that she did follow protocol?

22       A.     She might have.  I don't remember.

23       Q.     Do you recall a conversation with

24  Dr. Williams in the parking lot at FAU?

25       A.     No, I do not.  No, I do not.



Case 0:15-cv-60621-DPG   Document 79-1   Entered on FLSD Docket 06/27/2016   Page 195 of 200

CHARLES L. BROWN, SR.                              March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                             194

 1       Q.    Do you not recall or -- I'm sorry.  Strike

 2  that.

 3             Do you recall Dr. Williams asking you to

 4  review her file on the Rotela incident?

 5       A.    No, I don't recall that.

 6       Q.    Going back to my question on the parking

 7  lot.  Do you recall whether a conversation occurred

 8  next to your car behind the student services

 9  building?

10       A.    No, I don't recall.

11       Q.    In your answer to Number 9, Interrogatory

12  Number 9, it says it was recommended to me -- I'm

13  sorry.  Tell me when you're looking at it.

14       A.    I'm looking at it.

15       Q.    Okay.  It was recommended by Mr. King to

16  me that the plaintiff receive a letter of reprimand,

17  but I made the decision to terminate the plaintiff

18  based upon the reasons stated above in Interrogatory

19  Number 6.

20       A.    Uh-huh.

21       Q.    When did Dr. King recommend that you give

22  Dr. Williams a letter of reprimand?

23       A.    I don't recall the date, a time, I really

24  don't.

25       Q.    Okay.  Would it surprise you if Dr. King



1   said it was your decision to give Dr. Williams a

2   letter of reprimand?

3            MS. WYDLER:  Object to the form.

4            THE WITNESS:  Yes.  He might have

5        forgotten, yes.

6        Q.    (By Ms. Chattergoon)  Why did Dr. King

7   recommend that he -- that you give Dr. Williams a

8   letter of reprimand?

9        A.    Pardon me?

10           MS. WYDLER:  You're cutting out.

11       Q.    (By Ms. Chattergoon)  I'm sorry, can you

12  hear me?

13       A.    Yes.  Yes, I can now.

14       Q.    What was the reason Dr. King wanted to

15  give Dr. Williams a letter of reprimand?

16       A.    For not following protocol.  That was it,

17  for not following protocol.

18       Q.    And that protocol was what again?

19       A.    In terms of the Rotela case and he had

20  some concerns about some other cases.  Just her

21  following protocol and responsiveness to him.

22       Q.    What other cases?

23       A.    We've had other cases, judicial cases,

24  timely cases, just being timely, that's all.

25       Q.    I'm sorry, I didn't hear.



1      A.    Being timely in terms of getting things

2    done and responding to him.

3      Q.    I'm sorry, I still didn't hear you,

4    Dr. Brown.

5      A.    I said being timely in responding to him.

6      Q.    Okay.  Was there -- did he complain of

7    or --

8            MS. CHATTERGOON:  I'm sorry, Madam

9        Reporter, could you read back my question and

10       his response.

11           (The record was read by the reporter as

12   follows:  "Question.  What other cases?

13           Answer.  We've had other cases, judicial

14   cases, timely cases, just being timely, that's all.

15           Question.  I'm sorry, I didn't hear.

16           Answer.  Being timely in terms of getting

17   things done and responding to him.

18           Question.  I'm sorry, I still didn't hear

19   you, Dr. Brown.

20           Answer.  I said being timely in responding

21   to him.")

22      Q.    (By Ms. Chattergoon)  Okay.  These other

23   cases that you're referring to, Dr. Brown, did

24   Dr. King state that Dr. Williams didn't follow

25   protocol in those cases?



1    A.    He may -- no.  No, it was just being

2  timely and working with him.

3    Q.    And so the only case that he stated

4  Dr. Williams failed to follow protocol was the Rotela

5  matter?

6    A.    Yes.  At this time -- at that time, yes.

7    Q.    I'm sorry?

8    A.    At that time, yes.

9    Q.    Had Dr. King ever recommended that you

10 give a letter of reprimand to Terry Mena for any

11 reason?

12   A.    No.

13   Q.    Had Dr. King ever recommended that you

14 give a letter of reprimand to A.J. Chase for any

15 reason?

16   A.    No.

17   Q.    Do you know if Dr. King ever disciplined

18 Terry Mena?

19   A.    No, I do not.

20   Q.    Would you have to sign off on that

21 discipline if it happened?

22   A.    Yes, I would.

23   Q.    Do you know whether A.J. Chase was

24 disciplined by Dr. King for any reason?

25   A.    No, she wasn't.  No, she wasn't.



CHARLES L. BROWN, SR.                                    March 11, 2016
WILLIAMS vs. FLORIDA ATLANTIC                                        198

1        Q.     Do you know if A.J. Chase and Terry Mena

2    were modifying notice of charges letters?

3        A.     No.

4        Q.     When Dr. King recommended a letter of

5    reprimand be given for Dr. Williams' failure to

6    follow protocol, as you say, did you ever question

7    whether Terry or A.J. failed to follow that same

8    protocol?

9        A.     I think Dr. King would have made me aware

10   of it.  No.

11       Q.     But did you ask the question?

12       A.     No, I did not.

13             MS. CHATTERGOON:  Give me a second.  I'm

14        just looking for an exhibit here.  Could we find

15        FAU 1513 through 1522 and mark it as Exhibit 7.

16             MS. WYDLER:  What is it?

17             MS. CHATTERGOON:  It's the e-mail

18        regarding the reprimand.

19             MS. MOLDOF:  What were the numbers again,

20        I'm sorry?

21             MS. CHATTERGOON:  FAU 1513 through 1522.

22             (Plaintiff's Exhibit-Brown-7 was marked

23   for identification.)

24       Q.     (By Ms. Chattergoon)  When did you decide

25   to give Dr. Williams a letter of reprimand?



1      A.    I don't remember the date.

2      Q.    Okay.  If you take a look at Page 2 of

3 Exhibit 7, it's marked fifteen -- FAU 1514.  There is

4 an e-mail from Corey King to you on April 4th, 2013.

5 It says -- the subject is wording.  Do you see that?

6      A.    Uh-huh.

7      Q.    Do you see that e-mail, Dr. Brown?

8      A.    On Page 2?

9      Q.    On Page 2.

10      A.    Yes.

11      Q.    Does that refresh your memory as to when

12 you decided to give Dr. Williams a letter of

13 reprimand?

14      A.    Yes.

15      Q.    Okay.  So was it sometime around

16 April 4th, 2013?

17      A.    Yes.  That's what the letter says.

18      Q.    Okay.  And why was Dr. King giving you

19 possible wording for the letter to Dr. Williams?

20            MS. WYDLER:  Object to form.

21            THE WITNESS:  Where is the wording?

22      Q.    (By Ms. Chattergoon)  I'm looking at --

23 I'm looking at the e-mail on Page 2.  That's all I

24 want you to look at right now.

25      A.    Because he's -- he's her direct -- he was

