# EXHIBIT

# B

Corey King Vol 1
March 10, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:  15-CV-60621-DPG

ROZALIA WILLIAMS,

                Plaintiff,
vs.

FLORIDA ATLANTIC UNIVERSITY,
CHARLES L. BROWN, SR., an
individual, and COREY KING, an
individual,

                Defendants.
_____/

DEPOSITION OF

DR. COREY KING

VOLUME 1 of 2
Pages 1 through 96

Thursday, March 10th, 2016
10:00 a.m. - 5:30 p.m.

US LEGAL SUPPORT
3440 Hollywood Boulevard
Hollywood, Florida

Stenographically Reported By:
Ashley C. Nehme, FPR
Florida Professional Reporter

Corey King Vol 1
March 10, 2016                          4

```
 1    The following proceedings began at 10:13 a.m.:
 2             THE COURT REPORTER:  Please, raise your
 3         right hand.
 4             Do you solemnly swear or affirm that the
 5         testimony you are about to give in this case
 6         will be the truth, the whole truth, and nothing
 7         but the truth so help you God?
 8             THE WITNESS:  I do.
 9                      DR. COREY KING
10    having been first duly sworn, was examined and
11    testified as follows:
12                    DIRECT EXAMINATION
13      BY MS. CHATTERGOON:
14         Q.   Good morning, Dr. King.  Could you please
15    state your name for the record.
16         A.   Corey King.
17             MS. WYDLER:  Just for record purposes, I
18         would like on the record that the Plaintiff,
19         Dr. Rozalia Williams, is observing the
20         testimony here today by the witness.  And per
21         our agreement, you're going to start with
22         corporate rep questions.
23             MS. CHATTERGOON:  Yes.
24             MS. WYDLER:  And then indicate to the
25         witness when you will switch over to questions
```

Corey King Vol 1
March 10, 2016

1   you turn on the second page, it has a posting date

2   of January 10th, 2014, correct?

3       A.   Correct.

4       Q.   And it says their hiring authority email

5   cking14@FAU.  That's your email, correct?

6       A.   Correct.

7       Q.   Did you submit this posting for this job?

8       A.   Yes.

9       Q.   And why did you do so?

10      A.   Because we were looking for a position,

11  the Associate Dean in the Broward campus.

12      Q.   There's a job postdate of January 31st,

13  2014.  Do you see that?

14      A.   Yes.

15      Q.   So the job was open for about 21 days.  Is

16  that a normal job posting for the University?

17      A.   Two weeks is the minimum for the

18  University.  Two weeks, so 14 days.

19      Q.   And this is the position that was vacated

20  by Dr. Williams?

21      A.   Yes.

22      Q.   Okay.  If you look at the first page under

23  the posting summary.

24      A.   Uh-huh.

25      Q.   Who writes this position summary?

1        A.    Usually the supervisor in consultation

2   with HR.

3        Q.    Who would be the supervisor for this

4   posting?

5        A.    I am.

6        Q.    Okay.  So you assisted in writing this

7   position summary?

8        A.    I did, yes.

9        Q.    Okay.  If you look at -- Well, let's just

10  go through it for a second.  It says, "The Associate

11  Dean is responsible for the following areas:

12  Diversity; student services, including students with

13  disabilities; multicultural affairs, and

14  international students; student life recreation;

15  leadership; student government; Student Union;

16  campus recreation; Center for Specific Engagement;

17  orientation, and student conduct.  And that

18  reflects -- That reflects what is on the

19  organizational chart in Exhibit 1, correct?

20       A.    Counseling, psychological services, and

21  student health is not mentioned.

22       Q.    Okay.

23       A.    Those two were moved from this position,

24  at that time.

25       Q.    Where were they moved to?

1        A.    They were reporting to the director of the

2   overall FAU services.

3        Q.    And who was that?

4        A.    Student Health Services at the time was

5   Cathy Wallace, and Counseling/Psychological Services

6   was Kirk Dougher.

7        Q.    What was your position as of January 10th,

8   2014?

9        A.    Associate Vice President Dean of Students.

10        Q.    And going to the second paragraph of the

11   position summary it says, "The Associate Dean

12   reports to the Associate Vice President and Dean of

13   Students and serves as a member of the Senior Vice

14   President of Student Affairs leadership team.

15   Flexible hours, including weekend and evening work

16   required."  Do you see that?

17        A.    Yes.

18        Q.    So this position reported to you?

19        A.    At the time of the posting, yes.

20        Q.    Was there a time that the Associate Dean

21   of Student Affairs on the Broward campus did not

22   report to you?

23        A.    Prior to the posting it did not report to

24   me.

25        Q.    Who did that position report to?

Corey King Vol 1
March 10, 2016                                    21

```
 1        A.    The Senior Vice President of Student
 2    Affairs.
 3        Q.    And who was it prior to January 2014?  Who
 4    was the Senior Vice President?
 5        A.    Dr. Charles Brown.
 6        Q.    Okay.  Why was there a change in
 7    reporting?
 8        A.    It was the decision of the Senior Vice
 9    President.
10        Q.    Do you know why that decision was made?
11        A.    I can say it was in relation to - from my
12    understanding from the Senior Vice President, it was
13    in relation to the handling of the Rotela case.
14        Q.    Okay.  What about the handling of the
15    Rotela case made that decision happen?
16        A.    That wasn't disclosed to me.
17        Q.    Dr. Brown would know that?
18        A.    Yes.
19        Q.    All right.  The next paragraph, it says,
20    "Essential duties are highly complex.  Develop
21    strategies, policies, and practices.  It applies
22    highly-developed rated and problem-solving skills.
23    Has authority to waive or deviate from established
24    policies and procedures without prior approval.
25    Exercises considerable authority and independent
```

1   judgment and has substantial latitude for

2   independent action."  Did any of these duties change

3   for this posting?

4        A.   No.

5        Q.   So these essential duties as described

6   here were the same duties that Dr. Williams had to

7   adhere to?

8        A.   Yes.

9             (The referred-to document was marked by

10       the court reporter for identification as

11       Plaintiff's Composite Exhibit 3.)

12   BY MS. CHATTERGOON:

13       Q.   I'm going to do this as Composite Exhibit

14   3.

15            Just let me know when you had a chance to

16   review it, Dr. King.

17       A.   Yes.

18       Q.   Okay.  The first letter is a letter to

19   Dr. Horstman dated January 8th, 2014 offering him

20   the interim position of Associate Dean, correct?

21       A.   Yes.

22       Q.   Okay.  Who was in -- Well, let me strike

23   that.

24            Do you recall when Dr. Williams separated

25   her position as Associate Dean of Students for the

Corey King Vol 1
March 10, 2016                          25

```
 1         Q.    Would Robin Kabat know that?

 2         A.    Yes.

 3         Q.    Do you recall when Dr. Horstman was

 4   permanently placed into the position of Associate

 5   Dean of the Broward campuses?

 6         A.    No.   That would be in his personnel file.

 7         Q.    On the second page of that Exhibit 3

 8   there's a request for a 20 percent increase for

 9   Dr. Horstman based on his need to travel to the

10   Davie campus.   Do you see that?

11         A.    Yes.

12         Q.    Had that been done for any other dean -

13   Associate Dean of Students, at that time?

14               MS. WYDLER:   Form.

15         A.    It is customary in the University

16   environment that when a person is placed in an

17   interim position, they're given some type of

18   increase for additional responsibilities.

19   BY MS. CHATTERGOON:

20         Q.    Okay.   But that was not for additional

21   responsibilities, that was for travel, correct?

22         A.    According to this memo, you're correct.

23         Q.    Okay.   So just take a look at the first

24   page for me, the annual salary of $60,564.   Do you

25   know if that was an increase for Dr. Horstman in
```

1    compensated for qualifications and responsibilities

2    of the position, so...

3              MS. CHATTERGOON:   I'm going to mark this

4         as Exhibit 4.

5              (The referred-to document was marked by

6         the court reporter for identification as

7         Plaintiff's Exhibit 4.)

8              MS. WYDLER:   What designation are you

9         addressing now?

10             MS. CHATTERGOON:   Off the record.

11             (A discussion was held off the record,

12        after which the following proceedings were

13        held:)

14   BY MS. CHATTERGOON:

15        Q.   So I want to talk to you, Dr. King, about

16   the FAU's policy and procedures for investigating

17   threats made by students.   What is that policy?   Or

18   can you tell me what the university's policy and

19   procedures are for investigating threats made by

20   students?

21        A.   So threats made by students falls under

22   two areas of the University.   First is the

23   University Student Code of Conduct, which is not a

24   policy or procedure.   Our Student Code of Conduct is

25   a regulation which is governed by the Board of

1    Trustees.  So all of the procedures that happen

2    under 4.007 is under a regulation.  So here this

3    document is a Student Crisis Awareness Committee,

4    and is a committee that meets to discuss potential

5    students of interest and it is for the sole purpose

6    of intervening with students and being proactive.

7    So students of interest come to this committee to

8    discuss.  So this management policy, along with the

9    Student Code of Conduct Regulation 4.007 governs

10   that process.

11       Q.   So that would also govern the procedure

12   for investigating threats made by students, correct?

13       A.   Either this policy and/or Regulation

14   4.007, correct.

15       Q.   Okay.  All right.  Let's talk about this

16   policy, which is Exhibit No. 4 that I marked.

17       A.   Yes.

18       Q.   It's the Student Threat Assessment and

19   Management Policy.  It's marked FAU 1231 through

20   1234.

21       A.   Uh-huh.

22       Q.   And this is the - it details what the

23   Student Crisis Awareness Committee and the Student

24   Intervention Team, their purposes and functions,

25   correct?

Corey King Vol 1
March 10, 2016                           38

```
 1   committee?
 2        A.   Dr. A.J. Chase.
 3        Q.   And what was her actual position?
 4        A.   Associate Dean Northern Campuses.
 5        Q.   It was for northern campuses or was it for
 6   a specific campus?
 7        A.   Northern campuses, yeah.  Northern
 8   campuses, yes.
 9        Q.   Did Terry Mena also sit on this committee?
10        A.   Yes.
11        Q.   What was his position?
12        A.   Associate Dean of Boca campus.
13        Q.   You stated northern and Broward campus,
14   but there's also a Boca campus?
15        A.   That's our main campus, Boca Raton.
16        Q.   How many associate deans were there at the
17   time of Dr. Williams' employment?
18        A.   Three, three associate deans.
19        Q.   So that would have been Dr. Williams,
20   Terry Mena and A.J. Chase, correct?
21        A.   Correct.
22        Q.   And so Terry Mena was the Associate Dean
23   of the Boca campus?
24        A.   Correct.
25        Q.   And it was just one campus, your main
```

Corey King Vol 1
March 10, 2016                                    39

1    campus?

2        A.    Our main campus.

3        Q.    And A.J. Chase was the Associate Dean of

4    the northern campuses, which consisted of how many

5    campuses?

6        A.    Jupiter which is our honors college,

7    Harbor Branch, and I believe - we had a Treasure

8    Coast campus that had subsequently closed.

9        Q.    And so how often would this SCAC Committee

10   meet?

11       A.    It typically would meet every two weeks.

12       Q.    And what was the purpose of meeting every

13   two weeks?

14       A.    The purpose as stated in the document on

15   page - on the first page.

16       Q.    Okay.  And so who set the agenda for this

17   SCAC meeting?

18       A.    I did at that point.  I was the Associate

19   VP and Dean of Students.  The agenda was set by

20   people submitting names for conversation for the

21   group.

22       Q.    So members of the committee would submit

23   names for conversation for the group, correct?

24       A.    Yes.

25       Q.    What it required - or were the members

1    required to submit a name before taking any action

2    against a student?

3        A.   (Nods head in the negative.)

4        Q.   You have to say yes or no.

5        A.   No.

6        Q.   And then tell me, what is the Student

7    Intervention Team?

8        A.   The Student Intervention Team is a smaller

9    group.  The purpose of that is to act on the

10   recommendations of the SCAC and to respond to actual

11   and imminent risk or emergency situations to prevent

12   individuals from harming themselves or others.

13       Q.   And did this -- Who were the members of

14   this committee?

15       A.   Composition in No. 4 was myself, was the

16   Associate Vice President Dean of Students, associate

17   deans, assistant deans, the Chief of Police,

18   Director of Housing, faculty member, and advisory

19   group from CAPS and OSD and things of that nature.

20       Q.   So Dr. Williams would have sat on this

21   committee, as well, correct?

22       A.   In her role as Associate Dean, yes.

23       Q.   And how often did this committee meet?

24       A.   As deemed necessary.

25       Q.   I'm sorry?

Corey King Vol 1
March 10, 2016                                    43

1        A.   Yes.

2        Q.   And this is the regulation you stated

3   earlier that the University is required to follow

4   with regard to threats made by students, correct?

5        A.   In investigations, yes.

6        Q.   In investigations.  Okay.

7             Can you walk me through how an

8   investigation begins and through the resolution.

9        A.   So a -- There is a complainant.  There is

10  usually a report of some nature that comes to an

11  appropriate University official within the Dean of

12  Students office.  It is only those individuals in

13  the Dean of Students office under the Dean's

14  designee who can invoke the code.

15       Q.   Who would those be?

16       A.   It would be the Dean and the three

17  Associate Deans and the Assistant Dean.

18       Q.   Okay.

19       A.   And the Assistant Director.

20       Q.   Okay.

21       A.   So a report comes and those individuals

22  review the report.  And from that, according to the

23  code, there should be - there will be an

24  investigatory conference.  So a student receives a

25  letter of an investigatory conference.  The only

Corey King Vol 1
March 10, 2016                              46

1    next level.

2         Q.    Okay.   Is there a board for the appeals

3    process?

4         A.    There is no board for the appeals process.

5         Q.    Who makes the final decision in the

6    appeals process?

7         A.    The Vice President for Student Affairs

8    makes the final appeal decision for the University.

9    There is an appeal beyond the Vice President for

10   Student Affairs in the Circuit Court.

11        Q.    Let me just go back to the report.   You

12   said the report is made to the appropriate

13   individual designee; that would be the dean, the

14   three associate deans, the assistant dean, and the

15   assistant director, correct?

16        A.    Correct.

17        Q.    All right.   Is there a specific person for

18   each campus that is designated to receive a report?

19   For example, on the Broward campus, would it be the

20   Associate Dean of Students for the Broward campus

21   who would be the person giving that report to?

22        A.    Yes.

23        Q.    And then you said an investigatory

24   conference is held.   Well, let me ask you, wherein

25   the code does it provide for these procedures?

Corey King Vol 1
March 10, 2016

1    of a student or the University community.  In my

2    time as a Student Conduct Officer at FAU, emergency

3    measures are taken before an investigatory

4    conference or Notice of Charges are issued, because

5    emergency measures means we have a threat to the

6    safety and welfare of a student or the University

7    community, and that's to my knowledge.

8        Q.   Is there a chart for the process of

9    applying the Student Code of Conduct at the

10   University?

11       A.   There is a flowchart, and it's in the

12   front of the actual blueprint of the printed Student

13   Code Conduct book.

14       Q.   Does that flowchart identify where

15   emergency measures must be taken?

16       A.   I'm unable to view that in my thought

17   process, but the process of this document such where

18   emergency measures SIT as compared to the other

19   procedures, indicates to me in my time at FAU, that

20   emergency measures are taken prior to an

21   investigatory conference or Notice of Charges or

22   anything thereafter.

23       Q.   During your time at FAU, since you

24   mentioned it, do you recall a situation where

25   emergency measures were taken after the

Corey King Vol 1
March 10, 2016

```
 1   investigatory conference or Notice of Charges?

 2        A.    I do not.

 3             MS. CHATTERGOON:  Off the record for a

 4        second.

 5             (A recess was taken from

 6        11:21 a.m. until 11:29 a.m., after which the

 7        following proceedings were held:)

 8             (The referred-to document was marked by

 9        the court reporter for identification as

10        Plaintiff's Exhibit 6.)

11   BY MS. CHATTERGOON:

12        Q.    Prior to our break, Dr. King, we talked

13   about flowcharts and we happen to have the Student

14   Code of Conduct for 2012 to 2013 and we've made

15   copies of that with the flowchart.  Is this the

16   flowchart that was in effect for 2012 to 2013?

17        A.    Correct.

18        Q.    And I want you to take a look at the

19   flowchart for me and it goes through the steps that

20   you discussed earlier.  It says complaint or

21   incident report, investigation.  There's an arrow

22   for matter closed or there's a box next to it with

23   emergency measures, which include interim

24   suspension, interim removal, housing, other

25   restrictions.  Do you see that?
```

1    yes, we dealt with that student; oh, yes, we...  So

2    there was more of a University approach of handling

3    that student or case management of a student.

4        Q.    So the handling or case management of that

5    student would be discussed in those meetings with

6    those committee members?

7        A.    Yes.

8        Q.    Okay.  Once a either the Associate Dean or

9    Associate Director issued a Notice of Charges, was

10   that Notice of Charges required to be approved by

11   the either Associate Dean or Senior Vice President

12   before it was sent to the student?

13       A.    Approved, no.

14       Q.    And so for this flowchart in Exhibit 6,

15   the Associate Dean designee, Assistant Dean,

16   Assistant Director had the responsibility for that

17   incident report through which process here on this

18   flowchart?

19            For example, an Associate Dean got the

20   incident report.  Were they responsible for the

21   investigation, the Notice of Charges, the student

22   conduct conference?

23       A.    Case management, yes.

24       Q.    Case management.

25       A.    With the exception of emergency measures.

Corey King Vol 1
March 10, 2016

```
 1    Paragraph 9 for Emergency Measures.

 2         A.   Yes.

 3         Q.   It would seem to me that any person

 4    defined under 4F would have the authority to take

 5    emergency measures?

 6         A.   Correct.  If you look on Page 2 it also at

 7    the end says or designee.  So again, the Dean of

 8    Students has a right to designate even more

 9    individuals to do that based on their authority.

10         Q.   Okay.

11         A.   Yes.

12         Q.   But here it also defines Dean of Students

13    as the Associate Dean of Students, correct?

14         A.   As the Dean of Students, the Dean of

15    Students determine their designee.  And those

16    designees go in -- So when the book is printed for

17    2013/2014, the Dean could say I want to add another

18    position.  It is the Dean of Students every year who

19    determines who the designees would be for that

20    authority.  That's why this book is printed every

21    year.

22         Q.   So for 2012 and 2013 academic year.

23         A.   Yes.

24         Q.   The designee included the Associate Vice

25    President Dean of Students, the Associate Dean of
```

Corey King Vol 1
March 10, 2016

 1    Students, and the Assistant Dean of Students,

 2    correct?

 3         A.    Correct.

 4         Q.    For the emergency measures going back to

 5    Page 8.

 6         A.    Yes.

 7         Q.    It says here, "Emergency measures include

 8    but are not limited to one or more of the

 9    following."  And there are five measures that are

10    given?

11         A.    Yes.

12         Q.    Is there a requirement that one measure is

13    taken before another?  For example, does interim

14    suspension have to be taken before interim removal

15    from University housing?

16         A.    No.

17         Q.    I want to go back to that flowchart for a

18    second.

19               Once the Notice of Charges is issued.

20         A.    Yes.

21         Q.    There's a student conduct conference.

22         A.    Yes.

23         Q.    At that conference is where the student

24    actually enters into a plea or says they're not

25    responsible and want a hearing, correct?

Corey King Vol 1
March 10, 2016                         73

```
 1        A.    Yes.

 2        Q.    And in fact, you responded on March 9th,

 3   which was a Saturday, stating, "I will call you this

 4   weekend."  Correct?

 5        A.    Yes.

 6        Q.    Was this Dr. Williams' attempt to consult

 7   with you regarding the Ryan Rotela case?

 8             MS. WYDLER:  Objection.  Form.

 9    BY MS. CHATTERGOON:

10        Q.    Let me strike the question and I'll ask a

11   better question.

12             Prior to this email, did Dr. Williams

13   attempt to consult with you on the Ryan Rotela case?

14             MS. WYDLER:  Objection.

15        A.    The fact that the term student is used, I

16   would have not have been aware at that time.  The

17   email says, "I'm regarding a student."  So I was not

18   aware of the student that she was referring to.

19    BY MS. CHATTERGOON:

20        Q.    Okay.  My question was and let me reask

21   the question.

22        A.    Okay.

23        Q.    Do you recall whether Dr. Williams

24   contacted you regarding Ryan Rotela prior to this

25   email?
```

 1        overlap.  If you want to produce someone else

 2        for the investigation, I can do it that way.

 3        But there's no way for me to conduct a

 4        deposition with him being the person involved

 5        in the investigation and as the corporate rep

 6        without asking his recollection and separate

 7        it.  You can have your standing objection and

 8        I'll ask him, it will just make the deposition

 9        longer.

10            MS. WYDLER:  That's fine.  I think that's

11        the appropriate procedure if you're asking

12        recollection questions.

13            MS. CHATTERGOON:  Okay.

14    BY MS. CHATTERGOON:

15        Q.    The question is still pending.

16        A.    Repeat, please.

17        Q.    Sure.

18            Do you know whether you spoke to

19    Dr. Williams on March 10th?

20        A.    I remember speaking to her that - before

21    the weekend was over.

22        Q.    On 1454 it's the Notice of Charges dated

23    March 8th, 2013.

24        A.    Yes.

25        Q.    Is this notice of charges -- Strike that.

Corey King Vol 1
March 10, 2016                          81

 1        A.    No.

 2        Q.    So when else can an emergency measure

 3   letter be sent out?

 4        A.    At any point during the process, if the

 5   alleged perpetrator does anything that exemplifies

 6   an immediate threat or harm, an interim measure

 7   letter can be issued.

 8        Q.    What if the victim indicates that they

 9   need an emergency measure to take place during the

10   investigation of the incident report?

11        A.    The victim does not determine that.  The

12   victim shares with the appropriate student conduct

13   officer information and that person makes a

14   professional judgment based on the information

15   provided.

16        Q.    Okay.  Fair enough.

17              So during the investigation of a

18   complaint, if the appropriate person determines that

19   an emergency measure is necessary, can that

20   emergency letter be sent out?

21        A.    Yes.

22        Q.    And you're saying it has to be a separate

23   letter, it cannot be combined with the Notice of

24   Charges?

25        A.    Our standard practice is there's a

Corey King Vol 1
March 10, 2016                               82

1   separate letter for each step of our process.

2       Q.   Is there a policy in the Code of Conduct

3   that states that?

4       A.   In the regulation?

5       Q.   In the regulation.

6       A.   It does not state that.

7       Q.   The Notice of Charges letter in 1454

8   stated that - to the student that there was a

9   student conduct conference on March 15th, 2013.  Do

10  you see that?

11      A.   Yes.

12      Q.   Do you know if that conference ever took

13  place?

14           Well, let me reask that question.  I'll

15  ask a better question.  If you look at 1455 there's

16  a student rights dated March 15th, 2013.  Can we

17  assume that student conference took place?

18      A.   Yes.

19      Q.   What happens at that student conference?

20      A.   So according to our code, after a Notice

21  of Charges has been issued, which does indicate,

22  again, there is some separation between letters, a

23  student conduct conference may be established.

24  There are no witnesses called, at that point.  The

25  student conduct conference is not audio taped.  The

Corey King Vol 1
March 10, 2016

1    one?

2         A.   Since this is not dated, I can't confirm.

3    I don't see a date here.

4         Q.   Do you recall what the other statement -

5    what the other statement said?

6         A.   I believe the other statement was actually

7    in a video done by Dr. Brown.

8         Q.   Did you provide Dr. Brown with any

9    information in order to make that statement?

10        A.   No.

11        Q.   That video statement?

12        A.   No.

13        Q.   Do you know whether the Media Relations

14   Department coordinated that statement with

15   Dr. Brown?

16        A.   Yes.

17        Q.   Do you know the reason that video

18   statement was released?

19        A.   On request of the University President.

20        Q.   And who was that, at the time?

21        A.   Mary Jane Saunders.

22        Q.   Do you know the reason for the video

23   statement?

24             MS. WYDLER:  Object to form.  Asked and

25        answered.

Corey King Vol 1
March 10, 2016                          91
Corey King Vol 1
March 10, 2016

1        A.    It was her request.

2    BY MS. CHATTERGOON:

3        Q.    Did Dr. Saunders ever state why she wanted

4    that statement released via video?

5        A.    Not any form I was in.

6        Q.    Do you know if it was within any form

7    within the University?

8        A.    Yes.  I am confident that if she gave

9    directive, she would have provided reasons for why

10   she wanted it done.

11       Q.    Do you know if there are any records of

12   those reasons?

13       A.    No.

14       Q.    And just to our last designation regarding

15   the student, the Davie student pavilion?

16       A.    Yes.

17       Q.    Do you have knowledge of the issues

18   surrounding the Davie student pavilion?

19       A.    I do.

20       Q.    And there is an allegation that was made

21   against Dr. Williams that she failed to carry out

22   supervisory directives regarding this pavilion on

23   the Davie campus.  Are you aware of that?

24       A.    Yes.

25       Q.    What were those failures?

Corey King Vol 1
March 10, 2016

 1        A.    I was aware that in a conversation in a

 2   senior staff meeting with Student Affairs that a

 3   dialogue took place between Dr. Brown and

 4   Dr. Williams regarding the pavilion and the desire

 5   of the students to want to see the pavilion happen.

 6   And I believe also the Broward administration.

 7   Dr. Brown expressed a concern that it was too much

 8   money.

 9        Q.    Were you present at that meeting?

10        A.    It was a senior staff meeting; yes, I was.

11        Q.    And you're stating Dr. brown said it

12   was --

13        A.    Too much money.

14        Q.    -- too much money?

15        A.    Yes.

16        Q.    What was too much money?  The actual

17   building of the pavilion?

18        A.    Yes.

19        Q.    Do you know whether there was a cost

20   estimate for that pavilion at the time of that

21   meeting?

22        A.    Yes, I believe Dr. Williams had provided

23   the appropriate documents or information to

24   Dr. Brown.

25        Q.    Were those documents reviewed at that

Corey King Vol 1
March 10, 2016

1   meeting?

2        A.    They were not.  It was a discussion.

3        Q.    Okay.  And so Dr. Brown's directive was to

4   not proceed with the pavilion?

5        A.    Dr. Brown directives in that meeting, from

6   what I heard, was it was too much money.

7        Q.    Do you know if there was a directive not

8   to proceed with the pavilion?

9        A.    No.

10       Q.    Do you know whether Dr. Brown -- Well,

11   strike that.

12             Do you know whether that pavilion was ever

13   built?

14       A.    It was not.

15       Q.    Do you know why it was never built?

16       A.    I assume it cost too much money.

17       Q.    Okay.  So how then did Dr. Williams fail

18   to carry out supervisory directives?

19       A.    That's a question of her direct

20   supervisor, at that time, Dr. Brown.

21       Q.    Prior to this senior staff meeting that

22   you're talking about was there a plan to build a

23   student pavilion?

24       A.    There was a -- Yes.

25       Q.    And how was that pavilion to be funded?

Corey King Vol 2
March 10, 2016

1   subordinate?

2         A.    Nope.

3         Q.    Do you know if she's ever made a complaint

4   against you?

5         A.    Not to my knowledge.

6         Q.    When you became the Associate Vice

7   President and Dean of Students in 2008, did you

8   receive any training for that position from FAU?

9         A.    Not specifically from the institution, but

10  Dr. Brown did send me to conferences.

11        Q.    What conferences did you go to?

12        A.    SACSA and NASPA.

13        Q.    Can you tell me what those are?

14        A.    SACSA is the Southern Association for

15  College Student Affairs, and NASPA is the National

16  Association for Student Personnel Administrators.

17        Q.    Do you recall when you went to those

18  trainings?

19        A.    I do not.

20        Q.    Have you been back to either of those

21  conferences?

22        A.    Yes.

23        Q.    When was the last time you went?

24        A.    Last year.

25        Q.    Did you attend any of those conferences

Corey King Vol 2
March 10, 2016

```
 1   anywhere from 2011 to 2014?

 2        A.   Yes.

 3        Q.   Okay.  Which ones?

 4        A.   Between that time, both of them.

 5        Q.   Okay.  How often?

 6        A.   Well, they happen once a year, so I would

 7   go once in the fall to SACSA and once in the spring

 8   to NASPA.

 9        Q.   So you attended both conferences in 2011?

10        A.   That I can't remember when.  I don't

11   recall that.

12        Q.   What about 2012?

13        A.   I don't recall 2012.

14        Q.   What about 2013?

15        A.   Yes.

16        Q.   What about 2014?

17        A.   Yes.

18        Q.   Do you know whether any of the -- Strike

19   that.

20             As your -- In your position as Associate

21   Vice President and Dean of Students, did you

22   supervise any employees?

23        A.   Yes.

24        Q.   How many?

25        A.   Between 12 and 15.
```

1    A.J. Chase.  So I'm not sure the timeframe of when

2    Joe left.  I believe A.J. Chase was in the northern

3    campuses during 2010.  I'm not sure when Maryann

4    Mertzer left.

5         Q.   What about 2012 and 2013, was that Terry

6    Mena and A.J. Chase?

7         A.   Yeah, definitely.

8         Q.   And Dr. Williams?

9         A.   2012 and 2013 is more clear for me.

10         Q.   So those were only three Associate Dean of

11    Students?

12         A.   Yes.

13         Q.   These two conferences, the SACSA and the

14    NASPA, did Terry Mena attend any of those

15    conferences?

16         A.   He may have went -- Yeah, he went to

17    NASPA.  He didn't go to SACSA.

18         Q.   Did A.J. Chase go to any of those

19    conferences?

20         A.   No.

21         Q.   What about Dr. Williams?

22         A.   No.

23         Q.   Okay.  Who -- Did Dr. Brown have to

24    approve the employees going to these conferences?

25         A.   Those direct reports, yes.

Corey King Vol 2
March 10, 2016                    111

1        Q.   And he would have to approve you going to

2   those conferences, correct?

3        A.   Yes.

4        Q.   Did FAU pay for you to attend these

5   conferences?

6        A.   Yes.

7        Q.   Do you know if they paid for Terry to

8   attend these conferences?

9        A.   Yes.

10        Q.   Do you know whether Dr. Williams or A.J.

11   Chase requested to attend these conferences?

12        A.   I don't know that.

13        Q.   Who would know that?

14        A.   Dr. Brown.

15        Q.   Other than going to these conferences, did

16   you receive any other type of training from the

17   University?

18        A.   Yes.

19        Q.   What were they?

20        A.   Antidiscrimination training.

21        Q.   When did you receive that?

22        A.   When I first got there.

23        Q.   Okay.  Did you attend a training seminar,

24   or how was that training?

25        A.   It was an in-person training seminar.

Corey King Vol 2
March 10, 2016

1   Here you list a complaint made to Ed Rowe by a Maria

2   Salazar regarding handling of a transportation issue

3   for disability.  How do you know of this complaint?

4        A.   So when a complaint is made against a

5   staff member or employee, EOP would reach out to you

6   to let you know the nature of the complaint and that

7   an investigation is going on.

8        Q.   Okay.  Who reached out to you?

9        A.   Ed Rowe.

10       Q.   Do you recall when?

11       A.   I do not.

12       Q.   Do you recall what Ed said to you about

13   this complaint?

14       A.   Exactly what's stated there.

15       Q.   Can you tell me in your own words what was

16   said?

17       A.   He indicated that a person had - a student

18   had reached out to him in terms of her disability

19   and felt that when her husband was trying to assist

20   her that she, basically, was demanded to - felt she

21   was demanded by the Associate Dean or whoever in

22   that purview to provide documentation so that her

23   husband could help her in her accommodations.

24   That's what I generally remember.

25       Q.   Okay.  Do you remember if this was before

Corey King Vol 2
March 10, 2016                                        140
Corey King Vol 2
March 10, 2016

1    or after the Rotela incident?

2         A.    I don't recall.

3         Q.    Do you recall whether the student's

4    husband had an altercation with any other student on

5    campus?

6         A.    Yes.

7         Q.    Okay.

8         A.    I was aware of that.

9         Q.    Who made you aware of that?

10        A.    I believe Dr. Williams did in some form.

11   I don't know if it was the SCAC or we were talking

12   in another venue, but I do remember that.

13        Q.    It says here in your response, "When her

14   husband was banned from campus due to an altercation

15   with another student, Ms. Salazar complained that

16   she would not be able to walk all the way to her

17   class buildings where her husband would not be

18   required to drop her off."  Do you recall any other

19   details regarding that statement that the husband

20   was banned from campus?

21        A.    No.

22        Q.    It then says, "Plaintiff improperly

23   demanded medical documentation of this student's

24   disability before allowing for an accommodation to

25   provide access to campus for this student, which is

Corey King Vol 2
March 10, 2016

1    against University policy."  How do you know

2    Dr. Williams improperly demanded medical

3    documentation?

4          A.    That was based on the student's report,

5    the student's complaint.

6          Q.    Did you ever discuss that with

7    Dr. Williams?

8          A.    No, not at all.

9          Q.    Do you know whether Dr. Williams sent this

10   student to disability services and to Ed Rowe's

11   department?

12         A.    No.

13         Q.    Why didn't you have a discussion with

14   Dr. Williams about this?

15         A.    The practice has been when EOP informs me

16   of an investigation I do not inform - well, they

17   inform us.  We should not be discussing it with the

18   staff members until the investigation is completed.

19         Q.    Do you know if an investigation was ever

20   completed?

21         A.    I didn't get a final report, so I'm

22   assuming it was not.

23         Q.    Do you know if it's -- Is it normal

24   procedure for you to get a report?

25         A.    The supervisor, if there is an

Corey King Vol 2
March 10, 2016

1   investigation and findings, the supervisor would get

2   a report, a final report, but I don't remember

3   seeing a final report on this.

4        Q.   Who would know whether there was a final

5   report on this?

6        A.   EOP.

7        Q.   Mr. Rowe?

8        A.   Yes.

9        Q.   Was Dr. Williams ever reprimanded for this

10  Maria Salazar complaint?

11       A.   Not to my knowledge.

12       Q.   And you don't recall if this was before or

13  after the Rotela incident, correct?

14       A.   I do not.

15       Q.   In your answer here you state, "There was

16  another incident where an FAU alumni called EOP

17  office to complain about another alumni daughter FAU

18  student worker.  Do you have any firsthand knowledge

19  of that complaint?

20       A.   Firsthand knowledge?

21       Q.   Yes.  Do you have any -- How do you know

22  this incident occurred?

23       A.   EOP again.  Informed.

24       Q.   Was that Mr. Rowe?

25       A.   I can't remember.  I can't recall.  It

Corey King Vol 2
March 10, 2016

```
 1        A.   Staff meetings and conversations and

 2   trainings emergency measures have always been on a

 3   separate letter.  We always discuss with me or

 4   Dr. Brown any type of emergency measures that we

 5   were going to take.  That's been standard practice.

 6        Q.   You said you discussed with you or

 7   Dr. Brown the emergency measures to be taken?

 8        A.   Well, because Dr. Brown is the VP,

 9   sometime if - the associate deans discuss with

10   Dr. Brown before they get to me in interim measures

11   if he agrees, it happens.

12        Q.   So you're saying that all three associate

13   deans were aware of your interpretation of these

14   emergency measures, correct?

15             MS. WYDLER:  Object to form.

16        A.   I believe they were.

17   BY MS. CHATTERGOON:

18        Q.   And just to go back to your statement, you

19   said it was discussed in meetings?

20        A.   Yeah.

21        Q.   Okay.  Do you know if Terry Mena ever

22   implemented emergency measures during his time as

23   Associate Dean of Students for the Boca campus?

24        A.   I can't recall.

25        Q.   What about A.J. Chase?
```

Corey King Vol 2
March 10, 2016

1       A.    Can't recall.

2       Q.    Do you know whether prior to the Ryan

3   Rotela incident whether Dr. Williams ever

4   implemented any emergency measures?

5       A.    I can't recall.

6       Q.    You go on to say, "Plaintiff

7   unilaterally - acted unilaterally to bar Mr. Rotela

8   from his class with Dr. Poole and also from coming

9   into contact with other students from Dr. Poole's

10  class possibly implicating his ability to attend

11  other classes without proper authority to do so."

12  Why was that a violation?

13      A.    That decision was made without discussing

14  it with either myself or Dr. Brown as has been our

15  practice if we're taking interim measures.

16      Q.    It goes on to say, "In doing so, she

17  modified a standard Notice of Charges letter without

18  authority or approval of FAU General Counsel's

19  Office potentially exposing FAU to liability."  Was

20  Dr. Williams required to seek authority or approval

21  from the General Counsel's Office to modify a Notice

22  of Charges letter?

23      A.    That has been our practice when we modify

24  the letters that we consult with our General

25  Counsel.

Corey King Vol 2
March 10, 2016                                150

```
 1        Q.    How was Dr. Williams supposed to be aware
 2   of that?
 3        A.    In Page 10 of the Student Code of Conduct
 4   it specifically states what should be in the Notice
 5   of Charges.  And when we add or take away from that,
 6   that means for me the regulation is being adjusted
 7   and there needs to be conversation with General
 8   Counsel.
 9        Q.    How would Dr. Williams know that?  Where
10   is that stated?
11        A.    Page 10D says specifically what's in the
12   Notice of Charges.  It's very clear.
13        Q.    Does 10D state authority or approval from
14   the General Counsel's Office shall be sought if it
15   was to be modified?
16        A.    It does not.
17        Q.    Okay.  Has there been any memos or
18   additional policies given to either the Associate
19   Dean of Students or any other designee stating that
20   they should seek authority of the - or approval of
21   the General Counsel's Office for modifying a Notice
22   of Charges letter?
23        A.    No.
24        Q.    Has that been discussed in any meetings?
25        A.    Yes.
```

Corey King Vol 2
March 10, 2016                                    153
Corey King Vol 2
March 10, 2016

1    BY MS. CHATTERGOON:

2        Q.   I'm showing you what's been marked as

3    Exhibit No. 12.  It's FAU1505 and 1506.  Are these

4    examples of templates that were provided to the

5    Associate Deans or designees?

6        A.   Yes.

7        Q.   Do you know if Joanna Ellwood provided

8    these templates?

9        A.   The expectation is she provided these in

10   training.

11       Q.   Okay.  Do you know when was the last time

12   these templates were provided to the Associate Dean

13   of Students?

14       A.   I do not.

15       Q.   And these are templates, correct, not form

16   letters?

17            MS. WYDLER:  Object to the form.

18            MS. CHATTERGOON:  Well, strike that.

19   BY MS. CHATTERGOON:

20       Q.   Is there a difference between a template

21   and a form letter?

22       A.   Yes.

23       Q.   What's the difference?

24       A.   The difference is for me that there are

25   places in a template that you can put information in

Corey King Vol 2
March 10, 2016

1   regarding the charges may change, the alleged

2   violation may change, the date and time of a meeting

3   may change.  So it gives you opportunity to change

4   pertinent data related to that specific case.

5        Q.   Okay.  And what's the definition of a form

6   letter?

7        A.   For me a form letter would be what is the

8   student rights, that letter that they initial.  That

9   form never changes.  It is the same.

10       Q.   We talked about emergency measures

11  earlier, and you said that you believe that a

12  separate letter is required for emergency measures;

13  is that correct?

14       A.   Yes.

15       Q.   This Student Code of Conduct requires that

16  emergency measures be furnished in writing; is that

17  correct?

18       A.   Yes.

19       Q.   And as you sit here today, you're saying

20  all emergency measures have been done on a separate

21  letter?

22       A.   To my knowledge.

23       Q.   To your knowledge?

24       A.   Yes.

25       Q.   Do you know whether Terry Mena ever

Corey King Vol 2
March 10, 2016                    155

1   modified the Notice of - template Notice of Charges

2   or Notice of Interim Suspension?

3          A.   I do not.

4          Q.   In Exhibit 12?

5          A.   I do not.

6          Q.   Do you know whether A.J Chase ever did?

7          A.   I do not.

8          Q.   Do you know whether Dr. Williams did?

9          A.   Outside of this case, I do not.

10              (The referred-to document was marked by

11         the court reporter for identification as

12         Plaintiff's Composite Exhibit 13.)

13   BY MS. CHATTERGOON:

14         Q.   I'm going to show you what I'm going to

15   mark as Composite 13.  I'm showing you what's been

16   marked as Exhibit No. 13.  It's Plaintiff's 560

17   through 566.  The first page on that exhibit is a

18   Notice of Charges dated March 23, 2011 to a student

19   named Julius Christian.  Do you see that?

20         A.   Yes.

21         Q.   Have you ever seen this document before?

22         A.   I do not believe so.

23         Q.   Look at the third page of that exhibit for

24   me.  It looks like an agenda for a SIT meeting dated

25   February 10th, 2011.

Corey King Vol 2
March 10, 2016                                    156

```
 1       A.   Yes.
 2       Q.   There is a student of interest, Julius
 3  Christian?
 4       A.   Yes.
 5       Q.   Do you see that?
 6       A.   Yes.
 7       Q.   Would you have attended this meeting?
 8       A.   Yes.
 9       Q.   And is this the -- We talked earlier about
10  the Student Intervention meetings and SCAC meetings
11  where student names are submitted for discussion.
12       A.   Yes.
13       Q.   Is this how the agenda would look if a
14  student's name was submitted?
15       A.   Yes.
16       Q.   So taking a look at the Notice of Charges
17  for Mr. Christian, this seems to be on the same
18  template or almost the same template that you claim
19  Joanna Ellwood gave in trainings, correct?
20       A.   Or Notice of Charges.
21       Q.   It's the second page.
22       A.   Pretty similar, yes.
23       Q.   Okay.  And if you look at the second to
24  last paragraph there it says, "Until this matter is
25  resolved you may not attend your URP 4979 class,
```

1    threat to the health and wellbeing and safety.  So

2    from February 10th to March 23rd and not interim

3    measures, again, to me that would raise flags.

4      BY MS. CHATTERGOON:

5        Q.   What would raise flags?

6        A.   That you take -- You discuss a person on

7    February the 10th and interim measures are taken o

8    March the 23rd.  That's over a month and 13 days

9    later.

10       Q.   Okay.  And this was in 2011, correct?

11       A.   Those are the dates.

12       Q.   Do you know if Dr. Williams was ever

13   reprimanded for this Notice of Charges?

14       A.   I was not aware of this Notice of Charges.

15       Q.   Who would have been aware of this Notice

16   of Charges?

17       A.   I would -- I would have to yield, again,

18   to Joanna Ellwood, who is our conduct officer.

19       Q.   Do you know whether at the time Julius

20   Christian was discussed at the SIT meeting whether

21   there was a report or charge brought against him at

22   that point?

23       A.   I can't recall, again, February 10th, but

24   I can say standard practice is that if interim

25   measures were discussed on February the 10th, I'm

Corey King Vol 2
March 10, 2016                              168

Corey King Vol 2
March 10, 2016

1    not clear why March 23rd they were invoked.

2         Q.    Well, I'm not saying whether interim

3    measures were discussed.

4         A.    Okay.  I don't remember Christian being

5    discussed.  I can't remember what was discussed in

6    that meeting.

7         Q.    So is it possible the student was

8    discussed and then a case was later brought against

9    the student and that's why emergency measures were

10   taken a month later?

11        A.    It's possible that a case was brought

12   against the student, but emergency measures are more

13   immediate and imminent to the actual date of the

14   incident, so...

15        Q.    We spoke earlier in your capacity as the

16   corporate rep deposition as to when those emergency

17   measures could be taken, correct?

18        A.    Uh-huh.

19        Q.    And looking at the flowchart that we

20   looked at, the emergency measures could be taken at

21   the very beginning of the incident, during the

22   investigation procedure?

23        A.    Yes.

24        Q.    Or at the Notice of Charges procedure?

25        A.    Yes.        U.S. LEGAL SUPPORT
                              (813) 876-4722

1    Q.   Correct? Corey King Vol 2
              March 10, 2016

2    A.   That is correct.

3    Q.   Okay.

4    A.   You did ask me though in this meeting were

5    emergency measures discussed regarding Julius

6    Christian and I indicated I didn't remember.  But I

7    would like to say that if they were discussed in

8    this on February the 10th --

9    Q.   Okay.  Let me finish my question.

10        MS. WYDLER:  Can you not interrupt him

11        while he's giving testimony.

12        MS. CHATTERGOON:  I'm sorry.  I'll move to

13        strike as non responsive, because there was no

14        question pending.

15   BY MS. CHATTERGOON:

16   Q.   Do you know if a case was brought to this

17   SIT meeting being discussed, do you know whether

18   there was a continuing investigation for Julius

19   Christian?

20   A.   I can't recall what was discussed at this

21   particular meeting.

22   Q.   So you don't recall whether - or you don't

23   know the reason, I should ask, why interim measures

24   were taken against him on March 23rd, 2011?

25   A.   I do not. U.S. LEGAL SUPPORT
                        (813) 876-4722

Corey King Vol 2
March 10, 2016                    177

```
 1        Q.   With General Counsel.

 2             But earlier you stated there were no

 3   emergency measures or specific letter for emergency

 4   measures under 3A through E, there was no template I

 5   should say.

 6        A.   There is a template for emergency

 7   measures, but there is no template for specific

 8   barring for classes or the other one you showed me,

 9   because again, we have practice discussed those

10   emergency measures with General Counsel and they

11   have assisted us in drafting those letters.  So

12   therefore, we discuss emergency measures with

13   General Counsel.

14        Q.   So there's no template though?

15             MS. WYDLER:  Object to the form.

16        A.   Not for the specific ones you indicate.

17   BY MS. CHATTERGOON:

18        Q.   So for the specific ones I indicate - I

19   stated, if those emergency measures were going to be

20   taken place, the Associate Dean or designee would

21   have to, in your opinion, discuss that with the

22   General Counsel?

23        A.   That's been our practice, yes.

24        Q.   Going back to the template for Notice of

25   Charges.  On this template does it indicate where
```

Corey King Vol 2
March 10, 2016                    187

1    that what you're referring to?

2         A.    Yes.

3         Q.    But that regulation doesn't state that the

4    emergency measures have to be in a separate letter,

5    correct?

6         A.    It does not.

7         Q.    Just going back to your answer for No. 6,

8    Interrogatory No. 6, you put here that "Dr. Williams

9    potentially exposed FAU to liability."  What

10   liability were you referring to?

11        A.    All of the -- Our entire Student Code of

12   Conduct is exposed to liability.  In terms that when

13   you bring sanctions against students and charges,

14   they have a right to involve lawyers.  They have a

15   right to appeal our decisions to the Circuit Court,

16   so it's risky and there's liability whenever you

17   invoke code.

18        Q.    So if ever a Notice of Charges were given

19   to a student, there's a potential for liability

20   there?

21        A.    Yes, and there's potential for greater

22   liability if that notice is modified.

23        Q.    In your opinion?

24        A.    In practice with notification by General

25   Counsel.  Yes, in my opinion.

Corey King Vol 2
March 10, 2016

```
 1   deposing you in your individual capacity now I need

 2   to ask you a couple more questions.  If you take a

 3   look at 1452.  This is the email that Ms. Williams -

 4   Dr. Williams sent you regarding her investigation of

 5   the Ryan Rotela matter, correct?

 6        A.   Yes.

 7        Q.   Okay.  And you said, "I will call you this

 8   weekend."  Do you recall speaking to Dr. Williams

 9   that weekend?

10        A.   I believe so.

11        Q.   Do you recall what the discussion

12   surrounded?

13        A.   It was around this incident.

14        Q.   Okay.  Do you recall what was said?

15        A.   I believe she provided me with some of the

16   specifics of the case.

17        Q.   Do you recall what she said about the

18   specifics of the case?

19        A.   Not completely.

20        Q.   Okay.  Do you recall whether she indicated

21   to you that it was similar to the Julius Christian

22   matter?

23        A.   I do not recall that.

24        Q.   Do you recall her telling you that she

25   issued the same emergency measures that she did in
```

Corey King Vol 2
March 10, 2016                              192

Corey King Vol 2
March 10, 2016

1    the Julius Christian matter?

2         A.    I don't recall that.

3         Q.    Do you recall her telling you that she

4    placed emergency measures in the Notice of Charges?

5         A.    I don't recall that.

6         Q.    Do you recall her stating that she did not

7    do a separate letter of emergency measures?

8         A.    I don't recall that.

9         Q.    Do you recall her discussing with you her

10   investigation of the matter?

11        A.    Yes.

12        Q.    What about the investigation of the matter

13   do you recall?

14        A.    I just recall her giving me the facts of

15   what she has learned about the case.

16        Q.    Do you recall what that was?

17        A.    Not specifically, but I do remember a

18   student -- It was related to the classroom exercise

19   and what was happening, the student's frustration.

20   But more importantly, was focused on what happened

21   after the class, and that the student had allegedly

22   threatened or confronted the faculty member.

23        Q.    Do you recall whether she told you if she

24   spoke to the faculty member?

25        A.    I do remember she had spoken to Deandre

Corey King Vol 2
March 10, 2016                          193

1    Poole.                        Corey King Vol 2
                                   March 10, 2016

2        Q.    Deandre Poole was the faculty member?

3        A.    Correct.

4        Q.    Do you recall what she stated, if

5    anything, that Dr. Poole stated to her?

6        A.    I do recall her stating that the faculty

7    member was either uncomfortable or afraid for the

8    student to come back to class.

9        Q.    Did she state to you that Dr. Poole did

10   not want the student coming back to his class?

11       A.    More or less, yes.

12       Q.    Well, is that yes or no?

13             MS. WYDLER:  Object to the form.

14       A.    I can't remember exactly what she said.  I

15   do remember that the faculty member, she indicated,

16   was somewhat concerned about his safety or about

17   this student returning to class.

18    BY MS. CHATTERGOON:

19       Q.    And if a faculty member was concerned

20   about his or her safety, what would be the procedure

21   in removing the student from the class, if any?

22       A.    Again, I could give my professional

23   opinion is that if a student has threatened a

24   faculty member and is threatening behaviors, to me,

25   that's a threat to the University community.  That's

Corey King Vol 2
March 10, 2016                                    198

1    submission of names for the SCAC meeting?

2         A.    Typically, yes.

3         Q.    And what was the reason for that?

4         A.    So we would know if there were any

5    students of interest.  If there were a few names

6    submitted or one name submitted, we typically would

7    not meet.  So it was a determination of whether we

8    needed to meet as a group.

9         Q.    So this email went out on March 11th.

10   That was the Monday after you had spoken to

11   Dr. Williams, correct?

12        A.    Yes.

13        Q.    So you were aware of the Ryan Rotela

14   incident, at that point?

15        A.    At that point, on Monday, yes.

16        Q.    Did that meeting ever occur, that SCAC

17   meeting?

18        A.    Doesn't look like there's a cancellation,

19   so I'm assuming it did.

20        Q.    Do you know if Ryan Rotela was ever

21   discussed during that SCAC meeting?

22        A.    I do believe during one of the meetings he

23   was discussed.

24        Q.    Do you recall which meeting?

25        A.    I do not.

Corey King Vol 2
March 10, 2016

1      Q.    When do SCAC meetings usually occur?

2      A.    SCAC meetings usually occur on, I believe,

3   Tuesday, and SIT on Thursday or vice versa.  Let's

4   go back here.  No, SCAC on Thursday and the SIT

5   meets on Tuesday.

6      Q.    Do you recall whether you canceled the

7   SCAC or SIT meeting scheduled for March 12th?

8      A.    There doesn't seem to be an email, so I'm

9   assuming we had the meeting.

10     Q.    Going back to your discussion with

11  Dr. Williams regarding the Ryan Rotela matter on the

12  weekend of March 9th.

13     A.    Uh-huh.

14     Q.    Do you recall her telling you that she

15  needed to take an emergency measure because of

16  timing of when classes were to start?

17     A.    I do not.

18           (The referred-to document was marked by

19      the court reporter for identification as

20      Plaintiff's Exhibit 15.)

21   BY MS. CHATTERGOON:

22     Q.    I'm going to show you what's marked as 15.

23  This is FAU's academic calendar for 2012 and '13.

24  It says here mid-semester break, no classes March

25  4th through the 10th.  Would mid-semester break be

Corey King Vol 2
March 10, 2016                              200

1    Spring Break, what's considered Spring Break?

2         A.    Yes, Spring Break, uh-huh.

3         Q.    So according to this document, which has

4    been marked Exhibit No. 15, Spring Break was March

5    4th through the 10th, correct?

6         A.    Yes.

7         Q.    So when you spoke with Dr. Williams, the

8    school was currently on Spring Break and would

9    resume on March 11th, correct?

10        A.    Yes.

11        Q.    I included if that exhibit a calendar of

12   March 2013.  Once you had that conversation with

13   Dr. Williams, whether on the 9th or the 10th of

14   March, during that week, the 11th through the 15th,

15   did you have any other discussions with Dr. Williams

16   about Ryan Rotela?

17        A.    I don't recall.

18        Q.    Did you ever express any concerns with any

19   of the emergency measures Dr. Williams took against

20   Ryan Rotela?

21        A.    Not at that time.  I don't recall it.

22        Q.    Okay.  Do you recall whether Dr. Williams

23   told you she was meeting with the student again

24   after you spoke to her on the 9th or the 10th of

25   March?

1      A.    I don't know that.

2      Q.    Is there any other student hearing besides

3  the one described in the Student Code of Conduct?

4      A.    I need clarification.

5      Q.    Okay.   It says on this email attached,

6  "Please find the documents related to the student

7  hearing we discussed today."   You're saying it

8  doesn't indicate whether the student selected a

9  hearing, because those letters you're describing are

10 not in here, correct?

11     A.    Yes.

12     Q.    Do you know whether Ryan Rotela walked out

13 of the office before Dr. Williams could give him

14 those letters to sign?

15     A.    I don't.

16     Q.    Do you have any reason to believe that

17 Ryan Rotela did not select a hearing based on

18 anything in this packet that I've shown you?

19     A.    I don't.

20     Q.    Once a student selects a hearing and the

21 hearing documents are sent to Joanna -- Who is

22 Joanna Ellwood, by the way?

23     A.    She's the -- Right, now she's the

24 Associate Dean and Director of Student Conduct.

25     Q.    What was her position in 2013?

Corey King Vol 2
March 10, 2016                          210

1   with you."  You say, "I assisted in drafting the

2   reprimand with Human Resources and FAU counsel.  I

3   was advised by Dr. Brown that he decided to separate

4   Plaintiff, at will Plaintiff, prior to issuing a

5   formal reprimand."

6          When Dr. Brown consulted with you about

7   the reprimand, what was said to you?

8       A.    He said that he was going to issue a

9   reprimand to Dr. Williams regarding the Rotela case.

10  And he asked for me to provide some language to

11  Human Resources regarding my involvement or the Code

12  of Conduct, something related to that.

13      Q.    Did he say why he was reprimanding

14  Dr. Williams?

15      A.    He did not.

16      Q.    Had Dr. Brown been involved in the Ryan

17  Rotela matter, at this point?

18          MS. WYDLER:  Object to the form.

19      A.    I can't recall.

20    BY MS. CHATTERGOON:

21      Q.    Okay.  Let me back up that question for a

22  second.

23          Do you recall whether Dr. Williams ever

24  discussed the Ryan Rotela matter and the incident of

25  February 25th, 2013 with Dr. Brown before the Letter

U.S. LEGAL SUPPORT
(813) 876-4722

Corey King Vol 2
March 10, 2016

```
 1        Q.   So you didn't have any discussion about

 2   emergency measures on March 9th or 10th?

 3        A.   Yes, I remember talking about possible

 4   interim suspension and those discussions, but I

 5   don't remember specifically what it was.  I don't

 6   recall the specifics of the conversation.

 7        Q.   And you don't know whether you had any

 8   knowledge on March 9th or 10th that these emergency

 9   measures had been placed in that Notice of Charges?

10        A.   I did not have any knowledge, at that

11   point.

12        Q.   Do you know when the letter, Notice of

13   Charges letter was released to the media?

14        A.   I didn't know the Notice of Charges letter

15   were released to the media.

16        Q.   You stated it was in the media at that

17   time that Ryan Rotela was suspended from class?

18        A.   That's right.

19        Q.   How was it in the media?

20        A.   I'm assuming that Ryan Rotela told them.

21        Q.   And at that point, you reviewed the Notice

22   of Charges letter?

23        A.   I can't recall.

24        Q.   Had there ever been another public --

25   Strike that.
```

Corey King Vol 2
March 10, 2016                           224

Corey King Vol 2
March 10, 2016

1           Had there ever been another incident where

2    a student conduct was in the media or relayed to the

3    media, student conduct issue?

4           MS. WYDLER:  Form.

5       A.   I'm not sure if I see it as a student

6    conduct issue in terms of the media.  The media

7    focused on the class activity.  It focused on the

8    religious aspect and the academic freedom.  That was

9    pretty much the focus of the media.  It wasn't on

10   the conduct piece of it.

11   BY MS. CHATTERGOON:

12      Q.   Okay.  Fair enough.

13           So then why did you review the Notice of

14   Charges?

15      A.   I just remember at some point there was a

16   conversation of him being suspended from the class

17   and the academic did not do it, so who did.  So

18   Dr. Brown was concerned that he was not aware that

19   the student was suspended from the class.

20      Q.   Would Dr. Brown have to be aware if any

21   student was suspended from a class?

22      A.   Dr. Brown is aware of interim measures.

23      Q.   Of all interim measures for all 30,000

24   students?

25      A.   We don't take interim measures on all

Corey King Vol 2
March 10, 2016                          227

1    possibility of, yes.

2         Q.   Do you recall whether it was discussed why

3    Ryan Rotella's charges were dropped?

4         A.   I do not.

5         Q.   Do you recall Dr. Brown saying in a senior

6    staff meeting that the President said make it go

7    away?

8         A.   Yes.

9         Q.   What was he referring to?

10        A.   He said it to the group.

11        Q.   And was this in regards to the Ryan Rotela

12   matter?

13        A.   Yes.

14        Q.   And did he say anything else in that -

15   after saying that statement or before regarding the

16   Ryan Rotela matter?

17        A.   I don't recall.  I do recall that

18   statement, because he was very adamant and firm

19   about it.

20        Q.   Do you know what he meant by "make it go

21   away"?

22        A.   I do not.

23        Q.   Did you ever consult with Terry Mena on

24   emergency measures that he would have taken on his

25   campus?

1    Ryan Rotela incident, correct?

2         A.    Correct.

3         Q.    Did you ever have any discussions with

4    Dr. Brown about his video statement?

5         A.    Yes.

6         Q.    Can you tell me about those discussions?

7         A.    He said that the president wanted him to

8    do the video regarding his statement.

9         Q.    Did he say why?

10        A.    Because she felt it was a student and a

11   student matter.

12        Q.    Did the - that involve a student matter?

13        A.    Uh-huh.

14        Q.    Why was it -- Do you know why someone from

15   Student Academics didn't make the statement?

16        A.    They were asked first and they declined.

17        Q.    Why didn't the Provost make a statement?

18        A.    That I don't know.

19        Q.    Do you know if President Saunders asked

20   Dr. Brown to make the statement, the video statement

21   because he's black?

22             MS. WYDLER:  Object to the form?

23        A.    I'm not aware of that.

24   BY MS. CHATTERGOON:

25        Q.    Have you made any derogatory comments to

Student Hearing Request - Outlook Web App, light version                          Page 1 of 1



Hi Joanna:

Attached please find the documents related to the student hearing we discussed today.  Let me know if you have questions or need anything further..

RW



# FAU   SECURITY OFFENSE/INCIDENT REPORT



Florida Atlantic University                                    NUMBER:

OFFENSE/INCIDENT TYPE: _VERBAL THREAT_

DATE OCCURRED: _02/25/13_   WEEKDAY: _MONDAY_     TIME: _9:00_ AM/(PM)
SPECIFIC OFFENSE LOCATION: _LIBERAL ARTS BLDG - # 122_

VICTIM: _POOLE, DEANDRE_     INJURED: ☐ YES ☑ NO

☑ FACULTY   ☐ STAFF   ☐ STUDENT   ☐ VISITOR
ADDRESS: _3200 COLLEGE AVE._     PHONE (HOME): _____
_DAVIE, FL 33314_     PHONE (BUS.) - _561-299-3894_

OFFENSE REPORTED BY- _DR POOLE_

☑ FACULTY   ☐ STAFF   ☐ STUDENT   ☐ VISITOR
ADDRESS: _3200 COLLEGE AVE_     PHONE (HOME): _____
_DAVIE, FL 33314_     PHONE (BUS.) - _____

DATE REPORTED: _02/25/2013_ WEEKDAY: _MONDAY_   TIME: _9:00_ AM/(PM)

SUSPECTS: ☑ YES ☐ NO   VEHICLE INVOLVED: ☐ YES ☑ NO   WITNESSES: ☐ YES ☐ NO
DESCRIPTION OF STOLEN/DAMAGED PROPERTY/ESTIMATED VALUE/SERIAL NUMBERS: _____
_N/A_

BRIEF OFFENSE SUMMARY: _ACCORDING TO DR. POOLE, AS A RESULT_
_OF A CLASS ACTIVITY ONE OF HIS STUDENT BECAME_
_HOSTILE TOWARDS HIM BECAUSE HE DISAGREED_
_WITH THE WAY THE ACTIVITY WAS CONDUCTED._
_THE STUDENT A MR. RYAN ROTELA #Z23242352_
_WAITED UNTIL THE CLASS WAS DISMISSED TO_

FAU POLICE NOTIFIED: ☑ YES ☐ NO   DATE/TIME NOTIFIED _02/25/20/3_ TIME: _____
NAME OF FAU OFFICER NOTIFIED: _P.S.T. D. WILLIAMS_

PROPERTY HELD FOR EVIDENCE: ☐ YES ☑ NO   RETURNED TO OWNER: ☐ YES ☑ NO
PROPERTY RELEASED TO _N/A_     DATE: _/ /_
                    SIGNATURE

PREPARED BY: _P.S.T. D. WILLIAMS_   DATE: _2/25/13_ APPROVED BY: _____

FAU_0001439



**OFFENSE/INCIDENT SECURITY
REPORT - CONTINUATION**

Florida Atlantic University

Continuation from Page _____ 1

APPROACHED DR. POOLE TO VERBALLY BERATE HIM
STATING THAT HE WAS UNPROFESSIONAL AND AT
ONE STATED THAT HE WANTED STRIKE DR. POOLS
BECAUSE HE WAS SO UPSET WITH HIM.
MR. ROTELLA WAS SHOUTING AT THE TOP OF VOICE
IN A THREATENING MANNER "DON'T YOU EVER DO
THAT AGAIN, YOU HEAR ME"

ACCORDING TO DR. POOLE HE WAS IN FEAR AT
THE TIME AS MR. ROTELLA TOOK A DEFENSIVE
POSTURE WHILE POUNDING HIS HANDS TOGETHER
WHILE HE SHOUTED AT HIM.

UPON THE ARRIVAL OF THIS OFC. MR. ROTELLA HAD
ALREADY VACATED THE PREMISES.

WITNESS # 1

CUTHBERT, HUBERT W/M 222227587

WITNESS # 1 WAS NOT ON THE SCENE TO TAKE A
STATEMENT. ACCORDING TO DR. POOLE THIS WITNESS
IS FRIENDS WITH MR. ROTELLA AND THE TWO LEFT
THE CLASSROOM TOGETHER.

OFFICER NAME: D. WILLIAMS   OFFICER SIGNATURE: _____

PAGE 2 OF 2

2/28/13

Naomi Marion — Chair of Multicultural Studies
Intercultural class —
Student said he
lost his temper — was polite, dressed
appropriately at her meeting w/him.     philosophy major

Dr. Poole:
        Class exercise — him not to
        "Nat" "Brother" — What you did
was disrespectful — — you are
unprofessional!" Next student — it was
        just a name on the piece of paper —
stated in to the actual lesson
on the powerpoint.
        Dismissed class a 9 pm. Waited
after class to talk to him.
Asked   "Sarge" who not angry about it.
        After everyone left he walked up to
Nat + said: "I wanted to knock you
right out. How dare you! If you
ever do this again. You hear me. You leave
me;
        Leave now. I called security.
He took his bag —

Mostly after Spring
        break

FAU_0001441

*witness*

**Subject:** Homework
**Date:**    Tuesday, February 26, 2013 1:39:30 AM ET
**From:**    Hubbert Cuthbert
**To:**      Deandre Poole

Dr. Poole,

This is Sarge and I attached my homework to this document and want to thank you for accepting it.

I am at a loss for words in regarding what happened tonight. I just wanted to make it clear that I do not share the same views as my colleague and have the utmost respect for you as a professor.

Sincerely,
Andrew Cuthbert (Hubbert)

Page 1 of 1

FAU_0001442



Associate Vice President & Dean of Students
777 Glades Road, SS-8, 226
Boca Raton, FL 33431
Tel: 561.297.3546
Fax: 561.297.2502
*Division of Student Affairs*
*www.fau.edu/student*

WITNESS

Student Information Form

Please provide us with your current contact and personal information:

Student Full Name: Hubert Andrew Cuthbert        Student Z Number: 23227587

Local Mailing Address:                           Local Phone: _____

5490 NW 93RD TER        Cell Phone: (954) 6108263

SUNRISE, FL 33351        FAU E-mail: HCUTHBE72012@FAU.EDU

Class Standing (please circle): Freshman   Sophomore   (Junior)   Senior

FAU Greek/Athletic Team/Club/Organization Affiliation(s):
VERGREN OWLS

Do you work on- or off-campus:   N/A

I (___am/ ✓ am not) financial dependent on my family.

I (___am/ ✓ am not) currently registered with FAU Office of Student with Disabilities.

Major: SOCIAL WORK (BSW)

I have received a copy of the University Regulations 4.007 Student Code of Conduct process. Please sign and date at the bottom of this page.

Hubert Andrew Cuthbert          _____        Date 2/21/13
Student Name - Printed           Signature

Boca Raton ● Dania Beach ● Davie ● Fort Lauderdale ● Harbor Branch ● Jupiter ● Treasure Coast
*An Equal Opportunity/Equal Access Institution*

FAU_0001443

Hubbert Cuthbert Meeting                    7/28/13

Dr. Poole asked the class to do an
activity. Ryan said I'm not doing that.
They can pair together. Prof wanted
to see what people would do. We talked
about controversial things in class but it
didn't bother me. Nobody had a problem
w/ it but Ryan. Ryan wanted to wait
to talk to the prof. Wanted to tell Dr.
Poole it really bothered him & how it
was disrespectful. Stated talking loud say
Never do that again. Never do that again.
"You're going to hear from me."
    Caught her off guard. I like Dr. Poole,
I like her actions. Had no problem w/ it.
Does not share the same views.

FAU_0001444

Hubbert Cuthbert's Written statement.

3/13/13

RYAN WAS UPSET BECAUSE OF THE ASSIGNMENT. I COULD TELL BECAUSE OF THE HE LOOKED IN HIS FACE. HE FELT IT WAS DISRESPECTFUL TO STEP ON A PAPER WITH JESUS NAME ON IT. AFTER CLASS HE TOLD THE PROFFESOR HE WAS UPSET. HE SAID HE WASN'T A CHRISTIAN BUT DOING THAT WAS DISRESPECTFUL TO CHRISTIANS. HE SPOKE IN A WAY THAT MADE DR POOLE SAY YOU NEED TO LEAVE. WHEN DR POOLE SAID IT HE WAS ON HIS PHONE. RYAN TURNED AROUND AND LEFT.

BASED ON WHAT WAS READ FROM DR. WILLIAMS. IT SOUNDS LIKE I WOULD HAVE BEEN CAUGHT OFF GUARD. I WROTE DR POOLE AN EMAIL STATING THAT I RESPECT HIM AND OBVIOUSLY WHAT HAPPENED WAS NOT GOOD AND I DIDN'T SHARE THE SAME VIEWS. RYAN HAS A UNIQUE WAY OF EXPRESSING HIMSELF. "THATS JUST RYAN"

IN TERMS OF MY ABILITY TO RECALL SPECIFICS IS DUE TO BEING SERVICE CONNECTED WITH POST TRAUMATIC STRESS DISORDER.

Term: [ ]
ID: [ ]   Student, Herbert A.

Registration From Date: [ ]   Registration To Date: [ ]

| Term | CRN | Subject | Course | Section | Registration Status | CEU | Cross List | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Begin Time | End Time |
|------|-----|---------|--------|---------|---------------------|-----|-----------|-----|-----|-----|-----|-----|-----|-----|-----------|---------|
| | | | | | | | | | | | | | | | | |

Part of Term:
Grading Mode:
Credit Hours: 3.000

Start Date: 05-JAN-2013
End Date: 03-MAY-2013
Instructor: Decann-lekcsik, Gina D

Instructional Method:   Primary

Part of Term:
Grading Mode:
Credit Hours: 3.000

Start Date: 05-JAN-2013
End Date: 03-MAY-2013
Instructor: Luna, Noelya

Instructional Method:   Primary

Part of Term:
Grading Mode:
Credit Hours: 3.000

Start Date: 05-JAN-2013
End Date: 03-MAY-2013
Instructor: Poole, Dennis L

Instructional Method:   Primary

Co-op Education:

Total Credit Hours:   12.000

Total CEU Hours:   .000

FAU_0001446



Associate Dean of Students
3200 College Avenue, LA109
Davie, FL 33314
Tel: 954.236.1236
Fax: 954.236.1234
www.fau.edu/student

February 28, 2013                      INVESTIGATION CONFERENCE

Mr. Ryan Rotela
2868 N.W. 94th Avenue
Coral Springs, FL 33065-5024

Dear Mr. Rotela:

The Office of Student Conduct has received a complaint alleging that your conduct may have violated the Florida Atlantic University Student Code of Conduct, Regulation 4.007, specifically:

(N) Acts of verbal, written (including electronic communications) or physical abuse, threats, intimidation, harassment, coercion or other conduct which threaten the health, safety or welfare of any person.

This office is investigating the complaint to determine whether there are reasonable grounds to believe that the allegations of the complaint are true, and if are true, would constitute a violation of the Student code of Conduct. The investigation conference shall include the opportunity for the Dean of Students or designee(s) to interview and gather information from you; explain the Student Code of Conduct process and your rights and review the incident. If there are reasonable grounds to believe that the allegations of the complaint are true and would constitute a violation of the University's Student Code of Conduct, FAU Regulation 4.007, you will receive a notice of charges for the alleged violations.

As part of the investigation into the alleged incident, I would like to meet with you so that you may provide clarifying information to help me better understand the situation. You are requested to meet with me on Thursday, March 7, 2013 at 4 p.m. in the Associate Dean of Students office on the Davie Campus in LA 109. If you are unable to attend this meeting, please contact Alicemaude Hernandez at 954-236-1236 by Tuesday, March 5, 2013 to arrange an alternative appointment.

While you have not yet been charged with violating the Student Code of Conduct, Florida Atlantic University's Student Code of Conduct guarantees you certain rights when you are accused of violating the Student Code of Conduct. You can view these rights as provided in Florida Atlantic University Regulation 4.007 which can be found on-line: http://www.fau.edu/regulations/chapter4/4.007_Student_Code_of_Conduct.pdf

*Please be advised that a Student Affairs Hold may be placed on your records until final disposition of the complaint.*

Sincerely,

Rozalia Williams, Ed.D.
Associate Dean

Cc:/file

Boca Raton  •  Dania Beach  •  Davie  •  Fort Lauderdale  •  Harbor Branch  •  Jupiter  •  Treasure Coast
*An Equal Opportunity/Equal Access Institution*

FAU_0001447



**FAU**
FLORIDA
ATLANTIC
UNIVERSITY

Associate Vice President & Dean of Students
777 Glades Road, SS-8, 226
Boca Raton, FL 33431
Tel: 561.297.3546
Fax: 561.297.2502
*Division of Student Affairs*
*www.fau.edu/student*

## Student Information Form

Please provide us with your current contact and personal information:

Student Full Name: Ryan Rotela

Student Z Number: Z23242352

Local Mailing Address:

2868 NW 94th Avenue

Local Phone: _____

Cell Phone: 954-825-1036

FAU E-mail: rrotela1@fau.edu

Class Standing (please circle): Freshman   Sophomore   (Junior)   Senior

FAU Greek/Athletic Team/Club/Organization Affiliation(s):

_____

_____

Do you work on- or off-campus:

_____

_____

I (✓am/__am not) financial dependent on my family.

I (__am/✓am not) currently registered with FAU Office of Student with Disabilities.

Major: Communications

I have received a copy of the University Regulations 4.007 Student Code of Conduct process. Please sign and date at the bottom of this page.

Ryan Rotela
Student Name - Printed

_____
Signature

3/7/13
Date

Boca Raton ● Dania Beach ● Davie ● Fort Lauderdale ● Harbor Branch ● Jupiter ● Treasure Coast
*An Equal Opportunity/Equal Access Institution*

FAU_0001448



*INVESTIGATION CONT*

Associate Vice President    & Dean of Students
777 Glades Road, SS-8, 226
Boca Raton, FL 33431
Tel: 561.297.3546
Fax: 561.297.2502
*Division of Student Affairs*
*www.fau.edu/student*

## STUDENT RIGHTS

Please read and initial each line indicating your understanding of each student right provided to you in the Florida Atlantic University Student Code of Conduct, Regulation 4.007 (8). If you have any questions regarding these rights, please ask the Student Conduct or Housing staff member during the Student Conduct Conference or Investigation meeting.
Florida Atlantic University Regulation 4.007

(8)     A student against whom student conduct action may be taken shall have the following rights.

(a)    The right to be notified in correspondence of the charges against him/her in sufficient detail to prepare for a Hearing.

(b)    The right to a Hearing no less than five (5) business days after the University provides the student with a notice of charges, unless waived pursuant to University Regulation 4.007, or by final disposition in external court proceedings.

(c)    The right to a fair and impartial Hearing on the charges by the Student Conduct Board or University Hearing Officer.

(d)    the right to review, not less than three business days prior to the Hearing, the information which will be used by the University.

(e)    The right to present information and arrange for witnesses who voluntarily present information relevant to his or her defense at the Hearing.

(f)    The right to be assisted by an advisor chosen at his/her own expense. The advisor is not permitted to speak during or to participate in any part of the student conduct process.

(g)    The right to hear and question adverse witnesses who voluntarily testify at the hearing unless the student has waived a Hearing.

(h)    The right not to be forced to present testimony which would be self-incriminating. However, the University is not required to postpone student conduct proceedings pending the outcome of any outside criminal or civil case.

(i)    The right to request an appeal of the sanction imposed as long as appropriate appeal procedures are followed.

(j)    The right to have his/ her status remain unchanged pending final student conduct action except in cases involving the health, safety or welfare of the University Community.

(k)    The right to be informed of their rights provided in this Regulation 4.007.

By signing below, I acknowledge that I have reviewed and understand these "Student Rights".

Ryan Rotela
_____
Student Name – Printed

2 00 2324 2352
_____
Z Number

_____
Student Signature

3/7/13
_____
Date

Cc:/file

Boca Raton  ●  Dania Beach  ●  Davie  ●  Fort Lauderdale  ●  Harbor Branch  ●  Jupiter  ●  Treasure Coast
*An Equal Opportunity/Equal Access Institution*

FAU_0001449

Ryan

3/7/13

(In class) — did not appear
was offended because he moved
to another student w/o acknowledging it was wrong.
Escalated — had to go to a
little
supervisor → "escalated" because he never responded — should not reverse
I don't want this to happen again — wanted
his apology to know →

(After class) — went to him w/ an
associate he can joke with.
I felt intimidated, afraid —
" " attacked — it was recess so wait
after class to
finish clean up w/ prof.
→ Fear, intimidate + persecute →

told that

Did not say don't ever do this again —
Asked can I leave + go
off?

Asked if he uttered what I said →
re: [illegible]

[illegible] @ J he [illegible] at the
[illegible] after class so
This [illegible] issue this [illegible] doesn't happen
to a [illegible] student daughter.

FAU_0001450

(cont.)

3/7/13
page 2

He didn't feel what he was doing
was wrong. Could do it
again. Wanted to let him
know if ~~it~~ ~~could~~ he go it
[illegible]

Asked about what I "wanted" him to say —
Made clear I was seeking the facts.
Summarized what he said. He denied
it could even be perceived but
he engaged in "[illegible]" behavior.

FAU_0001451

Rozalia Williams

**From:** Corey King
**Sent:** Saturday, March 09, 2013 4:39 PM
**To:** Rozalia Williams
**Subject:** RE: Consultation on Conduct Case

I will call you this weekend.

Dr. Corey A. King
Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
~~~ Glades Road
Boca Raton, FL 33431-0991
Office: 561-297-3542
Fax: 561-297-2502

Confidentiality Notice: This E-Mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this communication in error, please do not distribute, notify the sender by E-Mail at the address shown above, then delete the original message with any attachments. Thank you for your compliance.

**From:** Rozalia Williams
**Sent:** Friday, March 08, 2013 5:46 PM
**To:** Corey King
**Subject:** Consultation on Conduct Case

Hi Corey:

I have a case I'm investigating regarding a student who allegedly engaged in threatening behavior toward a professor. I met with the student yesterday and he denied the allegation. I spoke with the professor today and was informed he preferred that the student not come back to class until the matter is resolved.

The class meets again on Monday. However, I have not formally charged the student. Let's talk about the where we go from here. Call me when you get a chance.

RW



Rozalia Williams, Ed.D.
Associate Dean of Students
Division of Student Affairs, FAU Broward Campuses
3200 College Avenue, Suite LA-109, Davie, FL 33314
Phone: 954-236-1236 | Fax: 954-236-1234
E-mail: rowillia@fau.edu | Web site: http://www.fau.edu/student/broward/

1

## Rozalia Williams

| | |
|---|---|
| From: | Rozalia Williams |
| Sent: | Friday, March 08, 2013 6:52 PM |
| To: | 'rrotela2013@fau.edu' |
| Cc: | 'rrotela1@gmail.com' |
| Subject: | Notice of Charges |
| Attachments: | Ryan Rotela Notice of Charges 3-8-2013.pdf |

Mr. Rotela:

Attached please find a notice of charges for an alleged violation of the Student Code of Conduct, Regulation 4.007.

Please contact me if you have questions.

Dr. Williams

**FAU**
**FLORIDA ATLANTIC UNIVERSITY**

Rozalia Williams, Ed.D.
Associate Dean of Students
Division of Student Affairs, FAU Broward Campuses
3200 College Avenue, Suite LA-109, Davie, FL 33314
Phone: 954-236-1236 | Fax: 954-236-1234
E-mail: rcwillia@fau.edu | Web site: http://www.fau.edu/student/broward/

---

Left voicemail @ 6:55 pm at (954) 825-1036

7:12 pm Ryan called. Will let me know on Monday if he can make the meeting. It may conflict w/ his work schedule. Asked about his class. I told him he cannot go to class because the prof. believes he violated the code + Ryan does not believe he engaged in behavior that violates the code. Told him he can waive his right to a hearing sooner than 5 days if he needs to reschedule.

7:18 Called Dr. Poole & informed her Ryan should not come to class.



Office of Associate Dean of Students
Broward Campuses
3200 College Avenue, LA109
Davie, FL 33315
tel: 954.236.1236
fax: 954.236.1234
Division of Student Affairs
www.fau.edu

### NOTICE OF CHARGES

March 8, 2013

Mr. Ryan Rotela
2868 N.W. 94th Avenue
Coral Springs, FL 33065-5024

Dear Mr. Rotela:

The office has received a complaint alleging your involvement in conduct which may constitute a violation of Florida Atlantic University's Student Code of Conduct, Regulation 4.007, specifically: (N) Acts of verbal, written (including electronic communications) or physical abuse, threats, intimidation, harassment, coercion or other conduct which threaten the health, safety or welfare of any person.

After an initial determination by this office that the student conduct process should proceed, you are being charged with violating FAU's Student Code of Conduct, Regulation 4.007, specifically: (N) Acts of verbal, written (including electronic communications) or physical abuse, threats, intimidation, harassment, coercion or other conduct which threaten the health, safety or welfare of any person.

You are requested to attend a Student Conduct Conference with me on Friday, March 15, 2013 at 1:00 p.m. During this session, you will be informed about the conduct process, your rights, a summary of the evidence and options available for the resolution of the charges. Any questions or concerns can also be addressed at this meeting. In the interim, you may not attend class (SPC 3710) or contact any of the students involved in this matter---verbally or electronically---or by any other means.

*Failure to attend the Student Conduct Conference constitutes your acceptance of responsibility for the charges above, your waiver of a University Hearing and waiver of any right of appeal to being held responsible for violating FAU's Student Code of Conduct. In this event, Notice of Sanctions will be issued. You retain the right to appeal the severity of any imposed sanctions. See Regulation 4.007(10)(e)(4).*

You have a number of rights guaranteed by the University as provided in Florida Atlantic University Regulation 4.007 (8) which can be found on-line:
http://www.fau.edu/regulations/chapter4/4.007_Student_Code_of_Conduct.pdf
*Please be advised that a Student Affairs Hold may be placed on your records until final disposition of the complaint.*

Sincerely,

Rozalia Williams, Ed.D.
Associate Dean
Cc:/file

Boca Raton  ●  Dania Beach  ●  Davie  ●  Fort Lauderdale  ●  Harbor Branch  ●  Jupiter  ●  Treasure Coast
*An Equal Opportunity/Equal Access Institution*

FAU_0001454



*— Student Conference —*

Associate Vice President    & Dean of Students
777 Glades Road, SS-8, 226
Boca Raton, FL 33431
Tel: 561.297.3546
Fax: 561.297.2502
*Division of Student Affairs*
*www.fau.edu/student*

## STUDENT RIGHTS

Please read and initial each line indicating your understanding of each student right provided to you in the Florida Atlantic University Student Code of Conduct, Regulation 4.007 (8). If you have any questions regarding these rights, please ask the Student Conduct or Housing staff member during the Student Conduct Conference or Investigation meeting.
Florida Atlantic University Regulation 4.007

(8)      A student against whom student conduct action may be taken shall have the following rights.

_RR_(a)      The right to be notified in correspondence of the charges against him/her in sufficient detail to prepare for a Hearing.

_RR_(b)      The right to a Hearing no less than five (5) business days after the University provides the student with a notice of charges, unless waived pursuant to University Regulation 4.007, or by final disposition in external court proceedings.

_RR_(c)      The right to a fair and impartial Hearing on the charges by the Student Conduct Board or University Hearing Officer.

_RR_(d)      the right to review, not less than three business days prior to the Hearing, the information which will be used by the University.

_RR_(e)      The right to present information and arrange for witnesses who voluntarily present information relevant to his or her defense at the Hearing.

_RR_(f)      The right to be assisted by an advisor chosen at his/her own expense. The advisor is not permitted to speak during or to participate in any part of the student conduct process.

_RR_(g)      The right to hear and question adverse witnesses who voluntarily testify at the hearing unless the student has waived a Hearing.

_RR_(h)      The right not to be forced to present testimony which would be self-incriminating. However, the University is not required to postpone student conduct proceedings pending the outcome of any outside criminal or civil case.

_RR_(i)      The right to request an appeal of the sanction imposed as long as appropriate appeal procedures are followed.

_RR_(j)      The right to have his/her status remain unchanged pending final student conduct action except in cases involving the health, safety or welfare of the University Community.

_RR_(k)      The right to be informed of their rights provided in this Regulation 4.007.

By signing below, I acknowledge that I have reviewed and understand these "Student Rights".

Ryan Retela
Student Name - Printed

Z 232 4335 2
Z Number

Student Signature

03-15-13
Date

Cc:/file

Boca Raton • Dania Beach • Davie • Fort Lauderdale • Harbor Branch • Jupiter • Treasure Coast
*An Equal Opportunity/Equal Access Institution*

**Rozalia Williams**

From:          Corey King
`ent:          Monday, February 25, 2013 7:02 PM
. o:           Alicia Keating; Artyce-Joy Chase; Audra Lazarus; Ca
               Cory; Jennifer Bebergal; Jill Eckardt; Joanna Ellwood
               Brown; Kirk Dougher; Michele Hawkins; Mihaela Me
               Bulger; Rozalia Williams; Sean Brammer; Stuart Ma
Subject:       no SCAC meeting on Tuesday



Corey A. King, D.Ed.

Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
777 Glades Road
Boca Raton, FL 33431-0991
Office:  561-297-3542

Fax:  561-297-2502



ΔπEXHIBIT  14
Deponent  King
Date 3|0|16  Rptr. AN
WWW.DEPOBOOK.COM

:PL000184

1

**Rozalia Williams**

| | |
|---|---|
| From: | Corey King |
| ent: | Wednesday, February 29, 2012 6:03 PM |
| To: | Mihaela Metianu; Artyce-Joy Chase; Audra Lazarus; Cathie Wallace; Eric Hawkes; Floydette Cory; Jennifer Bebergal; Jill Eckardt; Joanna Ellwood; Julie Servoss; Karen Miller; Michelle Brown; Kirk Dougher; Michele Hawkins; Nicole Rokos; Patricia Singer; Ron Bulger; Rozalia Williams; Sean Brammer; Stuart Markowitz; Terry Mena |
| Cc: | Susan Bussel |
| Subject: | SCAC/SIT Meeting |

Greetings!

We will not have an SCAC meeting on Thursday.  However, the SIT (smaller group) will be meet instead.

Thank you.

Dr. Corey A. King
Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
777 Glades Road
Boca Raton, FL 33431-0991
Office:  561-297-3542
Fax:  561-297-2502

Confidentiality Notice: This E-Mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this communication in error, please do not distribute, notify the sender by E-Mail at the address shown above, then delete the original message with any attachments. Thank you for your compliance.

:PL000185

**Rozalia Williams**

From:         Corey King
Sent:         Saturday, March 02, 2013 9:24 AM
To:           Audra Lazarus; Jill Eckardt; Karen Miller; Joanna Ellwood; Sean Brammer; Terry Mena;
              Patricia Singer; Kirk Dougher; Floydette Cory; Rozalia Williams; Artyce-Joy Chase
Cc:           Gayle Evans
Subject:      No SIT on Tuesday, March 5th

Corey A. King, D.Ed.

Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
777 Glades Road
Boca Raton, FL 33431-0991
Office:  561-297-3542

Fax:  561-297-2502

:PL000186

## Rozalia Williams

From:          Rozalia Williams
ent:           Monday, March 11, 2013 6:52 PM
fo:            Corey King
Subject:       RE: SCAC names

Ryan Rotela, Z# ~~████████~~

RW

**From:** Corey King
**Sent:** Monday, March 11, 2013 6:38 PM
**To:** Jill Eckardt; Terry Mena; Rozalia Williams; Karen Miller; Joanna Ellwood; Artyce-Joy Chase
**Cc:** Gayle Evans
**Subject:** SCAC names

Please submit any names for our SCAC meeting.

Corey A. King, D.Ed.

Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
~77 Glades Road
ɔca Raton, FL 33431-0991
Office:  561-297-3542

Fax:  561-297-2502

## Rozalia Williams

| | |
|---|---|
| **From:** | Corey King |
| **Sent:** | Monday, March 25, 2013 3:54 PM |
| **To:** | Alicia Keating; Artyce-Joy Chase; Audra Lazarus; Cathie Wallace; Dax Kuykendall; Floydette Cory; Jennifer Bebergal; Jill Eckardt; Joanna Ellwood; Julie Servoss; Karen Miller; Michelle Brown; Kirk Dougher; Michele Hawkins; Mihaela Metianu; Nicole Rokos; Patricia Singer; Ron Bulger; Rozalia Williams; Sean Brammer; Stuart Markowitz; Terry Mena |
| **Cc:** | Gayle Evans |
| **Subject:** | SCAC meeting |

We are meeting on Tuesday, March 26$^{th}$ at 11:30 am in the DOS Conference Room.

Dr. Corey A. King
Associate Vice President & Dean of Students
Student Services Building (SS #8), Room 226
Florida Atlantic University
777 Glades Road
Boca Raton, FL 33431-0991
Office: 561-297-3542
Fax: 561-297-2502

Confidentiality Notice: This E-Mail is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this communication in error, please do not distribute, notify the sender by E-Mail at the address shown above, then delete the original message with any attachments. Thank you for your compliance.

:PL000188

1

Δ(π)EXHIBIT 15
Deponent King
Dated 3/10/16 Rptr. AN
WWW.DEPOBOOK.COM

## Florida Atlantic University Academic Calendar 2012 – 2013

| | 2012 Fall Semester | 2013 Spring Semester | 2013 Summer Term 1 | 2013 Summer Term 2 | 2013 Summer Term 3 |
|---|---|---|---|---|---|
| Advance Registration begins (Enrolled degree-seeking students only, see myfau.fau.edu) | Begins November 5 for Spring 2013 | Begins April 1 for Summer/Fall 2013 | | | |
| **Priority Application Deadline – Freshman** | February 15 | -- | -- | -- | -- |
| Application Deadline – Freshman students* | May 1 | -- | February 15 | | |
| Application Deadline – Transfer students* | July 1 | November 15 | April 15 | | |
| Last day to apply for a reclassification of residency status | July 20 | November 30 | April 5 | April 5 | -- |
| Non-Degree Registration; see myfau.fau.edu | August 13 – 24 | January 2 – 11 | May 6 – 19 | May 6 – 19 | June 24 – 30 |
| Freshman Convocation | August 19 | -- | -- | -- | -- |
| **CLASSES BEGIN** | August 18 (Sat.) | January 5 (Sat.) | May 13 (Mon.) | May 13 (Mon.) | June 24 (Mon.) |
| Walk-In Registration | August 20 | January 7 | May 13 | May 13 | June 24 |
| **Last day at 5 p.m. to drop/add courses without consequences; courses are fee liable after this date; $100 late registration fee after this date. * However, for students with Saturday or Sunday only classes in Summer 1, 2 or 3, the drop/add period extends to following Sunday. This option may be used only through myfau.fau.edu** | August 24 (Fri.) | January 11 (Fri.) | May 17 (Fri.) * May 19 (Sun.) | May 17 (Fri.) * May 19 (Sun.) | June 28 (Fri.) * June 30 (Sun.) |
| **Grace period – Students responsible for payment of tuition & fees; no "W" for dropped courses; drops noted on student records as "W" after this period** | August 25 – Sept. 1 | January 12 – 18 | Policy does not apply to summer terms. | | |
| 60+ Audit Registration | August 28 | January 14 | May 20 | May 20 | July 1 |
| **Last day to pay tuition & fees:** Online until 11:00 pm, mail in (must be postmarked on or before last day to pay), drop box (Boca Raton campus); $100 late payment fee assessed if paid after this date | August 28 | January 14 | May 20 | May 20 | July 1 |
| Last Day to Submit Application for Degree | September 14 | January 25 | May 31 | May 31 | May 31 |
| Parent/Family Weekend | September 28 – 30 | | | | |
| **Last day to do a complete withdrawal and receive a 25% tuition adjustment; to receive this tuition adjustment for Summer 1, all summer courses (1, 2, & 3 terms) must be dropped** | September 18 | February 4 | June 10 | Policy does not apply to Summer Term 2 or Summer Term 3. | |
| Mid-Term Grading available this week | October 1 – 5 | February 18 – 22 | Policy does not apply to summer terms. | | |
| Last day to drop a course or withdraw without receiving an "F" in each course | October 15 | March 1 | June 21 | May 31 | July 12 |
| Mid-Semester Break, no classes | -- | March 4 – 10 | -- | -- | -- |
| Homecoming | October 20 – 27 | | | | |
| Last Day to Submit Doctoral Dissertation | November 5 | April 1 | July 8 | -- | -- |
| Honors Convocation | -- | April 22 | -- | -- | -- |
| Last Day to Submit Master's Thesis | November 13 | April 8 | July 15 | -- | -- |
| **LAST DAY OF CLASSES** | November 28 | April 24 | August 5 | June 21 | August 5 |
| **FINAL EXAMINATIONS** | Nov. 29 – Dec. 5 | April 25 – May 1 | | | |
| Three Commencement Ceremonies on Thursday in Fall 2012 and Spring 2013 | Dec. 6 – 9am, 1pm & 5pm | May 2 – 9am, 1pm & 5pm | Note: No classes or exams will be scheduled on Commencement days in any semester. | | |
| Two Commencement Ceremonies on Friday in Fall 2012 and Three on Friday in Spring 2013 | Dec. 7 – 9am & 1pm | May 3 – 9am, 1pm & 5pm | | | |
| Three Commencement Ceremonies in Summer 2013 | -- | -- | August 6 (Tues.) – 9am, 1pm, & 5pm | | |
| Semester Ends | December 7 | May 3 | August 6 | June 21 | August 6 |
| Grades due in Registrar's Office, 9 a.m. | Dec. 10 (Mon.) | May 6 (Mon.) | August 7 (Wed.) | June 24 (Mon.) | August 7 (Wed.) |

**\* Departmental deadlines may also apply. Consult the "Degree Program" section of the University Catalog for further information.**

| OFFICIAL UNIVERSITY HOLIDAYS (OFFICES CLOSED, NO CLASSES) | | | | | |
|---|---|---|---|---|---|
| September 3 | Labor Day | Winter Holiday December 24, 2012 – January 1, 2013 | | March 4 – 10 | Spring Break (No classes; offices open) |
| November 12 | Veteran's Day (observed) | | | May 27 | Memorial Day |
| November 22 – 25 | Thanksgiving Recess | January 21 | M.L. King Jr. Holiday | July 4 | Independence Day |

Note: During the academic year, Saturdays are considered instructional days. This calendar subject to change by appropriate authority.          Revised June 28, 2013



# March 2013